**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | § <br> § <br> § |
| Plaintiff, | § <br> § |
| v. | § <br> § |
| THE STATE OF TEXAS, | § <br> § |
| Defendant. | § <br> § <br> § |

Civil No. 1:21-cv-796

## COMPLAINT

The United States of America, by and through its undersigned counsel, brings this civil action

for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.      It is settled constitutional law that "a State may not prohibit any woman from making

the ultimate decision to terminate her pregnancy before viability." *Planned Parenthood of Se. Pa. v. Casey*,

505 U.S. 833, 879 (1992); *accord Roe v. Wade*, 410 U.S. 113 (1973).  But Texas has done just that.  It has

enacted a statute banning nearly all abortions in the State after six weeks—months before a pregnancy

is viable.  *See* Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021) (S.B. 8) (to be codified at Tex. Health &

Safety Code §§ 171.203(b), 171.204(a)). *See also, e.g., Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246,

248 (5th Cir. 2020).

2.      Texas enacted S.B. 8 in open defiance of the Constitution.  The statute prohibits most

pre-viability abortions, even in cases of rape, sexual abuse, or incest.  It also prohibits any effort to

aid—or, indeed, any *intent* to aid—the doctors who provide pre-viability abortions or the women who

exercise their right to seek one.  Because S.B. 8 clearly violates the Constitution, Texas adopted an

unprecedented scheme "to insulate the State from responsibility," *Whole Woman's Health v. Jackson*, No.

21A24, 2021 WL 3910722, at *1 (U.S. Sept. 1, 2021) (Roberts, C.J., dissenting), by making the statute

harder to challenge in court. Instead of relying on the State's executive branch to enforce the law, as is the norm in Texas and elsewhere, the State has deputized ordinary citizens to serve as bounty hunters who are statutorily authorized to recover at least $10,000 per claim from individuals who facilitate a woman's exercise of her constitutional rights. And Texas has mandated that its state judicial officers enforce this unconstitutional attack by requiring them to dispense remedies that undeniably burden constitutionally protected rights.

3.     It takes little imagination to discern Texas's goal—to make it too risky for an abortion clinic to operate in the State, thereby preventing women throughout Texas from exercising their constitutional rights, while simultaneously thwarting judicial review. Thus far, the law has had its desired effect. To date, abortion providers have ceased providing services prohibited by S.B. 8, leaving women in Texas unacceptably and unconstitutionally deprived of abortion services. Yet, despite this flagrant deprivation of rights, S.B. 8 remains in effect.

4.     The United States has the authority and responsibility to ensure that Texas cannot evade its obligations under the Constitution and deprive individuals of their constitutional rights by adopting a statutory scheme designed specifically to evade traditional mechanisms of federal judicial review. The federal government therefore brings this suit directly against the State of Texas to obtain a declaration that S.B. 8 is invalid, to enjoin its enforcement, and to protect the rights that Texas has violated.

5.     The Government also brings this suit to protect other federal interests that S.B. 8 unconstitutionally impairs. S.B. 8 conflicts with federal law by purporting to prohibit federal agencies from carrying out their responsibilities under federal law related to abortion services. Because S.B. 8 does not contain an exception for cases of rape or incest, its terms purport to prohibit the federal government and its employees and agents from performing, funding, reimbursing, or facilitating abortions in such cases. Moreover, S.B. 8's unconstitutionally broad terms purport to subject federal

employees and nongovernmental partners who carry out those responsibilities to civil liability and penalties.

6.      The United States therefore seeks a declaratory judgment that S.B. 8 is invalid under the Supremacy Clause and the Fourteenth Amendment, is preempted by federal law, and violates the doctrine of intergovernmental immunity.  The United States also seeks an order preliminarily and permanently enjoining the State of Texas, including its officers, employees, and agents, including private parties who would bring suit under the law, from implementing or enforcing S.B. 8.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

8.      This Court has authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the Fourteenth Amendment to the U.S. Constitution, 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable authority.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant resides within this judicial district and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

## PARTIES

10.     Plaintiff is the United States of America.

11.     Defendant, the State of Texas, is a State of the United States.  The State of Texas includes all of its officers, employees, and agents, including private parties who would bring suit under S.B. 8.

## FEDERAL LAW

## I. The Constitutional Right to an Abortion

12. Nearly fifty years ago, the Supreme Court held that the Constitution protects "a woman's decision whether or not to terminate her pregnancy." *Roe*, 410 U.S. at 153.[1] Thirty years ago, the Court "reaffirmed 'the most central principle'" of *Roe*— "a woman's right to terminate her pregnancy before viability." *June Med. Servs. L.L.C.* v. *Russo*, 140 S. Ct. 2103, 2135 (2020) (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 871 (plurality opinion)). *Casey* confirmed *Roe*'s "essential holding" recognizing the "right of a woman to choose to have an abortion before viability and obtain it without undue interference from the state, whose previability interests are not strong enough to support an abortion prohibition or the imposition of substantial obstacles to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846. State laws that prohibit abortion prior to viability or impose an "undue burden" on a woman's right to obtain an abortion before viability violate the Due Process Clause of the Fourteenth Amendment. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2298 (2016) (citation omitted).

## II. The Sovereign Interests of the United States

13. Where, as here, a State seeks to strip individuals of their ability to challenge state action that indisputably violates their federal constitutional rights, the United States has a profound sovereign interest in ensuring that those constitutional rights remain redeemable in federal court. The United States may sue to challenge such constitutional violations that "affect the public at large." *In re Debs*, 158 U.S. 564, 583-85 (1895) ("Every government, entrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient

---

[1] The allegations of this complaint encompass any individuals who become pregnant and seek an abortion, regardless of gender identity.

answer to its appeal to one of those courts that it has no pecuniary interest in the matter."); *see Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201-02 (1967).

14.     The prerogative of the United States to seek injunctive and declaratory relief "to restrain violations of constitutional rights . . . has long been recognized." *United States v. City of Jackson*, 318 F.2d 1, 11 (5th Cir. 1963). "The Constitution cannot mean to give individuals standing to attack state action inconsistent with their constitutional rights but to deny to the United States standing when States jeopardize the constitutional rights of the Nation." *Id.* at 15-16; *see also Fla. E. Coast Ry. Co. v. United States*, 348 F.2d 682, 685 (5th Cir. 1965) (finding United States possessed standing under *In re Debs*), *aff'd,* 384 U.S. 238 (1966).

15.     The United States therefore may sue a State to vindicate the rights of individuals when a state infringes on rights protected by the Constitution. And such an effort is particularly warranted where, as here, private citizens are—by design—substantially burdened in vindicating their own rights. In light of the attempt by Texas to strip its own citizens of the ability to invoke the power of the federal courts to vindicate their rights, the United States not only has a "quasi-sovereign interest in the health and well-being . . . of its residents in general" but also a "quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex. Rel. Barez*, 458 U.S. 592, 601–02 (1982) (the sovereign maintains an "interest in the health and well-being—both physical and economic—of its residents").

### III.     The Supremacy Clause and Preemption

16.     The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

17.     A state law is invalid if, *inter alia*, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it directly regulates "the activities of the Federal Government," *Mayo v. United States*, 319 U.S. 441, 445 (1943).

## IV.     Intergovernmental Immunity

18.     The doctrine of intergovernmental immunity arises from the Supremacy Clause of the U.S. Constitution and reflects the principle that "[s]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted . . . by Congress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. 316, 317 (1819); *see also Mayo*, 319 U.S. at 445 ("[T]he activities of the Federal Government are free from regulation by any state."); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that state laws cannot "control the conduct of" individuals "acting under and in pursuance of the laws of the United States"); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (recognizing that a regulation violates the doctrine of intergovernmental immunity if it "seek[s] to directly regulate the conduct of agents of the federal government").

19.     States also may not seek to directly regulate the performance of the federal government by regulating its contractors. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."); *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019) ("For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself."), *cert. denied,* 141 S. Ct. 124 (2020); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (holding unconstitutional a state law that "directly interfere[d] with the functions of the federal

government" by "mandat[ing] the ways in which [a contractor] renders services that the federal government hired [it] to perform").

## TEXAS SENATE BILL 8

### I.    Texas Enacts Senate Bill 8

20.    S.B. 8 bans abortions performed by a physician licensed by the State of Texas if cardiac activity has been detected in the embryo or fetus.  Specifically, S.B. 8 provides that "a physician may not knowingly perform or induce an abortion . . .  if the physician detect[s] a fetal heartbeat."  Tex. Health & Safety Code § 171.204(a).  S.B. 8 defines "fetal heartbeat" as "cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestation sac."  *Id.* § 171.201(1).

21.    An ultrasound can typically detect cardiac motion beginning at approximately six weeks of pregnancy, as measured from the first day of a patient's last menstrual period.[2]  But an embryo is not viable at six weeks, and many women do not even know they are pregnant at six weeks.

22.    A fetus generally is considered "viable" when "there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support," *Colautti v. Franklin*, 439 U.S. 379, 388 (1979), which is not until about 24 weeks, *see, e.g., Isaacson v. Horne*, 716 F.3d 1213, 1225 (9th Cir. 2013).

23.    S.B. 8 contains no exceptions for pregnancies that result from rape, sexual abuse, or incest, or for pregnancies involving a fetal defect incompatible with life after birth.  The law provides an exception only for an undefined "medical emergency . . . that prevents compliance" with the law. *Id.* § 171.205(a).

24.    The prohibitions in S.B. 8 apply to anyone who performs or induces a prohibited abortion, anyone who "knowingly" "aids or abets" the performance or inducement of a prohibited

---

[2] Throughout this complaint, the duration of pregnancy is measured from the first day of a person's last menstrual period.

abortion, and even anyone who "intends" to perform or aid a prohibited abortion. *Id.* § 171.208(a)(1)–(3). Under the statute, aiding and abetting includes "paying or reimbursing the costs of an abortion through insurance or otherwise." *Id.* § 171.208(a)(2).

25. S.B. 8 limits the defenses available to defendants and subjects them to a fee-shifting regime skewed in favor of claimants. In particular, S.B. 8 includes an "affirmative defense" that is available to a limited class of defendants if they can demonstrate that an award of relief would impose an undue burden on a particular woman or group of women seeking abortion. That limited defense is inconsistent with an "unbroken line" of Supreme Court cases, *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 269 (5th Cir. 2019), *cert. granted in part*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021), that prevent states from prohibiting abortion prior to viability without regard to the undue-burden test. And even if the undue-burden test were the appropriate framework, S.B. 8's affirmative defense fundamentally distorts the test, by, *inter alia*, limiting the scope of evidence on which a defendant may rely, S.B. 8 § 171.209(c), (d), and attempting to create new rules of construction and severability solely for state abortion laws and regulations. S.B. 8 §§ 171.206, 171.212.

26. Additionally, defendants in S.B. 8 enforcement actions are prohibited from raising other defenses enumerated under S.B. 8, including that they believed the law was unconstitutional; that they relied on a court decision, later overruled, that was in place at the time of the acts underlying the suit; or that the patient consented to the abortion. *Id.* § 171.208(e)(2), (3). S.B. 8 also states that defendants may not rely on non-mutual issue or claim preclusion or rely as a defense on any other "state or federal court decision that is not binding on the court in which the action" was brought. *Id.* § 171.208(e)(4), (5).

## II. S.B. 8 Deputizes Private Parties to Act as State Actors in a Public Enforcement Scheme and Uses the Judicial System to Deprive Women of Their Constitutional Rights

27. In a transparent effort to evade constitutional scrutiny, Texas has outsourced the authority to enforce S.B. 8 to ordinary citizens. S.B. 8 prohibits state and local governmental entities and their employees from enforcing the statute. In their place, S.B. 8 empowers any person to file suit against anyone who performs a prohibited abortion, aids or abets such an abortion, or "intends" to do either of those things. § 171.208(a). A successful claimant can obtain an injunction that prevents a defendant from engaging in these activities, and is entitled to at least $10,000 (S.B. 8 does not set a maximum) in "statutory damages" for each abortion the defendant has performed, aided, or abetted, as well as costs and attorney's fees.

28. The statute assigns enforcement authority to private individuals through civil litigation in state court as a means of evading lawsuits challenging S.B. 8's constitutionality. *Cf. Whole Woman's Health*, 2021 WL 3910722, at *1 (Roberts, C.J., dissenting) ("The desired consequence appears to be to insulate the State from responsibility for implementing and enforcing the regulatory regime."). Indeed, S.B. 8 was specifically designed to evade ordinary constitutional review. Specifically, the law bars its own enforcement by public agencies but creates a private cause of action that requires state courts to grant injunctive relief and statutory damages for constitutionally protected activity. §§ 171.207, 171.208(b).

29. This intent has been unmistakably revealed in public statements by the law's architects and champions. For example, the legislative director of Texas Right to Life stated that one of the "main motivations" for S.B. 8's design is to stymie judicial review. *See* Emma Green, *What Texas Abortion Foes Want Next*, The Atlantic (Sept. 2, 2021), https://www.theatlantic.com/politics/archive/2021/09/texas-abortion-ban-supreme-court/619953/ (asserting that S.B. 8 was

crafted out of "frustrat[ion]" with courts that "block[] pro-life laws because they think they violate the Constitution or pose undue burdens") (last visited Sept. 9, 2021).

30.     Moreover, one of the attorneys principally involved in advising the State on S.B. 8 recently offered a similar observation about laws bearing S.B. 8's private enforcement characteristic: "It is practically impossible to bring a pre-enforcement challenge to statutes that establish private rights of action, because the litigants who will enforce the statute are hard to identify until they actually bring suit." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1001 n.270 (2018), https://www.virginialawreview.org/wp-content/uploads/2020/12/Mitchell_Online.pdf (last visited Sept. 9, 2021).

31.     And Senator Bryan Hughes, one of the principal architects of S.B. 8 in the Texas Legislature, removed all doubt about this purpose when he informed reporters that S.B. 8's structure was intended to avoid the fate of other "heartbeat" bills that have been struck down as unconstitutional. *See* Jacob Gershman, *Behind Texas Abortion Law, an Attorney's Unusual Enforcement Idea*, The Wall Street Journal (Sept. 4, 2021, 9:38 A.M.), https://www.wsj.com/articles/behind-texas-abortion-law-an-attorneys-unusual-enforcement-idea-11630762683 (last visited Sept. 9, 2021). Sen. Hughes was quoted succinctly stating the point: "We were going to find a way to pass a heartbeat bill that was going to be upheld." *Id.* Sen. Hughes elsewhere deemed the statute a "very elegant use of the judicial system." Jenna Greene, *Column: Crafty lawyering on Texas abortion bill withstood SCOTUS challenge*, Reuters (Sept. 5, 2021, 1:52 P.M.), https://reuters.com/legal/government/crafty-lawyering-texas-abortion-bill-withstood-scotus-challenge-greene-2021-09-05/(last visited Sept. 9, 2021).

32.     While prior state efforts to unduly burden access to abortion services relied primarily upon executive enforcement of state law, "[i]t is doubtless true that a State may act through different agencies," including "its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all actions of the State denying equal protection of the laws, whether it be action

by one of these agencies or by another." *Virginia v. Rives*, 100 U.S. 313, 318 (1879). Awarding the monetary relief that S.B. 8 authorizes—to plaintiffs who need not demonstrate any injury or other connection to the underlying abortion procedure—constitutes state activity designed to violate the Fourteenth Amendment rights of women in Texas. "That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of th[e] [Supreme] Court." *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948). Thus, while Texas has gone to unprecedented lengths to cloak its attack on constitutionally protected rights behind a nominally private cause of action, it nonetheless has compelled its judicial branch to serve an enforcer's role. "State action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms." *Id.* at 20.

33.     Under the state-action doctrine, private actors also may be found to function as agents or arms of the state itself and thus are bound by the Constitution. *See, e.g.*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("state action may be found if . . . seemingly private behavior 'may be fairly treated as that of the State itself'"); *Smith v. Allwright*, 321 U.S. 649, 663 (1944) (private actor was acting as "agency of the state").

34.     The Supreme Court has deemed individuals to be state actors where they exercise "powers traditionally exclusively reserved to the State." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928-29 (2019). S.B. 8 vests individuals with law-enforcement authority—a power traditionally reserved exclusively to a sovereign—in a manner that appears to be "unprecedented," *Whole Woman's Health v. Jackson*, 2021 WL 3910722, at *2 (Roberts, C.J., dissenting). Among other things, S.B. 8 does so by providing individuals with unsupervised authority to police violations of the law, and by enabling them to obtain civil penalties against anyone in the state without any showing of personal injury.

35.     These individuals are also state actors to the extent they are significantly involved in conduct that would be unconstitutional if engaged in by the State itself or Texas has sanctioned their conduct. *See, e.g., Reitman v. Mulkey*, 387 U.S. 369, 380-81 (1967) (finding state action where law "authorize[d] . . . racial discrimination in the housing market"); *Smith*, 321 U.S. at 663-64 (state's establishment of primary system made the private party that set up an all-white primary "an agency of the state"); *Terry v. Adams*, 345 U.S. 461, 469-70 (1953) (similar). S.B. 8 implicates this doctrine by expressly authorizing—indeed, empowering—individuals to engage in conduct that violates the constitutional rights of women throughout Texas, in a manner in which the State itself would not be able to engage.

## III.    S.B. 8 Affects Interstate Commerce

36.     By stripping women of their constitutional rights to certain abortion services in Texas as well as outlawing many of the commercial services that provide abortion services and aid women seeking these services, S.B. 8 forces women who wish to obtain these services to travel out of Texas to other states in order to exercise their constitutional rights and it hinders businesses and non-profits engaged in this commercial activity.

37.     Indeed, the law has already had this effect, as "clinics in Oklahoma, Louisiana, New Mexico, Colorado, and Kansas are being inundated with a surge of pregnant people." Melissa Jeltsen, *Texas Is Already Creating Abortion Refugees*, N.Y. Mag. (Sept. 3, 2021) (last visited Sept. 9, 2021) https://nymag.com/intelligencer/2021/09/texas-is-already-creating-abortion-refugees.html. One clinic in Oklahoma reported that, after S.B. 8 went into effect, the numbers of calls it received from Texans increased from approximately three to five calls per day to between fifty and fifty-five. *See* Tahera Rahman, *Oklahoma Clinic Already Seeing A Surge In Texas Patients As Abortion Law Takes Effect*, WKRN (Sept. 3, 2021) (last visited Sept. 9, 2021) https://www.wkrn.com/news/oklahoma-clinic-already-seeing-a-surge-in-texas-patients-as-abortion-law-takes-effect/. The same article makes clear

that the proponents of S.B. 8 are "aware of women crossing state lines." *Id.* Before S.B. 8 took effect, most Texas women had access to a clinic within 24 miles round trip from their home; now, they will have to travel 496 miles round trip on average to obtain an out-of-state abortion. *See* Elisabeth Buchwald, *Texas Abortion Law: Women Will have to Travel 496 Miles On Average Round Trip to Get an Abortion Out-Of-State*, MarketWatch (Sept. 5, 2021), https://www.marketwatch.com/story/texas-abortion-law-women-will-have-to-travel-496-miles-on-average-round-trip-to-get-an-abortion-out-of-state-11630609618.

38.     Where the United States is obligated to provide the constitutional abortion services that S.B. 8 outlaws, S.B. 8 purports to require the United States to refrain from providing those services or to relocate women and possibly service providers out of Texas.

39.     Similarly, S.B. 8 purports to require the United States to terminate existing monetary contracts and agreements that involve the insurance of or reimbursement of the abortion services S.B. 8 bans.

40.     S.B. 8 further prohibits (and thus discourages) certain interstate commercial transactions involving Texas.  For example, S.B. 8 appears to apply to monetary transfers into the State of Texas if those funds may, in any manner, facilitate an abortion.  Thus, S.B. 8 may apply to insurance companies throughout the United States that cover abortion services provided in violation of the statute, as well as banks facilitating transfers of funds to reimburse women receiving restricted abortions.  And S.B. 8 may also apply to medical device transactions involving out-of-state sellers, including, for example, the sale of medical equipment that could be used to perform abortions outlawed under S.B. 8.

## S.B. 8 IRREPARABLY INJURES THE UNITED STATES

**I.      S.B. 8 Injures the United States by Depriving Women in Texas of their Constitutional Rights While Seeking To Prevent Them from Vindicating Those Rights in Federal Court**

41.     On September 1, 2021, S.B. 8 went into effect, prohibiting nearly all abortions after six weeks of pregnancy.  The law prohibits at least 85% of abortions that were previously lawful in the State.

42.     S.B. 8 unlawfully prohibits women from exercising the constitutional right to a pre-viability abortion—including for women in agencies' care and custody.  S.B. 8 violates the constitutional right to a pre-viability abortion by prohibiting health care providers from performing such abortions after six weeks.  To the extent that S.B. 8 could be viewed as only regulating pre-viability abortions, such that the undue burden standard would apply, the law also substantially burdens that right by imposing liability on individuals who aid or abet the provision of a prohibited abortion, thereby imposing substantial obstacles to a woman's right to elect the procedure.

43.     Under settled precedent, a ban on nearly all abortions after six weeks cannot survive constitutional review.  *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (striking six-week ban because "cardiac activity can be detected well before the fetus is viable [and] [t]hat dooms the law").  S.B. 8 attempts to circumvent this rule by imposing a distorted version of the "undue burden" test, requiring state courts to weigh the undue burden in every case as part of an "affirmative defense" in enforcement actions.  Tex. Health & Safety Code § 171.209(c), (d).  S.B. 8 requires persons who are sued to prove that the imposition of an injunction and monetary penalties against them will impose a substantial obstacle on patient access to care, and to do so without relying on the effect of "an award of relief against other defendants or other potential defendants," *id.* § 171.209(d)(2), even though the practical effect on abortion access across the state is a relevant consideration in evaluating

undue burden claims. Accordingly, S.B. 8's "undue burden" defense does not remedy the law's unconstitutional abortion ban.

44. S.B. 8 harms the United States by seeking to foreclose judicial review of a state law that flagrantly infringes the constitutional rights of the public at large and seeks to block the injured members of the public from challenging that law in court. The United States may sue to vindicate its interest in preventing Texas from effecting such a constitutional violation. The President also has the duty to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, a duty that is carried out in part by the Attorney General of the United States. *See, e.g., Ponzi* v. *Fessenden*, 258 U.S. 254, 262 (1922).

## II. S.B. 8 Unconstitutionally Restricts the Operations of the Federal Government and Conflicts with Federal Law

46. By prohibiting nearly all abortions in Texas after six weeks of pregnancy, without exceptions for rape, sexual abuse, or incest, S.B. 8 unconstitutionally conflicts with the statutory and constitutional responsibilities of the federal government. Specifically, S.B. 8 exposes federal personnel and grantees to liability for carrying out their federal obligations to provide access to abortion-related services to persons in the care and custody of federal agencies and interferes with federal contracts and grants with third-party providers who are obligated under their agreements to provide abortion-related services but refuse to do so to avoid liability under S.B. 8. S.B. 8 also increases the costs to federal agencies of carrying out their obligations under federal law to the extent that civil penalties and awards to claimants under S.B. 8 are allowable. In addition, it will increase reimbursable costs under federal contracts with third-party providers. Finally, it will increase costs to the extent that agencies must incur increased transportation and other costs to provide individuals in their care with abortion services outside the State of Texas that are required under federal law but prohibited by S.B. 8. Such impacts likely will be felt by numerous federal agencies and their personnel, including the Department

of Labor, the Office of Refugee Resettlement, the Bureau of Prisons, the Centers for Medicare and Medicaid Services, the Office of Personnel Management, and the Department of Defense.

### 1. Department Of Labor: Job Corps

47. S.B. 8 will likely interfere with the operations of and increase the costs of the Department of Labor's Job Corps Program, a program funded by Congress and administered by DOL that assists eligible young people ages 16 through 24 with completing their high school education, preparing for meaningful careers, and obtaining gainful employment. *See* 29 U.S.C. § 3191(1). This assistance is provided through Job Corps Centers.

48. Job Corps Centers are primarily operated by private contractors that have contractual relationships with DOL, though some are operated by the U.S Department of Agriculture Forest Service. *See* 29 U.S.C. § 3197(a), (d). There are four Job Corps Centers located in the state of Texas, all operated by private contractors. These are the David Carrasco Job Corps center, operated by the Odle Management Group; the Gary Job Corps center, operated by Adams and Associates; the Laredo Job Corps Center, operated by Strategix Management; and the North Texas Job Corps center, operated by Serrato Corporation (collectively, the "Texas Job Corps Centers" and the "Texas Job Corps Contractors"). S.B. 8 will interfere with these contractual relationships to the extent DOL's contracts require the Texas Job Corps Contractors and their personnel to provide abortion-related services prohibited by S.B. 8.

49. Job Corps provides program participants with room and board for up to three years, basic health care, a living allowance, certain transportation benefits, and career transition assistance.

50. Job Corps regulations specifically require the Texas Job Corps Contractors to provide "medical services, through provision or coordination of a wellness program which includes access to basic medical, dental and mental health services, as described in the Policy and Requirements

Handbook, for all students from the date of enrollment until separation from the Job Corps program." 20 C.F.R. § 686.530(d).

51. All Job Corps center contracts incorporate by reference the Job Corps Policy and Requirements Handbook, which "was developed to provide all mandatory program operation and reporting requirements for contractors operating Job Corps centers and providing enrollment and placement services." U.S. Dep't of Labor Office of Job Corps, *Policy and Requirements Handbook* (June 15, 2021) (hereinafter "PRH"), available at https://prh.jobcorps.gov/Pages/Home.aspx (last visited Sept. 9, 2021). Therefore, the Texas Job Corps Contractors are contractually required to comply with the requirements of the PRH.

52. The PRH provides detailed requirements with respect to mandatory medical services, including those that relate to reproductive health and planning. Specifically, the PRH requires contractors to ensure that enrollees have access to pregnancy-related services, including information and services related to abortion. *See* PRH § 2.3(R7)(a)-(d). S.B. 8 thus interferes with DOL's contractual relations by purporting to prohibit the provision of such contracted services and to impose liability on the contractors and their personnel providing those services. S.B. 8 thereby directs the conduct of such providers and constitutes a direct regulation of the federal government and its contractors.

53. The Texas Job Corps Centers also must identify "available community health/social resources and services" and make arrangements for transportation so that the students in the program may access those resources and obtain such services; this includes, among other family-planning and reproductive-health services, transportation to allow an enrollee to obtain an abortion permitted by federal law but prohibited by S.B. 8. *See* PRH § 2.3(R7)(c)(1), (3). S.B. 8 potentially exposes to liability those personnel who identify such resources and provide such transportation to an enrollee who wants or obtains an abortion prohibited by S.B. 8.

54.     To the extent S.B. 8 directs the conduct of federal contractors and their employees, the law is an unlawful direct regulation of the federal government and its contractors, and it unlawfully punishes federal contractors for carrying out the duties assigned to them by the federal government.

55.     To the extent that any of the Texas Job Corps Contractors is held liable for statutory damages under S.B. 8, DOL may have to reimburse them for such penalties, thereby increasing the costs of the Job Corps program. Federal contractors are entitled to reimbursement of costs necessary to contract performance that are "reasonable," "allocable," and "allowable." *See* 48 C.F.R. § 31.201-2(a). The costs of fines and penalties resulting from the failure of the contractor to comply with S.B. 8 are likely allowable and thus recoverable from DOL where the fines and penalties are "incurred as a result of compliance with specific terms and conditions of the contract." 48 C.F.R. § 31.205-15(a).

56.     Since DOL's contracts with the Texas Job Corps Contractors require the provision of abortion-related counseling and transportation services, the damages imposed under S.B. 8 on contractors and their staff acting within the scope of their employment are allowable and allocable contract costs and must be reimbursed by DOL, subject to procedural and other requirements for payment under the contracts.[3] Thus, in addition to having its programmatic priorities frustrated, DOL anticipates bearing the costs of the fines, costs, and attorney's fees that S.B. 8 authorizes claimants to recover in an action under S.B. 8.

57.     Additionally, if Texas Job Corps Contractors, in an effort to avoid liability under S.B. 8 or to ensure that students can exercise their constitutionally protected right to abortion, attempt to

---

[3] Under well-established principles of federal contracts law, contractors operating under cost reimbursement contracts (the Carrasco Job Corps Center, the Gary Job Corps Center) will be entitled to reimbursement of the reasonable additional costs the contractors will incur as a result of complying with the contractual terms set forth in the PRH. In cases where the operators work under fixed price contracts (the Laredo Job Corps Center, the North Texas Job Corps Center), they can obtain equitable (upward) adjustments to the contract price, citing an unforeseen change in circumstances beyond their control and not the result of their negligence or fault, and provided notification and other requirements for such adjustments are followed, which would include costs attributable to S.B. 8.

meet their contractual obligations by offering transportation outside of Texas to students who elect to terminate their pregnancies after a fetal heartbeat is detected, these new and additional costs that are reasonably necessary for contract performance may ultimately be passed through to DOL and payable by DOL under its contracts.

### 2. Office of Refugee Resettlement (ORR)

58. S.B. 8 likely will interfere with the operations of and increase the costs of the Office of Refugee Resettlement's transport of unaccompanied children in their care who request abortion-related services constitutionally protected by federal law but prohibited by S.B. 8. *See* 6 U.S.C. § 279(a), (b). Unaccompanied children (UC) are defined by statute as individuals without lawful immigration status under the age of 18 without an available parent or legal guardian in the United States available to provide care and physical custody; they are in the legal custody of the United States. *See* 6 U.S.C. § 279(b)(1), (g)(2); *see also* 8 U.S.C. § 1232(b)(1) ("[T]he care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services.").

59. Consistent with its obligations to provide care for the UC in its custody in Texas, ORR provides access to abortion services when requested and permitted by law, including in cases of rape or incest, following judicial bypass procedures or parental consent and subject to appropriations restrictions on paying for certain abortions under the Hyde Amendment. S.B. 8 erects a manifestly unconstitutional restriction on access to pre-viability abortion and, therefore, unlawfully interferes with ORR's operations by obligating it to transport UC outside the state to obtain those abortion-related services guaranteed by the Constitution. Indeed, courts have already found that minors in ORR custody cannot be obstructed in exercising their constitutional right to access abortion and abortion-related services. *See J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019).

### 3. Bureau of Prisons (BOP)

60.     Likewise, S.B. 8 will likely interfere with BOP's obligations to provide access to inmates in its care in Texas who elect to have an abortion that the Constitution guarantees them. *See, e.g.*, *Victoria W. v. Larpenter*, 369 F.3d 475, 483 (5th Cir. 2004). BOP houses female inmates at three institutions in Texas: Federal Prison Camp Bryan, Federal Medical Center Carswell, and Federal Detention Center Houston. The Federal Medical Center at Carswell, Texas, is the primary medical center for all females in BOP custody across the country.

61.     When a pregnant inmate in BOP custody elects to have such an abortion, BOP is required to facilitate that choice. Specifically, BOP regulations require a prison warden to "provide each pregnant inmate with medical, religious, and social counseling to aid her in making the decision whether to carry the pregnancy to full term or to have an elective abortion." 28 C.F.R. § 551.23(b). If the inmate thereafter signs a statement indicating that she elects to have an abortion, the prison's Clinical Director "*shall* arrange for an abortion to take place." *Id.* § 551.23(c) (emphasis added).

62.     BOP also bears certain costs when it facilitates an inmate's decision to have an abortion. For example, BOP "assumes all costs" associated with the abortion procedure "when the life of the mother would be endangered if the fetus is carried to term, or in the case of rape or incest." *See* BOP, *Program Statement, Female Offender Manual* May 12, 2021, at 17 https://www.bop.gov/policy/progstat/5200.07b.pdf (last visited Sept. 9, 2021). And "[i]n all cases[,] . . . whether the Bureau pays for the abortion or not, the Bureau may expend funds to escort the inmate to a facility outside the institution to receive" an abortion procedure. *Id.*

63.     By its terms, S.B. 8 purports to prohibit and create liability for carrying out BOP's regulatory obligation to facilitate or fund abortions for incarcerated women in Texas. *See* S.B. 8 § 171.208(a)(2) (establishing civil liability for "knowingly engag[ing] in conduct that aids or abets the performance or inducement of an abortion . . . . if the abortion is performed or induced in violation of" the statute").

64.     S.B. 8 further interferes with BOP operations because it imposes civil liability on those who "pay[] for or reimburse[e] the costs of an abortion[.]"  S.B. 8 § 171.208(a)(2).  Because S.B. 8 includes no carve out for abortions in cases of rape or incest, it purports to impose civil liability on BOP officials who are *required* to "assume all costs" for such abortions under federal law.  *See* BOP, *Program Statement, Female Offender Manual*, May 12, 2021 at 17, (last visited Sept. 9, 2021).  S.B. 8 therefore directly burdens and frustrates BOP's functions in cases of rape or incest for inmates located within Texas.

65.     S.B. 8 further imposes costs on BOP to the extent that the agency to meet its requirement to "arrange for [such] abortion[s] to take place," must now transport and escort the inmate to a facility outside of Texas in order to arrange that abortion.  To the extent that S.B. 8 directs the conduct of BOP personnel, it constitutes an unlawful direct regulation of the federal government.

### 4.  Centers for Medicare and Medicaid Services (CMS)

66.     States that participate in the Medicaid program must cover various medically necessary procedures that fall within certain service categories, such as physicians' services and inpatient and outpatient hospital services.  42 U.S.C. § 1396a(a)(10)(A).  Abortion is furnished as a service under one of these mandatory Medicaid service categories.

67.     In accord with that requirement, States may not categorically prohibit the coverage of medically necessary abortion procedures for which federal funds are permitted to be expended, including medically necessary abortions of pregnancies arising from rape or incest.  *See Hope Medical Grp. for Women v. Edwards*, 63 F.3d 418, 428 (5th Cir. 1995) (holding Louisiana statute that "categorically prohibits funding for abortions in cases of rape or incest without regard to whether the procedures might be medically necessary" violated Title XIX of the Social Security Act).

68.     Although States are permitted to specify the amount, duration, and scope of each covered service, they may not "arbitrarily deny or reduce the amount, duration, or scope of a required

service . . . solely because of the diagnosis, type of illness, or condition" and each service must be covered so as to "reasonably achieve its purpose." 42 C.F.R. §§ 440.230(a), (b), (c).

69.     S.B. 8 conflicts with federal law by purporting to prohibit the administration of and payment for all abortions in Texas arising from rape or incest after a fetal heartbeat is detected.  The statute arbitrarily denies Medicaid beneficiaries coverage of a procedure for which Medicaid coverage is mandatory, and the limits imposed by the statute restrict coverage under the mandatory physicians' services and inpatient and outpatient hospital services benefits to the extent that the state's coverage of these services is not sufficient to reasonably achieve the service's purpose.

### 5.  Office of Personnel Management (OPM)

70.     S.B. 8 will likely interfere with the operations of the U.S. Office of Personnel Management.

71.     OPM is responsible for negotiating and approving the health benefits plans made available to federal employees, annuitants, and certain other statutorily eligible persons.  Each year, OPM negotiates with qualifying carriers to establish a slate of health benefits plan options from which federal employees and annuitants may select.  *See* 5 U.S.C § 8902.  These negotiations encompass both the covered services each plan will offer and the cost of each plan.  Once OPM and a private carrier reach an agreement on the terms of a health benefits plan, they enter into a contract that must be executed by each party.

72.     Although under federal law, "health plan[s] under the Federal employees health benefits program" generally may not "provide[] any benefits or coverage for abortions" except "where the life of the mother would be endangered if the fetus were carried to term, or the pregnancy is the result of an act of rape or incest" (hereinafter, "permitted circumstances"), OPM has entered into contracts with qualifying carriers that cover abortion procedures in permitted circumstances. Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, §§ 613-14, 134 Stat. 1182. S.B. 8 is

inconsistent with those agreements and the procedures they cover to the extent S.B. 8 prohibits abortions-relates services authorized by federal law.

73.     Further, S.B. 8 imposes liability for aiding and abetting the performance of an abortion disallowed under S.B. 8, or even forming an intent to engage in this type of conduct. Thus, a party could endeavor to pursue a civil action, under S.B. 8, with respect to a health plan that "pa[id]" for an abortion that is prohibited under S.B. 8 (*e.g.*, an abortion of a pregnancy caused by rape or incest). To the extent this exposure to liability causes federal contractors to breach their agreements with the federal government to avoid such liability, S.B. 8 unlawfully directs their conduct—thereby directly regulating the federal government and its contractors.

### 6.  Department of Defense (DOD)

74.     S.B. 8 purports to interfere with and frustrate the Department of Defense's ability to provide abortions procedures permitted by federal law to eligible recipients.

75.     Federal law permits the provision of abortion procedures at DOD facilities in Texas "where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest." 10 U.S.C. § 1093(a). DOD provides these services directly at military medical treatment facilities (MTFs).

76.     Separately, DOD's TRICARE health care program also covers abortion procedures provided by private doctors in cases of rape or incest. *See* TRICARE, *Covered Services – Abortions*, https://tricare.mil/CoveredServices/IsItCovered/Abortion; *see also* TRICARE Policy Manual 6010.60-M, ch. 4 § 4.1.1 (Rev. C-1, March 10, 2017) ("TRICARE Policy Manual"), https://manuals.health.mil/pages/DisplayManualHtmlFile/2021-04-20/AsOf/tp15/C4S18_3.html (explaining cost of abortions may be cost-shared where "the pregnancy is the result of an act of rape or incest")

77.     "TRICARE also covers medical and/or mental health services related to the covered abortion." *Id.* The TRICARE Policy Manual provides that "[a]ll medically and psychologically necessary services and supplies related to a covered abortion are covered. This may include ultrasound performed prior to the abortion, pathology services, pregnancy tests, office visits, and any applicable requirements mandated by state and/or local laws. It also may include otherwise covered follow-up care, such as psychotherapy." TRICARE Policy Manual 6010.60-M, ch. 4 § 4.3. "Drugs such as Mifeprex and misoprostol and all associated services and supplies may [also] be cost-shared when the pregnancy is the result of an act of rape or incest." *Id.* § 4.4.

## III.    The Harms S.B. 8 Inflicts Are Imminent and Traceable to the State

78.     The United States has an "actual and well-founded fear that" the arms of the state that Texas has enlisted will enforce the law directly against it and its agencies, as well as against the public at large,  whom the State has endeavored to keep from challenging the statute.   *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).  There is a self-evident risk that at least one of the many state actors capable of enforcing the law would sue in the case of a violation, and that the state's judicial apparatus would adjudicate that claim.

79.     In fact, some individuals and organizations have already threatened to enforce the law. And individuals throughout Texas have already been chilled from exercising their constitutional rights or from providing abortion services based on their reasonable fear of enforcement.

### CLAIMS FOR RELIEF

### Count One: Supremacy Clause—Fourteenth Amendment

80.     Plaintiff hereby incorporates paragraphs 1 through 79 as if fully set forth herein

81.     The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

82. S.B. 8 violates the Fourteenth Amendment of the U.S. Constitution, as elucidated by the Supreme Court in *Roe* and *Casey*, by depriving women of the ability to obtain a pre-viability abortion in most cases. S.B. 8 therefore is invalid under the Fourteenth Amendment and the Supremacy Clause.

83. The Take Care Clause mandates that the President of the United States "shall take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. With respect to legal proceedings, the Attorney General carries out that duty. See *Ponzi* v. *Fessenden*, 258 U.S. 254, 262 (1922) (The Attorney General is "the hand of the president in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings … be faithfully executed.").

84. Texas has deliberately impeded the ability of women and providers to raise a challenge in federal court for a violation of their constitutionally protected rights. In so doing, Texas has foreclosed the ability of these individuals to seek relief in their own name. The United States therefore brings this suit to vindicate its interest in ensuring that Texas respects its obligations under the Constitution.

### Count Two: Preemption

85. Plaintiff hereby incorporates paragraphs 1 through 79 as if fully set forth herein.

86. S.B. 8 violates the Supremacy Clause and is preempted because it is contrary to the Fourteenth Amendment to the U.S. Constitution.

87. Moreover, S.B. 8 is preempted by federal law—including the statutes and regulations outlined above—to the extent it prohibits certain pre-viability abortions that federal agencies are charged with facilitating, funding, or reimbursing.

88. S.B. 8 conflicts and otherwise impedes the accomplishment and execution of the full purposes and objectives of federal law.

89. S.B. 8 therefore violates the Supremacy Clause because it is preempted under federal law.

### Count Three: Violation of Intergovernmental Immunity

90. Plaintiff hereby incorporates paragraphs 1 through 79 as if fully set forth herein.

91. S.B. 8 directly regulates the activities of the federal government and its contractors, grantees, and nongovernmental partners. S.B. 8 therefore violates the federal government's intergovernmental immunity and is invalid in such applications.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

a. A declaratory judgment stating that S.B. 8 is invalid, null, and void;

b. A preliminary and permanent injunction against the State of Texas—including all of its officers, employees, and agents, including private parties who would bring suit under S.B. 8—prohibiting any and all enforcement of S.B. 8;

c. Any and all other relief necessary to fully effectuate the injunction against S.B. 8's enforcement;

d. That this Court award the United States its costs in this action; and

e. That this Court award any other relief that it deems just and proper.

Dated: September 9, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

MICHAEL H. BAER

Counsel to the Acting Assistant Attorney
General, Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
Lisa Newman (TX Bar No. 24107878)
Kuntal Cholera
Christopher D. Dodge
Cody T. Knapp
James R. Powers
Joshua M. Kolsky
Olivia Hussey Scott
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*