**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| | § |
| | § |
| Plaintiff, | § |
| v. | § |
| | § |
| THE STATE OF TEXAS, | § |
| | § |
| Defendant. | § |

Civil No.  1:21-cv-796

# <u>EXHIBIT 3</u>

**Declaration of Amy Hagstrom Miller in Support of
Plaintiff's Motion for Temporary Restraining Order
and Preliminary Injunction**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | CASE NO. 1:21-cv-796-RP |
| The State of Texas, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DECLARATION OF AMY HAGSTROM MILLER</u>**
**<u>IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING</u>**
**<u>ORDER AND PRELIMINARY INJUNCTION</u>**

AMY HAGSTROM MILLER hereby declares under penalty of perjury that the following statements are true and correct:

1.      I am the President and Chief Executive Officer ("CEO") of Whole Woman's Health, LLC ("WWH").

2.      WWH currently operates three licensed abortion facilities in Texas, in Fort Worth (the "Fort Worth Clinic"), McAllen (the "McAllen Clinic"), and McKinney (the "North Texas Clinic"). WWH also operates abortion clinics in Baltimore, Maryland; Bloomington, Minnesota; and Alexandria, Virginia.

3.      As President and CEO of WWH, I am responsible for the management of these clinics and therefore am familiar with our finances and operations, including the services we provide and the communities we serve.

4.      I am also the President and CEO of Whole Woman's Health Alliance ("WWHA").

5.      WWHA is a nonprofit organization incorporated under Texas law.  Its mission is to provide abortion care in underserved communities, shift the stigma around abortion in our culture,

and ensure that every pregnant person deserves the compassion, respect, and dignity of being able to safely and legally end a pregnancy.

6.     WWHA currently operates an abortion clinic in Austin, Texas (the "Austin Clinic"), as well as abortion clinics in South Bend, Indiana and Charlottesville, Virginia.  The Austin Clinic opened in 2017 and is a licensed abortion facility.

7.     As President and CEO of WWHA, I oversee all aspects of the organization's work.

8.     The clinics operated by both WWH and WWHA are independent abortion providers, or abortion clinics that are not affiliated with any national organization (such as Planned Parenthood). Independent abortion providers provide approximately 60% of abortion care in the country. More than half of the abortion clinics in Texas are independent abortion providers.

9.     I have been working in the abortion care field since 1989.  I have done virtually every clinic job over the past three decades, from receptionist to sonographer to pathology technician to surgical assistant to counselor.  I have spent thousands of hours talking with abortion patients over the course of my career.  In my current role, I oversee all operations at the WWH and WHHA clinics, from staff management, to clinic security, to clinical services for patients. I am thoroughly familiar with all aspects of abortion clinic operations and patient care.

10.     I provide the following testimony based on my personal knowledge and review of WWH's and WWHA's business records.

**_Provision of Abortion Care at the WWH and WWHA Clinics in Texas_**

11.     Before September 1, 2021, the Austin, Fort Worth, and McAllen clinics offered procedural abortions up to 17.6 weeks and medication abortions up to 70 days gestation, as measured from the first day of a patient's last menstrual period ("LMP").  The McKinney clinic offered medication abortions up to 70 days gestation. In 2020, the four WWH/WWHA clinics in

Texas provided approximately 9,200 abortions. Of these patients, less than 10% were at gestations less than 6 weeks LMP.

12.     Multiple barriers to abortion care in Texas make it difficult, if not impossible, for patients to seek abortion care early in pregnancy. For example, Texas forces patients to receive in-person state-mandated biased counseling at least 24 hours before an abortion, requires minors to receive parental consent, and prohibits coverage of abortion care through its Medicaid program and in nearly all private insurance plans.

13.     Most of WWH/WWHA's patients in Texas are Black, Latinx, or people of color from marginalized communities.  Our patients overcome significant logistical and financial burdens to access abortion care at our clinics.  The majority of our patients are poor or low-income and receive at least partial financial assistance for their abortions.

14.     The patients we serve at our McAllen clinic face additional barriers to care. A majority of patients at the McAllen Clinic are Spanish speakers, and many face immigration-related restrictions on traveling outside of the Rio Grande Valley. For example, while many of the patients are in this country legally, their visas prohibit them from traveling outside of the Rio Grande Valley, so they cannot travel to New Mexico or even to San Antonio for any reason, including to access abortion services.

15.     Since S.B. 8 took effect on September 1, 2021, all four WWH/WWHA clinics in Texas have stopped offering both medication and procedural abortions for patients whose pregnancies have cardiac activity, meaning that our clinics are only providing abortions to patients with gestational ages under approximately 6 weeks LMP.  We have already turned away more than 100 patients since September 1, and every day the law is in effect, we are forced to turn away the majority of patients seeking an abortion.

### History of Clinic Closures in Texas

16.     Texas has a long history of using restrictive abortion laws to shutter clinics.

17.     In 2013, Texas passed House Bill 2, a law that required all abortion facilities to be licensed ambulatory surgical facilities and all abortion providers to have local hospital admitting privileges. Because WWH lacked sufficient physicians with admitting privileges in Beaumont and Austin, we had to shut those clinics down. Additionally, our clinic in McAllen was shut down for eleven months and was only reopened because of an injunction awarded by the United States District Court for the Western District of Texas. Ironically, one of our physicians in Austin was able to obtain admitting privileges in Fort Worth, and so he commuted by plane in order to keep our clinic in Fort Worth open. The cost of flights put further economic pressure on WWH.

18.     While H.B. 2 was ultimately struck down in 2016 as unconstitutional by the Supreme Court, WWH was severely strained by the litigation. And things have only gotten worse since 2013, as WWH has been forced to litigate three additional severe abortion restrictions since 2016.

19.     Because the regulatory environment in Texas is so hostile, the clinics shuttered by H.B. 2 have largely not reopened. Before 2013, there were 44 clinics providing abortion in Texas, and today there are only 20. In fact, the WWH clinic in Austin (now operated by Whole Woman's Health Alliance) is the only WWH clinic closed by H.B. 2 to have reopened since the Supreme Court struck it down.

20.     Less than two years after reopening, the Austin clinic was forced to close again because an anti-abortion pregnancy crisis center, Austin LifeCare, bought out the lease for our existing building. The Austin Clinic had to find a new location and relocate our operations, reopening again in February 2019.

21.     In my experience, the Austin clinic is the exception, not the rule. Independent abortion providers will not be able to recover from clinic closures.  Once abortion clinics close, they remain closed permanently.

22.     Abortion providers had a similar experience last year when Governor Abbott issued a COVID-19 executive order that forced all of the abortion providers in the state to stop providing abortions for around three weeks. Even this short closure had a devastating and lasting impact on both the clinics and our patients. Had the closure lasted even a few weeks more, many clinics would have closed for good.

23.     WWH and WWHA faced immense financial and institutional strain during the COVID-19 shutdown. Even though we were in compliance with all court orders issued during the shutdown, one of our physicians was targeted by anti-abortion activists who submitted a meritless complaint with the Texas Medical Board. While the complaint was ultimately dismissed, we were forced to devote immense staff time and attorney resources to mounting the physician's defense.

24.     We also kept a waiting list of our patients during the COVID-19 shutdown in hopes that we would be able to serve them as soon as the ban was lifted. We know that most of our patients were unable to travel out of state during the COVID shutdown. It took us months to recover from the patient backlog.

### *Senate Bill 8*

25.     I understand that Texas Senate Bill 8 ('S.B. 8") requires physicians to determine if a "fetal heartbeat" is present before performing an abortion.  *See* Tex. Health & Safety Code § 171.203(b). If the physician detects a "fetal heartbeat" or fails to test for it, they are prohibited from performing the abortion.  *See* Tex. Health & Safety Code § 171.204(a).

26.     Fetal or embryonic cardiac activity can be detected as early as six weeks LMP.  By prohibiting abortions at or after six weeks LMP, S.B. 8 bans approximately 90% of the abortions we previously performed at the three WWH clinics and one WWHA clinic in Texas.

27.     I further understand that a private right of civil action can be brought by any person against a) someone who performs an abortion in violation of S.B. 8; b) someone who aids or abets the performance of an abortion in violation of S.B. 8; or c) someone who intends to engage in a) or b). *See* Tex. Health & Safety Code § 171.208(a).  If the person suing is a Texas resident, they can file the case in a court in their home county.  *See* Tex. Health & Safety Code § 171.210(a)(4).

28.     I understand that if we lose any S.B. 8 lawsuit, we will be ordered to pay at least $10,000 for each violation and costs and attorney's fees for the prevailing claimants.  *See* Tex. Health & Safety Code § 171.208(b)(1).  We will also face a mandatory injunction, violation of which would expose us to additional contempt orders.  *See* Tex. Health & Safety Code § 171.208(b)(2).  And even if we prevail in those S.B. 8 lawsuits, we will spend thousands in costs and attorney's fees that S.B. 8 bars us from recovering from the unsuccessful claimant.  *See* Tex. Health & Safety Code § 171.208(i).

29.     Even if there is no basis for the suits we know will be filed, I understand that our physicians, nurses, and staff will be forced to travel to the claimant's home county, hire a lawyer, and spend months, if not years, defending themselves.

### *Impact of S.B. 8 on Abortion Access in Texas*

30.     S.B. 8 has had an immediate and devastating effect on abortion care in Texas.  I have had personal conversations with the majority of independent abortion clinics in Texas regarding S.B. 8 and can affirm that the independent abortion providers in Texas are all complying with S.B. 8.  All of these clinics continue, for now, to provide abortions only for pregnant people without any embryonic or fetal cardiac activity, meaning that we are forced to turn away the majority of patients seeking abortion in Texas.

31.    Now that abortion is almost entirely inaccessible in Texas, patients have few options and each of their stories is more heartbreaking than the last. The first patient we saw at our Fort Worth clinic on September 1 was ineligible under S.B. 8. She had a 3-month-old daughter and had just started a new job. She had just left an unsupportive partner and moved in with her parents and feared that if she told them about her pregnancy, they would kick her out. Similarly, we saw a patient on September 1 at our Austin clinic who was so stunned to learn she was 10 weeks LMP and ineligible for abortion in Texas that she was in too much shock to process our suggestions for where to turn for care. We saw another patient last week with consistent periods who had no signs of pregnancy other than a positive pregnancy test. The patient thought she was likely 4-5 weeks LMP but was shocked to learn that her ultrasound showed that she was beyond 13 weeks. The patient already has a young infant at home, less than a year old. We have not heard from any of these patients since they left our clinics.

32.    The majority of pregnant Texans who want an abortion will be forced to carry those pregnancies to term and face the risks—medical and financial—attendant with childbirth. Based on our prior experiences with clinic shutdown laws, we know that the majority of our patients will not be able to travel out of state to obtain an abortion due to their work, school, family, or childcare responsibilities and the high costs. In addition, many of our patients have cited fears about travel during the COVID-19 pandemic or an inability to travel due to COVID-19 as one of the many reasons they cannot travel out of state for care. Travel is particularly difficult, if not impossible, for our patients in the Rio Grande Valley, many of whom cannot travel out of state for fear of being deported. One patient told our staff she was unable to travel out of state and would instead try to obtain pills from Mexico.

33.    My staff is particularly concerned about the unaccompanied migrant teenagers who often present at our McAllen clinic, as the logistical barriers to these patients' care mean that they are unable to reach us for treatment prior to 9 weeks LMP. This is in part because the judicial bypass

process usually takes at least 2 weeks. The majority of these patients do not become pregnant through consensual sex and tend to be much younger than other minor patients we treat.

34.     Traveling out of state for abortion care presents significant, if not insurmountable, logistical and financial challenges for the majority of Texans that WWH and WWHA serves.  Over the last week and a half, we have seen some of our patients attempt to travel out of state, but even the lucky ones able to travel are both delayed in obtaining care and need to travel hundreds more miles to reach an abortion provider. For example, we saw one patient in McAllen who had already made a backup appointment in Oklahoma, an 11-hour drive away. I have also spoken to colleagues in Michigan, Florida, New York, New Mexico, and Georgia who have all seen patients from Texas in the last week.

35.     S.B. 8 also exacerbates the shame and stigma surrounding abortion access in Texas. Pregnant Texans are concerned that "any person"—from an abusive partner to a complete stranger— will prevent them from terminating their pregnancies and are now limited in their access to critical medical care to which they are constitutionally entitled.

36.     Being forced to delay a wanted abortion is nerve-wracking.  Patients who are delayed from accessing abortion must continue to cope with the physical symptoms of pregnancy, which for many include debilitating nausea and vomiting.  The longer a patient remains pregnant, the more likely it is that others will discover the pregnancy, including abusive partners or family members.  The cost of abortion care (as well as the medical risks of pregnancy and abortion) increase significantly with gestational age. Patients who are delayed from accessing abortion must also cope with the fear of not being able to obtain abortion care in time (based on other states' gestational age limits, as most of the states surrounding Texas ban abortion after 22 weeks LMP)—and of the life-altering consequences of having to go through childbirth against their will. We have seen at least two patients who obtained medication abortions before September 1 and returned at their follow-up visits after September 1 with

ongoing pregnancies—meaning they were in the very small fraction of patients for whom the medication abortion was unsuccessful. In the past, we would have provided these patients with procedures to complete their abortions, as that is the medical standard of care, but because of S.B. 8 we were forced to turn these patients away. One of these patients was only 18 years old. Our physician was so upset that a staff member had to help the doctor break the news to the patient.

37.     Inevitably, if S.B. 8 is not blocked, many Texans will be forced to carry pregnancies to term against their will.

### Impact of S.B. 8 on WWH and WWHA Clinics

38.     Even before September 1, the uncertainty created by S.B. 8 had a significant impact on our clinics. For months our staff have worried that our clinics will be forced to close and they will be out of a job. Staff have tremendous anxiety about being laid off or experiencing disruption to their incomes that will prevent them from supporting their families. This anxiety is exacerbated by the COVID-19 pandemic that is still raging in Texas and has interrupted schooling and childcare for the majority of our workforce. Our clinic staff have lived experience with work disruption related to prior clinic shutdowns in Texas (H.B. 2 and the COVID-19 executive order), and this current ban triggers worry and trauma from those prior experiences ten-fold.

39.     While we generally have low staff turnover, ever since S.B. 8 started receiving public attention, staff began to express serious fears that their jobs would no longer exist come September 1. In fact, over the last several months, we have lost around one staff member every week, including two of our clinic directors. We have been interviewing replacements for these positions, but every applicant brings up S.B. 8 during their interview, asking questions we just can't answer.

40.     Our physicians in particular, many of whom are licensed in multiple states and travel to Texas to provide patient care, are extremely concerned about their potential personal and professional liability under S.B. 8. Our physicians and nurses worry that lawsuits under S.B. 8 might

trigger investigations and other repercussions, including loss of licensure, that will follow these professionals for the rest of their careers, even if they choose to practice outside Texas.

41.     Beginning on September 1, WWH and WWHA began complying with S.B. 8, feeling we had no other choice. Even though we are complying, our staff remains incredibly concerned that lawsuits will be filed against them that will cause ruinous personal liability. We currently have 17 physicians that work at our Texas clinics, but only one of our physicians unconditionally agreed to come to work on September 1. The rest of our physicians, particularly the ones that travel from out of state, are concerned that if lawsuits are filed against them, they will be required to report these lawsuits to their professional licensure boards and hospitals in every state where they are licensed, and that they will ultimately lose their professional privileges and credentials. For most of our physicians, the risk was too great to even come to work.

42.     Compliance with S.B. 8 is not a long-term solution for our clinics.  If the law remains in effect for an extended period of time, and we are only able to serve a fraction of our patients with a fraction of our staff, we will have to shutter our doors and stop providing any healthcare to the communities we serve.  I believe that, without court-ordered relief in the next couple of weeks, S.B. 8 will shutter most if not all of the remaining abortion clinics in Texas. The independent providers in Texas are most at risk, as their only source of regular income is fees for providing abortions. We simply cannot stay open if we are only providing a fraction of patient services.

43.     I also have no doubt that WWH, WWHA, our physicians, our nurses, and our staff will be targeted by individuals opposed to abortion who will file lawsuits under S.B. 8, including the protesters who frequently picket our clinics and harass us and our patients. Indeed, we already have.

44.     The threat of lawsuits began almost immediately after Governor Abbott signed S.B. 8 into law.  In late May, an individual snuck into the Austin Clinic by following a patient through the front door to evade our security.  Once inside, the individual distributed a letter about S.B. 8 to our

10

Austin Clinic staff and those present in the reception area.  This letter is attached as Exhibit 1 to my declaration.  The individual was asked to leave, but once outside, the individual was joined by another person and both individuals continued to distribute the letter to staff outside, still on the clinic's private property.  This letter informs staff that they can be sued for providing or facilitating abortions after the detection of a "fetal heartbeat" and encourages them to report their colleagues to the letter's authors—"K+W Partnership."  The letter gives a phone number and email address for individuals to use to report violations of S.B. 8 and states: "please call or send us a text at any time."  If anti-abortion individuals would go to this length to encourage lawsuits several months before S.B. 8 was scheduled to take effect, I have no doubt that they will bring suits against us if we begin providing abortions after 6 weeks LMP without a court order.

45.     The threats have continued despite our public statements that we would be and now are in compliance with S.B. 8.  On the day before S.B. 8 took effect, our Fort Worth clinic opened at 7:30 am and was working until 11:56 pm to serve as many patients as possible before the law took effect at midnight. Our physician and staff were in tears, terrified that they would not be able to see every patient who was still sitting in the waiting room before the deadline. All the while, our clinic was under surveillance from anti-abortion activists stationed outside. Protesters flooded the areas around our clinic, shining flashlights into the cars of patients as they entered and exited the parking lots. After nightfall, the protesters brought in giant lights and shined them at the clinic, illuminating the parking lot and the building in order to track our every move.  The protesters called the fire and police departments multiple times throughout that day in an attempt to stop our work or slow down the last abortions we would be able to provide after six weeks LMP.

46.     Since September 1, the threats have only gotten worse. Several days before S.B. 8 took effect, my staff brought to my attention a website run by Texas Right to Life called prolifewhistleblower.com. Screenshots from this website are attached as Exhibit 2 to my declaration.

The website requests information from individuals interested in enforcing S.B. 8, including those interested in "litigating" or becoming a "plaintiff." See Ex. 2 at 7. My staff also identified a subreddit called "TexasBountyHunters" where individuals have posted plans to enforce S.B. 8. In addition, WWH and WWHA have seen an uptick in protester activity at our clinics, and threatening calls, emails, and social media posts. For example, one message we received read: "It's a shame we can no long murder innocent babies in their mother's womb. If your women are so about 'Their body, their choice' then let's make the law say this: As long as a woman is willing to die along with her unborn child we'll allow her to get rid of it. You see? It's not about her body at all, it's about the body of the unborn child which is a human at conception. Thank God for the sane people that still exist in this world. You should be in prison for life."

47.     The longer S.B. 8 remains in effect without an injunction blocking its enforcement, the more probable it is that the law will permanently close WWH and WWHA in Texas and destroy abortion access for millions of Texans.

Dated: September 14, 2021

                                            /s/ Amy Hagstrom Miller
                                            AMY HAGSTROM MILLER

12

Exhibit 1

K+W PARTNERSHIP



(512) 366-2893 kwpartnership@protonmail.com

May 22, 2021

**To all employees both medical and clerical:**

The 'Heartbeat bill' has been signed into Texas law and will become effective September 1st 2021. Those who provide or facilitate abortions after a fetal heartbeat has been detected will be in violation of the law and are subject to private lawsuits. Fetal heartbeat can be detected as early as 3 weeks gestation and almost always by 6 ½ weeks. Please be aware that if you are involved in such an abortion one of your employees has the right to report you.

If you are aware of any babies in danger of being aborted at or around 6 weeks gestation, please call or send us a text at any time.

Thank you,

K+W Partnership
512-366-2893
kwpartnership@protonmail.com

Exhibit 2

Help enforce the Texas Heartbeat Act





# Help enforce the Texas Heartbeat Act

**JOIN THE TEAM**     **SEND AN ANONYMOUS TIP**

GETTING INVOLVED

# During the Regular Session of the 87th Legislature, Texas lawmakers passed Senate Bill 8, the Texas Heartbeat Act.

SB 8 requires an abortionist to use standard medical practice to detect the preborn child's heartbeat before an elective abortion. If the heartbeat is detected, then the abortion is prohibited. A heartbeat is generally detectable around six weeks of gestation.

If the abortionist is acting in bad faith or does not properly document the method and results of the heartbeat detection the law is violated. Individuals who aid or abet an illegal abortion can also be sued under SB 8.

**SB 8 is unique since enforcement is in the hands of private citizens. The Texas Heartbeat Act calls upon citizens to hold abortionists accountable to following the law.** Any Texan can bring a lawsuit against an abortionist or someone aiding and abetting an abortion after six weeks. If these individuals are proved to be violating the law, they have to pay a fine of at least $10,000.

## Join the team of Pro-Lifers working to enforce the Texas Heartbeat Act.

Click Here

## Send an anonymous tip or information about potential violations of the Texas Heartbeat Act.

Click Here



Privacy - Terms





# Help enforce the Texas Heartbeat Act

JOIN THE TEAM          SEND AN ANONYMOUS TIP

# Fill out this questionnaire to help us plug you into the best way you can enforce the law and hold the abortion industry accountable:

**Name** *

E.g. John Doe

**Street Address** *

E.g. 42 Wallaby Way

**Apartment, suite, etc**

**City**

E.g. Sydney

**State/Province**

E.g. New South Wales

**ZIP / Postal Code**

E.g. 2000

**Country**

Select country

**Phone** *

E.g. +1 300 400 5000

Privacy - Terms

**Email Address** *

> E.g. john@doe.com

**Occupation**

0 / 150

**Employer**

0 / 15

**Are you currently or have you ever been elected to public office?** *

☐ Yes

☐ No

**How are you involved in the Pro-Life movement?** *

☐ Sidewalk counselor

☐ Pray outside abortion facilities

☐ Volunteer at pregnancy center

☐ Other

**Are you involved in a local Pro-Life organization?**

☐ Yes

☐ No

**How are you interested in enforcing the Texas Heartbeat Act?** *

☐ Litigating

☐ Plaintiff

☐ Data collection

☐ Other

**Is there an abortion provider currently in your city?** *

Privacy - Terms

☐ Yes

☐ No

**Best time for TRTL team member to call you to talk about enforcing the Texas Heartbeat Act?** *

Hours

```
0
```

Minutes

```
0
```

```
AM                                                                    ⌄
```

**If applicable: Do you have information about potential violations of the Texas Heartbeat Act?**

```
Please include as much detail as possible.




                                                                        
```

0 / 500

Submit





Privacy - Terms





# Help enforce the Texas Heartbeat Act

**JOIN THE TEAM**

**SEND AN ANONYMOUS TIP**

If you want to help enforce the Texas Heartbeat Act anonymously, or have a tip on how you think the law has been violated, fill out the form below. We will not follow up with or contact you.

**How do you think the law has been violated?**

Please include as much detail as possible.

0 / 500

**If you have any attachments of evidence for how you think the law is being violated, please attach them below**

Drag and Drop (or) **Choose Files**

Pictures, files, etc.

**How did you obtain this evidence?**

0 / 200

**Clinic or Doctor this evidence relates to**

Privacy - Terms

0 / 20

**City**

0 / 30

**State**

0 / 30

**Zip**

0 / 5

**County**

0 / 30

**Are you currently elected to public office?**

☐ Yes

☐ No

Submit





Privacy - Terms