**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | § | |
| | § | Civil No.  1:21-cv-796 |
| THE STATE OF TEXAS, | §<br>§ | |
| Defendant. | §<br>§ | |

# EXHIBIT 7

# Declaration of Anna Rupani in Support of Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

THE STATE OF TEXAS,

     Defendant.

Civil No. 1:21-cv-796

**DECLARATION OF ANNA RUPANI IN SUPPORT OF PLAINTIFF'S MOTION FOR
A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

I, Anna Rupani, declare as follows:

1.     I am Co-Executive Director of Fund Texas Choice ("FTC"), a nonprofit corporation incorporated in Texas that arranges and pays for transportation, lodging, and childcare for Texans seeking abortion care.

2.     Our mission is to help vulnerable Texans access abortion through safe, confidential, and comprehensive practical support. FTC was founded in 2013 in response to H.B. 2, a Texas statute that shuttered over half of the state's abortion facilities, imposing long wait-times on abortion patients and forcing them to travel long distances for abortion care.

3.     As Co-Executive Director, my primary responsibility is to help ensure that the organization fulfills its mission. To this end, I serve as a liaison between our staff and Board of Directors, monitor and build our budget, supervise staff in the administration of our programmatic work, and develop client-centered policies.

4.     I bring to this position considerable experience as an attorney and licensed social worker who has provided direct services to survivors of intimate partner violence ("IPV") and human trafficking and unaccompanied minors seeking healthcare, including abortion care. This experience

1

inspired me to dedicate much of my time and energy to getting the many resources Texans need to obtain an abortion to the most vulnerable residents of the state.

5.      I provide the following testimony based on personal knowledge acquired through my service at FTC, including consultation with staff and Board members, and review of the organization's business records.

## FTC's Services

6.      FTC currently employs two full-time staff members and one part-time staff member, and we serve people throughout Texas. A program coordinator fields texts and calls from Texans seeking abortion care who cannot afford to travel to an abortion provider. The coordinator then works with those who have abortion appointments to help plan and support their trip.

7.      We book and directly pay vendors for bus tickets, ride shares, and lodging—and air fare for those forced out of Texas for abortion care. FTC also books and directly pays for the transportation and lodging of companions for minor clients or clients who have a fetal anomaly. Additionally, FTC provides a food stipend to clients.

8.      We reimburse clients for gasoline costs incurred during their journey. Further, most abortion providers do not allow patients to bring their children to their appointments, particularly during the COVID-19 pandemic. So, when clients are unable to find affordable childcare, we work with them to match their child(ren) with a caretaker,  or we try to reimburse them for the care they can secure.

9.      FTC connects callers unable to pay for the abortion itself to nonprofit organizations that provide cash subsidies to defray the cost of abortion services. These organizations are generally known as "abortion funds."

10.     Occasionally, we help callers identify the closest abortion provider that is appropriate for them and try to secure an abortion appointment for them despite long wait times.

11.     We accept intakes until we have exhausted our budget. On average, we spend over

$15,000 a month on practical support for clients. Our policy is to follow up with them twice after their

abortion appointment —first a few days after the appointment when they have returned home, and

then again weeks afterwards.

12.     In addition to providing practical support to access abortion care, FTC helps interested

clients tell the stories of how they obtained their abortion care, which includes connecting them to the

media. We regard this as a way to combat abortion stigma, which furthers our mission.

### FTC's Clients

13.     In 2020, 404 Texans reached out to FTC for help accessing an abortion. We were able

to provide practical support to 330 of them.

14.     Almost all of our callers have pregnancies past six weeks gestational age for a variety

of reasons. Many are unaware they are pregnant before that point. Others exceed six weeks trying to

cobble together resources to travel to an abortion provider, making a second, State-mandated trip to

the abortion provider, or petitioning for a judicial bypass of Texas's parental consent requirement for

adolescents.

15.     These factors can also push clients past 22 weeks of pregnancy, the gestational age cut-

off for obtaining an abortion in Texas, subject only to narrow circumstances. Consequently, even

before Texas Senate Bill 8 ("S.B. 8") took effect, on September 1, 2021, about 35% of our clients had

no choice but to obtain an abortion out of state.

16.     Virtually every expense associated with long-distance travel, whether it be

transportation, lodging, or childcare, is magnified when our clients leave the state due to the greater

length of the journey and higher cost of living in some states. Additionally, having to navigate a new

environment exacerbates the stress and anxiety that some clients experience in connection with their

pregnancy.

17.     The low-income population we serve generally cannot absorb the costs of an unforeseen medical expense, much less the costs of traveling out of state for that care. These include lost wages from significant time off from work, for which we are unable to reimburse clients. Thus, many of our clients must stitch together resources from multiple organizations within and outside of Texas to ultimately obtain an abortion.

18.     In following up with clients after their scheduled abortion appointments, we find that, each year, some fall short of the resources needed to reach the abortion provider despite significant financial and practical support. Because the cost of an abortion increases with the gestational age of the pregnancy, the time it takes to gather resources delays some clients to a point when they can no longer afford their abortion, triggering another cycle of having to gather resources and further delaying their care. Some of our clients are IPV survivors whose abusers prevent them from accessing abortion care when the abusers learn of the survivors' intentions, despite the survivors' best efforts to conceal their pregnancies from their abusers. Others have no option but to travel out of state for abortion care, but are unable to do so because they cannot spend the necessary time away from work, school, or home. This includes IPV survivors who cannot leave home for an extended period without arousing the suspicions of their abusers, and minors who cannot leave home or school for an extended period without arousing the suspicions of coercive, unsupportive or abusive family members.

### Impact of SB 8 on FTC and its Clients

19.     I understand S.B. 8 to have banned abortion care in Texas at approximately six weeks of pregnancy, prohibited "aiding or abetting" such abortions, and prohibited intending to do either. I also understand S.B. 8 to have enabled private parties to sue anyone who engages in these activities for a *minimum* of $10,000 per abortion.

20.     In the two weeks that S.B. 8 has been in effect, it has ravaged abortion access in Texas, inflicted profound suffering on our clients, and severely strained our capacity.

4

21.     The number of callers seeking assistance from FTC has shot up from approximately ten per week to ten to fifteen per day. All but one has been unable to obtain an abortion in Texas because no abortion provider is offering abortion care in the state after approximately six weeks of pregnancy, and virtually all our clients are past six weeks.

22.     As a result, our callers are frantically trying to secure the resources needed to attend abortion appointments out of state. By driving virtually all Texas residents out of state for abortion care and saddling abortion facilities closer to various areas of Texas with long wait times, S.B. 8 has forced our callers to secure appointments in farther and farther locations, including Tulsa and Oklahoma City, Oklahoma; Wichita, Kansas; Santa Fe and Albuquerque, New Mexico; Denver, Colorado; and Seattle, Washington. Traveling to any of these locations from Texas has been much more expensive, logistically demanding, and nerve-wracking for our clients than traveling within the state, particularly during the COVID-19 pandemic. It has required air-fare for some of the cities outside of Texas in addition to car- or bus-fare for the abortion appointments themselves, and forced clients concerned about contracting COVID-19 into crowded airports, planes, and bus terminals. The out-of-state travel precipitated by S.B. 8 has also required lodging spanning multiple days, added food costs, extended time away from work depriving clients of critical wages and jeopardizing their jobs, extended time away from children requiring alternate care arrangements, extended time away from home making it difficult to conceal a pregnancy or abortion from an abuser, and extended time away from school compromising minors' confidentiality before their parents.

23.     One of our clients obtained an ultrasound, as required by another Texas abortion restriction, on September 1, after S.B. 8 had taken effect, only to learn there was cardiac activity and she would be unable to obtain an abortion in Texas. To do so, she traveled almost 200 miles round-trip within the state. Since then, she has struggled to secure enough time off of work to leave Texas. The client's appointment is not for another three weeks, in Oklahoma City, Oklahoma, which will

5

require her to make close to a 1,000-mile round-trip for abortion care. It remains unclear whether she

will be able to obtain the time off needed to complete her journey.

24.     Another client has an appointment today in Albuquerque, New Mexico and called us

in a panic yesterday because, despite fighting tooth and nail, she had been unable to come up with the

funds for a hotel or any ground transportation. Fortunately, we were able to work with another

practical support organization to make sure she could obtain her abortion.

25.     Significantly, the time needed to collect the resources and make the arrangements

needed to leave the state is pushing our clients later into their pregnancies. Another consequence of

S.B. 8 is that most of our current clients must end their pregnancies without the support of loved

ones, who can rarely make lengthy trips without substantial financial and practical support either.

26.     Since S.B. 8 took effect, the process of traveling out of state for abortion care is all the

more stressful for our clients because the facilities in neighboring states are now booked well-beyond

capacity, with multi-week wait times for appointments. As a result, our clients now have to choose

between obtaining earlier appointments in even more distant locations or delaying their abortion care

even longer to get an appointment *closer* (but not close) to home. Most of our clients attempt to travel

farther because they are committed to ending their pregnancies as soon as possible. For some, the

urgency stems from the medical risks and symptoms of ongoing pregnancy, including debilitating

nausea. One Texan faced with this dilemma, piled her children into her car and drove over 15 hours

overnight to obtain a medication abortion in Kansas rather than struggle to patch together the money

needed for air-fare and childcare or remain in limbo. Another Texan traveled 12 hours round-trip to

Oklahoma during the day to get her procedure because she did not want her partner to know and was

scared he would find out if she was not home overnight.

27.     At the same time, S.B.8 has constrained FTC's ability to increase its budget to match

the surge in callers and greater scope of their needs. In the seven business days thus far in September,

we have already spent $10,000. We estimate that we will expend at least $25,000 before October, or a minimum of $10,000 more than usual. Yet, at least fifteen potential donors have expressed fear that funding FTC could be understood as aiding or abetting under the statute. Accordingly, we have been unable to increase the number of callers we help since S.B. 8 took effect.

28.     When FTC lacks the resources to help a caller leave the state for abortion care, we refer them to other practical support organizations throughout the country. Because these organizations are serving the same influx of Texans, however, they too are often at capacity. Several callers have been unable to obtain assistance from any of us and thus unable to leave Texas for an abortion. Notably, almost all of them have at least one child at home and have expressed that they cannot afford to care for their existing children if they are forced to have another. In my experience, these callers will carry to term against their will if S.B. 8 remains in effect.

29.     Other clients are stuck in Texas with unwanted pregnancies *despite* assistance from FTC, other practical support organizations, or abortion funds. Now that the schoolyear has begun, minors who cannot confide in their families about their pregnancies or desire for an abortion are unable to explain a protracted absence from school. Thus, S.B. 8 condemns minors to carry to term or take matters into their own hands.

30.     FTC has a lot of experience helping vulnerable Texans navigate the regime of abortion restrictions in our state. Despite our staff working 12- to 14-hour days, however, we cannot meet the level and scope of need we are seeing since S.B. 8 took effect. Indeed, no network of organizations can serve the untold number of Texans seeking abortions whose only option now is to leave the state, but who cannot afford to or are practically unable to do so. Currently, the relatively fortunate clients are those who are able to leave Texas, subject nonetheless to delayed abortion care, lengthy travel, and significant time away from work and home. In these ways, S.B. 8 has triggered an unprecedented crisis that will persist until the statute is invalidated.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

_____
Anna Rupani