**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF TEXAS,

Defendant.

Case No. 1:21-cv-796-RP

**UNITED STATES' EMERGENCY MOTION FOR A
TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................1

I.      Legal Background ...............................................................................................1

II.     Senate Bill 8 ......................................................................................................2

III.    Procedural History: Other Relevant Lawsuits ..................................................6

IV.    Impacts of S.B. 8 on Patients ............................................................................7

STANDARD OF REVIEW .................................................................................................12

ARGUMENT ......................................................................................................................12

I.      THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS .........13

     A.    S.B. 8 Violates the Federal Constitution ...............................................13

          1.    S.B. 8 Violates the Fourteenth Amendment and the Supremacy Clause .............13

          2.    As Applied to Programs of the Federal Government, S.B. 8 Violates Principles of Preemption and Intergovernmental Immunity ..................................16

     B.    This Suit Is a Proper Means by Which to Challenge S.B. 8, Given Texas's Attempt to Foreclose Other Means of Judicial Review. ..................................22

          1.    The United States Has Authority to Bring This Suit. ................................22

          2.    Texas Is a Proper Defendant and Relief Against It Will Redress the United States' Injury. ..................................28

II.     THE GOVERNMENT FACES IRREPARABLE HARM .......................................33

III.    THE BALANCE OF EQUITIES TIP IN FAVOR OF AN INJUNCTION......................34

IV.    SCOPE OF RELIEF ........................................................................................34

CONCLUSION....................................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alden v. Maine,*
    527 U.S. 706 (1999)..................................................................................................28

*Am. Life Ins. Co. v. Stewart,*
    300 U.S. 203 (1937)..................................................................................................25

*Arizona v. California,*
    283 U.S. 423 (1931)..................................................................................................16

*Arizona v. United States,*
    567 U.S. 387 (2012)........................................................................................16, 23, 28

*Babbitt v. United Farm Workers Nat. Union,*
    442 U.S. 289 (1979)..................................................................................................28

*Bluefield Water Ass'n v. City of Starkville,*
    577 F.3d 250 (5th Cir. 2009)....................................................................................12

*Boeing Co. v. Movassaghi,*
    768 F.3d 832 (9th Cir. 2014)....................................................................................17

*Burnett v. Grattan,*
    468 U.S. 42 (1984)....................................................................................................25

*CIGNA Corp. v. Amara,*
    563 U.S. 421 (2011)..................................................................................................24

*City of El Cenizo v. Texas,*
    264 F. Supp. 3d 744 (W.D. Tex. 2017)....................................................................33

*Cooper v. Aaron,*
    358 U.S. 1 (1958) .....................................................................................................25

*Denson v. United States,*
    574 F.3d 1318 (11th Cir. 2009)............................................................................16-17

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965)..................................................................................................29

*Ex parte Young,*
    209 U.S. 123 (1908)....................................................................................................3

*Felder v. Casey*,
  487 U.S. 131(1988) .......................................................................................................14

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ......................................................................................................18

*GEO Grp., Inc. v. Newsom*,
  493 F. Supp. 3d 905 (S.D. Cal. 2020), *appeal filed*, No. 20-56172 (9th Cir. Nov. 6, 2020)................24

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ......................................................................................................15

*Goodyear Atomic Corp. v. Miller*,
  486 U.S. 174 (1988) ......................................................................................................17

*Haywood v. Drown*,
  556 U.S. 729 (2009) ......................................................................................................14

*Heckman v. United States*,
  224 U.S. 413 (1912) ......................................................................................................23

*Hope Medical Grp. for Women v. Edwards*,
  63 F.3d 418 (5th Cir. 1995) ..........................................................................................21

*Howlett By and Through Howlett v. Rose*,
  496 U.S. 356 (1990) ......................................................................................................14

*In re Debs*,
  158 U.S. 564 (1895) ........................................................................................ 22, 23, 25, 26

*In re Grand Jury Subpoena*,
  866 F.3d 231 (5th Cir. 2017) ........................................................................................29

*In re Neagle*,
  135 U.S. 1 (1890) ..................................................................................................... 16, 18

*J.D. v. Azar*,
  925 F.3d 1291 (D.C. Cir. 2019) ....................................................................................19

*Jackson Women's Health Org. v. Dobbs*,
  945 F.3d 265 (5th Cir. 2019), *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021) .....2

*Jackson Women's Health Org. v. Dobbs*,
  951 F.3d 246 (5th Cir. 2020) ................................................................................... 2, 13

*June Medical Servs. L.L.C. v. Russo*,
  140 S. Ct. 2103 (2020) ....................................................................................................2

*Knick v. Township of Scott,*
    139 S. Ct. 2162 (2019) ........................................................................................26

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ..................................................................................... 26, 34

*Leiter Minterals, Inc. v. United States,*
    352 U.S. 220 (1957) ........................................................................................29

*Mayo v. United States,*
    319 U.S. 441 (1943) ................................................................................. 13, 16

*M'Culloch v. Maryland,*
    17 U.S. 316 (1819) ..........................................................................................13

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ........................................................................................14

*Mitchum v. Foster,*
    407 U.S. 225 (1972) ........................................................................................25

*MKB Mgmt. Corp. v. Stenehjem,*
    795 F.3d 768 (8th Cir. 2015) ...........................................................................2

*Moe v. Confederated Salish & Kootenai Tribes of Flathead, Rsrv.,*
    425 U.S. 463 (1976) ........................................................................................28

*New Jersey v. New York,*
    345 U.S. 369 (1953) ........................................................................................31

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) ........................................................................................33

*Nixon v. Condon,*
    286 U.S. 73 (1932) ..........................................................................................31

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................................12, 34

*Ohio v. Thomas,*
    173 U.S. 276 (1899) ........................................................................................18

*Paine Lumber Co. v. Neal,*
    244 U.S. 459 (1917) ........................................................................................24

*Patsy v. Board of Regents,*
    457 U.S. 496 (1982) ........................................................................................25

*Planned Parenthood of Central Mo. v. Danforth,*
  428 U.S. 52 (1976) ...................................................................................................15

*Planned Parenthood of Se. Pa. v. Casey,*
  505 U.S. 833 (1992) ..........................................................................................*passim*

*Planned Parenthood S. Atl. v. Wilson,*
  No. 3:21-cv-508, 2021 WL 672406 (D.S.C. Feb. 19, 2021) ......................................2

*Preterm-Cleveland v. Yost,*
  394 F. Supp. 3d 796 (S.D. Ohio 2019) .....................................................................2

*Pulliam v. Allen,*
  466 U.S. 522 (1984) ................................................................................................32

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
  831 F.3d 500 (D.C. Cir. 2016) ................................................................................34

*Regal Knitwear Co. v. N.L.R.B.,*
  324 U.S. 9 (1945) ....................................................................................................30

*Reitman v. Mulkey,*
  387 U.S. 369 (1967) ................................................................................................31

*Roe v. Wade,*
  410 U.S. 113 (1973) ..................................................................................................1

*Sanitary Dist. of Chicago v. United States,*
  266 U.S. 405 (1925) ................................................................................................23

*Shelley v. Kraemer,*
  334 U.S. 1 (1948) ................................................................................................31-32

*SisterSong Women of Color Reprod. Just. Collective v. Kemp,*
  472 F. Supp. 3d 1297 (N.D. Ga. 2020) .....................................................................2

*Skinner v. Ry. Labor Executives' Ass'n,*
  489 U.S. 602 (1989) .......................................................................................... 29, 31

*Smith v. Allwright,*
  321 U.S. 649 (1944) ................................................................................................31

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ...................................................................................... 28, 30

*Testa v. Katt,*
  330 U.S. 386 (1947) ................................................................................................26

*Texas v. Dep't of Labor,*
  929 F.3d 205 (5th Cir. 2019) ................................................................ 30, 31

*Trump v. Vance,*
  140 S. Ct. 2412 (2020) ................................................................................16

*U.S. Postal Serv. v. City of Berkeley,*
  No. C 16-04815 WHA, 2018 WL 2188853 (N.D. Cal. May 14, 2018) ................24

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) ...................................................................23

*United States. v. American Bell Tel. Co.,*
  128 U.S. 315 (1888) ..................................................................................23

*United States v. Arizona,*
  641 F.3d 339 (9th Cir. 2011) .......................................................................33

*United States v. Bd. of Cnty. Commr's of Cnty. Of Otero,*
  843 F.3d 1208 (10th Cir. 2016) ...................................................................23

*United States v. California,*
  No. 2:18-cv-721-WBS-DB, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) .........24

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019), *cert. denied,* 141 S. Ct. 124 (2020) ............ 17, 23

*United States v. City of Arcata,*
  629 F.3d 986 (9th Cir. 2010) ...............................................................18, 24, 28

*United States v. City of Jackson,*
  318 F.2d 1 (5th Cir. 1963) ..................................................................... 23, 26

*United States v. City of Philadelphia,*
  644 F.2d 187 (3d Cir. 1980) ........................................................................26

*United States v. Hall,*
  472 F.2d 261 (5th Cir. 1972) .......................................................................31

*United States v. Kernen Constr.,*
  349 F. Supp. 3d 988 (E.D. Cal. 2018) ...........................................................24

*United States v. King Cnty.,*
  CASE NO. 20-0203 RJB, 2020 WL 2745745 (W.D. Wash. May 27, 2020) ........24

*United States v. Mississippi,*
  380 U.S. 128 (1965) ..................................................................................29

vi

*United States v. New Jersey,*
　Civil Action No. 20-1364 (FLW) (TJB), 2021 WL 252270 (D.N.J. Jan. 26, 2021) ........................ 24

*United States v. Solomon,*
　563 F.2d 1121 (4th Cir. 1977) ........................................................................................................ 26

*United States v. South Carolina,*
　720 F.3d 518 (4th Cir. 2013) .......................................................................................................... 23

*United States v. State of Minnesota,*
　270 U.S. 181 (1926) ....................................................................................................................... 27

*United States v. State Water Res. Control Bd.,*
　988 F.3d 1194 (9th Cir. 2021) ........................................................................................................ 23

*United States v. Texas,*
　EP-21-CV-173-KC, 2021 WL 3362598 (W.D. Tex. Aug. 3, 2021) ................................................ 24

*United States v. Washington,*
　971 F.3d 856 (9th Cir. 2020), *as amended,* 994 F.3d 994 (9th Cir. 2020) ................................... 23

*Va. Uranium, Inc. v. Warren,*
　139 S. Ct. 1894 (2019) ................................................................................................................... 13

*Virginia v. State of West Virginia,*
　246 U.S. 565 (1918) ....................................................................................................................... 29

*Watson v. Sutherland,*
　72 U.S. 74 (1866) ........................................................................................................................... 24

*Whole Woman's Health v. Hellerstedt,*
　136 S. Ct. 2292 (2016) ................................................................................................................... 15

*Whole Woman's Health v. Jackson,*
　--- F. Supp. 3d ---, 1:21-CV-616-RP, 2021 WL 3821062 (W.D. Tex. Aug. 25, 2021) ................ 3, 6

*Whole Woman's Health v. Jackson,*
　No. 21A24, --- S. Ct. ---, 2021 WL 3910722 (Sept. 1, 2021) ............................................ 6, 7, 13, 30

*Whole Woman's Health v. Jackson,*
　No. 21-50792, 2021 WL 4128951 (5th Cir. Sept. 10, 2021) .............................................................. 7

*Winter v. Nat. Res. Def. Council, Inc.,*
　555 U.S. 7 (2008) ........................................................................................................................... 12

*Wyandotte Transp. Co. v. United States,*
　389 U.S. 191 (1967) ....................................................................................................................... 23

*Wyoming v. Livingston,*
  443 F.3d 1211 (10th Cir. 2006)................................................................................17

## U.S. CONSTITUTION

U.S. Const. art. II, § 3........................................................................................................25

U.S. Const. art. VI, cl. 2....................................................................................................13

## STATUTES

5 U.S.C. § 8902..........................................................................................................20, 21

6 U.S.C. § 279...................................................................................................................19

8 U.S.C. § 1232.................................................................................................................19

10 U.S.C. § 1074...............................................................................................................19

10 U.S.C. § 1093...............................................................................................................19

18 U.S.C. § 1531...............................................................................................................27

28 U.S.C. § 2283...............................................................................................................29

29 U.S.C. § 3191...............................................................................................................20

29 U.S.C. § 3197...............................................................................................................20

42 U.S.C. § 1983..........................................................................................................14, 24

42 U.S.C. § 1396a.............................................................................................................21

42 U.S.C. § 1396d.............................................................................................................21

Consolidated Appropriations Act, 2021,
  Pub. Law No. 116-260, 134 Stat. 1182 (Decl. 27, 2020)............................................20-21

## FEDERAL RULES

Fed. R. Civ. P. 65 ....................................................................................... 12, 30, 31, 34

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

28 C.F.R. § 551.23.............................................................................................................17

42 C.F.R. § 440.230...........................................................................................................22

**OTHER AUTHORITIES**

Senate Bill 8,
   87th Leg., Reg. Sess. (Tex. 2021)
   (to be codified at Tex. Health & Safety Code §§ 171.203(b), 171.204(a)) ("S.B. 8") ................*passim*

## INTRODUCTION

The State of Texas adopted S.B. 8[1] to prevent women from exercising their constitutional rights. Even though "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability," *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992), Texas has banned abortions months before viability—at a time before many women even know they are pregnant.

When other States have enacted laws abridging reproductive rights to the extent that S.B. 8 does, courts have enjoined enforcement of the laws before they could take effect. In an effort to avoid that result, Texas devised an unprecedented scheme that seeks to deny women and providers the ability to challenge S.B. 8 in federal court. This attempt to shield a plainly unconstitutional law from review cannot stand. The United States seeks a temporary restraining order or a preliminary injunction enjoining the enforcement of S.B. 8. This relief is necessary to protect the constitutional rights of women in Texas and the sovereign interest of the United States in ensuring that its States respect the terms of the national compact. It is also necessary to protect federal agencies, employees, and contractors whose lawful actions S.B. 8 purports to prohibit.

Although S.B. 8 was designed to create jurisdictional obstacles to the ability of women and providers to sue to protect their rights, those obstacles do not impede the relief sought through this suit—an action brought by the United States against the State of Texas itself. The United States has the authority and responsibility to ensure that Texas cannot insulate itself from judicial review for its constitutional violations and to protect the important federal interests that S.B. 8 impairs. Accordingly, this Court should enjoin enforcement of S.B. 8.

## BACKGROUND

### I.    Legal Background

Nearly fifty years ago, the Supreme Court held that the Constitution protects "a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153 (1973). Thirty

---

[1] Senate Bill No. 8, 87th Leg., Ch. 62 Reg. Sess. (Tex. 2021) (to be codified at Tex. Health & Safety Code §§ 171.203(b), 171.204(a)).

years ago, the Court in *Casey* "'reaffirmed' 'the most central principle'" of *Roe*—"a woman's right to terminate her pregnancy before viability." *June Medical Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2135 (2020) (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 871 (plurality op.)). *Casey* also reaffirmed *Roe*'s "essential holding" recognizing the "right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the state, whose previability interests are not strong enough to support an abortion prohibition or the imposition of substantial obstacles to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 834.  The Fifth Circuit has likewise recognized that, "[i]n an unbroken line dating to *Roe v. Wade*, the Supreme Court's abortion cases have established (and affirmed, and re-affirmed) a woman's right to choose an abortion before viability." *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 269 (5th Cir. 2019), *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021) (hereafter *Jackson I*).  Indeed, the Fifth Circuit declared invalid a law enacted by Mississippi that, like S.B. 8, imposed a near-total ban on abortions after detection of a fetal heartbeat.  *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (hereafter *Jackson II*).  Other courts have done the same.[2]

## II.    Senate Bill 8

On May 19, 2021, the State of Texas enacted S.B. 8, which effectively bans abortions performed after cardiac activity has been detected in the embryo.  Specifically, S.B. 8 provides that "a physician may not knowingly perform or induce an abortion . . . if the physician detect[s] a fetal heartbeat."  Tex. Health & Safety Code § 171.204(a).  An ultrasound can typically detect cardiac activity

---

[2] *See MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772-73 (8th Cir. 2015) (affirming injunction against North Dakota law that "generally prohibits abortions" after "fetal heartbeats are detectable" because "there is no genuine dispute that" the law "generally prohibits abortions before viability" and "Supreme Court precedent hold[] that states may not prohibit pre-viability abortions"); *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-cv-508, 2021 WL 672406, at *2 (D.S.C. Feb. 19, 2021) (enjoining a similar South Carolina law, noting that "courts have 'universally' invalidated laws that ban abortions beginning at a gestational age prior to viability" and collecting cases); *SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 472 F. Supp. 3d 1297, 1306 (N.D. Ga. 2020) (enjoining Georgia law that "prohibits abortions once" a fetus "has been determined to have a 'detectable human heartbeat.'"); *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 803 (S.D. Ohio 2019) (Ohio law prohibiting abortions when the fetus has detectable cardiac activity "places an 'undue burden' on a woman's right to choose a pre-viability abortion.").

beginning at approximately six weeks of pregnancy, as measured from the first day of a patient's last menstrual period.  *See* Decl. of Allison Gilbert, M.D. (Ex. A.) ("Gilbert Decl.") ¶ 17; *Whole Woman's Health v. Jackson*, No. 1:21-CV-616-RP, 2021 WL 3821062, at *2 n.3 (W.D. Tex. Aug. 25, 2021).  S.B. 8 contains no exceptions for pregnancies that result from rape, sexual abuse, or incest, or for cases involving serious fetal anomalies, including those incompatible with life after birth.  The law includes only an exception for "a medical emergency . . . that prevents compliance" with the law.  Tex. Health & Safety Code § 171.205(a).

Texas designed S.B. 8 with the specific objective of evading judicial review of its unconstitutional provisions, as its architects have made clear.  For example, Texas State Senator Bryan Hughes, one of the principal architects of S.B. 8, lauded the statute's "very elegant use of the judicial system"[3] and acknowledged that S.B. 8's structure was intended to avoid the fate of other "heartbeat" bills that have been struck down as unconstitutional.[4]  An attorney who participated in drafting the legislation described it as an effort to "counter the judiciary's constitutional pronouncements."[5]  And the legislative director of Texas Right to Life stated that one of the "main motivations" for S.B. 8's design was a desire to stymie judicial review.[6]

Because any state official responsible for enforcing an unconstitutional state law could be sued

---

[3] Jenna Greene, "Column: Crafty lawyering on Texas abortion bill withstood SCOTUS challenge," Reuters (Sept. 5, 2021, 1:52 p.m.), attached as Exhibit A to Declaration of Newman, https://reuters.com/legal/government/crafty-lawyering-texas-abortion-bill-withstood-scotus-challenge-greene-2021-09-05/.

[4] Jacob Gershman, "Behind Texas Abortion Law, an Attorney's Unusual Enforcement Idea," The Wall Street Journal (Sept. 4, 2021, 9:38 a.m.), attached as Exhibit B to the Newman Decl., https://www.wsj.com/articles/behind-texas-abortion-law-an-attorneys-unusual-enforcement-idea-11630762683 (quoting Sen. Hughes as stating "We were going to find a way to pass a heartbeat bill that was going to be upheld.").

[5] Michael S. Schmidt, "Behind the Texas Abortion Law, a Persevering Conservative Lawyer," N.Y. Times (Sept. 12, 2021), attached as Exhibit C to the Newman Decl., https://www.ny-times.com/2021/09/12/us/politics/texas-abortion-lawyer-jonathan-mitchell.html.

[6] Emma Green, "What Texas Abortion Foes Want Next," The Atlantic (Sept. 2, 2021), attached as Exhibit D to the Newman Decl., https://www.theatlantic.com/politics/archive/2021/09/texas-abortion-ban-supreme-court/619953/ (asserting that S.B. 8 was crafted out of "frustrat[ion]" with courts that "block[] pro-life laws because they think they violate the Constitution or pose undue burdens").

for pre-enforcement injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908), S.B. 8 purports to withdraw enforcement responsibilities from the State's executive and administrative officers and employees. *See* Tex. Health & Safety Code § 171.207(a) ("No enforcement of this subchapter . . . may be taken or threatened by this state, a political subdivision, a district or county attorney, or an executive or administrative officer or employee of this state or a political subdivision against any person, except as provided in Section 171.208."). Instead, Texas chose to rely on private persons to enforce S.B. 8 through the Texas judicial system. S.B. 8 creates a civil action that allows "[a]ny person, other than an officer or employee of a state or local governmental entity in this state," to enforce S.B. 8 by filing a lawsuit in state court. *Id.* § 171.208(a). Such civil claims may be brought against any person who performs a prohibited abortion, anyone who "knowingly engages in conduct that aids or abets" the performance of a prohibited abortion, and even anyone who "intends" to perform or aid a prohibited abortion. *Id.* § 171.208(a)(1)-(3). There is no requirement that the private enforcer have any connection to or injury from the abortion or the aiding and abetting of it. Under the statute, aiding and abetting includes "paying for or reimbursing the costs of an abortion through insurance or otherwise." *Id.* § 171.208(a)(2). A successful claimant can obtain an injunction "sufficient to prevent the defendant from violating" S.B. 8, and is further entitled to at least $10,000 in "statutory damages" for each abortion the defendant has performed, aided, or abetted. *Id.* § 171.208(b). S.B. 8 also contains a one-way fee-shifting provision that allows successful plaintiffs to recover their costs and attorney's fees, but forbids defendants sued under S.B. 8 from recovering their fees and costs. *Id.* §§ 171.208(b)(3), 171.208(i).

Where an S.B. 8 enforcement action is brought, the statute purports to further limit the available defenses. In particular, it is no defense to rely "on any court decision that has been overruled on appeal or by a subsequent court, even if that court decision had not been overruled when the defendant engaged in [the] conduct," or to rely "on any state or federal court decision that is not binding on the court in which the action has been brought." *Id.* § 171.208(e)(2)-(4).

Although binding precedent establishes that *any* prohibition on pre-viability abortion is unconstitutional, *see Casey*, 505 U.S. at 846, S.B. 8 contains a defense based on a narrow and distorted

4

version of the "undue burden" test that applies to regulations, rather than prohibitions, of pre-viability abortions. Under S.B. 8, that defense may be invoked only by a defendant who "has standing to assert the third-party rights of a woman or group of women seeking an abortion," and it applies only if "the defendant demonstrates that the relief sought by the claimant will impose an undue burden on that woman or that group of women seeking an abortion." Tex. Health & Safety Code § 171.209(b). To make the required "undue burden" demonstration, the defendant must "introduce[] evidence proving that: (1) an award of relief will prevent a woman or a group of women from obtaining an abortion; or (2) an award of relief will place a substantial obstacle in the path of a woman or a group of women who are seeking an abortion." *Id.* § 171.209(c). An undue burden cannot be established by relying on the law's effects on other providers and alleged aiders and abettors—*i.e.*, by "merely demonstrating that an award of relief will prevent women from obtaining support or assistance, financial or otherwise, from others in their effort to obtain an abortion," or that "an award of relief against other defendants or other potential defendants will impose an undue burden on women seeking an abortion." *Id.* § 171.209(d). And even this limited "undue burden" defense may be retroactively revoked, to the extent the Supreme Court overrules its past decisions. *Id.* § 171.209(e).

Stepping back, the clear intent of S.B. 8's provisions is to deprive women of their constitutional rights while simultaneously preventing any court from enjoining the statute's enforcement. The law uses the threat of civil liability to cut off the supply of post-six-week abortions in the State. It creates a widespread class of potential plaintiffs who might file harassing lawsuits, stacks the decks of such suits in favor of the plaintiffs—through the one-way fee-shifting system and the systematic limitation of affirmative defenses—and extends liability to *anyone* who plays a role in facilitating a prohibited abortion. Thus far, the statute has had the desired effect of deterring abortion providers from offering virtually any abortions. *See infra* pp. 7-12. So long as providers are chilled from performing, inducing, or attempting these newly prohibited abortions in Texas, state courts will not have occasion to rule on the constitutionality of the statute in an enforcement proceeding. And even if individual providers decide to reinstate their services, they could at most prevail in an enforcement dispute against a single private plaintiff, leaving other providers in legal limbo.

Normally, a statute that so successfully stripped a state's citizens of their constitutional rights would fall victim to a slew of pre-enforcement challenges. But Texas has sought to save S.B. 8 from that fate by washing its hands of responsibility for enforcing the law. By purporting to deprive individual plaintiffs of state officials to sue, and then leveraging the interplay of the doctrines of standing and sovereign immunity, Texas has endeavored to stymie anyone who challenges the law in court. As outlined below, the State's brazen gambit has thus far paid off.

## III.   Procedural History: Other Relevant Lawsuits

Given the clear constitutional violation at its core, S.B. 8 naturally prompted legal challenges prior to its effective date. But because of the State's efforts to impede federal judicial review, the other actions have been beset by procedural complications. Most notably, a group of abortion providers and other advocates who support patients in need of an abortion challenged S.B. 8 before this Court in *Whole Woman's Health v. Jackson*, No. 1:21-CV-616-RP (W.D. Tex.). They filed suit against a state court judge and a county clerk (in their official capacities and as class representatives for such state officials), against various Texas executive officials in their official capacities, and against an individual who previously expressed his intent to bring enforcement actions under S.B. 8. *See Whole Woman's Health*, 2021 WL 3821062, at *6.

After this Court rejected the Texas officials' motion to dismiss, *see id.* at *8-23, the defendants took an immediate appeal to the Fifth Circuit, which stayed this Court's proceedings, including a scheduled preliminary injunction hearing, and declined to enter its own injunction pending appeal. *See Whole Woman's Health v. Jackson*, No. 21-50792 (5th Cir. 2021).

On September 1, 2021, the Supreme Court denied the plaintiffs' emergency application for an injunction pending appeal, over the dissent of four Justices. *See Whole Woman's Health v. Jackson*, No. 21A24, --- S. Ct. ---, 2021 WL 3910722 (Sept. 1, 2021). The Court's order noted that the plaintiffs had "raised serious questions regarding the constitutionality of the Texas law at issue," but denied relief, finding that the plaintiffs had not "carried their burden" as to the "complex and novel antecedent procedural questions." *Id.* at *1. For example, the majority found it unclear whether "state judges

6

asked to decide a lawsuit under Texas's law" could be enjoined under *Ex parte Young* if the law is unconstitutional. *Id.*

In dissent, Chief Justice Roberts noted that "[t]he statutory scheme before the Court is not only unusual, but unprecedented," because "[t]he legislature has imposed a prohibition on abortions after roughly six weeks, and then essentially delegated enforcement of that prohibition to the populace at large," with the "desired consequence appear[ing] to be to insulate the State from responsibility for implementing and enforcing the regulatory regime." *Id.* The Chief Justice stated that he "would grant preliminary relief to preserve the status quo ante—before the law went into effect—so that the courts may consider whether a state can avoid responsibility for its laws in such a manner." *Id.* at *2. Justices Breyer, Sotomayor, and Kagan each wrote a dissenting opinion, noting the need to preserve judicial review in the face of S.B. 8's unusual enforcement regime. *See id.* at *3-5.

On September 10, 2021, the Fifth Circuit denied the plaintiffs' motion to dismiss the private defendant's appeal, stayed all district court proceedings in *Whole Woman's Health* pending appeal, and expedited the appeal. *Whole Woman's Health v. Jackson*, No. 21-50792, 2021 WL 4128951(5th Cir. Sept. 10, 2021).

## IV.   IMPACTS OF S.B. 8 ON PATIENTS

Amidst the flurry of legal challenges, S.B. 8 took effect on September 1, 2021. The devastating effects warned of in the pre-enforcement litigation immediately became a reality for patients and providers in Texas. *See Whole Woman's Health v. Jackson*, No. 1:21-CV-616-RP (W.D. Tex.). S.B. 8 has gravely and irreparably impaired women's ability to exercise their constitutional right to an abortion across the State. Gilbert Decl. ¶¶ 25-27. Due to the prospect of ruinous liability for clinics and providers, beginning September 1, abortion providers in Texas ceased providing abortions after six weeks, absent a medical emergency, which likely amounts to between 85 and 95% of all abortions previously provided. Decl. of Amy Hagstrom Miller (Ex. 3) ("Hagstrom Decl.") ¶ 11; Gilbert Decl. ¶ 13; Decl. of Melaney A. Linton (Ex. 4) ("Linton Decl.") ¶¶ 13, 21. One Planned Parenthood affiliate provided 205 abortions in the week before S.B. 8 went into effect and only 52 abortions in the week after the law went into effect. Linton Decl. ¶¶ 25-26. Because all providers in Texas are adhering to

S.B. 8, Linton Decl. ¶ 17; Hagstrom Decl. ¶ 30, the vast majority of women seeking abortions in Texas are being turned away.  Hagstrom Decl. ¶ 15.  All the while, clinics in neighboring states are receiving panicked calls from patients in Texas and continue to see "large increases in minor patients, survivors of sexual assault, patients with a maternal or fetal diagnosis, and patients with later gestational ages." Decl. of Rebecca Tong (Ex. 5) ("Tong Decl.") ¶ 29.

Some women with the ability to travel are forced to seek treatment options in Oklahoma, Kansas, New Mexico, and Colorado where abortion providers have been overwhelmed with Texas residents unable to obtain abortions in Texas.  Decl. of Vicki Cowart (Ex. 6) ("Cowart Decl.") ¶¶ 8, 13, 18; Decl. of Anna Rupani (Ex. 7) ("Rupani Decl.") ¶ 22.  Women are being forced to travel hundreds—and sometimes thousands—of miles to obtain an abortion under harrowing circumstances in the middle of a COVID surge.  Tong Decl. ¶ 21; Gilbert Decl. ¶ 38 (complications wrought by COVID); Rupani Decl. ¶ 22; Cowart Decl. ¶¶ 9, 19.  One patient "got in her car at midnight in Texas so that she could drive through the night and make it to Oklahoma in the morning for her abortion appointment, and then she had to turn around the same day to travel back to Texas."  Decl. of Joshua Yap, M.D., MPH, AAHIVS (Ex. 8) ("Yap Decl.") ¶19; Rupani Decl. ¶ 26 (patient "piled her children into her car and drove over 15 hours overnight to obtain a medication abortion").  Patients from Texas are traveling sometimes five to eight hours each way to get to a health center in Oklahoma, Yap Decl. ¶ 20, and on average patients are traveling 650 miles each way to reach abortion clinics in the southwest, Cowart Decl. ¶ 9 (detailing trips of 790 miles, 930 miles, 1000 miles each way).  One minor, who was raped by a family member, traveled eight hours from Galveston to Oklahoma to get an abortion, Yap. Decl. ¶ 22, and other survivors of sexual assault have to bear the additional burden of taking time off work and arranging childcare because abortions are not available in Texas, Yap. Decl. ¶ 23; Linton Decl. ¶ 31.  Another patient facing violence at the hands of her husband is "discreetly attempting to leave Texas without her husband finding out," and is "desperate" and "selling personal items" to scrape together the funds needed for an out-of-state abortion.  Cowart Decl. ¶ 10.  Another "patient traveled six hours (one way) to get to Oklahoma and said she drove alone because she was worried" that asking someone to "accompany her" would subject that person to liability under S.B. 8.

Yap Decl. ¶ 19; Gilbert Decl. ¶ 46.  In one day, one patient drove a 1000 mile round trip *alone* "because she didn't have paid time off work and couldn't afford" to miss her shift.  Cowart Decl. ¶ 12.

Lengthy trip times have caused women to miss hard-to-obtain appointments, stitch together transportation from others, ride-shares, buses, and planes; obtain overnight accommodation that women often cannot afford; and solicit additional childcare for their family.  Yap. Decl. ¶ 21; Gilbert Decl. ¶ 38; Rupani Decl. ¶¶ 16-17, 22; Cowart Decl. ¶¶ 10-12.  The law is also "having a particularly burdensome effect on minors who need a judicial bypass," Linton Decl. ¶ 30; Hagstrom Decl. ¶ 33; and on those who are homeless, Linton Decl. ¶ 31.  The waiting times and logistical hurdles inherent in traversing multiple states to get an abortion have made it such that some women are no longer eligible for a medication abortion and instead are subjected to more invasive procedural abortions. Yap Decl. ¶18; Tong Decl. ¶ 25; Gilbert Decl. ¶ 47.  One provider's on-the-ground account describes the dire state of affairs:

> What I have seen unfold since S.B. 8 took effect has been absolutely devastating. The patients that are able to make it to Oklahoma to get their abortion are having to make substantial sacrifices and overcome numerous obstacles, including struggling to come up with the funds to make the trip to Oklahoma. They are also scared that someone may find out that they had an abortion when they go back home to Texas and are unsure of what could happen to them under S.B. 8. Those patients who are seeking abortions in the context of intimate partner violence or other family violence are risking more than they already do in order to travel out of state to end their unwanted pregnancies. People are also worried about having to travel long distances in the middle of a pandemic and what that could mean for the health and safety of themselves and their families. And I too fear that this increased travel puts myself, our staff, and our patients at greater risk of contracting COVID-19. I also know that we are seeing only a fraction of the people in Texas who are seeking to have an abortion, with some finding care in other states and others who simply cannot travel out of state or are afraid to do so. I fear that many people, especially those with the fewest resources, will not be able to obtain safe abortion care at all and will either seek to terminate their pregnancies themselves outside the medical system, or be forced to carry unwanted pregnancies to term.

Yap Decl. ¶¶ 26-27.

Though some women may be able to scrape together the necessary resources to travel out of state, the reality in Texas is that a majority of patients simply will "not be able to travel out of state to obtain an abortion due to their work, school, family, or childcare responsibilities and the high costs."

Hagstrom Decl. ¶ 32; Rupani Decl. ¶ 18.  For example, some women facing immigration-related restrictions are unable to travel out of the Rio Grande Valley to obtain abortions.  Hagstrom Decl. ¶ 14; Gilbert Decl. ¶ 45.  These obstacles will make it such that "[t]he majority of pregnant Texans who want an abortion will be forced to carry those pregnancies to term and face the risks—medical and financial—attendant with childbirth."  Hagstrom Decl. ¶ 32.  The effects on patients forced to carry a pregnancy to term can be serious.  Women face "debilitating physical symptoms," an increased risk that "abusive partners or family members" will discover a pregnancy, higher costs and medical risks that increase with gestational age, and "the life-altering consequences of having to go through childbirth against their will."   Hagstrom Decl. ¶ 36; Tong Decl. ¶ 25; Gilbert Decl. ¶ 31. For women who are able to travel out of state, time-sensitive appointments are now severely delayed for three weeks or more because of the demand.  Tong Decl. ¶ 13 (appointments previously available within a few days now booking three weeks out); Rupani Decl. ¶¶ 23, 26; Cowart Decl. ¶ 14; Yap Decl. ¶ 5.

Not only has S.B. 8 imperiled the rights of Texas residents; it has had an extreme impact on the rights of women in other states, including in Oklahoma, Kansas, Colorado, Nevada, and New Mexico.  Since S.B. 8 took effect, clinics in Tulsa and Oklahoma City have "seen an overall staggering 646% increase of Texan patients" as compared to the first six months of the year.  Yap Decl. ¶¶ 14-16. One provider there described the "surge of Texas patients" who are "scared and frantically trying to get appointments" in a state outside of Texas.  Yap Decl. ¶ 13.  Texas residents are claiming between 50% and 75% of appointments available at Planned Parenthood's Oklahoma health centers, causing women in Oklahoma to face scheduling backlogs of several weeks.  Yap Decl. ¶¶ 15, 17; Tong Decl. ¶ 11 (two-thirds of patient calls in Oklahoma City coming from Texas); *id.* ¶ 20 (half of calls from patients in Texas); Cowart Decl. ¶ 8 (53% of monthly patient volume from Texas in one week). Some clinics in neighboring states do not have "the capacity to accommodate large numbers of out-of-state patients" in addition to the communities they already serve, Tong Decl. ¶ 31; Cowart Decl. ¶¶ 17-18. By way of comparison, in 2020 there were 55,966 abortions performed in Texas on Texas residents, 10,368 abortions performed in Colorado, and 2,735 abortions performed in New Mexico.  Cowart Decl. ¶ 18.  "[T]here is simply no way" that out-of-state clinics can "increase capacity by that sort of

magnitude" to absorb the influx of Texas patients.  Cowart Decl. ¶ 18.  To make matters worse, clinics are finding it nearly impossible to hire additional doctors and support staff given the current threats from S.B. 8 layered atop the challenges of hiring in a pandemic, Tong Decl. ¶ 32; Cowart Decl. ¶ 19.

In addition to the effects on patients, S.B. 8 has emboldened vigilante activities against providers and staff, including "relentless harassment," Linton Decl. ¶ 36; "trespassing; conducting drone surveillance; blocking roads, driveways, and entrances; yelling at staff and patients; using illegal sound amplification; video recording staff, staff vehicles, and license plates, as well as surreptitiously recording inside the health center; [and] trying to follow staff home."  Linton Decl. ¶ 37.  The threat of lawsuits began almost immediately after S.B. 8 was signed into law, including from vigilantes who snuck into a clinic to encourage individuals to report violations of S.B. 8, and attempted to slow down, harass, and intimidate women who were seeking an abortion on the evening before S.B. 8 went into effect.  Hagstrom Decl. ¶¶ 44-46; Gilbert Decl. ¶ 44 (dramatic increase in the number of protesters and threatening phone calls).  This harassment continued on Reddit forums discussing how individuals could turn in doctors and messages to one doctor threatening murder.  Linton Decl. ¶ 37.

In addition, many physician providers, including those who are licensed in multiple states, now fear that lawsuits under S.B. 8 "might trigger investigations and other repercussions, including loss of licensure, that will follow these professionals for the rest of their careers, even if they choose to practice outside Texas."  Hagstrom Decl. ¶ 40.  For more physicians and staff, the risk of ruinous liability makes it such that "the risk [is] too great to even come to work."  Hagstrom Decl. ¶ 41; Gilbert Decl. ¶ 40 (describing the "catastrophic" effect of S.B. 8); Gilbert Decl. ¶¶ 50-52  To take one example, at Whole Woman's Health, which currently has 17 physicians on staff at its Texas clinics, only one physician has unconditionally agreed to work after September 1.  Hagstrom Decl. ¶¶ 38-41 (losing one staff member a week); Gilbert Decl. ¶ 41 (only two of eight physicians providing care); Linton Decl. ¶ 39 (prospective staff declined job offers because of S.B. 8).

Thus, S.B. 8 has effectively deterred providers from performing any abortions that would violate its terms.  The continued shutdown of Texas clinics may have the effect of closing some abortion clinics for good.  Hagstrom Decl. ¶¶ 22, 42. Without court ordered relief, Whole Woman's Health

"will have to shutter [its] doors and stop providing any healthcare to the communities" it serves. Hagstrom Decl. ¶ 42; Gilbert Decl. ¶¶ 43, 53 (Southwestern clinic in Dallas).

The continued applicability of an unquestionably unconstitutional law to patients in Texas presents more than a theoretical question about the viability of abortion rights. The constitutional right to a pre-viability abortion guaranteed by *Roe* and *Casey* rings hollow every day for many women in Texas—some who must travel great lengths to obtain an abortion and for others who cannot and may have to carry a pregnancy to term or dangerously take matters into their own hands.

## STANDARD OF REVIEW

A court may enter a temporary restraining order or a preliminary injunction as a means of preventing harm to the movant before the court can fully adjudicate the claims in dispute. Fed. R. Civ. P. 65(a), (b). The movant seeking either form of relief bears the burden to establish that (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in its favor; and (4) an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009). When the Federal Government is a party, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

The United States satisfies all requirements necessary for a temporary restraining order and preliminary injunction. Under settled principles of constitutional law, the United States has "a substantial likelihood that [it] will prevail on the merits[.]" *Bluefield*, 577 F.3d at 252-53. Unless enforcement of S.B. 8 is enjoined, the United States will be injured by Texas's attempt to circumvent its obligations under the Federal Constitution by thwarting mechanisms of judicial review provided by federal law, as well as by S.B. 8's effect on the operations of the Federal Government. Those threatened injuries to the sovereign interests of the United States outweigh any conceivable harm that Texas could claim were this Court to enjoin enforcement of a clearly unconstitutional law.

I.      **THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS**

The United States is likely to succeed on the merits because S.B. 8 was enacted in violation of the Fourteenth Amendment and the Supremacy Clause.  The United States has the authority to seek redress from this Court against the State of Texas, particularly in light of the procedural obstacles that Texas erected to shield S.B. 8 from judicial scrutiny in suits by directly affected persons.

**A.  S.B. 8 Violates the Federal Constitution.**

Under the Supremacy Clause, the United States Constitution "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2; *see also Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (noting that the Constitution itself displaces inconsistent state laws).  It is well-settled that the Fourteenth Amendment prevents states from banning abortion before a fetus is viable.  Because S.B. 8 has that effect, it is plainly unconstitutional under binding precedent.  Moreover, pursuant to the doctrines of preemption and intergovernmental immunity, "states have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government."  *M'Culloch v. Maryland*, 17 U.S. 316, 317 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943).  S.B. 8 impermissibly regulates the Federal Government in a number of different contexts and poses unlawful obstacles to the accomplishment of federal objectives.

**1.  S.B. 8 Violates the Fourteenth Amendment and the Supremacy Clause.**

There can be no dispute that S.B. 8 is contrary to the decades of precedent prohibiting states from banning abortions before fetal viability.  *See supra* pp. 1-2.  The Act prohibits any "abortion on a pregnant woman if the physician detected a fetal heartbeat," Tex. Health & Safety Code § 171.204(a), with only a limited exception for "medical emergenc[ies]" that prohibit compliance with the Act, *id.* § 171.205.  A "fetal heartbeat" can be detected months before viability.  *See id.* § 171.201(1); *see also Jackson II*, 951 F.3d at 248 (per curium).  Indeed, before the Supreme Court, Texas did not even attempt to defend the constitutionality of S.B. 8 on the merits.  *See Whole Woman's Health v. Jackson*, 2021 WL 3910722, at *3 (Sotomayor, J., dissenting) ("The Act is clearly unconstitutional under existing

13

precedents.  The respondents do not even try to argue otherwise. Nor could they: No federal appellate court has upheld such a comprehensive prohibition on abortions before viability under current law." (citations omitted)).  Accordingly, S.B. 8 is an affront to the Fourteenth Amendment of the U.S. Constitution.

That affront is deepened by the extraordinary procedural mechanisms Texas has designed to prevent women from vindicating their Fourteenth Amendment rights.  S.B. 8 denies the individuals whose constitutional rights are violated a mechanism by which they can protect those rights in court. And by delegating enforcement authority to private bounty hunters, the statute ensures that the only way providers may challenge the constitutionality of S.B. 8 is by performing abortions prohibited by the law and risking ruinous penalties—a prospect that has succeeded in its intended goal of chilling the prohibited activity altogether.  *See supra* pp. 7-12.  The Act's design thus converts an already severe intrusion on constitutionally protected rights into an effective blockade of those rights.  That scheme is plainly irreconcilable with the Fourteenth Amendment, and amounts to an unprecedented and impermissible attempt to circumvent the supremacy of the U.S. Constitution itself.  *Cf. Haywood v. Drown*, 556 U.S. 729, 742 & n.9 (2009) (explaining that "the Supremacy Clause cannot be evaded by formalism," as a "contrary conclusion . . . would provide a roadmap for States wishing to circumvent our prior decisions"); *Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 383 (1990) ("The force of the Supremacy Clause is not so weak" that a state may "overrule our [prior] decision" by selectively withholding jurisdiction).  It also subverts the mechanisms Congress designed—42 U.S.C. § 1983 and the Declaratory Judgment Act—to ensure that plaintiffs may bring suit to challenge and enjoin unconstitutional laws before they are enforced.  *See Felder v. Casey*, 487 U.S. 131, 138 (1988); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

S.B. 8's "undue burden" affirmative defense does not cause the statute to satisfy *Casey*.  Under *Casey*, the undue burden standard applies to laws that regulate, but do not prohibit, pre-viability abortion; if such laws impose an "undue burden" on a woman's right to obtain an abortion before viability, they violate the Fourteenth Amendment.  505 U.S. at 846.  *Casey* made plain that the undue-burden standard "does not disturb the central holding of *Roe*": "[A] State may not prohibit any woman from

14

making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879 (plurality op.). Thus, a ban like S.B. 8 is unconstitutional without regard to an undue burden analysis.

In any event, S.B. 8's "undue burden" defense is available—at best—only to those sued in relation to those abortions performed despite S.B. 8; it does nothing for women who cannot obtain an abortion because doctors who might perform the procedure or organizations that might fund it decline to do so due to the *threat* of a civil lawsuit under S.B. 8. Many providers may understandably forgo performing abortions rather than risk the significant monetary penalties—and the certain, un-recoverable legal fees, *see* Tex. Health & Safety Code § 171.208(i)—provided for under S.B. 8. Hag-strom Decl. ¶¶ 27-29; Gilbert Decl. ¶¶ 51-52. The effect of S.B. 8 is to dismantle the network of providers so that women seeking an abortion cannot get one. That outcome itself imposes an undue burden on women's rights.

Moreover, S.B. 8's affirmative defense bears no resemblance to the "undue burden" standard established in *Casey*. It is available only to those with "standing to assert the third-party rights of a woman or group of women seeking an abortion," and it requires courts to evaluate the defense through the narrowest lens possible—*i.e.*, without reference to any effect the law may have on a woman's ability to "obtain[] support or assistance, financial or otherwise, from others in their effort to obtain an abortion," and without reference to any effect the law may have on "other defendants or other potential defendants," Tex. Health & Safety Code § 171.209(b), (d), even though courts evalu-ating undue burden claims must consider the real-world, cumulative effects of the challenged state law.[7] Under S.B. 8's undue burden defense, a provider thus must show that imposing liability against it alone will impose an undue burden on a woman's ability to obtain an abortion, without consideration

---

[7] *See Casey*, 505 U.S. at 877 ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose *or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." (emphasis added)); *see also, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309, 2312-18 (2016) (evaluating significant evidence regarding the real-world effects of the law, including on clinic closures and geographic availability); *Gonzales v. Carhart*, 550 U.S. 124, 164-65 (2007) (citing approvingly *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 77-79 (1976), which "invalidated a ban on saline amniocentesis, the then-dominant second-trimester abortion method," because it was "an unreasonable or arbitrary regulation designed to inhibit, and *having the effect of inhibiting*, the vast majority of abortions after the first 12 weeks" (emphasis added)).

of the impact of liability or the threat of liability against other providers. *Id.* But that standard will likely be impossible to meet in most cases, having the effect of depriving women of the right to obtain a pre-viability abortion. Indeed, in enacting a law so clearly at odds with binding judicial precedents, Texas appears to have acted with the *purpose* of infringing women's constitutional rights. That alone renders the law invalid. *See Casey*, 505 U.S. at 878 (plurality op.) ("An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."). Accordingly, the affirmative defense does not cure S.B. 8's flaws; the Act plainly and facially violates the Fourteenth Amendment and the Supremacy Clause and its enforcement should be enjoined.

### 2. As Applied to Programs of the Federal Government, S.B. 8 Violates Principles of Preemption and Intergovernmental Immunity.

Even apart from S.B. 8's direct conflict with the Fourteenth Amendment, the Act further violates the Supremacy Clause by impermissibly purporting to regulate the Federal Government's activities and posing an obstacle to the accomplishment of federal objectives under these programs. That interference occurs across a number of federal contexts, and renders S.B. 8 invalid under the Supremacy Clause.

Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). The preemption doctrine "includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* Additionally, under the doctrine of intergovernmental immunity, States can neither "control the operations of the constitutional laws enacted by Congress" nor directly impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020); *see also Mayo*, 319 U.S. at 445; *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."). They accordingly cannot impose civil or criminal liability on federal officials for carrying out their federal duties. *See In re Neagle*, 135 U.S. 1 (1890); *see also, e.g.*, *Denson v. United States*, 574 F.3d 1318,

1346-48 (11th Cir. 2009); *Wyoming v. Livingston*, 443 F.3d 1211, 1213 (10th Cir. 2006).  Nor can they regulate the performance of the Federal Government by regulating its contractors.  *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."); *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019) ("For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself."), *cert. denied*, 141 S. Ct. 124 (2020); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (holding unconstitutional a state law that "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which [a contractor] renders services that the federal government hired [it] to perform").

S.B. 8 interferes with the accomplishment of federal objectives and impermissibly regulates the Federal Government in several ways.  First, S.B. 8 purports to prohibit federal personnel and contractors from carrying out their federal obligations to assist in providing access to abortion-related services to persons in the care and custody of federal agencies and to impose damages liability on them.  For example, to allow federal inmates to exercise their constitutional rights, Federal Bureau of Prison ("BOP") regulations provide that a BOP prison's Clinical Director "*shall* arrange for an abortion to take place" after a pregnant inmate signs a statement choosing an elective abortion.  28 C.F.R. § 551.23(c) (emphasis added).  BOP also bears certain costs when it facilitates an inmate's decision to have an abortion; for example, BOP "assumes all costs" "in the case of rape or incest."  Decl. of Alix McLearen, Ph.D. (Ex. 9) ("McLearen Decl.") ¶¶ 8-13.  And "[i]n all cases[,] . . . whether the [BOP] pays for the abortion or not, the [BOP] may expend funds to escort the inmate to a facility outside the institution to receive" an abortion procedure.  28 C.F.R. § 551.23(c); *see also* McLearen Decl. ¶¶ 8-13 (explaining BOP's policies concerning abortion for inmates).  S.B. 8, however, threatens civil liability on persons who aid or abet the performance of an abortion, including those who "pay[] for or reimburs[e] the costs of an abortion," regardless of whether the abortion is the result of rape or incest.  Tex. Health & Safety Code § 171.208(a)(2); *see also id.* § 171.208(j) (providing only that civil actions "may not be *brought by a person who* impregnated the abortion patient through an act of rape, sexual

assault, incest, or" other prohibited acts (emphasis added)).  The law thus "disrupts the performance of required duties of BOP staff" by, among other operational disruptions, likely "creat[ing] confusion among BOP staff employed in Texas to whether they can follow established BOP policy."  McLearen Decl. ¶ 15 (further explaining S.B. 8 "may also create fear of personal liability for complying with established BOP rules and policy, undermining BOP staff's performance of their duties and responsibilities").  By purporting to impose civil liability on BOP personnel for performing their federal duties, S.B. 8 violates the Supremacy Clause.  *See Ohio v. Thomas*, 173 U.S. 276, 283 (1899) ("[F]ederal officers who are discharging their duties in a state . . . are not subject to the jurisdiction of the state in regard to those very matters of administration which are thus approved by federal authority."); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly."); *cf. Neagle*, 135 U.S. at 76 (deputy U.S. marshal "acting under the authority of the law of the United States" was "not liable to answer in the courts of California" for acts taken under that authority).[8]  S.B. 8 is accordingly preempted insofar as it would prohibit the furnishing of such assistance by BOP personnel.

The United States Marshals Service ("USMS"), which is responsible for the pretrial detainment of inmates, is similarly situated to BOP.  *See generally* Decl. of John Sheehan (Ex. 10).  Like BOP inmates, individuals in USMS custody may elect to have an abortion under the agency's policy directives.  *Id.* ¶ 7. In cases of rape or incest, or where the pregnancy could endanger the life of the mother, USMS policy requires the agency to pay for the procedure after certain requirements are met.  *Id.* ¶¶ 8-9.  Where an inmate elects to have an abortion, USMS arranges transportation and guard services to move the inmate to and from the location for the procedure.  *Id.* ¶ 11.  S.B. 8 therefore purports to

---

[8] Texas's jurisdictional tactics, *see* Part I.B, *infra*, likewise cannot defeat preemption.  Regardless of the likelihood of a person bringing an enforcement action against BOP or its employees, the dispositive point is that S.B. 8 purports to impose a duty on BOP and its employees not to facilitate, or provide reimbursement for, almost all abortions after six weeks, and that duty itself conflicts with BOP regulations and policy.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 882 (2000) ("[T]his Court's preemption cases do not ordinarily turn on . . . how likely it is that state law actually would be enforced.  Rather, this Court's pre-emption cases ordinarily assume compliance with the state-law duty in question." (emphasis omitted)).

impose civil liability on USMS staff for performing duties similar to their BOP colleagues, with similar attending disruptions to USMS operations.  *Id.* ¶¶ 13-19.

Military service members similarly have a statutory entitlement to medical care, including abortion services at military medical treatment facilities ("MTFs") in cases where the mother's life would be endangered by carrying the fetus to term or in instances of rape or incest.  10 U.S.C. §§ 1074; 1093(a).  S.B. 8 purports to impede the Department of Defense's ("DoD") implementation of its statutory obligation to provide such medical services to service members by outlawing pre-viability abortions after a fetal heartbeat is detected in the case of rape or incest, and by threatening civil liability against DoD personnel involved in providing such services.

Also, the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") is statutorily obligated to care for certain unaccompanied noncitizen children, who are defined by statute as individuals without lawful immigration status under the age of 18 without a parent or legal guardian in the United States who is available to provide care and physical custody.  These individuals are in the legal custody of the United States.  *See* 6 U.S.C. § 279(b)(1), (g)(2); *see also* 8 U.S.C. § 1232(b)(1).  This population includes tender-aged children, pregnant and parenting teens, and youth who have been trafficked.  Decl. of James De La Cruz (Ex. 11) ("De La Cruz Decl.") ¶ 7.  The D.C. Circuit has already held that minors in ORR custody cannot be obstructed in exercising their constitutional right to access abortion and abortion-related services.  *See J.D. v. Azar*, 925 F.3d 1291, 1337 (D.C. Cir. 2019).  Consistent with its obligations to provide care for the unaccompanied children in its custody in Texas and to allow them to exercise their constitutional rights, ORR must provide access to abortion services when requested and permitted by law, including in cases of rape or incest, following judicial bypass procedures or parental consent, and subject to appropriations restrictions on paying for certain abortions.  De La Cruz Decl. ¶ 12.  S.B. 8 erects a manifestly unconstitutional restriction on access to pre-viability abortion for unaccompanied minors in ORR custody and purports to regulate ORR's administration of a federal program by, in effect, requiring ORR to move unaccompanied children out of Texas in order to make available abortion services that are required under federal law. De La Cruz Decl. ¶ 18.

Second, S.B. 8 interferes with federal directives to third-party providers who are contractually obligated to provide abortion-related services. For example, the Department of Labor's ("DOL") Job Corps is a program funded by Congress and administered by DOL that assists eligible young people ages 16 through 24 with completing their high school education, preparing for meaningful careers, and obtaining gainful employment. *See* 29 U.S.C. § 3191(1). This assistance is provided through Job Corps centers, which are primarily operated by private contractors that have contractual relationships with DOL. *Id.* § 3197(a), (d); Decl. of Patrice Rachel Torres (Ex. 12) ("Torres Decl.") ¶¶ 5, 9.

All Job Corps contractors are required to comply with the requirements of the Job Corps Policy and Requirements Handbook ("PRH"), which was "developed to include all mandatory program operation and reporting requirements in one document." Decl. of Jillian Matz (Ex. 13) ("Matz Decl.") ¶ 6; *see also* Torres Decl. ¶ 11. The PRH requires contractors to offer enrollees a family planning program that includes counseling and information about options to terminate a pregnancy, as well as to provide transportation for purposes of obtaining an abortion. Torres Decl. ¶¶ 12-15. Each of DOL's contracts with the operators of the Texas Job Corps centers incorporates the PRH's requirements by reference. Matz Decl. ¶¶ 6-7. In light of S.B. 8, compliance with these contractual terms will require DOL's Texas contractors to expose themselves to civil liability or to incur expenses that will ultimately be passed on to DOL. *See id.* ¶¶ 11-13. S.B. 8 thus interferes with the ability of DOL's contractors to carry out DOL directives by purporting to prohibit the provision of such contracted services and to impose liability on the contractors and their personnel providing those services.

S.B. 8 similarly burdens the operations of the Office of Personnel Management ("OPM"). OPM is responsible for negotiating and approving the health benefits plans made available to federal employees, annuitants, and certain other statutorily eligible employees. Each year, OPM negotiates and contracts with qualified carriers to establish a slate of health benefits plan options from which federal employees may select. *See* 5 U.S.C § 8902; Decl. of Laurie Bodenheimer (Ex. 14) ("Bodenheimer Decl.") ¶ 3. OPM has entered into contracts with qualified carriers that cover abortion procedures in permitted circumstances, such as when the pregnancy is the result of an act of rape or incest. Bodenheimer Decl. ¶ 5; Consolidated Appropriations Act, 2021, PL 116-260, 134 Stat 1182 §§ 613-14

(Decl. 27, 2020) (incorporating Hyde Amendment restrictions).  S.B. 8 interferes with these federal functions by purporting to impose liability on any Federal Employees Health Benefits Program health plan that covers the cost of an abortion in Texas.  *See* S.B. 8 § 171.208(a)(2) (creating liability for "paying for or reimbursing the costs of an abortion through insurance or otherwise").  Due to S.B. 8, carriers may breach the terms of their agreed-upon health benefit plans and refuse to provide reimbursement for abortions performed in Texas.  *See* Bodenheimer Decl. ¶¶ 9-12.  Further, "S.B. 8 may also impact OPM's negotiations with carriers regarding health benefits to be provided in future years" since "[c]arriers may refuse to continue to cover abortion services that they determine conflict with S.B. 8," materially "interfer[ing] with OPM's statutory duty and discretion to approve plans containing terms that OPM finds to be necessary and desirable in FEHB plan contracts."[9] *Id.* ¶ 14.

Finally, S.B. 8 also violates statutory and regulatory provisions applicable to the Medicaid program in Texas, which is a cooperative state-federal program federally administered by Centers for Medicare & Medicaid Services ("CMS").  States that participate in the Medicaid program must cover various medically necessary procedures that fall within certain service categories such as inpatient and outpatient hospital services (as specified in 42 U.S.C. § 1396d(a)(1) and (a)(2)) and physician services (as specified in 42 U.S.C. § 1396d(a)(5)(A)).  42 U.S.C. § 1396a(a)(10)(A).  "Abortions that are necessary to save the life of a pregnant person, or resulting from rape or incest," may fall within the scope of procedures that may be medically necessary and covered by the mandatory service categories under this statute and optional service categories covered under the Texas state plan.  Decl. of Anne Marie Costello (Ex. 15) ("Costello Decl.") ¶ 9.  In accord with Medicaid coverage requirements, the Fifth Circuit has held that States may not categorically prohibit the coverage of medically necessary abortion services for which federal funds are permitted to be expended, including medically necessary abortions of pregnancies arising from rape or incest.  *See Hope Med. Grp. for Women v. Edwards*, 63 F.3d 418, 428 (5th Cir. 1995) (holding Louisiana statute that "categorically prohibits funding for abortions in cases

---

[9] 5 U.S.C. § 8902(m) expressly notes that "[t]he terms of any contract" negotiated by OPM and a carrier "which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans."

of rape or incest without regard to whether the procedures might be medically necessary" violated Title XIX of the Social Security Act). Although States may specify the amount, duration, and scope of each covered service, they may not "arbitrarily deny or reduce the amount, duration, or scope of a required service . . . solely because of the diagnosis, type of illness, or condition," and each service must be covered so as to "reasonably achieve its purpose." 42 C.F.R. § 440.230(a), (b), (c). S.B. 8 conflicts with these provisions of federal law by prohibiting payment by Medicaid for all abortions in Texas arising from rape or incest after fetal cardiac activity is detected. The statute arbitrarily denies Medicaid beneficiaries coverage for a procedure for which Medicaid coverage is available under mandatory service categories and optional service categories covered in the State, and the limits imposed by the statute restrict coverage to the extent that the State's coverage of these service categories is not sufficient to reasonably achieve the service's purpose. Costello Decl. ¶ 14.

### B. This Suit Is a Proper Means by Which to Challenge S.B. 8, Given Texas's Attempt to Foreclose Other Means of Judicial Review.

Texas's primary tactic in the related litigation pending before the Fifth Circuit has been not to defend S.B. 8 on the merits but instead to contend that lawsuits filed to challenge the Act are procedurally flawed, principally arguing that the *Ex parte Young* exception to sovereign immunity is unavailable given S.B. 8's novel enforcement scheme. That asserted procedural flaw is not implicated in this lawsuit, however, which is filed by the United States, and thus is not subject to the same jurisdictional hurdles that have thus far impeded other litigants. As explained below, the United States has the authority to sue the State of Texas, the State is a proper defendant against whom to seek relief, and this Court can enjoin Texas from enforcing S.B. 8 and thereby redress the United States' injuries.

#### 1. The United States Has Authority to Bring This Suit.

It is well established that the United States may seek equitable relief to protect federal interests, including injuries to its sovereignty. The Supreme Court has consistently applied this principle, including in *In re Debs*, 158 U.S. 564 (1895), in which the Court recognized that the United States had authority to seek an injunction against the Pullman rail strike. The Court explained that "[e]very gov-

ernment, entrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter." *Id.* at 584; *see also, e.g.*, *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("Our decisions have established, too, the general rule that the United States may sue to protect its interests."). The Supreme Court has repeatedly recognized the authority of the United States, even without an express statutory cause of action, to seek equitable relief to vindicate various federal interests and constitutional guarantees, including to alleviate burdens on interstate commerce, *Debs*, 158 U.S. at 584; protect the public from fraudulent patents, *United States v. American Bell Tel. Co.*, 128 U.S. 315 (1888); protect Indian tribes, *Heckman v. United States*, 224 U.S. 413 (1912); carry out the Nation's treaty obligations, *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1925); and challenge state measures that interfere with an agency's administration of federal law, *Arizona*, 567 U.S. at 405.

The Fifth Circuit recognized the same authority to protect federal interests in *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963), holding that the United States could challenge racial segregation that burdened interstate commerce. *Id.* at 14-17. The Fifth Circuit reasoned that "[w]hen a State, not by some sporadic act against a particular individual but by a law or pattern of conduct, takes action motivated by a policy which collides with national policy as embodied in the Constitution, the interests of the United States 'to promote the interest of all' gives it standing to challenge the State in the courts." *Id.* at 14.

In the last decade alone, the United States has brought numerous cases for equitable relief to protect interests of the federal government, notwithstanding the absence of express statutory authority to do so. *See, e.g.*, *Arizona*, 567 U.S. 387; *United States v. State Water Res. Control Bd.*, 988 F.3d 1194 (9th Cir. 2021); *United States v. Washington*, 971 F.3d 856 (9th Cir. 2020), *as amended*, 994 F.3d 994 (9th Cir. 2020); *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020); *United States v. Bd. of Cnty. Comm'rs of Cnty. of Otero*, 843 F.3d 1208 (10th Cir. 2016); *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir.

2012); *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir. 2010).[10]  That is in keeping with the "maxim of equity stat[ing] that '[e]quity suffers not a right to be without a remedy.'" *CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011) (quoting R. Francis, Maxims of Equity 29 (1st Am. ed. 1823)).  The Supreme Court has therefore recognized that equity will provide a cause of action where no adequate remedy at law exists. *See, e.g.*, *Paine Lumber Co. v. Neal*, 244 U.S. 459, 476-77 (1917) ("where a threatened infringement" of a constitutional right "will produce injury and damage for which the law can afford no remedy . . . resort may be had to equity; and when this does appear, the right to an injunction arises because that is the only appropriate relief"); *Watson v. Sutherland*, 72 U.S. 74, 79 (1866) ("The absence of a plain and adequate remedy at law affords the only test of equity jurisdiction, and the application of this principle to a particular case, must depend altogether upon the character of the case.").

Applying the foregoing principles, the United States has the authority to sue here.  This litigation implicates numerous federal interests, which support the authority of the United States to seek equitable relief in this Court.

A suit by the United States in equity is appropriate based on the extraordinary facts of this case because Texas has sought to inhibit other pathways for federal judicial review of an enactment that clearly violates the constitutional rights of its citizens, thereby depriving individuals of an adequate and effective remedy at law.  To begin, S.B. 8 is an extraordinary and unprecedented attempt to evade a State's obligation to respect the Fourteenth Amendment through the mechanisms established by Congress.  Texas has enacted a law that indisputably violates individuals' constitutional rights, and has simultaneously structured that law to prevent the very individuals it injures from vindicating their rights through the established process of federal judicial review.  In particular, the law appears tailor-made to evade 42 U.S.C. § 1983, which Congress enacted to "ensure" that individuals could turn to the federal courts to secure relief—including the equitable remedy of an injunction—against violations

---

[10] *See also United States v. Texas*, 2021 WL 3362598 (W.D. Tex. Aug. 3, 2021); *United States v. New Jersey*, 2021 WL 252270 (D.N.J. Jan. 26, 2021); *GEO Grp., Inc. v. Newsom*, 493 F. Supp. 3d 905, 916 (S.D. Cal. 2020), *appeal filed*, No. 20-56172 (9th Cir. Nov. 6, 2020); *United States v. King Cnty.*, 2020 WL 2745745, at *1 (W.D. Wash. May 27, 2020); *United States v. California*, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018); *United States v. Kernen Constr.*, 349 F. Supp. 3d 988 (E.D. Cal. 2018); *U.S. Postal Serv. v. City of Berkeley*, 2018 WL 2188853 (N.D. Cal. May 14, 2018).

of federal constitutional rights committed under color of state law. *Burnett v. Grattan*, 468 U.S. 42, 55 (1984). Section 1983 "assign[s] to the federal courts a paramount role in protecting constitutional rights." *Patsy v. Board of Regents*, 457 U.S. 496, 503 (1982); *see Mitchum v. Foster*, 407 U.S. 225, 241 (1972). And that statute provides a mechanism for judicial review *before* individuals expose themselves to liability by violating an unconstitutional law. *See Patsy*, 457 U.S. at 504 (finding that Congress, in enacting the precursor to § 1983, intended to "'throw open the doors of the United States courts' to individuals *who were threatened with* . . . the deprivation of constitutional rights, and to provide these individuals *immediate* access to the federal courts notwithstanding any provision of state law to the contrary" (emphasis added) (citation omitted)).

S.B. 8 seeks to thwart the mechanisms established by Congress and to circumvent Texas's obligation to respect the federal constitutional right to abortion within its borders, by removing enforcement responsibility from state executive officials, who would ordinarily be enjoined under the doctrine of *Ex parte Young*—and thus far, it has largely succeeded. *See supra* pp. 7-12. "The threatened continuation" of this attempt by Texas to violate the Constitution and strip individuals of their rights to challenge this law qualifies as "a special exigency, one which demand[s] that the courts should do all that courts can do." *Debs*, 158 U.S. at 579; *see also Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937) (suit in equity appropriate where the right's holder "had no remedy at law at all except at the pleasure of an adversary"). The United States therefore brings this suit to vindicate its substantial sovereign interest and duty to "take Care that the Laws be faithfully executed" by preventing States from attempting to insulate their flagrant violations of the Constitution from judicial review. *See* U.S. Const. art. II, § 3; *see also Cooper v. Aaron*, 358 U.S. 1, 17 (1958) ("constitutional rights . . . can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes . . . whether attempted ingeniously or ingenuously").

The unique circumstances presented here—including, most notably, S.B. 8's deliberate attempt to thwart ordinary mechanisms of federal judicial review through a congressionally conferred cause of action—distinguish this case from past cases where courts have held that the mere fact that federal constitutional rights are being violated does not necessarily authorize the United States to sue.

25

*See, e.g.*, *United States v. City of Philadelphia*, 644 F.2d 187, 201 (3d Cir. 1980); *United States v. Solomon*, 563 F.2d 1121, 1123 (4th Cir. 1977). There is no need for this court to consider whether the United States can sue to enjoin other state conduct that violates individuals' constitutional rights. It is sufficient for this case simply to recognize that the United States can sue to enjoin state conduct where the state law's substantive prohibition exceeds the State's constitutional authority, the law has widespread impact, and the State has additionally designed its laws in order to preclude the ability of the persons whose rights it is violating—here, pregnant individuals—to prevent the State from depriving them of their rights, including through the ordinary mechanism of relief in federal court. *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (courts "must be vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge"). S.B. 8 seeks to absolve the State of responsibility for the statute's effects and enforcement, while at the same time seeking to deter the exercise of constitutionally protected conduct by deputizing enforcement authority to private persons throughout the United States who need not have any personal connection to the conduct, but who are deliberately incentivized to sue by a bounty of at least $10,000 per abortion. And the State's singling out of this core federal constitutional right and simultaneous effort to obstruct access to a federal forum and remedy presents circumstances far different from *City of Philadelphia*. *Cf. Testa v. Katt*, 330 U.S. 386, 394 (1947); *Knick v. Township of Scott*, 139 S. Ct. 2162, 2169-70 (2019). Where, as here, systemic constitutional violations implicate distinctly federal interests, the United States may seek to prevent the constitutional violations on behalf of the "public at large," *see Debs*, 158 U.S. at 564, 583-85, to protect the integrity of our constitutional structure and to provide for review and relief in a federal court that Congress provided but that Texas has effectively denied to the persons whose rights are violated.

Moreover, the United States has an interest because Texas's violation of constitutional rights interferes with interstate commerce. *See City of Jackson*, 318 F.2d at 14 ("When the action of a State violative of the Fourteenth Amendment conflicts with the Commerce Clause and casts more than a shadow on the Supremacy Clause, the United States has a duty to protect the 'interests of all'. The courts offer the first avenue for counter-action by the Nation."); *see also Debs*, 158 U.S. at 583-84.

Here, S.B. 8 undoubtedly interferes with interstate commerce.  S.B. 8 purports to impose liability on persons anywhere in the nation who aid or abet (or even intend to aid or abet) the provision of an abortion in Texas.  Texas thereby impermissibly burdens the interstate commercial activities of, *e.g.,* out-of-state insurance companies that provide reimbursement for prohibited abortions in Texas, banks that may process the payment of such reimbursements, and the sellers of medical devices used to carry out abortion procedures.  Compl. ECF No. 1, ¶ 40.  Prohibiting nearly all abortions after six weeks in Texas also drives women to providers in other states (including some women who would have traveled into Texas from elsewhere), overburdening out-of-state clinics and creating backlogs for residents of other states seeking care.  *See infra* pp. 10-11.  That a regulation of abortion may implicate interstate commerce has already been recognized by Congress, as when it relied on the Commerce Clause to pass the ban on "partial-birth abortions."  *See* 18 U.S.C. § 1531(a) (restricting the provision of such procedures "in or affecting interstate or foreign commerce").

The United States' authority to bring this suit is also independently grounded in other specific federal interests.  For example, Texas's violations are distinctly felt by individuals in the United States' care and custody, such as unaccompanied children in the custody of ORR and individuals incarcerated within the Bureau of Prisons.  "[T]he United States" has "a real and direct interest in [a] matter" that "arises out of its guardianship" over certain persons whose rights are at stake and who are "entitled to [the United States'] aid and protection."  *United States v. Minnesota*, 270 U.S. 181, 194 (1926).  In these circumstances, the United States has a "right to invoke the aid of a court of equity [to] remov[e] unlawful obstacles to the fulfillment of its obligations."  *Id.*  Here, as explained above, the United States is responsible for the protection of unaccompanied minors in ORR's custody and persons in BOP and USMS custody, and so the United States may bring suit to challenge "unlawful" deprivations of those individuals' constitutional rights.  In the absence of judicial relief from this Court, the established Fourteenth Amendment rights of these various populations within the United States' care and custody may be violated.

Finally, independent of all of the considerations discussed above, the United States may seek equitable relief because, as already demonstrated, S.B. 8 concretely interferes with the Federal Government's activities. *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 474 n.13 (1976) (recognizing that the United States has standing to bring preemption claims); *cf. Arizona*, 567 U.S. at 405.  As explained above, the Federal Government possesses various legal authorities and obligations to facilitate or fund certain pre-viability abortions, which are now proscribed by S.B. 8.  *See supra* pp. 16-22.  Thus, there is a credible threat of an enforcement action being brought based on the federal government's activities—*i.e.*, by any one of the millions of individuals Texas has deputized with authority to bring such actions.  *Cf. City of Arcata*, 629 F.3d at 989 (holding that the United States had Article III standing to challenge municipal ordinances because "[t]he ordinances, which are enforced by civil penalties, proscribe some activity encouraged by federal law").  Texas can hardly dispute that a credible threat of enforcement exists, as that is the very point of S.B. 8—to enable and encourage such enforcement actions, and to coerce compliance based on the threat of such enforcement proceedings.  *Cf. Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (credible threat exists unless fear of prosecution is "imaginary or wholly speculative").

Thus, the United States has authority to bring this equitable suit against Texas for its violations of the Constitution and interference with the administration of federal programs.[11]

> **2.  Texas is a Proper Defendant and Relief Against It Will Redress the United States' Injury.**

The State of Texas is also a proper defendant against whom to bring this action, notwithstanding the State's efforts to avoid review through S.B. 8's unprecedented enforcement mechanism.

As a threshold matter, Texas is not shielded from this suit by sovereign immunity.  Unlike in suits brought by private individuals, state sovereign immunity does not apply to suits for injunctive relief brought by the United States against a State.  *See Alden v. Maine*, 527 U.S. 706, 755 (1999) ("In

---

[11] The United States has suffered injury-in-fact sufficient to support Article III standing for the reasons set forth above.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

ratifying the Constitution, the States consented to suits brought . . . by the Federal Government."); *United States v. Mississippi*, 380 U.S. 128, 140 (1965).

Texas also doubtless causes the injuries that the United States now seeks to remedy. The State of Texas enacted S.B. 8 and continues to authorize individuals to file suit under its auspices to enforce that law. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615-16 (1989) (finding state action where the government removed "all legal barriers" to private conduct at issue and "made plain . . . its strong preference" that private parties engaged in the conduct).

Moreover, the United States' injuries are redressable by this Court through relief issued against the State of Texas. Equitable relief entered against a State may be enforced against whichever "governmental power" and agencies of the State may be needed to vindicate the judgment. *See Virginia v. West Virginia*, 246 U.S. 565, 593-600 (1918). Here, Texas has entrusted the power of enforcing S.B. 8 to private parties, and they—acting on the State's behalf—exercise that power through civil suits filed in state court. Accordingly, to prevent Texas from implementing and enforcing its unconstitutional scheme, this Court should any enjoin state court proceedings initiated under S.B. 8.

The civil actions that S.B. 8 incentivizes are an appropriate target of injunctive relief. Although the Anti-Injunction Act generally provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State," 28 U.S.C. § 2283, that rule "does not apply when the United States seeks the injunction[.]" *In re Grand Jury Subpoena*, 866 F.3d 231, 233 (5th Cir. 2017). Federal courts may therefore enjoin state court proceedings that the Constitution prohibits. *See Dombrowski v. Pfister*, 380 U.S. 479, 485-86, 497 (1965) (where "defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights" but, rather, would entail "a substantial loss or impairment of freedoms of expression," equitable relief restraining state prosecution is appropriate). Here, it is appropriate for the United States to essentially "obtain[] a stay of state court proceedings" where doing so would "prevent threatened irreparable injury to a national interest." *Leiter Minerals, Inc. v. United* States, 352 U.S. 220, 290-91 (1957). The Court could thus redress the United States'

injuries by simply enjoining state-court proceedings to enforce S.B. 8.[12]  Alternatively, to the extent
the Court concludes that more specific relief is necessary or appropriate, it could craft injunctive relief
in one or more of three ways.

First, the Court could enjoin any person who files suit under S.B. 8 from prosecuting his or
her claim.  Here, an injunction against Texas can run to the individuals who file civil enforcement
actions because, at a minimum, those individuals would qualify as "persons who are in active concert
or participation with" the State.  Fed. R. Civ. P. 65(d)(2)(C).   The purpose of Rule 65 is to prevent
defendants from creating schemes to evade judicial review and enforcement by ensuring that injunc-
tive relief "not only binds the parties defendants but also those identified with them in interest, in
'privity' with them, represented by them or subject to their control."  *See Regal Knitwear Co. v. N.L.R.B.*,
324 U.S. 9, 14 (1945).  This rule is based on the principle that "defendants may not nullify a decree by
carrying out prohibited acts through aiders and abettors, although they were not parties to the original
proceeding."  *Id.*  Accordingly, an injunction may run against a nonparty that is in "'privity' with an
enjoined party," including a "nonparty whose interests were represented adequately by a party in the
original suit."  *Texas v. Dep't of Labor*, 929 F.3d 205, 211 (5th Cir. 2019).

Individuals who bring suits under S.B. 8 meet that test.  S.B. 8 vests those individuals with
law-enforcement authority, a traditionally exclusive state power, in a manner and to a degree that
appears to be "unprecedented," *Whole Woman's Health v. Jackson*, 2021 WL 3910722 at *1 (Roberts,
C.J., dissenting)—among other things, by giving them unsupervised authority to police violations of
the law, and by enabling them to obtain civil penalties against anyone in the state without any showing
of personal injury.  Individuals suing under S.B. 8 are not suing "for violation of distinct legal duties
owed" to them as individuals, but instead are suing "for violation of legal duties owed the public."
*Texas v. Dep't of Labor*, 929 F.3d at 213.  Moreover, unlike federal statutes such as Title VII and the

---

[12] For the reasons discussed herein, the United States meets the traceability and redressability ele-
ments of Article III standing.  *See Spokeo*, 136 S. Ct. at 1547.

Fair Labor Standards Act where the Fifth Circuit has deemed agencies not to be in privity with individuals, here S.B. 8 does not "authorize[] both government litigation and private actions" for violation of distinct legal duties owed to each.  *See id.*  S.B. 8 instead authorizes only private litigation for the vindication of injuries to the public at large, rather than any individual litigant.[13]  At bottom, Texas has deputized enforcement of S.B. 8 to private parties in the hopes that they would be beyond the reach of any pre-enforcement relief.  Rule 65 does not permit such a result.  *Cf. United States v. Hall*, 472 F.2d 261, 267-68 (5th Cir. 1972) (injunctions under Rule 65 can extend to private persons not party to the suit when they are "in a position to upset the court's adjudication" between the existing parties).  The application of an injunction to private persons who commence a suit under S.B. 8 is reinforced by the proposition that in a proceeding brought against a State itself, the State is properly regarded as representing its citizens.  *Cf. New Jersey* v. *New York*, 345 U.S. 369, 373 (1953) (recognizing "the principle that the state, when a party to a suit involving a matter of sovereign interest, must be deemed to represent all its citizens" (citation omitted)).

Second, an injunction against the State—enjoining proceedings initiated under S.B. 8—could specify that it runs to the state judiciary.  It has "long been established by decisions of th[e] [Supreme] Court" that "the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment."  *Shelley v. Kraemer*,

---

[13] Indeed, individuals who file suits under S.B. 8 are properly considered state actors—a result courts have endorsed where a state sanctions or is significantly involved in conduct that would be unconstitutional if engaged in by the state itself.  *See, e.g.*, *Reitman v. Mulkey*, 387 U.S. 369, 380-81 (1967) (finding state action where law "authorize[d] . . . racial discrimination in the housing market"); *Smith v. Allwright*, 321 U.S. 649, 663-64 (1944) (state's establishment of primary system made party that set up an all-white primary "an agency of the state"); *Nixon v. Condon*, 286 U.S. 73 (1932) (state's conferral of authority to party committee to determine who may vote in primary created state action); *Skinner*, 489 U.S. at 615-16 (1989) (finding state action where the government removed "all legal barriers" to private conduct at issue and "made plain . . . its strong preference" that private parties engaged in the conduct).  Moreover, in light of the details of the S.B. 8 enforcement scheme outlined above, the individuals who file suits under S.B. 8 should be considered "agents" of the State under Rule 65 and would be subject to an injunction against the State on that basis, *see* Fed. R. Civ. P. 65(d)(2)(B).  But this Court does not need to decide whether such individuals are "agents" because the provision of Rule 65 covering individuals "in active concert or participation" with a party plainly applies here.

334 U.S. 1, 14 (1948).  And it also well established that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."  *Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984).  Although relief against a judicial officer should be "reserved for really extraordinary causes," *id.* at 538, this case presents just such an extraordinary situation.  Texas has established a scheme to largely extinguish a constitutional right within its borders while purporting to prohibit any executive official from enforcing that scheme, for the purpose of making it more difficult for individuals to seek redress of the constitutional violation in federal court.  Having attempted to ensure that individuals whose rights are violated may not sue the state actors normally responsible for enforcing state law, Texas cannot persuasively contend that state judges may not be enjoined from playing a role in the State's unconstitutional scheme.[14]

Finally, an injunction prohibiting the State of Texas from enforcing S.B. 8 could also specify that it enjoins all state employees and officers needed to administer civil actions regarding S.B. 8 or to enforce judgments arising from those actions.  Relief against the State could bind, for example, clerks that would docket complaints seeking S.B. 8 damages, as well as officers of the State charged with enforcing any money judgment pursuant to the statute.

---

[14] The United States recognizes that the Fifth Circuit recently decided in parallel litigation that the plaintiffs could not pursue injunctive relief as to S.B. 8 against state court judges.  *Whole Women's Health v. Jackson*, No. 21-50792, Dkt. 95, at 11-14 (5th Cir. Sept. 10, 2021) (per curiam).  But neither of the grounds for the Courts of Appeals' decision apply here.  First, the Fifth Circuit's conclusion that sovereign immunity protects Texas judges, *id.* at 11, is inapposite because as previously discussed, actions for equitable relief by the United States are not limited by the State's sovereign immunity.  Second, the Fifth Circuit's conclusion in *Whole Woman's Health* that no "actual controversy" exists as to judicial officers because "judges are disinterested neutrals," *id.* at 12, is also inapposite.  The fact that the judges are neutral and disinterested does not change the fact that they are the state officers who oversee the proceedings that are the linchpin of Texas' effort to deny (or unduly burden) women's exercise of their constitutional rights.  Moreover, there is certainly an "actual controversy" here between the United States and Texas, which enacted S.B. 8 and has encouraged lawsuits pursuant to it.  Even if a suit directly against a judge could not proceed, this is a suit against Texas, including its officers, employees, and agents.  And, as noted, injunctive relief may run against state court judges in "extraordinary causes" *Pulliam*, 466 U.S. at 538, such as this one, where the United States seeks to protect its federal interest in preventing States from skirting the obligations of our National compact by attempting to preclude pre-enforcement review of a blatantly unconstitutional law."

For all of these reasons, the United States has authority to bring this suit, and has demonstrated a likelihood of success that S.B. 8 is unconstitutional and should be enjoined.

## II.       THE GOVERNMENT FACES IRREPARABLE HARM

As the Supreme Court and other courts have long established, irreparable harm results from the enforcement of a state law that violates the Constitution. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (assuming that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause") (citation and internal quotation marks omitted); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) ("We have 'stated that an alleged constitutional infringement will often alone constitute irreparable harm.'"); *City of El Cenizo v. Texas*, 264 F. Supp. 3d 744, 809 (W.D. Tex. 2017) (noting that "[f]ederal courts at all levels have recognized that a violation of constitutional rights constitutes irreparable harm as a matter of law and no further showing of irreparable injury is necessary" (citing cases)). Indeed, Texas recently "conceded that the United States has suffered per se irreparable harm" where a Texas state law violated the Supremacy Clause and Texas failed to contest that a violation constitutes per se irreparable harm. *United States v. Texas*, No. 3:21-cv-173-KC, ECF No. 52, at 15 (W.D. Tex. Aug. 26, 2021) (noting Texas failed to contest that a violation constitutes per se irreparable harm). As already demonstrated above, S.B. 8 deprives women in Texas of their constitutional rights while presently preventing them from vindicating those rights in court, in clear violation of the Fourteenth Amendment and the Supremacy Clause. The Act harms the United States' interest in ensuring that States do not evade their obligations under the Constitution and then try to insulate their actions from judicial review, as well as its interest in protecting the constitutional rights of women in its care and custody. To allow States to circumvent the Federal Constitution in this manner would offend the basic federal nature of the Union. Thus, the unconstitutionality of S.B. 8 alone suffices to establish irreparable harm.

In addition, S.B. 8 also irreparably injures the United States by restricting the operations and responsibilities of the Federal Government. As discussed above, S.B. 8 conflicts with programs and activities administered by numerous federal agencies, including BOP, USMS, DOD, ORR, DOL,

OPM, and CMS and interferes with the Federal Government's ability to provide access to, assistance for, or funding for abortions in instances required or permitted by federal law, such as in the case of rape or incest.  S.B. 8 would thus significantly impede the Federal Government's ability to fulfill its responsibilities and authorities under Federal law.

## III.    THE BALANCE OF EQUITIES TIP IN FAVOR OF AN INJUNCTION

The final two factors—the balance of equities and the public interest—merge where the federal government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (Government's "harm and the public interest are one and the same, because the government's interest *is* the public interest").  Here, these factors manifestly favor the United States.  The United States has a strong and legitimate interest in ensuring that states respect their obligations under the Constitution, and in fulfilling the United States' responsibilities under Federal law.  If Texas's attempt to nullify the Constitution of the United States prevails, it may become a model for action in other areas, by other states, and with respect to other constitutional rights and judicial precedents.

In contrast, Texas will not suffer any cognizable harm from an injunction.  The clear purpose and effect of S.B. 8 is to deny women rights guaranteed to them by the U.S. Constitution, while attempting to evade judicial review.  Texas plainly lacks any legitimate interest in that impermissible objective, and it has no valid interest in insulating its unconstitutional laws from judicial review.  *See Velazquez*, 531 U.S. at 545.  An injunction, therefore, would serve the public interest by not only protecting constitutional rights but also by advancing the rule of law.  In sum, the balance of the equities and the public interest tilt decidedly in favor of enjoining S.B. 8.

## IV.    SCOPE OF RELIEF

This Court should temporarily or preliminarily enjoin enforcement of S.B. 8.  The United States requests that this injunction prohibit the maintenance of any civil proceeding pursuant to S.B. 8 and that it bind all of Texas's officers, employees, and agents, as well as those persons in active concert or participation with them.  *See* Fed. R. Civ. P. 65(d)(2).  For the reasons stated above, the Court could further specify the scope of that relief, including by expressly stating that it applies to

private individuals who attempt to initiate enforcement proceedings under S.B. 8.  Of course, Texas is also free to propose the specific terms of an injunction that would prevent proceedings filed under S.B. 8 from being maintained.  Texas is responsible for crafting S.B. 8, and it is therefore well positioned to shed light on the provisions of an injunction that would prevent the State from implementing its unconstitutional scheme.

Finally, in any injunction it issues, the Court should require the State of Texas to take affirmative steps to provide individuals who seek to bring actions under S.B. 8 with actual notice of the injunction—such as by requiring Texas to post the injunction on court websites and inform all state court judges and judicial employees about the injunction.  There is no unfairness in requiring the State of Texas to undertake these acts to provide sufficient notice of the injunction, given that it was the State of Texas itself that chose to delegate its public enforcement authority to the citizenry at large.

**<u>CONCLUSION</u>**

For these reasons, the Court should temporarily or preliminarily enjoin enforcement of S.B. 8.

Date: September 14, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

MICHAEL H. BAER
Counsel to the Acting Assistant Attorney
General, Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
Lisa Newman (TX Bar No. 24107878)
Kuntal Cholera
James R. Powers
Joshua M. Kolsky
Cody T. Knapp
Christopher D. Dodge
Olivia Hussey Scott
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that I conferred via email with counsel for the State of Texas regarding the relief requested in this application.  Counsel for the State indicated that the State is opposed to the requested relief.

*/s/ Lisa Newman*
Lisa Newman

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this filing was emailed to counsel for the State of Texas: Will Thompson, Beth Klusmann, and Natalie Thompson at the Office of the Attorney General.  I further certify that parties will also be served pursuant to Rule 5(b) of the Federal Rules of Civil Procedure.

*/s/ Lisa Newman*
Lisa Newman
