**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Civil No.  1:21-cv-796 |
| THE STATE OF TEXAS, | § | |
| | § | |
| Defendant. | § | |

# <u>EXHIBIT 1</u>

## Declaration of Allison Gilbert, M.D. in Support of Motion of United States of America for Temporary Restraining Oder and Preliminary Injunction

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:21-cv-796-RP |
| | ) | |
| THE STATE OF TEXAS, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF ALLISON GILBERT, M.D., IN SUPPORT OF THE MOTION OF THE UNITED STATES OF AMERICA FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

ALLISON GILBERT, M.D., declares under penalty of perjury that the following statements are true and correct:

1.      I am the Medical Director of Southwestern Women's Surgery Center ("Southwestern"), a licensed ambulatory surgical center in Dallas. I am also a Staff Physician at Southwestern.

2.      I submit this declaration in support of the United States of America's Motion for Temporary Restraining Order and Preliminary Injunction to prevent enforcement of Texas Senate Bill 8 ("S.B. 8"). The facts I state here and the opinions I offer are based on my education, training, and practical experience as an OB/GYN and an abortion provider; my expertise as a doctor and abortion provider; my personal knowledge; my review of Southwestern's business records and information obtained through the course of my duties at Southwestern; and my research and familiarity with relevant medical literature recognized as reliable in the medical profession.

**My Background**

3.      I am licensed to practice medicine in Texas, Alabama, and Massachusetts, and am board-certified in Obstetrics and Gynecology. I am a member of the American College of Obstetricians and Gynecologists ("ACOG"), the Society of Family Planning, the Texas Medical Association, and the Dallas County Medical Association. I provide the full spectrum of reproductive health care to women and pregnant people, including obstetric care for low-, medium-, and high-risk pregnancies, and am trained to provide abortion care up to 24 weeks as dated from the first day of the patient's last menstrual period ("LMP").

4.      I graduated from the University of Oklahoma College of Medicine with an M.D. in 2014. I completed my internship in obstetrics and gynecology in 2015 and my residency in obstetrics and gynecology in 2018, both at the University of Alabama at Birmingham. After residency, I completed a two-year fellowship in family planning at Brigham and Women's Hospital in Boston, Massachusetts. I also graduated from the Harvard T.H. Chan School of Public Health with a Master in Public Health degree in 2019. My *curriculum vitae*, which sets forth my experience and credentials, is attached as Exhibit 1.

5.      I began working at Southwestern in August of 2020, as a Staff Physician and as Co-Medical Director. As of September 1, 2021, I am a Staff Physician and Medical Director. I moved to Texas because I wanted to increase abortion access for underserved populations in the South.

6.      As Medical Director of Southwestern, I oversee Southwestern's policies and procedures, guided by evidence-based medicine, to ensure that we are following current and best practices. I also review patients' charts to make sure that Southwestern is following those procedures, and I review any patient complications in the rare circumstances in which they arise.

7.      In my role as Medical Director, I work closely with the OB/GYN program directors at several medical residency programs throughout the state to provide training in abortion care to

OB/GYN and family medicine residents during their clinical rotations at Southwestern. I occasionally teach residents from other in-state residency programs as well as medical students and fellows from out-of-state programs. Southwestern has a robust training program for residents, and I have personally worked with approximately twenty residents over the last year.

8.      In addition to my management responsibilities, I am also a full-time Staff Physician at Southwestern. As a Staff Physician, I provide a wide range of gynecological care to our patients, including but not limited to, abortion care, contraception, pregnancy testing, STI testing, and diagnosis of ectopic pregnancies. I spend approximately three days a week providing clinical care at Southwestern and an additional day doing administrative work at the clinic.

### Southwestern Women's Surgery Center

9.      Southwestern operates a licensed ambulatory surgical center in Dallas, Texas. Before S.B.8 took effect, the clinic provided medication abortion and procedural abortion care up to the legal limit in Texas, as well as miscarriage management and contraceptive services. Before S.B. 8 took effect, Southwestern provided medication abortion up to 10 weeks from the first day of a patient's last menstrual period ("LMP") and procedural abortions through 21 weeks and 6 days LMP.  Since September 1, 2021, Southwestern has provided only procedural abortions up until detection of a "fetal heartbeat" as defined under S.B. 8 and described below.

10.      In a typical year, prior to S.B. 8 taking effect, the clinic performed approximately 9,000 medication and procedural abortions, and I personally performed between 2,000 and 3,000 abortions at Southwestern over the last year.

11.      In a medication abortion, the patient takes two medications, mifepristone and misoprostol, that together cause a pregnancy termination in a process similar to a miscarriage. Since S.B. 8 took effect, the clinic has stopped providing medication abortions because of a concern that in the rare instance where the medication fails to complete the abortion, the clinic would be unable

3

to provide the medically appropriate procedure to complete the abortion. Medication abortion is thus not an option we feel we can provide patients in light of S.B. 8's restrictions, even though it is medically preferred for many patients.

12.     Procedural abortion is performed using gentle suction, sometimes along with the insertion of instruments through the vagina and cervix, to empty the patient's uterus. After approximately 18 weeks LMP (and in some instances after 16 weeks LMP), a procedural abortion may involve two separate appointments—along with an additional state-mandated counseling and ultrasound appointment[1]—to prepare the cervix for the abortion and then perform the procedure. Although sometimes known as "surgical abortion," abortion by procedure does not involve surgery in the traditional sense:  It does not require an incision into the patient's skin or a sterile field.

13.     The vast majority of abortion patients at Southwestern before S.B. 8 took effect were 6 or more weeks LMP. In 2020, Southwestern performed only 936 abortions for patients up to 5 weeks, 6 days LMP—only 10% of the 8,623 abortions the clinic provided in total that year.

**S.B. 8 Bans Abortion Before Viability**

14.     I have reviewed the provisions of S.B. 8, which bans abortion once a "fetal heartbeat" has been detected and establishes civil penalties for physicians who provide and others who aid or abet the provision of that care.[2] S.B. 8 defines "fetal heartbeat" as "cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac."[3]

15.     My understanding is that exceptions to S.B. 8 are very narrow. A physician could provide an abortion after a "fetal heartbeat" is detectable only if there is a medical emergency, which Texas law defines as "a life-threatening physical condition aggravated by, caused by, or arising from

---

[1] Tex. Health & Safety Code §§ 171.011-171.016.
[2] Tex. Health & Safety Code §§ 171.204, 171.208.
[3] Tex. Health & Safety Code § 171.201(a).

a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed."[4]

16.     S.B. 8's use of terminology is confusing and, in many cases, medically inaccurate. In the field of medicine, physicians measure pregnancy from the first day of a patient's last menstrual period ("LMP"). Fertilization of the egg typically occurs at two weeks LMP. Pregnancy begins one week later, at three weeks LMP, when the fertilized egg implants in the uterus and lasts until 40 weeks LMP. For the first nine weeks LMP, an embryo develops in the uterus. It is not until approximately 10 weeks LMP that clinicians recognize the embryo as a fetus.

17.     In a typically developing embryo, cells that form the basis for development of the heart later in gestation produce cardiac activity that can be detected with ultrasound. Detection of this cardiac activity with ultrasound happens very early in pregnancy at approximately 6 weeks, 0 days LMP, and sometimes sooner.[5] At this point in pregnancy, an ultrasound may reveal a fluid-filled sac—or gestational sac—within the uterus. An ultrasound at this early gestation may also show a dot within the gestational sac, which represents the developing embryo, and an electrical impulse that appears as a visual flicker within that dot. No fully developed heart is present at this time.

18.     As a result, S.B. 8 defines "fetal heartbeat" to include not just "heartbeat" in the medical sense, but also early electrical impulses present in the embryo before the full development of the cardiovascular system.

19.     Viability is medically impossible at 6 weeks LMP, the time at which early cardiac activity is generally detectable and at which S.B. 8 bans abortion. Viability is medically understood as the point when a fetus has a reasonable likelihood of sustained survival after birth, with or without

---

[4] Tex. Health & Safety Code §§ 171.204(a), 171.205(a), 171.002(3).
[5] I personally have observed cardiac activity as early as 5.4 weeks LMP.

artificial support. This is an individual medical determination that occurs much later in pregnancy—at approximately 24 weeks LMP—if at all.[6]

**S.B. 8 Bans Abortion Before Many Patients Know They Are Pregnant**

20.     Many patients do not know they are pregnant at 6 weeks LMP and thus seek abortion care only after cardiac activity is detectable. That is because the commonly known markers of pregnancy—a missed menstrual period and pregnancy symptoms—are not the same for all pregnant people.

21.     First, not every pregnant person can rely on a missed menstrual period to determine whether they are pregnant. In people with an average menstrual cycle (e.g., a period every 28 days), fertilization begins at 2 weeks LMP, and they miss their period at 4 weeks LMP. Many people do not experience average menstrual cycles, though. Some people have regular menstrual cycles but only experience periods every 6 to 8 weeks, or even further apart. Others do not know when they will experience their next period because they have irregular cycles, which are caused by a variety of factors, including polyps, fibroids, endometriosis, polycystic ovary syndrome, eating disorders, and other anatomical and hormonal reasons. Some people may have irregular menstrual cycles because they are taking contraceptives or are breastfeeding. As a result, many people may not suspect they are pregnant until much later than 4 weeks LMP.

22.     Second, many people will not exhibit the commonly known symptoms of pregnancy. For instance, people may have negative results from over-the-counter pregnancy tests even when pregnant because these tests often cannot detect a pregnancy at 4 weeks LMP or earlier. Additionally, symptoms such as nausea or fatigue differ for each pregnant person, and some people never experience those symptoms. Further complicating early detection of pregnancy, it is common

---

[6] Some embryos and fetuses are never viable, such as those in ectopic pregnancies and those with certain fetal diagnoses.

for pregnant people to experience light bleeding when the fertilized egg is implanted in the uterus and mistake that bleeding for a menstrual period.

23.     Most patients obtain an abortion as soon as they are able.  In fact, the vast majority of abortions in the United States and in Texas take place in the first 12 weeks of pregnancy. Still, most patients are at least 6 weeks LMP into their pregnancy when they make an abortion appointment.

24.     In Texas, physicians are required to perform an ultrasound on a patient before performing an abortion. Ultrasounds typically cannot detect a pregnancy until sometime between 4 and 5 weeks LMP; before that time, the gestational sac is simply too small for the ultrasound to detect.

25.     As a practical matter, S.B. 8 is a near total ban on abortion. It prohibits abortion care at the earliest moments that a pregnancy may be detected and often before a patient has any reason to suspect that they may be pregnant.

26.     Even under the best circumstances, if a Texan determines they are pregnant as soon as they miss their period, they would have roughly two weeks to decide whether to have an abortion, comply with state-mandated procedures for obtaining an abortion, resolve all financial and logistical challenges associated with abortion care in Texas, and obtain an abortion.

27.     As a result of S.B. 8, the many pregnant people who do not learn that they are pregnant until after 6 weeks LMP may never access abortion in Texas.

**S.B. 8 Is Devastating for Pregnant People in Texas.**

28.     Abortion is a common procedure. Approximately one in four women in this country will have an abortion by the age of forty-five.[7] Providers in Texas performed over 50,000 abortions

---

[7] Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1907 (2017).

last year,[8] and others in the state self-manage their abortions (*i.e.*, on their own without following a

physician's advice) using a range of methods that can include herbs and vitamins, birth control pills,

alcohol or drugs, and misoprostol obtained over the counter in Mexico.[9]

29.     Abortion is also one of the safest medical procedures.[10] Fewer than 1% of pregnant

people who obtain abortions experience a serious complication.[11] And even fewer abortion

patients—only approximately 0.3%—experience a complication that requires hospitalization.[12]

30.     Abortion is far safer than pregnancy and childbirth.[13] The risk of death from carrying

a pregnancy to term is approximately 14 times greater than the risk of death associated with

abortion.[14] In addition, complications such as blood transfusions, infection, and injury to other

organs are all more likely to occur with a full-term pregnancy than with an abortion.

31.     Pregnant patients have a multitude of reasons for seeking abortion care. For many,

maternal health concerns make abortion desirable and even necessary. Pregnancy, including an

uncomplicated pregnancy, significantly stresses the body, causes physiological and anatomical

changes, and affects every organ system. It can worsen underlying health conditions, such as

diabetes and hypertension. Some people develop additional health conditions simply because they

are pregnant—conditions such as gestational diabetes, gestational hypertension (including

---

[8] Tex. Health & Human Servs. Comm'n, ITOP Statistics, https://www.hhs.texas.gov/about-hhs/records-statistics/data-statistics/itop-statistics.

[9] *See* Liza Fuentes *et al.*, *Texas Women's Decisions and Experiences Regarding Self-Managed Abortion*, 20 BMC Women's Health 6 (2020).

[10] *See, e.g.*, Comm. on Reprod. Health Servs., Nat'l Acads. of Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 10, 59, 77-79, 162-63 & tbl. 5-1 (2018).

[11] Ushma Upadhyay, et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 175 (2015).

[12] *Id.*

[13] E.G. Raymond & D.A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215-19 (2012).

[14] *See id.* at 215.

preeclampsia), and hyperemesis gravidarum (severe nausea and vomiting). People whose pregnancies end in vaginal delivery may experience significant injury and trauma to the pelvic floor. Those who undergo a caesarean section (C-section) give birth through a major abdominal surgery that carries risks of infection, hemorrhage, and damage to internal organs.

32.     Many Texans seek abortion care due to family considerations. The majority of pregnant people who have abortions are already parents: sixty-one percent of pregnant patients who obtain abortions already have at least one child.[15] They do not desire—and, as described below, may not be able to afford or properly care for—another child.

33.     Many Texans obtain abortions because they are unable to meet their basic needs. Pregnant patients who seek abortion care are often low-income and below the federal poverty line. 14.7% of working Texans live in poverty, and 34.5% are low income.[16] This number is even higher for women of color; 19.1% of Black women and 20.5% of Latina women live in poverty in Texas.[17] These patients are in dire financial circumstances and often struggle to pay for needs like housing, food, and medical care.[18] As a result, these patients believe that obtaining an abortion is the best decision for themselves and for their families.

---

[15] Jenna Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Institute (2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.

[16] Every Texan, *Poverty in Texas: 4.1 Million Texans Live in Poverty*, https://everytexan.org/images/2019_Poverty_in_Texas.pdf; *see also Nat'l Women's L. Ctr., Poverty Rates State by State, 2018* (2019), https://nwlc.org/wp-content/uploads/2019/10/Poverty-Rates-State-by-State-2018.pdf.

[17] Nat'l Women's L. Ctr., *supra* at 16.

[18] United for ALICE TX, *ALICE in Texas: A Financial Hardship Study* (2020), https://www.unitedforalicetx.org/sites/unitedforalicetx.org/files/2020ALICEReport_TX_FINAL.pdf.

34.     Other patients seek abortions because having another child is not right for them and their families at the present time.[19] Sixty-six percent of abortion patients intend to have at least one child in the future.[20] Some Texans become pregnant when they are young or still in school and want to wait to have children later in life.[21] Some become pregnant with a partner with whom they do not wish to share a child.[22] Others may be managing their own unrelated health issues, such as substance abuse disorders, and may determine that having a child would not be the best choice for them in their current condition.[23]

35.     Some patients choose to have an abortion because their pregnancies are the result of rape, incest, or other intimate partner violence. For patients who have been abused, being pregnant often subjects them to increased surveillance and decreased control over their lives.[24] Being pregnant also may make it more likely that their abusers will perpetrate more physical violence against them.[25] Terminating the pregnancy may be critical for their physical health and psychological well-being.

36.     Still other Texans obtain abortions following a diagnosis of fetal anomalies, which can result in severe disabilities or be lethal for the fetus. These diagnoses are made later in pregnancy—well after 6 weeks LMP.  In fact, some genetic anomalies cannot be identified until closer to 18 to 20 weeks LMP.

---

[19] *See, e.g.,* Laura D. Lindberg et al., *Early Impacts of the COVID-19 Pandemic: Findings from the 2020 Guttmacher Survey of Reproductive Health Experiences*, Guttmacher Institute (2020), https://www. guttmacher. org/report/early-impacts-covid-19-pandemic-findings-2020-guttmacher-survey-reproductive-health.

[20] Nat'l Abortion Fed'n, *Women Who Have Abortions*, https://prochoice.org/wp-content/uploads/women_who_have_abortions.pdf.

[21] M. Antonia Biggs et al., *Understanding Why Women Seek Abortions in the US*, 13 BMC Women's Health 19 (2013).

[22] *Id.*

[23] *Id.*

[24] Sarah C.M. Roberts et al., *Risk of violence from the man involved in the pregnancy after receiving or being denied an abortion*, 12 BMC Medicine 144 (2014).

[25] *Id.*

37.     Even after patients learn that they are pregnant and decide they want an abortion, Texans already face multiple challenges when they seek abortion care, and these burdens make it exceedingly difficult to obtain abortions before 6 weeks LMP. Pregnant patients living less than 100 miles from an abortion provider must make two trips to the clinic to receive state-mandated counseling and an ultrasound during a first appointment and then an abortion procedure no less than 24 hours later during a second appointment.[26] No telehealth appointments are permitted, either for the state-mandated counseling[27] or for medication abortion.[28] Patients who are eighteen years old or younger also must obtain written parental authorization or a court order for an abortion.[29]

38.     These additional requirements—which are medically unnecessary—are particularly burdensome for pregnant patients who are seeking abortion care for any of the reasons described above. Patients must coordinate transportation to the clinic, childcare for their family, lodging if they live far from a clinic, and time off from work (which may not be paid). For patients traveling long distances to the clinic, avoiding possible exposure to COVID-19 brings additional challenges. Patients may drive instead of relying on public transportation, carry their own food and water to avoid public spaces, or make multiple trips instead of staying overnight. These logistical hurdles are doubled because of Texas' two-trip requirement. Further, for the many poor and low-income Texans, obtaining an abortion is impossible without financial assistance—hopefully from a supportive source like an abortion fund, but often from predatory lenders. These logistical and financial burdens undoubtedly delay pregnant people from obtaining abortions. And because many people may not know they are pregnant at 6 weeks LMP, these burdens make it so that even those

---

[26] Tex. Health & Safety Code Ann. §§ 171.011-171.016.

[27] *Id.*

[28] *Id.* § 171.063.

[29] *Id.* §§ 33.001-33.014.

patients who do know they are pregnant are unable to obtain abortion care at such an early point in pregnancy.

### S.B. 8 Has Been Devastating for Southwestern and Its Patients

39.     Southwestern has weathered short-term abortion bans in Texas before and barely survived. Last year, when Southwestern was shut down for approximately three weeks due to the COVID-19 executive order shutdown, the impact was severe. Repeatedly having to stop and restart services, as various court orders allowed us to reopen only to be shut down again hours later, created absolute chaos for our patients and staff. The COVID-19 shutdown took an immense emotional toll on our staff and drove our clinic to the financial brink. When the executive order was ultimately lifted, it took us months to work through the patient backlog. Even then, we were unable to see every patient who needed our services.

40.     S.B. 8 is like no other abortion restriction or abortion ban we have dealt with before. Seeing no other choice, Southwestern has been complying with S.B. 8 since it took effect on September 1. The immediate impact of S.B. 8 on our patients, staff, and physicians has been truly catastrophic.

41.     Our staff is plagued by fear and instability. I am one of only two physicians, out of the eight physicians that typically provide care at our clinic, who is currently providing abortions at Southwestern. While our other physicians are willing to provide S.B. 8-compliant abortions, we feel constrained to limit the potential liability of our physicians to lawsuits brought under S.B. 8 by having fewer physicians providing abortions. Bringing in additional providers also adds to the clinic's costs at a time when Southwestern confronts an unknown period of higher security costs and significantly reduced patient volume. Most of our staff remain seriously concerned that even providing abortions in compliance with S.B. 8 will draw lawsuits from anti-abortion vigilantes or others seeking financial gain under S.B. 8's bounty hunting scheme.

42.     The limited number of staff members who are willing to continue to work with S.B. 8 in effect find themselves scrambling to help as many patients as we can. Our staff are staying at the clinic later and later each night, until 9 p.m. sometimes, to serve every single patient we can while they are still eligible for care under S.B. 8. This situation is obviously not healthy or sustainable.

43.     Because Southwestern has a sister clinic in Albuquerque, New Mexico, our management also made the decision to temporarily send 13 of our staff members to Albuquerque, and pay for their housing there, to help serve the influx of patients from Texas. While these staff members agreed to be away from their families in Texas for a short amount of time, the arrangement is neither financially nor practically sustainable and is far from a solution to the problems posed by S.B. 8. If the law is not struck down soon, Southwestern's clinic in Dallas will inevitably close.

44.     Since September 1, 2021, we have seen a significant uptick both in protester activity and threatening calls to the clinic. The number of protesters camped outside our facility on a daily basis has doubled, including one protester who regularly stands outside the clinic in scrubs covered in fake blood, screaming at everyone who enters the clinic things like "no mommy, don't kill me." While we used to receive a threatening phone call every few weeks, we are now getting them nearly every day. Last week, a caller yelled at the staff member that answered the phone: "I'm going to tie up staff in chains and torture them! God protects these babies. I met him and I know he will torture you!" Another caller yelled at the staff: "Did you know Gov Greg Abbott is coming by tomorrow? You didn't know that? He is coming tomorrow, and he is going to shut y'all down, you bitch!" Other callers say things like "you know abortions are illegal in Texas, right?" Our staff are understandably scared to come to work every day.

45.     The impact of S.B. 8 on our patients has been devastating. Since September 1, we are only able to help a fraction of the patients we ordinarily would see and treat, as most patients who

13

come into our clinic are beyond the gestational limit imposed by S.B. 8. We are turning away patients in droves, and while some are able to travel to our sister clinic in Albuquerque or elsewhere, the majority are not. For example, there have been multiple undocumented patients who were ineligible for an abortion under S.B. 8, but who stated that traveling out of state was not an option for fear of being stopped by border patrol and deported. Another patient said she could not travel out of state because she could not tell her unsupportive family that she was having an abortion and "disappear for a few days" without an explanation.

46.     Patients are panicked, both for themselves and their loved ones. The second day the law took effect, I saw a patient for counseling who was eligible for an abortion under S.B. 8 but nonetheless broke down in tears because she was so scared that her sister, who was planning to drive her to the clinic the next day for her procedure, would be sued under S.B. 8 for aiding and abetting. Other patients are making appointments before they have received a positive pregnancy test, seeking unnecessary blood tests and procedures, for fear that if they are pregnant, they will be unable to access care. I saw another patient last week who has been taking the same contraception consistently for a decade and nonetheless found herself pregnant. She was only 5.4 weeks LMP but had detectible cardiac activity, so I had to turn her away.

47.     As stated above, our clinic has been forced to stop providing medication abortion to our patients while S.B. 8 is in effect. We are concerned that in the rare instance where the medication fails to complete the abortion, we would be unable to provide the medically appropriate procedure to complete the abortion. While medication abortion is medically preferred for many patients, it is not an option we feel we can provide in light of S.B. 8's restrictions. For example, I had two patients last week who are minors, who had never had a pelvic exam before, and who both preferred a medication abortion that I was unable to provide.

48.     Texas's pre-existing 24-hour waiting period, which has always been a substantial hurdle for patients, is also compounding the burden of S.B. 8 on patient care. Since September 1, about 1 out of every 15 of my patients have become ineligible for abortion care between their first and second appointments. These patients are devastated to learn that after two appointments at our facility, their only option for abortion care is to leave Texas, which not all can do. One patient, for example, showed cardiac activity when she arrived for her abortion and upon learning she was ineligible for an abortion, she broke down in tears. I talked to a colleague in Alabama who saw a patient last week from Dallas who drove ten hours to get to her, only to be forced to wait several days for her procedure due to Alabama's 48-hour waiting period.

49.     At the same time, because under S.B. 8 patients only have a very limited window of time after discovering they are pregnant to decide that they want an abortion, S.B. 8 is forcing some patients to make a decision about their abortion before they are truly ready to do so.

### S.B. 8 Is Devastating for Abortion Providers in Texas

50.     S.B. 8 is intended to take away my ability as a highly trained OB/GYN to provide the care to patients which I have been licensed by the State of Texas to provide. I moved to Texas because I am morally compelled to provide abortion care to patients in need. Not being able to do the job that I spent years being trained to do is personally devastating. I am deeply concerned about what S.B. 8 means for my chosen profession, for the certifications I worked so hard to obtain, and for my future as both a doctor and a Texan.

51.     The civil penalties and burdens of litigation threatened by this ban are severe and, as described above, have already prevented abortion providers from carrying out our medical and ethical duties.

52.     Because S.B. 8 allows almost anyone to sue me, Southwestern, and the staff who work with me, I continue to worry that just by coming to work, I risk exposure to multiple lawsuits

that will take time and emotional energy—and prevent me from providing the care my pregnant patients need. These lawsuits will also impose a heavy financial burden on me even if they are ultimately unsuccessful. I am already severely constrained in the care I am able to legally provide under S.B. 8, and continuing to comply with this cruel, unconstitutional law, is neither feasible nor sustainable for much longer.

53. If S.B. 8 remains in effect for many more weeks to come, Southwestern will be unable to keep its doors open and may never be able to reopen.

Dated: September 13, 2021

/s/ *Allison Gilbert*

Dr. Allison Gilbert

Exhibit 1

# ALLISON LYNNE GILBERT, MD, MPH

8616 Greenville Ave, Ste 101
Dallas, TX 75243
agilbert@southwesternwomens.com
(214) 742-9310 (p)
(214) 969-9468 (f)

---

**EDUCATION**

| | |
|---|---|
| July 2018-May 2019 | Master of Public Health<br>Harvard T.H. Chan School of Public Health<br>Boston, MA |
| Aug 2010-May 2014 | Doctor of Medicine<br>University of Oklahoma College of Medicine<br>Oklahoma City, OK |
| Aug 2006-May 2010 | Bachelor of Arts in Biology<br>Colorado College<br>Colorado Springs, CO |

---

**POST-DOCTORAL TRAINING**

| | |
|---|---|
| July 2018-June 2020 | Family Planning Fellowship<br>Division of Family Planning,<br>Department of Obstetrics, Gynecology and Reproductive Biology<br>Brigham and Women's Hospital<br>Boston, MA |
| June 2014-June 2018 | Obstetrics and Gynecology Residency<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |

---

**CLINICAL WORK EXPERIENCE**

| | |
|---|---|
| Sept 2021-Present | Medical Director & Staff Physician<br>Southwestern Women's Surgery Center<br>Dallas, TX |
| Aug 2020-Aug 2021 | Co-Medical Director & Staff Physician<br>Southwestern Women's Surgery Center<br>Dallas, TX |
| July 2018-June 2020 | Clinical Fellow<br>Department of Obstetrics, Gynecology and Reproductive Biology<br>Brigham and Women's Hospital<br>Boston, MA |
| July 2018-June 2020 | Physician (part-time)<br>Wellesley Women's Care<br>Newton Wellesley Hospital<br>Newton, MA |

---

**BOARD CERTIFICATION AND LICENSURE**

| | |
|---|---|
| 2020 | Advanced Cardiac Life Support (ACLS)/Basic Life Support (BLS) |
| 2020 | Texas Medical License, Active |
| 2020 | American Board of Obstetrics and Gynecology Certifying Examination, passed |
| 2018 | Massachusetts Medical License, Active |
| 2018 | American Board of Obstetrics and Gynecology Qualifying Examination, passed |
| 2015 | Alabama Medical License, Active |

**HONORS AND AWARDS**

| | |
|---|---|
| 2020 | Outstanding Medical Student Teaching<br>Department of Obstetrics, Gynecology and Reproductive Biology<br>Brigham and Women's Hospital<br>Harvard Medical School<br>Boston, MA |
| 2018 | Chairman's Award of Excellence<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2018 | Best Teaching Chief Resident<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2018 | Alpha Omega Alpha Honor Society<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2017, 2018 | The Society for Academic Specialists in General Obstetrics and Gynecology<br>Resident Award for Academic Excellence<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2015, 2018 | Resident Research Award<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2015, 2016 | Resident Teaching Award<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |

**RESEARCH INTERESTS**

| | |
|---|---|
| 2018-Present | Medication abortion management in the setting of pregnancy of unknown location |

**PUBLICATIONS**

Goldberg A, Hofer R, Cottrill A, Fulcher I, Fortin J, Dethier D, **Gilbert A,** Janiak E, Roncari D. Mifepristone and misoprostol abortion for undesired pregnancy of unknown location. NAF's 2021 Virtual Annual Meeting Oral Abstracts. Contraception. 2021; 103 (5): 373-375.

**Gilbert A,** Barbieri R. When providing contraceptive counseling to women with migraine headaches, how do you identify migraine with aura? OBG Manag. 2019 October; 31 (10): 10-12.

**Gilbert A**, Goepfert A, Mazzoni S.  Bixby Postpartum LARC Program. UAB Department of OBGYN Evidence-Based Guidelines: Protocols and Policies.  8 May 2017.

Becker D, Thomas E, **Gilbert A**, Boone J, Straughn JM, Huh W, Bevis K, Leath C, Alvarez R.  Improved outcomes with dose-dense paclitaxel-based neoadjuvant chemotherapy in advanced epithelial ovarian carcinoma.  Gynecologic Oncology. 2016 Jul; 142 (1): 25-29.

Van Arsdale A, Arend R, Mitchell C, **Gilbert A**, Leath C, Huang G. Evaluation of circulating neutrophils as a biomarker for outcomes in uterine carcinosarcoma. J Clin Oncol 34, 2016 (suppl; abstr e17121).

**POSTERS**

**Gilbert A,** Clay V, Wang M, Arbuckle J, Boozer M, Harper L. "You can't get pregnant:" Contraceptive counseling by non-gynecologic specialties.  Poster presented at: Society for Maternal Fetal Medicine Annual Clinical Meeting; Las Vegas, NV; Feb 2019.

Becker D, Thomas E, **Gilbert A**, Boone J, Straughn JM, Huh W, Bevis K, Leath C, Alvarez R.  Improved outcomes with dose-dense paclitaxel-based neoadjuvant chemotherapy in advanced epithelial ovarian carcinoma.  Poster presented at: Society of Gynecologic Oncology Annual Clinical Meeting; San Diego, CA; March 2016.

Bryant C, **Gilbert A**, Arnold K, Nightengale L.  Improving awareness and knowledge of advocacy and impacting outcomes in the local medical community.  Poster presented at: Doctors for America Leadership Conference; Washington, D.C.; March 2014.

**TEACHING AND PRESENTATIONS**

| | |
|---|---|
| 2021 | Family planning Jeopardy! Resident lecture given at: University of Oklahoma, Dept. Ob/Gyn, Oklahoma City, OK |
| 2021 | Providing abortions in a hostile state. Family Planning Division lecture given at: Brigham and Women's Hospital, Boston, MA |
| 2021 | Abortion complications and management. Resident lecture given at: University of Oklahoma, Dept. Ob/Gyn, Oklahoma City, OK |
| 2020 | Medical management of early pregnancy loss.  Grand Rounds given at: Newton Wellesley Hospital, Dept. Ob/Gyn, Newton, MA |
| 2020 | Contraception for those with medical co-morbidities. Resident lecture given at: Tufts Medical Center, Boston, MA |
| 2020 | Pregnancy options counseling and difficult patient cases. Medical student lecture given at: Harvard Medical School, Boston, MA |
| 2020 | Abnormal uterine bleeding. Medical student lecture given at: Harvard Medical School, Boston, MA |
| 2020 | Anticoagulation and abortion. Family Planning Division lecture given at: Brigham and Women's Hospital, Boston, MA |
| 2019 | Pregnancy options counseling and difficult patient cases. Resident lecture given at: University of Oklahoma, Oklahoma City, OK |
| 2019 | Introduction to OR Culture and Skills, Transitions to the PCE (PWY150). Medical student simulation given at: Harvard Medical School, Boston, MA |
| 2019 | Combination oral contraceptives: Troubleshooting "The Pill." Gynecology Division lecture (1500 Lecture) given at: Brigham and Women's Hospital, Boston, MA |
| 2019 | Gynecologic office practice.  Resident simulation given at: Brigham and Women's Hospital, Boston, MA |
| 2019 | Vasectomy and updates in male contraception.  Family Planning Division lecture given at: Brigham and Women's Hospital, Boston, MA |
| 2019 | Contraception in women with cardiovascular disease.  Cardiology Division lecture given at: Brigham and Women's Hospital, Boston, MA |
| 2019 | Combination oral contraceptives.  Resident lecture given at: Tufts Medical Center, Boston, MA |
| 2019 | Contraceptive technology.  Undergraduate lecture given at: Massachusetts Institute of Technology, Cambridge, MA |
| 2019 | Following declining human chorionic gonadotropin values in pregnancies of unknown location: When is it safe to stop?  Regional journal club given at: Planned Parenthood League of Massachusetts, Boston, MA |
| 2019 | Natural family planning methods.  Family Planning division lecture given at: Brigham and Women's Hospital, Boston, MA |
| 2019 | LARCs, papaya and post-abortion hemorrhage workshop.  Resident simulation given at: Brigham and Women's Hospital, Boston, MA |
| 2017 | Combination oral contraceptives.  Resident lecture given at: University of Alabama at Birmingham, Birmingham, AL |
| 2017 | Anticoagulation and abortion.  Family Planning Division lecture given at: University of North Carolina Chapel Hill, Chapel Hill, NC |
| 2016 | Secondary amenorrhea.  REI Division lecture given at: University of Alabama at Birmingham, Birmingham, AL |
| 2016 | Postoperative PCA management.  Resident lecture given at: University of Alabama at Birmingham, Birmingham, AL |

**LEADERSHIP**

| | |
|---|---|
| 2017-2018 | Administrative Chief of Education<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2016-2018 | Young Professionals Council<br>Planned Parenthood Southeast<br>Birmingham, AL |
| 2016-2018 | Resident Coordinator for Immediate Postpartum LARC Program<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2016-2017 | Resident Selection Committee Chair<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| 2015-2016 | Philanthropy Committee Co-Chair<br>Department of Obstetrics and Gynecology<br>University of Alabama at Birmingham<br>Birmingham, AL |
| | American College of Obstetrics and Gynecology |
| 2016-2017 | District VII Junior Fellow Secretary and Treasurer |
| 2015-2016 | District VII Junior Fellow Advocacy Chair |
| 2015-2016 | Alabama Section Junior Fellow Chair |
| 2014-2015 | Alabama Section Junior Fellow Vice Chair |

**PROFESSIONAL MEMBERSHIPS**

| | |
|---|---|
| 2021-Present | Dallas County Medical Association |
| 2021-Present | Texas Medical Association |
| 2018-Present | Society of Family Planning |
| | American College of Obstetricians and Gynecologists |
| 2021-Present | Fellow |
| 2012-2021 | Junior Fellow |