THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br>v.<br><br>THE STATE OF TEXAS,<br><br>                  Defendant. | §<br>§<br>§<br>§<br>§<br>§  Civil No.  1:21-cv-796<br>§<br>§<br>§<br>§ |

# EXHIBIT 4

## Declaration of Melaney A. Linton in Support of Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>THE STATE OF TEXAS,<br><br>    Defendant. | Civil Action No. 1:21-cv-00796-RP |

**DECLARATION OF MELANEY A. LINTON IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION**

I, Melaney A. Linton, declare as follows:

1. I am over the age of 18. I make this declaration based on personal knowledge of the matters stated herein and on information known or reasonably available to my organization. If called to do so, I am competent to testify as to the matters contained herein.

2. I am President and CEO of Planned Parenthood Gulf Coast, Inc. ("PPGC"). PPGC is a Texas not-for-profit corporation headquartered in Houston. We operate six health centers in the Houston Metropolitan area that provide a range of family planning services and other preventative care, including physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, screening and treatment for sexually transmitted infections, pregnancy testing and counseling, and certain procedures, including biopsies and colposcopies. In addition to those centers, PPGC has a facilities and services agreement with a separate organization, Planned Parenthood Center for Choice, Inc. ("PPCFC"), which has licenses

that allow it to provide abortion services at two health centers, and of which I am also the President and CEO. PPCFC is also a Texas not-for-profit corporation that is headquartered in Houston. It operates a licensed ambulatory surgical center ("ASC") in Houston and a licensed abortion facility in Stafford. PPCFC and its predecessor organizations have provided abortion in Houston and southeast Texas since 1973.

3. I am responsible for the management of these organizations and therefore am familiar with our operations and finances, including the services we provide and the communities we serve. In addition to PPGC, there are two other Planned Parenthood affiliates who provide health care services in Texas. Due to the nature of our affiliation with Planned Parenthood Federation of America, I am familiar with those affiliates' operations as well, although they are independent entities controlled by boards and management wholly separate from PPGC and PPCFC.

4. One of those affiliates, Planned Parenthood South Texas ("PPST"), is the parent corporation of Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), both not-for-profit corporations headquartered in San Antonio. PPST Surgical Center operates an ASC licensed by the Texas Health and Human Services Commission ("HHSC") and two HHSC-licensed abortion facilities—all of which are located in San Antonio. Prior to S.B. 8, PPST Surgical Center provided abortions, miscarriage management, and contraception at each of its three HHSC-licensed facilities to the degree permitted by state law.

5. The other affiliate is Planned Parenthood of Greater Texas ("PPGT"). PPGT is a Texas not-for-profit corporation headquartered in Dallas, and is the parent corporation to two separate entities that provide reproductive health care services throughout central, east, north, and west Texas. One of those entities, Planned Parenthood of Greater Texas Family Planning and

Preventative Health Services, provides a range of family planning and other health services at 18 health centers throughout its service areas. Those services include physical exams; contraception and contraceptive counseling; clinical breast exams; HIV testing; pre-exposure prophylaxis ("PrEP") and post-exposure prophylaxis ("PEP") HIV prevention; screening and prevention for cervical cancer; testing for certain sexually transmitted infections; pregnancy testing and counseling; gender-affirming hormone therapy; and certain procedures such as biopsies and colposcopies. The other entity, Planned Parenthood of Greater Texas Surgical Health Services ("PPGTSHS") provides abortion, miscarriage management, and contraception at ASCs licensed by HHSC in Austin, Dallas, and Fort Worth and HHSC-licensed abortion facilities in Waco, El Paso, and Lubbock, Texas.[1]

6. Taken together, these Planned Parenthood entities operate eleven of the approximately two dozen facilities licensed by HHSC as either abortion facilities or as ASCs that provide abortions in the state.

7. I submit this declaration in support of Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction. On September 1, 2021, Texas Senate Bill 8 ("S.B. 8" or the "Act") took effect and banned the provision of abortion in Texas after embryonic cardiac activity can be detected, which usually occurs by approximately 6 weeks of pregnancy—but can occur days sooner—as measured from the first day of a patient's last menstrual period ("LMP"). As a result, Texas abortion providers have been legally prohibited from providing abortions after

---

[1] Abortion services are temporarily unavailable in El Paso due to the COVID-19 pandemic, and are currently unavailable in Lubbock due to a City ordinance banning abortion that is subject to an ongoing legal challenge. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 2385110 (N.D. Tex. June 1, 2021) (dismissing case for lack of jurisdiction), *mot. for reconsideration filed* (June 29, 2021), ECF No. 52.

approximately 6 weeks of pregnancy since September 1, 2021, leaving the vast majority of people seeking abortion services without access to care at our health centers, or indeed anywhere in Texas.

8. The Act has made it virtually impossible to access abortion in Texas because it bans abortion at a point in pregnancy before many patients even realize they are pregnant. While some patients have been able to pull together the resources to travel out of state for medical care, many others cannot do so and are being forced to carry their pregnancy to term against their will or to seek ways to end their pregnancies on their own.

### Planned Parenthood Abortion Services in Texas

9. As noted above, prior to September 1, PPCFC, PPGTSHS, and PPST Surgical Center provided abortion, as well as miscarriage management and contraception, to patients in Texas.

10. Prior to S.B. 8 taking effect, PPCFC's Houston ASC offered medication abortion through 10 weeks LMP and procedural abortion through 21 weeks 6 days LMP; the Stafford abortion facility offered medication abortion through 10 weeks LMP. Prior to August 2021, PPCFC provided approximately between 400 and 500 abortions per month.

11. PPST Surgical Center offered medication abortion through 10 weeks LMP and procedural abortion through 15 weeks 6 days LMP. Prior to August 2021, PPST Surgical Center provided approximately between 200 and 300 abortions per month.

12. PPGTSHS's Austin health center is licensed as an ASC and offered medication abortion through 10 weeks LMP and procedural abortion through 21 weeks 6 days LMP; its Dallas health center is licensed as an ASC and offered medication abortion through 10 weeks LMP and procedural abortion through 18 weeks 6 days LMP; its Fort Worth health center is licensed as an

ASC and offered medication abortion through 10 weeks LMP and procedural abortion through 13 weeks 6 days LMP; and its Waco health center is licensed as an abortion facility and offered medication abortion through 10 weeks LMP and procedural abortion through 15 weeks 6 days LMP.

13. While most patients obtain an abortion as soon as they are able, most patients are nonetheless at least 6 weeks LMP into their pregnancy by the time they come in for an abortion. In 2019, approximately 92% of abortions that PPCFC provided were at 6 weeks LMP or later. This means only 8% of 2019 PPCFC patients would have likely qualified for an abortion under the Act, although for some, there may have been embryonic cardiac activity at the time of the abortion prior to six weeks. In 2019, PPGTSHS performed 6,984 abortions, and approximately 93.4% were performed at 6 weeks LMP or later. In 2019, approximately 90% of abortions PPST Surgical Center provided were done at 6 weeks LMP or later.

14. Patients likely reach us at or after 6 weeks LMP because they do not learn they are pregnant before that time. Even for someone with normal periods, 6 weeks LMP is only two weeks after a missed period, and many patients (including young people and those on birth control) do not have normal periods. And even after a patient learns that they are pregnant and decides they want to terminate the pregnancy, arranging an appointment for an abortion may take some time. Even assuming an appointment is available at a health center that is accessible to a patient, they need to come in for at least two visits (due to a different Texas law), and have to take time off work, arrange child care, and deal with other logistical issues that can result in some delay. For our patients living in poverty and/or without insurance, which is most, travel-related and financial barriers also help explain why the vast majority of our patients do not—and realistically could not—obtain abortions before 6 weeks LMP.

15. The near impossibility of obtaining an abortion within the time permitted by the Act is all the more clear for our minor patients. Minor patients without a history of pregnancy may be less likely to recognize early symptoms of pregnancy than older patients who have been pregnant before. In addition, some of these patients cannot obtain written parental authorization for an abortion as required by state law and must obtain a court order permitting them to receive care. Tex. Fam. Code §§ 33.001–33.014. A court may take up to five business days to rule on a patient's petition to bypass the state's parental-consent law for abortions, *id.* § 33.003, not including any time that may be necessary for a minor patient to appeal an unfavorable decision. That process cannot realistically happen before a patient's pregnancy reaches 6 weeks LMP.

### Effects of S.B. 8's Abortion Ban

16. Since S.B. 8 took effect on September 1, exactly what we feared would happen has come to pass.

17. S.B. 8 exposes PPCFC, PPGTSHS, and PPST Surgical Center, as well as their doctors, nurses, and other staff members, to substantial liability for providing or assisting an abortion prohibited by the law and requires courts to enjoin violations. The risk of civil liability, damages, and certain cost of litigation if a provider offers abortion in violation of S.B. 8 (as well as the possibility of a court order stopping the provider from providing abortions) means that none of the Planned Parenthood providers—and, to my knowledge, no other abortion provider in Texas—has offered services after embryonic cardiac activity is detected since September 1.

18. Given the strong anti-abortion sentiments held by some Texans and others outside of Texas, I am certain that lawsuits under S.B. 8 would be filed against us if we were to provide abortions in violation of S.B. 8. Indeed, opponents of abortion rights have subjected us to

harassment and false complaints in the past, even when we have complied fully with our legal obligations. We nearly always have protestors outside our health centers, monitoring who enters and exits the building. They have made complaints to government officials based on completely unfounded allegations. By way of example, a few years ago, a protestor called local law enforcement falsely alleging that we had performed an abortion after the state's legal gestational age limit, which at the time was 21 weeks and 6 days LMP (but is now around 6 weeks LMP under S.B. 8). Authorities then opened a criminal homicide investigation, which included grand jury proceedings. Although the investigation was ultimately completed with no findings of any wrongdoing (because, of course, we did not do what the protestor alleged we did), we nevertheless had to divert time and resources to comply with the baseless investigation.

19. As another example, after a secretly recorded video alleging that we participated in unlawful tissue donation practices appeared online, we were investigated by multiple federal, state, and local government officials. No government entity has found us guilty of any crime and the allegations have been widely discredited; in fact, a Houston grand jury cleared us, and instead, indicted the filmmakers (though those charges were dismissed on procedural grounds). Nevertheless, the resulting investigations were very distressing for staff and costly to the organization.

20. The costs of defending against what could be a flood of lawsuits in every county in Texas would be impossible for abortion providers to absorb, even if they were to win each case.

21. Because of the real possibility that PPST Surgical Center and its physicians and staff will be sued for providing *any* abortions, and be forced to defend against these meritless lawsuits, it has suspended all abortion services as of September 1.

22. Both PPCFC and PPGTSHS are offering abortion services in compliance with S.B. 8. That means that when a patient calls PPCFC, they are informed that if they are unsure of the date of their last menstrual period or if they believe they might have a gestational age of 6 weeks LMP or less, they can come in for an ultrasound appointment to date the pregnancy and check for embryonic cardiac activity. Under Texas law, most patients must come to the health center to receive a state-mandated ultrasound and information from the same physician who is to perform the abortion at least 24 hours before the procedure. Tex. Health & Safety Code § 171.012.

23. PPCFC call centers also inform patients that if there is embryonic cardiac activity, they will have to seek abortion out of state, and so if they think the pregnancy is greater than six weeks LMP, they may come in for an ultrasound to help them determine the gestational age of their pregnancy, but we will not be able to perform their abortion. Explaining the new law to people and the fact that it means we cannot provide them an abortion, and then helping them navigate a way to get out of state and get to another provider, means that calls with patients are taking twice as long as they used to. As a result, our hold times have increased significantly, which in turn makes it harder for us to reach and schedule those people who may still be eligible for an abortion but have a short window to get in for an appointment before they are banned.

24. Currently, for patients who do come in for an ultrasound appointment, the pregnancy is dated and we check for embryonic cardiac activity. If there is cardiac activity, the only option for that patient is to be referred out of state for the abortion, which we have had to do for the vast majority of patients. In the event that there is no embryonic cardiac activity, the patient is scheduled for a second appointment, which must be at least 24 hours later per Texas law.

25. From 9/1/21 to 9/10/21 PPCFC performed 123 ultrasounds at the patient's (day 1) ultrasound appointment (which, again, for most patients, must occur at least 24 hours before the abortion procedure per Texas law). We had 63 patients scheduled to have abortions from 9/2/21 to 9/11/21. But because some patients had embryonic cardiac activity by the time they returned, from 9/2/21 to 9/11/21, we were only able to perform abortions for 52 patients.

26. Overall, the number of patients that PPCFC has been able to provide abortions to has dropped dramatically. To put these numbers in perspective, before S.B. 8 took effect, we performed, on average, 25 abortions per day. And in the week before S.B. 8 took effect, from 8/25/21–8/31/21, we provided 205 abortions (of which 184 were for people who live in Texas).

27. Unfortunately, we have had to inform some patients at their second visit that they were barred under S.B. 8 from having an abortion. At their first visit, there was no embryonic cardiac activity on the ultrasound, but when they came back the next day after the state-mandated waiting period, there was embryonic cardiac activity and we were not able to provide the abortion. This means patients can lose their ability to access abortion in Texas literally overnight. As a result, our physicians have to caution patients that even though cardiac activity is not shown at the ultrasound appointment, it could occur on the day of the abortion, which causes patients significant stress.

28. Another patient was found to be about five weeks pregnant without embryonic cardiac activity, so she could have qualified for an abortion, but at the same visit, she also learned she had COVID-19. By the time she would finish the mandatory quarantine, she would be too far along in her pregnancy to get an abortion in Texas.

29. We have also had patients where embryonic cardiac activity was shown days earlier than 6 weeks LMP. It's difficult to explain to these patients that although this typically doesn't occur until 6 weeks LMP, their pregnancy is showing embryonic cardiac activity sooner and therefore they cannot have an abortion. These patients are incredibly frustrated because they feel like they did everything "right" under the law by trying to get to the abortion clinic as soon as possible, but they still are being blocked from having an abortion. As a result, our physicians explain to patients that S.B. 8 is effectively a near total ban on abortion.

30. As we anticipated, the law is having a particularly burdensome effect on minors who need a judicial bypass. We have already seen minors who do not show embryonic cardiac activity at their initial ultrasound appointment, but will inevitably show cardiac activity by the time that they come back for the abortion because it will take them days to get a judicial bypass. These patients are so desperate, and we are worried that they will do something unsafe because the only alternative for them to get an abortion is to go out of state, which is incredibly difficult for a minor to do on their own. It is also our experience that some minors seeking a judicial bypass do so because they cannot tell their parents about their pregnancy and abortion decision for fear of violence. We worry S.B. 8 will force them into a dangerous situation.

31. We have also had to turn away other patients in particularly distressing situations, including patients who are experiencing sexual assault and patients who are homeless.

32. Of course, none of this data captures the likely many patients who have seen the news and have learned about S.B. 8 becoming law and just do not call.

33. Obviously, this has been extremely hard on our patients who are trying to make personal, private decisions about their families and their lives, and who now must travel hundreds

(and perhaps thousands) of miles to access care that we would otherwise be able to provide safely and in their own communities. Even for those patients with the means to get out of state, travel will delay patients in obtaining care, which may push them into a later, more expensive abortion that carries greater risks.

34. For many, due to their incomes, their work and family situations, their immigration status, and other reasons, travel out of state is just not a feasible option and they are now left with nowhere to turn. We have already had a woman who came to one of our health centers reporting that because she had no money or resources, she said she had turned to the internet where she found some "abortion tea." She took it, and it didn't work. The ultrasound showed embryonic cardiac activity, and so we had to tell her that her only option was to try and travel out of state.

35. In addition to these devastating effects of S.B. 8 on our patients, the past 10 days have been nothing short of agonizing for our staff. No one should be forced to risk overwhelming costs of litigation and crushing penalties to provide safe and common health care. No one should be subject to state-directed harassment for caring for patients in need.

36. Abortion providers deal with relentless harassment from abortion opponents, including as they come into work each day, which has increased since S.B. 8 took effect. For example, Texas Right to Life ("TRTL") launched a "whistleblower" website to recruit S.B. 8 claimants, as well as "informants" to support S.B. 8 enforcement suits by providing information about abortion providers' and support networks' perceived violations. Though the website, which could previously be found at www.prolifewhistleblower.com, is currently down, TRTL has expressed its intention to quickly restore it.[2] The website stated that "[a]ny abortion performed in violation of

---

[2] BeLynn Hollers, *Texas Right to Life Says It Plans to Restart Abortion Whistleblower Webiste*, Dallas Morning News (Sept. 9, 2021), https://www.dallasnews.com/news/2021/09/09/texas-right-to-life-

11

the Texas Heartbeat Act is a criminal offense, and any individual or entity that aids or abets an abortion on a child with a detectable heartbeat in Texas is violating the law as well." It further provided that "[TRTL] will ensure that these lawbreakers are held accountable for their actions" and invited visitors to "[j]oin the Team of Pro-Lifers working to enforce" S.B. 8 and "[s]end an anonymous tip or information about potential violations" of the Act. Recruits who clicked on the button inviting them to become a "team member" by submitting contact information were asked: "How are you interested in enforcing the Texas Heartbeat Act?" with response options of "Litigating," "Plaintiff," "Data Collection," and "Other" and they were also asked to provide the "best time for a TRTL team member to call you to talk about enforcing" S.B. 8. Individuals who selected the option to send an anonymous tip were asked to provide "as much detail as possible" on "how [they thought] the law ha[d] been violated," as well as "how [they] obtain[ed] this evidence" and the "Clinic or Doctor this evidence relate[d] to."

37.   Our staff have also had to endure protestors trespassing; conducting drone surveillance; blocking roads, driveways, and entrances; yelling at staff and patients; using illegal sound amplification; video recording staff, staff vehicles, and license plates, as well as surreptitiously recording inside the health center; trying to follow staff home; and more. On the first day S.B. 8 went into effect, we had to call the police because a protestor was blocking the driveway with his vehicle. He came back the next day, and even had a porta-potty delivered. The next day, someone trespassed on the property and vandalized a few of our signs. We are also aware that someone created a forum on Reddit where numerous individuals posted discussions on how they could be bounty hunters under S.B. 8 and turn doctors into the police, which has since been taken down.

---

says-it-plans-to-restart-abortion-whistleblower-website-tomorrow/.

One of our physicians who has been in the news talking about the Texas law has personally received messages calling him a murderer and saying that he should be killed. As a result, we have had to expend more resources ensuring our health centers and staff and patients remain safe.

38. Despite the harassment, our dedicated staff return to work because they are committed to Planned Parenthood's mission of providing comprehensive reproductive health care services. They have devoted their lives and careers to serving and advocating for their patients. And now S.B. 8 has prevented them from fulfilling our mission. Our physicians will do anything, as long as it is safe and legal, to help patients get access to care. In fact, one of our providers at PPCFC is setting up an arrangement to provide services at a different provider in a neighboring state in order to try to help ease, to some degree, the situation there due to an influx of Texas patients. And given the shortage of abortion providers, it is not unusual for abortion providers to provide care at multiple locations, including in several states. I know that prior to S.B. 8, there was a physician who routinely flew from New England to San Antonio to provide care at PPST Surgical Center.

39. If we are not able to resume providing abortion services soon, I am worried about our ability to retain staff. Even before S.B. 8 took effect, the Act was already taking a negative toll on our ability to recruit new staff. PPCFC has already had two prospective staff members decline job offers specifically because of fear of S.B. 8.

40. In addition, both practically and emotionally, abortion providers and their staff are now barely hanging on due to S.B. 8. Our staff are doing all they can to help patients navigate this awful law, including working long hours to get patients in as quickly as possible for their appointments. They are doing their best to provide as many ultrasounds on a daily basis as they can in order to catch those few patients where cardiac activity will not be detected, but there are only so

many working hours in a day and our staff are still dedicated to providing high-quality care. This experience has also been traumatic for our physicians and staff as they must tell patient after patient that they cannot care for them, despite that, medically, they should be able to and, indeed, went through significant medical training to provide the very medical care that their patients are asking them to provide and are entitled to receive. They are essentially being forced to inflict trauma on their patients.

41. Every day that S.B. 8 is in effect, our patients are in jeopardy. Draconian laws like S.B. 8 do not stop people from needing abortions, and they don't stop abortions from happening—by eliminating safe and legal options, they only force abortion care underground with potentially devastating consequences. This cruel and dangerous law is causing irreparable harm to our patients and the communities we serve.

42. In short, both for the abortion providers in Texas and tens of thousands of patients who are being denied access to critical health care and whose health, safety, and lives are in jeopardy, it is critical that the court grants the relief sought by the U.S. Government in order to restore our patients' access to safe, legal abortion as soon as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 13, 2021

*/s/ Melaney A. Linton*

Melaney A. Linton