**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>§<br>§<br>§</td><td></td></tr>
<tr><td style="text-align:center">Plaintiff,</td><td>§<br>§</td><td></td></tr>
<tr><td>v.</td><td>§<br>§</td><td>Civil No.  1:21-cv-796</td></tr>
<tr><td>THE STATE OF TEXAS,</td><td>§<br>§</td><td></td></tr>
<tr><td style="text-align:center">Defendant.</td><td>§<br>§</td><td></td></tr>
</table>

# <u>EXHIBIT 8</u>

**Declaration of Joshua Yap, M.D., MPH, in Support of Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

      v.

THE STATE OF TEXAS,

               Defendant.

Civil Action No. 1:21-cv-00796-RP

**DECLARATION OF JOSHUA YAP, M.D., MPH, AAHIVS IN SUPPORT OF
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION**

I, Joshua Yap, M.D., MPH, AAHIVS, declare as follows:

      1.      I am over the age of 18 and competent to testify as to the matters contained herein. I make this declaration based on personal knowledge of the matters stated herein and on information known or reasonably available to me.

      2.      I am a board-certified Family Medicine physician and am licensed to practice medicine in Oklahoma, Kansas, Arkansas, Missouri, California, and Tennessee. I graduated from medical school at Loma Linda University School of Medicine in 2015. I completed my internship and dual residency in Family Medicine and Preventive Medicine at Montefiore Medical Center and Albert Einstein College of Medicine in 2019. I obtained my Master of Public Health degree in 2019 from the City University of New York School of Public Health. I obtained training in abortion care during my dual residency at Montefiore Medical Center and Albert Einstein College of Medicine, as well as during an extended training in abortion care in Illinois and in Texas.

3.      I am employed by and provide health care services at Planned Parenthood of Arkansas & Eastern Oklahoma ("PPAEO")'s Tulsa, Oklahoma health center. I also provide health care services on a regular basis at Comprehensive Health of Planned Parenthood Great Plains, Inc. ("CHPPGP")'s Oklahoma City health center.

4.      I understand that Texas Senate Bill 8 ("S.B. 8" or the "Act") bans the provision of abortion in Texas after embryonic cardiac activity can be detected, which, based on my clinical experience and training, occurs by approximately 6 weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("LMP").

5.      Since S.B. 8 took effect on September 1, 2021, I have witnessed the devastating effect S.B. 8 has had on Texans and their ability to exercise their constitutional right to choose abortion.  I have treated numerous individuals who reside in Texas and who have been forced to travel to Oklahoma to terminate their pregnancies. The surge of Texans that we have provided abortions to in our Oklahoma health centers since September 1 is unprecedented, and the demand only continues to grow. Indeed, as I explain further below, this is causing our schedules to become very backlogged and I fear that we will not be able to continue to serve our existing patient population in Oklahoma in a timely manner given the overflow of patients coming from Texas. I believe this will force many patients to have abortions later in pregnancy, pressure patients from communities in Oklahoma to scramble to seek care in other states farther away, influence some patients to attempt to terminate their pregnancies outside the medical system altogether in unsafe ways, or result in people carrying unwanted pregnancies to term.

6.      I submit this declaration in support of Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction.

**Planned Parenthood's Provision of Abortion Services in Oklahoma**

7.      PPAEO's and CHPPGP's Oklahoma health centers provide a broad range of sexual and reproductive health care and education services, including abortion care, contraception care and counseling, pregnancy testing and prenatal referrals, testing and treatment for sexually transmitted infections, PrEP, PEP, clinical breast exams, breast and cervical cancer screenings, colposcopies and biopsies, condyloma treatment, and gender-affirming hormone therapy and hormone replacement therapy.

8.      We have provided abortions in Oklahoma to over 1,300 patients already this calendar year. We provide procedural abortion care[1] for patients up through approximately 17 weeks gestational age as measured from a patient's LMP and medication abortion up through 77 days gestational age.

9.      I am the only abortion provider at our Tulsa health center. Although we aim to staff our Oklahoma City health center with other physicians, including out-of-state doctors who each travel to Oklahoma to provide care a few days per month, so that I can focus on providing care in Tulsa, I still occasionally travel to Oklahoma City to provide abortions there when no other provider can.

10.     Patients seek abortion care for a variety of reasons, including, for example, being unable to divert time, financial resources, or caretaking resources away from existing children or other family members; being unable to absorb the additional financial burden; having become pregnant as the result of rape; having an abusive partner; being unable to take time away from their educational or career paths; being in the military and on the cusp of deployment; and medical

---

[1] This is also sometimes referred to as "surgical abortion," though it does not involve making any incisions.

3

reasons, including, for example, a fetal diagnosis, a history of previous high risk pregnancies, or a cancer diagnosis that requires choosing between effective treatment and pregnancy.

11.     People seeking abortions already have a difficult time accessing abortion care. Nationwide, the majority of abortion patients live near or below the federal poverty line and many more are low-income.[2] As a result, many have difficulty obtaining the funds for an abortion, obtaining transportation to a health center (particularly as Oklahoma has virtually no public transportation outside the major cities), being able to get and afford to take a day off from work, and finding childcare for existing children. All of these logistics need to be arranged before a patient can obtain an abortion and that all takes time. Moreover, the State of Oklahoma imposes a 72-hour waiting period before anyone can obtain an abortion. These obstacles that patients need to overcome to access an abortion can be significantly worse for people who must travel long distances and cross state lines to access an abortion.

12.     Abortion is a time sensitive medical procedure. Delays can result in patients being pushed past the point when they can obtain a medication abortion, even if that would be the preferable method for that patient. Delays can also push patients beyond the point by which they can obtain abortion care at all in Oklahoma.

### Impact of S.B. 8

13.     As I mention above, since S.B. 8 took effect, we are seeing a surge of Texas patients seeking abortion care in Oklahoma. Pregnant people from Texas are scared and are frantically trying to get appointments. They are doing everything they can to get to a state that will allow them to terminate their pregnancies.

---

[2] Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008–2014*, 107 Am. J. Pub. Health 1904, 1906 (2017).

14.     Since S.B. 8 took effect twelve days ago, I was the sole provider at our Tulsa and Oklahoma City health centers from 9/1/21 to 9/12/21 and treated 69 patients who reside in Texas. In the days leading up to S.B. 8's effective date, I also treated many patients from Texas who had heard about the law in the news and were already scared about what it meant for them. To put this data in context, while we have always provided abortions in Oklahoma to patients who live in other states, including Texas, in the first six months of 2021 we treated a total of 175 Texas residents. That means that we saw 40% of the total number of patients from Texas that we would normally see in six months in just twelve days. And since S.B. 8 took effect, we have seen an overall staggering 646% increase of Texan patients per day compared to the first six months of the year.

15.     Currently, people who are traveling from Texas to get an abortion in Oklahoma are taking up at least 50% (and on some days nearly 75%) of the appointments we have available at our Oklahoma health centers. For example, on Saturday, September 10, I provided abortions at our Tulsa health center and of the 28 patients that received abortions, 17 were from Texas. The day before when I provided abortions in Oklahoma City, of the 30 patients who received abortions, 23 of those patients were from Texas.

16.     We expect this trend to only worsen over the coming weeks. Indeed, there are over 240 Texans that have made appointments to have abortions at our Oklahoma health centers this week and next week. Specifically, for the week of September 13, there are 101 people scheduled to have abortions at our Tulsa health center, of which 52 are from Texas. And at our Oklahoma City health center, there are 219 people scheduled to have abortions, of which 137 are people who live in Texas.

17.     We are doing everything we can to accommodate this surge from Texas, but our schedule is still becoming backlogged, and it is resulting in our patients experiencing even longer delays than usual. We are currently scheduling for initial abortion consult appointments out into late September and early October, after which (per Oklahoma's mandatory delay law) patients still have to wait at least 72 hours before they can get an abortion.

18.     We have already had one woman from Texas who made an appointment to have an abortion in Oklahoma but by the time she was scheduled, completed the consult appointment, and made it in for the abortion appointment, we learned she was past the gestational age limit by which we could provide an abortion at our clinic. We regrettably had to refer that Texas patient to a health center hours away in Colorado. We have had at least two patients from Texas make appointments to have a medication abortion but after they had traveled to our Tulsa health center, we determined that they were ineligible for a medication abortion and had to be rescheduled for another day to get a procedural abortion. This meant they had to travel back to Texas, and then make *another* round trip from Texas to Oklahoma—traveling hundreds of miles to get an abortion. We had to reschedule one of these patients for one week later because—due to her work schedule—the only day she could make the long trip to Oklahoma was the following Saturday. This is a concern we have heard from other Texas patients, too. Our schedule was already booked but we made an exception because otherwise this patient would have had to wait two weeks, forcing her to have a more expensive procedure, which she said she could not afford.

19.     While historically (before S.B. 8 took effect) the patients we treated from Texas tended to live near the border, we are now seeing patients in Oklahoma who are traveling from all across Texas. I treated one patient, for example, who got in her car at midnight in Texas so that she

could drive through the night and make it to Oklahoma in the morning for her abortion appointment, and then she had to turn around the same day to travel back to Texas. Another patient traveled six hours (one way) to get to Oklahoma and said she drove alone because she was worried about asking someone to accompany her in case they could get in trouble under S.B. 8.

20.     Just since S.B. 8 took effect, I have treated patients who have traveled from as far as Austin, Houston, Round Rock and San Antonio, which means patients are traveling anywhere from 5 to 8 hours (one way) to get to our health centers in Tulsa or Oklahoma City. I have also treated patients coming from cities in Texas that are closer, like Dallas-Fort Worth, Paris, and Wichita Falls, but even these patients had to make 2- to 4-hour trips (one way) to get to our Oklahoma health centers. While almost all of the Texas patients we have seen have traveled by car or bus, I can think of at least one patient who got a last minute ticket to come by plane, and returned back to Texas the same day.

21.     I also treated a patient from Texas who found someone to give her a ride to Tulsa, Oklahoma for her appointment, but the trip took longer than expected and they arrived too late for her to get an abortion that day. We managed to accommodate her on the Oklahoma City schedule for the next day, but she had to scramble to find a hotel in Oklahoma for the night and get assistance to be able to pay for the hotel. Unfortunately, her ride could not spend the night in Oklahoma so she had to also find help to get to Oklahoma City from Tulsa, and then we had to help her with a bus ticket to get back to Texas. There was only one bus that she could take, so we had to get her in and out of the abortion clinic with enough time to make it to the bus station. This is just one example of the numerous obstacles patients have to overcome when they are forced to travel long distances and across state lines to get an abortion. And while we are going to extraordinary

measures to accommodate patients due to S.B. 8, this is not a sustainable way to operate our health centers.

22.     One of the most heart-wrenching cases I have seen recently was of a Texas minor who had been raped by a family member and traveled (accompanied by her guardian) all the way from Galveston, Texas—a 7- to 8-hour drive, one way—to get her abortion in Oklahoma because she was more than six weeks pregnant and could not get an abortion in Texas. And this patient is not the only sexual assault survivor from Texas that I have treated recently.

23.     I provided an abortion to another woman from Texas who had been raped and could not get an abortion in Texas because of S.B. 8. She was upset and furious that she could not get an abortion close to home and in her own state. She had to figure out how to take extra time off from work to make the trip to Oklahoma, as well as find childcare for her children. I know of at least one other patient from Texas on our schedule for this upcoming week who has indicated that their pregnancy was a result of sexual assault. Several patients from Texas have commented that they can't believe their state would ban abortion, and that they are so disappointed in their home state of Texas.

24.     Because our schedules in Oklahoma are quickly filling up, we have also begun telling people that they can travel to our health centers in Kansas, or even Arkansas, to get an appointment sooner. Although that is an even farther drive for some patients from Texas, we have seen a few patients from Texas at those health centers and even more are making appointments for the coming weeks.

25.     The high level of frustration and trauma that these Texas patients are experiencing is also taking a physical and emotional toll on our staff, who are helping them manage this horrible

situation. Our staff are working to their best of ability to try to deal with the influx of patients, but they are growing tired and stressed and need to take breaks because it is traumatic for them too.

26.     I have devoted my career to providing high-quality sexual and reproductive health care. What I have seen unfold since S.B. 8 took effect has been absolutely devastating. The patients that are able to make it to Oklahoma to get their abortion are having to make substantial sacrifices and overcome numerous obstacles, including struggling to come up with the funds to make the trip to Oklahoma. They are also scared that someone may find out that they had an abortion when they go back home to Texas and are unsure of what could happen to them under S.B. 8. Those patients who are seeking abortions in the context of intimate partner violence or other family violence are risking more than they already do in order to travel out of state to end their unwanted pregnancies. People are also worried about having to travel long distances in the middle of a pandemic and what that could mean for the health and safety of themselves and their families. And I too fear that this increased travel puts myself, our staff, and our patients at greater risk of contracting COVID-19.

27.     I also know that we are seeing only a fraction of the people in Texas who are seeking to have an abortion, with some finding care in other states and others who simply cannot travel out of state or are afraid to do so. I fear that many people, especially those with the fewest resources, will not be able to obtain safe abortion care at all and will either seek to terminate their pregnancies themselves outside the medical system, or be forced to carry unwanted pregnancies to term.

28.     Abortion is one of the safest medical procedures, but by forcing patients to travel long distances and likely delay their procedures, Texas is endangering its citizens. Not only is there no medical basis for this ban, but it is already inflicting serious hardship and trauma on patients who are making very personal decisions that are right for them and their families.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 13, 2021

/s/ Joshua Yap

Joshua Yap, M.D., MPH, AAHIVS