# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
| ) | |
| Plaintiff,     ) | |
| ) | Civil No. 1:21-cv-796-RP |
| v.     ) | |
| ) | |
| THE STATE OF TEXAS,     ) | |
| ) | |
| Defendant.     ) | |

**[PROPOSED] *AMICI CURIAE* BRIEF OF MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, WISCONSIN, AND THE ATTORNEY GENERAL OF NORTH CAROLINA IN SUPPORT OF PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MAURA HEALEY
*Attorney General of Massachusetts*

Elizabeth N. Dewar+
*State Solicitor*
Abigail B. Taylor+
*Chief, Civil Rights Division*
Amanda Hainsworth*
*Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
Telephone: (617) 963-2618
Fax: (617) 727-5762
Email: amanda.hainsworth@mass.gov

*pro hac vice* application pending
+pro hac vice* applications forthcoming

Dated: September 15, 2021

*(Additional counsel are listed on signature page)*

**TABLE OF CONTENTS**

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ..................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................................ 3

ARGUMENT .......................................................................................................................... 5

    I.    This Court Must Not Permit Texas to Flout Precedent With Its Unconstitutional Abortion Ban........................................................................................................................ 5

        A.   S.B. 8 is designed to accomplish exactly what the Constitution forbids a state from doing. ........................................................................................................................... 6

        B.   Texas's private enforcement mechanism does not shield such brazen disrespect for the Constitution from judicial review. .............................................................................. 8

    II.   Immediate Injunctive Relief Is Essential to Stanch the Irreparable Harms Being Inflicted by Texas's Unconstitutional Ban. ........................................................................ 14

CONCLUSION ..................................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Brentwood Acad. v. Tenn. Secondary Sch. Athl. Ass'n*, 531 U.S. 288 (2001) ................... 11

*Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1953) ............................................... 12, 13

*Bush v. Orleans Parish Sch. Bd.*, 188 F. Supp. 916 (E.D. La. 1960),
    *aff'd, Orleans Parish Sch. Bd. v. Bush*, 365 U.S. 569 (1961) ..................................... 12

*Bush v. Orleans Parish Sch. Bd.*, 191 F. Supp. 871 (E.D. La. 1961),
    *aff'd, Louisiana v. United States*, 367 U.S. 908 (1961) ............................................. 12

*Cooper v. Aaron*, 358 U.S. 1 (1958) ....................................................................... 4, 12, 13

*Dep't of Conservation and Dev. v. Tate*, 231 F.2d 615 (1956) ......................................... 13

*Derrington v. Plummer*, 240 F.2d 922 (5th Cir. 1956) ..................................................... 12

*Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991) ........................................ 9

*Ex Parte Virginia*, 100 U.S. 339 (1880) .............................................................................. 9

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .................................................................... 3, 6

*Hall v. Garson*, 430 F.2d 430 (5th Cir. 1970) ................................................................... 10

*Hamm v. Va. State Bd. of Elections*, 230 F. Supp. 156 (E.D. Va. 1964),
    *aff'd, Tancil v. Woolls*, 379 U.S. 19 (1964) ........................................................... 12

*Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir. 1996) ............................... 18

*Isaacson v. Horne*, 716 F.3d 1213 (9th Cir. 2013) ............................................................. 4

*Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019),
    *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021) ......................... 4

*Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246 (5th Cir. 2020) ..................... 3, 6, 7

*Jane L. v. Bangerter,* 102 F.3d 1112 (10th Cir. 1996) ........................................................ 4

*June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103 (2020) ................................................ 3, 6

*Loving v. Virginia*, 388 U.S. 1 (1967) ............................................................................... 12

ii

*MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015) ........................................... 4

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ............................... *passim*

*Roe v. Wade*, 410 U.S. 113 (1973) ............................................................................ *passim*

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ...................... 14, 17

*Romer v. Evans*, 517 U.S. 620 (1996) ................................................................................ 12

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ............................................................... 5, 9, 10, 12

*Smith v. Texas*, 311 U.S. 128 (1940) ................................................................................. 13

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...................................................................... 3, 6

*Terry v. Adams*, 345 U.S. 461 (1953) ................................................................................. 6

*Turner v. City of Memphis*, 369 U.S. 350 (1962) ............................................................. 12

*United States v. Classic*, 313 U.S. 299 (1941) ................................................................. 10

*United States v. Peters*, 9 U.S. 115 (1809) ...................................................................... 13

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ................................... 3, 6, 7

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................................ 12

**Constitutional Provisions and Statutes**

Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021)

§ 30.022 ............................................................................................................. 8

§ 171.208(a)(2) ............................................................................................... 1, 17

§ 171.208(b) ....................................................................................................... 9

§ 171.208(b)(2) .......................................................................................... 1, 16, 17

§ 171.208(b)(3) ................................................................................................. 16

§ 171.208(e)(3) ................................................................................................... 8

§ 171.208(e)(5) ................................................................................................... 7

§ 171.208(e)(7) ............................................................................7

§ 171.208(i)...............................................................................16

§ 171.209(d)(2) .......................................................................7, 9

§ 171.212(e) .................................................................................9

**Miscellaneous**

Emma Batha, *U.S. States Making 2021 Moves on Abortion Rights and Access*,
   Thomson Reuters Found. News (Sept. 1, 2021), https://tinyurl.com/rsk3r4mt..........18

Neelam Bohra, *Texas Law Banning Abortion as Early as Six Weeks
   Goes into Effect as the U.S. Supreme Court Takes No Action*,
   Texas Tribune (Aug. 31, 2021), https://tinyurl.com/5dzwtsjh..............................14, 16

Declaration of Polin C. Barraza, *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .............................................................15

Declaration of Andrea Ferrigno, *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .............................................................14

Declaration of Allison Gilbert, M.D., *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .......................................................14, 15

Declaration of Jessica Klier, *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .............................................................14

Declaration of Bhavik Kumar, M.D., M.P.H., *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .......................................................14, 15

Declaration of Ken Lambrecht, *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .............................................................15

Declaration of Melaney A. Linton,  *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .............................................................15

Declaration of Amy Hagstrom Miller, *Whole Woman's Health v. Jackson*,
   No. 1:21-cv-00616-RP (filed July 13, 2021) .............................................................15

Adam Edelman, *New Mexico Braces for Influx After Supreme Court
   Allows Texas Abortion Restrictions* (Sept. 3, 2021), NBC News,
   https://tinyurl.com/srhh7ct5 ........................................................................................2

Diana Greene Foster, et al., *Socioeconomic Outcomes of Women Who Receive
and Women Who are Denied Wanted Abortions in the United States,*
Am. J. Pub. Health 108, no. 3 (2018), https://tinyurl.com/yeawzmpf ........................15

Caitlin Gerdts, et al., *Side Effects, Physical Health Consequences, and
Mortality Associated with Abortion and Birth after an Unwanted Pregnancy,*
Women's Health Issues 26-1, 57-58 (2016), https://tinyurl.com/56e3pb9d ...............15

Rachel Benson Gold, *Lessons from Before Roe: Will Past Be Prologue?,*
The Guttmacher Institute Report on Public Policy (March 2003),
https://tinyurl.com/yw7r2kev .......................................................................... 18

Julia Goldberg, *NM Abortion Providers See Surge from Texas,*
Santa Fe Reporter (Sept. 8, 2021), https://tinyurl.com/3shcfvpc ...................................2

Daniel Grossman et al., *Self-Induction of Abortion Among Women
in the United States,* 18(36) Reprod. Health Matters 136 (2010),
https://tinyurl.com/5atnu3f..........................................................................................15

Soumya Karlamangla, *What the Texas Abortion Law Means for California,*
New York Times (Sept. 9, 2021), https://tinyurl.com/7d38umu3 ...............................2

Meryl Kornfield, et al., *Texas Created a Blueprint for Abortion Restrictions.
Republican-Controlled States May Follow Suit,*
Washington Post (Sept. 3, 2021), https://tinyurl.com/4wh4y577 .............................. 18

Meryl Kornfield, *A Website for 'Whistleblowers' to Expose Texas Abortion Providers
was Taken Down—Again,* Washington Post (Sept. 6, 2021),
https://tinyurl.com/37crxb34..........................................................................................16

Angie Leventis Lourgos, *Texas Abortion Law: Here are 4 Things to
Know About How It Might Affect Illinois,* Chicago Tribune (Sept. 2, 2021),
https://tinyurl.com/4rxs7aaa............................................................................................2

Shefali Luthra, *After the Texas Abortion Ban, Clinics in Nearby States
Brace for Demand,* The Guardian (Sept. 2, 2021), https://tinyurl.com/phnjfbbu....... 2

Jolie McCullough and Neelam Bohra, *As Texans Fill Up Abortion
Clinics in Other States, Low-Income People Get Left Behind,*
Texas Tribune (Sept. 3, 2021), https://tinyurl.com/ud8c3u8 ................................. 2, 17

Shannon Najmabadi, *Colorado Abortion Providers Are Preparing for an
Influx of Patients from Texas,* Colorado Sun (Sept. 3, 2021),
https://tinyurl.com/2sssuvrc...........................................................................................2

Sarah C.M. Roberts, et al., *Risk of violence from the man involved in the pregnancy after receiving or being denied an abortion*, BMC Medicine (2014), https://tinyurl.com/36jm874n ...................................................................................15

Iris Samuels, *New Texas Abortion Law Pushes Women to Out-of-State Clinics*, Bloomberg (Sept. 2, 2021), https://tinyurl.com/2zahksas...........................................17

Humberto Sanchez, *More Texans Could Seek Abortions in Nevada Following New Texas Six-Week Ban,* Nevada Independent (Sept. 2, 2021), https://tinyurl.com/njjz69bf.............................................................................................2

Texas Right to Life, prolifewhistleblower.com (last visited Sept. 3, 2021) ......................16

Esther Wang, *Here's What Happens When Texas's Extreme Abortion Ban Goes into Effe*ct, The New Republic (Aug. 31, 2021), https://tinyurl.com/4a828e7z .........16

Kari White, et al., Tex. Pol'y Evaluation Project, Research Brief, *Texas Senate Bill 8: Medical and Legal Implications* 2 (July 2021), https://tinyurl.com/4pc5rzhs .................................................................................... 17

Whole Woman's Health Facebook Page (Sept, 2, 2021), https://tinyurl.com/33sz9a6z................................................................................16

Becky Willeke, *Texas Abortion Ban Has Patients Calling Illinois Clinics,* Fox 2 Now St. Louis, (Sept. 1, 2021), https://tinyurl.com/tpkr66a3 ............................2

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

The Supreme Court has long recognized that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992). But in direct contravention of nearly a half century of Supreme Court precedent, Texas has banned nearly all pre-viability abortions within its borders. Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021) ("S.B. 8"). Texas has also paired its lawless abortion ban with a sweeping prohibition on "aiding or abetting" any abortion that violates S.B. 8—regardless of whether a person knows that a particular abortion would violate the law. S.B. 8, § 171.208(a)(2). And in an effort to evade federal court review of this plainly unconstitutional law, S.B. 8 vests direct enforcement authority in private individuals rather than state executive officials, offering people with no connection whatsoever to any particular abortion a $10,000 minimum bounty per abortion. S.B. 8, § 171.208(b)(2).

*Amici* States Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and the Attorney General of North Carolina Joshua H. Stein are committed to ensuring the safety of residents of our States who must seek medical care in Texas while present as students, workers, or visitors. We likewise have an interest in safeguarding the ability of clinicians in our States to provide abortion services in other States when they are licensed and otherwise qualified to do so. And we also have an interest in ensuring that each State abides by its constitutional obligation not to prohibit access to otherwise lawful and safe abortion care, because any substantial reduction in the availability of abortion services in one State can cause

1

people to seek services in other States, thereby potentially burdening their health care systems

and limiting access to care for their own residents. Indeed, this phenomenon is already occurring

as a result of S.B. 8.[1]  In New Mexico, for example, an influx of patients from Texas has already

strained provider resources and made it more difficult for New Mexico residents to receive

timely care.[2]  Similar impacts are being seen or expected to be seen in other *Amici* States,

including California,[3] Colorado,[4] Illinois,[5] and Nevada.[6]

     *Amici* States are equally committed to ensuring that residents of our States who assist

individuals in obtaining abortion care in Texas do not face the threat of liability under the vague

and expansive "aiding or abetting" provisions of S.B. 8.  There are myriad people and

organizations in *Amici* States who may be targeted under S.B. 8, including family and friends

who support people in terminating their pregnancies prior to viability in Texas; academics and

clinicians affiliated with institutions in *Amici* States who perform research used to support

---

[1] *See* Shefali Luthra, *After the Texas Abortion Ban, Clinics in Nearby States Brace for Demand*, The Guardian (Sept. 2, 2021), https://tinyurl.com/phnjfbbu.

[2] *See* Jolie McCullough and Neelam Bohra, *As Texans Fill Up Abortion Clinics in Other States, Low-Income People Get Left Behind*, Texas Tribune (Sept. 3, 2021), https://tinyurl.com/ud8c3u8 ("At a clinic in Albuquerque, New Mexico, an abortion provider said that on Tuesday, the day before the law's enactment, every patient who had made an appointment online was from [Texas]. By Thursday, all of New Mexico's abortion clinics were reportedly booked up for weeks, and a Dallas center had dispatched dozens of employees to help the much less populated state's overtaxed system."); Adam Edelman, *New Mexico Braces for Influx After Supreme Court Allows Texas Abortion Restrictions* (Sept. 3, 2021), NBC News, https://tinyurl.com/srhh7ct5; Julia Goldberg, *NM Abortion Providers See Surge from Texas*, Santa Fe Reporter (Sept. 8, 2021), https://tinyurl.com/3shcfvpc.

[3] *See* Soumya Karlamangla, *What the Texas Abortion Law Means for California,* New York Times (Sept. 9, 2021), https://tinyurl.com/7d38umu3.

[4] *See* Shannon Najmabadi, *Colorado Abortion Providers Are Preparing for an Influx of Patients from Texas*, Colorado Sun (Sept. 3, 2021), https://tinyurl.com/2sssuvrc.

[5] *See* Angie Leventis Lourgos, *Texas Abortion Law: Here are 4 Things to Know About How It Might Affect Illinois,* Chicago Tribune (Sept. 2, 2021), https://tinyurl.com/4rxs7aaa; Becky Willeke, *Texas Abortion Ban Has Patients Calling Illinois Clinics,* Fox 2 Now St. Louis, (Sept. 1, 2021), https://tinyurl.com/tpkr66a3.

[6] *See* Humberto Sanchez, *More Texans Could Seek Abortions in Nevada Following New Texas Six-Week Ban,* Nevada Independent (Sept. 2, 2021), https://tinyurl.com/njjz69bf.

abortion access in Texas; people in *Amici* States who donate or provide in-kind support to

abortion funds and other abortion advocacy groups in Texas; students who reside in *Amici* States

but attend schools in Texas and volunteer as clinic escorts or in other capacities that support

abortion access; nonprofit organizations headquartered in *Amici* States that are engaged in

abortion advocacy in Texas; attorneys who reside in *Amici* States who work on abortion access

in Texas; and many others. *Amici* States have a significant interest in protecting our residents

from vexatious and costly litigation, particularly when such litigation is predicated on nothing

more than their involvement in constitutionally protected activity.

### SUMMARY OF THE ARGUMENT

Nearly half a century ago, the Supreme Court first recognized the constitutional right to

terminate a pregnancy before viability. *Roe v. Wade*, 410 U.S. 113, 163 (1973). The Court has

repeatedly affirmed *Roe*, including in the face of increasingly bold attempts by State legislatures

to undermine or altogether eliminate their residents' ability to exercise this constitutional right.

*See, e.g.*, *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2120 (2020) (plurality opinion); *id.* at

2135 (Roberts, C.J., concurring); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300

(2016); *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) ("Before viability, a State may not

prohibit any woman from making the ultimate decision to terminate her pregnancy.") (internal

quotation and citation omitted); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (constitutional

right to terminate a pregnancy before viability); *Casey*, 505 U.S. at 846.

Applying this unbroken line of precedent, federal courts across the country, including the

Fifth Circuit, have uniformly held that pre-viability abortion bans are facially unconstitutional,

regardless of any purported State interests and "without resort to the undue burden balancing

test." *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (per curiam)

3

(6-week ban) ("*Jackson II*"); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 272-74 (5th

Cir. 2019), *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021) (15-week ban);

*see also MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 776 (8th Cir. 2015), *cert. denied*, 136 S.

Ct. 981 (2016) (6-week ban); *Isaacson v. Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013), *cert.*

*denied*, 571 U.S. 1127 (2014) (20-week ban); *Jane L. v. Bangerter,* 102 F.3d 1112, 1114-18

(10th Cir. 1996) (equivalent of 22-week ban).

      S.B. 8 represents a new and dangerous frontier in the quest by some State legislatures to

restrict or eliminate abortion access in violation of well-established law.  At its core, S.B. 8 is an

across-the-board ban on almost all abortions in the state of Texas, in open and purposeful

disregard of *Roe*, *Casey*, and their numerous progeny.  In enacting S.B. 8, the Texas Legislature

evinced its willingness to ignore the Supreme Court's constitutional rulings and to thwart judicial

review by creating a private, rather than government, enforcement scheme.  Such an

unprecedented attack on our constitutional order and the rule of law must be unequivocally

rejected.

      Because the Supreme Court's precedents are clear that S.B. 8's ban on nearly all pre-

viability abortions is *per se* unconstitutional under the Fourteenth Amendment, the only question

in this case is whether Texas can succeed in evading compliance with binding precedent by

delegating to private individuals the task of enforcing this patently unconstitutional law.  This

Court must not permit such a result—nor need it.  The Supreme Court has not hesitated to

recognize state action for Fourteenth Amendment purposes when faced with similar "evasive

schemes" for trampling constitutional rights under color of state law, including where—as

here—state courts are enlisted to enforce private actors' efforts to deny constitutional rights to

their fellow citizens.  *See, e.g., Cooper v. Aaron*, 358 U.S. 1, 16-17 (1958) (constitutional rights

declared by the Supreme Court cannot be "nullified openly and directly" or "indirectly . . . through evasive schemes" by "state legislators or state executive or judicial officers"); *Shelley v. Kraemer*, 334 U.S. 1, 14-19 (1948) (state court enforcement of racially restrictive covenant in private agreement violates the Fourteenth Amendment).

In addition to the serious threat that S.B. 8 poses to our constitutional order and the rule of law, S.B. 8 will also cause—indeed, has *already* caused—countless people in Texas to suffer irreparable harm as a result of the deprivation of their constitutional right to terminate a pregnancy before viability. Today, virtually no one can obtain an abortion in Texas. In order to obtain abortion care, patients now have to travel out-of-state, which makes abortion for many people too difficult, too time-intensive, and too costly. As a consequence, many will now be forced to carry unwanted pregnancies to term. And forcing people into unwanted pregnancies will result in negative health and socioeconomic consequences for both them and their children. In the face of this extraordinary attempt by Texas to eliminate abortion services long protected by the Fourteenth Amendment and the serious harms that people in Texas and elsewhere will suffer as a result, this Court should grant immediate relief.

## ARGUMENT

### I. This Court Must Not Permit Texas to Flout Precedent With Its Unconstitutional Abortion Ban.

By enacting a law that plainly violates the constitutional rulings of the Supreme Court and that purports to shield that law from judicial review, the Texas Legislature has inflicted a serious injury on the very rule of law. This Court should not permit the Constitution to be so notoriously abused.

### A. S.B. 8 is designed to accomplish exactly what the Constitution forbids a state from doing.

The plain—indeed admitted—purpose of S.B. 8's private enforcement regime is to effectuate an across-the-board ban on constitutionally protected activity. For this reason alone, S.B. 8 stands apart from virtually all other statutory private rights of action in *Amici* States and elsewhere. And even in its particulars, S.B. 8's private enforcement regime is markedly distinct in ways demonstrating that the law was specifically designed "to do precisely that which the [Four]teenth Amendment forbids": to ban nearly all pre-viability abortions in Texas. *Terry v. Adams*, 345 U.S. 461, 469-70 (1953) (striking down an electoral process managed by a private volunteer organization that excluded Black people from voting because of their race and noting that the "effect of the whole procedure . . . is to do precisely what the Fifteenth Amendment forbids"); *see also Casey*, 505 U.S. at 846 (holding that the State's interests are not strong enough to ban abortion before viability).

Above all, S.B. 8's purpose to effectuate an unconstitutional ban is demonstrated by the statute's very prohibition on almost all pre-viability abortions. This ban is *per se* unconstitutional under nearly a half century of the Supreme Court's precedent. *See Casey*, 505 U.S. at 846; *Roe*, 410 U.S. at 163; *see also Jackson II*, 951 F.3d at 248. The Supreme Court has repeatedly affirmed and reaffirmed *Roe*'s "essential holding" that "the State's interests are not strong enough to support a prohibition on abortion" prior to viability, *Casey*, 505 U.S. at 846; *see also June Med. Servs.*, 140 S. Ct. at 2120 (2020) (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2300 ("Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right" and are "constitutionally invalid.") (internal quotations and citations omitted); *Gonzales*, 550 U.S. at 146; *Stenberg*, 530 U.S. at 921.

6

But S.B. 8 goes further, purporting to mandate a wholesale revision of the constitutional standard applicable to abortion restrictions even *within* this unconstitutional ban. It instructs state court judges to impose a novel form of an "undue burden" test as an affirmative defense applicable to each specific patient under a detailed set of requirements that are not consistent with Supreme Court precedent, including because the law precludes courts from considering S.B. 8's impact on other patients' abortion access. *Compare* S.B. 8, § 171.209(d)(2), with *Jackson II*, 951 F.3d at 248 (6-week abortion ban is facially unconstitutional without resort to undue burden test); *Whole Woman's Health*, 136 S. Ct. at 2313 (describing how the undue burden balancing test must be conducted, including that it must take into account statewide impacts).

Other unusual provisions further evince S.B. 8's goal to effectuate an unconstitutional ban on nearly all pre-viability abortions. The statute outlaws a host of defenses to claims made against abortion providers, including any argument that enforcement of S.B. 8's near-complete abortion ban against the provider would violate the constitutional rights of the patient or other third parties. S.B. 8, § 171.208(e)(7). It also bars defenses predicated on nonmutual claim or issue preclusion—thus forcing providers to litigate issues repeatedly. *Id.* § 171.208(e)(5).

The statute even goes so far as to provide for retroactive liability in advance. It provides that, in the event the Supreme Court overrules *Roe* and *Casey* at some unknown later date, providers can be held liable for abortions performed today, even though abortions performed today are indisputably legal under Supreme Court precedent as a constitutional matter. Likewise, it provides that providers can be held liable for abortions performed during any period of time in which S.B. 8 itself is enjoined if that injunction is later vacated. Specifically, the statute bars a defense in "reliance on any court decision that has been overruled on appeal or by a

7

subsequent court, even if that court decision had not been overruled when the defendant engaged in conduct that violates this subchapter." S.B. 8, § 171.208(e)(3).

And the statute attempts to thwart judicial review of the law by enacting a separate and onerous fee-shifting provision that guarantees an award of attorney's fees to the defendants in any case in which a plaintiff seeks declaratory or injunctive relief against any abortion restriction or regulation if the plaintiff fails to prevail on every single claim and cause of action asserted. S.B. 8, § 30.022.

These extraordinary provisions, taken together, make clear that S.B. 8's intended purpose is to maximize the extent to which private individuals can leverage Texas's courts to do precisely what Texas officials cannot do directly and what the Fourteenth Amendment forbids: the elimination of nearly all pre-viability abortions in Texas. And the architects of S.B. 8 have admitted as much. *See, e.g.*, U.S. Compl. (ECF 1) ¶¶ 29-31.

### B. Texas's private enforcement mechanism does not shield such brazen disrespect for the Constitution from judicial review.

Texas seeks to avoid judicial review of S.B. 8's *per se* unconstitutional ban on almost all pre-viability abortions by cloaking its ban with a private enforcement mechanism. But the Supreme Court's state action jurisprudence makes clear that a state may not so simplistically obscure its own defiance of our Constitution. Indeed, it is hard to imagine a more appropriate use of this Court's remedial authority than the circumstances here: where a state has openly defied almost fifty years of Supreme Court precedent in order to curtail the constitutionally protected federal rights of millions of vulnerable people.

This Court should not acquiesce in Texas's attempt to evade judicial review by purporting to delegate direct enforcement authority solely to private individuals. The fact remains that private parties cannot enforce S.B. 8's unconstitutional ban without the involvement

8

of the coercive power of the State, which acts through "'its legislative, its executive, or its judicial authorities'" and "'in no other way.'" *Shelley*, 334 U.S. at 14 (quoting *Ex Parte Virginia*, 100 U.S. 339, 347 (1880)). And here, to effectuate S.B. 8's across-the-board ban on constitutionally protected activity, Texas has created a specific structure within its state court system to enforce this ban in the context of private litigations. This coercive structure includes requiring state courts to award specific forms of monetary and injunctive relief to S.B. 8 claimants who prove a violation of S.B. 8's unconstitutional abortion ban, *see* S.B. 8, § 171.208(b)—relief that would result in the deprivation of individual constitutional rights under the Fourteenth Amendment. And it includes a set of specific rules that state courts must apply in adjudicating S.B. 8 claims, including rules—such as the application of the incorrect undue burden standard—that are themselves imbued with constitutional defects. *See* S.B. 8, §§ 171.209(d)(2), 171.212(e); *supra*, at 6-7.

In these circumstances, the fact that Texas's legislature has directed state courts to enforce S.B. 8's unconstitutional ban on nearly all pre-viability abortions through the mechanism of heavily incentivized private litigation, rather than directly through a government enforcement proceeding, does not eliminate state action for Fourteenth Amendment purposes. *See Shelley*, 334 U.S. at 14-19 (judicial enforcement of racially restrictive covenant constitutes state action for Fourteenth Amendment purposes); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 622-24 (1991) (holding that a private litigant's exercise of peremptory challenges in jury selection was pursuant to a course of state action and noting that "a private party could not exercise its peremptory challenges absent the overt, significant assistance of the court"). Rather, "the misuse of power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law, is state action taken 'under color of state law'.'"

*Hall v. Garson*, 430 F.2d 430, 439 (5th Cir. 1970) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)) (finding state action where Texas law permitted landlords to enter their tenants' residences and seize property).

     *Shelley* is particularly instructive. In *Shelley*, the Supreme Court held that a state court's judicial enforcement of a private contract written to exclude people of color from ownership of real property violated the Fourteenth Amendment. 334 U.S. at 18-19. The Court made clear that "the action of the States to which the [Fourteenth] Amendment has referenc[e] includes action of state courts and state judicial officials." *Id.* at 18. Indeed, the Court noted, "it has never been suggested that state court action is immunized from the operation of [the Fourteenth Amendment] simply because the act is that of the judicial branch of the state government." *Id.* Accordingly, even though the litigation was between private parties and involved discrimination defined by a private agreement, the judicial enforcement by state courts of the discriminatory agreement was itself the act that deprived the purchasers of their constitutional rights. *Id.* at 19. Put differently, "the Amendment [is not] ineffective simply because the particular pattern of discrimination, which the State has enforced, was defined initially by the terms of a private agreement." *Id.* at 20. Rather, "[s]tate action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms. And when the effect of that action is to deny rights subject to the protection of the Fourteenth Amendment, it is the obligation of this Court to enforce the constitutional commands." *Id.*

     The same obligation exists here, where the deprivation of Fourteenth Amendment rights is as clear as it was in *Shelley*, and where that constitutional deprivation stems even more directly from state action. Unlike in *Shelley*, which involved a court's enforcement of a racially discriminatory private agreement, here it is Texas's own legislature that has directed Texas

10

courts to enforce a state-created ban on constitutionally protected activity. In other words, Texas "is *responsible* for the specific conduct" at issue here—that is, a ban on constitutionally protected activity, and Texas has "provide[d] significant encouragement, either overt or covert" for the effectuation of that ban. *See Brentwood Acad. v. Tenn. Secondary Sch. Athl. Ass'n*, 531 U.S. 288, 295-96 (2001) (identifying considerations for discerning state action) (emphasis in original) (internal quotations and citations omitted). As part of that ban, S.B. 8 instructs state court judges how to weigh and rule on substantive legal defenses, including those that implicate the Fourteenth Amendment interests, such as the application of the incorrect undue burden standard in contravention of binding precedent. *See supra* at 6-7. Further, unlike in *Shelley*, where the state courts applied rules of general applicability in construing and enforcing the terms of a private agreement that had the effect of a constitutional deprivation, Texas's legislature here has directed its courts to apply a unique set of procedural rules specifically designed to effect this unconstitutional ban, including rules that mandate the award of specific monetary and injunctive relief in cases where a pre-viability abortion has occurred, with the specific purpose of depriving people of their rights under the Fourteenth Amendment.

Permitting Texas to evade federal review of a plainly unconstitutional law through such an enforcement scheme—state action with the sheerest veneer of private action—could have significant implications for the Fourteenth Amendment and for the rule of law in our Republic. In our country's history, state policymakers have not infrequently adopted laws that have targeted politically unpopular groups—anti-miscegenation laws, segregation laws, anti-Asian laws, and anti-LGBTQ laws—and many of these laws have been struck down as

unconstitutional.[7]  Yet some state officials have attempted to avoid compliance with precedent with which they disagree.  State legislatures throughout the South enacted a spate of laws specifically designed to evade compliance with *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1952), for example, and to perpetuate racial segregation in places of public accommodation more broadly.  *See, e.g., Bush v. Orleans Parish Sch. Bd.*, 188 F. Supp. 916, 921-37 (E.D. La. 1960), *aff'd, Orleans Parish Sch. Bd. v. Bush*, 365 U.S. 569 (1961); *Bush v. Orleans Parish Sch. Bd.*, 191 F. Supp. 871, 873-75 (E.D. La. 1961), *aff'd, Louisiana v. United States*, 367 U.S. 908 (1961).  These statutes ranged from enactments that openly defied *Brown, see, e.g., Bush*, 188 F. Supp. at 923-37, to practices that relied on private individuals to perpetuate the legacy of racial segregation, such as leasing public spaces to private individuals who continued to engage in racially discriminatory conduct. *See, e.g., Derrington v. Plummer*, 240 F.2d 922, 925-26 (5th Cir. 1956) (holding that the Fourteenth Amendment prohibits racially discriminatory conduct through the instrumentality of a lessee); *see also Turner v. City of Memphis*, 369 U.S. 350, 353 (1962) (same); *Hamm v. Va. State Bd. of Elections*, 230 F. Supp. 156, 157-58 (E.D. Va. 1964), *aff'd, Tancil v. Woolls*, 379 U.S. 19 (1964) ("[N]o State can directly dictate or casually promote a distinction in the treatment of persons solely on the basis of their color. To be within the condemnation, the governmental action need not effectuate segregation of facilities directly.").

In each of these cases, federal courts concluded that the Fourteenth Amendment applied, "whatever the agency of the State taking the action," *Cooper*, 358 U.S. at 16-17 (citing, *inter alia, Shelley*, 334 U.S. at 1), or "whatever the guise in which it is taken," *id.* (citing *Derrington v.*

---

[7] *See, e.g., Romer v. Evans*, 517 U.S. 620 (1996); *Loving v. Virginia*, 388 U.S. 1 (1967); *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1953);  *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

*Plummer*, 240 F.2d at 922 and *Dep't of Conservation and Dev. v. Tate*, 231 F.2d 615 (1956)).  In other words, constitutional rights "can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously'."  *Id.* at 17 (quoting *Smith v. Texas*, 311 U.S. 128, 132 (1940)).

So too here, this Court should not permit Texas to "nullif[y] indirectly" the constitutional rights recognized in *Roe* and *Casey* through the "evasive scheme" that it has created in S.B. 8. *Id.*  Consider, for example, if a state legislature had adopted S.B. 8 in 1958, instead of 2021; prohibited the desegregation of schools in defiance of *Brown*, instead of pre-viability abortions in defiance of *Roe* and *Casey*; and vested the parents of white students with the exclusive authority to enforce the statute against any Black child who sought to attend a segregated white school in accordance with the Fourteenth Amendment.  No federal court would hesitate to conclude that a state could not, consistent with the Fourteenth Amendment, provide a forum in its courts for private lawsuits designed to effectuate a ban on school desegregation in contravention of *Brown*. The same must be true here.  As the Supreme Court long ago explained, "[i]f the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery; and the nation is deprived of the means of enforcing its laws by the instrumentality of its own tribunals." *United States v. Peters*, 9 U.S. 115, 136 (1809).

A contrary result could have profound consequences for our constitutional order and the rule of law.  *Amici* States recognize that states across the country have policy preferences in areas as diverse as gun rights, freedom of religion, marriage equality, and voting rights.  And legislative bodies' policy preferences—including in our own states—may at times be in tension

with or even conflict with constitutional principles.  We likewise recognize the vital role that judicial review plays in resolving these tensions.  But, where longstanding Supreme Court precedent clearly and unambiguously forecloses a particular policy as unconstitutional, a state cannot be permitted to disregard that precedent *and* shield that law federal judicial review.

## II.  Immediate Injunctive Relief Is Essential to Stanch the Irreparable Harms Being Inflicted by Texas's Unconstitutional Ban.

S.B. 8's prohibition on nearly all pre-viability abortions in Texas not only flagrantly disregards the Constitution and the rule of law, it also is inflicting grave harms on people across Texas this very day, with mounting harms cascading beyond Texas's borders as well. "[I]mmediate relief is essential" to prevent these harms and serve the public interest.  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (per curiam).

The irreparable harms inflicted by S.B. 8 are manifest across Texas and are increasingly evident in our own states.  As a result of S.B. 8, abortion providers in Texas have almost entirely stopped providing abortions as of midnight on August 31, 2021.[8]  Because the vast majority of people do not know that they are pregnant until after the pregnancy is considered six weeks along (dated from the last menstrual period), the effect of S.B. 8 is to deprive 85-90% of the people who seek abortions in Texas of their constitutionally protected right to choose to terminate a pregnancy.[9]

---

[8] *See, e.g.*, Neelam Bohra, *Texas Law Banning Abortion as Early as Six Weeks Goes into Effect as the U.S. Supreme Court Takes No Action*, Texas Tribune (Aug. 31, 2021), https://tinyurl.com/5dzwtsjh (noting that a Whole Woman's Health clinic in Texas was "engulfed" with treating over 100 patients on August 31st and that Whole Woman's Health clinics throughout Texas performed abortions until 11:59 pm that day).

[9] *See Whole Woman's Health v. Jackson*, No. 1:21-cv-00616-RP, Declaration of Allison Gilbert, M.D. ("Gilbert Decl.") (ECF 19-1) ¶ 14, July 13, 2021; Declaration of Bhavik Kumar, M.D., M.P.H.  ("Kumar Decl.") (ECF 19-2) ¶ 12, July 13, 2021; Declaration of Andrea Ferrigno ("Ferrigno Decl.") (ECF 19-3) ¶ 14, July 13, 2021; Declaration of Jessica Klier (ECF 19-4) ¶ 12,

Denying nearly all Texans who are or become pregnant their constitutional right to terminate a pregnancy will also lead to negative health and socioeconomic consequences for people who are forced to delay or forgo an abortion.  Forcing a patient to carry an unwanted pregnancy to term creates a greatly heightened risk of death, in part due to the dangerous risks of postpartum hemorrhage and eclampsia.[10]  Physical violence is a further risk, when carrying an unwanted pregnancy to term results in a person remaining in contact with a violent partner.[11]  Lack of access to abortion also results in poorer socioeconomic outcomes, including lower rates of full-time employment and increased reliance on publicly funded safety-net programs.[12]  And lack of access to abortion may cause people to attempt self-induction, which can result in grave long-term medical consequences.[13]

---

July 13, 2021; Declaration of Ken Lambrecht (ECF 19-5) ¶ 9, July 13, 2021; Declaration of Melaney A. Linton (ECF 19-6) ¶ 8, July 13, 2021; Declaration of Amy Hagstrom Miller (ECF 19-7) ¶ 10, July 13, 2021; Declaration of Polin C. Barraza (ECF 19-10) ¶ 8, July 13, 2021.

[10] Caitlin Gerdts, et al., *Side Effects, Physical Health Consequences, and Mortality Associated with Abortion and Birth after an Unwanted Pregnancy*, Women's Health Issues 26-1, 57-58 (2016), https://tinyurl.com/56e3pb9d; *see also* Gilbert Decl. ¶¶ 30-31(noting that people who carry a pregnancy to term against their will face a mortality risk fourteen times greater than that associated with abortion and that those with pre-existing conditions will be forced to incur the heightened medical and mental health risks associated with continuing pregnancy); Kumar Decl. ¶ 29 (noting that people with pre-existing medical conditions will either need to travel out-of-state or "wait and see" if their health deteriorates to such an extent that they fall within S.B. 8's narrow "medical emergency" exception).

[11] *See* Sarah C.M. Roberts, et al., *Risk of violence from the man involved in the pregnancy after receiving or being denied an abortion*, BMC Medicine (2014), https://tinyurl.com/36jm874n.

[12] *See* Diana Greene Foster, et al., *Socioeconomic Outcomes of Women Who Receive and Women Who are Denied Wanted Abortions in the United States*, Am. J. Pub. Health 108, no. 3, at pp. 407-413 (2018), https://tinyurl.com/yeawzmpf.

[13] Daniel Grossman et al., *Self-Induction of Abortion Among Women in the United States*, 18(36) Reprod. Health Matters 136, 143 (2010), https://tinyurl.com/5atnu3f (discussing medical risks associated with self-induced abortion).

S.B. 8 has also already had significant impacts on clinics in Texas, which may ultimately be forced to close entirely—inflicting yet more harm.  S.B. 8 proponents have been vocal about their intent to sue abortion providers and others under S.B. 8, going so far as to setting up a "whistleblower" website to encourage people to submit anonymous "tips" that abortions have been performed in violation of S.B. 8 and invite people to be plaintiffs in S.B. 8 proceedings.[14] This obvious threat of lawsuits under S.B. 8 has already "create[d] a culture of fear among providers and staff,"[15] and clinics report struggling to hire and retain staff who fear S.B. 8 and are uncertain about the future of abortion in Texas.[16]

Fears of ruinous litigation costs and clinic closures are not unfounded, given that S.B. 8's enforcement mechanism was intentionally designed to *encourage* litigation against providers in Texas, while also eliminating a basic safeguard against unfounded suits.  The law includes a bounty of "not less than $10,000 per abortion," S.B. 8, § 171.208(b)(2), combined with one-sided attorney's fees provisions: while courts "shall" award attorney's fees and costs to any plaintiff who prevails, *id.* § 171.208(b)(3), providers are statutorily *barred* from recovering their attorneys' fees and costs even if they prevail, *id.* § 171.208(i) (bar on fee awards to defendants is "[n]otwithstanding any other law").  Together, these provisions create powerful financial

---

[14] Texas Right to Life, prolifewhistleblower.com (last visited Sept. 3, 2021) (website statistics as of September 3, 2021 indicated that it had been shared over 40,000 times); Meryl Kornfield, *A Website for 'Whistleblowers' to Expose Texas Abortion Providers was Taken Down—Again*, Washington Post (Sept. 6, 2021), https://tinyurl.com/37crxb34 (noting that the website had been subsequently de-platformed by GoDaddy and Epik, but that Texas Right to Life intends to get the website "back up soon to continue collecting anonymous tips").

[15] Esther Wang, *Here's What Happens When Texas's Extreme Abortion Ban Goes into Effe*ct, The New Republic (Aug. 31, 2021), https://tinyurl.com/4a828e7z; Whole Woman's Health Facebook Page (Sept, 2, 2021), https://tinyurl.com/33sz9a6z ("Our staff and providers are so afraid."),

[16] *See* Bohra, *supra* note 8.

16

incentives to sue under S.B. 8, with seemingly zero downside to filing harassing, vexatious, or frivolous litigation.

S.B. 8 has also already had impacts outside of Texas's borders.  Clinics in nearby states, including *Amici* States, have already experienced a marked increase in "desperate" calls from people in Texas.  For example, clinics in Colorado, Oklahoma, and Kansas have already experienced an increase in inquiries and are anticipating a "patient increase of up to 40%" as a result of S.B. 8, forcing them to "ramp up supplies and staffing."[17]  In New Mexico, all abortion clinics were reportedly booked up for weeks just one day after S.B. 8 went into effect.[18]

Because many people who seek an abortion rely on others in obtaining access to such care, S.B. 8 also threatens to harm countless people who provide that support to Texas patients.[19] S.B. 8's broad and undefined "aiding or abetting" provision would seem to create at least $10,000 liability for anyone who so much as gives a patient a ride, regardless whether that supportive person even knows that, based on the precise timing of the abortion procedure, it will violate S.B. 8.  S.B. 8, §§ 171.208(a)(2), (b)(2).  And, by threatening sweeping liability, the law cruelly isolates patients when assistance is most needed.

The public interest thus weighs heavily in favor of granting relief.  There is no evidence whatsoever that S.B. 8 advances a public interest in imposing an across-the-board ban on constitutionally protected conduct.  *See Roman Catholic Diocese*, 141 S. Ct. at 68 (emergency relief warranted in part because state failed to demonstrate that restrictions on First Amendment

---

[17] Iris Samuels, *New Texas Abortion Law Pushes Women to Out-of-State Clinics*, Bloomberg (Sept. 2, 2021), https://tinyurl.com/2zahksas.
[18] *See* McCullough and Bohra, *supra* note 2.
[19] *See* Kari White, et al., Tex. Pol'y Evaluation Project, Research Brief, *Texas Senate Bill 8: Medical and Legal Implications* 2 (July 2021), https://tinyurl.com/4pc5rzhs (noting that 43% of Texans who sought an abortion in Texas in 2018 had someone drive them to their abortion and 57% had a friend, family member, or partner help them pay).

rights were necessary); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (public interest is not disserved by an injunction preventing implementation of an unconstitutional statute). To the contrary, S.B. 8 is causing great harm and will continue to wreak havoc for patients in Texas and elsewhere. Moreover, Texas has inflicted these harms at a time when nineteen states have already enacted ninety-seven restrictions on abortion—including twelve partial or total bans—in just a six-month period.[20] While lower courts have generally, as they must, applied Supreme Court precedent to enjoin these bans, Texas's success in avoiding such an injunction through S.B. 8's procedural ploy would embolden likeminded states to enact "copycat" laws,[21] which could quickly lead to successful bans in many states. If access to safe and legal abortion is severely restricted or banned in states across the country, vast "abortion deserts" will arise. The inevitable result is that some patients will be forced to travel hundreds or thousands of miles to receive care, health care systems in states like ours that continue to provide abortion access will face untenable strain, and many patients without resources to travel will simply be unable to receive the care that they need, leading to negative health consequences.[22]

In view of the grave harms inflicted by S.B. 8 and its disregard for nearly fifty years of Supreme Court precedent, the Court should immediately enjoin S.B. 8's enforcement.

---

[20] Emma Batha, *U.S. States Making 2021 Moves on Abortion Rights and Access*, Thomson Reuters Found. News (Sept. 1, 2021), https://tinyurl.com/rsk3r4mt.

[21] Meryl Kornfield, et al., *Texas Created a Blueprint for Abortion Restrictions. Republican-Controlled States May Follow Suit*, Washington Post (Sept. 3, 2021), https://tinyurl.com/4wh4y577 (noting that a quarter of states are likely to introduce legislation that mirrors S.B. 8).

[22] *See, e.g.,* Rachel Benson Gold, *Lessons from Before Roe: Will Past be Prologue?,* The Guttmacher Institute Report on Public Policy 10 (March 2003), https://tinyurl.com/yw7r2kev ("The year before the Supreme Court's decision in *Roe v. Wade*, just over 100,000 women left their own state to obtain a legal abortion in New York City. According to an analysis by The Alan Guttmacher Institute, an estimated 50,000 women traveled more than 500 miles to obtain a legal abortion in New York City; nearly 7,000 women traveled more than 1,000 miles, and some 250 traveled more than 2,000 miles, from places as far as Arizona, Idaho and Nevada.").

## CONCLUSION

The Court should grant the United States of America's motion for a temporary restraining order and preliminary injunction.

Respectfully submitted,

/s/ *Amanda Hainsworth*
Elizabeth N. Dewar+
*State Solicitor*
Abigail B. Taylor+
*Chief, Civil Rights Division*
Amanda Hainsworth*
*Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
Telephone: (617) 963-2618
Fax: (617) 727-5762
Email: amanda.hainsworth@mass.gov

*\*pro hac vice* application pending
+*pro hac vice* applications forthcoming

Dated: September 15, 2021

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway
10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for the District of Columbia*
400 6th Street NW
Washington, D.C. 20001

CLARE E. CONNORS
*Attorney General of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

19

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

ANDREW J. BRUCK
*Acting Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

JOSHUA H. STEIN
*Attorney General of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
*Attorney General of Pennsylvania*
16th Floor, Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
*Attorney General of Virginia*
202 North 9th Street
Richmond, VA 23219

ROBERT W. FERGUSON
*Attorney General of Washington*
1125 Washington Street SE PO Box 40100
Olympia, WA 98504-0100

JOSHUA L. KAUL
*Attorney General of Wisconsin*
17 W. Main St.
Madison, WI 53703