# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

UNITED STATES OF AMERICA,     §
            §
   *Plaintiff*,       §
            §
v.             §   Case No. 1:21-cv-00796-RP
            §
THE STATE OF TEXAS,      §
            §
   *Defendant*.      §

## DEFENDANT'S MOTION TO DISMISS,
## RESPONSE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION,
## AND MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................ii

Index of Authorities ..............................................................................................................iii

Introduction ............................................................................................................................1

Standard ...................................................................................................................................3

Argument .................................................................................................................................3

    I.   The Federal Government Lacks the Power to Sue Texas for the Requested Relief.................4

       A.  There Is No Justiciable Controversy between the Federal Government and Texas...........4

       B.  The Federal Government Cannot Obtain Relief against State Courts, Much Less
           Private Individuals ...............................................................................................................6

           1. This Court Cannot Enjoin Private Non-Parties.................................................................7

           2. This Court Cannot Enjoin Texas Courts ........................................................................10

       C.  The Federal Government Is Not Injured ..........................................................................17

           1. The Federal Government Lacks *Parens Patriae* Standing...................................................18

           2. The Federal Government Lacks a Sovereign Injury.........................................................19

       D.  The Federal Government Lacks a Cause of Action ...........................................................22

           1. There Is No Constitutional or Statutory Cause of Action...............................................22

           2. There Is No Common-Law or Equitable Cause of Action...............................................24

           3. Congress Has Displaced Any Cause of Action ...............................................................30

    II.  The Texas Heartbeat Act Is Lawful .......................................................................................34

       A.  The Federal Government Has Not Shown a Clear Violation of the Fourteenth
           Amendment........................................................................................................................34

       B.  The Federal Government Has Not Clearly Shown the Act Is Preempted or
           Violates Intergovernmental Immunity ............................................................................38

           1. Standard..........................................................................................................................38

           2. The Act Does Not Prohibit Carrying Out Federal Obligations .....................................39

           3. The Act Does Not Interfere with Federal Contracts ......................................................42

           4. The Act Is Consistent with Medicaid .............................................................................43

    III. The Federal Government Has Not Clearly Shown Irreparable Harm.......................................44

       A.  A Preliminary Injunction Would Not Eliminate the Possibility of Future Liability..........45

       B.  Heartbeat Defendants and the Federal Government Have an Adequate Remedy
           at Law for any Liability Determined in State Court .............................................................50

    IV. The Federal Government Has Not Clearly Shown that the Balance of Equities and Public
       Interest Favor an Injunction..................................................................................................54

    V.  The Requested Injunction Is Unlawfully Broad ......................................................................54

    VI. Request for a Stay Pending Appeal........................................................................................56

Conclusion .............................................................................................................................57

INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ...................................................................................................54

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020), *vacated as moot, Planned Parenthood Ctr. for Choice v.*
  *Abbott*, 141 S. Ct. 1261 (2021) ....................................................................................35

*Adams & Boyle, P.C. v. Slatery*,
  494 F. Supp. 3d 488 (M.D. Tenn. 2020) .....................................................................19

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) .....................................................................................................55

*Aldridge v. Miss. Dep't of Corrections*,
  990 F.3d 868 (5th Cir. 2021) .......................................................................................38

*Alemite Mfg. Corp. v. Staff*,
  42 F.2d 832 (2d Cir. 1930) (Hand, J.) ......................................................................8, 9

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................................30, 33

*Alexander v. Trump*,
  753 F. App'x 201 (5th Cir. 2018) (per curiam) ...........................................................23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) .........................................................................................18, 19, 20

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) .....................................................................................24

*American Postal Workers Union, AFL-CIO v. U.S. Postal Service*,
  766 F.2d 715 (2d Cir. 1985) ...................................................................................47, 48

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................................................23, 33

*Arpin v. Santa Clara Valley Transp. Agency*,
  261 F.3d 912 (9th Cir. 2001) .......................................................................................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................................4

*Ayotte v. Planned Parenthood of N. New Eng.*,
  546 U.S. 320 (2006).................................................................................................56

*Bauer v. Texas*,
  341 F.3d 352 (5th Cir. 2003)............................................................................. 10, 11

*Bethell v. Peace*,
  441 F.2d 495 (5th Cir. 1971)...................................................................................7

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014)..................................................................................39

*Bond v. United States*,
  572 U.S. 884 (2014)...............................................................................................18

*Bryant v. Maffucci*,
  729 F. Supp. 319 (S.D.N.Y. 1990).........................................................................41

*Buckingham Corp. v. Karp*,
  762 F.2d 257 (2d Cir. 1985)...................................................................................48

*Buntrock v. SEC*,
  347 F.3d 995 (7th Cir. 2003)..................................................................................51

*Bush v. Lucas*,
  462 U.S. 367 (1983)...............................................................................................27

*Cavett v. Ellis*,
  578 F.2d 567 (5th Cir. 1978)..................................................................................14

*Chase Nat. Bank v. City of Norwalk*,
  291 U.S. 431 (1934)............................................................................................9, 10

*City of Georgetown v. Alexandria Canal Co.*,
  37 U.S. 91 (1838)...................................................................................................28

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...............................................................................................11

*Clark v. State of Wash.*,
  366 F.2d 678 (9th Cir. 1966)..................................................................................15

*Clark v. Valeo*,
  559 F.2d 642 (D.C. Cir. 1977) (Tamm, J., concurring).........................................21

*Coleman v. United States*,
  No. 5:16-cv-817-DAE, 2017 WL 1278734 (W.D. Tex. Jan. 3, 2017) .................47

*Committee on the Judiciary of the U.S. House of Representatives v. McGahn,*
    973 F.3d 121 (D.C. Cir. Aug. 31, 2010), *vacated,* No. 19-5331 (D.C. Cir. July 13,
    2021).............................................................................................................................................26

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
    543 U.S. 157 (2004)..................................................................................................................30

*Cranor v. 5 Star Nutrition, L.L.C.,*
    998 F.3d 686 (5th Cir. 2021)...................................................................................................29

*Croft v. Governor of Texas,*
    562 F.3d 735 (5th Cir. 2009)...................................................................................................44

*Davis v. Passman,*
    442 U.S. 228 (1979)..................................................................................................................23

*In re Debs,*
    158 U.S. 564 (1895)............................................................................................................*passim*

*Dentsply Int'l, Inc. v Antitrust Division of the U.S. Dep't of Justice,*
    No. CA 98-693, 1999 WL 33748872 (D. Del. Jan. 5, 1999) .............................................53

*Denver & R.G.R. Co. v. United States,*
    241 F. 614 (8th Cir. 1917).......................................................................................................22

*Detroit Edison Co. v. NLRB,*
    440 U.S. 301 (1979)....................................................................................................................8

*Digital Recognition Network, Inc. v. Hutchinson,*
    803 F.3d 952 (8th Cir. 2015)...................................................................................................26

*In re Diocese of Lubbock,*
    --- S.W.3d ---, 2021 WL 2386135 (Tex.).............................................................................51

*Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,*
    609 F.2d 1083 (4th Cir. 1979).................................................................................................10

*In re Doe 2,*
    19 S.W.3d 278............................................................................................................................51

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975)..................................................................................................................50

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006)..................................................................................................................50

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982) (Stevens, J., concurring in part and concurring in the
    judgment) ..................................................................................................................................46

v

*Elam v. Kansas City S. Ry. Co.*,
635 F3d 796 (5th Cir. 2011) ..................................................................................38

*Felder v. Casey*,
487 U.S. 131 (1988) ..............................................................................................38

*Fenner v. Boykin*,
271 U.S. 240 (1926) ..............................................................................................52

*Flagg Bros., Inc. v. Brooks*,
436 U.S. 149 (1978) ..............................................................................................10

*Foy v. Univ. of Tex. at Dall.*,
No. 3:96-cv-3406, 1997 WL 279879 (N.D. Tex. May 13, 1997), *aff'd*, 146 F.3d
867 (5th Cir. 1998) (per curiam)..........................................................................47

*Freedom From Religion Found., Inc. v. Mack*,
No. 21-20279, 2021 WL 2887861 (5th Cir. July 9, 2021)............................ 27, 28

*Garcia v. United States*,
No. 01-cv-801, 2001 WL 34873962 (S.D. Fla. Oct. 29, 2001) ...........................53

*In re Gee*,
941 F.3d 153 (5th Cir. 2019)........................................................................... 15, 37

*Georgia v. City of Chattanooga*,
264 U.S. 472 (1924) ........................................................................................ 50, 52

*Gibson v. Matthews*,
926 F.2d 532 (6th Cir. 1991)................................................................................41

*Gras v. Stevens*,
415 F. Supp. 1148 (S.D.N.Y. 1976) (Friendly, J.) ....................................... 10, 12

*Green v. Mansour*,
474 U.S. 64 (1985)................................................................................................27

*Green Valley Special Util. Dist. v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) (Oldham, J., concurring) ................................. 24, 32

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999)......................................................................... 14, 15, 26, 46

*Haggard v. State of Tenn.*,
421 F.2d 1384 (6th Cir. 1970) ..............................................................................15

*Haywood v. Drown*,
556 U.S. 729 (2009)..............................................................................................38

*Hearth, Inc. v. Dep't of Pub. Welfare,*
   617 F.2d 381 (5th Cir. 1980) (per curiam) .................................................................23

*Heideman v. South Salt Lake City,*
   348 F.3d 1182 (10th Cir. 2003) ...............................................................................44

*Henry v. First Nat'l Bank of Clarksdale,*
   444 F.2d 1300 (5th Cir. 1971) ..........................................................2, 10, 11, 17

*Hernandez v. Mesa,*
   140 S. Ct. 735 (2020).............................................................................23, 32, 35

*Hohe v. Casey,*
   868 F.2d 69 (3d Cir. 1989) .......................................................................................44

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013)...................................................................................................8

*Hope Medical Group for Women v. Edwards,*
   63 F.3d 418 (5th Cir. 1995).......................................................................................44

*Howlett By and Through Howlett v. Rose,*
   496 U.S. 356 (1990)...................................................................................................38

*Hu v. Huey,*
   325 F. App'x 436 (7th Cir. 2009) (per curiam) .........................................................10

*Int'l Controls & Measurements Corp. v. Watsco, Inc.,*
   853 F. Supp. 585 (N.D.N.Y. 1994).............................................................................8

*J.D. v. Azar,*
   925 F.3d 1291 (D.C. Cir. 2019)................................................................................41

*Jackson Women's Health Org v. Dobbs,*
   945 F.3d 265 (5th Cir. 2019), *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S.
   May 17, 2021)...........................................................................................................35

*Jinks v. Richland County,*
   538 U.S. 456 (2003)..................................................................................................21

*Jones v. Wells Fargo Bank, N.A.,*
   No. 5-14-cv-943-RP, 2015 WL 12734177 (W.D. Tex. Jan. 21, 2015) (Pitman, J.) ...........24

*Justice Network Inc. v. Craighead County,*
   931 F.3d 753 (8th Cir. 2019).....................................................................................12

*In re Justices of Supreme Court of Puerto Rico,*
   695 F.2d 17 (1st Cir. 1982) (Breyer, J.) ...................................................................11

*Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*,
511 F.3d 762 (7th Cir. 2007) (Easterbrook, J.) ................................................ 8

*Lamar v. 118th Judicial Dist. Court of Tex.*,
440 F.2d 383 (5th Cir. 1971) (per curiam) ................................................ 15

*Leavitt v. Jane L.*,
518 U.S. 137 (1996) (per curiam) ................................................ 55, 56

*Lee v. Yee*,
643 F. Supp. 593 (D. Haw. 1986), *aff'd sub nom. United States v. Hawaii*, 832 F.2d
1116 (9th Cir. 1987) (per curiam) ................................................ 22

*Lewis v. Young*,
996 F.2d 306, 1993 WL 241788 (5th Cir. 1993) (per curiam) ................................................ 15, 56

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................ 31

*Lion Health Servs., Inc. v. Sebelius*,
635 F.3d 693 (5th Cir. 2011) ................................................ 56

*Londono-Rivera v. Virginia*,
155 F. Supp. 2d 551 (E.D. Va. 2001) ................................................ 16

*Louvein v. Moody*,
12 S.W.2d 989 (Tex. Comm'n App. 1929) ................................................ 39

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 (1982) ................................................ 10

*Madias v. Dearborn Fed. Credit Union*,
916 F. Supp. 659 (E.D. Mich. 1996) ................................................ 49

*Mayor, Aldermen & Commonalty of City of New York v. Miln*,
36 U.S. (11 Pet.) 102 (1837) ................................................ 18

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam) ................................................ 3, 27, 37

*Mendez v. Heller*,
380 F. Supp. 985 (E.D.N.Y. 1974) (per curiam), *aff'd*, 530 F.2d 437 (2d Cir.1976) .......... 11, 12, 14

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*,
725 F.3d 65 (2d Cir. 2013) ................................................ 38

*Mi Familia Vota v. Abbott*,
977 F.3d 461 (5th Cir. 2020) ................................................ 27, 28

*Middlebrooks v. Thirteenth Judicial Dist. Circuit Ct.*,
   323 F.2d 485 (8th Cir. 1963) (per curiam) ................................................................16

*Milligan, Tr. for Westech Capital Corp. v. Salamone*,
   No. 1:18-cv-327-RP, 2019 WL 1208999 (W.D. Tex. Mar. 14, 2019) (Pitman, J.) ............8

*Missouri v. Jenkins*,
   515 U.S. 70 (1995) ..................................................................................................56

*Moye v. Clerk, DeKalb County Superior Court*,
   474 F.2d 1275 (5th Cir. 1973) (per curiam) ..............................................................15

*Muskrat v. United States*,
   219 U.S. 346 (1911) ..........................................................................................*passim*

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .......................................................................................1, 51, 54

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................6, 55, 57

*Norfolk S. Corp. v. Oberly*,
   594 F. Supp. 514 (D. Del. 1984) ..............................................................................44

*North Dakota v. United States*,
   495 U.S. 423 (1990) ................................................................................................39

*Novedea Sys., Inc. v. Colaberry, Inc.*,
   No. 6:20-cv-180, 2020 WL 9211073 (E.D. Tex. Dec. 11, 2020) ................................24

*Ohio v. Yellen*,
   No. 1:21-cv-181, 2021 WL 2194219 (S.D. Ohio Apr. 16, 2021) ..........................48, 52

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) (en banc) ..............................................................6, 26

*Osterberg v. Peca*,
   12 S.W.3d 31 (Tex. 2000) ........................................................................................40

*Oxford Capital Ill., L.L.C. v. Sterling Payroll Fin., L.L.C.*,
   No. 1:01-cv-1173, 2002 WL 411553 (N.D. Ill. Mar. 15, 2002) ..................................49

*Paisey v. Vitale In & For Broward County*,
   807 F.2d 889 (11th Cir. 1986) ..........................................................................11, 17

*Palmer v. Jackson*,
   617 F.2d 424 (5th Cir. 1980) ..................................................................................40

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ...................................................................................................... 17

*Penrod Drilling Corp. v. Williams*,
    868 S.W.3d 294 (Tex. 1993) (per curiam) ........................................................ 36, 38

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
    505 U.S. 833 (1992) ............................................................................................ 34, 35, 56

*Pool v. City of Houston*,
    978 F.3d 307 (5th Cir. 2020) ..................................................................................... 49

*Preiser v. Rodriguez*,
    411 U.S. 475 (1973) ............................................................................................... 17, 33

*Pulliam v. Allen*,
    466 U.S. 522 (1984) ............................................................................... 11, 12, 14, 15

*Pulphus v. Ayers*,
    2018 WL 1110678 (D.C. Cir. Feb. 28, 2018) ....................................................... 44

*R.R. Comm'n v. United States*,
    290 S.W.2d 699 (Tex. Civ. App.—Austin 1956), *aff'd*, 317 S.W.2d 927 (Tex. 1958) ...................... 39

*Raines v. Byrd*,
    521 U.S. 811 (1997) ....................................................................................................... 6

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945) ...................................................................................................... 9, 13

*Return Mail, Inc. v. United States Postal Serv.*,
    139 S. Ct. 1853 (2019) ............................................................................................... 39

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) ................................................................................................... 27

*Scott v. Donald*,
    165 U.S. 107 (1897) ..................................................................................................... 7

*Scurlock Permian Corp. v. Brazos Cnty.*,
    869 S.W.2d 478 (Tex. App.—Houston [1st Dist.] 1993) (writ denied) ............ 51

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020) ............................................................................................... 56

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ................................................................................................ 17, 33

*Shelley v. Kraemer,*
    334 U.S. 1 (1948) ........................................................................................................... 17

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ..................................................................................... 44

*Siler v. Storey,*
    587 F. Supp. 986 (N.D. Tex. 1984) ............................................................................... 16

*Slotnick v. Garfinkle,*
    632 F.2d 163 (1st Cir. 1980) .......................................................................................... 10

*Spagnola v. Mathis,*
    859 F.2d 223 (D.C. Cir. 1988) (en banc) ...................................................................... 27

*State v. River Forest Dev. Co.,*
    315 S.W.3d 128 (Tex. App.—Houston [1st Dist.] 2010) (Bland, J.) ............................. 51

*State v. Scott,*
    460 S.W.2d 103 (Tex. 1970) .......................................................................................... 51

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ........................................................................................................... 6

*Stevens v. Frick,*
    372 F.2d 378 (2d Cir. 1967) .......................................................................................... 10

*Swearingen v. Keller,*
    No. 1:16-cv-1181-LY, ECF 18 (W.D. Tex. July 7, 2017) ............................................. 16

*Tamez v. Chertoff,*
    No. 1:08-cv-55, 2008 WL 2214319 (S.D. Tex. Apr. 16, 2008) ..................................... 53

*Tate v. Am. Tugs, Inc.,*
    634 F.2d 869 (5th Cir. 1981) .......................................................................................... 47

*Teltech Sys., Inc. v. Bryant,*
    702 F.3d 232 (5th Cir. 2012) .......................................................................................... 38

*Texas v. Department of Labor,*
    929 F.3d 205 (5th Cir. 2019) ................................................................................. 8, 9, 42

*Texas v. Florida,*
    306 U.S. 398 (1939) ....................................................................................................... 22

*Texas v. Ysleta del Sur Pueblo,*
    367 F. Supp.3d 596 (W.D. Tex. 2019) .......................................................................... 24

*The Real Truth About Obama, Inc. v. FEC,*
   2008 WL 4905254 (4th Cir. Oct. 28, 2008) ...................................................................44

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ...................................................................................................6

*Travis v. Pennyrile Rural Elec. Co-op.,*
   399 F.2d 726 (6th Cir. 1968).........................................................................................50

*United States v. California,*
   655 F.2d 914 (9th Cir. 1980).................................................................................. 22, 25

*United States v. City of Jackson,*
   318 F.2d 1 (5th Cir. 1963) .................................................................................16, 21, 30

*United States v. City of Philadelphia,*
   644 F.2d 187 (3d Cir. 1980) ..............................................................................23, 25, 30, 31

*United States v. County Sch. Bd. of Prince George County,*
   221 F. Supp. 93 (E.D. Va. 1963) ...................................................................................25

*United States v. Hartford Acc. & Indem. Co.,*
   460 F.2d 17 (9th Cir. 1972) ...........................................................................................25

*United States v. Madison County Board of Education,*
   326 F.2d 237 (5th Cir. 1964) .........................................................................................24

*United States v. Mattson,*
   600 F.2d 1295 (9th Cir. 1979) ................................................................................ 30, 31

*United States v. Morrison,*
   529 U.S. 598 (2000).......................................................................................................21

*United States v. Raines,*
   362 U.S. 17 (1960).........................................................................................................34

*United States v. Rural Elec. Convenience Co-op. Co.,*
   922 F.2d 429 (7th Cir. 1991)..........................................................................................52

*United States v. Solomon,*
   563 F.2d 1121 (4th Cir. 1977) ................................................................................ 21, 29

*United States v. United Mine Workers of Am.,*
   330 U.S. 258 (1947).......................................................................................................46

*United Steelworkers of Am. v. United States,*
   80 S. Ct. 177 (1959) (Frankfurter, J., concurring).......................................................29

*Viands Concerted, Inc. v. Reser's Fine Foods, Inc.*,
No. 2:08-cv-914, 2008 WL 4823053 (S.D. Ohio Oct. 31, 2008)......................................47

*Victoria W. v. Larpenter*,
369 F.3d 475 (5th Cir. 2004)...........................................................................................41

*Walmart Inc. v. U.S. Dep't of Justice*,
No. 4:20-cv-00817, ECF 43 (E.D. Tex. Dec. 4, 2020) ......................................................53

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)........................................................................................................54

*Whole Woman's Health v. Cole*,
790 F.3d 563 (5th Cir. 2015), *rev'd on other grounds sub nom. Whole Woman's Health v.*
*Hellerstedt*, 136 S. Ct. 2292 (2016) ................................................................................36

*Whole Woman's Health v. Jackson*,
No. 21-50792, 2021 WL 4128951 (5th Cir. Sept. 10, 2021).....................................*passim*

*Whole Woman's Health v. Jackson*,
No. 21A24, 2021 WL 3910722 (U.S. Sept. 1, 2021) ...................................................3, 17

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989)....................................................................................................31, 45

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..............................................................................................................3

*Wyandotte Transportation Co. v. United States*,
389 U.S. 191 (1967)........................................................................................................29

*Ex parte Young*,
209 U.S. 123 (1908).................................................................................................*passim*

*Ex parte Young*,
290 U.S. 123 (1908)........................................................................................................27

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017) ...............................................................................23, 27, 30, 33

**Statutes**

5 U.S.C. § 702 ....................................................................................................................6

10 U.S.C. § 1074..............................................................................................................41

18 U.S.C. §§ 241–42 ........................................................................................................31

18 U.S.C. § 248(c)(2)(A)...............................................................................................1, 32

18 U.S.C. § 248(c)(3)(A) ......................................................................................................19

28 U.S.C. § 1257(a) ...............................................................................................................51

42 U.S.C. § 1983 ............................................................................................................ *passim*

42 U.S.C. §§ 2000a-5(a), 2000e-5(f)(1) .................................................................................32

42 U.S.C. § 2000b(a) .............................................................................................................33

42 U.S.C. §§ 2000b(a), 2000c-6(a) ..........................................................................................2

42 U.S.C. § 2000h-2 ..............................................................................................................32

52 U.S.C. §§ 10101(c), 10308(d), 10504, 20510 .................................................................32

52 U.S.C. § 10701(a)(1) ....................................................................................................1, 32

Cal. Bus. & Prof. Code § 865.2 .............................................................................................43

Tex. Civ. Prac. & Rem. Code § 30.022 ...............................................................................3, 37

Tex. Civ. Prac. & Rem. Code § 51.012 ..................................................................................51

Tex. Civ. Prac. & Rem. Code §§ 104.001, 104.004 ................................................................9

Tex. Gov't Code §§ 22.001(a), 22.007(a) .............................................................................51

Tex. Gov't Code § 402.045 .....................................................................................................9

Tex. Health & Safety Code 171.208(e) ...................................................................................2

Tex. Health & Safety Code §§ 171.008, 245.011(c)(10)–(11) ..............................................37

Tex. Health & Safety Code § 171.203 .....................................................................................3

Tex. Health & Safety Code § 171.203(b) ..............................................................................37

Tex. Health & Safety Code § 171.205 ...................................................................................19

Tex. Health & Safety Code § 171.207(a) ...............................................................................28

Tex. Health & Safety Code § 171.208 .....................................................................................3

Tex. Health & Safety Code § 171.208(a) ..........................................................................34, 39

Tex. Health & Safety Code §§ 171.208(a), 171.209(b)(2) ....................................................44

Tex. Health & Safety Code § 171.208(d) ..............................................................................46

Tex. Health & Safety Code § 171.208(e)(3) ......................................................... 46, 50

Tex. Health & Safety Code § 171.209 .......................................................... 35, 37, 51

Texas Health and Safety Code § 171.212 .................................................................55

**Other Authorities**

28 C.F.R. § 551.23 .....................................................................................................40

Fed. R. App. P. 8 ........................................................................................................57

Fed. R. Civ. P. 62(c) ..................................................................................................57

Fed. R. Civ. P. 65(d)(1) ...............................................................................................6

Fed. R. Civ. P. 65(d)(2) ...........................................................................................7, 13

John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008) ...........................28

*Opinion: Why I Violated Texas's Extreme Abortion Ban* (Sept. 18, 2021),
    https://www.washingtonpost.com/opinions/2021/09/18/texas-abortion-
    provider-alan-braid ..............................................................................................36

Restatement (Second) of Agency § 14 (1958) .............................................................8

Tex. R. Civ. P. 60 ......................................................................................................52

U.S. Const. amend. XIV, § 5 ..........................................................................18, 23, 31

U.S. Const. amend. XXVI ...........................................................................................32

U.S. Const. art. I, § 8 ..........................................................................................23, 30

U.S. Const. art. VI .....................................................................................................53

U.S. Const. art. VII ....................................................................................................20

## INTRODUCTION

The Court should deny the federal government's motion for a preliminary injunction and dismiss this case. Article III does not permit courts to hear "a proceeding against the government in its sovereign capacity" when "the only judgment required is to settle the doubtful character of the legislation in question." *Muskrat v. United States*, 219 U.S. 346, 361–62 (1911).

Disregarding this jurisdictional defect, the federal government seeks extraordinary relief—an injunction against non-party private individuals and state judges—without even identifying a cause of action. Congress has created numerous specific causes of action for the Attorney General, but not one applies here. Congress has created causes of action for the Attorney General to enforce various constitutional rights, *see, e.g.*, 52 U.S.C. § 10701(a)(1), and statutory abortion rights under the Freedom of Access to Clinic Entrances Act, *see* 18 U.S.C. § 248(c)(2)(A). But Congress has never created a cause of action to enforce a constitutional right to abortion. Instead, it has repeatedly refused to create a broader cause of action for the Attorney General.

The federal government asks the Court to dispense with the normal cause-of-action requirement based on unfounded fears that the Texas Heartbeat Act will otherwise "evade judicial review." Nothing could be further from the truth. The constitutionality of the Texas Heartbeat Act can be reviewed in the same way that virtually all of state tort law is: State-court defendants raise constitutional defenses before neutral judges sworn to follow the U.S. Constitution and, if necessary, appeal to the U.S. Supreme Court. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

True, some abortion providers might prefer to be federal-court plaintiffs rather than state-court defendants, but that preference is not a constitutional right. It is also an issue that Congress has already considered. The Attorney General has statutory causes of action to enforce certain Fourteenth Amendment rights if he concludes that the affected individuals "are unable . . . to initiate and maintain appropriate legal proceedings." 42 U.S.C. §§ 2000b(a), 2000c-6(a). But those causes of action are

limited to equal protection rights. Congress's detailed cause-of-action scheme precludes the Attorney General from bringing this suit to enforce a constitutional right to abortion.

The federal government also asks this Court to disregard the standard limitations on injunctive relief. Effectively conceding that an injunction against the State would be useless—because the State does not enforce the Heartbeat Act—the federal government seeks an injunction running against two groups of non-parties: (1) private individuals who might bring heartbeat suits and (2) state courts that might adjudicate those suits. Binding precedent forecloses both options.

The Court cannot decide that absent third parties are subject to an injunction without letting them be heard. And "an injunction against a state court would be a violation of the whole scheme of our government." *Ex parte Young*, 209 U.S. 123, 163 (1908). As the Fifth Circuit recently held, "[i]t is absurd to contend . . . that the way to challenge an unfavorable state law is to sue state court judges, who are bound to follow not only state law but the U.S. Constitution and federal law." *Whole Woman's Health v. Jackson*, No. 21-50792, 2021 WL 4128951, at *5 (5th Cir. Sept. 10, 2021).

What is worse, the federal government asks the Court to overcome all of these hurdles in order to issues an ineffective injunction against a valid law. According to the federal government, abortion providers are "chilled" by the prospect of future liability in state court. But on these facts, a preliminary injunction would not "unchill" abortion providers. In light of the strong possibility that any preliminary injunction would eventually be stayed or reversed, allowing heartbeat suits in state court to proceed, abortion providers would still face the prospect of future liability. *See* Tex. Tex. Health & Safety Code 171.208(e). In this case—where the alleged irreparable harm flows from the mere prospect of future liability—a preliminary injunction would not help.

Finally, the Texas Heartbeat Act is constitutional. Even the federal government does not challenge the constitutionality of many provisions in the Heartbeat Act. No one disputes the constitutionality of requiring doctors to determine "whether the woman's unborn child has a

detectable fetal heartbeat. Tex. Health & Safety Code § 171.203. No one disputes the constitutionality of the provision governing attorney's fees. *See* Tex. Civ. Prac. & Rem. Code § 30.022. The federal government's challenge is limited to the provision authorizing private causes of action, *see* Tex. Health & Safety Code § 171.208, but even that argument is limited to the statute's pre-viability applications. The federal government raises no argument that Texas cannot authorize heartbeat suits for post-viability abortions. In any event, the Heartbeat Act cannot violate Supreme Court precedent because it incorporates the Court's "undue burden" test as a defense.

In the end, the motion for a preliminary injunction "presents complex and novel antecedent procedural questions on which [the federal government has] not carried [its] burden." *Whole Woman's Health v. Jackson*, No. 21A24, 2021 WL 3910722, at *1 (U.S. Sept. 1, 2021). As a result, the Court "cannot say" that the federal government has "met [its] burden to prevail [on] an injunction." *Id.*

## STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

## ARGUMENT

The Court should dismiss this case because it lacks subject-matter jurisdiction and because the

federal government lacks a cause of action. The Court should deny preliminary injunctive relief for additional reasons: The federal government has not clearly shown that the Texas Heartbeat Act is unconstitutional, that a preliminary injunction would remedy irreparable harm, or that the balance of equities and public interest favor extraordinary relief.

## I.    The Federal Government Lacks the Power to Sue Texas for the Requested Relief

### A.    There Is No Justiciable Controversy between the Federal Government and Texas

This is not an Article III case or controversy. No federal court can hear a case to determine the constitutionality of a statute that the sovereign defendant is not enforcing. The fact that private parties may rely on the challenged statute in other litigation does not create a case or controversy against the sovereign. It simply shows that those other cases would be the proper cases for deciding the constitutionality of the challenged statute.

That is the holding of *Muskrat v. United States*, in which the Supreme Court considered a series of federal statutes affecting property rights of particular Indians. 219 U.S. 346 (1911). The first statute gave a defined group of Indians property rights in certain tribal assets, including lands. Subsequent federal statutes reduced those rights. Congress then created a new cause of action allowing Indians injured by the subsequent statutes to sue the federal government "to determine the validity of [those subsequent] acts of Congress." *Id.* at 349–50.

The Indian plaintiffs filed suit, just as Congress invited. They sought "to restrain the enforcement of [the challenged statutes] upon the ground that [they were] unconstitutional and void." *Id.* at 349. There was no doubt that the challenged statutes injured the plaintiffs' property interests. Those statutes "attempt[ed] to increase or extend the restrictions upon alienation, encumbrance, or the right to lease the allotments of lands" and "increase[d] the number of persons entitled to share in the final distribution of lands and funds." *Id.* at 360.

Nevertheless, the Supreme Court held that the suit was not "a 'case' or 'controversy,' to which,

under the Constitution of the United States, the judicial power alone extends." *Id.* at 361. The federal government, though "made a defendant," had "no interest adverse to the claimants." *Id.* at 361. The plaintiffs were not demanding that the government cease some enforcement action. They wanted "to determine the constitutional validity of this class of legislation." *Id.* But federal courts cannot entertain "a proceeding against the government in its sovereign capacity" when "the only judgment required is to settle the doubtful character of the legislation in question." *Id.* at 361–62. Such a judgment would not even have bound "private parties, when actual litigation brings to the court the question of the constitutionality of such legislation." *Id.* at 362. Thus, the suit was "not judicial in its nature within the meaning of the Constitution." *Id.*

Of course, the Court was willing to hear subsequent suits involving private parties. "The questions involved in this proceeding as to the validity of the legislation may arise in suits between individuals, and when they do and are properly brought before this court for consideration they, of course, must be determined in the exercise of its judicial functions." *Id.* But the interest in more quickly deciding "the constitutionality of important legislation" could not outweigh the Article III limitations on federal court jurisdiction.

*Muskrat* controls here. If the *Muskrat* plaintiffs could not sue a sovereign to challenge the constitutionality of laws enforced through private litigation, then neither can the federal government here sue Texas to challenge the Heartbeat Act. A sovereign's interest in the constitutionality of its laws, standing alone, does not make it a proper defendant. Nor does the fact that private parties will rely on those laws in other cases, even when those cases will be litigated in the sovereign defendant's courts. Indeed, that is especially so because, unlike the United States here, the Muskrat plaintiffs at least had cognizable injuries and an express cause of action. *Cf. infra* Part I.C–D.

There is no doubt that *Muskrat* remains good law. The Supreme Court cites it in major cases about federal jurisdiction. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998); *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

In fact, the Fifth Circuit expressly relied on *Muskrat* when it held that federal courts lacked jurisdiction to hear a challenge to Louisiana's statute providing "a private cause of action against medical doctors performing abortions." *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc). The court described *Muskrat* as "holding that the United States as defendant had no interest adverse to the claimants." *Okpalobi*, 244 F.3d at 426 (citing *Muskrat*, 219 U.S. 346). The same is true of Texas here. Any injury is not traceable to or redressable by any future action by the State. Thus, this is not a case or controversy that can support the exercise of federal jurisdiction.

### B.   The Federal Government Cannot Obtain Relief against State Courts, Much Less Private Individuals

Any injunction must explain *who* must act or refrain from acting. After all, "an injunction is a judicial process or mandate operating *in personam*." *Nken v. Holder*, 556 U.S. 418, 428 (2009). It therefore must "direct[] the conduct of a particular actor." *Id.*

The federal government is trying to avoid this inherent limitation on injunctive relief by asking for relief against "the State of Texas." ECF 6-2. Of course, when the shoe is on the other foot, the federal government insists that any injunction "entered against the United States . . . shall specify the Federal officer or officers . . . personally responsible for compliance." 5 U.S.C. § 702. That makes sense. Without clarity about who is supposed to do what, a defendant cannot ensure compliance with an injunction. That is why "[e]very order granting an injunction . . . must . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).

In this case, any injunction would have to specify which Texas officials are supposed to refrain from enforcing the Texas Heartbeat Act. The federal government offers only two possibilities: (1) private individuals who bring suit under the Heartbeat Act, or (2) the state courts that adjudicate those lawsuits. This Court cannot order relief against either group.

### 1.  This Court Cannot Enjoin Private Non-Parties

The federal government would have this Court enjoin private third parties from filing heartbeat suits in state court, but they are not parties to this case. An "injunction is overbroad" if "it attempts to affect rights between [a party] and [others] who [are] not parties to the action." *Bethell v. Peace*, 441 F.2d 495, 498 (5th Cir. 1971); *see also Scott v. Donald*, 165 U.S. 107, 117 (1897) ("The decree is also objectionable because it enjoins persons not parties to the suit.").

In an effort to avoid the due process problems with enjoining non-parties, the federal government argues that private potential plaintiffs are either "agents" of the State or "in active concert" with the State and thus bound by a judgment against the State. Fed. R. Civ. P. 65(d)(2). That question is not properly before the Court, but in any event, private would-be plaintiffs are not connected to the State and therefore cannot be enjoined.

First, third parties have a right to be heard on whether they are "agents" or "in active concert," so the Court cannot decide that question without their participation. Even when a party and a non-party are obviously related, as with parent and subsidiary corporations, the non-party cannot be named in an injunction without first being heard. In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, the parties "stipulated that 'for purposes of this litigation [HRI] and its parent Hazeltine Corporation will be considered to be one and the same company." 395 U.S. 100, 109 (1969). Relying on that stipulation, the district court issued an injunction against HRI, which was a party to the litigation, as well as Hazeltine, which was not. *See id.* The Supreme Court "vacat[ed] the judgments against Hazeltine." *Id.* at 110. Although injunctions can bind "those persons 'in active concert or participation with'" the parties, "[i]t was error to enter the injunction against Hazeltine, without having made this determination in a proceeding to which Hazeltine was a party." *Id.* at 112.

"*[W]hether* a particular person or firm is among the 'parties' officers, agents, servants, employees, and attorneys; [or] other persons in active concert or participation with' them is a decision

that may be made only after the person in question is given notice and an opportunity to be heard." *Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007) (Easterbrook, J.) (quoting Fed. R. Civ. P. 65(d)(2)). Thus, an injunction purporting to bind non-parties would be ineffective. *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 315–16 (1979) (noting "substantial doubt whether the Union would be subject to a contempt citation were it to ignore the restrictions"). A court "cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen [to that extent ineffectual], and the persons enjoined are free to ignore it." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (Hand, J.).

Second, the federal government asserts, in a footnote and without any supporting citation, that "the individuals who file suits under S.B. 8 should be considered 'agents' of the State under Rule 65." ECF 6-1 at 31 n.13. The federal government has forfeited that argument because it "has not adequately briefed it." *Milligan, Tr. for Westech Capital Corp. v. Salamone*, No. 1:18-cv-327-RP, 2019 WL 1208999, at *6 n.7 (W.D. Tex. Mar. 14, 2019) (Pitman, J.) (citing *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008)). Even if it were properly presented, it would be wrong. Private parties "are plainly not agents of the State" even when they have an interest in defending the constitutionality of state law. *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013). A private plaintiff bringing a heartbeat suit cannot be Texas's agent because Texas lacks "the right to control the conduct of" that private plaintiff. Restatement (Second) of Agency § 14 (1958). This is a far cry from the type of agency relationship required by Rule 65. *See, e.g., Int'l Controls & Measurements Corp. v. Watsco, Inc.*, 853 F. Supp. 585, 589 (N.D.N.Y. 1994) (subsidiary not agent of parent corporation).

Third, private parties are not "in active concert" with the State. The Fifth Circuit rejected the federal government's theory in *Texas v. Department of Labor*, 929 F.3d 205 (5th Cir. 2019). In that case, the Department of Labor ("DOL") was enjoined from enforcing one of its rules regulating overtime. *See Texas*, 929 F.3d at 207. The rule itself, however, remained in effect, and a private plaintiff sought

to enforce the rule against her employer. *See id.* The district court that had enjoined DOL held the employee in contempt, but the Fifth Circuit reversed. *See id.* at 214. DOL could not have "adequately represented [the employee's] interests" because there was no "legal relationship" making DOL "accountable to" the employee. *Id.* at 211. Further, DOL could not adequately represent private employees because the Fair Labor Standards Act ("FLSA") "explicitly establishes a private right of action" allowing employees to sue. *Id.* at 212. The Fifth Circuit expressly rejected the theory that "DOL represents every worker's legal interests through its enforcement of the FLSA so as to bind every worker in the United States to an injunction where the DOL is the only bound party." *Id.* at 213.

So too here. Texas has no legal relationship with absent third parties, and Texas does not represent the interests of those who would bring private causes of action. *See* ECF 28. Relatedly, the Texas Attorney General is generally not authorized to represent private individuals. *See* Tex. Civ. Prac. & Rem. Code §§ 104.001, 104.004; Tex. Gov't Code § 402.045.

"In essence," Rule 65(d) prevents defendants from "nullify[ing] a decree by carrying out prohibited acts through aiders and abettors," *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945), but even the federal government does not contend that private individuals are Texas's "aiders and abettors." If a private individual files a heartbeat lawsuit in state court, that individual has not "helped to bring about . . . an act of a party," which is the only thing the Court "has power to forbid." *Alemite Mfg. Corp.*, 42 F.2d at 833.

In the end, the federal government effectively asks this Court to enjoin "'all persons to whom notice of the order of injunction should come," but such an overbroad injunction would be "clearly erroneous." *Chase Nat. Bank v. City of Norwalk*, 291 U.S. 431, 436 (1934). The Court cannot "make punishable as a contempt the conduct of persons who act independently and whose rights have not

been adjudged according to law." *Id.* at 437 (citing *Alemite Mfg. Corp.*, 42 F.2d at 832).[1]

### 2.     This Court Cannot Enjoin Texas Courts

The federal government invites the Court to "specify that [an injunction] runs to the state judiciary," ECF 6-1 at 31, but that "would be a violation of the whole scheme of our government." *Ex parte Young*, 209 U.S. 123, 163 (1908). Even as it recognized a federal court's power to enjoin state executive officials "from commencing suits" in state courts, the Supreme Court cautioned that such authority "does not include the power to restrain a court from acting in any case brought before it." *Id.* "The difference between the power to enjoin an individual from doing certain things, and the power to enjoin courts from proceeding in their own way to exercise jurisdiction, is plain, and no power to do the latter exists because of a power to do the former." *Id.*

The Fifth Circuit has long rejected lawsuits against state judges. "The case or controversy requirement of Article III of the Constitution requires a plaintiff to show that he and the defendants have adverse legal interests," but "[t]he requirement of a justiciable controversy is not satisfied where a judge acts in his adjudicatory capacity." *Bauer v. Texas*, 341 F.3d 352, 359 (5th Cir. 2003).

Confirming that this rule applies here, the Fifth Circuit recently held that plaintiffs challenging the Heartbeat Act were "not 'adverse' to the state judges." *Whole Woman's Health v. Jackson*, No. 21-50792, 2021 WL 4128951, at *5 (5th Cir. Sept. 10, 2021) (quoting *Bauer*, 341 F.3d at 359). "When acting in their adjudicatory capacity, judges are disinterested neutrals who lack a personal interest in

---

[1] The federal government contends that "individuals who file suits under S.B. 8 are properly considered state actors," ECF 6-1 at 31 n.19, but even when "the State [is] responsible for [a] statute," "[a]ction by a private party pursuant to [the] statute, without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 938–39 (1982) (describing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978)). "[T]here is no 'state action' to be found in the mere filing of a private civil tort action in state court." *Henry v. First Nat'l Bank of Clarksdale*, 444 F.2d 1300, 1312 (5th Cir. 1971); *see also Slotnick v. Garfinkle*, 632 F.2d 163, 166 (1st Cir. 1980); *Stevens v. Frick*, 372 F.2d 378, 381 (2d Cir. 1967); *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1086 (4th Cir. 1979); *Hu v. Huey*, 325 F. App'x 436, 440 (7th Cir. 2009) (per curiam); *Gras v. Stevens*, 415 F. Supp. 1148, 1152 (S.D.N.Y. 1976) (three-judge district court) (Friendly, J.). But even if private individuals qualified as state actors, that would not allow the Court to enjoin them as non-parties for the reasons explained above.

the outcome of the controversy." *Id.* "It is absurd to contend, as Plaintiffs do, that the way to challenge an unfavorable state law is to sue state court judges, who are bound to follow not only state law but the U.S. Constitution and federal law." *Id.*

In light of that obligation, neither the federal government nor any potential state-court defendant can show a "*certainly impending*" injury traceable to state courts. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Whether any given state court will find the defendant liable is a matter of pure speculation. If a state-court defendant presented a meritorious constitutional defense, then the state judge would be duty-bound to dismiss the case. The federal government presents no evidence suggesting that state judges will fail to do so. Moreover, in light of a state judge's obligation not to prejudge cases, each judge lacks the adverse interests necessary to support federal jurisdiction at this time, even if at some later time that judge might rule as the federal government fears.

The other federal courts to consider this question have reached the same conclusion. As now-Justice Breyer wrote for the First Circuit, "at least ordinarily, no 'case or controversy' exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *In re Justices of Supreme Court of Puerto Rico*, 695 F.2d 17, 21 (1st Cir. 1982) (Breyer, J.). The Supreme Court and the Fifth Circuit have approved that ruling. *See Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984) (citing *In re Justices of Supreme Court of Puerto Rico*, 695 F.2d 17); *Bauer*, 341 F.3d at 361 (same).

Similarly, the Eleventh Circuit affirmed the denial of a preliminary injunction against a state judge in *Paisey v. Vitale In & For Broward County*, 807 F.2d 889 (11th Cir. 1986). Relying on the Fifth Circuit's decision in *Henry*, the court rejected as "without merit" the federal-court plaintiff's argument that "[a state judge's] action in hearing [the state-court plaintiff's] lawsuit . . . violates his federal rights." *Id.* at 893. There was "absolutely no basis for alleging action under color of state law merely by virtue of the fact the Florida state courts [were] adjudicating [the] controversy." *Id.* at 894–95.

In *Mendez v. Heller*, the court held that a state judge did not "have an interest adverse to [the

11

plaintiff's] in the determination of the" constitutionality of a state statute because he was "a judicial officer bound to decide the issue according to the law as he finds it." 380 F. Supp. 985, 990 (E.D.N.Y. 1974), *aff'd*, 530 F.2d 437, 459 (2d Cir.1976). "The critical difficulty" preventing federal jurisdiction was "that any action that [the state judges] could take . . . would necessarily be a judicial determination," meaning "the essential quality of adverseness is intrinsically absent." *Id.* at 993.

Judge Friendly similarly explained that a plaintiff challenging the constitutionality of a state statute could not sue state judges because any relevant actions they took would "be in their capacity as judges who, like [federal judges], have taken an oath or affirmation to support the Constitution of the United States." *Gras v. Stevens*, 415 F. Supp. 1148, 1151 (S.D.N.Y. 1976) (three-judge district court). "If [the plaintiff was] right in thinking that" the challenged law was unconstitutional, then the state judges would be "as bound to strike it down as [federal judges] are." *Id.*

Ignoring this on-point caselaw, the federal government cites *Pulliam* for the proposition that judicial immunity does not bar injunctive relief against a judge. That is irrelevant. Judicial immunity is not the only barrier to issuing injunctive relief against a judge. As *Pulliam* itself recognized, "Article III also imposes limitations on the availability of injunctive relief against a judge." *Pulliam*, 466 U.S. at 538 n.18. Those Article III limitations are what the cases cited above applied.[2]

Effectively conceding the impropriety of suing a judge *directly*, the federal government suggests it can sue a judge *indirectly*: "Even if a suit directly against a judge could not proceed, this is a suit against Texas, including its officers, employees, and agents." ECF 6-1 at 32 n.14. Under *Muskrat*, though, a judgment against a sovereign defendant does not bind that sovereign's courts in future

---

[2] It is worth noting that Congress thought *Pulliam* was wrong about judicial immunity. "Congress responded to *Pulliam* in 1996 by amending § 1983 to abrogate its holding." *Justice Network Inc. v. Craighead County*, 931 F.3d 753, 763 (8th Cir. 2019). "The Senate report indicates that the amendment 'restores the doctrine of judicial immunity to the status it occupied prior to . . . *Pulliam'* because *Pulliam* had departed from '400 years of common-law tradition and weakened judicial immunity protections.'" *Id.* at 763 n.6 (quoting S. Rep. 104-366, at *36–37, 1996 U.S.C.C.A.N. 4202, 4216).

litigation. The Supreme Court explained that "a proceeding against the government in its sovereign capacity" to determine the constitutionality of its legislation would not resolve the issue for "private parties, when actual litigation brings to the court the question of the constitutionality of such legislation." *Muskrat*, 219 U.S. at 361–62. That makes sense only if the federal courts hearing such claims would not have been bound by a judgment against the United States. By analogy, then, an injunction against Texas in this case would not bind state courts hearing heartbeat lawsuits.

In any event, the federal government gets things precisely backward. There are *more* hurdles, not fewer, to enjoining those who are not named as defendants. As explained above, this Court cannot pre-decide that judicial officials are within the scope of Rule 65(d)(2)—and would therefore be subject to any injunction issued against Texas—when they are not parties to this case. *See supra* Part I.B.1.

Moreover, judicial officials are not within the scope of Rule 65(d)(2) and would not be covered by an any injunction issued against Texas. Judicial officials are not "aiders and abettors" of Texas. *Regal Knitwear Co.*, 324 U.S. at 14. On the contrary, they are "acting in their adjudicatory capacity" as "disinterested neutrals who lack a personal interest in the outcome of the controversy." *Whole Woman's Health v. Jackson*, No. 21-50792, 2021 WL 4128951, at *5 (5th Cir. Sept. 10, 2021).

The federal government next proposes that, even if the Court cannot enjoin state judges, it could enjoin state court clerks, *see* ECF 6-1 at 32, but federal courts cannot enjoin any part of the state judiciary from adjudicating claims. The Supreme Court itself rejected the contention that a federal court would have "power to prevent any investigation or action by a grand jury" because a grand jury "is part of the machinery of a criminal court, and an injunction against a state court would be a violation of the whole scheme of our government." *Ex parte Young*, 209 U.S. at 163.

The Fifth Circuit also rejected the federal government's theory just a few weeks ago. A clerk's "duty within the court is to accept and file papers in lawsuits, not to classify 'acceptable' pleadings. Accordingly, the clerks are improper defendants against whom injunctive relief would be

meaningless." *Id.* The federal government's argument does nothing to dispel the "grave doubts that the clerks of various courts have a real interest in defending" actions taken by the courts because "their job [is] primarily ministerial." *Cavett v. Ellis*, 578 F.2d 567, 570 n.6 (5th Cir. 1978); *see also Mendez v. Heller*, 380 F. Supp. 985, 990 (E.D.N.Y. 1974) (per curiam) (ruling that "the Clerk of the Marital Part has no adversary interest" because "if the complaint is one that the Court, State or Federal, advises him is properly to be entertained and filed, it is his duty to file it"), *aff'd*, 530 F.2d 437, 460 (2d Cir.1976) (concluding the clerk "is not an appropriate defendant").

In addition, injunctive relief against state courts is barred because such an injunction was "unknown to equity jurisprudence" before 1789. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999). "[T]he equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence." *Id.* Thus, this Court must ask "whether the relief [the federal government] requested here was traditionally accorded by courts of equity." *Id.* at 319. The Supreme Court has already supplied the answer: No.

"At the common law itself, there was no such thing as an injunction against a judge. Injunctive relief was an equitable remedy that could be awarded by the Chancellor only against the parties in proceedings before other courts." *Pulliam*, 466 U.S. at 529 (citing 2 J. Story, Equity Jurisprudence ¶ 875, p. 72 (11th ed. 1873)). The *Pulliam* majority and dissent were in agreement on this point: "[S]uits for injunctive relief against a judge could not be maintained either at English common law or in the English courts of equity." *Id.* at 549 (Powell, J., dissenting). The source on which both relied—Joseph Story's famous treatise on equity—could hardly be clearer or more authoritative:

> A writ of injunction is in no just sense a prohibition to those courts in the exercise of their jurisdiction. It is not addressed to those courts. It does not even affect to interfere with them. The process, when its object is to restrain proceedings at law, is directed

only to the parties.[3]

That *Pulliam* itself contemplated injunctive relief against a judge "under § 1 of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983," 466 U.S. at 524, does not undermine the *Grupo Mexicano* limitation on injunctive relief available under "[t]he Judiciary Act of 1789." 527 U.S. at 318. *Grupo Mexicano* itself distinguished between "the Court's general equitable powers under the Judiciary Act of 1789" and "its powers under [a] statute authorizing issuance of [specific] injunctions." *Id.* at 326.

Confirming these limits on injunctive relief are related limits on the writ of prohibition. Historically, the writ of prohibition has been used "to control inferior courts," *Pulliam*, 466 U.S. at 532 n.6, but federal courts cannot issue the writ to control state courts.

In "modern practice," courts usually "do not distinguish between mandamus and prohibition." *In re Gee*, 941 F.3d 153, 158 n.2 (5th Cir. 2019). Thus, the Fifth Circuit precedent forbidding writs of mandamus to a state court also forbids writs of prohibition. "[F]ederal courts have no general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties where mandamus is the only relief sought." *Lamar v. 118th Judicial Dist. Court of Tex.*, 440 F.2d 383, 384 (5th Cir. 1971) (per curiam); *see also Moye v. Clerk, DeKalb County Superior Court*, 474 F.2d 1275, 1276 (5th Cir. 1973) (per curiam) ("[A] federal court lacks the general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties where mandamus is the only relief sought."); *Lewis v. Young*, 996 F.2d 306, 1993 WL 241788, at *1 (5th Cir. 1993) (per curiam). Other courts agree. "[F]ederal courts have no authority to issue writs of mandamus to direct state courts or their judicial officers in the performance of their duties." *Haggard v. State of Tenn.*, 421 F.2d 1384, 1386 (6th Cir. 1970). "The federal courts are without power to issue writs of mandamus to direct state courts or their judicial officers in the performance of their duties." *Clark v.*

---

[3] 2 Joseph Story, Commentaries on Equity Jurisprudence at 166 § 575 (1836), available at https://www.google. com/books/edition/Commentaries_on_Equity_Jurisprudence_as/u7E-_kNzfCgC?hl.

*State of Wash.*, 366 F.2d 678, 681 (9th Cir. 1966). This Court even dismissed "as frivolous" a complaint "equivalent [to] a petition for mandamus relief because it request[ed] this court to direct the state court." *Swearingen v. Keller*, No. 1:16-cv-1181-LY, ECF 18 at 7–8 (W.D. Tex. July 7, 2017).

When federal courts consider prohibition separately from mandamus, they still refuse to issue writs of prohibition to state courts. Prohibition "is not an appropriate remedy to control jurisdiction of other, nonsubordinate courts." *Siler v. Storey*, 587 F. Supp. 986, 987 (N.D. Tex. 1984). Thus, "a federal district court cannot issue a writ to a state court." *Londono-Rivera v. Virginia*, 155 F. Supp. 2d 551, 559 n.1 (E.D. Va. 2001); *see Middlebrooks v. Thirteenth Judicial Dist. Circuit Ct.*, 323 F.2d 485, 486 (8th Cir. 1963) (per curiam) ("Since we have no power to review and correct any order or judgment of the state court, we cannot issue writs in potential control or supervision as to such a power."). This limit on federal judicial authority has been known since the beginning of our country.[4]

Finally, even if injunctive relief against state courts were otherwise proper—it is not—it would run afoul of congressionally placed limits on injunctive relief. When Congress created a cause of action for the redress of constitutional violations, it specifically forbade injunctive relief against state judges. "[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *see Whole Woman's Health v. Jackson*, 21-50792, 2021 WL 4128951, at *5 (5th Cir. Sept. 10, 2021). To be sure, the federal government is not proceeding under Section 1983, albeit because it is not authorized to do so. *See United States v. City of Jackson*, 318 F.2d 1, 8 (5th Cir. 1963). But Section 1983 still evinces congressional policy. "[T]he fact that Congress chose to" forbid injunctive relief against state courts in Section 1983 "strongly indicates that Congress had

---

[4] *See* Letter from Alexander J. Dallas, the first reporter of Supreme Court decisions, to Thomas Jefferson (Feb. 13, 1805), transcript available at https://founders.archives.gov/documents/Jefferson/99-01-02-1147 and scanned image available at https://www.loc.gov/resource/mtj1.032_0499_0502/ (arguing that federal courts cannot issue writs of prohibition to start courts).

no wish to create" the opportunity for such injunctive relief in a suit it has not authorized at all. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 75–76 (1996); *see infra* Part I.D (explaining that Congress has not authorized the Department of Justice to bring this suit). "It would wholly frustrate explicit congressional intent to hold that the" federal government "could evade this" limitation on injunctive relief "by the simple expedient of putting a different label on [its] pleadings." *Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973) (preventing state prisoner plaintiffs from evading the exhaustion requirement of habeas claims by bringing Section 1983 claims instead).

Against all of this authority, the federal government relies on *Shelley v. Kraemer*, 334 U.S. 1 (1948), *see* 6-1 at 31–32, but *Shelley* found state action "only after a final judgment or otherwise dispositive order on the merits had been rendered by the state court," not in the mere adjudication of a case. *Henry*, 444 F.2d at 1309 (footnote omitted) (distinguishing *Shelley*); *Paisey*, 807 F.2d at 893 (same). *Shelley* therefore cannot support a claim for injunctive relief before any judgment has issued, especially because the substance of any future judgment is, at this point, a matter of speculation. Further, *Shelley*'s procedural posture illustrates how review of state-court action is supposed to work. The Supreme Court granted certiorari to review the judgments of two state supreme courts that adjudicated the rights of private litigants. *See Shelley*, 334 U.S. at 4–6. Even *Shelley* did not contemplate a federal-court injunction against a state-court judge.

### C.    The Federal Government Is Not Injured

The federal government had no apparent interest in challenging the Texas Heartbeat Act until the Supreme Court denied private plaintiffs' motion for an injunction pending appeal. *See Whole Woman's Health*, 2021 WL 3910722, at *1. It now forthrightly argues that "jurisdictional obstacles to the ability of women and providers to sue to protect their rights" justify its decision to sue Texas. ECF 6-1 at 1. That is fatal to its standing because "settled doctrine" holds that a sovereign plaintiff lacks standing where it is "merely litigating as volunteer the personal claims of its citizens." *Pennsylvania v.*

*New Jersey*, 426 U.S. 660, 665 (1976) (collecting cases).

### 1.    The Federal Government Lacks *Parens Patriae* Standing

The federal government claims *parens patriae* standing, but it misapplies the doctrine. Relying on precedent authorizing the States to sue as *parens patriae*, the federal government assumes that it has the same authority. It does not.

A suit purportedly "to protect the constitutional rights of women in Texas" cannot rest on *parens patriae* standing. ECF 6-1 at 1. A *parens patriae* cannot "step[] in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982). "In fact, if nothing more than this is involved— *i.e.*, if the State is only a nominal party without a real interest of its own—then it will not have standing under the *parens patriae* doctrine." *Id.* at 600–01 (collecting cases).

The Supreme Court has said that *States* can support *parens patriae* standing based on their "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general" and their "quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607. The States "have broad authority to enact legislation for the public good," *id.*, and "health laws of every description" are within the States' "police" powers. *Mayor, Aldermen & Commonalty of City of New York v. Miln*, 36 U.S. (11 Pet.) 102, 133 (1837) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824)). That is why States have a quasi-sovereign interest in the general health and well-being of their citizens.

But the federal government does not have the same authority. Unlike the States, it does not possess the police power. *See, e.g.*, *Bond v. United States*, 572 U.S. 884, 854 (2014). True, "the Congress" has an interest in the enforcement of the Fourteenth Amendment, U.S. Const. amend. XIV, § 5, but it has not given the U.S. Attorney General any authority to bring a *parens patriae* suit about abortion rights. On the contrary, it has impliedly prohibited such suits by creating a much more limited *parens*

*patriae* regime for abortion rights. The Freedom of Access to Clinic Entrances Act authorizes "the Attorney General of a *State*" to "commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State" regarding certain statutory abortion rights. 18 U.S.C. § 248(c)(3)(A) (emphasis added). The federal government has not pointed to any similar *parens patriae* statute authorizing it to sue here.

Even if the federal government could bring a *parens patriae* action based on the general health of Texas citizens, it has not clearly shown that the Texas Heartbeat Act is hazardous to women's health. Pregnancy is not an illness. And to the extent a woman's pregnancy places her health in danger, the law contains an exception for medical emergencies. *See* Tex. Health & Safety Code § 171.205. Indeed, in channeling abortions that might have been performed later in a woman's pregnancy to the earlier stages, the Texas Heartbeat Act makes abortion safer. "The earlier in pregnancy that an abortion is done, the safer it is." *Adams & Boyle, P.C. v. Slatery*, 494 F. Supp. 3d 488, 514 (M.D. Tenn. 2020) (quoting the abortion provider's medical expert), *rev'd. sub nom. Bristol Regional Women's Center, P.C. v. Slatery*, 7 F.4th 478 (6th Cir. 2021) (Thapar, J.). Without evidence of a public-health injury, the federal government's *parens patriae* argument fails on its own terms.

Finally, the federal government's transparent effort to overcome the sovereign-immunity problems that plagued private challenges to the Heartbeat Act demonstrates the inapplicability of *parens patriae* standing. As Justice Brennan explained, "where one State brings a suit *parens patriae* against another State, a more circumspect inquiry may be required in order to ensure that the provisions of the Eleventh Amendment are not being too easily circumvented by the device of the State's bringing suit on behalf of some private party." *Alfred L. Snapp & Son*, 458 U.S. at 611 (Brennan, J., concurring). The same circumspection is required here.

### 2.  The Federal Government Lacks a Sovereign Injury

The federal government also claims a "sovereign interest" in making sure States do not violate

the Constitution, ECF 6-1 at 1, but that is not an interest that can support standing. True, the Supreme Court has recognized a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" that "involves the power to create and enforce a legal code." *Alfred L. Snapp*, 458 U.S. at 601. But the Constitution is not a legal code created by the federal government. On the contrary, the federal government was created by the Constitution, and the States, not the federal government, created the Constitution. *See* U.S. Const. art. VII. Again, although the Constitution gives Congress the power to enforce the Fourteenth Amendment through appropriate legislation, Congress denied the executive branch any authority to enforce any right to abortion under the Fourteenth Amendment. *See infra* Part II.D. For these reasons, the federal government does not have a sovereign interest that could support standing.

The federal government cites *In re Debs*, 158 U.S. 564 (1895), but it misunderstands the case. *See* ECF 6-1 at 32–33. That case explains that the federal government, like any other party, can bring any lawsuit in which it has a proprietary interest. The federal government has such an interest "in the mails," so it had standing on that basis. *Debs*, 158 U.S. at 583. The Supreme Court also pointed to a second basis for standing: the federal government's interest in protecting interstate commerce. The Supreme Court included the following *dicta*:

> Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.

*Debs*, 158 U.S. at 584.

*Debs*' interference-with-commerce theory of standing turned on the fact that "[t]he national government, given by the constitution power to regulate interstate commerce, has by express statute assumed jurisdiction over such commerce when carried upon railroads." *Id.* at 586. That meant the

federal government was "charged, therefore, with the duty of keeping those highways of interstate commerce free from obstruction, for it has always been recognized as one of the powers and duties of a government to remove obstructions from the highways under its control." *Id.* That was the "dut[y]" "the discharge of" which gave the federal government "standing" to seek "proper assistance" from the courts. *Id.* at 584.

Standing under *Debs* requires the federal government to demonstrate "a well-defined statutory interest of the public at large." *United States v. Solomon*, 563 F.2d 1121, 1127 (4th Cir. 1977). "[A]n interest, in the generic sense," is not enough. *Id.* at 1125. "[T]he Debs Court specifically noted that the duty on which the standing of the United States rested arose not simply from the constitutional grant of power to regulate commerce but from congressional action expressly assuming and implementing that power." *Clark v. Valeo*, 559 F.2d 642, 654 (D.C. Cir. 1977) (Tamm, J., concurring).[5]

In this case, however, the federal government has not "by express statute assumed jurisdiction over" post-heartbeat abortions. *Id.* at 586. The only federal abortion statute cited banned partial-birth abortions. *See* ECF 6-1 at 27 (citing 18 U.S.C. § 1531(a)). Indeed, under the Supreme Court's Commerce Clause jurisprudence, there is a serious question whether Congress even has the power to protect all post-heartbeat abortions without some further jurisdictional hook, *see United States v. Morrison*, 529 U.S. 598, 615–16 (2000), let alone whether the Executive Branch can unilaterally sue to protect those abortions based on the purported effect on interstate commerce. *Cf. Jinks v. Richland County*, 538 U.S. 456, 464 (2003) (noting the possibility that a law could be enacted "as a 'pretext' for

---

[5] The federal government relies on *United States v. City of Jackson* to support its reading of *Debs*, *see* ECF 6-1 at 23 (citing 318 F.2d 1 (5th Cir. 1963)), but it omits that case's subsequent history. On a petition for rehearing, two members of the original three-judge panel partially withdrew their concurrences. *See* 320 F.2d 870 (5th Cir. 1963). Depriving the original opinion of a majority, those two judges specified that the federal government had "ample statutory authorization for the maintenance of th[e] suit" and therefore did "not reach the question whether the United States would have standing to sue under the Commerce Clause of the Constitution absent all of these enactments of the Congress." *Id.* at 872–73 (Bootle, J., specially concurring); *accord. id.* at 873 (Ainsworth, J., specially concurring).

'the accomplishment of objects not entrusted to the [federal] government'"). Congress certainly has not created a statutory duty for the executive branch to remove a State's regulations of abortion.

Without a statutory duty to prevent private lawsuits under the Texas Heartbeat Act, the federal government cannot claim standing to seek "proper assistance in . . . the discharge of" such a duty. *Debs*, 158 U.S. at 584.

### D.    The Federal Government Lacks a Cause of Action

Relatedly, the federal government also does not have a cause of action. "The federal government, of course may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980); *see also Lee v. Yee*, 643 F. Supp. 593, 596 (D. Haw. 1986), *aff'd sub nom. United States v. Hawaii*, 832 F.2d 1116 (9th Cir. 1987) (per curiam).

The federal government's sovereign status does not change the analysis. "When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors."[6] "[I]t must establish a case of equitable cognizance, and a right to the particular relief demanded." *Id.* Thus, a court cannot award relief unless it is convinced "that a cause of action cognizable in equity is alleged and proved," even when one sovereign sues another. *Texas v. Florida*, 306 U.S. 398, 411 (1939).

For this reason, the federal government must establish "a right of action given by some statute" or "a common-law right of action." *Denver & R.G.R. Co. v. United States*, 241 F. 614, 616 (8th Cir. 1917) (rejecting a claim by the federal government). This it cannot do.

### 1.    There Is No Constitutional or Statutory Cause of Action

The federal government does not appear to rely on any constitutional or statutory cause of

---

[6] 1 John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* at 586 § 330 (1905), https://www.google.com/books/edition/A_Treatise_on_Equitable_Remedies/CZpDAQAAMAAJ?hl.

action—and rightfully so.

The Constitution does not create causes of action at all. Instead, it empowers Congress to pass legislation creating causes of action in certain circumstances. *See, e.g.*, U.S. Const. art. I, § 8; U.S. Const. amend. XIV, § 5. The two constitutional provisions at issue in this case, the Supremacy Clause and the Due Process Clause, are no exceptions. "[T]he Supremacy Clause . . . certainly does not create a cause of action" either expressly or impliedly. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). It "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* The same goes for the Due Process Clause with regard to its restrictions on state law. *See, e.g.*, *Hearth, Inc. v. Dep't of Pub. Welfare*, 617 F.2d 381, 382–83 (5th Cir. 1980) (per curiam) (refusing to find an implied cause of action under the Fourteenth Amendment's Due Process Clause); *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) (per curiam); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) ("[A] litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution."). "[T]he fourteenth amendment does not implicitly authorize the United States to sue to enjoin violations of its substantive prohibitions." *United States v. City of Philadelphia*, 644 F.2d 187, 201 (3d Cir. 1980).[7]

The federal government also disclaims any effort to identify a statutory cause of action. *See* ECF 6-1 at 23 ("even without an express statutory cause of action," "absence of express statutory

---

[7] In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court accepted "a former congressional staffer's Fifth Amendment claim of dismissal based on sex," but "it is doubtful that" the Supreme Court would "reach[] the same result" if it "decided [that case] today." *Hernandez v. Mesa*, 140 S. Ct. 735, 741–43 (2020). In any event, regardless of what *Davis* says about sex-discrimination claims under the Fifth Amendment's Due Process Clause, it did not consider abortion claims under the Fourteenth Amendment's Due Process Clause, which has a separate enforcement scheme, *see* U.S. Const. amend. XIV, § 5; 42 U.S.C. § 1983, nor did it consider creating a cause of action in favor of the federal government. "[T]he notable change in the [Supreme] Court's approach to recognizing implied causes of action" has turned "expanding the *Bivens* remedy" into "a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). Thus, as the federal government has repeatedly and successfully urged when it is a defendant rather than a plaintiff, this Court should not countenance "even a modest extension" of *Bivens*, much less the radical transformation that would be required to support a cause of action in this case. *Id.* at 1864.

authority"). Although Congress has authorized suits by other types of plaintiffs to enforce the Fourteenth Amendment against other types of defendants, and has authorized the federal government to enforce certain other constitutional rights and statutory abortion rights through civil suits, no statute confers a cause of action on the federal government to sue Texas for the claim here.[8]

## 2. There Is No Common-Law or Equitable Cause of Action

The federal government has not identified a specific common-law or equitable cause of action that could support this suit. It asks for an injunction, but "an injunction is not a cause of action." *Novedea Sys., Inc. v. Colaberry, Inc.*, No. 6:20-cv-180, 2020 WL 9211073, at *2 (E.D. Tex. Dec. 11, 2020); *see also Jones v. Wells Fargo Bank, N.A.*, No. 5-14-cv-943-RP, 2015 WL 12734177, at *4 (W.D. Tex. Jan. 21, 2015) (Pitman, J.).

No equitable cause of action applies here. Courts have consistently declined to recognize equitable causes of action that would allow the federal government to generally challenge alleged constitutional violations.

The Fifth Circuit rejected the federal government's efforts to litigate the Fourteenth Amendment rights of individuals in *United States v. Madison County Board of Education*, 326 F.2d 237 (5th Cir. 1964). There, the federal government "urge[d] that the violations of the Fourteenth Amendment rights of the children of members and employees of the Armed Forces burden[ed] the exercise of the war power" and gave the federal government the right to bring suit. *Id.* at 242. Describing the federal government's argument as "unprecedented and extremely dangerous," the Fifth Circuit held that the Fourteenth Amendment and the war power combined could not support the suit. *Id.* at 242–43; *accord*

---

[8] "The Declaratory Judgment Act provides no independent cause of action." *Texas v. Ysleta del Sur Pueblo*, 367 F. Supp.3d 596, 602 (W.D. Tex. 2019); *accord Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 500 (5th Cir. 2020) (Oldham, J., concurring). The federal government as repeatedly and successfully advanced that position as a defendant. *See, e.g., Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). Regardless, the Declaratory Judgment Act could not support a request for a preliminary injunction.

*United States v. County Sch. Bd. of Prince George County*, 221 F. Supp. 93, 104 (E.D. Va. 1963).

Other courts agree. In *Philadelphia*, the Third Circuit considered "whether the United States has implied authority to sue a city and its officials for an injunction against violations of the fourteenth amendment rights of individuals." 644 F.2d at 189. "[A]lmost every court that has had the opportunity to pass on the question" has agreed "that the United States may not sue to enjoin violations of individuals' fourteenth amendment rights without specific statutory authority." *Id.* at 201. That precedent is consistent with the "three separate refusals of Congress to grant [the Attorney General] this authority and a widely-shared understanding that the authority does not exist." *Id.* at 203.

The federal government attempts to distinguish this case on the ground that it is exceptional. *See* ECF 6-1 at 26. But the federal government seems to believe its cases are often "exceptional," and the precedent cited above has already explained why that proposed limitation is unworkable. *Philadelphia*, 644 F.2d at 201. The federal government also cites the Take Care Clause, *see* ECF 6-1 at 25, but that does not change anything. *See id.* at 199 (rejecting that argument).

Nor is there an equitable cause of action for the federal government's Supremacy Clause claims. No precedent "hold[s] that considerations of federal supremacy can create a cause of action where none exists under state law or otherwise." *United States v. Hartford Acc. & Indem. Co.*, 460 F.2d 17, 19 (9th Cir. 1972) (affirming judgment against the federal government).

In fact, the Supreme Court has already rejected the federal government's theory: The financial obligation to reimburse a federal contractor for expenses created by state law is not sufficient to create a federal cause of action. In *United States v. California*, a federal contractor managed oil drilling operations on behalf of the federal government. 507 U.S. 746, 748 (1993). California imposed taxes on the contractor, which the contractor paid under protest with funds provided by the federal government. *See id.* at 748–49. The federal government then filed suit against California, "argu[ing] it was entitled to recovery based on the federal common-law cause of action for money had and

received." *Id.* at 749. The Supreme Court unanimously rejected that claim. "[T]he Government cannot use the existence of an obligation to indemnify [a federal contractor] to create a federal cause of action for money had and received to recover state taxes paid by [that contractor]." *Id.* at 754.

The federal government acknowledges the "past cases where courts have held that the mere fact that federal constitutional rights are being violated does not necessarily authorize the United States to sue." ECF 6-1 at 25. It attempts to distinguish those cases on the ground that the Heartbeat Act "thwart[s] ordinary mechanisms of federal judicial review through a congressionally conferred cause of action," *id.*, but the statute does not thwart judicial review at all. It not only allows but *requires* pre-enforcement judicial review in state court, and a losing litigant can seek review by the U.S. Supreme Court. There is nothing "unique" about the "circumstances presented here." ECF 6-1 at 25. State tort law is often "enforced" by private parties in state court with appeals to the U.S. Supreme Court. Indeed, the Texas Heartbeat Act is not even the only state law to create a private cause of action that the Fifth Circuit has considered in the last twenty years. *See Okpalobi*, 244 F.3d at 429 (reversing an injunction regarding Louisiana's similar law); *see also Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) (noting "enforcement [occurs] only through private actions").

In any event, even if these were "unique circumstances," it would not justify the creation of a new equitable cause of action. As the Department of Justice has successfully urged when it is opposing novel equitable relief based on putatively unique circumstances, the Supreme Court's "traditionally cautious approach to equitable powers . . . leaves any substantial expansion of past practice to Congress," not lower federal courts. *Grupo Mexicano*, 527 U.S. at 329; *see Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, 973 F.3d 121, 123–24 (D.C. Cir. Aug. 31, 2010), *vacated*, No. 19-5331 (D.C. Cir. July 13, 2021). The federal government's proposal to create a new equitable cause of action would violate not only *Grupo Mexicano* but also the Supreme Court's post-*Bivens* precedent. When a plaintiff argues that "traditional equitable powers [do not] suffice to give necessary

constitutional protection" and that "a damages remedy is necessary," the Supreme Court considers "a number of economic and governmental concerns." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017). Considering these concerns, the Supreme Court has not recognized a *Bivens* cause of action in more than forty years. *See id.* at 1854–55 (describing "the only instances in which the Court has approved of an implied damages remedy under the Constitution itself"). Those same considerations counsel against creation of new equitable causes of action beyond the "traditional equitable powers" federal courts have enjoyed since 1789. *Id.* at 1856. *See supra* n.7.

The federal government further suggests it must have a cause of action because "equity suffers not a right to be without a remedy," ECF 6-1 at 24 (cleaned up), but it ignores the available remedies, including raising constitutional defenses in state court and removal of any suits against federal officers. Moreover, the federal government is in no position to make this argument in light of its success persuading the Supreme Court rights often do not have remedies. For example, the Supreme Court has declined to create a *Bivens* cause of action even when there would be "no remedy whatsoever for" particular claims. *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (describing *Bush v. Lucas*, 462 U.S. 367, 386 (1983)); *see Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc) (explaining the import of *Chilicky* and *Bush*).

Notably, the federal government does *not* rely on the equitable cause of action that allows federal courts to "grant injunctive relief against state *officers* who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326–27 (emphasis added); *see Ex parte Young*, 290 U.S. 123 (1908). Even when "no one . . . is arguing about sovereign immunity," "the second of *Ex parte Young*'s holdings" is relevant to "whether [the plaintiff] has an equitable cause of action." *Freedom From Religion Found., Inc. v. Mack*, No. 21-20279, 2021 WL 2887861, at *4 n.3 (5th Cir. July 9, 2021). But an *Ex parte Young* action cannot be brought against Texas. *See Green v. Mansour*, 474 U.S. 64, 68 (1985). It must be brought against a state officer enforcing the challenged law, not the State itself. *See Mi Familia Vota v.*

*Abbott*, 977 F.3d 461, 467 (5th Cir. 2020). Here, the federal government has not sued a state official at all, much less an "official [with] a sufficient 'connection' with the enforcement of an allegedly unconstitutional law." *Id.* at 467; *see also Mack*, 2021 WL 2887861, at *4. Moreover, there is no equitable tradition of the federal government invoking *Ex parte Young* to vindicate the constitutional rights of individuals. *See supra* Part I.C.1.

Likewise, although equity sometimes provides a cause of action that "enable[s] potential legal defendants to assert their defenses preemptively," John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008), the federal government does not and cannot invoke that proposition here. The federal government is not a potential defendant to a heartbeat suit in state court. Nor has the federal government asserted a defense by suing a would-be state-court plaintiff. Instead, it has sued Texas itself. Sovereign immunity aside, an equitable cause of action for an anti-suit injunction against Texas does not make any sense because Texas could not institute a heartbeat suit against anyone, much less the federal government. *See* Tex. Health & Safety Code § 171.207(a); *Whole Woman's Health*, 2021 WL 4128951, at *4 ("No enforcement power means no enforcement power.").

None of the cases that the federal government cites supports a cause of action here. The federal government relies on *Debs*, *see* ECF 6-1 at 22–23, but as explained above, the cited portions of that case were about whether the federal government had standing, not whether it had a cause of action. *See supra* Part I.C.2. *Debs* did not extensively analyze the federal government's cause of action because the Supreme Court was considering a petition for habeas corpus, not an appeal from the underlying injunction, but it was the well-known equitable cause of action to abate a public nuisance. "[T]he obstruction of a highway is a public nuisance, and a public nuisance has always been held subject to abatement at the instance of the government." *Debs*, 158 U.S. at 587 (citation omitted).

Since long before *Debs*, it had been "settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general." *City of Georgetown v. Alexandria*

*Canal Co.*, 37 U.S. 91, 98 (1838). "The crux of the Debs decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest." *United Steelworkers of Am. v. United States*, 80 S. Ct. 177, 186 (1959) (Frankfurter, J., concurring).

The cause of action to abate a public nuisance, however, is no help to the federal government in this case. The Texas Heartbeat Act simply creates a private cause of action. That is not a public nuisance, and the federal government does not argue otherwise. *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 691–92 (5th Cir. 2021) (listing examples of public nuisances, including "loud and disturbing noises," "bad odors, smoke, dust and vibration").

Moreover, even if *Debs* had created a cause of action, it would not apply where "there is . . . no factor of interstate commerce." *Solomon*, 563 F.2d at 1129. "Where . . . there was no basis on which to claim that interstate commerce was obstructed by a denial of civil rights in violation of some congressional enactment, four courts have held that the government lacks nonstatutory authority to sue." *Id.* at 1128.

In this case, the federal government does not bring a commerce claim, nor does it cite any actual *evidence* that the Texas Heartbeat Act burdens interstate commerce. *Cf.* ECF 6-1 at 27 (citing unverified allegations from the complaint, which cannot support a preliminary injunction). What evidence that does exist in the record suggests that, if anything, the Act is stimulating rather than obstructing interstate travel. *See* ECF 6-8 ¶¶ 10–11 (noting increase in Texas women traveling to Oklahoma); *id.* ¶¶ 19–20 (same for Kansas). In any event, an intrastate regulation of medicine is not sufficiently connected to interstate commerce to trigger *Debs. See supra* Part I.C.2.

The federal government also cites *Wyandotte Transportation Co. v. United States*, 389 U.S. 191 (1967), *see* ECF 6-1 at 23, but that case was about implied causes of action found in statutes. Because the federal government does not claim a statutory cause of action here, *see supra* Part I.D.1, *Wyandotte* is irrelevant. In any event, "the unrefined analysis employed in *Wyandotte* is no longer an accurate

statement of the law." *Philadelphia*, 644 F.2d at 192. "In the mid–20th century, the Court followed a different approach to recognizing implied causes of action than it follows now." *Abbasi*, 137 S. Ct. at 1855; *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (refusing to "revert . . . to the understanding of private causes of action that held sway 40 years ago").

Next, the federal government relies on *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963), but it fails to cite the opinions on rehearing, in which two members of the original three-judge panel partially withdrew their concurrences. *See* 320 F.2d 870 (5th Cir. 1963). Depriving the original opinion of a majority, those two judges specified that the federal government had "ample statutory authorization for the maintenance of th[e] suit" and therefore did "not reach the question whether the United States would have standing to sue under the Commerce Clause of the Constitution absent all of these enactments of the Congress." *Id.* at 872–73 (Bootle, J., specially concurring); *accord. id.* at 873 (Ainsworth, J., specially concurring) ("I do not reach the question of the propriety or standing of the United States to sue under the Commerce Clause (Art. I, § 8), the Fourteenth Amendment, or any other provision of the Constitution.").

*Jackson*, then, depended on "statutory authorization" to sue, *id.* at 872 (Bootle, J., specially concurring), not an extra-statutory authority that the federal government now claims. *See* ECF 6-1 at 23. In any event, the reasoning in the original majority opinion is not persuasive and has been "much criticized." *Mattson*, 600 F.2d at 1298.[9]

### 3.  Congress Has Displaced Any Cause of Action

Finally, even if a cause of action could be inferred from some source, Congress displaced it by

---

[9] The federal government also cites a series of cases in which the parties did not argue about whether a cause of action existed. *See* ECF 6-1 at 22–23. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). That said, those cases generally involved proprietary or sovereign harms to the United States that at least arguably fell within established causes of action, unlike the federal government's attempt here to vindicate the individual constitutional rights of women in Texas.

enacting a detailed remedial scheme for enforcement of Fourteenth Amendment rights that does not include this kind of suit by the federal government against States. "[A] court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

There have been "three express refusals of modern Congresses to grant the Executive general injunctive powers in this field, which not only demonstrates explicit congressional intent not to create the power claimed here by the Attorney General but also reveals an understanding, unanimously shared by members of Congress and Attorneys General, that no such power existed." *Philadelphia*, 644 F.2d at 195. This Court should not attempt to override "congressional policy denying the federal government broad authority to initiate an action whenever a civil rights violation is alleged." *United States v. Mattson*, 600 F.2d 1295, 1299–300 (9th Cir. 1979).

The Constitution gives Congress, not the other branches, "power to enforce, by appropriate legislation," the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 5. Congress has long exercised that power. "Congress has created numerous mechanisms for the redress of denials of due process." *Philadelphia*, 644 F.2d at 192. In addition to providing for other forms of enforcement, Congress has created causes of action for both private citizens and the Attorney General. But none of those causes of action applies here.

Section 1983, for example, creates a private cause of action for private individuals to sue local governments as well as local and state officials to vindicate almost all federal-law rights. *See* 42 U.S.C. § 1983; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Congress provided an analogous criminal statute empowering the federal government to bring criminal prosecutions. 18 U.S.C. §§ 241–42. But Congress has not provided a similarly broad *civil* cause of action *for* the federal government or *against* a State.

Instead, Congress has authorized the Attorney General to engage in civil litigation regarding

constitutional rights in only limited circumstances. For example, the Attorney General is empowered to "institute . . . actions for injunctive relief . . . to implement the twenty-sixth article of amendment to the Constitution of the United States," which lowered the voting age. 52 U.S.C. § 10701(a)(1); *see* U.S. Const. amend. XXVI. Congress has also authorized the Attorney General to bring lawsuits to protect certain other voting rights. *See* 52 U.S.C. §§ 10101(c), 10308(d), 10504, 20510. Further, the Attorney General is empowered to "intervene in" federal lawsuits "seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, sex or national origin." 42 U.S.C. § 2000h-2.

Congress has also given the Attorney General express causes of action to enforce various statutory rights, including statutory rights related to abortion. "If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of [the Freedom of Access to Clinic Entrances Act], the Attorney General may commence a civil action in any appropriate United States District Court." 18 U.S.C. § 248(c)(2)(A); *see also* 42 U.S.C. §§ 2000a-5(a), 2000e-5(f)(1).

The one thing Congress has not done is give the Attorney General a cause of action to enforce constitutional abortion rights, let alone against a State. That omission, viewed in light of the detailed remedial scheme Congress has enacted for the vindication of related rights, prevents the federal government from suing here.

The unifying theme of the Supreme Court's cause-of-action precedent is that judicially recognized causes of action may not undermine the more limited remedial schemes that Congress has established. *See Green Valley Special Util. Dist. v. City of Schertz,* 969 F.3d 460, 499–501 (5th Cir. 2020) (Oldham, J., concurring); *see also Hernandez v. Mesa,* 140 S. Ct. 735, 747 (2020) ("It would be anomalous to impute a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action" (cleaned up)). When identifying implied statutory causes of

action, for example, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Similarly, "when alternative methods of relief are available, a *Bivens* remedy usually is not," especially if the absence of an express cause of action "might be more than 'inadvertent.'" *Abbasi*, 137 S. Ct. at 1849, 1863. And "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996); *see also Armstrong*, 575 U.S. at 327 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."). Even when interpreting an express cause of action like Section 1983, the Supreme Court is careful to ensure that the cause of action is not so broad that it would allow a plaintiff to "evade" a "requirement" of a more limited habeas remedy. *Preiser*, 411 U.S. at 489–90.

So too here. The more limited options that Congress has provided for enforcing constitutional rights generally and abortion rights in particular demonstrate that the federal government cannot have a cause of action here.

The federal government's response is that it must be allowed to bring suit because private individuals face hurdles to bringing pre-enforcement suits in lower federal courts. *See* ECF 6-1 at 25–26. But Congress anticipated this issue. In other cases, Congress has authorized the Attorney General "to institute for or in the name of the United States a civil action" when private individuals "are unable, in [the Attorney General's] judgment, to initiate and maintain appropriate legal proceedings." 42 U.S.C. § 2000b(a) (public facilities); *id.* § 2000c-6(a) (public schools). It did not do so here.

\*     \*     \*

For decades, the Supreme Court has recognized that Congress is "perfectly competent . . . to authorize the United States to be the guardian of that public interest in a suit for injunctive relief."

33

*United States v. Raines*, 362 U.S. 17, 27 (1960). But Congress has not authorized the federal government to sue in this case. If the Department of Justice wants to expand its authority, it should direct its requests to Congress, not this Court.

## II.  The Texas Heartbeat Act Is Lawful

### A.  The Federal Government Has Not Shown a Clear Violation of the Fourteenth Amendment

The federal government contends that the Texas Heartbeat Act is *per se* unconstitutional because it "ban[s] abortion before a fetus is viable." ECF 6-1 at 13. But the Texas Heartbeat Act does not "ban" all pre-viability abortions. It sensibly regulates abortion consistent with both the Constitution and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

Under *Casey*, States cannot enforce "a prohibition of abortion" or "a substantial obstacle to the woman's effective right to elect the procedure" before viability. *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992). While the Court treats "a legislative ban on nontherapeutic abortions" before "viability" as *per se* unconstitutional, *id.* at 860, mere "obstacles" are evaluated under the "undue burden" test. *See id.* at 874. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877.

The federal government argues for skipping the undue-burden analysis because the Heartbeat Act is "a ban," not an obstacle. ECF 6-1 at 15. But Texas has not banned all pre-viability abortions.

Instead, Texas has enacted a private cause of action to encourage, insofar as possible, that any abortions take place before a heartbeat is detectable. *See* Tex. Health & Safety Code § 171.208(a). Pre-viability abortions remain an option, most obviously before a heartbeat is detectable. *See, e.g.*, ECF 6-7 ¶ 25 (noting that the Planned Parenthood Center for Choice, Inc., performed 52 abortions over 10 days after the Heartbeat Act took effect).

Moreover, the Act does not prohibit pregnant women from receiving abortions, and it lifts its

regulation of third parties to the extent necessary to prevent an undue burden on a pregnant woman's rights. *See id.* § 171.209(b). By its own terms, then, the Texas Heartbeat Act channels abortions to the pre-heartbeat time period, except when doing so would impose an undue burden. Shifting the time at which some abortions occur is not a "ban" under *Casey. See In re Abbott*, 954 F.3d 772, 788-89 (5th Cir. 2020) (holding that postponement of some abortions was not a "ban" on previability abortion), *vacated as moot, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021). Finally, the Heartbeat Act is not tied "to a specific gestational age." *Jackson Women's Health Org v. Dobbs*, 945 F.3d 265, 273 (5th Cir. 2019), *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021).

That a law prevents some abortions from occurring, even pre-viability, does not make it a "ban." In *Gonzales v. Carhart*, the Supreme Court considered a statute prohibiting partial-birth abortions "both previability and postviability." 550 U.S. 124, 156 (2007). The statute's "necessary effect" was to cause "some women to carry the infant to full term, thus reducing the absolute number" of abortions." *Id.* at 160. Still, the Supreme Court analyzed (and upheld) the statute under the undue-burden test, not the *per se* rule against "bans." *See id.* at 156–67. Similarly, in *June Medical*, the Supreme Court applied the undue-burden test to a law that would "leave thousands of Louisiana women with no practical means of obtaining a safe, legal abortion." 140 S. Ct. at 2130. Preventing some pre-viability abortions is not enough to turn a statute from a regulation into a ban.

Under the undue-burden test, the federal government's claim fares no better. The Texas Heartbeat Act, after all, incorporates the Supreme Court's test. Its statutory undue-burden defense is modelled on the test *Casey* applies to regulations of pre-viability abortions. *See* Tex. Health & Safety Code § 171.209.

Even as everyone is adjusting to the new law, women have been able to obtain post-heartbeat abortions. Dr. Alan Braid, for example, reports that at least one of his patients received an abortion "beyond the new legal limit," though he did not indicate whether it was pursuant to the "undue

burden" exception.[10]   Other pregnant women have received post-heartbeat abortions by traveling across state lines. *See* ECF 6-8 ¶¶ 11, 21; *see Whole Woman's Health v. Cole*, 790 F.3d 563, 597–98 (5th Cir. 2015), *rev'd on other grounds sub nom. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). According to the federal government, these options will increase over time as out-of-state abortions providers are "working hard to expand [their] capacity and increase the number of patients [they] can serve." ECF 6-8 ¶ 32.

The federal government points to abortion providers' fear of liability—liability they believe is plainly unconstitutional. *See, e.g.*, Gilbert Decl. ¶ 41; Hagstrom Miller Decl. ¶ 41; Linton Decl. ¶ 24. Thus, the federal government would have this Court believe both (1) that the Texas Heartbeat Act is facially unconstitutional and (2) that abortion providers no longer perform post-heartbeat abortions due to a reasonable fear of liability under the Act. Both cannot be true. Whenever imposing liability under the Act would be unconstitutional, Texas courts will not do so. Neither litigants nor this Court should assume that Texas courts would be unwilling to apply Supreme Court precedent. *See Penrod Drilling Corp. v. Williams*, 868 S.W.3d 294, 296 (Tex. 1993) (per curiam).

The federal government complains that the statutory undue-burden defense does not match the Supreme Court's undue-burden standard in all relevant details, *see* ECF 6-1 at 15–16, but that is irrelevant. Texas courts accept constitutional as well as statutory defenses, so if in any particular case the Constitution requires a broader defense than the statute provides, state courts will be ready to accept that argument. But at this point, there is no way to know whether the alleged differences between the two defenses will ever arise in litigation, much less be material to the outcome.

Finally, the federal government half-heartedly suggests one last merits theory: that "Texas appears to have acted with the *purpose* of infringing women's constitutional rights." ECF 6-1 at 16.

---

[10] Alan Braid, *Opinion: Why I Violated Texas's Extreme Abortion Ban* (Sept. 18, 2021), https://www.washingtonpost.com/opinions/2021/09/18/texas-abortion-provider-alan-braid/.

Proof of any unlawful motive must appear in the record, *Mazurek*, 520 U.S. at 972, yet the federal government cites no evidence of the Texas Legislature's purpose. The Court cannot "assume unconstitutional legislative intent even when statutes produce harmful results." *Id.* Moreover, in the preliminary-injunction context, the evidence must amount to a "*clear showing*" of unconstitutionality. *Id.* The absence of any evidence of an unlawful purpose in *Mazurek* resulted in the reversal of a preliminary injunction. *Id.* at 976. It should preclude the entry of such an injunction here, especially in light of the Legislature's decision to provide a statutory defense modeled on Supreme Court precedent. *See* Tex. Health & Safety Code § 171.209.

Notably, the federal government makes no attempt to show that many of the Act's other provisions create an undue burden on abortion. *See In re Gee*, 941 F.3d 153, 172 (5th Cir. 2019) (per curiam) (explaining that "the Supreme Court has analyzed abortion provisions separately rather than cumulatively"). The requirement that a doctor first attempt to detect a fetal heartbeat, Tex. Health & Safety Code § 171.203(b), resembles Texas's preexisting requirement that physicians make the unborn child's heart auscultation audible prior to the abortion, *id.* § 171.012(a)(4)(D). The federal government offers no evidence that this creates an undue burden on women in Texas.

Likewise, the federal government provides no evidence or argument that the Act's fee-shifting provision for challenges to abortion laws, Tex. Civ. Prac. & Rem. Code § 30.022, or requirement that physicians make and keep certain records whenever any abortion is performed due to a medical emergency, Tex. Health & Safety Code §§ 171.008, 245.011(c)(10)–(11), imposes an undue burden on previability abortions.

At bottom, the federal government's complaint is that the Heartbeat Act is difficult to effectively enjoin. ECF 6-1 at 14. But there is no requirement that a state write its laws to make them easily enjoined under Section 1983. Indeed, any state-created private cause of action would fall under that theory. The cases cited by the federal government confirm only that the States may not oust

federal claims from their courts, *Haywood v. Drown*, 556 U.S. 729, 742 & n.9 (2009); *Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 383 (1990), or place such restrictions on them that they cannot be heard, *Felder v. Casey*, 487 U.S. 131, 138 (1988). State courts are open to hear constitutional challenges and, if federal subject-matter jurisdiction can be found, so are federal courts.

> **B.     The Federal Government Has Not Clearly Shown the Act Is Preempted or Violates Intergovernmental Immunity**

The federal government raises "as applied" preemption and intergovernmental-immunity claims, *see* ECF 6-1 at 16–22, but it has not clearly shown a violation of either doctrine. To create a conflict where none exists, the federal government overstates the Act's reach and its own operations.

> **1.     Standard**

Conflict preemption "is present when (1) 'compliance with both state and federal law is impossible,' or (2) state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Aldridge v. Miss. Dep't of Corrections*, 990 F.3d 868, 875 (5th Cir. 2021) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989)). The "inquiry begins with the presumption that federal statutes do not supersede States' historic police powers, unless Congress clearly and manifestly intended to do so." *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012). "This assumption applies with 'particular force'" in a field "traditionally occupied by State law." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 804 (5th Cir. 2011) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). Preemption requires more than "the mere fact of tension between federal and state law," but rather a "sharp conflict between state law and federal policy." *Williams*, 987 F.3d at 198 (quotations omitted). "Indeed, federal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 725 F.3d 65, 102 (2d Cir. 2013) (quotation omitted).

Intergovernmental immunity prohibits State laws that "regulate[] the United States directly or

discriminate[] against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (citations omitted). "[G]enerally applicable" laws do not run afoul of intergovernmental immunity, even if they result in "an increased economic burden on federal contractors as well as others." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). But a state law violates intergovernmental immunity if it "interferes with a federal contractor's ability to 'discharge its contractual obligations' consistent with the terms set out by the federal government." *Student Loan Servicing All.*, 351 F. Supp. 3d at 73–74.

### 2.     The Act Does Not Prohibit Carrying Out Federal Obligations

The federal government's first theory is that the Heartbeat Act "purports to prohibit federal personnel and contractors from carrying out their federal obligations," ECF 6-1 at 17, but the law does no such thing.

As an initial matter, Texas courts are unlikely to interpret the Act to apply to the federal government or those carrying out federal obligations. Texas courts presume that state statutes do not regulate the federal government. Texas statutes generally "includ[e] an implied exemption in favor of the United States" and are held to be "inapplicable to the United States." *R.R. Comm'n v. United States*, 290 S.W.2d 699, 702 (Tex. Civ. App.—Austin 1956), *aff'd*, 317 S.W.2d 927 (Tex. 1958). The same presumption applies in favor of federal contractors when they act "under the direction and exclusively in the official service of the United States." *Louvein v. Moody*, 12 S.W.2d 989, 990 (Tex. Comm'n App. 1929) (refusing to "attribute[] to the Legislature" a "[p]urpose to impose such a burden" on the federal government "in the absence of compelling words").

That is particularly likely here because the Heartbeat Act creates a private cause of action only against certain "person[s]." Tex. Health & Safety Code § 171.208(a). "In the absence of an express statutory definition," courts often apply "a longstanding interpretive presumption that 'person' does not include the sovereign, and thus excludes a federal agency." *Return Mail, Inc. v. United States Postal*

*Serv.*, 139 S. Ct. 1853, 1861–62 (2019) (quotation marks omitted). That is doubly so in light of the federal government's constitutional objections. Texas courts "interpret statutes in a manner to avoid constitutional infirmities" whenever "possible." *Osterberg v. Peca*, 12 S.W.3d 31, 51 (Tex. 2000).

This Court cannot assume that the Heartbeat Act applies to the federal government and its contractors. The federal government's motion does not acknowledge the existence of this canon of construction, much less dispute its applicability. To the extent the federal government thinks Texas is misinterpreting its statute, the Court should abstain in favor of a Texas court. "The *Pullman* case establishes two prerequisites for *Pullman* abstention: (1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980). Both are present here. There is more than a "possibility" that state court will rule the Act does not apply to the federal government or those working for it (including contractors), which would moot, or at least present in a different posture, the federal government's Supremacy Clause claims.

In the alternative, even if the Heartbeat Act reaches the federal government, it does not interfere with federal activities.

*Bureau of Prisons*: The Bureau of Prisons does not arrange for abortions that violate the Texas Heartbeat Act. While federal regulations require a warden to arrange for an abortion should an inmate choose to abort her child, 28 C.F.R. § 551.23, the warden is also required to "ensure compliance with the applicable law regarding these matters." *Id.* § 550.20. A BOP guidance document explains that "[s]taff should abide by applicable federal and state (the state in which the institution is located) laws and regulations." Ex. A at DOJ-11. Thus, there is no conflict between the federal regulations and state law. The federal regulations expressly incorporate state law, including the Heartbeat Act.

By declining to violate state laws, federal officials do not violate anyone's constitutional rights. BOP warns pregnant inmates "that laws related to the termination of pregnancy vary among states."

ECF 6-12 at 36. The mere fact of the mother's incarceration does not exempt an abortion from state regulation. *See, e.g.*, *Victoria W. v. Larpenter*, 369 F.3d 475, 480 (5th Cir. 2004) (prisoner would "soon be past the time limit for a legal abortion"); *Gibson v. Matthews*, 926 F.2d 532, 536 (6th Cir. 1991) (federal officials not liable under *Bivens* for refusing to furnish abortion to inmate in 22nd week of pregnancy); *Bryant v. Maffucci*, 729 F. Supp. 319, 320–21, 328 (S.D.N.Y. 1990) (no Section 1983 violation in refusing to furnish abortion to inmate in third trimester of pregnancy).

*Marshal's Service*: According to the federal government, women in custody of the U.S. Marshal's Service "may elect to have an abortion under the agency's policy directives." ECF 6-1 at 18. Yet the federal government omits a key qualification: "a USMS prisoner may elect to have an abortion *consistent with state law*," as its own declarant explains. ECF 6-13 at ¶ 7 (emphasis added); *accord* Ex. B at DOJ-1154–55. Marshal's Service activities therefore do not violate the Heartbeat Act.

*Department of Defense*: The federal government provides no evidence of DOD activities. It simply cites two federal statutes, neither of which requires DOD to provide abortions at all. A statute generally entitling servicemembers to medical and dental care does not prove that DOD provides abortions. *See* 10 U.S.C. § 1074. Nor does a statute *prohibiting* federal funding for most abortions. *See id.* § 1093. There is thus no evidence that DOD provides abortions, much less that it somehow does so in manner inconsistent with the Heartbeat Act.

*Office of Refugee Resettlement*: The federal government mischaracterizes ORR's role. *See* ECF 6-1 at 19. Out-of-circuit precedent requires only that the federal government "step out of the way" when an alien in its custody wants an abortion. *J.D. v. Azar*, 925 F.3d 1291, 1328 (D.C. Cir. 2019). "[A]lthough government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those obstacles not of its own creation." *Id.* (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)). Nothing requires ORR to ensure that aliens are not "obstructed" by state regulations. On the contrary, ORR practice is to treat a "state-law deadline for an abortion" as an

independent obstacle not of its own creation. *Id.* at 1304–05. Indeed, ORR has announced that it acts "in alignment with state law governing the conduct of medical providers who provide abortions to minors." Ex. C at DOJ-1003. ORR requires its "care providers . . . to comply with state law governing access to abortion and abortion services." ECF 6-14 ¶ 12. And ORR notifies a pregnant minor that she has "the right to decide whether to continue [her] pregnancy and give birth or to have a *legal* abortion." Ex. D at DOJ-1078 (emphasis added). Thus, there is no conflict.

### 3.    The Act Does Not Interfere with Federal Contracts

The federal government's second theory is that the Heartbeat Act "interferes with federal directives to third-party providers who are contractually obligated to provide abortion-related services." ECF 6-1 at 20. Not so.

*Department of Labor.* The federal government argues that Job Corps contractors will provide abortions services in a way that violates the Heartbeat Act, *see* ECF 6-1 at 20, but the federal government's own handbook explains that "[a]ll center health staff and providers must follow accepted professional standards of care and are subject to prevailing state laws." Ex.E [11] There is thus no conflict between federal instructions to Job Corps contractors and state law.

Even if the law were otherwise, the problem would be entirely hypothetical. The four Job Corps Centers in Texas encounter very few pregnant students and incur no costs related to abortion. At the Job Corps Center in El Paso there were only 3 pregnant students in 2021, 1 in 2020, and 22 in 2019. Ex. F at DOJ-21. "None" of them "opted to terminate pregnancy." *Id.* The Laredo Job Corp Center had 0 pregnant students in 2020, 1 in 2019, and 2 in 2018. Ex. G at DOJ-138. None of them terminated their pregnancies. *Id.* The Job Corps Center in San Marcos does "not have knowledge of" "how many students opt to terminate pregnancy," which itself demonstrates that students seeking

---

[11] Job Corps, *Policy and Requirements Handbook* § 2.3 R13 (June 15, 2021), https://prh.jobcorps.gov/PRH%20 Chapter%202/PRH%20Chapter%202%20-%2006.15.21.pdf (cited in ECF 6-15 ¶ 11).

abortions does not impose costs on the contractor. Ex. H at DOJ-77. The North Texas Job Corps Center had 12 pregnant students over 3 years, and only 1 or 2 sought an abortion. Ex. I [DOJ-220 through DOJ-224] at DOJ-223. The contractor clarified, however, that it "does not incur costs of students who choose to have an abortion" and "did not transport the student to the abortion clinic." *Id.*

*Office of Personnel Management*: Even the federal government does not contend that a conflict will arise between OPM's health insurance contracts and the Heartbeat Act. The most it says is that a conflict "may" arise. ECF 6-1 at 21. The federal government's declarant discusses only what "could" happen, ECF 6-17 ¶¶ 10–13, and how health insurance carriers "may" react, *id.* ¶ 14. The federal government seemingly has not even asked the carriers what they are doing. Regardless, a conflict will not arise because a State's substantive regulations operate in a different space than federal coverage decisions do. When a medical procedure does not occur because a State's substantive law prohibits it, issues related to whether such a procedure would be covered are irrelevant. For example, California has prohibited mental health providers from "engag[ing] in sexual orientation change efforts with a patient under 18 years of age," Cal. Bus. & Prof. Code § 865.2, but no one contends that a federal health insurance plan covering such a service would override the State's substantive regulation.

### 4.    The Act Is Consistent with Medicaid

The federal government's final theory is that the Heartbeat Act "violates statutory and regulatory provisions applicable to the Medicaid program in Texas," ECF 6-1 at 21, but the Medicaid program does not conflict with the Heartbeat Act for the same reasons other federal health insurance plans do not. The fact that a federal program would provide funding to cover a procedure *if it occurred* does not conflict with a State's substantive regulations that prevent the procedure from occurring.

The federal government cites *Hope Medical Group for Women v. Edwards*, 63 F.3d 418 (5th Cir. 1995), *see* ECF 6-1 at 21–22, but that case is doubly irrelevant. First, the case considered a law

restricting funding under "Louisiana's state Medicaid program," not a generally applicable regulation of the practice of medicine. *Hope Med.*, 63 F.3d at 420–21. Second, the court held Louisiana's law invalid because it "categorically prohibits funding for abortions in cases of rape or incest without regard to whether the procedures might be medically necessary." *Id.* at 428. The Texas Heartbeat Act is not so categorical. It creates express exceptions "if a physician believes a medical emergency exists" or if it would "impose an undue burden." Tex. Health & Safety Code §§ 171.208(a), 171.209(b)(2).

## III.    The Federal Government Has Not Clearly Shown Irreparable Harm

The federal government wrongly argues that "enforcement of a state law that violates the Constitution" always causes "irreparable harm" sufficient to justify a preliminary injunction. ECF 6-1 at 33. That is not true. "It is not enough simply to argue that there has been some violation of [the Constitution]; [a plaintiff] must allege a personal violation of rights" such that the harm is irreparable under the traditional understanding of that term. *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & St., Inc.*, 454 U.S. 464, 486 n.22 (1982)).[12] The federal government has previously made this same point as a defendant. *See, e.g.*, Initial Brief for Appellee, *Pulphus v. Ayers*, 2018 WL 1110678, at *50–51 (D.C. Cir. Feb. 28, 2018); Brief of Appellees Federal Election Commission and United States Department of Justice, *The Real Truth About Obama, Inc. v. FEC*, 2008 WL 4905254, at Part II (4th Cir. Oct. 28, 2008).

Now, the federal government relies on *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* *("NOPSI")*, but that case did not consider whether there was irreparable harm—even on the federal

---

[12] *See also, e.g.*, *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 522 (D. Del. 1984) ("The Third Circuit has made it clear that not all violations of constitutional rights constitute irreparable injury.") (citing *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978)); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.") (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 301 (2000)); *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (explaining that before determining irreparable injury, "[i]t is necessary, however, to consider the specific character of the First Amendment claim") (emphasis added); *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (collecting cases); ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however.").

government's telling it merely "assume[ed] that irreparable injury may be established" in circumstances not presented there. ECF 6-1 at 33 (citing *NOPSI*, 491 U.S. 350, 366-67 (1989)). In reality, *NOPSI* discussed only whether obviously unconstitutional statutes "may possibly" or "[p]erhaps" establish irreparable injury in the context of whether a federal court should abstain, not grant a preliminary injunction. 491 U.S. at 366-67.

And here, even if a heartbeat defendant's injuries somehow flowed through to the federal government, irreparable harm could occur only if (1) the threat of such litigation "chills" the exercise of constitutional rights or (2) heartbeat defendants have to pay an unconstitutional judgment. But neither alleged harm can support injunctive relief in these circumstances. A preliminary injunction cannot redress the first, and state-court litigation is an adequate remedy at law for the second.

### A.   A Preliminary Injunction Would Not Eliminate the Possibility of Future Liability

The federal government complains that "clinics and providers" have ceased providing abortions "[d]ue to the prospect of ruinous liability" under the Heartbeat Act. ECF 6-1 at 7. But in these circumstances, no *preliminary* injunction from a *federal district court* could remedy that alleged harm. The *threat* of liability would remain given the significant possibility that a preliminary injunction would be stayed, reversed, or not turned into a permanent injunction (including on procedural grounds). Abortion providers would still face the threat of future state-court litigation for abortions performed during the pendency of the injunction if the injunction were set aside. Unsurprisingly, therefore, the federal government introduces no evidence that a preliminary injunction would eliminate the alleged "chill" for any abortion clinics that fear liability under the Heartbeat Act. As the requested relief would not prevent the alleged irreparable harm, it should be denied.

According to the federal government, "individuals throughout Texas have already been chilled from exercising their constitutional rights or from providing abortion services based on their reasonable fear of enforcement." ECF 1 ¶ 79. The federal government further alleges that this change

45

in behavior by third parties "will increase [its] costs to the extent that agencies must incur increased transportation and other costs to provide individuals in their care with abortion services outside the State of Texas." *Id.* ¶ 46. In other words, the federal government believes that it will suffer because third parties fear suffering future judgments from private suits.

A preliminary injunction would not help the federal government avoid that alleged harm. A preliminary injunction ceases to be binding, of course, if "it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947). And if that were to happen, the Act specifically provides that "reliance on any court decision that has been overruled on appeal or by a subsequent court" is "not a defense." Tex. Health & Safety Code § 171.208(e)(3). A preliminary injunction cannot serve as "a grant of total immunity from future [enforcement]." *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring in part and concurring in the judgment). "[F]ederal judges have no power to grant such blanket dispensation from the requirements of valid legislative enactments." *Id.* At this preliminary stage, there is no equitable remedy that could provide such immunity. *See Grupo Mexicano*, 527 U.S. at 332. Indeed, even if one were to think that the preliminary injunction somehow might prohibit heartbeat suits for abortions performed before it was set aside on appeal, potential state-court defendants *cannot know now that courts will later so hold*. And all of this is especially true because an heartbeat suit can be brought up to four years after the cause of action accrues (not to mention the possibility of tolling during the pendency of any preliminary injunction). *See* Tex. Health & Safety Code § 171.208(d).

Thus, in these circumstances, even if the Court preliminarily enjoined enforcement of the Heartbeat Act, abortion providers would still face the threat of future enforcement actions. Notably, the federal government has failed to introduce any evidence to support the counterintuitive theory underlying its requested injunction: namely, that abortion providers are so "chilled" by the Heartbeat Act that they are unwilling to risk raising a constitutional defense in state court (even though the

federal government claims that defense is unambiguously compelled by U.S. Supreme Court precedent), but would nevertheless be "unchilled" by a mere preliminary injunction from this Court despite the serious risk of appellate reversal (given the serious procedural problems with the federal government's suit). In this context, that theory of redress is illogical, and the federal government's failure to introduce actual evidence supporting it is fatal.

"An indispensable prerequisite to issuance of a preliminary injunction is *prevention* of irreparable injury." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981) (emphasis added). "[I]t is a necessary corollary to the idea of irreparable injury without a preliminary injunction that the injury complained of will in fact be prevented by the injunction." *Viands Concerted, Inc. v. Reser's Fine Foods, Inc.*, No. 2:08-cv-914, 2008 WL 4823053, at *11 (S.D. Ohio Oct. 31, 2008), *report and recommendation adopted*, 2009 WL 1728289, at *13 (S.D. Ohio June 16, 2009) ("An injunction would not, as a matter of law, prevent the irreparable injury Viands asserts it will endure.").

When a proposed preliminary injunction "would not likely prevent the kind of irreparable injury Plaintiff seeks to prevent," it cannot issue. *Coleman v. United States*, No. 5:16-cv-817-DAE, 2017 WL 1278734, at *2 (W.D. Tex. Jan. 3, 2017); *see also Foy v. Univ. of Tex. at Dall.*, No. 3:96-cv-3406, 1997 WL 279879, at *3 n.1 (N.D. Tex. May 13, 1997), *aff'd*, 146 F.3d 867 (5th Cir. 1998) (per curiam) (denying an injunction because the plaintiff had not shown it would "remedy the irreparable injury of which he complains").

Applying this rule, the Second Circuit reversed a preliminary injunction in *American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 766 F.2d 715 (2d Cir. 1985). There, the alleged "chilling of protected speech and union activities stem[med] not from the interim discharge, but from the threat of permanent discharge" by an employer. *Id.* at 722. But "the threat of permanent discharge . . . is not vitiated by an interim injunction," so there was no way the "chilling of the right to speak or associate could logically be thawed by the entry of an interim injunction." *Id.*; *see also Buckingham Corp. v. Karp*,

762 F.2d 257, 262 (2d Cir. 1985).

Similarly, in *Chiafalo v. Inslee*, the plaintiffs argued "that the mere potential of a monetary penalty has a chilling impact on [their] ability to exercise their First Amendment rights." 224 F. Supp. 3d 1140, 1147 (W.D. Wash. 2016). The court denied a preliminary injunction because such "relief would have no impact on Plaintiffs' decisionmaking calculus." *Id.* at 1148. "Whether or not the court preliminarily enjoins the State from enforcing the $1,000.00 civil penalty," the plaintiffs' decision-making would occur in light of the prospect of eventually having to pay the penalty because a preliminary injunction does not guarantee permanent relief. *Id.* In the end, "preliminary injunctive relief would not mitigate the chilling effect of the discretionary statutory penalty." *Id.*

More recently, a federal court denied a motion for preliminary injunction against the federal government on this same theory. In *Ohio v. Yellen*, the State of Ohio sought a preliminary injunction preventing the Secretary of the Treasury from attempting to recoup federal funding from it. No. 1:21-cv-181, 2021 WL 1903908, at *14 (S.D. Ohio May 12, 2021). Ohio argued that a preliminary injunction "would provide *clarity* about the legal consequences of its decisions." *Id.* at *15. The court denied relief because a preliminary injunction effective "while this case is pending does not—indeed cannot—provide the clarity that Ohio seeks." *Id.* Regardless of whether the court issued injunctive relief, Ohio would face the same lack of clarity about the defendant's power to recoup federal funds. With a preliminary injunction, Ohio would face "possible recoupment . . . once the Court issues a merits decision, *i.e.*, if the Court . . . were to decline to convert the preliminary injunction into a permanent injunction." *Id.* Similarly, without a preliminary injunction, "the funds possibly could be recouped down the road . . . once again depending on the outcome of this case." *Id.*

The same rationale applies here. According to the federal government abortion providers are declining to provide certain abortions because they fear future lawsuits. But a preliminary injunction could not assuage that fear because it could not permanently prevent such lawsuits. A preliminary

injunction in force only "until this action is concluded . . . . would not eliminate the risk of multiple judgments and verdicts." *Oxford Capital Ill., L.L.C. v. Sterling Payroll Fin., L.L.C.*, No. 1:01-cv-1173, 2002 WL 411553, at *5 (N.D. Ill. Mar. 15, 2002). Potential heartbeat suits brought during the pendency of this case are no more fearsome that those brought after a preliminary injunction is vacated. Thus, a preliminary injunction cannot prevent the federal government's alleged irreparable harm.

Consider Whole Woman's Health ("WWH"), for example. According to its President and CEO, "every day the law is in effect, [WWH is] forced to turn away the majority of patients seeking an abortion." ECF 6-6 ¶ 15. WWH also complains of "uncertainty" caused by the existence of the Act, "[e]ven before September 1," its effective date. ECF 6-6 ¶ 38. Of course, federal courts cannot stop a state statute from being "in effect," much less erase it from existence. *See Pool v. City of Houston*, 978 F.3d 307, 309 (5th Cir. 2020) (citing Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)).

Planned Parenthood is in a similar position. It says that "[t]he *risk* of civil liability, damages, and certain cost of litigation . . . means that" they no longer provide abortions that would violate the Heartbeat Act.  ECF 6-7 ¶ 17 (emphasis added). Again, a preliminary injunction cannot eliminate the "risk" that Planned Parenthood will someday face liability for violating the law.

In the end, "[t]he total inability of the requested preliminary injunction to prevent plaintiff's allegedly irreparable injury sounds a death knell for plaintiff's motion." *Madias v. Dearborn Fed. Credit Union*, 916 F. Supp. 659, 661 (E.D. Mich. 1996). Thus, any "chill" created by the Act is not irreparable harm that can be prevented by a preliminary injunction.[13]

---

[13] Even if the federal government had moved for a declaratory judgment, which is based on statute rather than equity, it would not change this analysis. First, "prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). Second, even if there were a "preliminary declaration," it would not provide a defense to an state-court action after it expired or was reversed. *See* Tex. Health & Safety Code § 171.208(e)(3).

B.   **Heartbeat Defendants and the Federal Government Have an Adequate Remedy at Law for any Liability Determined in State Court**

Abortion providers who are not "chilled" also cannot be the source of irreparable harm justifying injunctive relief. As an initial matter, the federal government seems to disclaim this theory. It argues that "abortion providers in Texas ceased providing abortions after six weeks, absent a medical emergency." ECF 6-1 at 7. If the federal government is right, then no abortion providers will face heartbeat suits at all, much less face irreparable injury from them.

Nonetheless, the federal government also seems to suggest that third parties will suffer irreparable harm if and when state courts find them liable under the Act. Even if that were so, it would not harm *the federal government*. But it is not so because any such third party will have an adequate remedy at law: raising any relevant defense, including a constitutional defense, in the state-court action. *See Georgia v. City of Chattanooga*, 264 U.S. 472, 483–84 (1924) (holding Georgia had an adequate remedy at law because "[a]ll its objections and defenses may be interposed in the Tennessee court"). Federal courts cannot grant injunctive relief unless the "remedies available at law . . . are inadequate." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

That rule applies with special force when a plaintiff asks a federal court to enjoin threatened litigation. "An injunction against threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis v. Pennyrile Rural Elec. Co-op.*, 399 F.2d 726, 729 (6th Cir. 1968). As Judge Posner explained:

> If *A* knows that *B* is about to sue him and thinks that *B*'s suit is barred by the statute of limitations, *A* cannot file suit against *B* asking that *B* be enjoined from bringing his suit on the ground that *A* has a good defense to it. The reason that the cases give for this result is that *A* has an adequate remedy at law—to interpose the statute of limitations as a defense in the case brought by *B*—and lack of an adequate remedy at law is a prerequisite to obtaining equitable relief.

*Buntrock v. SEC*, 347 F.3d 995, 997 (7th Cir. 2003) (internal quotation marks omitted).

Of course, defendants in future civil actions will be able to raise the Heartbeat Act's alleged

unconstitutionality as a defense. That is so, the Supreme Court of Texas explains, because the Texas Rules of Civil Procedure "authorize pleading of every conceivable defense in an answer, including unconstitutionality of a statute on which suit may be based." *State v. Scott*, 460 S.W.2d 103, 107 (Tex. 1970); *see also In re Doe 2*, 19 S.W.3d 278, 284 (explaining that unconstitutionality "should generally be raised as an affirmative defense to enforcement of the statute") (citing *Scott*, 460 S.W.2d at 107).[14]

And indeed, defendants regularly raise such a defense. *See, e.g.*, *In re Diocese of Lubbock*, --- S.W.3d ---, 2021 WL 2386135 (Tex.) (plaintiff asserted unconstitutionality as a defense to civil liability, arguing imposition of tort liability violated the First Amendment); *see also Scurlock Permian Corp. v. Brazos Cnty.*, 869 S.W.2d 478, 483–84 (Tex. App.—Houston [1st Dist.] 1993) (writ denied) (unconstitutionality of the Texas constitution also an affirmative defense in the context of civil liability); *State v. River Forest Dev. Co.*, 315 S.W.3d 128, (Tex. App.—Houston [1st Dist.] 2010) (no pet.) (Bland, J.) (unconstitutionality also an affirmative defense in the context of criminal liability).[15]

If state trial courts reject those defenses, defendants can appeal through the state-court system. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 51.012; Tex. Gov't Code §§ 22.001(a), 22.007(a). And critically, they can then seek review by the U.S. Supreme Court. *See* 28 U.S.C. § 1257(a).

This has long been considered an adequate remedy at law to address unlawful state-court judgments. When the State of Georgia sought equitable relief against a condemnation proceeding in Tennessee state court, the Supreme Court held that "Georgia has a plain, adequate, and complete remedy in the condemnation proceedings" because "[a]ll its objections and defenses may be

---

[14] The federal government about the Heartbeat Act's limits on third-party standing, but that provision does not injure anybody because (1) it is consistent with Supreme Court precedent and (2) any state-court defendant who disagrees can simply challenge that provision as well. *See* Tex. Health & Safety Code § 171.209.

[15] The Heartbeat Act also provides for a statutory "undue burden" defense. *See* Tex. Health & Safety Code § 171.209. The federal government argues that the statutory undue-burden defense is not as protective as it believes the Constitution to be, *see* ECF 1 ¶ 25, but the federal government does not dispute that state-court defendants can argue that the statute is unconstitutional regardless of whether they can satisfy the statutory undue-burden defense. *See, e.g.*, *New York Times Co.*, 376 U.S. at 263.

interposed in the Tennessee court." *Georgia*, 264 U.S. at 483. Indeed, the same rule applies even when the would-be federal plaintiff faces criminal liability rather than the mere civil liability at issue here. *See Fenner v. Boykin*, 271 U.S. 240, 244 (1926) (explaining that "[t]he accused should first set up and rely upon his defense in the state courts" and that "ample opportunity for ultimate review [in the Supreme Court] in respect of federal questions").

To the extent the federal government is interested in any given case, it is free to intervene and challenge the constitutionality of the Act. *See* Tex. R. Civ. P. 60. Because the federal government can "intervene in the state court proceeding," it has "an adequate remedy at law that precludes the award of equitable relief." *United States v. Rural Elec. Convenience Co-op. Co.*, 922 F.2d 429, 433 (7th Cir. 1991) ("If the government may intervene, the injunction should be denied.").

The federal government cannot credibly argue that the ability to raise a constitutional defense is not an adequate remedy. It routinely takes the position that Texas takes here, including just five months ago. When Ohio challenged a federal statute, it claimed irreparable harm from potential proceedings the federal government could initiate against Ohio. Urging the court to deny preliminary injunctive relief, DOJ argued that "[a]n injunction against [even] threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." Defs.' Opp'n to Ohio's Motion for Prelim. Inj., *Ohio v. Yellen*, No. 1:21-cv-181, 2021 WL 2194219 (S.D. Ohio Apr. 16, 2021) (quoting *Travis*, 399 F.2d at 729).

Indeed, DOJ has often argued that "[a]n injunction against threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin"—at least when it is acting as defense counsel.[16] Just nine months ago,

---

[16] *E.g.*, Defendants' Response to and Motion to Dismiss Plaintiffs' First Amended Complaint for Injunctive and Declaratory Relief, *Tamez v. Chertoff*, No. 1:08-cv-55, 2008 WL 2214319 (S.D. Tex. Apr. 16, 2008) (quoting *Travis*, 399 F.2d at 729); Federal Defendants' Consolidated Opposition to Plaintiffs' Motion for Preliminary Injunction and Motion for Summary Judgment, and Cross-Motion for Summary Judgment, *Garcia v. United States*, No. 01-cv-801, 2001 WL 34873962 (S.D. Fla. Oct. 29, 2001) (quoting *Travis*, 399 F.2d at 729); Brief in

DOJ recognized, "it is firmly established that a party's ability to assert its claim as a defense in another proceeding constitutes an adequate remedy at law." Defs.' Mot. Dismiss for Lack of Jurisdiction, *Walmart Inc. v. U.S. Dep't of Justice*, No. 4:20-cv-00817, ECF 43 at 12 (E.D. Tex. Dec. 4, 2020).

DOJ's traditional position is right: defendants will be able to raise constitutional defenses in state court, and that is sufficient to avoid irreparable injury.

Finally, for essentially the same reasons, the federal government is wrong to argue that the Heartbeat Act "harms the United States by seeking to foreclose judicial review." ECF 1 ¶ 44. The Act does no such thing. In fact, it *requires* judicial review before any enforcement takes place.

As the federal government admits, the Heartbeat Act is enforced by "private individuals through civil litigation in state court," ECF 1 ¶ 28, where defendants can raise constitutional defenses before neutral judges. *See* U.S. Const. art. VI (providing that "the judges in every state shall be bound" by the federal Constitution).

This puts abortion providers in a better position than most regulated parties. Many regulatory laws allow executive officials to enforce them without any kind of pre-deprivation process. Under this law, however, a defendant has the benefit of judicial process before any penalty can be imposed.

At bottom, the federal government seems to be perturbed that judicial review of the Heartbeat Act will likely occur through state courts rather than federal courts. That is no cause for complaint. State courts are competent to decide federal constitutional questions, and they routinely do so.

Consider state tort law. It is common for a State's tort law to be enforced through private lawsuits rather than by state officials. So when someone has a federal constitutional objection to some aspect of state tort law, there usually is not a state actor who can be sued in federal court. Instead, that

---

Support of Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, *Dentsply Int'l, Inc. v Antitrust Division of the U.S. Dep't of Justice*, No. CA 98-693, 1999 WL 33748872 (D. Del. Jan. 5, 1999) (quoting *Travis*, 399 F.2d at 729, and citing *Rural Elec. Convenience Co-op. Co.*, 922 F.2d at 433).

person may raise a constitutional defense in any private tort suit brought in state court. Perhaps the most famous example of this ubiquitous phenomenon is a First Amendment challenge to defamation liability, as in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). There, an Alabama official sued the New York Times Company and other defendants for libel based on a newspaper advertisement. *See id.* at 256. In state court, the defendants argued that imposing liability for libel "abridged the freedoms of speech and of the press that are guaranteed by the First and Fourteenth Amendments." *Id.* at 263. Because the defendants lost at trial, they appealed through the state-court system and then to the U.S. Supreme Court, *see id.* at 263–64, which reversed after ruling that the First Amendment provided greater protection than the Alabama courts had recognized, *see id.* at 292. Nor is there anything unique about common-law torts recognized by state courts: The same principle applies equally where a state *legislature* creates *statutory* civil remedies for private plaintiffs that allegedly violate the defendant's federal constitutional rights. *See id.* at 265 (Alabama defamation law was "supplemented by statute").

## IV.   The Federal Government Has Not Clearly Shown that the Balance of Equities and Public Interest Favor an Injunction

The only alleged harm relevant to the federal government itself, as opposed to third parties it cannot represent, are speculative and *de minimis* financial costs. That is presumably why the federal court did not seek relief until four months after the Heartbeat Act was passed. But federal courts do not issue injunctions "to restrain an act the injurious consequences of which are merely trifling." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982). Texas's interest, on the other hand, is significant because an injunction preventing the enforcement of state law "clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

## V.   The Requested Injunction Is Unlawfully Broad

Even if the Court determined that some portion or application of the Heartbeat Act is unlawful, it could not enter the injunction that the federal government proposes. *See* ECF 6-2.

The federal government's first proposal is improper because it would not operate *in personam*.

An order "that enforcement proceedings pursuant to S.B. 8 are temporarily and preliminary enjoined until further order of this Court" is not an injunction at all. ECF 6-2 at 1. "[A]n injunction is a judicial process or mandate operating *in personam*." *Nken*, 556 U.S. at 428. Thus, an injunction must be "directed at someone." *Id.* Because the federal government's first proposed injunction would not run against any person at all, it is categorically improper.

The federal government's third proposal is improper because Texas cannot comply with it. For example, the State has no method of identifying "all civil claimants filing any new cases that are in any way authorized by the provisions of S.B. 8." ECF 6-2 at 2. The Texas judiciary is highly localized. There is no statewide e-filing system, much less a cadre of state employees to review every complaint that is filed.

Finally, the Court should not issue a blanket injunction of the Act for two reasons: (1) it has two severability clauses, and (2) the injunction must be limited to the federal government's harm.

In section 171.212 of the Texas Health and Safety Code, the Texas Legislature explicitly stated that (1) it intended all provisions of chapter 171, in which the heartbeat provisions are located, to be severable, and (2) it would have enacted any and all provisions of chapter 171 regardless of whether any provisions are subsequently determined to be unconstitutional. Section 12 of the Heartbeat Act also confirms that each provision is severable.

Federal courts are to apply severability clauses in state laws. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law."). Where the legislature "has explicitly provided for severance by including a severability clause in the statute," the Court must presume that the legislature "did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (plurality op.). As the Supreme Court has explained, courts should "enjoin only the unconstitutional applications of

a statute while leaving other applications in force, or . . . sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29 (2006) (citation omitted).

Thus, a preliminary conclusion that the heartbeat provision is unconstitutional should have no impact on the remainder of the law. Significantly, a private cause of action is not an undue burden for post-viability abortions, which States can prohibit in nearly all circumstances. *Casey*, 505 U.S. at 846. The federal government has provided no evidence that the Act is unconstitutional as applied to post-viability abortions, so the Court must sever those abortions from any injunction.

*Whole Woman's Health v. Hellerstedt* is not to the contrary. 136 S. Ct. 2292 (2016). There, the Court declined to apply a severability clause when plaintiffs challenged a single statute that incorporated an "integrated" set of health-and-safety standards. *Id.* at 2319–20. The Court concluded that doing so would amount to "quintessentially legislative work." *Id.* at 2319. But recognizing that the Heartbeat Act can apply to post-viability abortions does not require legislative work. Instead, this case resembles *Jane L.*, in which the Supreme Court required severance when abortion regulations applied both before and after 20 weeks' gestation. 518 U.S. at 139–44.

Any injunction must also be limited to the scope of the harm. *See Lewis*, 518 U.S. at 357. The harm identified by the federal government concerns payment for abortions performed as a result of rape, incest, or life/health of the mother. Thus, any injunction should be limited to those specific circumstances, as "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (cleaned up); *see also Missouri v. Jenkins*, 515 U.S. 70, 88, 89 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation" (cleaned up)).

## VI.  Request for a Stay Pending Appeal

The Court should deny the federal government's motion for the reasons explained above. If

the Court grants the motion, however, Texas respectfully moves for a stay pending appeal or, at the very least, an administrative stay that would allow the State to seek a stay from the appropriate appellate courts. *See* Fed. R. Civ. P. 62(c); Fed. R. App. P. 8. The factors discussed above apply equally to Texas's request for a stay. *Nken*, 556 U.S. at 534.

### CONCLUSION

Texas respectfully requests that the Court dismiss this case and deny the federal government's motion for a temporary restraining order and preliminary injunction.

Date: September 29, 2021

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation

*/s/ William T. Thompson*
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

BETH E. KLUSMANN
Assistant Solicitor General
Tex. State Bar No. 24036918

NATALIE D. THOMPSON
Assistant Solicitor General
Tex. State Bar No. 24088529

ERIC A. HUDSON
Senior Special Counsel
Tex. State Bar No. 24059977

LEIF A. OLSON
Special Counsel
Tex. State Bar No. 24032801

BENJAMIN S. WALTON
Assistant Attorney General
Tex. State Bar No. 24075241

AMY S. HILTON
Assistant Attorney General
Tex. State Bar No. 24097834

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
will.thompson@oag.texas.gov
beth.klusmann@oag.texas.gov
natalie.thompson@oag.texas.gov
eric.hudson@oag.texas.gov
leif.olson@oag.texas.gov
benjamin.walton@oag.texas.gov
amy.hilton@oag.texas.gov

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF CONFERENCE**

I certify that on September 29, 2021, I conferred with counsel for the federal government, who represented that the federal government opposes Texas's motion for a stay pending appeal.

*/s/ William T. Thompson*
WILLIAM T. THOMPSON

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 29, 2021, and that all counsel of record were served by CM/ECF.

*/s/ William T. Thompson*
WILLIAM T. THOMPSON