# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

## DECLARATION OF WILLIAM T. THOMPSON IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, RESPONSE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, AND MOTION FOR STAY PENDING APPEAL

I, William T. Thompson, hereby declare as follows:

1.  I am over 18 years of age and am fully competent to make this declaration. I am Deputy Chief for the Special Litigation Unit at the Texas Office of Attorney General, and I am admitted to practice law in this Court, and I represent the State of Texas in the above-captioned matter. I submit this Declaration in support of Defendant's motion to dismiss, response to plaintiff's motion for a preliminary injunction, and motion for stay pending appeal. I have personal knowledge of the facts stated herein.

2.  Appended to Defendant's motion to dismiss, response to plaintiff's motion for a preliminary injunction, and motion for stay pending appeal are the following exhibits:

| Ex. No. | Title |
|---|---|
| A | **Bureau of Prisons Technical Guidance.** Federal Bureau of Prisons, *Managing Pregnant and Postpartum Offenders* (Feb. 2021) (produced by Plaintiff) |
| B | **Marshals Service Policy Directives.** United States Marshals Service, *Policy Directives* § 9.5 "Pregnant Prisoner Care" (Dec. 16, 2019) (produced by Plaintiff) |
| C | **Office of Refugee Resettlement Policy Memorandum.** United States Office of Refugee Resettlement, *Policy Memorandum—Medical Services Requiring Heightened ORR Involvement* (Sept. 29, 2020) (produced by Plaintiff) |

| D | **Office of Refugee Resettlement Manual of Procedures**. United States Office of Refugee Resettlement, *The UAC Manual of Procedures* § 3 "Services" (July 2021) (produced by Plaintiff) |
|---|---|
| E | **Job Corps Handbook.** Job Corps, *Policy and Requirements Handbook* ch. 2 "Student Support Services" § 2.3 R13 (June 15, 2021), available at https://prh.jobcorps.gov/PRH%20 Chapter%202/PRH%20Chapter%202%20-%2006.15.21.pdf. |
| F | **Job Corps Data—Carrasco Center**. Correspondence and data produced by Plaintiff. |
| G | **Job Corps Data—Laredo Center**. Correspondence and data produced by Plaintiff. |
| H | **Job Corps Data—Gary Center**. Correspondence and data produced by Plaintiff. |
| I | **Job Corps Data—North Texas Center**. Correspondence and data produced by Plaintiff. |

3.      The exhibits listed above are true and correct copies of what they purport to be.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on September 29, 2021

*/s/ William T. Thompson*
William T. Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2021, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ William T. Thompson*
William T. Thompson

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit A

# Managing Pregnant and Postpartum Offenders

Technical Guidance

Federal Bureau of Prisons

February 2021

**For Official Internal Use Only**. The contents of this Technical Guidance may be duplicated and used within the BOP for official purposes only. Duplication or use for any other purpose must have the express permission of the Assistant Director, Health Services Division, Federal Bureau of Prisons. The BOP does not warrant this guidance for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof. Proper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are individual-specific. Referenced Program Statement versions within this guideline are for informational purposes only. Please refer to the most current versions of any referenced Program Statement(s). Consult the BOP Health *Services Technical Guidance Page* to determine the date of the most recent update to this document: *http://sallyport.bop.gov/co/hsd/TechnicalGuidance.jsp*

*Federal Bureau of Prisons*
*Technical Guidance*

*Managing Pregnant and Postpartum Offenders*
*February 2021*

# TABLE OF CONTENTS

1. PURPOSE ........................................................................................................................... 2

2. DEFINITIONS ..................................................................................................................... 2

3. IDENTIFICATION OF PREGNANT OFFENDERS ................................................................... 4

4. USE OF RESTRAINTS ......................................................................................................... 4

5. SENTRY CODES .................................................................................................................. 5

6. ELECTRONIC HEALTH RECORD (EHR) CODES ................................................................... 6

7. MEDICAL DUTY STATUS RESTRICTIONS ........................................................................... 7

8. MULTIDISCIPLINARY TREATMENT APPROACH ................................................................. 7

   Intake Assessment ............................................................................................................ 7

   Mental Health Assessment ............................................................................................... 7

   Social Work Assessment ................................................................................................... 8

9. BASELINE MEDICAL EVALUATION (HISTORY & PHYSICAL EXAMINATION) AND TREATMENT PLAN ........ 9

10. SPECIAL MEDICAL CONSIDERATIONS .............................................................................. 9

11. ABORTION ...................................................................................................................... 10

   Medical, Religious, and Social Counseling ...................................................................... 10

   Laws Related to Abortion ............................................................................................... 10

   Costs Associated with Abortion ..................................................................................... 10

12. INFANT PLAN OF CARE MANAGEMENT ......................................................................... 11

   Custodian Care ............................................................................................................... 11

   Adoption ......................................................................................................................... 11

   Foster Care ..................................................................................................................... 11

   Agency Custody .............................................................................................................. 11

13. INSTITUTION BIRTH COMMUNICATION ........................................................................ 12

14. SPECIAL CONSIDERATIONS AFTER DELIVERY ................................................................ 12

15. RESIDENTIAL REFERRALS ............................................................................................... 12

   Mothers and Infants Together (MINT) ............................................................................ 13

   Residential Parenting Program (RPP) ............................................................................. 13

16. POSTPARTUM ................................................................................................................ 14

17. DOCUMENTATION OF PREGNANCY OUTCOMES .......................................................... 14

18. INFANT RELEASE ........................................................................................................... 14

DOJ−00000002

## 1. PURPOSE

The Federal Bureau of Prisons (BOP) *Technical Guidance* for the *Management of Pregnant and Postpartum Offenders* provides recommendations for the management and treatment of offenders who are pregnant on intake into BOP custody, as well as those in postpartum recovery.

To ensure better care for this small, but service-intensive population, the BOP has established additional levels of oversight for female offenders, specifically, pregnant and postpartum offenders. This technical guidance integrates all pregnancy and postpartum policies, processes, and procedures to simplify and standardize the provision of services across the agency.

BOP policies specific to pregnant and postpartum offenders are listed in the following program statements: PS 5200.02 Female Offender Manual and PS 6031.04 Patient Care.

## 2. DEFINITIONS

**Abandonment:** The pregnant offender declines to identify an appropriate custodian or to specify a plan of care for her infant after delivery.

**Abortion:** An elective or spontaneous termination of a pregnancy.

**Custodian:** The person the pregnant offender chooses to act as the infant's caregiver while she is incarcerated. This person can be a family member, a friend, or other person.  After the infant is delivered and while the offender is incarcerated, the custodian assumes care of the infant, including financial responsibility for the infant's expenses.

**Drug history:** Instances of reported illicit and recreational drug use.

**Ectopic pregnancy:** Pregnancy when a fertilized egg grows outside the uterus, often in the fallopian tube.

**Full term:** A pregnancy that lasts between 39 weeks and 40 weeks, 6 days.

**Gestational age:** This term describes how far along the patient is in her pregnancy, measured in weeks.

**Genetic history:** Assessment of the risk of inherited medical conditions and single gene disorders to the fetus.

**High-Risk Pregnancy:** A woman who has one or more risk factors or issues that may increase either her or her baby's chance for health problems, preterm delivery, or threatens the life of the mother and possibly her fetus. (Refer to Section 10. Special Medical Considerations for further discussion of risk factors).

DOJ−00000003

**Immunization:** A vaccine that helps a person's immune system become protected against a certain infectious agent in a controlled way.

**Infection history:** The history of any infectious disease; includes tuberculosis (TB), HIV, viral hepatitis and sexually transmitted infections (STIs).

**Menarche:** The first menstrual cycle, or first menstrual bleeding, in a female.

**Menstrual period:** Normal vaginal bleeding that occurs as part of a woman's menstrual cycle.

**Mothers and Infants Together (MINT):** A residential program promoting bonding skills for pregnant offenders.  The offender resides with the infant at all times inside a contract Residential Reentry Center (RRC) under the direction of the Reentry Services Division (RSD).

**Multiple births:** A birth at which the mother delivers two or more children at the same time.

**Obstetric history:** Events relating to previous pregnancies and deliveries, including all information related to the events.

**Postpartum:** The time period of 12 weeks, or longer as determined by the healthcare professional responsible for the health and safety of the patient, after delivery.

**Postpartum depression:** Depression that is suffered by some mothers following childbirth, typically arising from the combination of hormonal changes, psychological adjustment to motherhood, and fatigue.

**Pregnant:** The state of carrying a developing embryo or fetus within the female body.

**Premature:** Pregnancy delivered prior to the 37th week of pregnancy.

**Psychiatry Services:** Mental health services available within BOP for referral for mental health concerns or medication management of other mental illness.

**Psychotherapy:** The use of personal interaction methods with a mental health provider to help a person change behavior and overcome problems. Psychotherapy or "talk therapy" can be used to learn about and treat an individual's moods, thoughts, and behaviors. It can also be supportive to individuals experiencing distressing thoughts and feelings.

DOJ−00000004

**Residential Parenting Program (RPP):** The Bureau has an agreement with the state of Washington Department of Corrections to place qualified, interested pregnant offenders in the RPP at the Washington Correctional Center for Females in Gig Harbor.

**Ultrasound:** A medical imaging test that uses high-frequency sound waves to capture live images of the developing fetus inside the body.

## 3. IDENTIFICATION OF PREGNANT OFFENDERS

A pregnancy test (urine or serum) is ordered for all newly committed female offenders of childbearing age as soon as they enter BOP custody. It is important to rapidly identify and evaluate pregnant offenders at intake in an effort to detect those at highest risk for fetal abnormalities and complications in their pregnancy.

A pregnant offender may be identified and confirmed by health services staff.  Upon learning or confirmation of the offender's pregnancy, health services staff should notify psychology services, social worker (institution or regional social worker), and unit management. Appropriate additional staff (i.e., captain, lieutenants, and executive staff) should also be notified of the pregnant offender at the facility.

To ensure the identification of pregnant and postpartum offenders, PRE-NATAL and POSTPARTUM Medical Duty Status (MDS) SENTRY codes, and EHR health problem codes, are promptly entered by health services staff. (Refer to Section 5. SENTRY Codes and Section 6. Electronic Health Record (EHR) Codes for a list of appropriate codes.)

## 4. USE OF RESTRAINTS

Restraints for pregnant and postpartum offenders will be used in accordance with PS 5500.15 Correctional Services Manual, PS 5538.07 Escorted Trips, PS 5540.08 Prisoner Transportation Manual and PS 5566.06 Use of Force and Application of Restraints. These policies state restraints may be used under extreme circumstances, which "cannot be reasonably contained through other methods." Other methods would include additional staff, supervisory staff presence, or maintaining physical control of the offender. It is important to note the restriction is on the use of restraints as a whole, not simply what may or may not injure a fetus. The restriction on restraints applies to escorted trips, placement in restrictive housing, routine escorts throughout the institutions, and any other situations when the use of restraints may be necessary.

Upon learning of the offender's pregnancy or post-partum status, the pregnant offender is notified within 48 hours of the restraint restrictions outlined in the First Step Act, as well as how to report the inappropriate use of restraints. The offender is provided the following information:

DOJ−00000005

*The use of restraints on offenders during the period of pregnancy and postpartum recovery period (12 weeks or longer after delivery, as determined by the healthcare provider) is prohibited unless it is determined:*

- *the offender is an immediate and credible flight risk that cannot reasonably be prevented by other means; or*
- *poses an immediate and serious threat of harm to herself or others that cannot reasonably be prevented by other means; or*
- *a healthcare professional responsible for the health and safety of the offender determines that the use of restraints is appropriate for the medical safety of the offender.*

*In the case that restraints are used, only the least restrictive restraints necessary to prevent harm or risk of escape may be used. The restraints MAY NOT be applied:*

- *around the ankles, legs, or waist of an offender; or*
- *to restrain an offender's hands behind her back; or*
- *to restrain an offender using four-point restraints; or*
- *to attach an offender to another offender.*

*The offender should report the inappropriate use of restraints to a staff member immediately.  Other ways to report include email via TRULINCS, file an Administrative Remedy, or write to the Office of Inspector General.*

If restraints are used on an offender who is pregnant, post-partum, recently had a miscarriage, or recently had a terminated pregnancy, the staff involved is required to submit a report no later than 30 days after placing the offender in restraints to the Woman and Special Populations Branch (WASPB) Administrator, the Bureau Medical Director, and the Correctional Services Administrator. The report will describe the facts and circumstances surrounding the use of restraints to include the reasons for their use, the details of their use (including the type of restraints used and the length of time), and any observable effects of their use.

## 5. SENTRY CODES

For purposes of providing appropriate medical treatment and management, all offenders who are pregnant or in the postpartum recovery period must have the appropriate codes entered into SENTRY as listed below. Further directions can be found on the WASPB Sallyport page http://sallyport.bop.gov/co/rsd/female_offender/index.jsp, including a flowchart for using the appropriate code. These codes are entered by health services staff, as applicable.

| SENTRY Assignment Code | Description |
|---|---|
| PRE-NATAL | PREG-IM NOTF'DRESTRAINTRESTRIC |
| PREG EDD | PREGNANCY - EXPECTED DUE DATE |
| MRNOTIFIED | MINT/RES PARENT NOTIFIED OF |
| MINTRPPINT | MINT/RES PARENT INTEREST |

DOJ−00000006

| | |
|---|---|
| MINTRPPDCL | MINT/RES PARENT I/M DECLINED |
| MR MED YES | MINT/RES PARENT MED APPVL YES |
| MR MED NO | MINT/RES PARENT MED APPVL NO |
| MINTUNTYES | MINT UNIT TEAM REFD YES |
| MINTUNTNO | MINT UNIT TEAM REFD NO |
| RPP UNTYES | RES PARENT UNIT TEAM REFD YES |
| RPP UNT NO | RES PARENT UNIT TEAM REFD NO |
| MINTDENIED | DENIED MINT PLACEMENT |
| RPPDENIED | DENIED RES PARENT PLACEMENT |
| MINT PL DT | MINT DATE OF PLACEMENT |
| RPP PL DT | RES PARENT DATE OF PLACEMENT |
| POSTPARTUM | POSTPARTUM RECOVERY |
| BRSTPMP | BREAST PUMP PROVIDED |

## 6. ELECTRONIC HEALTH RECORD (EHR) CODES

For purposes of providing appropriate medical treatment and management, all pregnant offenders must have the appropriate code for pregnancy entered into the EHR health problem list as listed below. This information is entered by a health services provider.

| ICD-10 Code | Description |
|---|---|
| Z34.90 | Encounter for supervision of normal pregnancy |
| O09 | Encounter for supervision of high-risk pregnancy |
| O34.219 | Maternal care for scar from previous cesarean delivery |
| O45.19 | Premature separation of placenta |
| O15.1 | Eclampsia complicating labor |
| O76 | Heart rate or rhythm (abnormal) |
| O44.1 | Placenta covering the opening of the cervix |
| O02.1 | Intrauterine fetal death (missed abortion) |
| O72.2 | Retained membranes or portions of placenta |
| O42.90 | Premature rupture of membranes |
| O70.9 | Perineal laceration |
| O24.429 | Gestational diabetes in childbirth |
| O72.20 | Postpartum with retained placenta |
| O60.10 | Preterm labor with preterm delivery |

→Coding of pregnant offenders is imperative for accurate records to ensure all are receiving appropriate care and management.
→All BOP offenders who are pregnant are assessed by the appropriate health services staff during intake, history and physical, and any other clinical encounters, as appropriate.

DOJ−00000007

# 7. MEDICAL DUTY STATUS RESTRICTIONS

The medical duty status (MDS) should reflect the offender is pregnant. MDS restrictions should be entered in the EHR as clinically indicated for all pregnant and post-postpartum offenders such as lower bunk, no climbing, and no ladders along with any other clinically pertinent restrictions.

# 8. MULTIDISCIPLINARY TREATMENT APPROACH

Healthcare for pregnant offenders requires a multidisciplinary approach.

**Intake Assessment**
The offender is seen by health services staff for a comprehensive intake screening within required time frames. Health services staff will confirm the pregnancy status (Refer to Section 3. Identification of Pregnant Offenders). If the pregnancy is confirmed, a health services staff member refers the offender to psychology services and a social worker (institution or regional social worker) for appropriate assessments and interventions.

Although the Women and Special Populations Branch (WASPB) staff is not part of the onsite assessment process, WASPB manages and provides oversight of the pregnant offender population. Therefore, on confirmation of pregnancy, WASPB staff should be consulted and kept apprised of the offender's case throughout pregnancy and postpartum recovery. Some institutions employ Special Population Coordinators. In this case, they should be consulted as well.

The following considerations should be reviewed for all pregnant offenders:
- Medical Records key the PRENATAL code into SENTRY.
- Review PS 5200.02 Female Offender Manual to include considerations for the following:
  - **Additional nutritional or commissary items** - This information is documented and provided to the Food Service Administrator and Trust Fund Supervisor.
  - **Housing Considerations -** Medical staff may recommend a change in housing (closer to Health Services) or lower bunk for safety reasons.
- Eligibility for MINT or RPP
- Refer to the PS 6031.04 Patient Care section on Female Healthcare for additional clinical considerations for pregnant offenders.

**Mental Health Assessment**
Upon diagnosis, a psychologist assesses the offender's mental health concerns and provides individualized counseling support and other programmatic interventions, as appropriate. The assessment should give special consideration to the challenges a pregnant offender may face over the course of a pregnancy. These topics may include social support, family connections, stress management, and the management of any existing mental illness over the course of a pregnancy.

DOJ−00000008

The diagnostic assessment is documented in the EHR under the title, Diagnostic and Care Level Formulation, and includes the following: relevant historical information, presenting problems/symptoms, diagnostic formulation, and care level formulation. Pregnant offenders may continue to request or be referred to psychology services throughout their pregnancy and postpartum period.

**Social Work Assessment**
The social worker educates the offender about services and programs offered during pregnancy and postpartum recovery, as well as providing her with educational resources such as *The Guide for Expecting Mothers in the BOP.*

When there is a regional social worker referral, institution staff facilitates communication with the offender. The social worker should discuss topics such as carrying the child to term, participating in a residential parenting program, and identifying a custodian for the child. This assessment is documented in the offender's electronic medical file. Outcomes from the assessment that have corresponding SENTRY codes should also be entered. Ongoing support related to the needs of both the offender and her child should be provided throughout the pregnancy and postpartum recovery period.

- **Pregnancy options** – Offenders are provided options that include carrying the pregnancy to term or terminating it in accordance with PS 5200.02 Female Offender Manual. It is the responsibility of the offender to determine how to proceed with her pregnancy. The offender should be offered medical, religious, and social counseling to assist her in making a decision. Refer to Section. 11 Abortion for additional information.

- **Carry to Term** – For offenders who choose to carry to term, the social worker should outline and discuss options, such as any interests in participating in a residential parenting program. If the offender is not interested, the social worker should outline and discuss child placement options. Assign SENTRY assignments consistent with the offender's interests and needs.

- **Residential Parenting Programs** – Discuss residential parenting programs including locations, as well as the benefits and eligibility criteria of each program. Assign SENTRY assignments consistent with the offender's interests and needs. Refer to Section 15. Residential Referrals for additional information.

- **Child Placement** – Outline and discuss options for offenders who will not remain with their infant after birth. Options include custodian care, adoption, foster care, and agency custody. Refer to Section. 12 Infant Plan of Care Management for additional information.

The social worker should follow-up with the offender throughout the pregnancy and postpartum recovery to address identified interests and needs.

DOJ−00000009

## 9. BASELINE MEDICAL EVALUATION (HISTORY & PHYSICAL EXAMINATION) AND TREATMENT PLAN

When a pregnancy is confirmed, a complete medical evaluation should be performed to classify the offender, detect the presence or absence of pregnancy complications, assist in formulating an individualized treatment and management plan, and provide a basis for continuing care. If the diagnosis of pregnancy was made prior to entry in the BOP, a review of the previous treatment plan, when available, is recommended. Appropriate laboratory tests are recommended to evaluate the offender's condition.

The pregnant offender should be referred to an obstetric gynecologist for baseline evaluation that includes the components and recommendations based on guidance provided by the American College of Obstetricians and Gynecologists.

## 10. SPECIAL MEDICAL CONSIDERATIONS

**High-Risk Pregnancy**
A high-risk pregnancy requires care from specialty trained providers. When considering the diagnosis of high-risk pregnancy, risk factors to consider include: existing health conditions (high blood pressure, diabetes, HIV, etc.), morbid obesity, multiple fetuses, or advanced maternal age.

Following the diagnosis of high-risk pregnancy by a medical provider, the offender should be classified as Care Level 4 and, in collaboration with WASPB and a social worker, the provider considers the appropriateness for a residential placement. For those offenders initially denied a residential placement, but subsequently show improved medical status, a re-evaluation should be conducted to determine if placement in a residential placement is appropriate.

**Pregnancy with Two or More Fetuses**
These pregnancies frequently require increased monitoring due to potential fetal compromise.

**Comorbid Conditions**
For guidance on the examination and treatment of the following complications and comorbidities, refer to the Centers for Disease Control and Prevention (CDC) website on Maternal and Infant Health, under Pregnancy Complications https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-complications.html and/or National Institute of Health, US National Library of Medicine https://www.nlm.nih.gov.
- Gestational diabetes
- Pregnancy induced hypertension
- Fetal genetic abnormalities
- Placenta previa abruption
- Mental health and substance use disorders

DOJ−00000010

- Hyperemesis gravidarum
- Obesity
- Urinary tract infection
- Anemia
- Sexually transmitted diseases
- Hepatitis
- Human immunodeficiency virus (HIV)
- Tuberculosis
- Thyroid disorders
- Autoimmune disorders
- Coagulation defects

# 11. ABORTION

The offender has the responsibility to decide either to end the pregnancy through abortion or continue the pregnancy to term. Refer to PS 5200.02 Female Offender Manual.

**Medical, Religious, and Social Counseling**
The Warden ensures that each pregnant offender is provided with medical, religious, and social counseling to aid her in making the decision whether to carry the pregnancy to full term or to have an elective abortion.  If an offender chooses to have an abortion, she signs a written statement indicating she chose to have an abortion and she has been provided the opportunity for counseling (medical, religious, and social). This document is scanned into the offender's electronic health record.

When medical, religious, and social counseling sessions are completed, each staff member involved documents the session in a memorandum to the offender's central file.  This document should also be scanned into the offender's electronic health record.

A copy of each request for an elective abortion and the supporting documentation from the medical, religious, and social counseling sessions is sent for information purposes to the BOP Medical Director's attention.

On receipt of the offender's written statements, ordinarily submitted through the unit manager, the Clinical Director or designee shall arrange for an abortion.

**Laws Related to Abortion**
Staff should abide by applicable federal and state (the state in which the institution is located) laws and regulations. Regional counsel should be consulted if there are questions concerning the interpretation of laws and regulations.

**Costs Associated with Abortion**
The Bureau only assumes all costs associated with the abortion procedure when the life of the mother would be endangered if the fetus is carried to term, or in the case of rape or incest.

In all other cases, non-Bureau funds must be used to pay for any abortion procedure. Otherwise, the planned abortion may not be performed.  However, whether the Bureau

10

DOJ−00000011

pays for the abortion or not, the Bureau may use its funds to escort the offender to a facility outside the institution to receive the procedure.

Pursuant to Section 103 of the Department of Justice Appropriations Bill for Fiscal Year 1996 (Public Law 104-134), the Bureau may not use appropriated funds to require any person to perform or facilitate the performance of an abortion. Staff members who wish to have no involvement in facilitating the performance of abortions need to advise their supervisor of this fact.  Supervisors cannot order a staff member's involvement in facilitating this procedure.

## 12. INFANT PLAN OF CARE MANAGEMENT

If the offender does not go to MINT or RPP, she must identify a plan of care for the infant. Plan of care options may include custodian, adoption, foster care, or agency custody. The components of this plan should be put in place following the initial assessment. Situations not addressed below will be managed on a case by case basis with the involvement of unit team as needed.

**Custodian Care**
The social worker educates the custodian on expectations for notification and time frames for taking custody of the infant. The offender is responsible for working with the unit team to add the custodian to her visitation list. The social worker should be available throughout the pregnancy to address any needed changes to the offender's plan.

Based on the location of the custodian and the hospital, the social worker cannot notify the custodian when the offender goes into labor or delivers the infant.  It is the responsibility of the hospital to complete all aspects (i.e., paperwork, transportation of the infant home, infant medical care, etc.) pertaining to the release of the infant to the custodian. The hospital determines when the infant will be discharged based on individual medical needs.

**Adoption**
The offender may choose adoption for her infant. She may select her own agency or private party for the adoption. The social worker should assist in facilitating communication and completion of necessary paperwork with all parties. Staff should allow special visits for adoption coordination. Staff should allow legal visits for adoption attorneys.

**Foster Care**
The offender may choose foster care for her infant. She may select her own agency for foster care placement. The social worker should assist in facilitating communication and completion of necessary paperwork with all parties.  Staff should allow special visits for foster care coordination.

**Agency Custody**
In the event the pregnant offender does not choose a plan of care (i.e., there is no custodian and adoption is not arranged), the infant will be considered abandoned. The social worker should collaborate with hospital staff and local child welfare agency to determine

DOJ−00000012

appropriate placement of the infant. The social worker should continue to work with community agencies and the offender to ensure continuity of care.

## 13. INSTITUTION BIRTH COMMUNICATION

Each institution should maintain a current list of pregnant offenders including expected delivery date, security and custody level, projected release date, offender's plan of care for the infant, and contact information for the person assuming responsibility for the infant after delivery. The institution identifies appropriate staff to make the birth notification to the person assuming responsibility for the infant. This includes a plan for after-hours notifications.

## 14. SPECIAL CONSIDERATIONS AFTER DELIVERY

After delivery, the offender may care for the infant at the hospital, which includes but is not limited to, holding and feeding the infant. Additionally, the offender may have access to the infant within the hospital (i.e., neonatal intensive care unit (NICU), nursery, etc.). The custodian should have access to the infant, independent of the offender's location at the hospital.

If the newly delivered infant requires hospitalization after the offender returns to the institution, institution staff may keep the offender informed of updates regarding the infant's medical care. The institution may arrange visitation between the offender and the infant during the infant's hospitalization.

## 15. RESIDENTIAL REFERRALS

There are two Bureau programs available for pregnant offenders: Mothers and Infants Together (MINT) and Residential Parenting Program (RPP). The social worker should discuss these programs with all pregnant offenders and collaborate with the WASPB regarding offenders who are interested in being referred. Offenders are eligible to enter MINT or RPP ideally at least two months prior to delivery. The offender may decline participation at any time. SENTRY codes are updated reflecting referral status and placement.

Unit Management completes the referral and forwards to the Residential Reentry Management Branch for consideration. If an offender is found ineligible for MINT or RPP by Unit Management, SENTRY codes are updated and the Women and Special Populations Branch (WASPB) is notified.

Referral process goes as follows:
1.  Health services staff indicates whether an offender is approved for a residential placement (MINT/RPP). If the offender is not approved based on medical reasons, she should be placed on medical hold, so the offender will remain at the current institution for monitoring and re-evaluations. Medical denials need to be reported to

DOJ−00000013

WASPB and SENTRY codes updated. (Note: A high-risk pregnancy does not automatically eliminate an offender from being eligible and appropriate for MINT/RPP.)

2. If there are no medical contraindications, health services staff complete the EHR Exit Summary (Medical/Psychological Pre-Release Evaluation BP-A0351).
3. SENTRY codes are updated to reflect eligibility status.

**Mothers and Infants Together (MINT)**
A residential program promoting bonding skills for pregnant offenders. The offender resides with the infant at all times inside a contract Residential Reentry Center (RRC) under the direction of the Reentry Services Division (RSD).

It is recommended for the offender and infant to remain in the program for at least 180 days. In consultation with WASPB, additional time may be approved for the offender and infant to stay in the program.

*Eligibility for MINT*
- The offender must be pregnant upon commitment, with an expected delivery date prior to her projected release date.
- The offender or custodian must assume financial responsibility for the infant's expenses while residing at MINT.
    - o If the offender or custodian are unable or unwilling to bear the infant's financial cost, the offender may be returned back to the institution.
- She must have less than five years remaining on her sentence.
- There are no plans of placement of the infant for adoption.

**Residential Parenting Program (RPP)**
The Bureau has an agreement with the state of Washington Department of Corrections to place qualified, interested pregnant offenders in the RPP at the Washington Correctional Center for Females in Gig Harbor. This voluntary program allows for pregnant offenders to reside with their child up to 30 months post-delivery.

*Eligibility for RPP*
- Pregnant upon commitment, with an expected delivery date prior to projected release date
- Scored as minimum security with OUT or community (COM) custody
- Release dates or home detention eligibility dates within 30 months of the expected delivery date
- No 200 or higher series incident reports in the last 6 months
- Satisfactory or higher work evaluations if applicable
- Clear of all serious disciplinary violations of an aggressive or assaultive nature
- No current no-contact orders with minor children, no sex offense convictions, no crimes against a child, no domestic violence or other violent convictions, and no contact-founded allegation or inclusive referrals for neglect or abuse with child protective services

DOJ−00000014

## 16. POSTPARTUM

On return to the institution, the offender will be evaluated by a medical provider and can be referred to a social worker to determine postpartum needs.

→SENTRY PRE-NATAL code needs to be replaced with POSTPARTUM.

Offenders are allowed to nurse infants in the institution visiting room, during visitation. Health services staff should issue breast pumps to offenders for the purpose of maintaining milk production.  In very rare instances, the Warden may request approval from the Health Services Division for the offender's milk supply to be stored.

→SENTRY codes are updated to reflect the issuance of a breast pump.

## 17. DOCUMENTATION OF PREGNANCY OUTCOMES

The result of the birth shall be documented in the EHR using the following outcome(s):
- Live birth
- Abortion
- Preterm birth
- Ectopic pregnancy
- Miscarriage
- Still birth
- Released pregnant
- Neonatal death
- Maternal death
- Other

## 18. INFANT RELEASE

In the event the offender does not go to a residential program, the status of the infant's placement should be noted in the EHR (i.e., parent, custodian, adoption, foster care, agency custody).

DOJ−00000015

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit B

United States Marshals Service POLICY DIRECTIVES

PRISONER OPERATIONS

**9.5     PREGNANT PRISONER CARE**

**A.      Proponent:**  Prisoner Operations Division (POD).

**B.      Purpose:**  This policy directive establishes policy and procedures for the provision of health care services to pregnant prisoners in the custody of the United States Marshals Service (USMS).

**C.      Authority:**  The Director derives authority for the care and custody of prisoners from 28 C.F.R. § 0.111 (j), (k) and 18 U.S.C. § 4086.  The Director's authority to manage standards for prisoner health care derives from 18 U.S.C. §§ 4006, 4013, 4241- 4247; and S.142 - Hyde Amendment Codification Act.

**D.      Policy:**

1.    All prisoners will receive medically necessary health care services.

2.    Emergency health care will be provided immediately to prisoners (no pre-authorization is required).

3.    Only POD, Office of Medical Operations (OMO) authorized health care personnel can deny or defer requests.

4.    Pregnant prisoners will have access to obstetric care.

5.    The prisoner is solely responsible for determining whether to have an abortion or to bear the child.

6.    The USMS is not responsible for the care of the infant after delivery.

7.    Under no circumstances will a newborn child accompany the prisoner to the detention facility.

8.    A prisoner may elect to have an abortion consistent with state law, but federal funds cannot be used to pay for an abortion unless the prisoner became pregnant as a result of rape or incest; or the prisoner's life is in danger as a result of the pregnancy.

9.    Federally funded abortions require POD/OMO and Office of General Counsel (OGC) review unless there is a medical emergency.

10.   Other than security and reasonable transportation to/from an appropriate facility, the USMS will not assist the prisoner in non-federally funded abortions.

11.   All requests for exceptions to this policy will be sent in memorandum format with the United States Marshal's signature to the Assistant Director, POD.

**E.      Responsibilities:**

1.    **POD:**

a.    Provides professional expertise and guidance to districts for pregnant prisoner care;

b.    Adjudicates all pregnancy services not listed in USMS Publication 9, *Prisoner Health Care Guidance to Districts*; and

DOJ-00001151

      c.      Notifies OGC when a prisoner requests a federally funded abortion (i.e., life endangerment, rape).

2.    **Districts:**

    a.      Notify POD/OMO when a USMS prisoner pregnancy is confirmed via the ███████████████.

    b.      Contact the U.S. Attorney's office to review the potential for releasing the prisoner on bond or personal recognizance upon notification of a USMS prisoner pregnancy or abortion request;

    c.      Notify POD/OMO when there is a court motion or order to provide pregnancy services not listed in USMS Publication 9.

    d.      Inform the prisoner and/or her attorney that the prisoner is responsible for making all arrangements for the infant's care;

    e.      Assist the prisoner, as appropriate, in coordinating child custody arrangements with family or community social services;

    f.      Notify the hospital of USMS financial responsibilities;

    g.      Notify POD/OMO ██████████ when a USMS prisoner requests an abortion;

    h.      Obtain the prisoner's written consent for an abortion;

    i.      Ensure all financial arrangements are complete prior to transporting a prisoner for a non-federally funded abortion; and

    j.      Arrange for the prisoner to have a federally funded abortion only after OGC has determined that the legal requirements of the Hyde Amendment have been met.

3.    **OGC:** Provides guidance to POD/OMO related to any federally funded abortion requests and the legal requirements of the Hyde Amendment.

**F.**    **Procedures:**

1.    **Pregnancy Notifications:**

    a.      If the district is made aware of a prisoner's reported pregnancy prior to the prisoner reaching the detention facility, the district will request the detention facility confirm a pregnancy.

    b.      Per USMS Policy Directive 9.4, *Prisoner Health Care Management,* the district will notify POD/OMO of the prisoner's pregnancy by using ██████████. The prisoner medical submission will include:

        1)    Detention facility prisoner medical submission;

        2)    Jail contact information; and

        3)    Supporting medical documentation as needed.

    c.      POD/OMO will acknowledge the pregnancy notification in ██████████ and provide additional instructions related to prenatal care of the prisoner and confirm the pre-authorization of any future routine care related to the pregnancy as indicated in USMS Publication 9.

    d.      The district will update the "Cautions and Medical Conditions" section of the ██████████.

        1)      This record entry will indicate the prisoner is pregnant and the expected delivery date, if known.

        2)      If the prisoner will be transported, the district will print ██████████ to accompany the prisoner.

e.      The district will notify appropriate court officials (e.g., Defense Attorney, U.S. Attorney's office) to review the possibility for the prisoner's release on bond or personal recognizance.

f.      The district will provide immediate written notice via ████████████████ ███████████████████████████████████████████████ to the health care facility and the attending physician for termination of financial responsibility if a prisoner is released from USMS custody.

**2.**    **Prenatal Care:**

a.      The district will refer to USMS Policy Directive 9.4 and USMS Publication 9 for pre-natal care authorization and to arrange for child delivery.

        1)      Once POD/OMO approves a pre-authorization for routine care, it will cover all subsequent routine visits associated with that pregnancy.

        2)      The district will contact POD/OMO using ████████████ to get approval for "non-routine prenatal care" (e.g., testing, additional ultrasounds, amniocentesis, home uterine monitoring devices, and stress tests).

b.      The USMS Medical Director must approve requests for voluntary surgical sterilization (even during delivery) unless court ordered.

**3.**    **Child Delivery, Custody, and Financial Responsibilities:**

a.      The district must promptly inform the prisoner prior to delivery that she is responsible for making formal arrangements for the custodial placement of the child immediately after birth.

        1)      The district will advise the prisoner to contact her attorney to assist in determining custodial care (e.g., relatives, friends, community social services).

        2)      The district will assist the prisoner, as appropriate, in contacting the prisoner's family or community social service agency to assist the prisoner in determining the placement of the child.

b.      The prisoner or attorney will notify the district who will be providing custodial care and financial responsibility for the infant upon delivery using ████████████ ██████████████████████████████.

        1)      The purpose of ████████████████████ is to specify financial responsibility for any children born to a prisoner while in USMS custody.

        2)      The individual or entity who will assume responsibility for the child or children immediately after delivery will complete ████████████████ ██████.

        3)      The district will provide a copy of the completed ████████████████ ████████████ to all attending physicians, as well as to the hospital where the prisoner will be admitted for maternity care and delivery.

4)     The district will upload the ███████████████████████.

c.     The district will provide written notification to the attending physician and the hospital of billing responsibilities and requirements related to the pregnancy well in advance of the prisoner's admission to the hospital for delivery. The notification will include the following statements.

    1)     The USMS will reimburse the hospital for costs related to the labor and delivery of this individual's infant(s), as well as for her room and board for up to 48 hours post-delivery for a vaginal delivery or up to 72 hours post-delivery for a cesarean delivery at the Medicare rate.

    2)     The USMS will reimburse the hospital only for costs directly related to the delivery of this individual's infant(s).

    3)     The USMS will not reimburse the hospital for any costs directly related to the care of the infant(s) born to this individual, including the first newborn and routine screening.

    4)     No other procedures are authorized at this time, including voluntary sterilizations done at the time of delivery.

    5)     If additional procedures are necessary, contact the local USMS office for pre-authorization.

    6)     All invoices must be submitted to the USMS district office on one of the following forms:

        a)     OMB-0938-1197 CMS-1500, *Health Insurance Claim Form;* or

        b)     Form CMS-1450, *UB-04 Uniform Bill*, to the USMS district office.

    7)     The USMS pays no more than Medicare rates.

    8)     A sample notification letter explaining physician and hospital billing responsibilities and requirements related to the pregnancy is located on the POD/OMO Intranet site.

d.     After delivery, the district will return the post-partum prisoner from the hospital to the detention facility.

e.     Under no circumstances will a newborn child accompany the prisoner to the detention facility, except in accordance with the detention facility's visitation policy.

**4.**    **Federally Funded Abortions:**

a.     The prisoner may elect to have an abortion consistent with state law and federal law and will notify authorities (e.g., detention facility, attorney, court, district) of such decision.

b.     The district will notify POD/OMO via ███████████ if the prisoner requests to have an abortion per USMS Policy Directive 9.4.

c.     The USMS may expend federal funds only for abortions when the pregnancy will result in **prisoner's life endangerment** or when the pregnancy was the **result of rape or incest**.

d.     Except in medical emergencies, the district will coordinate with legal and/or medical authorities to obtain the following documentation to support the request for a federally funded abortion.

1) **Pregnancy was the result of rape:**  The district will coordinate with the appropriate authorities (e.g., medical provider, U.S. Attorney's office, Defense Attorney) to verify and document the circumstances of the rape. In situations where medical evidence is not available, a judicial authority may make the determination that the prisoner's claim of rape is substantiated.

2) **Endangerment of prisoner's life:**  The attending physician must provide a written statement with supporting documentation that the life of the mother would be endangered if the fetus were carried to term.

e. The district will ensure the above legal and medical statements and related documents are forwarded to POD/OMO ███████████████.

1) POD/OMO will verify adequate medical documentation has been provided to support the federally funded abortion request.

2) POD/OMO will forward the abortion request to OGC with a medical recommendation.

3) OGC will review the request to determine whether federal funds may be used in accordance with federal statutes (e.g., Hyde Amendment).

4) POD/OMO will notify the district of OGC's determination and update ███ ███████.

f. If the request for a federally funded abortion has met the requirements of the Hyde Amendment and the prisoner chooses to have an abortion, the district will:

1) Obtain the prisoner's written consent for the abortion; and

2) Make the necessary arrangements for the prisoner to have an abortion at an appropriate medical facility at government expense.

g. After the abortion, the district will return the prisoner from the hospital to the detention facility.

5. **Non-federally Funded Abortions:**

a. The prisoner may elect to have an abortion consistent with state law and federal law and will notify authorities (e.g., detention facility, U.S. Attorney's office, district) of such decision.

b. The district will notify POD/OMO via ████████████ if the prisoner requests to have an abortion per USMS Policy Directive 9.4.

c. The district will have the prisoner sign a written statement acknowledging her decision to have an abortion and her acceptance of financial responsibility for the abortion.

1) The prisoner and her defense attorney will identify required funding for the abortion and may access community resources to assist with the abortion.

2) In addition to supporting medical information confirming the prisoner's pregnancy, the district will upload the prisoner's written statement acknowledging her decision to have an abortion and her acceptance of financial responsibility for the abortion to ██████████.

d. The district will have the prisoner, through her attorney, finalize all financial arrangements before the district makes any transportation arrangements.

       1)      Other than transportation and security, the district will not assist in this process.

       2)      USMS funds may be used only for security and reasonable transportation to/from an appropriate facility to perform the abortion.

   e.      After the abortion, the district will return the prisoner from the hospital or procedure facility to the detention facility.

**G.**     **Definitions:**

   1.     **Prenatal Care:**  Medical care provided during pregnancy, routine health screenings (weight, blood pressure, pulse, and temperature), routine lab tests, prenatal vitamin supplements, and nutritional counseling.

**H.**     **References:**

   1.     28 C.F.R. § 0.111, *General Functions*.

   2.     18 U.S.C. § 4006, *Subsistence for Prisoners*.

   3.     18 U.S.C. § 4013, *Support of United States Prisoners in Non-Federal Institutions*.

   4.     18 U.S.C. § 4086, *Temporary Safe-Keeping of Federal Offenders by Marshals*.

   5.     18 U.S.C. § 4241, *Determination of Mental Competency to Stand Trial to Undergo Post Release Proceedings*.

   6.     18 U.S.C. § 4242, *Determination of the Existence of Insanity at the Time of the Offense*.

   7.     18 U.S.C. § 4243, *Hospitalization of a Person Found Not Guilty Only by Reason of Insanity*.

   8.     18 U.S.C. § 4244, *Hospitalization of a Convicted Person Suffering from Mental Disease or Defect*.

   9.     18 U.S.C. § 4245, *Hospitalization of an Imprisoned Person Suffering from Mental Disease or Defect*.

   10.    18 U.S.C. § 4246, *Hospitalization of a Person Due for Release but Suffering from Mental Disease or Defect*.

   11.    18 U.S.C. § 4247, *General Provisions for Chapter*.

   12.    Hyde Amendment Codification Act, dated January 24, 2013.

   13.    USMS Policy Directive 9.4, *Prisoner Health Care Management*.

   14.    USMS Publication 9, *Prisoner Health Care Guidance to Districts*.



   19.    OMB-0938-1197 CMS-1500, *Health Insurance Claim Forms*.

20.     UB-04 Uniform Bill (CMS-1450), *Health Insurance Claim Form (*for Medicare Administrative Contractors).

I.      **Cancellation Clause:**  Supersedes USMS Policy Directive 9.5, *Health Care for Pregnant Prisoners,* updated October 9, 2018, and will remain in effect until superseded, updated, or cancelled.

J.      **Authorization and Date of Approval:**

**By Order of:**                                    **Effective Date:**


_____/s/_____                   ___12/16/2019___
Donald W. Washington
Director
U.S. Marshals Service

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit C



ADMINISTRATION FOR
# CHILDREN & FAMILIES
Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

# POLICY MEMORANDUM

## Medical Services Requiring Heightened ORR Involvement
### September 29, 2020

### Applicability

This policy brings up to date the March 21, 2008, policy on medical procedures requiring heightened ORR involvement (hereinafter "Medical Procedures 2008 policy") as it applies to unaccompanied alien children ("UAC"), as defined in 6 U.S.C. § 279(g)(2). ORR issued the Medical Procedures 2008 policy stating that certain decisions would require heightened ORR involvement and limited decision-making by grantees. This document updates the cross-references in the Medical Procedures 2008 policy and otherwise brings that policy up to date to reflect current policy, including policy on abortion.

### General Policy

Serious medical services, including significant surgical or medical procedures, abortions, and services that may threaten the life of a UAC, require heightened ORR involvement and limited decision-making by grantees.

### General Procedures

When a grantee learns that a UAC has been advised by a doctor to undergo or wishes to seek serious medical services requiring heightened ORR involvement (i.e., significant surgical or medical procedures, abortions, and services that may threaten the life of a UAC), the grantee must follow the procedures for Significant Incident Documentation and Reporting at section 5.8 of the ORR Policy Guide (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-5#5.8) and for Medical Services at section 3.4 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.4). In addition, for all serious medical services that require heightened ORR involvement other than abortions, the grantee must immediately notify the Deputy Director for Children's Programs and provide all available details about the situation. If the grantee is uncertain whether a serious medical service requires heightened ORR involvement, the grantee should notify the Division of Health for Unaccompanied Children and request guidance.

As the situation progresses, grantees must respond to requests from the Deputy Director for Children's Programs for information and updates as soon as possible and no later than within 24 hours of such requests. Further, for medical services and procedures governed by this policy other than abortion, grantees are prohibited from taking any actions in these cases without direction and approval from ORR. (Note: This does not include emergency medical situations. Follow procedures at section 3.4.5 for responding to medical emergencies.)

DOJ−00001002

For all medical services and procedures governed by this policy (subject to the exceptions for abortion discussed below) in cases requiring heightened ORR involvement, ORR may contact or may require the grantee to contact the UAC's parent or legal guardian. Depending upon the particular circumstances, ORR (or the grantee at ORR's request) may inform the parent or legal guardian of the UAC's medical situation and ask the parent or legal guardian how he/she wishes the situation to be resolved.

## Medical Related Costs

In instances where the cost of the medical procedure or the medical service requires a Treatment Authorization Request (TAR), the grantee must follow ORR policies related to obtaining a TAR, subject to any congressionally imposed appropriations restrictions. See ORR Policy Guide, 3.4.9 Provider Reimbursement (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.4.9)

Approval to cover the related costs in no way implies consent to conduct the procedure or provide the medical service when consent by a parent or legal guardian is required and cannot be obtained.

In addition, ORR funds may not be used for legal services or court costs related to the case of a UAC seeking an abortion through a state judicial bypass procedure.

## Procedures Specific to Requests for Abortion and Alignment with State Law

Congress made the Secretary of HHS responsible for the care and custody of all unaccompanied alien children. 8 U.S.C. § 1232(b)(1).

Given the authority that Congress vested in HHS, the legal position of HHS is that state courts cannot lawfully compel the ORR federal staff or ORR care providers to: consent to the provision of abortions to UAC; bring UAC to state court; facilitate access to UAC by state-appointed guardians or attorneys ad litem; or provide a state court, or a state-appointed guardian or attorney ad litem, with access to federal records.

Nevertheless, HHS has determined as a matter of policy that HHS and ORR federal staff will exercise their delegated federal custodial authority in a manner informed by child welfare principles and in alignment with state law governing the conduct of medical providers who provide abortions to minors. For example, some states require that physicians provide parental notification of the intent to perform an abortion, receive a state judicial bypass order, or certify that a medical emergency exists, before providing an abortion to a minor. *See, e.g.,* Tex. Occ. Code Ann. § 164.052; Tex. Fam. Code §§ 33.002, 33.003, 33.004. These statutory requirements typically apply to the physicians who provide the abortions and not to the parents, guardians, or conservators of the minors.  *See id*.

If a state-licensed physician seeks consent from ORR or ORR care provider staff to provide an abortion to a UAC, the policy of ORR remains that "neither ORR nor the care provider may provide consent."

If a physician seeks the assistance of ORR or ORR care provider staff in providing parental notification before performing an abortion, in compliance with state law, then ORR shall support the efforts of the physician to comply with state law. Such assistance may involve providing the parent's last known

DOJ−00001003

contact information to the physician, or facilitating communication between the physician and the parent. Subject to the exceptions listed below, neither the ORR federal staff nor ORR care providers shall require parental notification of the UAC's intent.

If the UAC obtains a state judicial bypass order authorizing the physician to provide an abortion to the UAC, and the UAC still wishes to have the abortion, then the ORR federal staff shall not undertake actions to prevent the UAC from obtaining the abortion. In that scenario, the ORR federal staff shall instruct the care provider sheltering the UAC that it shall not take actions to prevent the UAC from obtaining the abortion.

If the physician certifies that a medical emergency exists, and the UAC still wishes to have the abortion, then the ORR federal staff shall not undertake actions to prevent the UAC from obtaining the abortion. The ORR federal staff shall instruct care providers that they shall not take actions to prevent a UAC from obtaining an abortion in the event of such certified medical emergency.

**No Obstruction or Interference**

ORR care providers must notify the ORR federal staff of any UAC who is pregnant or requesting an abortion using the Significant Incident Reporting mechanism in section 5.8 of the ORR Policy Guide. ORR federal staff and ORR care providers shall not take actions to obstruct or interfere with UAC access to state judicial bypass proceedings (however ORR is not required to fund representation in those hearings), non-directive options counseling, abortion counseling, or an abortion. ORR federal staff and ORR care providers shall ensure UAC have access to medical appointments related to pregnancy in the same way they would with respect to other medical conditions.

**Notification**

ORR federal staff and care providers shall not communicate information about a UAC's pregnancy (including the fact of the pregnancy) or decision whether to have an abortion (before or after the abortion) to individuals other than staff members or the UAC, except that they may nevertheless communicate such information to an applicant or approved sponsor subject to the conditions discussed in the following paragraph, and to others if the UAC: needs emergency medical care and is unable to inform an emergency medical provider herself; or authorizes the ORR federal staff or care providers to communicate the information to a specific individual.

Nothing in this provision prohibits the ORR federal staff from communicating information to an applicant or approved sponsor regarding a serious health complication arising from pregnancy, birth or abortion that ORR finds in good faith the UAC may experience or require follow-up care to address after having been transferred to the custody of that applicant or approved sponsor. In addition, nothing in this provision prohibits the ORR federal staff from communicating information regarding the UAC's pregnancy to an applicant or approved sponsor if the ORR federal staff has found in good faith that ORR must communicate the information to confirm that the applicant or approved sponsor can provide the financial and emotional support needed by the UAC associated with carrying the pregnancy to term, giving birth, and/or parenting.

If the ORR federal staff makes either finding in good faith, then they shall document the finding in a declaration executed pursuant to 28 U.S.C. § 1746, and shall document attempts to first secure the UAC's consent to the disclosure and promptly notify the UAC when the disclosure has been made. Moreover, in all such cases, the information disclosed to the applicant or approved sponsor should be

DOJ-00001004

limited to that which is appropriate to ensure that the sponsor is equipped to adequately care for the UAC, and communicated as close to the conclusion of the sponsorship vetting and approval process as reasonably possible and in time to ensure the sponsor can provide the financial and emotional support needed by the UAC associated with carrying the pregnancy to term, giving birth, or parenting.

When an ORR care provider is required, as a matter of state licensing requirements, to communicate information about a UAC's abortion-related decision to individuals other than the UAC, the ORR care provider acts in consultation with its own legal counsel and without the involvement of the ORR federal staff. The care provider will notify ORR of any communication with individuals other than the UAC that it makes pursuant to a state licensing requirement.

**Applicability of Hyde Amendment**

Nothing in this policy supersedes applicable Federal appropriations restrictions (known as the "Hyde Amendment"), prohibiting the Federal Government from paying for abortions other than in cases where the pregnancy is the result of an act of rape or incest; or in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed. *See e.g.* sections 506 and 507, Title V of Pub. L. 116-94 "Further Consolidated Appropriations Act, 2020." Nothing in this policy may be read to prohibit ORR or HHS from requesting documentation and otherwise reasonably ensuring that requests for Federal payment adhere to the Hyde Amendment restrictions.

**Care Providers with Sincerely Held Religious Objections to Pregnancy Termination**

Nothing in this policy prohibits ORR from providing accommodations to care providers who maintain a sincerely held religious objection to abortion. If a UAC in the care of such a provider is discovered to be pregnant, ORR's field staff will personally deliver any legally required notice to the UAC orally and in writing, along with other pregnancy-related information required by ORR policy.

DOJ−00001005

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit D



ADMINISTRATION FOR
CHILDREN & FAMILIES
Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

# The UAC **Ma**nual of **P**rocedures
# (UAC MAP)

## *For ORR Staff, Contractors, and Grantees*

# Section 3: Services

**Office of Refugee Resettlement**
**Office of the Director**
**The Division of Policy and Procedures**
**July 2021 – Version 3.0**

DOJ−00001009

# Section 3: Services

**Table of Contents**

3.1 Summary of Services ................................................................................................................. 5

3.2 Care Provider Admissions and Orientation for UAC ................................................................ 6

3.2.1 Admissions for UAC ............................................................................................................... 6

    Quick Glance: UAC Personal Property ...................................................................................... 8

    Quick Glance: Tips for Completing the Initial Intakes Assessment ......................................... 10

3.2.2 Orientation ........................................................................................................................... 11

    Quick Glance: Orientation Accessibility .................................................................................. 12

    Quick Glance: Care Provider Grievance Policies and Procedures ........................................... 13

3.3 Care Provider Required Services ............................................................................................. 15

3.3.1 UAC Assessment and Case Review ...................................................................................... 16

    Quick Glance: Guide to the Assessment for Risk .................................................................... 18

    Quick Glance: Guide to the UAC Assessment ......................................................................... 19

    Quick Glance: Guide to the Individual Service Plan ................................................................ 21

    Quick Glance: Guide to the UAC Case Review ........................................................................ 21

    Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History ...... 24

    Quick Glance: Summary of UAC Case Records ....................................................................... 25

3.3.2 Long Term and Concurrent Planning .................................................................................... 26

3.3.3 Screening for Child Trafficking and Services for Victims ...................................................... 27

3.3.4 Safety Planning .................................................................................................................... 29

3.3.5 Academic Educational Services ........................................................................................... 31

3.3.6 Vocational Educational Services .......................................................................................... 32

3.3.7 Services Related to Culture, Language, and Religious Observation ..................................... 33

3.3.8 Recreation and Leisure Time Services ................................................................................. 34

3.3.9 Nutritional Services ............................................................................................................. 35

3.3.10 Telephone Calls, Visitation, and Mail ................................................................................. 35

3.3.11 Clothing and Personal Grooming ....................................................................................... 36

3.3.12 Assignment of Chores ........................................................................................................ 37

DOJ−00001010

3.3.13 Behavior Management ...................................................................................................... 38

3.3.14 Transportation Services ................................................................................................... 39

3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations in RTCs ........................... 41

3.3.16 Notification and Reporting of the Death of a UAC ......................................................... 41

3.3.17 Use of Restraints During Transport and in Immigration Court ........................................ 42

3.3.18 Restraints in Immigration Court and Asylum Interviews ................................................. 42

**3.3.19 Transportation for *Saravia* Hearings** ............................................................................ 42

3.4 Health Care Services ............................................................................................................ 43

3.4.1 Health Care Eligibility and General Standards .................................................................. 45

3.4.2 Initial Medical and Dental Examinations .......................................................................... 45

3.4.3 Requests for Health Care Services, including Serious Medical Services Requiring
Heightened ORR Involvement ................................................................................................... 49

     Quick Glance: Abortion-Related State laws .................................................................... 53

3.4.4 Medication Administration and Management ................................................................... 54

3.4.5 Responding to Medical Emergencies ............................................................................... 54

3.4.6 Management of Communicable Diseases ......................................................................... 55

3.4.7 Maintaining Health Care Records and Confidentiality ...................................................... 56

3.4.8 Medical Clearance Prior to Release or Transfer ............................................................... 57

3.4.9 Provider Reimbursement ................................................................................................. 57

3.5 Guiding Principles for the Care of UAC Who are LGBTQI ....................................................... 59

3.5.1 Zero Tolerance for Discrimination and Harassment ......................................................... 59

3.5.2 Prohibition on Segregation and Isolation ......................................................................... 59

3.5.3 Confidentiality with Regards to Sexual Orientation and Gender Identity .......................... 59

3.5.4 Housing ........................................................................................................................... 59

3.5.5 Restroom and Dressing Area Accommodations ............................................................... 59

3.6 Long-Term Foster Care ......................................................................................................... 59

3.6.1 ORR Long-Term Foster Care Service Provision ................................................................. 60

3.6.2 Change in Placements While in ORR Long-Term Foster Care ............................................ 63

3.6.3 Additional Questions and Answers About This Topic ........................................................ 63

Appendix 3.1 Checklist for Child Friendly Environment ............................................................. 64

DOJ—00001011

Appendix 3.2 Initial Intakes Assessment ...................................................................... 67

Appendix 3.3 *Garza* Notice (English and Spanish) ......................................................... 70

Appendix 3.4 Assessment for Risk ............................................................................... 72

Appendix 3.5 Interviewing Guidance for Clinicians and Caseworkers ......................... 75

Appendix 3.6 UAC Assessment .................................................................................... 79

Appendix 3.7 Individual Service Plan ........................................................................... 85

Appendix 3.8 UAC Case Review ................................................................................... 86

Appendix 3.9 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS Reentry Self-Report Questionnaire ............................................................................... 90

Appendix 3.10 Legal Declaration ................................................................................ 124

Look for these **icons** for quick cues on what is required for a specific procedure or a reference to a particular policy in the UAC Policy Guide.

📖 **UAC Policy Guide (ORR Guide to Children Entering the United Stated Unaccompanied)**
✉ Email
📫 Mail
🕓 Tasks associated with a deadline
🗐 Form or other template
🖱 UAC Portal
☎ Phone call

DOJ—00001012

# 3.1 Summary of Services

📖 **See Section 3.1 of UAC Policy Guide**

## OVERVIEW

This section includes procedures for care providers who are administering required services for UAC in ORR care, including admissions and orientation; UAC screenings, assessments and required notices; education; nutritional services; services related to culture, language, and religious observation; recreation and leisure time; telephone calls and visitation rights; and other mandated services.

Care providers are required to provide services in a child-friendly, structured, safe, and productive environment that meets respective state guidelines, relevant federal law and settlement agreements, their Cooperative Agreements, the ORR Policy Guide and the UAC Manual of Operations (UAC MAP) and local building, fire, and health and safety codes. For general guidance see **Appendix 3.1 Checklist for Child Friendly Environment**.

These services must be sensitive to the age, culture, religion, dietary needs, native language, sexual orientation, gender identity, and other important individual needs of each UAC. All UAC in ORR care are entitled to human rights protections and freedom from discrimination and abuse.

Care providers must administer all services and assessments for all UAC even if a UAC is in ORR custody for a short time.  Care providers are required to have the capacity to provide services in the language spoken by the majority of UAC in their facility and/or provide translation services.

ORR expects care providers to tailor the dissemination of information, such as the orientation regarding sexual abuse and sexual harassment, in a manner that is appropriate for tender aged UAC and other younger UAC in their care. ORR also expects clinicians and other qualified staff to find effective ways to tailor delivery of services, such as substituting standard group counseling sessions for direct observation and therapeutic play and games in an informal setting, to address post trauma needs of younger UAC.

Care providers must provide UAC who are placed into staff secure, secure, and RTC with notice of the reasons for the placement or continued placement. Care providers must regularly review a restrictive placement for a possible "step downs" to a less restrictive environment.

DOJ-00001013

## 3.2 Care Provider Admissions and Orientation for UAC

📖 **See Section 3.2 of the UAC Policy Guide**

### OVERVIEW

Care provider services begin when the care provider takes physical custody of the UAC. At that point, the care provider admits the UAC into the care provider program via the UAC Portal, provides food and beverages and other services, and notifies and informs UAC of his or her rights and responsibilities. The care provider gives the UAC an orientation within **48 hours of admission**.

| Key Players | Responsibilities |
|---|---|
| Designated care provider staff | Admits UAC into program, provides placement authorization form and required notifications to UAC, conducts an initial medical exam, and provides a standard orientation to all UAC. |

| Related Forms/Instruments | Used By |
|---|---|
| *Placement Authorization Form* | Designated care provider staff |
| *Authorization for Medical, Dental, and Mental Health Care* | Designated care provider staff |
| *Initial Intakes Assessment* and *Interviewing Guidance for Clinicians and Caseworkers* | Designated care provider staff |
| *Notice of Placement in a Restrictive Setting* | Designated care provider staff |
| *Notice to Juvenile Aliens in Federal Facilities Funded by DHS or HHS by Reason of Their Immigration Status* | Designated care provider staff |
| *Legal Resource Guide for UAC* | Designated care provider staff |
| *Initial Medical Exam* | Designated care provider staff |

## 3.2.1 Admissions for UAC

📖 **See Section 3.2.1 of the UAC Policy Guide**

### PROCEDURES

1. **Upon arrival at the care provider facility**, the designated staff admits the UAC to the care provider program in the UAC Portal by completing the following steps:

DOJ−00001014

- Go to the Admission tab of their specific program. **NOTE:** ORR care providers with more than one facility must designate the correct program from the list (see **Fig. 3.1 UAC Portal Admission Navigation Tab**).

## Fig. 3.1 UAC Portal Admission Navigation Tab



- Enter the UAC case file by clicking on the Alien number on the left-hand side which brings the user to the Admission screen (see **Fig. 3.2 Admission Screen**).

- Select "admit" under status.

- If the UAC did not arrive at the program, contact ORR Intakes to confirm the status of the UAC and ask ORR Intakes if "cancel" should be selected for the status of the UAC (do not select the status "pending").

- Answer "yes" to the question "By selecting "Yes" in this field…" and fill in the date and time, and click "save."

- Upload all DHS documents and forms given to the facility at placement.

**NOTE: UAC MAP Section 1.3.4 UAC Transferred to ORR Custody** includes a "**Quick Glance: How to Admit UAC to Program**" as well as additional guidance on reviewing and uploading DHS records in the UAC Portal.

## Fig. 3.2 Admission Screen



**NOTE:** Foster parents are not responsible for admitting UAC.

DOJ−00001015

2. **Within 2 hours of admission and within 4 hours of admission into an HPC or Influx Care Facility**, the designated staff:

- Provides food and beverage to the UAC (asking about any food allergies and/or dietary restrictions);

- Allows the UAC to shower or bathe, with assistance if required due to disability or young age;

- Provides the UAC with clean clothing, clean bedding, and personal hygiene items and documents this in the UAC case file;

- Ensures, to the extent practical under the circumstances, that the UAC does not come into contact with other UAC currently placed at the program until he or she has showered/bathed and eaten;

- Creates an inventory list for all cash and other property obtained at admission. The UAC must sign the inventory sheet and the care provider must provide the UAC with a copy of the inventory, retaining the original document in the UAC case file. See **Quick Glance: UAC Personal Property**. 🕐📑

---

### Quick Glance: UAC Personal Property

Care providers must conduct an inventory of all UAC cash and property upon admission into the care provider's care. UAC belongings that are stored must be kept in a secure location to be returned to the UAC at release or transfer. Care providers must prevent mishandling, loss, or theft of the UAC's personal cash and property. UAC

UAC's personal property should be thoroughly cleaned and sanitized before storage or use by the UAC. UAC should have access to their personal property upon request, if safety allows, during normal business hours or other reasonable time during the weekends or holidays.

Care providers must develop a waiver for UAC who wish to keep certain pre-approved items, such as religious bracelets or prayer books or materials, in their possession while in care. The inventory must be updated to include any additional property the UAC received during the UAC's stay with the care provider.

In the event that a UAC runs away, the care provider must keep any property the UAC leaves behind for 90 days. If the UAC does not contact the care provider to claim their property within 90 days, gently used clothing or other similar items may be donated to a local charity or shelter. If the UAC leaves items of value ($25 or more in cash, jewelry), the care provider must try to contact the parent or family either in home country or in the United States for their preference (mail the property or donate). If the care provider is unable to reach the parent or family, items of value may be donated to a local charity or shelter. The care provide may recycle or dispose of any items that are unable to be donated

---

DOJ-00001016

3. **Within 24 hours of admission**, the designated care provider staff:

- Verifies that all DHS documents that accompanied the UAC are complete and accurate. If the UAC's reported name or date of birth is incorrect, the designated staff attempts to verify the information on the UAC birth certificate through school records and/or the UAC's parents, if possible (see also step 4 below).

- Takes the UAC's photograph and uploads it to the UAC portal. (**NOTE**: Care providers may take photographs and record videotapes of UAC in care for purposes of identification or for the child's personal use. ORR prohibits release of any photographs or videotapes of any UAC for public use, including for training purposes or for promotional materials without written authorization from ORR.)

- Determines if it is safe to allow the UAC to contact family members or other relatives, following ORR policy and procedures and the care provider's internal safety procedures. Provides UAC an opportunity with assistance, as necessary, to contact family members, or other relatives, or the UAC's consulate.

- Uploads the following into the UAC Portal and saves a copy in the UAC case file case file with appropriate signatures:
  - *Placement Authorization* form
  - *Authorization for Medical Dental and Mental Health Care* form
  - *Page 2 of Legal Resource Guide – Legal Service Provider List for UAC*
  - Supporting documents from referring federal agency (e.g. DHS)

**NOTE**: If there are concerns that the UAC may be 18 years of age or older, the designated staff follows the procedures outlined in **UAC MAP Section 1.6.2 Instructions**.

4. **Within 24 hours of obtaining the UAC birth certificate** and the name and age of the UAC doesn't match the DHS records, the designated care provider staff notifies the local DHS FOJC about the discrepancy in information and includes information about how the discrepancy was identified and the attempts made to verify the information, such as verification from Consulate. The notification includes a request to DHS FOJC for an updated Notice to Appear (NTA) to reflect the correct name and A number. If the UAC has an attorney, cc the attorney in the correspondence. (also see **UAC MAP Section 1.3.4 Transfer of Custody to ORR**). The designated staff makes changes to the name and/or DOB in the UAC Portal.

5. **Within 24 hours of admission**, care provider staff trained in the use of the *Initial Intakes Assessment* form:

DOJ−00001017

- Interviews the UAC in a private setting using all questions in the assessment to identify any immediate needs and/or issues.

- Completes all sections of the *Initial Intakes Assessment* in the UAC Portal.

- Saves a copy in the UAC case file.

- If the UAC responses raise suspicions that the UAC's health or life is at imminent risk or his/her condition places the safety of others at imminent risk, calls 9-1-1 for crisis response and transportation to the nearest emergency room; follows significant incident reporting procedures (see **Ops Guide Section 5.7.3 Significant Incidents**).

- Determines if the UAC's responses indicate that he/she falls under any of the criteria for trafficking under TVPRA. 🐦📑

See **Quick Glance: Tips for Completing the Initial Intakes Assessment** and **Appendix 3.2 Initial Intakes Assessment**

**NOTE:** Care providers must complete a new *Initial Intakes Assessment* after each transfer within the ORR network.

## Quick Glance: Tips for Completing the Initial Intakes Assessment

The Initial Intakes Assessment allows the care provider to identify any immediate needs or issues, identify the severity of any medical or mental health needs and ensure that the needs are met; facilitate gathering of basic identifying information, and inform the UAC's initial housing/bed assignment.

Phrase questions in a child-friendly and culturally appropriate manner to engage the UAC. Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.

**UAC Basic Information**—Auto-populates in the UAC Portal

**Family Information**—Document any relative or non-relative contracts in the United States as well as the name and contact information of anyone that the UAC wishes to inform of their placement.

**Medical**—Document any observable or reported medical needs and immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care, and/or any on-call medical staff member for further guidance on the need to seek immediate medical care.

**Mental Health**--Document any observable or reported mental health questions in this section and/or if any concerning behaviors or emotions were observed or reported and immediately report them to the clinician, lead case manager, program director, or other

DOJ−00001018

supervisor designated for follow-up care for further guidance on the need to seek mental health care.

**Safety Assessment**--Document any observations and/or concerns that the UAC has regarding his/her safety. If the UAC answers "yes" to any of the safety assessment concerns, immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care for further guidance.

**Interviewer Summary of Critical Issues that Need Immediate Attention** and **Action Taken**— Summarize critical issues and note the steps taken to address identified critical issues as well as any actions for the immediate future.

**Certification**—Enter name, title, and date and time the assessment was completed. If a translator was used, enter the translator's, name, language translated, and the date and time.

**See also UAC Policy Guide Section 5.8 Significant Incident Reports and Notification Requirements for information gathered at intakes that may require an SIR.**

6. **Within 48 hours of admission**, for secure, staff-secure or non-TAR (Treatment Authorization Request) residential treatment center programs **only**, the care provider staff:

   • Provides the UAC with the *Notice of Placement in a Restrictive Setting* and ensures that the UAC signs or marks the notice. The original signed form is placed in the UAC case file and a copy uploaded to the UAC Portal.  (If the UAC refuses or declines to sign the form, the staff member should note that on the form and complete the staff section).

   • Notifies the UAC of the opportunity to request a *Flores* bond hearing (see **UAC MAP Section 2.9 Bond Hearings for Unaccompanied Alien Children**). ⊕▤↴

7. **Within 2 business days**, the designed staff ensures that UAC receives an initial medical exam and uploads the *Initial Medical Exam* form and any prior medical evaluations (for UAC transfers) into the UAC Portal and saves a copy into the Health tab (see **3.4.2 Initial Medical and Dental Examinations**) the UAC case file. ⊕▤↴

# 3.2.2 Orientation

📖 **See Section 3.2.2 of the UAC Policy Guide**

## PROCEDURES

DOJ−00001019

---

**Quick Glance: Orientation Accessibility**

The care provider must present the orientation in a way that is appropriate for the age, culture, and language of the child or youth. The orientation must be provided in formats that are accessible to UAC with limited English proficiency, visual or audio impairments, or other type of disability, as well as those with limited literacy skills.

- If the UAC is not literate, the care provider must verbally explain all the documents in the UAC's native or preferred language.

- If forms are not translated into a language that the UAC can read, the care provider staff must verbally translate the document for the child or youth and document in the UAC's case file that the form was verbally translated.

- Care providers lacking staff who speak a UAC's native or preferred language must make every attempt to utilize a professional translation service for the UAC's orientation. In cases where no such service exists or is unavailable, care providers must consult with the FFS, PO and other relevant stakeholders to create and implement a strategy for communicating with the UAC as effectively as possible. One possible strategy may be to create a written translation of the orientation information and documents.

---

1. **Within 48 hours of admission**, the care provider provides a standardized orientation for all UAC that, at a minimum (see **Quick Glance: Orientation Accessibility** above), includes the following topics:

   - Explanation of the nature of the UAC's custody in ORR including the fact that they will either be released to a qualified sponsor in the United States; or they will attend a court hearing to request to go home to their family; or will request to work with an attorney to file for legal relief to stay in the United States.

   - Emphasis that the UAC must attend an immigration court hearing whichever occurs first either:
     - After the UAC is released to a sponsor at a court located nearest the sponsor; or
     - After the UAC has been in ORR custody for 60 days at a court located near the care provider, or
     - While in ORR custody, the UAC may request at any time to go to immigration court earlier and not wait the full 60 days.

   - Care provider rules, responsibilities, and procedures;

   - Care provider behavior management policies;

   - Care provider grievance policies and procedures (see **Quick Glance: Care Provider Grievance Policies and Procedures**);

   - Care provider daily schedule;

DOJ−00001020

- The UAC's rights and responsibilities;
- The fact that they will get a legal rights presentation by a legal rights attorney ("The Know Your Rights" presentation) and will receive a pamphlet about the immigration process;
- Emergency and evacuation procedures;
- Explanation regarding the possibility of transfer to another care provider facility or an influx care facility. ☺

## Quick Glance: Care Provider Grievance Policies and Procedures

Care providers must have written internal grievance policies and procedures that meet the following standards.

If needed or requested by the UAC, a staff member, another youth, a family member, UAC's legal representative or a legal service provider may help a UAC write up the grievance. All staff must be trained on the grievance policy and procedures. Extra copies of the UAC grievance forms need to be readily available to UAC.

Examples of grievance may include, but are not limited to:
- Complaints of services denied/not being provided to the UAC
- Forceful religious observation
- Unresolved complaints regarding shelter environment/living conditions
- Sexual abuse, sexual harassment, or inappropriate sexual behavior
- Breach of confidentiality by staff
- Staff putting UAC at risk of harm
- Unnecessary monitoring of mail/phone calls

Written grievance policies and procedures must be easily understood by children and provided in the languages of the majority of UAC in care. The grievance procedure must clearly explain the following: the process for initiating a grievance, how and by whom the grievance will be addressed and the procedure to follow if the grievance is not addressed in a satisfactory manner.

The care provider must take into consideration the age and maturity of the child when processing any grievance. Copies of written grievances and their final resolutions must be maintained in the UAC's case file.

The care provider must implement policies and procedures to identity and handle time-sensitive incidents reported through a grievance that involve an immediate threat to the health, safety, or welfare or a child or youth. In the case of medical emergencies, staff must ensure the minor receives proper medical attention.

DOJ−00001021

The care provider must address the grievance policy and procedures during program orientation and post grievance procedures in a common area. Each UAC in attendance must receive a copy.

Care providers must report all UAC grievances according to ORR reporting policies and procedures. (For example, if the grievance is about a fight between UAC, they report via a regular SIR. If the grievance is about sexual harassment, they report it as a SA/SIR) The program must provide a written decision or response to the grievance within 5 days of receipt. Care providers must immediately respond to allegations of sexual abuse or sexual harassment reported via a grievance. If the grievance involves an immediate threat to the health, safety, or welfare of a UAC, the care provider must immediately respond as needed.

2. **Within 48 hours of admission,** the care provider must provide all UAC with a separate orientation  from any immigration-related topics, on sexual abuse and sexual harassment policies and procedures, including but not limited to:

- Zero tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior;

- The right of UAC to be free from sexual abuse and sexual harassment as well as the UAC's right to be free from retaliation for reporting such incidents;

- Definitions and examples of UAC-on-UAC sexual abuse, staff-on-UAC sexual abuse, coercive sexual activity, appropriate and inappropriate relationships, and sexual harassment;

- How to report sexual abuse and sexual harassment, including:
  o Reporting to any care provider staff member, volunteer or contractor either verbally, in writing, or via a grievance;
  o Reporting to ORR by telling an FFS or calling the ORR Hotline;
  o Informing an outside community service provider via telephone or in writing;
  o Reporting to consular officials via telephone or in writing.
- An explanation of a UAC's right to receive treatment and counseling if the UAC is abused.

- Boundaries and respecting one another.

As part of the orientation, the care provider must

- Provide every UAC with the **ORR Pamphlet (What You Need to Know About Sexual Abuse and Harassment**;

- Provide every UAC with a care provider pamphlet that contains, at a minimum, the following:

DOJ−00001022

  o The care provider's policies and procedures related to sexual abuse and
   sexual harassment;

  o The child or youth's rights and responsibilities related to sexual abuse
   and sexual harassment;

  o How to contact diplomatic or consular personnel.

- Provide every UAC information regarding the local and/or national service
  providers and organizations (local child advocacy centers, rape crisis centers,
  immigrant victim service providers, and or other community service provider to
  provide services to victims of sexual abuse and sexual harassment that occurred
  at the care provider facility) available to assist UAC.

Care providers must document in case files that every UAC received the orientation and
the ORR and care provider pamphlets as well as the list of local and/or national service
organizations available to assist UAC, as noted below in **Quick Glance: Summary of UAC
Case Records**. ☺📖🗐

3. As part of the orientation described in step 2 above, the care provider provides verbal
   and written notice  to ALL UAC regardless of gender the notice in English and Spanish
   related to the *Garza* court ruling as well as the **ORR Pamphlet (What You Need to Know
   About Sexual Abuse and Harassment)**. ☺📖🗐

**See Appendix 3.3 *Garza* Notice (English and Spanish)**

**NOTE:** The *Garza* ruling includes a requirement to post the English and Spanish versions of the
notice on housing bulletin boards adjacent to the notice required by ORR's Interim Final Rule.
Care providers must display ORR Posters and notices in prominent locations throughout the
facility, including on housing bulletin boards, next to telephones, and throughout the care
provider facility. See **UAC Policy Guide 4.7.2 Bulletin Board Postings**.

4. The care provider's designated staff provides the UAC a tour of the care provider's
   facility and shows what various areas are used for, noting emergency evacuation routes
   and exits. If safety does not allow for a tour, the facility layout and emergency routes
   and exits must be verbally explained to the UAC.

5. The care provider documents that the UAC receives all orientation information in the
   UAC case file. 🗐

# 3.3 Care Provider Required Services

📖 **See Section 3.3 of the UAC Policy Guide**

DOJ—00001023

## OVERVIEW

This section includes procedures for all *Flores* mandated services for care providers in all settings, including standard shelter, restrictive settings, and long term foster care.

| Key Players | Responsibilities |
|---|---|
| Case manager or clinician | Conducts *Assessment for Risk* and *UAC Assessment*; develops *Individual Service Plan* and *UAC Case Review* (case manager). |
| Other care provider staff | Provide services, including education, transportation, activities related to *Flores* mandated services. |
| Foster care parent(s) | Provides services in a community setting |

| Related Forms/Instruments | Used By |
|---|---|
| *Assessment for Risk* | Qualified case manager or clinician (**UAC Policy Guide 4.8.1** notes who may conduct the assessment) |
| *UAC Assessment* | Qualified case manager or clinician |
| *Individual Service Plan* | Qualified case manager or clinician |
| *UAC Case Review* | Qualified case manager or clinician |
| *Ohio Youth Assessment System (OYAS) Reentry (RET) Tool*<br>  • *OYAS-RET Interview Guide*<br>  • *OYAS-RET Score Sheet*<br>  • *OYAS-RET Self Report Questionnaire* | Qualified case manager or clinician in secure and staff secure facilities |

# 3.3.1 UAC Assessment and Case Review

📖 **See Section 3.3.1 of the UAC Policy Guide**

## PROCEDURES

### Assessment for Risk

1. **Within 72 hours of admission**, a qualified case manager or clinician conducts an *Assessment for Risk* to assess the UAC for risk of being a victim or a perpetrator of sexual abuse while in ORR care. The case manager or clinician:

   • Interviews the UAC in a private setting in a child-friendly and culturally appropriate manner using all questions in the instrument (see **UAC Policy Guide Section 4.8.1 Assessment for Risk**).

DOJ−00001024

- Uses the specific questions in the assessment, but also draws upon their professional training and experience to obtain additional information to complete a thorough assessment.

- Completes all sections of the *Assessment for Risk* in the UAC Portal using information gathered from a variety of sources, including, but not limited to, the *Assessment for Risk* interview, any other conversations with the UAC, court records, case files, behavioral records, and other relevant documentation.

- Saves a copy of the *Assessment for Risk* in the UAC case file. 🌐📄

2. The clinician reviews the results:

- Makes an individualized determination to ensure the safety and health of the child, using the Assessment for Risk, along with any other completed assessments to inform the child's assignment for housing, education, recreation, and other services.

- Considers the youth's gender self-identification and the health and safety of UAC when making a housing assignment for a transgender or intersex UAC (see **UAC Policy Guide Section 4.8.2 Use of Assessment Information**).

- Does not use the result of the Assessment for Risk to place a child on one-on-one supervision unless there are exigent circumstances (see **UAC Policy Guide Section 4.8.2**).

- Reports any UAC disclosures made during the assessment in accordance with ORR policies and Procedures.

- If the assessment indicates that the child experienced prior sexual victimization or perpetrated sexual abuse, ensures follow-up, as appropriate, with any necessary medical or mental health services.

- If medical or mental health referral is necessary, the UAC must receive a medical and/or mental health evaluation **no later than 72 hours after the referral**.

- If the UAC's responses indicate that they fall under any of the criteria for a mandatory or discretionary home study and/or post release services, immediately refers the case following the referral process (see **UAC MAP Section 2.4.2 Home Study Requirement**). 🌐

3. The case manager or clinician:

- Continuously updates the *Assessment for Risk* when the case manager or clinician learns any new information that would change the housing, education, recreation, and other service assignments of the UAC.

DOJ−00001025

- Updates the *Assessment for Risk* **every 30 calendar days** while the UAC is in care (**every 90 days for UAC in long term foster care**).

- Completes a new Assessment for Risk after each transfer within the ORR network of care. This includes transfers to an Influx Care Facility.

- Immediately reports any significant changes in behaviors indicative of emotional stress, significant shifts in behavior and/or symptoms requiring intervention of a mental health professional to the Shift Supervisor and Lead Clinician. 📆🗐

**NOTE**: Do not delete previously entered information when updating the *Assessment for Risk*.

See **Quick Glance: Guide to the Assessment for Risk** and **Appendix 3.4 Assessment for Risk**

---

**Quick Glance: Guide to the Assessment for Risk**

**UAC Basic Information**—Auto-populates in the UAC Portal.

**Information Clinicians or Qualified Case Managers Obtain from Child or Youth**—Document the UAC's responses.

**Questions for Clinicians or Qualified Case Managers to Answer**—Document your professional assessment of the individual case based on observations and information reported by the UAC during the interview and review of case files and other records.

**Housing, Other Service Assignments, and Follow-Up**—Document any housing or other service assignments needed to ensure the safety and well-being of the UAC. Indicate specific actions and follow-up. If housing and other service assignments changed at any time, including after the initial placement, describe the change, the reason for the change, and date in this section.

**Certification**—Enter the signature of the official completing the assessment including name, title, and the date and time the assessment was completed. If using a translator, have the translator enter his/her signature, name, the language translated, and the date and time the assessment was completed.

---

## UAC Assessment

1. **Within 5 calendar days of admission,** a qualified case manager or clinician conducts a UAC Assessment by

    - Interviewing the UAC in a private setting using the *Interviewing Guidance for Clinicians and Case Workers* to evaluate the UAC for services and as a basis for the UAC's release plan.

DOJ−00001026

- Completing all sections of the *UAC Assessment* in the UAC Portal (see **Quick Glance: Guide to the UAC Assessment**). 🕐▤

**See <u>Appendix 3.5 Interviewing Guidance for Clinicians and Caseworkers</u>**

2. If the qualified case manager or clinician needs to update the *UAC Assessment* **past the five calendar day time frame**, he or she enters the additional required or relevant information into the *UAC Case Review*.  🕐▤

3. If the UAC's responses indicate that he/she falls under any of the criteria for a mandatory or discretionary home study and/or post release services, immediately refers the case following the referral process (see **UAC MAP Section 2.4.2 Home Study Requirement**).

4. The UAC Assessment must be fully completed before:

   - Submitting a home study referral
   - Submitting a release recommendation
   - Submitting a transfer request except in the case of an emergency transfer
   - The case coordinator issues a third-party recommendation. 🕐▤

**NOTE**: Complete a new UAC Assessment after each transfer within the ORR network of care.

---

**Quick Glance: Guide to the UAC Assessment**

The UAC Assessment interview must be in a private setting. The interviewer must phrase questions in a child-friendly and culturally appropriate manner to engage the UAC. The interviewer must ask follow-up questions based on the UAC responses to obtain as much detail needed to inform the following: individual service plan, safety plan, and the UAC's release plan, regardless if the questions are explicitly stated in the *UAC Assessment* instrument and the *Interviewing Guidance for Clinicians and Case Workers*.

**Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.**

The questions may be asked out of order so that the interview may flow naturally.

Assessment of the UAC does not end with the interview. The interviewer must continue to build a rapport with the UAC and continuously assess him/her while the UAC remains in ORR care.

**UAC Basic Information**—Auto-populates in the UAC Portal.

---

DOJ−00001027

**Additional Basic UAC Information**—Document the city and neighborhood of origin, previous placement, religious affiliation, case manager's name, and clinician's name.

**Journey and Apprehension**—Document the circumstances leading up to and including the UAC's journey to the United States and his/her apprehension.

**Family and Significant Relationships**—Document familial and other significant relationships in the UAC's country of origin and in the United States.

**Medical**—Document any health concerns raised by the UAC, the UAC's medical and medication history, and any reported allergies. Review the UAC Portal Health Tab to ensure that the initial medical exam was completed and fully documented. If a medical exam is not completed, notify medical staff immediately. If the information required is in the UAC Portal Health Tab, write "see Health Tab" in lieu of entering the information.

**Education**—Document the UAC's academic history in order to determine the appropriate educational services for the UAC.

**Legal**—Document the provision of legal services while in ORR custody and whether the legal service provider identified possible legal relief.

**Criminal History**—Document any criminal history disclosed by the UAC to help determine if the UAC is in the appropriate level of care or if the UAC needs further assessment.

**Mental Health and Behavior**—Document the UAC's mental status during the interview to evaluate the UAC's level of post-traumatic stress, depression, and exposure to violence and the UAC's substance use history.

**Trafficking**—Document any trafficking concerns in the UAC's country of origin, during the UAC's journey, and in the United States. This includes concerns related to coercion, debt bondage/labor trafficking, and commercial sex trafficking.

**Mandatory TVPRA 2008**—Document whether the case requires a TVPRA-mandated home study based on information gathered in the assessment and from any other relevant sources.

**Additional information**—Report any additional information that may be pertinent to the UAC's identified needs that has not been covered in the sections above or that requires further elaboration. Identity assessment areas that require immediate follow-up or intervention. Note any significant issues that are not urgent but may require additional assessment, observation, or services.

**Certification**—Enter the signature of the official completing the assessment including name, title, and the date and time the assessment was completed. If a translator was used, have the translator enter his/her signature, name, the language translated, and the date and time the assessment was completed.

See **Appendix 3.6 UAC Assessment**

### Individual Service Plan

DOJ—00001028

1. **Within 5 calendar days of admission and concurrent with completion of the UAC Assessment,** the case manager uses information gathered from preceding interviews and assessments (i.e., *Initial Intakes Assessment, UAC Assessment, Assessment for Risk*) to complete in the UAC Portal an *Individual Service Plan (ISP)* for the UAC (see **Quick Glance: Guide to the ISP**). 🕐📋☑️

2. Creates a new *ISP* **every 30 calendar days after admission** (**90 calendar days for LTFC**) and any time there is a substantive changes in the UAC's case information. **NOTE**: the 30 days is always after admission, even though another *ISP* might have occurred in the interim. 🕐📋☑️

**NOTE**: Complete a new *ISP* after each transfer within the ORR network of care.

---

**Quick Glance: Guide to the Individual Service Plan**

Case managers complete the following sections of the *Individual Service Plan (ISP)* in the UAC Portal:

**UAC Basic Information**—Auto-populates in the UAC Portal.

**Mandatory Services**—Document the start and end date and the person responsible for mandatory services. If the service only occurs once and does not span over multiple days, the start and end dates will be the same. If the service is ongoing, an end date does not need to be entered until the UAC is released from care.

**Other Services (optional)**—Document any additional services; enter the type of service, task, frequency, start and end date, and person responsible.

**Certificate**—Enter the signature, name, title, and date and time the *ISP* was completed. Include a copy of the certified ISP in the UAC case file.

---

See <u>Appendix 3.7 Individual Service Plan</u>

### UAC Case Review

1. **After 30 calendar days in care or when substantive changes or receipt of additional information after the UAC Assessment *is* complete,** the case manager completes all sections of the UAC Case Review in the UAC Portal. See **Quick Glance: UAC Case Review**. 🕐📋☑️

---

**Quick Glance: Guide to the UAC Case Review**

Case managers complete the following sections of the *UAC Case Review* in the UAC Portal:

**UAC Basic Information**—Auto-populates in the UAC Portal.

---

DOJ−00001029

**Medical**—Document any observable or reported medical needs. If any observed or reported medical concerns are checked in this section, they must be immediately reported to the clinician, lead case manager, program director, shift supervisor, and/or any on-call medical staff member for further guidance on the need to seek immediate medical care.

**NOTE:** If the information required in this section is in the UAC Portal Health Tab, the case manager may write "see Health Tab" in lieu of entering the information.

**Legal**—Document provision of legal services while in ORR care and whether the legal service provider identified possible legal relief.

**Trafficking**—Document any trafficking concerns in the UAC's country of origin, during the UAC's journey, and in the United States. This includes concerns related to coercion, debt bondage/labor trafficking, and commercial sex trafficking. **NOTE:** Click "yes" to the question that the child is a victim of a severe form of trafficking in persons if ORR has issued a trafficking eligibility letter for the UAC even if the case is still waiting for the final Trafficking Eligibility Letter from OTIP.

**Mandatory TVPRA 2008**—Document whether the case requires a TVPRA-mandated home study based on information gathered in the assessment and from any other relevant sources.

Recommendations—Document the current release recommendation for the UAC.

**Care Plan**—Document actions taken and outline care plans that have or will be implemented to address reunification, legal, and mental health needs, and/or issues.

**Certificate**—Enter the signature, name, title, and date and time the assessment was completed.

2. If the UAC's responses indicate that he/she falls under any of the criteria for a mandatory or discretionary home study and/or post-release services, the case manager immediately refers the case following the referral process in **UAC MAP Section 2.4.2**.

3. The case manager maintains direct contact with each UAC in care and **meets at least once a week** with each UAC to discuss reunification options. The case manager documents the weekly meetings with the UAC and communication with potential sponsors in the UAC case file. 📑🕑

4. The case manager continuously updates the *UAC Case Review* **within 30 calendar days after admission (90 days for LTFC)** or in the following circumstances:

   - The care provider receives required or relevant information that was unknown during the time of the assessment

   - The care provider receives additional information from the UAC or other sources.

   **NOTE:** Do not delete previously entered information when updating the *UAC Case Review*. 📑🕑

DOJ−00001030

5. The case manager creates a new UAC Case Review:

- **Every 30 calendar days after admission** into a shelter, staff secure, secure, transitional foster care or residential treatment center care provider facility

- **Every 90 calendar days after admission** into an ORR long term foster care program

- Any time there is a substantial change in the UAC's case information (e.g., upon reunification, age out, or voluntary departure) 📑 🕓

See <u>Appendix 3.8 UAC Case Review</u>

## UAC with Known, Disclosed, or Alleged Violent Criminal History

1. In addition to *the Initial Intake Assessment, UAC Assessment, ISP*, and *UAC Case Review*, the case manager gathers criminal history information as described in the **Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History**.

   The case manager **immediately** elevates the criminal history information to the clinician, case coordinator and the assigned FFS to review placement based on the alleged crime and completes an *SIR* and notifies the UAC's parents/legal guardian, potential sponsor, attorney of record or the local legal service provider, and child advocate, if applicable. The FFS reviews the case, placement, and sponsorship and notifies DHS ICE to request that they verify the criminal activity, which may include an Interpol check or record request from the UAC's Consulate.

   For UAC with known, disclosed, or alleged violent criminal history, clinicians must request a psychologist perform a psychological risk assessment as described below. Where appropriate, collect criminal history information and the completed psychological assessment. The psychological assessment must be completed **within 7 business** days of the child's admission **(or when care provider is made aware of the criminal history.** The psychological evaluation focuses on:

   - Current level of functioning

   - Treatment recommendations

   - Placement recommendations

   - Risk assessment

   - Psychosexual (if applicable) 🕓

DOJ-00001031

2.  The clinician reviews the psychological assessment in collaboration with the case manager to determine if the UAC is in the appropriate placement level of care and if the UAC needs any additional services.

3.  The case manager notifies the assigned FFS and case coordinator of any case updates and follows ORR home study policy and procedures for cases that meet the TVPRA or other home study criteria. 🖱

---

### Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History

If a UAC has a known, disclosed, or alleged violent criminal history that includes violence toward others (e.g., murder, attempted murder, rape, sexual assault, assault with a deadly weapon, arson, an act that resulted in the serious injury or death of another), the case manager  and FFS work together to gather information about the activity.

**UAC Adjudicated in the United States**

1.  The case manager obtains UAC criminal records, court records, court disposition, correctional detention records, child welfare records, mental health records, dental records, medical records, police reports, proof of rehabilitation, and letters of explanation of the incident(s).

2.  The case manager identifies and contacts the parole or probation officer and/or child welfare worker assigned to the UAC, if any.

If the case manager is unable to successfully obtain criminal records or contact the courts or law enforcement entities, he/she documents attempts to obtain additional information and elevates the issue to the FFS for assistance.

If criminal records are no longer available because they have been expunged, the case manager verifies as much information as possible with the relevant court or law enforcement entity; documents efforts to obtain information in the UAC Case Review, and proceeds with making a recommendation regarding the suitability of the potential sponsor and current ORR placement level.

**UAC Reportedly Involved in Criminal Activity in His/Her Country of Origin**

1.  The case manager reaches out to the Country of Origin Consulate for assistance in corroborating any allegations. **NOTE:** Do not reach out to the Consulate if the UAC has filed a credible fear claim.

2.  The FFS asks DHS and/or other law enforcement entities for assistance in verifying criminal activity in country of origin.

---

*All UAC in Secure and Staff Secure*

DOJ−00001032

1. All UACs placed in secure and staff secure must undergo a risk assessment **within 30 days of referral to the program** by a clinician trained in the use of the *Ohio Department of Youth Services (OYAS) Reentry Tool*, which is comprised of the *OYAS-RET Interview Guide, OYAS-RET Score Sheet,* and *OYAS-RET Self Report Questionnaire.*   Clinicians use *OYAS Reentry Tool* in conjunction with other appropriate clinical assessment tools and their professional judgement to establish a comprehensive assessment of risk level. The clinician uploads completed *OYAS-RET Interview Guide, OYAS-RET Score Sheet,* and *OYAS-RET Self Report Questionnaire* into the UAC Portal and saves copies in the UAC Portal and in the UAC case file.

   **NOTE: Prior to the interview, the clinician must inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.** 🔲📋🖐

2. UAC in staff secure and secure undergo a re-assessment **every 30 days following the initial *OYAS* assessment** and the file updated in the UAC Portal and case file. 🔲📋

   **See UAC MAP Section 1.4.2 30 Day Restrictive Placement Case Review**

**See Appendix 3.9 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS Reentry Self-Report Questionnaire**

## CASE MANAGEMENT

1. Case managers are responsible for gathering and maintaining the UAC case records. This includes keeping the UAC Portal up-to-date as well as the hard copy file. See **Quick Glance: Summary of UAC Case Records**. Case managers manage the case file by:

   - Timely entry and organization of documents, records, and any other information in the UAC case file.

   - Including records generated and gathered for the UAC and his/her sponsor.

   - Storing hard copy UAC case files in a secure location accessible only to case managers, clinicians and other designated staff and archiving records in a secure location.

---

### Quick Glance: Summary of UAC Case Records

The master case file is the complete UAC file.  For service delivery, programs typically maintain documents separately while the child is in care (i.e. the phone logs might be housed in areas where UAC make the actual calls, medical usually keeps their documents separate while the child is in care, some required document are on the UAC Portal, etc.)

DOJ−00001033

When a child is discharged, programs must consolidate all the separate files into a master case file, so that all the information is in one place.  Depending on the facility, the master case file is either electronic or hard copy or a combination of both.

The UAC Case File includes at minimum (see **UAC Policy Guide Section 5.6.2 Maintaining Case Files**):

- Criminal or delinquency records, including but not limited to, police reports, arrest records, court information, and probation records
- Psychological, psychiatric, and/or psychosocial records
- Individual Service Planning
- Educational assessments and records, including individualized education plans, report cards, and other education status updates
- Clinical screening tools
- Medical records, including but not limited to, immunization records, TB tests, physicals, prescription information, specialist visits, ER visits, drug and alcohol treatment, Treatment Authorization Requests, other medical treatment and follow-up
- Dental records, including but not limited to, documenting the UAC's scheduled dentist visit, reporting on the dental visit, any dental exams and any dental work
- Significant Incident Reports and internal incident reports
- Official ORR forms (such as Placement Authorization, Notice of Placement in a Restrictive Setting
- Any documentation required under State licensing

2. Case managers must meet with each UAC at a minimum of once a week to assess and discuss case outcome goals and services. UAC placed temporarily in hospitals and mental health facilities should continue to receive visits from case managers at a minimum of once a week to assess and communicate the needs and progress of UAC to the care provider staff and the FFS. Case managers must document these meetings with the UAC in the case manager notes section of the UAC case file. 📑

3. Case manager must participate in weekly staffing meeting with care provider staff and the Case Coordinator to provide recommendations for best course of action on behalf of UAC. (See additional case management consultations for UAC in restrictive environments).

## 3.3.2 Long Term and Concurrent Planning

📖 **See Section 3.3.2 of the UAC Policy Guide**

DOJ−00001034

# 3.3.3 Screening for Child Trafficking and Services for Victims

📖 **See Section 3.3.3 of the UAC Policy Guide**

## PROCEDURES

**UAC Assessment Tool**

📖 **See Section 3.3.1 of the UAC Policy Guide**

**Referrals**

1. If the care provider suspects the child may be a victim of trafficking, refer the case to the Office on Trafficking in Persons (OTIP) **within 24 hours.** ⏱

2. Care provider make referrals by emailing the child's *Significant Incident Report (SIR)* with trafficking concerns and the child's *UAC Assessment* to **Childtrafficking@acf.hhs.gov**. ✉

3. In cases where the care provider is uncertain whether a child may be a victim of trafficking, or if the care provider is uncertain whether to make a referral, the care provider can email OTIP at **Childtrafficking@acf.hhs.gov** or call OTIP at **202-205-4582** to schedule a case staffing. ✉☎

**Eligibility and Interim Assistance Letters**

📖 **See Sections 3.3.3 and 5.6.2 of the UAC Policy Guide**

1. OTIP issues and mails the Eligibility and Interim Assistance Letters to the care provider facility in which the child is currently housed. The care provider must retain the letter until the child leaves the care provider's custody. The original letter must go with the child upon release or transfer per **UAC Policy Guide Section 5.6.2 Maintaining Case Files**. 📄

2. If the care provider submitted a referral to OTIP and the child leaves the care provider's custody before the Eligibility or Interim Assistance Letter arrives, the care provider must immediately notify OTIP and provide an updated address and point of contact for the child by emailing **Childtrafficking@acf.hhs.gov**. The timely notification of a change of address is imperative to ensure that the child can access time-limited benefits and services. ✉

DOJ−00001035

When a care provider receives Eligibility and Interim Assistance Letters while the child is in their care:

1. The care provider must explain next steps and help the child and child's sponsor to understand the benefits and the services available to the child, including comprehensive case management services through the Trafficking Victim Assistance Program (TVAP).

   - Information about services is available here:
     **https://www.acf.hhs.gov/sites/default/files/otip/traffickingservices.pdf**

   - ⬦ Information about TVAP case management services is available here:
     **https://www.acf.hhs.gov/otip/trafficking-victim-assistance-program-grantees**

2. When OTIP issues an Interim Assistance Letter, OTIP will include a TVAP provider on the email to help facilitate the process of connecting the child to TVAP case management services. After receipt of this email, the care provider must give the TVAP provider the child's most recent contact information to ensure the child receive services. ⊠

3. The care provide must explain to the child and child's sponsor the importance of keeping the original copy of the Interim Assistance and/or Eligibility Letter in order to access benefits and services.

4. If there are any questions regarding victim assistance, benefits, or local service referrals, the care provider, child, or child's sponsor can call the National Human Trafficking Hotline (NHTH) at **888-373-7888**, which is available 24 hours a day, 7 days a week. ☎

5. If there are any questions about state-specific protocols for benefits and services, the state refugee coordinators can provide further guidance.

6. Document the details of these discussions and explanations in the UAC case file. 🗎

When a child has a case that is being reviewed by OTIP and is discharged from the care of a care provider *prior* to receiving the Eligibility or Interim Assistance Letter determination, the care provider must:

1. Explain the Child Eligibility process to the child and child's sponsor to help them to understand that the child's case is still under review by OTIP and to expect an upcoming decision on their case from the care provider, post-release services worker, or the identified point of contact.

2. Explain to the child and child's sponsor what to do should the child receive an Interim Assistance and/or Eligibility Letter, as well as the benefits and the services that are available to the child should the child be issued a letter.

DOJ−00001036

3. Explain to the child and child's sponsor the importance of keeping the original copy of the Interim Assistance and/or Eligibility Letter in order to access benefits and services.

4. When OTIP issues an Interim Assistance Letter, OTIP will include a TVAP provider on the email to help facilitate the process of connecting the child to TVAP case management services. While the child may be in the care of their sponsor, after receipt of this email, the care provider must give the TVAP provider the child's most recent contact information so that the child receives services. ✉

5. If there are any questions regarding victim assistance, benefits, or local service referrals, the care provider, child, or child's sponsor can call the National Human Trafficking Hotline (NHTH) at **888-373-7888**, which is available 24 hours a day, 7 days a week. ☎

6. If there are any questions about state-specific protocols for benefits and services, the state refugee coordinators can provide further guidance.

7. Document the details of these discussions and explanations in the UAC case file. 🗐

## 3.3.4 Safety Planning

📖 **See Section 3.3.4 of the UAC Policy Guide**

Care providers must develop a written safety and security plan contained in the care provider's policies and procedures to maintain safety. The safety plan must address the following emergencies: runaways, evacuations, medical and mental health emergencies, and disease outbreaks.

Care providers and foster care programs and homes must meet the safety requirements maintained by their local/state licensing entity, fire code regulations, and local zoning and building code regulations.

Care providers must submit all state and local licensing reports including citations, monitoring assessments and corrective actions, to the ORR PO **within three business days of receipt** of such reports, citations, or assessments. ✉🕐

*Safety Planning for Field Trips or Other Off-Site Outings*

The program must consider staffing ratios for field trips and outings for the safety of UAC as well as the type of outing.  The ratio should be higher than expected under normal conditions.

UAC not eligible for field trips or outings include:

- Those currently on 1:1 supervision

UAC MAP Section 3: Services (Version 3.0)                                                      29

DOJ-00001037

- Those determined to be a run risk
- UAC who have not completed all initial assessments
- UAC whose identity is in question
- UAC with behavior in last 48 hours that if done in public would draw unnecessary attention to all UAC at the outing or be deemed unsafe or aggressive.

### Procedures for UAC Who Run Away

In cases involving an unauthorized absence by a UAC (runaway), care providers should NOT discharge the UAC for **24-48 hours** (depending on the circumstances). They should follow emergency SIR reporting and notifications procedures that are outlined in the ORR Ops Guide Section 5.7.2. Emergency Incidents. 🔃

### Evacuations

Care providers must establish written evacuation plans for implementation in the event of earthquakes, fires, hurricanes, tornadoes, other natural disasters or other potentially dangerous situations that threaten the safety of the program or the UAC's placement. Foster care provider agencies shall have an evacuation plan for all foster homes. Emergency or respite care homes may be designated for this purpose. Foster care programs that provide other ORR residential care may use the shelter care facility, where appropriate.

Procedures shall also include a list of agencies and individuals to notify in the event of an evacuation. The list must include all relevant ORR contacts, the DHS, and local law enforcement. The emergency contact list shall be posted in the care provider's office area in a visible location.

Care providers shall identify information of importance to transport during the evacuation, including information on each UAC (identifying any health information, including allergies and prescription medications), a photo of each UAC, information on each UAC's potential sponsor, and important telephone numbers.

Additionally, care providers shall identify items of importance to transport during the evacuation, including medications taken by any UAC, and any other items that are essential to the well-being of any individual or group of UAC. In the event of an emergency, care provider staff will not be expected to physically remove case files. However, care providers shall have in place procedures to protect service and organizational records, whether in electronic or paper form, from destruction by fire, water, loss, other damage and from unauthorized access. Care providers are expected to comply with their state licensing requirements regarding the protection of records.

Care providers must conduct evacuation drills **every 60 days** to ensure maximum preparedness in the event of a disaster or potentially dangerous situation. Additional

DOJ−00001038

evacuation drills may occur depending on state licensing requirements. Each drill must use alarms and the complete and orderly evacuation of the building. Care providers must follow state licensing requirements pertaining to the specific content of the drill. Foster care programs must follow state licensing requirements for evacuation drills with all foster homes providing care to the ORR. 🖱

## 3.3.5 Academic Educational Services

📖 **See Section 3.3.5 of the UAC Policy Guide**

1. **Within 72 hours of admission**, a teacher or trained staff must assess a UAC to determine an individual educational competency level and document the assessment in the UAC case file and in the Education Tab under Assessments in the UAC Portal (see **Fig. 3.3 Education Assessment Tab**). 🖱

**Fig. 3.3 Education Assessment Tab**



2. Care providers must design a minimum of six hours of educational coursework to meet the unique competency levels of the UAC in care (as well as the *Flores* requirements), including linguistically appropriate educational materials and English language training, Monday through Friday, throughout the year. The care provider must submit the curriculum to the PO for approval (see below for exceptions for LTFC and Parenting UAC. Breaks for federal holidays do not need ORR approval). Educational field trips may count toward the six hours of coursework if approved by the PO.

   Daily class attendance must be documented in the UAC's case file. Care providers must provide academic reporting and progress notes on the UAC including transcripts, grades, or other assessments. These documents must be updated in the case file and in the UAC Portal. 📑

DOJ−00001039

3. **Upon release to a sponsor**, the care provider must include educational assessments and records. See **UAC MAP Section 2.8 Release from ORR Custody**. 🕐📋

### *Parenting UAC*

Parenting UACs who recently had a baby should follow the doctor's orders regarding when they may return to a full school day. The care provider should email the PO and FFS when a UAC will be out of school for an extended period of time and when the UAC returns to the classroom setting. For UAC who have toddlers, the care provider must care for the toddler so that the UAC may attend school.

### *Long Term Foster Care*

UAC who are in LTFC receive academic instructions in a community setting. Because most school districts do not offer year round academic instruction, LTFC providers must work with their POs to develop a summer learning schedule for UAC in care.

## 3.3.6 Vocational Educational Services

📖 **See Section 3.3.6 of the UAC Policy Guide**

1. Vocational programs may not replace academic education or substitute for basic subject areas, nor the required six hours of academic instruction.

2. The care provider must obtain prior authorization from their assigned PO before implementing a vocational program. The following information must be submitted in the authorization request:

    - Name of vocation or trade
    - Rationale
    - Staff qualifications
    - Location of vocational training
    - Safety precautions (staff)
    - Safety education (students)
    - Student capacity
    - Frequency and duration of course
    - Community partnerships
    - Course curriculum

DOJ−00001040

- Policy and procedures for standardizing the process of selling UAC created items and dispensing funds to the UAC from a sale of any item made by a UAC.

# 3.3.7 Services Related to Culture, Language, and Religious Observation

📖 **See Section 3.3.7 of the UAC Policy Guide**

1. The care provider must support the cultural identity of UAC through various programs and services, which may include:

    - Contact with family or other support system through telephone calls, letters, or visits
    - Addressing the UAC by his or her given names
    - Inclusion of cultural awareness in daily activities, such as menus, clothing, and hygiene routines
    - Celebration of culture-specific events and holidays
    - Academic education covering various cultures within a classroom setting

2. Care providers must ensure that UAC obtain skills necessary for acculturation in the United States. In addition to English language classes, services may include:

    - Access to community services
    - Academic learning, including geography
    - Celebration of U.S. holidays
    - Discussion of U.S. laws
    - Food and entertainment (e.g., music, books, magazines, and dancing)
    - Field trips to local historical, scientific, or cultural points of interest

3. Care providers must make every effort to provide on-site staff or interpreters who speak the native language of each UAC. If staff or on-site interpreters are unavailable in the geographic region of the care providers, they may utilize a paid translation services, such as a telephone-accessible language line.

4. Care providers must make every reasonable effort to provide services in the UAC's preferred language. The UAC may choose to communicate in his or her preferred or native language (safety of UAC and staff permitting).

DOJ—00001041

5. Care providers must grant UAC every opportunity to observe and practice their spiritual or religious beliefs. Care providers must provide the following:

- Assurances that religious and spiritual beliefs, including food preparation and dietary restrictions are permitted and accommodated;

- Internal procedures reflective of ORR religious services policy

- Religious items, books, or clothing at the UAC's request, provided that these requests are reasonable.

## 3.3.8 Recreation and Leisure Time Services

📖 **See Section 3.3.8 of the UAC Policy Guide**

1. Care providers must have a recreation and leisure plan that includes daily outdoor activity, weather permitting. The plan:

- Must include at least one hour per day of large muscle activity and one hour per day of structured leisure time activity that does not include time spent watching television.

- Be increased to three hours on days when school is not in session.

- Not be included in the 6 hours per day of required educational services.

- Account for insufficient onsite recreation areas by taking UAC to off-site parks, community recreation centers or other locations (off-site recreation involves a higher staff-to-child ratio—see staff ratios for field trips and outings).

**NOTE:** Care provider may not restrict outdoor recreational time because a UAC has previously run away or is a flight risk. Care providers are required to mitigate any flight risk concerns and allow UAC access to outdoor activities.

2. Care provider must provide, at a minimum, one monthly opportunity for escorted visits to the surrounding community for all UAC.

3. Foster parents must provide opportunities for recreation as part of the regular activities of the family. UAC in individual foster homes must participate in normal family and community activities with consideration to the demands of school, homework, and extra-curricular activities.

4. Care providers must document UAC's participation in physical activity, leisure time and off site visits in the UAC case file. 📄

DOJ–00001042

## 3.3.9 Nutritional Services

📖 **See Section 3.3.9 of the UAC Policy Guide**

## 3.3.10 Telephone Calls, Visitation, and Mail

📖 **See Section 3.3.10 of the UAC Policy Guide**

1. Care providers must develop internal procedures to accommodate potential visitors and include safety and privacy measures to ensure that the UAC and facility are safe and that the UAC may communicate with the visitor in private. The care provider should ensure the UAC's case file includes the approved list of visitors and a log documenting any visits.

2. Care providers must provide UAC the opportunity to make a minimum of two telephone calls per week (minimum 10 minutes each) to family members and/or sponsors in a private setting—this includes those living in the United States and abroad. UAC telephone calls must be private. A clinician or case manager or other professional staff may only listen in on a UAC conversation with the approval of the FFS, based on safety concerns. Care providers must document the weekly phone calls in the UAC case files as well as a list of approved contacts.

3. Care providers may use social media under supervision of the case manager to find and contact family members or potential sponsors for a particular UAC. A case manager or other staff must supervisor the use of social media for these purposes. While in care, UAC may not post to a social media site. Pictures or any identifying information of UAC in care (present or in the past) should not be posted to the care provider's Facebook or in any other care provider social media content.

4. UAC in LTFC may have access to cell phones and social media. The LTFC provider must ensure that every foster parent has ground rules in place on the safe use of social media and electronic devices, including cell phones and computers.  Ground rules should reflect the following best practices:

   - No UAC under the age of 13 may join Facebook or other social media sites.

   - Privacy settings for the Internet and Facebook must be set to the strictest levels.

   - Keeping the computer in a central location and high traffic zone for all users.

DOJ−00001043

- A requirement that all UAC understand the ground rules for social media and cell phone use in the household.

- Telling UAC to avoid responding to questionnaires, free giveaways and contests (these links make children susceptible to identity theft).

- Foster parent monitoring of pictures posted by UAC online and vetting of friends to make sure he/she is not a target. (A UAC's online friends should match his/her friends. Foster parents must have access to UAC Facebook page at any time.)

- Limiting use of computer, cell phone, and TV or gaming systems (i.e., only allowing cell phone usage at certain hours in the evening or after homework is completed).

- Educating UAC on importance of protecting their online reputation and being aware of online dangers.

- Foster parents must demonstrate and insist on proper technology etiquette, such as no bullying or teasing. Adults in the household must also teach youth to avoid disclosures and sharing of personal information, such as where they will be at a certain time or other information that may put them or others at risk of harm.

## 3.3.11 Clothing and Personal Grooming

📖 **See Section 3.3.11 of the UAC Policy Guide**

1. Care providers must confiscate or cover any gang-related UAC tattoos, accessory or other item by:

   - Covering gang symbol tattoos at all times

   - Replacing or repairing immediately defaced care provider property, including schools books and notebooks with gang-related symbols

   - Confiscating clothing with any religious symbol that may denote gang affiliation

   - Confiscating clothing worn by UAC in a certain manner that denotes gang affiliation

   - Room checks to ensure that UAC are not defacing property with gang symbols.

Further procedures may be developed by the care provider as deemed necessary and safe for containing gang-related symbols, tattoos, and accessories. 📖

DOJ−00001044

2. Upon UAC arrival, the care provider must wash and store the UAC clothing and must supply the UAC with clothing for court dates, classrooms, outdoor recreation, and sleeping, as well as undergarments and footwear and personal grooming items.

3. At a minimum of once a week, staff will collect soiled clothes to wash and return to the UAC in a timely manner.

4. Care providers may require UAC to wear school uniforms during school hours and school-related outings as long as UAC are allowed to wear their personal clothing at all other times.

## 3.3.12 Assignment of Chores

📖 **See Section 3.3.12 of the UAC Policy Guide**

1. Care providers must have written policies and procedures for chores that reflect the following:

    - UAC may not be assigned chores that generate income for care providers or replace duties of paid staff

    - UAC must be medically screened before being assigned chores

    - Assignments must be developmentally and age appropriate

    - Chores must not interfere with participation in educational services, leisure or recreation, or meal times, as well as time set aside for showers or other personal hygiene activities

    - UAC has the right to request an accommodation to a chore type or schedule based on religious or cultural beliefs

    - Chores may include the maintenance of a child's sleeping area and personal space as well as help cleaning classrooms

    - Staff and not UAC should apply any cleaning agents

    - UAC should not be responsible for cleaning bathrooms in common areas

    - UAC must have equal cleaning responsibilities

    - Chores/cleaning may not be used as a means of punishment

    - Cleaning supplies must be maintained in a locked area

    - UAC may not be forced to maintain uncomfortable positions while cleaning and must wear appropriate clothing and footwear

DOJ-00001045

## 3.3.13 Behavior Management

📖 **See Section 3.3.13 of the UAC Policy Guide**

All care providers (including LTFC) must have a behavioral management plan that meet child welfare best practice standards. All interventions must be positive and strength-based. Care providers may never subject UAC to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Behavior management plans must not affect the requirements of the Flores Settlement Agreement, including daily outdoor activity or leisure time.

The strength-based behavioral management policy must include the following:

- Credentials of the personnel involved in developing, approving, implementing, monitoring, and overseeing the implementation of the behavior management policy and procedures.

- System for training and assuring the competency (both written and practical) of individuals involved in all facets of behavior management.

- Procedures on how to handle, report, and follow-up behavioral incidents and emergencies.

- Documentation that all staff who come into contact with children subscribe to a Code of Ethics.

- Policy of providers that indicate that they must comply with discipline and restraint requirement as stated within the state licensure requirements.

- Crisis prevention/intervention procedures (i.e., approved de-escalation techniques, system for elevating instances of behavior that are dangerous to self or others to trained staff for review)

- Clearly articulated rules for the facility/home, list of minor and major behavioral infractions, earned privileges, and system for discipline that allow UAC to develop self-control, positive coping skills and the ability to assume responsibility for his or her actions.

- Any time of solitary time as a result of behavior must meet state licensing standards.

## PROCEDURES

1. Care providers must submit their behavior management plan to their PO for approval.
   ✉

DOJ−00001046

2. Care providers and foster/group homes must post the program rules and grievance procedures in English and language of majority of UAC in care.

3. Care providers may conduct drug testing of UAC in accordance with state licensing requirements. Care providers must have reason for testing the minor and document the information in the minor's medical records in the UAC Portal and in the UAC case file. Behavior management plans must not include drug testing as a consequence or as a form of intervention.

## 3.3.14 Transportation Services

📖 **See Section 3.3.14 of the UAC Policy Guide**

1. Care providers must comply with all local licensing requirements and state and federal regulations, including but not limited to the following:

   - Train all staff responsible for transporting UAC.
   - Transport UAC in a safe and humane manner and under the supervision of trained and experienced personnel.
   - Transport UAC in a manner that is appropriate to the UAC's age and physical and mental needs, including proper use of car seats for young children.
   - Transport UAC with special needs in vehicles that can best accommodate their needs.
   - The number of staff escorts must meet (or exceed) the minimum staff/child ratio required by the transporting care provider's licensing agency.
   - To the greatest extent possible under the circumstances when transporting UAC, assign transport staff of the same gender as the child or youth.
   - Maintain constant "line of sight and sound" supervision of each UAC during transport.
   - All occupants must wear a seat belt when the vehicle is moving.
   - The driver must have a valid state driver's license and have a cleared driving record.
   - The driver must drive defensively and take care to protect the occupants and vehicle, obey traffic laws, and report damage or accidents immediately to the care provider.

DOJ−00001047

- Complete a vehicle inspection report, including an odometer reading, following each trip.
- Create and maintain a manifest of UAC transported and account for each UAC at exit or entrance of the vehicle.
- Regularly maintain and inspect all vehicles used for transportation.
- Take immediate action for any defect that could render the vehicle unsafe and/or inoperable.

2. For any secure transportation:

- It must involve a trained care provider staff or an agency experienced in secure transportation. Training must include the following: conflict resolution without the use of physical or mechanical restraints, the safe and effective use of approved soft restraints, and the emergency use of safe and approved physical restraints during an emergency response.
- Trained shelter or foster care staff may transport UAC in their care to a staff-secure or secure placement as long as the staff's or UAC's safety is not compromised.
- Make all transportation decisions on a case-by-case basis in consultation with the FFS.
- For UAC in ORR funded staff secure facilities, shelter facilities, group homes, and foster care homes, ORR prohibits the use of mechanical restraints at any time.
- For transport of UAC's in ORR-funded secure detention facilities, ORR authorizes (but does not require) the use of soft restraints. If the transport can be safe and secure without mechanical restraints, then do not use restraints. ORR does not authorize hard restraints except in an emergency response during a secure transport.

Care providers must submit to their PO operational details concerning secure transportation services, use of mechanical restraints during secure transport and use of mechanical restraints in response to an emergency.

3. UAC with serious physical or mental health issues or exposed to a communicable disease should not be moved until medically cleared by a health care professional or ORR is consulted.

- The health care professional must email the medical clearance to the care provider and the FFS.
- If a care provider must move a UAC with a communicable respiratory disease (e.g., infectious TB), the UAC must wear a mask at all times and

DOJ−00001048

the care provider must implement Universal Precautions. If exposure is undetermined, the care provider should employ an emergency vehicle and consult with the Division of Health for Unaccompanied Children (DHUC).

## 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations in RTCs

📖 **See Section 3.3.15 of the UAC Policy Guide**

## 3.3.16 Notification and Reporting of the Death of a UAC

📖 **See Section 3.3.16 of the UAC Policy Guide**

Care providers must follow *SIR* reporting and notification procedures (see ORR Ops Guide Section 5.8.1 Emergency Incidents).

In addition to Emergency SIR reporting and notification procedures, in the event of a UAC death, care providers immediately notify ORR/DHUC, the FFS, the FFS Supervisor and the Project Officer. ORR/DHUC informs the ORR Director and as appropriate other senior ORR officials.

After notification, the ORR Director or designee coordinates with the ACF Office of Legislative Affairs and Budget (ACF/OLAB), HHS Assistant Secretary for Legislation (HHS/ASL), and HHS Assistant Secretary for Financial Resources (ACF/ASFR) to notify the appropriate Congressional officials of the UAC's death as certified by a medical doctor within 24 hours of certification of the death.

HHS/ASL notifies the appropriate Congressional officials with the following information regarding the deceased child:
- Age;
- Nationality;
- Gender;
- Time of death;
- Cause of death (if known) as attested to by a physician;
- Place of death; and,

DOJ-00001049

- Name of child (only if next of kin has been notified and do not object to the name being released).

HHS/ASL may provide the cause of death to Congressional officials in a subsequent notification if at the time of the original reporting the cause was unknown, or if the findings regarding the cause were later changed.

# 3.3.17 Use of Restraints During Transport and in Immigration Court

📖 **See Section 3.3.17 of the UAC Policy Guide**

# 3.3.18 Restraints in Immigration Court and Asylum Interviews

📖 **See Section 3.3.18 of the UAC Policy Guide**

# 3.3.19 Transportation for *Saravia* Hearings

This section describes the requirements for a UAC's transportation to all *Saravia* hearings. It also describes the requirements to have VTC available for a UAC for possible initial appearances in immigration court relating to a *Saravia* hearing.

ORR provides transportation for UAC to attend their *Saravia* hearing, as appropriate. Additionally, ORR will always allow the UAC to have access to Video Teleconferencing (VTC) or teleconference technology for purpose of any preliminary appearances at immigration courts in advance of their final *Saravia* hearing (e.g., a Master Calendar Hearing).

When a *Saravia* hearing is initiated, the UAC will receive a notification of the hearing from ICE that includes:

- The nature of the proceedings;

- The legal authority under which the proceedings are conducted;

- The specific acts that led to the UAC being rearrested under the *Saravia* gang-related standards;

ICE files the initial *Saravia* Hearing Notice with the immigration court in the jurisdiction of the UAC's arrest "as soon as practicable." Generally, the choice of venue (location) for the *Saravia* hearing depends on the minor's selection. ICE will allow any UAC scheduled for a *Saravia* hearing to choose the venue. It can be:

DOJ−00001050

- The jurisdiction where the UAC's arrest occurred;
- The jurisdiction where the UAC was residing; OR
- The jurisdiction of the UAC's current care provider in HHS custody.

However, if ORR finds that there is no care provider able to accept placement of the UAC within a three hours' drive of the immigration court for the jurisdictions closest to the location of arrest or the location of the UAC's residence, the hearing is not be required to be held there, regardless of the UAC's selection.

The final *Saravia* hearing must occur in person at the immigration court where the venue has been established. However, all of the UAC's prior appearances in court may be done via Video Teleconference (VTC), or teleconference.

Additionally, the following procedural rules with respect to venue and timing apply to all *Saravia* Hearings that may be of interest to ORR and its affiliated parties:

- If a UAC requests a change of venue, the program must notify the UAC's attorney of record and the FFS within 24 hours of becoming aware of the UAC's choice. If the UAC does not have an attorney, notifying the FFS is sufficient. The FFS will ensure that the DHS ICE Chief Counsel in the current jurisdiction is immediately notified of the UAC's change of venue request and provide guidance on filing a Change of Venue form.
- If not previously completed, within five (5) calendar days of the UAC receiving the *Saravia* Notice, the case manager then submits a Motion to Change Venue to the initial immigration court and documents this in the UAC case file.
- The case manager ensures that the immigration court is in receipt of the Motion to Change Venue if confirmation of receipt is not provided within two (2) business days.
- Upon confirmation that the venue has been changed, the case manager documents the new hearing date and location in the UAC's case file.
- Any time that a UAC receives a *Saravia* Notice, they are entitled to a *Saravia* Hearing within ten (10) calendar days of rearrest, or if a continuance or change of venue is granted as per the terms above. ICE is not allowed to oppose an initial request for a continuance if it is requested, though they can contest subsequent requests for continuances.
- Any time a change of venue is granted, the ten (10) calendar day period for the scheduling of the *Saravia* Hearing resets.

# 3.4 Health Care Services

DOJ-00001051

📖 **See Section 3.4 of the UC Policy Guide**

ORR's Division of Health for Unaccompanied Children (DHUC) oversees public health screening and the provision of health services to in ORR care. DHUC monitors for serious medical conditions and infectious diseases of public health importance through an automated notification system. DHUC responds to care provider programs 7 days a week and provides management guidance on infectious diseases, serious mental health conditions, and complex medical cases. DHUC also ensures reporting of public health information to the appropriate public health authorities.

Each care provider program that accepts placement of children in ORR custody must have an established network of healthcare providers, including specialists, emergency care services, mental health practitioners, and dental providers that will accept ORR's fee-for-service billing system.

ORR has developed its medical services policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel and communities. Through its care providers and other health care professionals and based on the requirements of the Flores Settlement Agreement, ORR provides the following services:

- Routine medical and dental care
- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception
- Emergency health services
- A complete medical examination (including screening for infectious diseases) **within two business days**
- Immunizations in accordance with recommendations of the Centers for Disease Control and Prevention (CDC)
- Administration of prescribed medications and special diets
- Appropriate mental health interventions

Under the terms of the Flores Settlement Agreement, ORR care providers must also provide:

- At least one individual counseling session per week conducted by a trained clinician with the specific objective of reviewing the child's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each child
- Group counseling sessions at least a week that may be adjusted according to the needs of the population.

DOJ–00001052

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each unaccompanied child. Care providers also must meet state and local licensing and public health requirements.

Care providers must also assist with serious medical services. These can include significant surgical or medical procedures, requests for abortions or abortions, and medical services that may threaten the life of a child and require heightened ORR involvement and limited decision-making by care providers (See **UC MAP Section 3.4.3 Requests for Health Care Services, including Serious Medical Services Requiring Heightened ORR Involvement**).

Care providers must ensure that a child is offered and/or provided specific medical and mental health care services if a child is sexually abused while in ORR Care. (See **ORR Policy Guide Section 4.9 Medical and Mental Care**).

Care providers must have policies and procedures based on state or local laws and regulations to ensure the safe, discreet, and confidential provision of prescription and nonprescription medications to children, secure storage of medications, and controlled administration and disposal of all drugs.

From intake to release, care providers must observe all children for signs or symptoms of communicable diseases and act accordingly to protect others against possible infection.

Care providers must have an identified space within the shelter facility that may be used for quarantine or isolation in the event that an unaccompanied child must be separated from the general population for a medical reason. The space must be suitable to house a child for days or weeks.

The care provider must have written policies, procedures, and practices that protect the confidentiality of medical information.

## 3.4.1 Health Care Eligibility and General Standards

📖 **See Section 3.4.1 of the UC Policy Guide**

## 3.4.2 Initial Medical and Dental Examinations

📖 **See Section 3.4.2 of the UC Policy Guide**

Each child must receive an initial medical examination (IME) within **2 business days** of admission to ORR. The purposes of the IME are to assess general health, administer

DOJ−00001053

vaccinations in keeping with U.S. standards, find out about health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis. The IME is based on a well-child examination, adapted for the UAC population with consideration of screening recommendations from the American Academy of Pediatrics, the Centers for Disease Control and Prevention (CDC), and the U.S. Preventive Services Task Force (USPSTF).

Components of the IME are outlined in the **Initial Medical Exam Form, the Supplemental TB Screening Form, and Program Guidance – Revised Initial Medical Exam Requirements**. The IME covers the following elements:

- History and physical: Vital signs, documentation of allergies, vision screen ($\geq$5 years), a medical history, a review of systems (signs and symptoms), and a physical exam.

- Review of psychosocial risk: Mental health screening, physical abuse history, sexual activity/abuse history, and substance use history.

- Risk- and age-based laboratory testing: Influenza (if symptomatic with fever and cough or sore throat); pregnancy (girls $\geq$10 years and girls <10 years who have reached menarche or reported sexual activity); lead level (6 months up to 6 years); HIV (adolescents $\geq$13 years and children <13 years who have reported sexual activity); hepatitis C (history of IV drug use); hepatitis B (history of IV drug use or sexual activity); and chlamydia, gonorrhea, and syphilis (history of sexual activity).

- TB screening: All children (except for babies of UAC who are born in the United States) are screened with a tuberculin skin test (TST) or blood test (interferon-gamma release assay [IGRA]); IGRA is the preferred test for children $\geq$2 years.  All adolescents $\geq$15 years also receive a chest x-ray (posterior-anterior [PA] view). Children <15 years only receive a chest x-ray if their TST or IGRA result is positive. Radiologists are to review and issue a report of their findings on all imaging studies including, chest x-rays.

- Assessment and plan: Clinical findings noted and diagnoses made, medications prescribed, vaccinations given (in accordance with the Advisory Committee on Immunization Practices [ACIP] catch-up schedule: **https://www.cdc.gov/vaccines/schedules/hcp/child-adolescent.html**, labs ordered/refused, and referrals or follow-up recommended.

All elements of the IME should be started within 2 business days of the child's admission to the care provider program. The IME is performed or supervised by licensed physicians (MD/DO) or non-physician practitioners (NP or PA). The **Initial Medical Exam Form** should be completed by the healthcare provider during the IME. The **Supplemental TB Screening Form** should be filled out by the healthcare provider performing the IME or by the health department if the provider does not perform these services. Data from these forms must be entered into the IME form in the UAC Portal; all health documents (screening forms, lab results, chest x-ray reports, vaccination records) must also be uploaded to the UAC Portal.

DOJ−00001054

For babies born in the United States to girls in ORR care, a Medicaid application should be prepared and submitted. The initial check-up should be documented in the UAC Portal and the office notes uploaded. 📄🕐✍️

## Vaccinations

UAC are eligible for the Vaccine for Children (VFC) Program and should be vaccinated by a VFC provider. Simultaneous administration of all indicated vaccines per the **ACIP catch up schedule** should be given during the IME. Minor illnesses (diarrhea, urinary tract infection, mild upper respiratory infection, and other low-grade febrile illness) are not contraindications to vaccination; in general, antibiotic treatment is not a contraindication to vaccination. Live virus vaccines (MMR and varicella), human papillomavirus (HPV), and polio (IPV) vaccines should be deferred for **pregnant girls**, but pregnant girls should receive all other indicated vaccinations: **https://www.cdc.gov/vaccines/pregnancy/hcp/guidelines.html**.

TB testing (TST or IGRA) can be done before or on the same day that live virus vaccines are administered; live vaccines may interfere with the response to TB testing and cause false negative results if TB testing is done 1 day to 4 weeks after administration of live vaccines. If a child will need hepatitis B testing (hepatitis B surface antigen), it is preferable to draw blood samples before administering vaccines since hepatitis B vaccine given before blood samples are collected can cause false positive hepatitis B results. If it is not logistically feasible to collect blood before vaccines are administered, other hepatitis B tests (hepatitis B core antibody and hepatitis B surface antibody) will need to be ordered to confirm active infection if the hepatitis B surface antigen result is positive. 🕐

## Repeat Examinations

Children who are transferred to another care provider program do not need to undergo another IME, unless specifically required by state law. If a new IME is required by state law, the care provider program should inform the FFS as well as the Division of Health for Unaccompanied Children (DHUC), and cite the relevant law for ORR review. If a new IME is performed, the new healthcare provider should be given a copy of the previous IME, including all lab and chest x-ray reports and vaccination records. Depending on the timing and previous diagnoses, not all components of the IME should be repeated; the care provider should consult with DHUC on these cases. For example, if the child was previously diagnosed with latent tuberculosis infection (LTBI), a repeat TB test (e.g., TST/IGRA, CXR) should not be performed. The vaccination record should be reviewed and the next round of vaccines given at the appropriate interval.

Children who are released from ORR custody, but are referred back into care will need another IME; however, they may not need all the components, depending on the results of their previous IME, length of time they were out of ORR custody, and exposure risk. In general, TB screening should be repeated if **more than 6 months have elapsed since the last screening** or if a new exposure to active TB is reported since the last screening and the child was not previously diagnosed with LTBI; if previously performed, HIV testing should be repeated if new

DOJ−00001055

exposure risk since last IME is revealed (IV drug use, sexual activity since last IME) and the child was not previously diagnosed with HIV infection; if previously performed, sexually transmitted disease testing should be repeated if new sexual activity since last IME is disclosed. The care provider should consult with DHUC on these cases. ⊕

**Follow-up Care**

Children should receive follow-up care for conditions identified during health exams, as directed by the healthcare provider. Examples:

- Children who fail a vision test (20/40 or worse in either or both eyes) during the IME should be referred to an optometrist.
- Pregnant girls should be referred for prenatal care.
- Children with a positive HIV test should be referred to an infectious disease specialist.

Children who remain in care for longer than 30 days should receive their next set of vaccinations per the **ACIP catch up schedule**. Children who remain in ORR care long-term should have routine well-child examinations scheduled at recommended intervals; in children over the age of 3 years, annual health exams are advised.

All follow-up care evaluations should be documented in the UAC Portal and documentation uploaded. ⊕ ↰

## Initial Dental Exam and Follow-Up Care

Care providers must provide appropriate dental care to UAC by providing initial dental evaluations, urgent dental care services, and follow-up dental services, as necessary. Prior ORR authorization is required for all dental services.

### Initial Dental Evaluation and Six (6)-Month Dental Evaluation

Care providers must provide UAC an initial dental evaluation **within 90 days but not before 60 days after the UAC's date of admission into ORR care**. If state guidelines require an initial dental evaluation with a dentist before the UAC's 60th day in care, the care provider must email evidence of the relevant state guidelines to the Division of Health for Unaccompanied Children (DHUC) for prior authorization in advance of any dental provider visit occurring before the UAC's 60th day in ORR care. ⊕ ✉

The initial dental examination must be completed in a single visit to a dental provider. UAC may only receive one initial dental examination while in ORR care. If a UAC is in ORR care for six (6) months or longer, the care provider may schedule another dental evaluation. Dental evaluations may occur every six (6) months to ensure UAC dental health. ORR may, in its discretion, approve preventive dental services only for children in ORR care for six (6) months or longer. ⊕

DOJ—00001056

If a UAC is transferred to another ORR care provider, the referring care provider must include all dental documentation with the UAC's transfer documentation, including initial dental examination information, if one was provided. 🗐

**Urgent Dental Care**

ORR will authorize urgent dental care, only if the UAC:

- Is experiencing acute tooth pain;

- Needs one or more procedures to maintain basic function; OR

- Has a severe and/or acute infection or a severe and/or acute infection is imminent (e.g. an abscess in a tooth or gums).

**Follow-Up Dental Services**

If a UAC received an initial dental evaluation and was given a treatment plan, care providers may request follow-up dental services via a TAR for UAC:

- Who have been in ORR care for longer than 90 days; OR

- Who are in long-term foster care.

If the UAC's treatment plan requires several procedures, care providers must ensure that the dental provider's treatment plan prioritizes procedures and treatments based on urgency and severity. DHUC will only approve up to four (4) procedures at one time but has discretion to approve more than four (4) procedures in one TAR in exceptional cases.

For each UAC requiring follow-up dental services, care providers may only submit up to four (4) procedures in one TAR and submit one TAR at a time. To request additional follow-up procedures, care providers must wait two weeks after the UAC's initial follow-up dental visit in order to submit another TAR to request up to four (4) more procedures. Care providers may repeat this two-week process until all follow-up dental procedures are complete. 🕐

## 3.4.3 Requests for Health Care Services, including Serious Medical Services Requiring Heightened ORR Involvement

📖 **See Section 3.4.3 of the UC Policy Guide and the Policy Memorandum: Medical Services Requiring Heightened ORR Involvement**

The following section covers procedures for notifying ORR of requests for serious medical services, which require heightened ORR involvement and limited decision making by the care provider. This section does not cover medical emergencies; see **UC MAP Section 3.4.5**

DOJ-00001057

**Responding to Medical Emergencies**. In addition, special procedures and requirements that apply to requests for abortions are covered in section **B** *below*.

### A. Serious medical services (other than abortion):

Serious medical services include, but are not limited to, the following:

- Significant surgical, medical, or dental procedures;
- Medical services that may threaten the life of a UC;
- Procedures requiring general anesthesia; and,
- Invasive diagnostic procedures (e.g. cardiac catheterization, invasive biopsy, amniocentesis). Examples of invasive tests include biopsies, excisions, cryotherapy, and endoscopy.

If a care provider is uncertain whether a serious medical service request requires heightened ORR involvement, the care provider should contact ORR's Division of Health for Unaccompanied Children (DHUC) and the assigned Federal Field Specialist (FFS) via email, and request guidance using the template below:

| ☒ Email Template: **Submitting a Serious Medical Procedure Request (SMR)** | |
|---|---|
| **From:** | Case Manager or other Care Provider staff |
| **To:** | DHUC (DCSMedical@acf.hhs.gov) |
| **CC:** | FFS |
| **Subject:** | SMR Request – [include Care Provider's name] |
| **Attachments:** | "SMR.Name of Procedure.Date" |

1. If a care provider learns that a child has been advised by a doctor to undergo or the child seeks a serious medical procedure requiring heightened ORR involvement (e.g., a procedure requiring general anesthesia, surgery, an invasive diagnostic procedure), the care provider must do the following:

   - Complete a *Serious Medical Procedure Request* (SMR) form and email DHUC at DCSMedical@acf.hhs.gov within 48 hours, excluding weekends and holidays.
     - Copy the assigned FFS, FFS Supervisor, Senior FFS Supervisor, Director of the Division of Unaccompanied Children's Operations, and Deputy Director for Children's Programs on the email.

   - Attach all medical and/or consultation notes that justify the requested procedure so there is no delay. **ORR will not review the SMR form without medical or consultation notes.**

DOJ−00001058

- Upload the SMR form to the Medical section under the UC Health tab in ORR's online case management system and save the file with the name "SMR.Name of Procedure.Date".

- Ensure the SMR form is approved by ORR *before* the appointment for the procedure/service is made. **Failure to do so may result in non-payment if the procedure is denied.** Approval may take up to 3 business days, and the decision will be sent via email.

  **Note:** ORR has authority to accept donations, including medical goods and services, from nongovernmental organizations per Section 230 of Public Law 116-68.

- Respond as soon as possible but no later than 24 hours to a request for an update from ORR's Deputy Director for Children's Programs. The care provider must include their assigned FFS on the correspondence.

**NOTE: Care providers are not to take any action on serious medical services without the direction and approval from ORR. This does not include emergency medical situations (See UC MAP Section 3.4.5 Responding to Medical Emergencies) or requests for abortions (See section *B. Request for Abortions* immediately below).**

2. DHUC determines who should facilitate contact between the medical provider and the child's parent or legal guardian, or DHUC may delegate this task to the FFS or care provider. If consent from the parent or legal guardian cannot be obtained, relevant state law requirements must be followed.

   - Depending upon the particular circumstances, ORR federal staff (or the care provider at ORR's request) may inform the parent or legal guardian of the UC's medical situation and ask the parent or legal guardian how he/she wishes the situation to be resolved.

### B. Request for Abortions

ORR federal staff and care providers must ensure minors have access to pregnancy-related medical appointments in the same manner that they would manage other medical conditions, in accordance with **Policy Memorandum: Medical Services Requiring Heightened ORR Involvement** and **ORR Policy Guide Section 4.9.2 Medical Services for Victims at Risk of Pregnancy**.

DOJ-00001059

1. Care providers must notify ORR of any minor who is pregnant or requesting an abortion using the significant incident reporting (SIR) mechanism in **ORR Policy Guide Section 5.8 Significant Incident Reports and Notification Requirements** and add the information in the UC Health tab in ORR's online case management system.

   a. If the abortion request is requesting use of federal funds (see **UC MAP Section 3.4.9 Provider Reimbursement**), care providers must notify DHUC by completing and submitting the *Serious Medical Request* form described above. However, the form is not to approve the procedure, itself, but rather solely to approve funding.

2. If care providers and/or another referring party would like to access additional assistance, one resource is Planned Parenthood at 1-800-230-PLAN (1-800-230-7526) or visit their website at https://www.plannedparenthood.org. Such website contains a directory of resources available in each State.

3. Care providers and/or another referring party may submit a referral for a Child Advocate appointment (see **UC MAP Section 2.3.4 Child Advocates)**.

4. Neither ORR federal staff nor care providers may provide consent for a state licensed medical provider to perform an abortion for a minor. See **Quick Glance: Abortion-Related State Laws**.

5. Care providers must provide updates related to the minor's abortion request in the *UC Case Review*.

**NOTE:** ORR Federal staff and care providers must not take action to prevent a minor's access to state judicial bypass proceedings (an order from the judge that allows minors to obtain abortions without the notifications or consent of their parents); as well as non-directive pregnancy options counseling that includes options for pregnancy continuation, abortion, or adoption. In addition, ORR funds may not be used for legal services or court costs related to the case of a UC seeking an abortion through a state judicial bypass procedure.

For confidential procedures in cases where a minor is pregnant or makes an abortion-related decision, please refer to **UC MAP Section 3.4.7 Maintaining Healthcare Records and Confidentiality.**

DOJ−00001060

---

**Quick Glance: Abortion-Related State laws**

Care provider staff who are subject to State law will follow evidenced-based child welfare practices and follow any applicable State laws related to the provision of abortions to minors. Some states require that medical providers provide parental notification of the intent to perform an abortion, receive a state judicial bypass order, or certify that a medical emergency exists, before providing an abortion to a minor. Neither ORR federal staff nor care provider staff provide the "informed consent" that is used to approve a state licensed physician performing an abortion on a UC. Furthermore, ORR will not interfere with UCs accessing legal assistance in the state judicial bypass process.

- If a physician seeks the assistance of ORR or care provider staff in obtaining parental notification before performing an abortion, in compliance with state law, then FFS and care provider must support the efforts of the physician to comply with state law.

  - The medical provider should submit in writing to care provider a request to obtain a contact information of the parent or legal guardian.

  - Within 24 hours the care provider must notify the assigned FFS of physician's request.

  - The FFS will review the physician's request and respond via email to the physician directly or request the care provider to provide the parent or legal guardian's last known contact information directly to the physician.

- If the pregnant UC obtains a state judicial bypass order (an order from a judge that allows minors to get abortions without the notification or consent of their parents) authorizing the physician to provide an abortion, and the minor still wishes to have the abortion, the care provider must immediately notify and send a copy of the order to the assigned FFS. The order must be uploaded into the online case management system in UC Documents.

- If the physician certifies that a medical emergency exists and the pregnant UC still wishes to have the abortion, the care provider should notify DHUC and FFS immediately by following procedures in **UC MAP Section 3.4.5 Responding to Medical Emergencies** and **Section 5.8.1 Emergency Incidents**.

---

***Care Providers with Sincerely Held Religious or Moral Objections to Pregnancy Termination***

If a minor who is requesting an abortion is placed in a care provider that has a sincerely held religious objection to providing information on and/or access to pregnancy-related medical

DOJ-00001061

services, including abortion, the case manager should notify the assigned FFS and Project Officer (PO) immediately for guidance. The next steps will follow:

1. The FFS (or another Federal staff designee) will deliver any legally required notice to the minor orally and in writing, along with other pregnancy-related information required by ORR Policy.

2. After the FFS delivers the required notifications, the FFS will email a brief summary of the meeting to the care provider, the assigned PO, DHUC, and the FFS Supervisor.

3. Care providers must document details of the meeting in the *UC Case Review*, such as the date and time, interpretation needs, etc.

4. If the FFS determines that a transfer to another care provider facility is necessary, the FFS will request that the care provider submit a *Transfer Request* without delay and **no later than within 24 hours**, following **UC MAP Section 1.4 Transfers within the ORR Care Provider Network.**

## 3.4.4 Medication Administration and Management

📖 **See Section 3.4.4 of the UC Policy Guide**

## 3.4.5 Responding to Medical Emergencies

📖 **See Section 3.4.5 of the UC Policy Guide**

A medical emergency is a serious medical condition caused by injury, illness, or toxic exposure, which is life threatening in nature.

**NOTE:** If a UC is pregnant and needs emergency medical care and is unable to inform an emergency medical provider herself of her pregnancy, then ORR federal staff or care providers may communicate to the medical provider the fact of the UC's pregnancy or abortion decision as it relates to the medical emergency.

Care provider staff must follow these steps in the event of a medical emergency:

1. Contact 9-1-1 and arrange the child's transportation to the nearest emergency room (ER) for evaluation.

DOJ-00001062

2. Render first aid as necessary until 9-1-1 responders arrive on the scene. Staff providing CPR should use a mouthpiece or do hand-only CPR.

3. Employ Standard Precautions (use of protection barriers, such as gloves, gowns, aprons, masks or protective eyewear) to reduce the risk of exposure to potentially infectious materials.

4. Notify immediately the care provider's Program Director of the medical emergency and the actions employed.

5. Submit an Emergency SIR to ORR within 4 hours of ER visit.

6. Notify the following stakeholders of the medical emergency within 48 hours of the emergency incident, per guidelines in Error! Reference source not found. **in UC MAP Section 5.8 Reporting Emergencies, Significant Incidents, and Program-Level Events.**

7. If hospitalization is recommended by the ER physician, contact the child on a daily basis by telephone and visitation.

8. Provide ORR and DHUC with regular updates on the child's health status and progress.

9. If hospitalization is not required, obtain medical records or documentation verifying that the child is stable enough for release to the care provider (for example, written doctor authorization or order, discharge instructions recommending release to the program with follow-up care).

10. Discuss the case with the care provider's case management and clinical staff. Evaluate whether the care provider can meet the child's medical needs. Review the ER or hospital discharge plan and implement treatment recommendations.

11. Request medical records related to the emergency treatment and any inpatient treatment from the medical services provider.

12. Maintain records in the child's health files.

# 3.4.6 Management of Communicable Diseases

📖 **See Section 3.4.6 of the UC Policy Guide**

DOJ–00001063

# 3.4.7 Maintaining Health Care Records and Confidentiality

📖 **See Section 3.4.7 of the UC Policy Guide**

***Confidentiality on Issues of Pregnancy, Birth, and Abortion***

In general, ORR federal staff and care providers must not communicate information about a UC's pregnancy (including the fact of the pregnancy) or the minor's decision on whether to have an abortion (before or after the abortion) to individuals other than ORR federal staff and care providers directly involved in the case or the UC.

Care providers and ORR/FFS may only communicate information about a UC's pregnancy or decision to have an abortion (before and after the abortion) to an approved sponsor, potential sponsor, or others, under the following circumstances:

1. The minor needs emergency medical care and is unable to inform the emergency medical provider herself (see UC MAP Section 3.4.5 Responding to Medical Emergencies);

2. The UC authorizes ORR federal staff or care providers to communicate the information to a specific individual;

3. A serious health complication arises from pregnancy, birth, or abortion and/or the UC may receive or require follow-up care after release from ORR custody (see the section below for additional follow-up requirements); and

4. To confirm that the sponsor or potential sponsor can provide for the UC's physical and mental well-being in order to carry the pregnancy to term, to give birth, and/or to parent (see the section below for additional follow-up requirements).

For circumstance #3 and #4 mentioned above, the next steps must be followed:

1. The FFS (or care provider at the FFS's request) must first make attempts to secure the UC's consent to the disclosure and document those attempts, as well as the outcome of the attempts, in the *UC Case Review.*

2. The FFS must document their good faith finding(s) in communicating the UC's pregnancy or serious health complication arising from pregnancy, birth, or abortion in a legal declaration (pursuant to 28 U.S.C. § 1746) (See Appendix 3.12).

DOJ−00001064

**NOTE**: Care providers must have up-to-date information on child's case in the online case management system in order for the FFS to review, assess, and complete a legal declaration, if needed.

a.   Once the legal declaration has been completed, the FFS must notify the care provider of the decision based on their good faith findings via email.

b.   The FFS (or care provider at the FFS's request) must communicate the information as close to the conclusion of the sponsorship process as reasonably possible but in time to ensure the sponsor can provide for the UC's physical and mental well-being.

c.   The FFS (or care provider at the FFS's request) must promptly notify the UC when the disclosure has been made.

**NOTE**: When an ORR care provider is required, as a matter of state licensing requirements, to communicate information about a UC's abortion-related decision to individuals other than the UC, the ORR care provider acts in consultation with its own legal counsel and without the involvement of the ORR federal staff. The care provider will notify ORR/FFS of any communication with individuals other than the UC that it makes under a state licensing requirement.

## 3.4.8 Medical Clearance Prior to Release or Transfer

📖 **See Section 3.4.8 of the UC Policy Guide**

## 3.4.9 Provider Reimbursement

📖 **See Section 3.4.9 of the UC Policy Guide**

Payment for health services while in ORR care is managed by a third party entity, Point Comfort Underwriters (PCU). Healthcare providers are encouraged to enter into an agreement with PCU *before* providing care for UCs. Contracting with PCU in advance will facilitate the appointment scheduling and billing process.  Programs should submit the names of selected healthcare providers directly to PCU who will then contact the healthcare providers and work out an agreement. Facilities providing emergency or urgent services do not need to have an agreement with PCU prior to administering care.

Care provider programs must obtain approval from PCU by submitting a Treatment Authorization Request (TAR) before a mental, dental, and medical service occurs, unless it is an

DOJ−00001065

emergency or urgent. Guidance on submitting TARs can be found on the PCU Portal, **https://maps.pointcomfort.com/login**.

> **NOTE**: Approval to cover the related costs in no way implies consent to conduct the procedure or provide the medical service when consent by a parent or legal guardian is required and cannot be obtained.

Payment for the Initial Medical Exam (IME) is pre-approved with the Initial Examination Authorization number, which is automatically generated on each child's ID document in the PCU Portal. All labs and chest x-rays that are part of the IME are included under the Initial Examination Authorization number, and do not require separate TARs as long as tests are performed within 72 hours of the IME date.

ORR will not approve or reimburse retroactive TARs submitted for dental procedures but may, in its discretion, allow exceptions for dental emergencies that occur over a weekend or federal holiday.

ORR is prohibited from paying for abortions, except in the following circumstances and may request documentation to ensure these adhere to the Hyde Amendment restrictions:

- Pregnancy is the result of an act of rape[1] or incest;

- The minor suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, which would, as certified by a physician, places the minor in danger of death unless an abortion is performed.[2]

Care providers must follow the procedures provided in **UC MAP Section 3.4.3, Requests for Health Care Services, including Serious Medical Services Requiring Heightened ORR Involvement.**

---

[1] Included in the definition of cases eligible for using federal funds are cases of statutory rape, following state laws in the location where the child is currently placed, regardless of where the sexual activity occurred.
[2] See e.g. sections 506 and 507, Title V of Pub. L. 116-94 "Further Consolidated Appropriations Act, 2020."

DOJ-00001066

## 3.5 Guiding Principles for the Care of UAC Who are LGBTQI

📖 **See Section 3.5 of the UAC Policy Guide**

## 3.5.1 Zero Tolerance for Discrimination and Harassment

📖 **See Section 3.5.1 of the UAC Policy Guide**

## 3.5.2 Prohibition on Segregation and Isolation

📖 **See Section 3.5.2 of the UAC Policy Guide**

## 3.5.3 Confidentiality with Regards to Sexual Orientation and Gender Identity

📖 **See Section 3.5.3 of the UAC Policy Guide**

## 3.5.4 Housing

📖 **See Section 3.5.4 of the UAC Policy Guide**

## 3.5.5 Restroom and Dressing Area Accommodations

📖 **See Section 3.5.5 of the UAC Policy Guide**

## 3.6 Long-Term Foster Care

📖 **See Section 3.6 of the UAC Policy Guide**

### OVERVIEW

DOJ−00001067

Foster care is the least restrictive placement option in the ORR continuum of care. As a community-based form of care, not all services will be provided within the residential structure of the foster/group home. UAC will typically access different elements of their care in several locations, including but not limited to, public school, foster care agency offices, foster homes, and counseling centers. ORR generally uses foster care, therefore, for more long-term placement and care of children, and implementation of procedures for their care may differ from shelter care settings.

Each foster family home must be licensed in accordance with state licensing regulations. However, ORR does not permit more than six children to a two-parent foster home, even if state licensing requirements allow for higher ratios. The number of children includes both foster and biological children. State-licensed group homes may have higher ratios, which are permissible by ORR. Placements must be based in individual needs and characteristics of each child and the overall makeup of the identified foster home.

Categories of long-term foster care providers include:

- Basic foster care: UAC resides with an unrelated licensed foster parent(s) and requires only the minimal services required in a licensed foster care setting.

- Therapeutic foster care: UAC resides with an unrelated licensed foster parent(s) but receives additional treatment services and/or supervision specific to the identified treatment needs. UAC with significant emotional, behavioral, medical, and/or developmental needs receive structured treatment within a therapeutic foster care setting.

- Basic group home: UAC resides in a living arrangement with a designated house parent(s) and/or staff. This setting is for those UAC who do not wish to be in a family setting.

- Therapeutic group home: UAC resides in a living arrangement with a designated house parent(s) and/or staff. The setting is for those UAC that have difficulties within a family setting and require therapeutic services/interventions due to significant emotional, behavioral, medical, and/or development needs.

## 3.6.1 ORR Long-Term Foster Care Service Provision

📖 **See Section 3.6.1 of the UAC Policy Guide**

### PROCEDURES

DOJ—00001068

In long-term foster care, an ORR care provider places the UAC with a state-certified caregiver, referred to as a "foster parent" or "house parent." The care provider is responsible for recruiting, assessing, selecting, credentialing, training, monitoring, and retaining foster/house parents and foster care sites.

The long-term foster care provider must establish community contacts for children, especially with regards to educational, health, spiritual, extra-curricular and recreational resources.

### *Educational Services in a Community Based School*

UAC in a foster home attend state-regulated public school or other state-licensed educational programs in the local school district of the foster and/or group home during the academic year. The foster care provider and foster parent take part in the selection of and arrangements for educational programs appropriate to UAC's age and abilities. Foster care providers and foster parents collaborate with school personnel and advocate as needed when there are any problems with UAC in the school setting.

In conjunction with the foster parents, the care provider's case manager takes an active role in attending school conferences, individual education plan (IEP) meetings, and similar activities, whenever possible.

For public school breaks longer than two weeks, care providers are required to develop a plan of study for UAC who are placed in foster care and submit it to their PO for approval.

**NOTE:** ORR is reviewing the year-round academic requirements for LTFC in light of the difficulty of individual foster homes to provide 6 hours of structured educational activities in the summer months.

### *Telephone Calls, Visitation, and Mail*

(also see **3.3.10 Telephone Calls, Visitation, and Mail**)

UAC placed in LTFC can have access to a personal cell phone, computers, and other communication methods that help prepare them for making a successful transition to independent living. However, the care provider must develop and disseminate ground rules for foster homes to enforce with all UAC in care. Care providers or foster parents must communicate these ground rules verbally and in writing to the UAC.
Family visitation follows state licensing regulations. ORR does not permit family visits to take place in foster homes or group homes, but they may occur at the administrative offices of the foster care provider.

Long-term foster care providers are not required to maintain telephone logs, except in cases with identified safety concern. In such cases, providers must maintain telephone logs as indicated in the child's safety plan.

DOJ−00001069

***Travel and Overnight Trips***

Requests for travel and overnight trips must follow state licensing regulations.
Any travel or overnight trip request requiring custodian consent by state regulations and any travel request involving a child with flight risk or safety concerns requires prior approval by ORR. The care provider submits a request to the FFS **10 days prior to the trip departure date** and keeps a copy in the UAC's file. ⟠⊠▤

Travel requests include information regarding travel destination, dates, mode and purpose, contact information and relationship of individual accompanying the UAC and exploration of any safety or security concerns.

***Counseling Services***

In accordance with the *Flores* Settlement Agreement, UAC in LTFC receive weekly individual counseling.

LTFC providers are encouraged to adapt group-counseling activities suitable to a community-based setting, such as youth advisory boards and foster youth support groups.

**NOTE:** At the request of a UAC, care providers are not required to complete the weekly individual counseling session or the group counseling session requirement of two group sessions per week. (See the addendum to the Cooperative Agreement.) Care providers must document this change in the UAC case file. ⊠▤

***Case Management Services***

1. LTFC care providers must implement and administer a case management system that tracks and monitors a UAC's progress on a regular basis to ensure that each UAC receives the full range of program services.

2. Care providers' case managers meet with UAC, at a minimum, once a month, either in person (preferred) or by telephone. The foster care provider uses an interdisciplinary team approach that includes active participation by the child (as appropriate) and a complementary partnership between the case manager and foster parents, and other agency staff members and stakeholders as needed.

4. Case managers maintain the Individual Service Plan and **update every 90 days**. Planning for independent living should be included as part of the ISP for UAC in LTFC (meal planning, cooking, nutritional requirements, medical checkups, available health care, and financial literacy). ⟠▤

5. The case manager maintains the UAC's records in the UAC Portal. ⟰

DOJ−00001070

# 3.6.2 Change in Placements While in ORR Long-Term Foster Care

📖 **See Section 3.6.2 of the UAC Policy Guide**

## PROCEDURES

Foster care providers (LTFC and TFC) must notify the FFS, CFS and the CC **24 hours prior to a placement change** and follow state licensing requirements. The foster care provider must document the change of placement in the UAC's case file. ⊕✉🗐

# 3.6.3 Additional Questions and Answers About This Topic

📖 **See Section 3.6.3 of the UAC Policy Guide**

Q: Can a minor in LTFC work during the summer?

A: Yes, barring any concerns by the PO, if he/she has the proper credentials, including any necessary permits required under state law and is still in the UAC program.
If h/she is transferred to URM, then the decision would be made by the legal guardian, or whoever has legal authority for him (which may be the alien himself if he's above the age of majority) following state law where the minor resides.

Q: One of our foster parents has offered paying for driving lessons for one of our UAC in care. If this permitted?

A: Yes, if state licensing approves.

Q: What employment forms does a foster parent need to provide to the LTFC or TFC provider?

A: All foster parents must provide an I-9 form to ensure that he/she may work in the United States.

Q: May foster families have pets in the home?

A: As long as state licensing requirements are met (including proper pet vaccines and licensing), the PO has the discretion to approve. Foster families must be vigilant for signs of allergies in the UAC.

DOJ—00001071

# Appendix 3.1 Checklist for Child Friendly Environment

The ORR policy is to ensure that, while adhering to state licensing requirements, UAC receive care a within a child-friendly residential environment that does not pose a safety risk to the child, staff, or neighborhood or a risk to the child of sexual abuse, sexual harassment, and inappropriate sexual behavior. The residential structure should emphasize a non-institutional, home-like atmosphere of care in the least restrictive environment.

| General Residential Structure | Yes/No |
|---|---|
| Controlled entry and exit from premises | |
| Clean | |
| Child-friendly (e.g. no fire, safety, or trip hazards; murals, colorful wall paint, pictures/posters on wall, etc.; youth permitted to personalize assigned room area with pictures, personal art work, etc.) | |
| Furniture and building are properly maintained | |
| Well-ventilated | |
| Adequately heated/cooled | |
| Cleaning chemicals inaccessible to youth | |
| Medical supplies/prescriptions inaccessible to youth | |
| Alarm systems in designated areas of the residential structure | |
| Video monitoring in common and living areas | |
| "Mirrored Windows"/windows in offices where staff and visitors meet with youth 1:1 | |
| Evacuation procedures posted prominently on each floor and at eye level for children and youth | |
| Fire extinguishers and smoke detectors in good working order and inspected as required | |
| Unsafe areas and equipment  inaccessible to youth | |
| Infants/Toddlers – age appropriate furniture (e.g. cribs/bedding, high chairs, toys, outlet covers) | |
| Preprogrammed phones that provide some level of privacy and are accessible to youth | |
| Documents that should be posted/accessible to youth (In English and Spanish/language most commonly spoken by youth) | Yes/No |
| Grievance policies and procedures  (grievance forms readily available to youth) | |
| ORR posters with phone numbers for UC to report sexual abuse/harassment | |
| ORR *and* care provider pamphlets on sexual abuse/harassment (additional copies readily available) | |
| *Garza* and other ORR Required Notices and Booklets | |
| Bedrooms | Yes/No |
| Adequately accommodate all youth (e.g. individual bed with mattress for each youth) | |

DOJ−00001072

| Natural Light/Dark at night | |
|---|---|
| Private place for youth to store personal belongings | |
| Provision of appropriate bed linens | |
| Desk and chair in room | |
| **Bathrooms** | **Yes/No** |
| Soap | |
| Toilet paper | |
| Towels | |
| Hygiene items | |
| Bathroom in good working order (e.g. toilets, sinks, drains, etc.) | |
| Hot/cold water available in sink and shower/bath tub | |
| Appropriate privacy | |
| **Kitchen** | **Yes/No** |
| UAC dietary restrictions posted/accessible to staff | |
| Food stored in a sanitary manner | |
| Knives/sharp objects inaccessible to youth | |
| **Outdoor Areas** | **Yes/No** |
| Video monitoring for exterior of building and surrounding premises | |
| Play equipment safe and in good repair | |
| **Vehicles** | **Yes/No** |
| Vehicle in good repair including, car seats and seatbelts, fire extinguisher; first aid kit. | |
| Insurance/Inspection current | |
| **Other** | **Yes/No** |
| Secure locations to store UAC personal property/valuables | |

# Guidance Checklist for Child-Friendly Environment –
# Individual Foster Home Checklist

The ORR policy is to ensure that, while adhering to state licensing requirements, UAC are provided care and placement within a child-friendly residential environment that does not pose a safety risk to the child, staff, or neighborhood. The residential structure should emphasize a non-institutional, home-like atmosphere of care in the least restrictive environment.

| **General Residential Structure** | **Yes/No** |
|---|---|
| Clean | |
| Child-friendly (e.g. no fire, safety, or trip hazards) | |
| Furniture and foster home are properly maintained | |
| Well-ventilated | |
| Adequately heated/cooled | |
| Cleaning chemicals inaccessible to youth | |
| Medical supplies/prescriptions inaccessible to youth | |

DOJ−00001073

| | |
|---|---|
| Evacuation procedures posted prominently on each floor | |
| Fire extinguishers and smoke detectors in good working order | |
| Unsafe areas inaccessible to youth | |
| Infants/Toddlers – age appropriate furniture (e.g. cribs/bedding, high chairs, toys, outlet covers) | |
| **Documents that should be posted/accessible to youth** | **Yes/No** |
| Foster home rules | |
| **Bedrooms** | **Yes/No** |
| Adequately accommodate all youth (e.g. individual bed with mattress for each youth) | |
| Natural Light/Dark at night | |
| Private place for youth to store personal belongings | |
| Provision of appropriate bed linens | |
| **Bathrooms** | **Yes/No** |
| Soap | |
| Toilet paper | |
| Towels | |
| Hygiene items | |
| Toilets in good repair | |
| Hot/cold water available in sink and shower/bath tub | |
| Appropriate privacy | |
| **Kitchen** | **Yes/No** |
| UAC dietary restrictions posted/accessible | |
| Food stored in a sanitary manner | |
| Knives/sharp objects inaccessible to youth | |
| **Outdoor Areas** | **Yes/No** |
| Play equipment safe and in good repair | |
| **Vehicles** | **Yes/No** |
| Vehicle in good repair including, car seats and seatbelts | |
| Insurance/Inspection current | |

DOJ–00001074

# Appendix 3.2 Initial Intakes Assessment

**First Name:**

**Last Name:**

**AKA:**
**Status:**
**Date of Birth:**                                    **Gender:**
**A No.:**                                            **LOS:**
**Age:**                                              **Current Program:**
**Child's Country of Birth:**                         **Admitted Date:**

A staff member in use of this form completes a section at intake of the child's admission at the care provider facility. The staff member completing this form must be trained to ask and gather sensitive information in a child-friendly and culturally appropriate manner. The purpose of this interview is to learn about the child and demonstrate to him/her that during her his/her safety and well-being is the care provider's foremost goal. In particular, these questions should help identify the severity of any medical or mental health needs the child has, ensure that the needs are appropriately met, facilitate gathering of basic identifying information, and inform the child's initial housing/bed assignment.

**Child's Arrival Date/Time:**                        **Intake Interview Date/Time:**
**Child's Primary Language:**
**Intake conducted in what**
**language:**
**Date of departure from home**                       **Date of Arrival in the US (approx.):**
**country:**

**Family Information**
Do you know anybody in the U.S.? Include relative and non-relative contacts in this section.

Is there someone we can contact to let them know you are here?

**Medical**

| | |
|---|---|
| Have you experienced any physical/medical problems today or in the last 30 days? | ☐ Yes ☐ No |
| If yes, please explain: | |
| Have you experienced any physical/medical problems? | ☐ Yes ☐ No |
| If yes, please explain: | |
| Do you have any allergies? | ☐ Yes ☐ No |
| If yes, please explain: | |
| Do you have any special dietary needs? | ☐ Yes ☐ No |
| If yes, please explain: | |

Are you currently taking any prescribed or other medication? If yes, list below. Other medication may include herbal remedies, over-the-counter remedies etc.
☐ Yes ☐ No

**Medication**

Observable or reported medical concerns (Check all that apply).

| | |
|---|---|
| Coughing | ☐ Yes ☐ No |
| Difficulty Breathing | ☐ Yes ☐ No |
| Dehydration | ☐ Yes ☐ No |
| Distress | ☐ Yes ☐ No |
| Confusion | ☐ Yes ☐ No |
| Fever | ☐ Yes ☐ No |
| Pregnant | ☐ Yes ☐ No |
| Exhaustion | ☐ Yes ☐ No |
| Lice | ☐ Yes ☐ No |
| Injuries | ☐ Yes ☐ No |
| Bruises | ☐ Yes ☐ No |
| Burns | ☐ Yes ☐ No |
| Scabies | ☐ Yes ☐ No |
| Vomiting | ☐ Yes ☐ No |
| Abdominal Pain | ☐ Yes ☐ No |
| Coughing Blood | ☐ Yes ☐ No |
| Nausea | ☐ Yes ☐ No |

DOJ−00001075

| Skin lesions/rash | ○ Yes ○ No |
| Sever/persistent headache | ○ Yes ○ No |
| Jaundice (Yellowing of the skin/whites of eyes) | ○ Yes ○ No |
| Neurological symptoms (Spasms, tics, uncontrollable movements, paralysis or numbness of any part of the body) | ○ Yes ○ No |
| Others(list) | ○ Yes ○ No |

If injuries, wounds, bruises present, describe them and how they occurred:

List of other medical concerns:

**Have you ever been to a doctor or stayed in a hospital?**      ○ Yes ○ No

If yes, please list any visit or stay for any reason. Also include visits to other healers or alternative treatment providers:

**Do you have a history of tuberculosis?**      ○ Yes ○ No

If yes explain:

**Do you have a history of seizures of convulsions?**      ○ Yes ○ No

If yes explain:

**Do you have any scars, birthmarks, or tattoos?**      ○ Yes ○ No

If yes explain:

If any observed or reported medical concerns are checked in the sections above, please report these to Program Director, shift supervisor, and/or any on call medical staff immediately for further guidance on the need to seek immediate medical care.

**Mental Health (Check all that apply)**

| | |
|---|---|
| Tried to hurt yourself? | ○ Yes ○ No |
| Had urges to hurt, injure or harm someone? | ○ Yes ○ No |
| Harmed anyone? | ○ Yes ○ No |
| Thought of attempting suicide or hurting yourself? | ○ Yes ○ No |
| Attempted suicide? | ○ Yes ○ No |
| Heard voices that others do not? | ○ Yes ○ No |
| Seen things or people that others do not see? | ○ Yes ○ No |
| Had trouble controlling anger or violent behavior? | ○ Yes ○ No |
| Are you having thoughts of harming yourself or someone else? | |

**Please explain any checked answers above.**

**Observable emotional concerns (Check all that apply)**

| | |
|---|---|
| Cooperative | ○ Yes ○ No |
| Uncooperative | ○ Yes ○ No |
| Alert | ○ Yes ○ No |
| Distracted | ○ Yes ○ No |
| Calm | ○ Yes ○ No |
| Excited | ○ Yes ○ No |
| Nervous | ○ Yes ○ No |
| Agitated | ○ Yes ○ No |
| Confused | ○ Yes ○ No |
| Sad | ○ Yes ○ No |
| Angry | ○ Yes ○ No |
| Other | ○ Yes ○ No |

If any the UC answered "yes" to any of the mental health questions and/or if any concerning behaviors and emotions were observed or reported, report to Program Director, shift supervisor, and/or any on call clinical staff immediately for further guidance on the need to seek mental health care.

Are you having thoughts of harming yourself or someone else?

**Safety Assessment**

**Do you feel safe now?**      ○ Yes ○ No

Explain if No:

**Do you fear that someone will harm you?**      ○ Yes ○ No

Explain if yes:

If the child answered "yes" to any of the safety health questions, report to Program Director or shift supervisor immediately for further guidance on how to ensure the child's safety.

Explain to the child where the child's room will be located in the facility, the number of potential roommates, the age and sex of the

roommates, and the bathroom and shower area associated with the potential room assignment. After having explained this, does he or      ○ Yes ○ No

she identify any specific fears about this potential housing assignment?

**Do you need anything right now?**

Interviewer summary of critical issues that need immediate attention:

Action taken (each action should correspond to the concern described above):

**Assessment For Risk**

The Assessment for Risk must be completed by a Clinician qualified Case Manager within 72 hours of a child or youth's admission to the care provider facility.

**Do you feel safe in your current room assignment or the assignment that will be given to you?**      ○ Yes ○ No

Explain:

**Has anyone made any inappropriate comments to you about your body, clothes, or appearance that made you uncomfortable so far at**      ○ Yes ○ No
**this facility?**

Explain:

DOJ-00001076

Do you identify as:

If the child or youth identified as transgendered or intersex, then ask whether the child or youth would rather have a female or male staff member conduct a pat down search if one was necessary?    ○ Male Staff    ○ Female Staff

Do you feel safe telling people about your sexual preference during your time in ORR care?    ○ Yes ○ No

Explain:

Is there something that you think we can do to help you feel safe and comfortable while you are here?    ○ Yes ○ Not at this time

Explain:

Do you find that people make a lot of sexual comments to you or about you?*    ○ Yes ○ No

Explain:

Have you ever been sexually active?

Have you ever felt like you needed to perform sexual favors or allow someone to touch your body in a sexual way in order to avoid additional harm, to obtain things you needed or wanted, or to be accepted by a person or group of people?    ○ Yes ○ No

Explain:

Have you ever been in trouble for having sex with another person?    ○ Yes ○ No

Explain:

Have you ever had to talk to a counselor, social worker, psychologist, teacher, or any other adult because of a sexual experience you had?    ○ Yes ○ No

Explain:

QUESTIONS FOR CLINICIAN TO ANSWER: [Every Question Must Be Answered]

Does the child or youth exhibit any gender nonconforming appearance or manner?    ○ Yes ○ No

Explain:

Does the child or youth have any current or criminal charges?    ○ Yes ○ No

Explain:

Explain:

Does the child or youth have any mental, physical, or developmental disability or illness or suspected of having any of the above?

What is the child's physical size and stature?    ○ Average    ○ Smaller than Average    ○ Larger than Average

Other specific information that may indicate heightened needs and/or additional safety precautions:    ○ Yes ○ No

Explain:

HOUSING, OTHER SERVICE ASSIGNMENTS, AND FOLLOW-UP

Housing and Other Service Plan

Clinician shared appropriate information with relevant care provider facility team    ☐

Explain:

Child or youth provided with psycho education on identified issue    ☐

Explain:

Child or youth provided with information on how to report threats, intimidation, or harassment by other children, youth, or facility staff    ☐

Explain:

Child or youth moved to a private room    ☐

Explain:

Child or youth moved to a room/dormitory area that matches the child or youth's gender identity (if different from sex)    ☐

Child or youth provided with alternative bathroom facilities or schedule    ☐

Explain:

Child or youth placed in educational or activities group(s) to reflect child or youth's gender identity (if different from sex)    ☐

Explain:

Developed and implemented a safety plan between child or youth, clinician, and care provider staff to address a specific issue    ☐

Explain:

Implemented increased clinical sessions    ☐

Explain:

Child or youth referred for professional mental health services    ☐

Explain:

Child or youth placed on closer staff supervision    ☐

Explain:

Staffed with FFS and CC for possible transfer    ☐

Explain:

Other    ☐

Explain:

Staff Signature:                                          Date:
Staff Name:                                              Staff Title:

Translator's Signature:                                  Date:
Translator's Name:                                       Language:

DOJ−00001077

## Appendix 3.3 *Garza* Notice (English and Spanish)

<u>Please read this notice</u>

If you are pregnant, no one who works for the government or the shelter can stop you from accessing counseling about all the options you have regarding your pregnancy, including birth (for parenting or adoption) or abortion. You have the right to decide whether to continue your pregnancy and give birth or to have a legal abortion. If you want a legal abortion, no one who works for the government or the shelter can stop you from getting one. Depending on the location of your shelter, you might need permission from a judge to get an abortion. No one who works for the government or the shelter can stop you from going to court if you need to. No one who works for the government or the shelter can stop you from going to appointments related to your pregnancy, including appointments for prenatal care, birth (for parenting or adoption), or to obtain an abortion.

No one who works for the government or the shelter can tell anyone about your pregnancy or your decision whether to have an abortion, without your permission, except:

1) They can tell an emergency medical provider if you need emergency medical care and your medical condition prevents you from telling the emergency medical provider yourself.

2) The government can tell your sponsor information about your pregnancy or abortion, but only if your sponsor will need to know about your pregnancy or abortion to help you with a serious health complication after you are released to them or to make sure that your sponsor can support you with your pregnancy, having a baby, or being a parent. Before the government tells your sponsor information about your pregnancy or abortion, they must first try to ask for your permission to tell your sponsor and they must tell you after they have informed your sponsor.

DOJ−00001078

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit E



# POLICY AND REQUIREMENTS HANDBOOK

## CHAPTER 2:
## STUDENT SUPPORT SERVICES

JUNE 15, 2021

## TABLE OF CONTENTS

**2.0   INTRODUCTION** .......................................................................................... 2.0-1

**2.1   COUNSELING** ............................................................................................... 2.1-1

**Requirements** ................................................................................................. 2.1-1
R1.   Organization ................................................................................. 2.1-1
R2.   Personal Assessment and Counseling Services ............................ 2.1-1
R3.   Career Assessment and Counseling .............................................. 2.1-2
R4.   My Pathway to Achieving Career Excellence Career Plan ........... 2.1-3
R5.   Placement Readiness .................................................................... 2.1-4

**2.2   COMMUNITY LIVING (RESIDENTIAL)** ...................................................... 2.2-1

**Requirements** ................................................................................................. 2.2-1
R1.   Student Self-Management Skills Development ............................. 2.2-1
R2.   Supervision of Student Living Areas ........................................... 2.2-1
R3.   Recreational Planning .................................................................. 2.2-1
R4.   Recreational Activities ................................................................. 2.2-2
R5.   Recreation Supervision ................................................................ 2.2-3
R6.   Community Service Projects ......................................................... 2.2-3
R7.   Water Safety Training .................................................................. 2.2-3
R8.   Use of Movies ............................................................................. 2.2-3
R9.   Leisure Time Employment ........................................................... 2.2-3
R10.  Student Benefit Fund ................................................................... 2.2-4
R11.  Welcome Kit ................................................................................ 2.2-5
R12.  Laundry Services ......................................................................... 2.2-5
R13.  Mail Services ............................................................................... 2.2-5
R14.  Linen and Bedding ....................................................................... 2.2-5
R15.  Inventory ..................................................................................... 2.2-5

**2.3   HEALTH SERVICES** ..................................................................................... 2.3-1

**Requirements** ................................................................................................. 2.3-1
R1.   Student Introduction to Health Services ...................................... 2.3-1
R2.   Health and Wellness Program ...................................................... 2.3-1
R3.   Oral Health and Wellness Program .............................................. 2.3-4
R4.   Mental-Health and Wellness Program .......................................... 2.3-5
R5.   Trainee Employee Assistance Program (TEAP) ........................... 2.3-7
R6.   Tobacco Use Prevention Program (TUPP) ................................... 2.3-11
R7.   Family Planning Program ............................................................. 2.3-12
R8.   HIV/AIDS .................................................................................... 2.3-13
R9.   Healthy Eating and Active Lifestyles .......................................... 2.3-15
R10.  Health Aspects of Sports ............................................................. 2.3-15
R11.  Basic Health Services Provided by Job Corps Centers ................. 2.3-16

R12. Health and Medical Costs Exceeding Basic Health Services Provided by Job
      Corps Centers ................................................................................. 2.3-16
R13. Professional Standards of Care ........................................................ 2.3-16
R14. Medication Management .................................................................. 2.3-17
R15. Waiver of Medical Care ................................................................... 2.3-17
R16. Health Care Guidelines ................................................................... 2.3-17
R17. Communicable Disease and Infection Control .................................. 2.3-18
R18. Inventory Records .......................................................................... 2.3-18
R19. Continuous Quality Improvement ................................................... 2.3-18

**2.4   DISABILITIES ........................................................................................ 2.4-1**

**Requirements ............................................................................................ 2.4-1**
R1.   Disability Coordinators ..................................................................... 2.4-1
R2.   Disability Accommodations ............................................................... 2.4-1
R3.   Reasonable Accommodation Process ................................................. 2.4-1
R4.   CIS Disability Data Collection and Accommodation Plans ............... 2.4-2
R5.   Referral Process ................................................................................ 2.4-2

**2.5   STUDENT CONDUCT ............................................................................... 2.5-1**

**Requirements ............................................................................................ 2.5-1**
R1.   Incentives ......................................................................................... 2.5-1
R2.   Rules and Sanctions .......................................................................... 2.5-1
R3.   Investigation and Disposition of Incidents ....................................... 2.5-2
R4.   Appeal Process .................................................................................. 2.5-2
R5.   Regional Appeals Board .................................................................... 2.5-2
R6.   Bullying and Sexual Harassment Training ........................................ 2.5-5

**2.6   EVALUATION OF STUDENT PROGRESS .................................................. 2.6-1**

**Requirements ............................................................................................ 2.6-1**
R1.   Evaluation of Student Progress ......................................................... 2.6-1
R2.   Content of Evaluations ...................................................................... 2.6-1
R3.   Transition to Career Development Period .......................................... 2.6-2

**EXHIBITS**

Exhibit 2-1    Infraction Levels, Definitions, and Appropriate Center Actions
Exhibit 2-2    Requirements for the Conduct of Fact-Finding Boards
Exhibit 2-3    Menu of Progressive Discipline Interventions and Sanctions for Minor Infractions
Exhibit 2-4    Job Corps Basic Health Care Responsibilities
Exhibit 2-5    Placement Pathway Prerequisites for Entry

**APPENDICES**

Appendix 201   Communicating with Persons with Disabilities
Appendix 202   Transmission, Storage, and Confidentiality of Medical, Health, and Disability-
               Related Information
Appendix 203   Medication Management Guidelines

**FORMS**

Form 2-01     Notice of Medical information Use, Disclosure, and Access
Form 2-02     HIV Testing Information Sheet
Form 2-03     Definitions and Documentation Requirements Related to Reasonable
              Accommodations for Applicants and Students with Disabilities
Form 2-04     Individualized Assessment of Possible Direct Threat
Form 2-05     Health Care Needs Assessment
Form 2-06     MyPACE Career Plan Review Checklist

## 2.0 INTRODUCTION

Chapter 2, Student Support Services which in addition to Chapter 3, covers career preparation period and career development period activities, provides a framework of requirements for center contractors in areas such as counseling, personal and career assessment, community living, leisure time employment, student benefit fund, health and wellness program, healthy lifestyle, disability accommodations and processes, student conduct, student sanctions, investigations, appeals, evaluation of student progress, and transition to the career development period among others. Requirements are detailed in the following sections within the chapter: Counseling; Community Living (Residential); Health Services; Disabilities; Student Conduct; and Evaluation of Student Progress. Job Corps enrollees must be provided services consistent with the Workforce Innovation and Opportunity Act and Job Corps requirements contained herein. Center staff are tasked with all areas of personal and career counseling and assessment of students, collaborating with students to create a My Pathway to Achieving Career Excellence Career Plan, overseeing residential community living and developing activities and events, providing welcome kits and basic living services, health services, trainee employee assistance program services, disability services, student conduct rewards and sanctions, and ongoing, frequent evaluations of student progress.

## 2.1 COUNSELING

**REQUIREMENTS**

*R1.  Organization*

Centers must provide personal counseling services with the following features:

a.  Designated counseling staff or qualified professionals

b.  Assigned caseloads

c.  Personal counseling sessions

d.  Availability of counseling services on weekends and in the event of emergencies

*R2.  Personal Assessment and Counseling Services*

Centers must provide intensive ongoing personal assessment and counseling services early within the first 60 days of the student's stay on center. These services will continue as needed throughout the student's enrollment to identify, assess, and assist students to address personal barriers to progress in academic and career technical training programs, with the following features:

a.  An intake assessment, including student history, conducted during the first 48 hours of enrollment (see Chapter 3, Section 3.4, R7 and R8). A copy of this assessment must be submitted to the Health and Wellness center for review and inclusion in the student's health record

b.  Ongoing structured, scheduled, and documented individual social development and adjustment counseling

c.  Group support sessions designed to identify and address specific issues, such as abuse, relationships, child care, homesickness, language and cultural barriers, etc.

d.  Identification of students who need more intensive services and referral to such services

e.  Intervention, implementation, and documentation of strategies to address personal issues, including mental health, medical issues, and challenges for English Language Learners (ELL)

f.  Support services, to include assisting with Unauthorized Absence (UA) retrieval; conferring with parents, Admissions Counselors, Career Transition Specialists, and social service agencies; and providing referrals to community resources, as appropriate

g.  Availability of counseling services on weekends and in the event of emergencies

***R3.  Career Assessment and Counseling***

Centers must provide career assessment and counseling services throughout the student's enrollment with the following features:

a.  Ongoing structured, scheduled, and documented individual career counseling sessions, which may be scheduled as part of a student's career development activities

b.  Management of students' career development through collaboration among the student, counselor, and interdepartmental Career Management Team (CMT) to assist the student in:

    1.  Setting and updating incremental short-term, mid-term, and long-term personal and career goals by ensuring Pathway Achievement Record (PAR) completion progress is current

    2.  Developing strategies and identifying actions necessary for students to prepare for and attain academic credentials and industry-recognized certifications

    3.  Identifying personal strengths and career challenges

    4.  Resolving personal issues affecting career readiness

    5.  Assessing transitional support needs and developing strategies to meet those needs

c.  Counselors must know and remain current on industry certifications offered and requirements for attainment

d.  During the Career Preparation Period, staff will assist students in identifying initial career goals and developing personalized strategies to reach those goals through:

    1.  An individualized schedule of appropriate academic, career technical training, and evening/weekend studies

    2.  Exposure, practice, and experiences to meet the Career Success Standards

    3.  Personal and career counseling to develop appropriate strategies and identify resources to address issues

e.  A review and confirmation of the student's initial My Pathway to Achieving Career Excellence (MyPACE) Career Plan and mid-term career pathway goals, within 30 days of entry into the Career Development Period

f.  Trained staff who can assist students, for whom a change of mid-term career (placement) goal is determined appropriate to:

1.  Modify the MyPACE Career Plan and reassign the student to a revised PAR.

2.  Submit the revised Career Plan to the Center Director or senior management designee for review and approval.

3.  Retain a copy of the approved revised Career Plan and revised Pathway Achievement Record in the student's permanent personnel file. (See Chapter 6, Section 6.4, R17, Student Personnel File.)

g.  Regular assessments and evaluations of student progress in meeting career goals in academic and career technical education and training programs, reviewing, and updating the student's MyPACE Career Plan and the PAR in accordance with Chapter 2, Section 2.6, R1 and R2

### R4.  *My Pathway to Achieving Career Excellence Career Plan*

a.  Centers must collaborate with each student to initiate a MyPACE Career Plan that must document the student's personal career goals, training needs, challenges, progress and accomplishments throughout enrollment and the post-center Career Transition Period.

At a minimum, the MyPACE Career Plan must include:

1.  Student long-term career goal (the ultimate career that the student will progress toward)

2.  Mid-term career pathway placement goals (immediate next steps upon Job Corps completion to support career progression), including one of the following:
    (a) Entry-level job placement in an in-demand industry sector on the pathway to the student's ultimate career
    (b) Entry into an apprenticeship program
    (c) Participation in one of Job Corps' Advanced Training (AT) programs
    (d) Enlistment in the armed services to pursue a career in the military
    (e) Enrollment in post-secondary education

3.  Student short-term specific, measurable, attainable, recorded, and time-bound (SMART) goals

4.  Desired geographic residence/work location

5.  Student interests, aptitudes, values, work styles, and career technical training preferences and choices

6.  Details regarding a student's prior employment, including:
    (a) employer
    (b) location
    (c) job title

(d) ending wage

Centers must verify the accuracy of this information.

7.  Student training needs to achieve career goals
    (a) Academic
    (b) Career technical training
    (c) Career Success Standards
    (d) Job search skills
    (e) Information technology (IT) skills
    (f) Driver's education and license

8.  Progress/accomplishments/achievements

9.  Career transition needs/challenges/strategies
    (a) Housing
    (b) Transportation
    (c) Child care
    (d) Health care
    (e) Work clothing and tools
    (f) Food and nutrition
    (g) Budgeting/money management
    (h) Counseling/mentoring
    (i) Job retention skills
    (j) Legal services
    (k) Application for federal funding for advanced education, as appropriate

b.  Students must update their MyPACE Career Plan by completing the accompanying curriculum. Once the MyPACE Career Plan is complete, students must be assigned the appropriate Pathway Achievement Record (PAR) that matches their mid-term goal. Students must update their PARs on an ongoing basis, in cooperation with appropriate staff, no less frequently than at each student's regularly scheduled evaluation of student progress.

c.  Each student's completed MyPACE Career Plan and PAR must be uploaded to the appropriate section of the Center Information System (CIS) e-Folder. Students must be provided copies of their MyPACE Career Plan and PARs whenever changes are made to the plan and at separation.

## R5.  *Placement Readiness*

To ensure that each student is fully prepared to effectively access resources and services that assist them in making a successful transition to his/her mid-term goal the interdepartmental Career Management Team (CMT) must:

a.  Collaborate with the Career Transition Service Provider and each student to:

1. Update and finalize the student's My Pathway to Achieving Career Excellence (MyPACE) Career Plan and Pathway Achievement Records (PAR);

2. Review and verify the student's mid-term career goal to:

   (a) Ensure the student has completed all assigned mid-term goal PAR tasks and activities and has proper supporting documentation of completed tasks;
   (b) Verify the student's understanding of the next steps needed to transition to the chosen mid-term career goal; and career pathway remains appropriate;
   (c) Confirm the student's transitional support needs and strategies to address them.

b. Facilitate the student's connection with his/her assigned Career Transition Specialist.

c. Submit each student's final MyPACE Career Plan and PAR to the Center Director or senior management designee for review and approval.

d. Retain a copy of the approved final MyPACE Career Plan and PAR in the student's permanent personnel file. (See Chapter 6, Section 6.4, R17, Student Personnel File.)

e. Upload a copy of the final MyPACE Career Plan and PAR in the Center Information System (CIS) e-Folder for the student's assigned Career Transition Specialist to access.

f. Ensure student has access to his/her final MyPACE Career Plan and PAR.

## 2.2 COMMUNITY LIVING (RESIDENTIAL)

**REQUIREMENTS**

*R1.   Student Self-Management Skills Development*

Centers must develop systems that involve students in the management of their living areas, which must incorporate the following features:

a.   Opportunities for all students to have input into the development of the center policies governing the management of their living areas

b.   Procedures to solicit input and feedback from, and disseminate information to students

c.   Student responsibility for maintaining cleanliness within their living areas

d.   Progressive opportunities to learn, practice, demonstrate personal responsibility and self-management skills, and to complete career pathway planning activities and Pathway Achievement Records (PAR)

*R2.   Supervision of Student Living Areas*

Centers must:

a.   Provide staff supervision in all student living areas at levels that assure visibility, the safety, security, and accountability of all students at all times.

b.   Develop a structured process for sharing information that ensures effective student accountability.

*R3.   Recreational Planning*

Centers must:

a.   Develop and maintain a calendar of recreational activities and events, and distribute the schedule to students in advance of the activities listed.

b.   Involve students in selecting and planning recreational activities.

c.   Conduct periodic surveys of student recreational interests and participation, and use the information gathered in planning recreational activities.

d.   Coordinate with career technical, academic, counseling staff, and social development staff to ensure integration of student training, including completion of My Pathway to Achieving Career Excellence (MyPACE) PARs, with leisure time activities.

e.   Consider cost effective options in planning off-center recreational activities.

**R4.   *Recreational Activities***

Centers must provide a wide variety of activities open to all students. Activities should reinforce and provide time to practice communication skills, to demonstrate positive attitudes and behaviors, and to work and participate in groups.

a.   Activities must include but are not limited to:

   1.   Group fitness classes

   2.   Individual fitness activities

   3.   Organized sports

   4.   Exercise groups or clubs

   5.   Group sessions with employers or career professionals

   6.   Entrepreneurship classes

   7.   Evening resume writing and interview techniques

   8.   Volunteering, mentoring or tutoring

b.   May include:

   1.   Cultural events

   2.   Dancing and theater

   3.   Radio and/or television mockups

   4.   Playwright, rap and poetry seminars

   5.   Physical education and conditioning (yoga, spinning, etc.)

   6.   Arts and crafts

   7.   Reading and computer resource facilities

   8.   Entrepreneurship classes

**R5.  Recreation Supervision**

Centers must provide adequate staff supervision of events, activities, facilities, and equipment to ensure participant safety.

**R6.  Community Service Projects**

Centers must provide opportunities for staff and students to participate in community service activities.

**R7.  Water Safety Training**

Centers must:

a.  Provide students with instruction in water safety as follows:

   1.  All centers must provide a video-taped presentation on water safety.

   2.  Centers sponsoring recreation trips that involve swimming, in-water activities, or access to pools/other bodies of water must provide water safety instruction and swimming proficiency tests for all students.

   3.  Centers with pools or ready access to pools/other bodies of water must provide water safety instruction and swimming proficiency tests for all students.

b.  Prohibit students from participating in swimming or other water-related activities until they have received water safety instruction and demonstrated swimming proficiency.

c.  Ensure that all water-related activities are supervised by certified lifeguards.

d.  Require the use of the buddy system in all swimming activities, and the use of personal flotation devices in all boating activities.

**R8.  Use of Movies**

Centers showing movies of commercial motion pictures to students on center must be licensed to do so under an umbrella license through a national agreement between the National Office of Job Corps (NOJC) and the Motion Picture Licensing Corporation.

Centers will receive a list of movie titles directly from the vendor(s) each month indicating the movies covered under the agreement. Center Operators will assume liability for showing any movie(s) that do not appear on the list.

**R9.  Leisure Time Employment**

a.  Centers may authorize gainful leisure time employment of students so long as the

employment does not interfere with training activities.

b. Leisure time employment is not considered training or work-based learning. Accordingly, students are not considered federal employees for Federal Employees' Compensation ACT (FECA) purposes while engaged in leisure time employment, except when the employment occurs on center.

### R10. *Student Benefit Fund*

Centers must establish a student benefit fund to be managed by the Student Government Association (SGA) with the assistance of center staff. The purpose of the fund will be to provide the SGA with the ability to purchase items and services for the benefit of all students. The fund must have the following features:

a. Be self-supporting and must not include any appropriated Job Corps funds. Allowable sources of income include, but are not limited to, the following:

   1. Operation of a store or canteen

   2. Operation of other concessions, such as vending machines

   3. Student fines

   4. Student fund-raising activities

b. A staff member designated to assist the SGA officers in overseeing the operation of the fund.

c. May not be used to pay for goods or services that are normally part of center operating costs.

d. A simple accounting system for the student benefit fund and involve SGA officers in the management of the accounting system. The accounting system must include, at a minimum, the following:

   1. A written accounting and audit plan

     The accounting plan must ensure the integrity of the fund by establishing an appropriate set of checks and balances, to include, at a minimum dual approval of all expenditures by the SGA president or designee and the center director or designee.

   2. Separation of payment and collection duties

   3. Maintenance of a bank account (checking or savings or both)

4. A written record of income and expenditures

5. Periodic financial reports

6. Annual audits by the center operator (corporate office or agency headquarters designee)

### R11. Welcome Kit

Upon arrival, centers must provide each residential student with the following personal items at no cost to the student:

a. Towels and wash cloths

b. Laundry bag

c. Toiletries

### R12. Laundry Services

Centers must provide adequate laundry facilities and supplies to residential students at no cost to the student, and training to students in the proper use of laundry equipment.

### R13. Mail Services

Centers must establish a secure, confidential, and prompt system for the receipt and distribution of mail and packages through the U.S. Postal Service and commercial delivery services.

### R14. Linen and Bedding

Centers must provide adequate linen and bedding for all residential students.

### R15. Inventory

Centers must:

a. Conduct and record an inventory of clothing and other personal effects when a student enters the residential program, and update the inventory after each clothing issue or purchase.

b. Inventory and secure a student's clothing and personal effects when the student is absent from the center without permission for more than 24 hours.

## 2.3 HEALTH SERVICES

**REQUIREMENTS**

**R1.  *Student Introduction to Health Services***

Centers must provide an overview of health services to new students by a member of the health services staff during the Career Preparation Period (CPP). This must include an explanation of procedures/tests that are performed as part of the medical and oral exam, information on Human Immunodeficiency Virus (HIV) and other sexually transmitted diseases, safe sex practices, family planning services, Trainee Employee Assistance Program (TEAP) services, mental health services, the importance of good health to obtain/maintain employment, and the notice describing how medical information about students may be used, disclosed, and how students can get access to this information.

**R2.  *Health and Wellness Program (See Exhibit 2-4, Job Corps Basic Health-Care Responsibilities.)***

Centers must provide basic[1] medical services to students. The Health and Wellness Program must include the following components:

a.  A cursory health evaluation[2], laboratory testing, and a medical history within 48 hours of arrival on center. The medical history must be documented on the Job Corps Health History Form. The cursory health evaluation and medical history must be conducted by a qualified health professional designated by the Center Physician.

b.  A complete entrance physical examination[3] and a review of the medical history within 14 days. The cursory evaluation, with the exception of the required entrance laboratory testing, may be omitted if the physical examination is conducted within 72 hours of a student's arrival on center. The physical examination must be provided by a qualified[4] health professional and documented on the Job Corps Physical Examination Form.

1.  When indicated, the center must furnish one pair of glasses that meet American National Standards Institute (ANSI) standards.

2.  Contact lenses must be provided if clinically indicated. Students who lose or damage glasses provided by Job Corps must replace them at their own expense.

3.  Students identified as having chronic health problems during the cursory or entrance physical must be monitored as directed by the Center Physician or other appropriate center health-care provider.

---

[1]  For a description of basic services, refer to Exhibit 2-4 (Job Corps Basic Health Care Responsibilities).
[2]  Reinstated and transfer students are exempt from the cursory health evaluation/physical examinations.
[3]  Near and distant vision screening, color vision screening, and hearing screening shall be part of the entrance physical examination.
[4]  As determined by the center physician who authorizes the activity by a written personal authorization.

c.  Laboratory tests within the time frames shown below:

| Entrance Laboratory Testing Requirements | Required Time Frame |
|---|---|
| HIV Antibody Test | Within 48 hours after arrival (see waiver condition, Section 2.3, R15) |
| Syphilis Serology | Optional[5] |
| Hemoglobin or Hematocrit | Within 48 hours after arrival |
| Sickle Cell Screening (must be offered to all at-risk students) | Within 48 hours after arrival |
| Urinalysis (dipstick) for Glucose/Protein | Within 48 hours after arrival |
| Drug Screen (urine) | Within 48 hours after arrival |
| (Males Only) | |
| Urinalysis (dipstick) for Leukocyte Esterase (gonorrhea screen) | Within 48 hours after arrival |
| Chlamydia Testing (urine) | Within 48 hours after arrival |
| Gonorrhea Testing if Leukocyte Esterase Screen is Positive (urine) | Within 48 hours after arrival |
| (Females Only) | |
| Pregnancy Test (urine) | Within 48 hours after arrival |
| Pap Smear | Females age $\geq 21$ years (unless documented pap smear results within 24 months before arrival on center) |
| | Within 14 days after arrival |
| | Students younger than 21 years only require pelvic/speculum exam for clinical indications such as pelvic pain, vaginitis, menstrual disorders, pregnancy, etc. |
| Chlamydia Testing (endocervical or urine) | All females; perform on urine if age < 21 years |
| | Within 48 hours after arrival (or at time of pelvic exam if age $\geq 21$ years) |
| Gonorrhea Testing (endocervical or urine) | All females; perform on urine if age < 21 years |
| | Within 48 hours after arrival (or at time of pelvic exam if age $\geq 21$ years) |

d.  Immunizations

All applicants are required to provide Admissions Counselors with current immunization records at the time of application. Records will be reviewed by center health staff on entry to determine currency of immunizations. Centers must immunize students for the following as directed by the Office of Job Corps:

1.  Immunizations or boosters if the following immunization series are incomplete or if current immunization records cannot be produced:
    (a) Tetanus and diphtheria toxoid (Td) or Tetanus-diphtheria-acellular pertussis (Tdap)
    (b) Inactivated polio vaccine (IPV) for students younger than 18 years
    (c) Measles, mumps, and rubella vaccine

---

[5]  Center physician may choose to continue screening for syphilis on entry if there is a significant prevalence in the center population.

2. Hepatitis B vaccine series

   At a minimum, Hepatitis B vaccine must be provided to health personnel and health occupations training students. Vaccination consent/declination must be documented in the staff member's personnel file or student health record. Vaccination of health occupations training students must begin six weeks prior to on-site clinical work experience.

   Refer to the Immunizations and Communicable Disease Control Technical Assistance Guide (TAG) for optional immunizations (e.g., influenza vaccine) that may be recommended but not required by the center physician, based upon availability.

   Centers should utilize the Vaccines for Children program to provide immunizations for eligible students according to the latest Centers for Disease Control and Prevention (CDC) guidelines.

e. A tuberculosis skin test (Mantoux) is required of all new students who do not have documented proof of a previous negative Mantoux test taken within the last 12 months. Annual tuberculin testing should be done for students in health occupations and for students at increased risk of infection. In addition, students in health occupations must receive a Mantoux test prior to clinical work experience in accordance with state or local health department requirements.

   Results of tuberculin skin testing should be interpreted without regard to a prior history of BCG vaccination.

   Refer to Treatment Guidelines in the Health-Care Guidelines TAG, for management of students with a positive Mantoux test.

f. A daily walk-in clinic outside of the training hours for students to receive routine health care.

g. An inpatient unit (during office hours) for minor conditions, such as respiratory infections or flu symptoms.

h. An appointment system for follow-up during the training day for treatment of chronic, urgent, and other conditions within the capabilities of center health professionals. Treatment guidelines for health must be used to manage common acute and chronic conditions.

i. Access to prescription medications.

j. An off-center specialist referral system.

k.  A 24-hour emergency-care system, to include on-center Cardio Pulmonary Resuscitation (CPR) and first aid and written referral plan or agreement for off-center medical, oral health, mental health, substance use, and inpatient care.

l.  Explain and have the student sign, on the first visit to health services, the notice describing how medical information about students may be used and disclosed, and how students can get access to this information (see Form 2-01, Notice of Medical Information Use, Disclosure, and Access).

**R3.  *Oral Health and Wellness Program (See Exhibit 2-4, Job Corps Basic Health Care Responsibilities.)***

Centers must provide basic dental services, as described below:

a.  The general emphasis of the Oral Health and Wellness Program must be on early detection, diagnosis of oral health problems, basic oral-health care, dental hygiene, and prevention/education (e.g., oral hygiene instructions, caries risk assessments, the relationship between oral health and employability, oral health and wellness plans).

b.  A dental readiness inspection must be completed within 14 days after arrival by the center dentist or designee as determined by the center dentist who authorizes the activity by a written personal authorization. The dental readiness inspection must be documented in the appropriate section on the Job Corps Physical Examination Form.

c.  An elective oral examination, including bitewing X-rays, priority classification, and treatment plan, must be completed and recorded on the Job Corps approved oral examination form by the center dentist upon student request as a follow up to the dental readiness inspection. The X-ray images should be securely stored as part of the student's health record.

d.  Dental procedures to treat oral disease and correct oral health conditions that may represent employability barriers, to include: restorations, extraction of pathological teeth, root canal therapy on anterior/other strategic teeth, replacement of missing upper anterior teeth with a removable prosthesis, and dental hygiene treatment for periodontal disease.

e.  Written referral plan or agreement with community facilities for emergent or urgent conditions treatable beyond the expertise of a general dentist.

f.  Job Corps shall not pay for student orthodontics. Applicants with orthodontic appliances must furnish:

1.  Proof of orthodontic care visits during previous three months consistent with orthodontic treatment plan.

2.  Proof that a treatment plan is in place for continued care.

    3.   A signed agreement that the cost of continued treatment and transportation related to treatment will be borne by the student, parent, or legal guardian.

    4.   A signed agreement by the applicant (parent/guardian of a minor) that he or she will remain compliant with orthodontic care and schedule all orthodontic appointments such that he or she will not exceed authorized leave limits for elective dental treatment.

**R4.** ***Mental-Health and Wellness Program (See Exhibit 2-4, Job Corps Basic Health-Care Responsibilities.)***

Centers must provide basic mental-health services as described below:

a.   The general emphasis of the Mental-Health and Wellness Program must be on the early identification and diagnosis of mental-health problems, basic mental-health care, and mental-health promotion, prevention, and education designed to help students overcome barriers to employability. The program uses an employee assistance program approach that includes short-term counseling with an employability focus, referral to center support groups, and crisis intervention.

b.   Assessment and possible diagnosis, to include:

    1.   Assessments and recommendations for Job Corps applicants;

    2.   Review of Social Intake Form (SIF) or intake assessment performed by counseling staff of students who indicate mental-health history, current mental-health problems, or who request to see the Center Mental-Health Consultant within one week of arrival;

    3.   Mental-health assessments and recommendations for referred students. Students who are assessed as a safety risk to self or others must be continuously supervised, until their case is resolved. Disposition should occur as soon as possible;

    4.   Determination when a Medical Separation with Reinstatement Rights (MSWR) or medical separation is appropriate and recommended for students with mental health conditions and/or substance use co-occurring conditions.

c.   Mental health promotion and education, to include:

    1.   Minimum of a one-hour presentation on mental-health promotion for all new students during the Career Preparation Period with an emphasis on employability:
       (a) Presentations must explain the Mental-Health and Wellness Program, what services are available, and how to make a self-referral.
       (b) Students will learn basic skills in identifying and responding to a mental health crisis.

2. At least one annual center-wide mental-health promotion and education activity

3. Clinical consultation with Center Director, management staff, and Health and Wellness Director regarding mental health-related promotion and education efforts for students and staff

4. Coordination with other departments/programs on center, including, but not limited, to residential, recreation, student government association, and Healthy Eating and Active Lifestyles (HEALS), to develop integrated promotion and education services

d. Treatment, to include:

1. Short-term counseling with mental-health checks as needed. The focus of these sessions should be on retention and behaviors that represent employability barriers;

2. Collaboration with TEAP specialist for short-term counseling of students with co-occurring conditions of mental-health issues and substance use;

3. Collaboration with center physician and Health-and-Wellness staff on psychotropic medication monitoring of stable students, with the advice of consulting psychiatrist, if appropriate;

4. Collaboration with counseling staff in developing and/or leading psycho-educational skill-building groups to promote wellness (e.g., relaxation training, anger management, mood regulation, assertiveness skills, handling relationships, sleep hygiene, etc.);

5. Information exchange through regular case conferences between the Center Mental Health Consultant, counselors, and other appropriate staff based on individual student needs;

6. Crisis intervention, as needed. In the event of a mental health emergency, the Center Mental-Health Consultant or the Center Physician must conduct a mental health evaluation as soon as possible, and when necessary, refer the student for psychiatric care. If the Center Physician or Center Mental-Health Consultant is not available, the student must be referred immediately to the emergency room of the nearest medical facility. If there is a life-threatening situation, 911 or the emergency response team should be called;

7. Referral to off-center mental-health professionals or agencies for ongoing treatment and/or specialized services;

8. A written referral/feedback system must be established and documented in the student-health record.

**R5.   Trainee Employee Assistance Program (TEAP) (See Exhibit 2-4, Job Corps Basic Health-Care Responsibilities.)**

Centers must provide basic TEAP services, as described below:

a.   The general emphasis of TEAP must be on prevention, education, identification of substance use problems, relapse prevention, and helping students overcome barriers to employability.

b.   Substance use prevention and education, to include:

1.   Minimum of a one-hour presentation on substance use prevention for all new students during the Career Preparation Period. This presentation must explain (1) TEAP prevention, education, and intervention services, (2) Job Corps drug and alcohol testing requirements and procedures, and (3) the consequences of testing positive for drug or alcohol use while in Job Corps

2.   Presentation(s) on managing substance misuse, abuse, and dependency symptoms and issues in the workplace for students during the Career Development and Transition Periods

3.   At least three annual center-wide substance use prevention and education activities

4.   Clinical consultation with Center Director, management staff, Center Mental Health Consultant, and Health and Wellness Director regarding substance use prevention and education efforts for students and staff

5.   Coordination with other departments/programs on center, to include, but not be limited to, residential, recreation, student government association, and HEALs, to develop integrated prevention and education services

c.   Assessment for identification of students at risk for substance use problems to include:

1.   Review of Social Intake Form (SIF) or intake assessment of all students performed by counseling staff within one week of arrival

2.   Formalized assessment measures (e.g., SASSI3 or SASSIA2), and clinical judgment to determine students' level of risk for substance use

3.   Collaboration with the Center Mental-Health Consultant to determine when a MSWR or medical separation is appropriate and should be recommended for a student with substance use conditions (see Chapter 2, Section 2.3, R5, e.5)

d.   Intervention services for students identified at an elevated risk for substance use, to include:

1. Individual and group intervention services with a focus on behaviors that represent employability barriers

2. Collaboration with the Center Mental-Health Consultant for students with co-occurring conditions of mental health issues and substance use

3. Referral to off-center substance abuse professionals or agencies for ongoing treatment and/or specialized services. Any student separating from Job Corps who has a substance use condition must be provided with a referral for support services in his or her home community

e. Drug and alcohol testing

1. Drug testing procedures:
   (a) Students in the following categories must be tested for drug use:
       (1) New and readmitted students must be tested within 48 hours of arrival on center.
       (2) Students who tested positive on entrance must be retested between the 37th and 40th day after arrival on center.
       (3) Students who are reasonably suspected[6] of using drugs at any point after arrival on center must be tested; this testing must take place as soon as possible after staff suspects use.
       (4) During a qualified emergency as defined in Section 3502(a)(4) of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, the procedures in R5.e.1(a)(1)-(3) are not applicable to students participating in distance learning off-center until they begin or resume on-site participation at a Job Corps center.

   (b) Biochemical testing is never permissible on a random basis, with the exception of designated licensed student drivers who are subject to 49 CFR Part 382 DOT Federal Motor Carriers Safety Administration. In addition, biochemical testing requested by work experience sites, union trades, or potential employers may only be performed by the requesting entity.

   (c) If a student refuses to provide a specimen or has an unexcused absence from his or her follow-up drug test, he or she shall be presumed guilty of the Level I infraction *Drugs: Use of drugs as evidenced by a positive drug test*. Students who state they are unable to produce a specimen must be referred to the center physician or designee for follow up.

   (d) Collection of urine for drug testing must be in accord with chain-of-custody principles and conducted by health and wellness staff or a staff member trained

---

[6] Reasonable suspicion is context specific, supported by specific and articulable facts, and may include (1) direct observation of drug use or behavioral signs or symptoms suggestive of drug use, or (2) specific reliable information that a student recently used drugs.

in urine collection procedures.

(e) The Job Corps nationally contracted laboratory must be used for all required drug testing. On-center urine drug testing is prohibited.

(f) Reinstated students cannot be subject to entry drug testing upon return to the center. Transfer students cannot be subject to drug testing upon arrival at receiving center. Both reinstated and transfer students shall be subject to testing for drugs upon suspicion of use only.

2. Alcohol testing procedures:
(a) Students who are reasonably suspected[7] of being intoxicated or consuming alcohol on center or under center supervision must be tested; this testing must take place immediately after staff suspects use.

(b) Centers must use devices that measure alcohol in the breath or saliva (e.g., breathalyzers or alcohol test strips/tubes/swabs). Alcohol testing must only be administered by a staff member trained in the use of these testing devices. All testing must be documented and the results submitted to the health and wellness center.

(c) If a student refuses to submit to a breathalyzer or provide a sample for alcohol testing, the student shall be presumed guilty of the Level I infraction *Alcohol: Possession, consumption, or distribution while on center or under center supervision.*

3. Students testing positive for drug or alcohol use:
(a) New students and readmitted students not previously separated for drug use Zero Tolerance (ZT separation code 5.2a); possession, use or distribution of drugs on center or under center supervision (ZT separation code 5.2b); possession, consumption, or distribution of alcohol while on center or under center supervision (ZT separation code 5.1b); or abuse of alcohol (ZT separation code 5.1b) who test positive on entry must receive intervention services and a follow-up drug test. The results of the follow-up drug test must be received on center prior to the end of the intervention period.

To remain in the program, students who test positive on entry must have a negative drug-test result at the end of the intervention period.

If an intervention period takes place during a center vacation period (i.e., winter break), the intervention period is suspended and resumes the day the student is scheduled to return to the center (e.g., if a student is on day #30 of his or her intervention period at the time of the center vacation, the day count will be

---

[7] Reasonable suspicion is context specific, supported by specific and articulable facts, and may include (1) direct observation of alcohol use or behavioral signs or symptoms suggestive of alcohol use, or (2) specific reliable information that a student recently used alcohol.

suspended at 30 days, and resume as day #31 the day, he or she is due back on center).  If a student does not report to the center on the day he or she is expected to return, the intervention period still resumes and the student is labeled an Unauthorized Absence.

If an intervention period takes place during off-center distance learning due to a qualifying emergency under the CARES Act, the intervention period restarts the day the student returns to the center to resume on-site participation.

Students who are an Unauthorized Absence on the day of their scheduled follow-up drug test shall be presumed guilty of the Level I infraction *Drugs: Use of drugs as evidenced by a positive drug test*.

(b) Readmitted students previously separated for drug use (ZT separation code 05.2a) that test positive on entry or any time during their second enrollment at Job Corps must be separated immediately without an intervention period. Such students shall not be allowed to reapply to Job Corps.

(c) Students who test positive for drug use by an off-center facility must be retested on center using the Job Corps nationally contracted laboratory as soon as possible, to include:
   (1) Work-based learning students who tested positive on a drug test administered by experience sites, union trades, or potential employers;
   (2) Students who tested positive on a drug test administered at a referral health facility (e.g., hospital emergency department, urgent care facility).

   This retest by the Job Corps nationally contracted laboratory must be classified as a suspicion-of-drug-use test. For students who test positive for drug use on this retest, centers must follow the same procedures outlined in (c) above.

(d) Student drivers who test positive for drug use under 49 CFR Part 382 DOT Federal Motor Carriers Safety Administration must follow the same procedures outlined in (c) above for positive suspicion tests. In addition, during the intervention period, student drivers who fall under DOT regulations are not permitted to drive.

(e) Students who test positive for alcohol use on suspicion must be referred to the TEAP specialist for assistance and the center's student conduct system for disciplinary action.

4.  Student notification of drug or alcohol test results
   (a) Students who test positive for drug use must be informed of their results by the TEAP specialist, Center Physician, or designee within 24 hours of receipt of positive result, or as soon as possible, given staff and student availability. Minor student's parent/guardian must be notified of positive test results as

required by applicable state laws for the state in which the center is located.

(b) Alcohol test results must be provided to the student by the person administering the test.

(c) Drug and alcohol test results must be shared only with center personnel who have a need to know for purposes of discipline, counseling, administration, and delivery of services (in accordance with 42 CFR, Part 2).

(d) If a student questions the validity of a confirmed positive drug test, he or she must be referred to the Center Physician or designee for counseling.

5. Medical Separations with Reinstatement Rights (MSWR) for substance use conditions:
   (a) Students may be given a MSWR for a diagnosed substance use condition, allowing the student to return to Job Corps to complete his or her training within 180 days. To return to Job Corps, proof of treatment completion from a qualified provider must be received.

   (b) A MSWR for substance use conditions can only be given if the following conditions are met:
       (1) The TEAP specialist and Center Director agree that the student has a diagnosed substance use condition.
       (2) There is a documented assessment of the student's diagnosed substance use condition by the TEAP specialist in collaboration with the center mental health consultant.

   (c) A MSWR cannot be granted in lieu of ZT separation when a positive follow-up test is reported during the intervention period.

   (d) If a student is placed on a MSWR during the intervention period, the intervention period is suspended and resumes the day the student is scheduled to return to the center.

### R6.  *Tobacco Use Prevention Program (TUPP)*

Implement a program to prevent the onset of tobacco use and to promote tobacco-free environments and individuals. To support this program, a TUPP Coordinator must be appointed (he or she need not be a health services staff member). At a minimum, this program must include:

a. Educational materials and activities that support delay and/or cessation of tobacco use

b. A smoke-free, tobacco-free environment that prohibits the use of all tobacco products in center buildings and center-operated vehicles

c.   Designated outdoor smoking areas located a minimum of 25 feet, or as required by state law, away from the building entrance

d.   Prohibition of the sale of tobacco products on center

e.   Adherence to federal and state laws regarding the use of tobacco products by minors

f.   Minors who use tobacco products must be referred to the TUPP

g.   All services provided should be documented in the student health record

### R7.   *Family Planning Program*

a.   A family planning program must be provided to all students on a voluntary basis. At a minimum, this program must include counseling, health promotion activities, and medical services, including birth control. The Center Director must appoint a staff member to implement and monitor this program.

b.   Students who are pregnant and/or experiencing pregnancy-related medical conditions must be afforded the same access to medical services, leave and medical separation as any other student experiencing a medical condition, unless otherwise provided by law.

c.   Once a center learns that a student is pregnant, pregnancy-related services must include:

1.   Prenatal services on center and/or in the community until separation, to include a comprehensive gestational record.

2.   The Center Physician, in conjunction with an obstetrical/gynecological provider and the student, will agree upon a care-management and separation plan that takes into account the health and safety of the pregnant student before and after childbirth.

3.   The center must identify available community health/social resources and services, and will make arrangements for transportation for the purpose of obtaining such resources and services consistent with Chapter 6, Section 6.7, R9.d. In lieu of the center providing transportation, the center may approve a student's request to be transported by a friend, partner or family member.

4.   The center cannot pay for an abortion unless the pregnancy is the result of rape or incest or unless a physician has certified that the student suffers from a physical disorder, injury, illness, or condition that places her in danger of death unless an abortion is performed.[8]

---

[8] The Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act of 2014, Title 5, Sec. 507(a) (P.L. 113-76) provides that the prohibition on the use of Federal funds for abortions described in Section 506 "shall not apply to an abortion (1) if the pregnancy is the result of an act of rape or incest; or (2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed."

5. A student that is experiencing a pregnancy-related medical condition may be placed on paid administrative leave in accordance with Exhibit 6-1 (see Pay status: Paid, Duty status: Not Present for Duty-Administrative Leave with Pay).

d. Pregnancy-related services must include information on the options of continuing or terminating the pregnancy.

e. If required by applicable state laws in which the center is located, the center must notify the student's parent/guardian of her pregnancy if she is a minor, and if required by applicable state law, inform the student of this requirement prior to the disclosure.

### R8.   HIV/AIDS

Centers must:

a. Test students for HIV infection under the following circumstances:

1. As part of the cursory medical examination (see Chapter 2, Section 2.3, R2.c)

2. If a student exhibits signs and/or symptoms of a possible AIDS-related condition

3. Upon reasonable suspicion of student exposure to HIV

4. When student is diagnosed with a newly contracted sexually transmitted disease

5. Upon student request and after physician consultation

b. Submit specimens for HIV testing to the nationally contracted laboratory. Centers shall not be reimbursed for HIV tests performed at other than the nationally contracted lab.

c. Provide pre-test counseling, in accordance with state laws, to all students regarding the HIV test.

1. Counsel each student about the test and its implications and document in the health record that the student received the HIV pre-test counseling and signed the "HIV Testing Information Sheet" in Form 2-02

2. Student refusal (see Chapter 2, Section 2.3, R15)

3. Testing waiver (see Chapter 2, Section 2.3, R15, Waiver of Medical Care)

d. Provide post-test counseling, in accordance with state laws, to all students regarding HIV test results:

1. **HIV Negative Students:** Individually inform and counsel (e.g., measures to

prevent HIV infection/transmission) all students with a negative HIV test result within 14 calendar days after receipt of test results.

2. **HIV Indeterminate Students:** Individually inform and counsel all students with an indeterminate HIV test result within five calendar days after receipt of test results. A student who has an indeterminate test result must be retested at three-month intervals until a conclusive test result (i.e., negative or positive) is obtained. If a conclusive result is not obtained within 6 months, no further testing is required.

3. **HIV Positive Students:**
   (a) **Inform and Counsel:** Individually inform and counsel all students with a positive HIV test result, preferably within 24 hours, but not later than 5 calendar days, after receipt of the written positive result. The Center Mental Health Consultant must be in attendance to assist in informing and counseling.

   (b) **Contact Notification:** HIV positive students must be instructed in how to notify their sexual contacts and intravenous drug contacts that they may have been exposed to HIV infection and to refer them for counseling and testing.

   The Center Physician or designee must report the student's HIV infection to the state and/or local health department, which will be responsible for contact notification both on- and off-center.

4. **Students Off-Center:** If a student is not on-center (e.g., Unauthorized Absence, Missing Minor Student, on leave) when his or her positive or indeterminate test result is received by the center, the Center Director or designee must make every attempt to contact and inform the student of his or her result. The health department at the student's location must be used to assist with the task of informing students who are no longer on-center.

5. Document post-test informing and counseling activities in the student's health record, including attempts to contact students not on-center (d.4 above).

e. Ensure that students who test positive for HIV infection are engaged in an interactive process to determine if an accommodation plan is needed (see center reasonable accommodation policy/process or national reasonable accommodation guidelines for specific requirements of accommodation process).

f. Ensure that students who test positive for HIV infection are engaged in case management for chronic illness on center.

g. Provide all students with information on HIV infection; including transmission and prevention (see Chapter 3, Section 3.4, R21, and Chapter 2, Section 2.3, R1).

### R9.   *Healthy Eating and Active Lifestyles*

Centers must provide students with an environment that supports healthy eating and active lifestyles, and provide students with education and experiences that promote lifelong health and physical well-being. At a minimum, this program must include the following components:

a.   Planning

   1.   Establish a Healthy Eating and Active Lifestyles Committee to oversee and coordinate this program. At a minimum, this committee must include the Health and Wellness Director, Food Services Manager/Supervisor, Recreation Supervisor or Specialist, TEAP Specialist, Residential Manager/Counseling Manager, and student representative.

   2.   Incorporate student interests and preferences when planning activities.

   3.   Demonstrate collaboration between various departments on center.

b.   Environment

   1.   Provide a variety of fitness activities open to all students, as outlined in Chapter 2, Section 2.2, R4.

   2.   Provide healthy eating selections and limit non-nutritious eating selections, as outlined in Chapter 5, Section 5.10, R3.

c.   Education and counseling

   1.   Provide educational activities and materials to all students that support regular physical activity, nutrition, and achieving a healthy weight, as outlined in Chapter 3, Section 3.4, R21.

   2.   Provide individualized weight management programming and/or counseling. Student participation in this program is highly recommended.

   3.   Incorporate motivational interviewing and goal setting at student's level of readiness for change.

d.   Assessment

   1.   Document, monitor, and assess program.

### R10.  *Health Aspects of Sports*

a.   All students participating in organized contact or rigorous sports (e.g., football,

basketball, boxing, and running) must be medically cleared by a health professional prior to participating. Physical examinations performed by center health personnel within one year of the organized sports activity can fulfill this requirement, at the discretion of the Center Physician. After one year, a current physical examination is required.

b.  A staff member trained in CPR/First Aid, with specific authorization in the center's standing orders, must be present at all organized contact or rigorous sports activities, including practice sessions and sports events.

c.  At a minimum, staff certified in CPR/First Aid must be present at all student boxing events and contact football games.

d.  In case of possible emergency, adequate transportation must be on the scene of all center-sponsored organized sports.

### R11. Basic Health Services Provided by Job Corps Centers

a.  Center operators are responsible for providing and paying for <u>basic</u> health care as detailed in Exhibit 2-4 (Job Corps Basic Health Care Responsibilities).

b.  Job Corps shall not pay for any health-related costs incurred by a student while on leave or pass unless previously authorized by the Center Director upon recommendation of a center health professional.

### R12. Health and Medical Costs Exceeding Basic Health Services Provided by Job Corps Centers

a.  Centers should assist students in seeking third-party health insurance coverage that will be available should the student have medical needs or costs beyond the basic health services provided by the center.

b.  If a student is determined to have a pre-existing or acquired health condition that significantly interferes with or precludes further training in Job Corps, or if a student is determined to have a health problem that is complicated to manage or for which necessary treatment will be unusually costly, the center must follow medical separation procedures (Chapter 6, Chapter 6, Section 6.2, R5, and Chapter 6, Section 6.2, R4.c.5) and determine whether referral to the Office of Workers' Compensation Programs (OWCP) is required (Chapter 5, Section 5.1, R40).

### R13. Professional Standards of Care

All center health staff and providers must follow accepted professional standards of care and are subject to prevailing state laws, including but not limited to:

a.  Maintaining a copy of current provider's license, Drug Enforcement Agency (DEA)

registration, and proof of liability insurance, if applicable, in center health facility.

b.   Documenting all prescribed medications and treatment in student health record.

c.   Documenting all laboratory procedures ordered and recording the results in student health record.

d.   Following current standards of care when providing health services and treating illnesses and injuries.

### R14. Medication Management (See Appendix 203, Medication Management Guidelines.)

a.   Centers must comply with all state and federal regulations regarding prescribed non-controlled medications, prescribed controlled substances, and over-the-counter medications.

b.   Centers must follow medication management guidelines as specified in Appendix 203.

### R15. Waiver of Medical Care

a.   The Center Physician/Nurse Practitioner (NP)/Physician Assistant (PA) may waive any portion of the medical examination and laboratory testing except for the entrance drug testing if in his or her opinion there is sufficient justification or if a student refuses. Such a waiver must be clearly documented by the Center Physician/NP/PA in the student's health record and include an explanation as to why the decision was made.

b.   The Center Physician/NP/PA may grant waivers of immunization requirements for valid **medical and/or religious reasons**. Such a waiver must be clearly documented by the center physician in the student's health record and include an explanation as to why the decision was made.

### R16. Health Care Guidelines

a.   All health-care guidelines must be approved and signed annually by the Center Physician, Center Mental Health Consultant, or Center Dentist, as appropriate.

b.   Current signed and dated health care guidelines must be kept in the Health and Wellness Center.

c.   Annually, each center must submit a memorandum to the Regional Office indicating which health care guidelines have been modified. Copies of any individual health staff authorizations and health care guidelines that have changed must be sent to the Regional Office for approval.  (Refer to Exhibit 5-2, Plan and Report Submission Requirements, for reporting deadlines.)

**R17. *Communicable Disease and Infection Control***

The center must:

a.  Report cases of disease to state and local health departments in accordance with state and local laws.

b.  Manage all cases of communicable disease and use protective measures as recommended by the Centers for Disease Control and Prevention (CDC).

c.  Biologically monitor the function of autoclaves and maintain a log of spore test results.

d.  Follow infection control measures as mandated by state and federal law.

**R18. *Inventory Records***

Maintain records on the dispensing, inventory, and disposal of medical and dental supplies and pharmaceuticals.

**R19. *Continuous Quality Improvement***

Center health staff must seek feedback from students, employ mechanisms to document quality of care provided, and document quality improvement activities.

## 2.4 DISABILITIES

### REQUIREMENTS

**R1. Disability Coordinators**

    a. The Health and Wellness Director (or a health staff designee) and Academic Manager (or an academic staff designee) will function as Disability Coordinators (DC) to oversee the program. Additional DCs may be appointed. Centers may choose to hire a full or part time DC to oversee the program rather than or in addition to appointing an academic and health DC.

    b. The roles and responsibilities of each DC will be defined in a standard operating procedure (SOP).

**R2. Disability Accommodations**

    a. Accommodations for Applicants and Students With Disabilities

        All applicants and students with disabilities must be provided the opportunity to request and receive reasonable accommodation in accordance with Section 188 of the Workforce Innovation and Opportunity Act of 2014 https://www.congress.gov/113/bills/hr803/BILLS-113hr803enr.pdf, Section 504 of the Rehabilitation Act of 1973 https://www2.ed.gov/policy/speced/leg/rehab/rehabilitation-act-of-1973-amended-by-wioa.pdf, and their implementing regulations. Guidelines for providing reasonable accommodation are outlined in Form 2-03, Definitions and Documentation Requirements Related to Reasonable Accommodations for Applicants and Students with Disabilities, and on the Job Corps Disability website.

    b. Definition of Disability

        For accommodation purposes, a disability is defined as a physical or mental impairment that substantially limits one or more of a person's major life activities.[9] Form 2-03 contains information explaining this definition, and related requirements, in detail. Whether a particular person has an impairment that satisfies this definition, and whether a specific accommodation is appropriate for a particular person, must be determined on a case-by-case basis by someone with appropriate expertise in the field.

**R3. Reasonable Accommodation Process**

    a. An applicant or student with a disability may request and receive reasonable accommodation to participate in the Job Corps program at any time during the

---

[9] Applicants and students who have a record of a disability, or who are regarded as having a disability, are protected from discrimination by federal disability nondiscrimination laws. However, the laws do not entitle these people to the positive actions, such as reasonable accommodations, that must be provided to applicants and students with current disabilities.

admissions process or enrollment. Each center will have a process for ensuring applicants/students with disabilities who request accommodation, indicate they may need accommodation, and/or provide documentation of a disability are engaged in an interactive process to consider/determine the functional limitations resulting from their disability and the potential accommodations that would allow them to participate in the Job Corps program. An SOP describing this process is required (see Exhibit 5-1) and the center's reasonable accommodation process will include all the components outlined in Form 2-03.

b.   The DCs will coordinate the center's reasonable accommodation process.

c.   During Career Transition Readiness all students will receive information about workers' rights and responsibilities including reasonable accommodation in the workplace (see Chapter 3, Section 3.4, R23, k).

### R4.   *CIS Disability Data Collection and Accommodation Plans*

a.   A DC will accurately enter the required data in the disability data collection and accommodation plan icons in CIS as soon as possible after the student enters the program.

b.   For students who require TABE testing accommodations, this data will be entered prior to the administration of the first TABE test.

c.   Only the DCs will have access to the disability data collection entry screen, disability data report and the accommodation plan report with notes report in CIS.

d.   Generally, only the DCs will have access to the accommodation plan entry screen; however, if a designee is appointed to enter accommodation plans, this staff person can have access.

e.   All center staff responsible for providing accommodations will have access to the accommodation plan report in CIS.

f.   Accommodation plans will not contain any medical or diagnostic information.

### R5.   *Referral Process*

a.   A written referral/feedback system must be established to document a referral to the DCs when a student discloses a disability and may want reasonable accommodation or staff suspects a student may have a disability that is impacting his/her success in the program and should meet with the DCs to consider reasonable accommodation.

b.   All referral forms will be stored in the student's accommodation file or in the student health record if no accommodation file exists.

## 2.5 STUDENT CONDUCT

**R1.  *Incentives***

Centers must develop processes to recognize students for positive behavior and performance, including rewards and what students must do to earn them.

**R2.  *Rules and Sanctions***

Centers must:

a.  Develop standards of conduct, including rules and sanctions. Conduct standards must:

1.  Parallel workplace expectations to the extent possible.

2.  Include, at a minimum, those infractions and corresponding actions in Job Corps' Zero Tolerance Policy, as detailed in Exhibit 2-1 (Infraction Levels, Definitions, and Appropriate Center Actions).

b.  Implement progressive disciplinary measures for behaviors identified as Minor Infractions, as defined in Exhibit 2-3 (Menu of Progressive Discipline Interventions and Sanctions for Minor Infractions).

c.  Prohibit the use of the following sanctions:

1.  Corporal punishment and measures designed to humiliate or degrade the student

2.  Physical force or solitary isolation (Physical restraint may be used only to the minimum extent necessary and only in situations that seriously threaten persons or property.)

3.  Dorm cleanup, kitchen duty, or other regular housekeeping chores used as a punishment

4.  Suspension of privileges for the dining hall, canteen, voting, religious services, or pay and allowances

5.  Restrictions to center in excess of 30 days

6.  Fines in excess of $5 per offense or per pay period

7.  Restitution in excess of $500 per enrollment

8.  Forced resignation from the program

**R3.   *Investigation and Disposition of Incidents***

a.   Centers must conduct investigations and Fact-Finding Boards (FFB) as follows:

1.   Convene Fact-Finding Boards in accordance with the requirements in Exhibit 2-2 (Requirements for the Conduct of Fact-Finding Boards).

2.   Provide Fact-Finding Boards with a written investigative report of the incident under consideration.  Boards may only consider evidence relevant to the infraction.

3.   Recommend appropriate sanctions in keeping with the level of infraction as shown in Exhibit 2-1 (Infraction Levels, Definitions, and Appropriate Center Actions).

4.   Report the outcomes of Fact-Finding Boards on the "Summary of Review Board Hearing" form and document the date and disposition of the Fact-Finding Board in Center Information System (CIS) within 48 hours of its completion.

b.   The National Director may suspend the timeframes for the Fact-Finding Board to issue its decision, if the student subject to the Fact-Finding Board is also the subject of an active police investigation.

**R4.   *Appeal Process***

Centers must develop a process for the appeal of disciplinary decisions, consistent with Exhibit 2-2.  The appeal process must, have the following features at a minimum:

a.   Students must be allowed to appeal disciplinary decisions from lower organizational levels to higher ones.

b.   Students must be notified in writing of their right to appeal a decision of the Center Director, resulting in dismissal from the program, to the Regional Appeals Board (RAB).  Student appeals must be made within 30 calendar days of their separation.

**R5.   *Regional Appeals Board***

In an effort to ensure due process, each Regional Office will establish a Regional Appeals Board (RAB) to review student appeals of disciplinary discharge from the Job Corps program. The RAB must operate as follows:

a.   The Regional Director will determine the composition of the RAB.

b.   In reviewing cases, the RAB must utilize only written documentation to include, at a minimum, the student's appeal letter intended to preserve the student's due process, and the record of the student's hearing at the center. The RAB will not hear oral testimony from interested parties.

c.  The RAB must rule on student appeals within 30 calendar days of the receipt of the student's appeal letter.

d.  In making a decision, the options open to the RAB are to:

    1.  Affirm the Center Director's decision to discharge the student.

    2.  Overturn the Center Director's decision to discharge the student.

    3.  Recode the separation (for zero tolerance offenses).

    4.  Remand the case to the center for rehearing.

    5.  Request additional information from the center and delay the RAB meeting to a later date.  Notify the center and student if the decision will be extended beyond the 30 calendar days for appeal resolution.

e.  If the RAB determines that all three of the following conditions are met, the RAB must affirm the disciplinary discharge of the student.

    1.  There is substantial evidence to support the alleged facts of the case.

    2.  The procedural requirements of the law and Job Corps policies were adequately met.

    3.  The facts of the case constitute an offense for which disciplinary discharge is permitted.

f.  If the RAB determines from the record that either of the following conditions pertain, the RAB must reverse the disciplinary discharge.

    1.  The evidence provided does not support the facts alleged.

    2.  The facts are supported by the evidence presented, but these facts do not constitute an offense for which disciplinary discharge is permitted.

g.  If the RAB determines that substantial procedural requirements were not met, the RAB may take either of the following actions.

    1.  It may reverse the Center Director's decision to discharge.

    2.  It may remand the case to the center for rehearing.

h.  If the RAB determines that there is not enough information in the record to make a determination, the RAB may delay the RAB meeting to another date and request additional written information from the center, the student, or any other source.  The

RAB must provide all interested parties an opportunity to respond to the additional information before the RAB makes its final decision. The RAB must notify the center and student if the delay will extend beyond the 30 calendar day resolution period.

i.  If the RAB overturns the decision of a Center Director to discharge a student from the program, the Regional Office must reestablish the student as follows:

   1.  If the student is allowed to resume training at the same center, the center must reestablish the student in the Center Information System (CIS) and arrange for the student's immediate return to the center.

   2.  If the student is transferred to another center, the sending center must take the following actions:

      (a) Re-establish the student in CIS

      (b) Initiate the transfer in CIS

      (c) Provide the student with transportation and an itinerary to the receiving center

      (d) Provide a complete copy of the student's personnel record (including medical records) to the receiving center

j.  Manage an automatic appeal of felonies/misdemeanors (dropped charges/not guilty) as follows:

   1.  If the student is found not guilty, or if the charges are dropped, the center will forward the case to the RAB for disposition.

   2.  The RAB will decide if the student should be:
      (a) Re-established at the same center
      (b) Re-established and transferred to another center
      (c) Re-entered into CIS with a different code

   3.  The center must complete appropriate CIS entries as advised by the RAB.

k.  Regional Offices must maintain a log of all cases reviewed by the RAB and the disposition of the cases.

l.  RAB decisions must be communicated in writing to the student and the center.

m. RAB decisions are final and represent the official decision of the Secretary of Labor.

### R6.   *Bullying and Sexual Harassment Training*

Centers must provide students regular proactive education on bullying, sexual harassment, appropriate behavior, appropriate staff/student boundaries, and consequences.

## 2.6  EVALUATION OF STUDENT PROGRESS

**REQUIREMENTS**

*R1.  Evaluation of Student Progress*

Centers must:

a.  Inform all new students that they will be formally evaluated at least every 60 days on their knowledge of and ability to demonstrate all eight Career Success Standards.

b.  Ensure that each student participates in ongoing evaluations, with appropriate staff, at least every 60 days.

c.  Arrange for each student's interdepartmental Career Management Team (CMT) to conduct a formal evaluation prior to the student's entry into the Career Development Period (CDP) and the Career Transition Period (CTP), at a minimum.

d.  Schedule special evaluations as needed, at any time during a student's enrollment.

*R2.  Content of Evaluations*

Centers must:

a.  Assess each student's progress in all major career development areas: academics, career technical training, industry certification attainment, work-based learning, career pathway preparation, social development, and recreation using the Evaluation module in CIS, including documentation of student progress in the My Pathway to Achieving Career Excellence (MyPACE) Career Plan and Pathway Achievement Record (PAR) tasks.

b.  Evaluate student performance on all eight Career Success Standards as well as any additional expectations the center wishes to evaluate.

c.  Provide each student with a schedule of individualized projects and activities to assist him or her in meeting the Career Success Standards in which a "Needs Improvement" rating is received.

d.  Collaborate with students in setting, affirming, and/or revising short-term, mid-term, and long-term personal, training, and career goals using the student's MyPACE Career Plan and Pathway Achievement Record (PAR):

1.  Review the student's mid-term career (placement) goal, PAR, and supporting documentation of completed tasks.

2.  Confirm the student's career pathway remains appropriate (Review Exhibit 2-5

Placement Pathway Prerequisites for Entry).

3. If the student requests a change in their mid-term pathway goal, the center must take the following action steps:

   (a) Student must submit a justification statement for mid-term career pathway change.
   (b) Interdepartmental CMT must review and agree with career pathway change; assist student in revising MyPACE Career Plan, and assign new PAR.
   (c) Center Director or designated senior manager must approve the revised MyPACE Career Plan and assignment of new PAR.

4. At a minimum, update the student's MyPACE Career Plan and PAR as a result of each evaluation, to reflect accomplishments and goal revisions.

e. Ensure students are evaluated by career development staff who are in and have direct contact with the students, such as counselors, instructors, residential advisors/residential counselors, and work site supervisors. Require evaluators to discuss their evaluations with students privately and in person.

f. Provide each student with an updated copy of his or her MyPACE Career Plan and PAR following each evaluation or whenever the plan or career pathway is changed, and upload revisions into the Center Information System (CIS) e-Folder.

### R3. *Transition to Career Development Period*

Centers must:

a. Ensure that each student receives ongoing evaluations, conducted by an interdepartmental Career Management Team (CMT).

b. Ensure each student's interdepartmental (CMT) conducts a formal evaluation prior to the student's entry into Career Development, which assesses the student's progress, determine readiness to participate, and identifies any needs for support services.

c. Collaborate with the student to review, verify, and finalize his or her initial My Pathway to Achieving Career Excellence (MyPACE) Career Plan, including:

   1. Short-term training goals (career technical training program selection and academic goal)

   2. Mid-term career goal (job placement, apprenticeship, advanced training, military enlistment, or post-secondary education). An assessment to determine if the career pathway is appropriate for the student (Refer to Exhibit 2-5 Placement Pathway Prerequisites for Entry)

3.  Long-term career goal (ultimate career that the student will progress toward)

4.  Tasks associated with career development and transitional needs as identified in Chapter 2, Section 2.1, R4 My Pathway to Achieving Career Excellence Career Plan

d.  Collaborate with each student to identify Career Success Standards that support their MyPACE Career Plan.

e.  Schedule support services for each student, as needed, to address barriers to full participation in Career Development.

f.  Assign each student to Career Development activities based on their individual progress and readiness to participate.

g.  Assign student a Pathway Achievement Record (PAR) based on his/her mid-term placement goal (direct job placement, apprenticeship, advanced training, military enlistment, or postsecondary education). The interdepartmental CMT will assign staff during the Career Development Period (CDP) to:

1.  Monitor, assist, and support the student in the completion of PAR tasks and activities, including transitional needs.

2.  Identify completion timelines and follow up.

h.  Ensure career plans include signatures from representatives for each department identified on the career plan.

i.  Submit each student's initial MyPACE Career Plan to the Center Director or senior management designee for review and approval. (Reference Form 2-06 MyPACE Career Plan Checklist and Exhibit 2-5 Placement Pathway Prerequisites for Entry)

j.  Retain a copy of approved MyPACE Career Plan and PAR in each student's permanent personnel file and upload any updated versions in the student's e-Folder.

## EXHIBIT 2-1
## INFRACTION LEVELS, DEFINITIONS, AND APPROPRIATE CENTER ACTIONS

**LEVEL I – ZERO TOLERANCE INFRACTIONS**

| INFRACTION | DEFINITION | CENTER ACTION | READMIT ELIGIBLE | SEPARATION CODE | Significant Incident Report (SIR) Required? |
|---|---|---|---|---|---|
| **Possession of a weapon on center or under center supervision** | Knowingly possessing an instrument whose primary use is to inflict bodily harm, including, but not limited to: <br> • Firearms and ammunition <br> • Explosives and incendiaries <br> • Knives <br> • Homemade weapons <br><br> Example: A knife is found in a student's locker. The Fact-Finding Board determines the knife belonged to the student. <br><br> Example: A knife is found in a student's locker. The Fact-Finding Board determines the knife was placed there by another student for the purpose of getting the student kicked out of the program, and the student did not know it was there. In that case, the Fact-Finding Board would determine that the student did not knowingly possess the weapon and would not be found responsible for the infraction. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| **Assault** | Taking a physical action with the intent to cause immediate bodily harm to another person unless taken in immediate response to another person taking such an action with the intent to prevent its continuation. <br><br> Example: A student (aggressor) strikes another student (victim). The victim defends him or herself by tackling the aggressor in an attempt to stop further assault. Upon investigation, the aggressor is charged with assault, but the victim is not. However, if the victim had become a secondary aggressor and proceeded to pummel the initial aggressor, then both would be charged with assault. <br><br> Example: A student (aggressor) attempts to strike another student (victim) and misses. The aggressor is charged with assault because the aggressor intended to cause bodily harm. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |

Exhibit 2-1 (Page 2)

| LEVEL I – ZERO TOLERANCE INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| INFRACTION | DEFINITION | CENTER ACTION | READMIT ELIGIBLE | SEPARATION CODE | Significant Incident Report (SIR) Required? |
| Threat of assault | Taking any action that intentionally causes another person to fear imminent bodily harm.<br><br>Example: One student raises a tray in the cafeteria as if to strike another student to intentionally cause fear. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| Threat to safety | Taking any action that causes another person to reasonably fear bodily harm, including threats expressed verbally or via email, text, blog or social media.<br><br>Example: A student uses social media to invite members of the community to come fight another student on center.<br><br>Example: A student makes a terroristic threat to bomb a dormitory. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| Sexual assault | Causing or engaging in sexual contact, or inappropriate touching of a sexual nature of another, without the voluntary, affirmative consent of all individuals involved.<br><br>Example:<br>• Forced sexual intercourse or sodomy<br>• Attempted rape<br>• Child molestation<br>• Fondling/groping | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |

Exhibit 2-1 (Page 3)

| LEVEL I – ZERO TOLERANCE INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Drugs: Possession or distribution of drugs on center or under center supervision** | Knowingly possessing, using, or distributing any of the following:<br>• Illegal drugs, as defined by the Controlled Substances Act including seeds and residue, except when the drug is possessed and/or used in accordance with a valid prescription<br><br>Note:  Under Federal law, no valid prescription can be provided for Schedule I drugs, including marijuana<br><br>• Synthetic drugs<br>• Legalized marijuana<br>• Prescription drugs not prescribed for the individual<br>• Substances used for the purpose of intoxication<br>• Over-the-counter medications for the purpose of intoxication<br>• Drug paraphernalia<br>• Drug sale ledger or distribution list | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.2b | Yes |

Exhibit 2-1 (Page 4)

| LEVEL I – ZERO TOLERANCE INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| INFRACTION | DEFINITION | CENTER ACTION | READMIT ELIGIBLE | SEPARATION CODE | Significant Incident Report (SIR) Required? |
| **Drugs: Use of drugs as evidenced by a positive drug test** | • Testing positive on a follow-up to an initial positive drug test.  The follow-up test is administered between the 37th and 40th day after arrival on center.<br>• Testing positive on a drug test administered on suspicion at any time.<br><br>NOTE: Job Corps has a policy of Zero Tolerance for drug use once the student is enrolled in the program. However, students with a history of drug use are not automatically disqualified from enrolling in Job Corps. As described in Chapter 2, Section 2.3, R5, students will be tested within 48 hours of initial arrival to the center. An initial positive drug test is considered to reflect drug use prior to the student's enrollment. Students who test positive are provided intervention services and retested between the 37th and 40th day after arrival on center, at which point a positive test is a Level I infraction.<br><br>NOTE: Students who refuse to provide a specimen or have an unexcused absence from a follow-up drug test shall be presumed guilty of this infraction. | Fact-Finding Board, automatic discharge if deemed responsible | Eligible after one year, but if individual tests positive for drug use upon readmission, they will be separated immediately and not allowed to reapply | 5.2a | Yes |

| LEVEL I – ZERO TOLERANCE INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Alcohol: Possession, consumption, or distribution while on center or under center supervision** | While on center or while off center but on a center-supervised activity, knowingly:<br>• Possessing alcohol<br>• Consuming alcohol<br>• Distributing alcohol to others<br><br>NOTE: Students who are aged 21 or older may drink alcohol when off center and not under center supervision; however, they cannot bring alcohol onto the center.<br><br>In addition, if students of any age return to the center intoxicated, it is categorized as a Level II "intoxication" infraction described below.<br><br>NOTE: Students who refuse to submit to a breathalyzer or provide a sample for alcohol testing shall be presumed guilty of this infraction. | Fact-Finding Board, automatic discharge if deemed responsible | Eligible after one year | 5.3c | Yes |
| **Abuse of Alcohol** | A pattern of alcohol consumption-related incidents demonstrated by receiving more than two Level II "Intoxication on center or under center supervision" infractions where the intoxication is the result of alcohol while enrolled in the program. The 3rd infraction elevates the behavior to Level I Abuse of Alcohol. | Fact-Finding Board, automatic discharge if deemed responsible | Eligible after one year | 5.3c | Yes |
| **Arrest for a felony or violent misdemeanor on or off center** | • Being arrested by law enforcement for a felony.<br>• Being arrested by law enforcement for a misdemeanor involving the use, attempted use, or threatened use of physical force against the person or property of another.<br><br>NOTE: If the student is subsequently found guilty of only a non-violent misdemeanor, as defined below, he/she shall instead be charged with committing the Level II infraction "Arrest for a non-violent misdemeanor on or off center".<br><br>If the charges are dropped or if the student is found not guilty, he/she will be exonerated. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |

| LEVEL I – ZERO TOLERANCE INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Illegal Activity** | Being convicted of a felony or misdemeanor as defined by Federal or state law, where the crime occurred while the student was enrolled in Job Corps. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| **Robbery or extortion** | Taking money or possessions of another from his/her person by force or intimidation. | Fact-Finding Board, automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| **Arson** | The malicious setting of fire to a structure or personal property belonging to another person or entity. | Fact-Finding Board, Automatic Discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| **Cruelty to animals** | The torture, ill-treatment, abandonment, willful infliction of injury or pain, beating, maiming, mutilating, or killing of any animal, whether belonging to the individual or another. | Fact-Finding Board, Automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |
| **Inciting a disturbance or creating disorder** | Persuading, encouraging, instigating, taunting, pressuring or threatening persons to disrupt a peaceful situation. Causing disorder or disrupting a peaceful situation. | Fact-Finding Board, Automatic discharge if deemed responsible | Not Eligible | 5.1a | Yes |

| LEVEL II INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Possession of a potentially dangerous item** | Knowingly possessing, without authorization or legitimate purpose, an instrument or substance that could readily be used to inflict bodily harm.<br><br>Example: Box cutter, scissors, trade tools, drain cleaner. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |
| **Theft/stealing** | Taking the property of another person or entity, with the intent of permanently depriving the owner. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |

| LEVEL II INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Intoxication on center or under center supervision** | While on center or while off center but on a center-supervised activity, exhibiting a state in which one's capacity to act or reason normally has been inhibited by the ingestion of a substance with the intent to cause such a state.<br><br>NOTE: Suspected intoxication from use of alcohol may be confirmed by a breathalyzer test if alcohol is found in the breath or saliva. However, this definition includes intoxication as a result of substances other than alcohol, so a negative breathalyzer does not preclude a student from being charged with an intoxication infraction.<br><br>NOTE: Possessing, consuming, or distributing alcohol while on center or while off center but on a center- supervised activity is categorized as a Level I infraction, as described above. | Fact-Finding Board | Eligible after 1 year | 5.3b | Yes |
| **Possession of stolen goods** | Possessing items that one knows, or reasonably should know, are stolen. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |
| **Bullying or harassment** | • Making repeated (2 or more instances) communications with the intent to threaten or hurt another person mentally or emotionally, including statements made orally, in writing or via email, blog, text or other social media.<br>• Making discriminatory remarks or ethnic slurs.<br>• Performance of curses, hexes, or other rituals or actions intended to harm others. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |

| LEVEL II INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Sexual harassment** | Making an unwelcome sexual advance(s), request(s) for sexual favors, sexually offensive remark(s), a sexual gesture(s) or other communication(s) of a sexual nature that contribute to an intimidating, hostile or offensive environment. Depending on its severity, a single incident may constitute sexual harassment. Harassment does not have to be of a sexual nature, however, and can include offensive remarks about a person's gender including behavior, comments, jokes, slurs, email messages, pictures or other conduct that contributes to an intimidating or offensive environment.  Sexual harassment may occur between males and females or between members of the same sex.<br><br>Example: A student tells an offensive joke, warranting on-the-spot intervention and counseling that the joke is inappropriate. The student continues to tell offensive jokes, which is then deemed sexual harassment.<br><br>Example: An overly explicit unwanted sexual advance. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |
| **False accusation** | Making a false accusation against another individual that could have resulted in a Level I infraction or staff disciplinary action, without any credible supporting evidence. | Fact-Finding Board | Eligible after 1 year | 5.1b | No |
| **Unfair money lending** | Lending money and either demanding repayment with interest or using intimidating methods to obtain repayment. | Fact-Finding Board | Eligible after 1 year | 5.1b | No |
| **Hazing or initiation** | Participating in any ritual, ceremony, ordeal or other activity that involves humiliating or verbally or emotionally abusing someone as a way of admitting him/her into a group or of granting him/her status. It shall not constitute a defense to the charge of hazing or initiation that the participant(s) took part voluntarily, that they voluntarily assumed the risks or hardship of the activity, or that no physical or mental injury was suffered. All participants engaged in a hazing or initiation activity are subject to disciplinary action. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |

| LEVEL II INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Gang representation or activity** | Wearing of gang clothing, colors; using signs or handshakes associated with known gangs identified by law enforcement; using gang names or displaying gang symbols or slogans. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |
| **Vandalism** | Intentionally damaging or destroying equipment or property belonging to another person or entity, including tagging. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |
| **Plagiarism** | Passing off the ideas or words of another as one's own without crediting the source.<br><br>Example: Copying a report from the internet and submitting as one's own work. | Fact-Finding Board | Eligible after 1 year | 5.1b | No |
| **Cheating** | • Providing questions/answers to another student during a test.<br>• Receiving questions/answers from another student during a test.<br>• Using online resources during a test. | Fact-Finding Board | Eligible after 1 year | 5.1b | No |
| **Arrest for a non-violent misdemeanor on or off center** | Being arrested by law enforcement for a misdemeanor that does not involve the use, attempted use, or threatened use of physical force against the person or property of another.<br><br>NOTE: Violent misdemeanors are categorized as Level I infractions and defined above.<br><br>If the charges are dropped or if the student is found not guilty, he/she will be exonerated. | Fact-Finding Board | Eligible after 1 year | 5.3b | Yes |
| **Bringing disrepute to the program** | Behaving in a manner that is likely to cause others to have a diminished or lower opinion of the center or the Job Corps program.<br><br>Example: While off center, creating some kind of disturbance in the community that did not result in an arrest (rowdy behavior which bothered citizens or merchants).<br><br>Example: Video recording occurrences of Level I, II, or III Infractions (such as videos of fights) and posting the footage on the internet. | Fact-Finding Board | Eligible after 1 year | 5.1b | Yes |

Exhibit 2-1 (Page 10)

| LEVEL II INFRACTIONS | | | | | |
|---|---|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **READMIT ELIGIBLE** | **SEPARATION CODE** | **Significant Incident Report (SIR) Required?** |
| **Pattern of minor infractions** | Receiving more than 4 minor infractions within a 60 calendar day timeframe.<br><br>The 5th infraction elevates the behavior to Level II, Pattern of Minor Infractions. | Fact-Finding Board | Eligible after 1 year | 5.3a | No |
| **Unauthorized Exit** | Leaving the Job Corps center campus or a center-supervised activity without approval from a staff member authorized to approve student leave and passes.<br><br>Example: A student leaves campus for any reason such as meeting a friend, conducting personal business, etc. without first securing appropriate approval. | Fact-Finding Board | Eligible after 1 year | 5.3d | Yes |

| MINOR INFRACTIONS | | | |
|---|---|---|---|
| **INFRACTION** | **DEFINITION** | **CENTER ACTION** | **Significant Incident Report (SIR) Required?** |
| **Failure to follow center rules impacting the rights or ability of others to benefit from the program** | Exhibiting a pattern of behavior infractions that impacts the rights of other enrollees or their ability to benefit from the program, including:<br>• Using profanity, or abusive or obscene language<br>• Interfering with the learning of others through disruptive behavior<br>• Smoking in unauthorized areas<br>• Cutting lines<br>• Maintaining or operating a private vehicle on center<br>• Gambling<br>• Failing to follow safety rules<br><br>Example: Failure to use safety equipment and protective gear; horseplay; misuse of tools. | Progressive interventions:<br>More than 4 occurrences during a 60 calendar day period results in automatic Level II infraction and Fact-Finding Board | No |
| **Failure to follow center rules impacting the individual's participation or progress in the program** | Exhibiting a pattern of behavior infractions that demonstrates the individual's lack of commitment to program participation or implicates self-endangerment including:<br>• Refusing to perform assignments<br>• Failing to follow instructions<br>• Being absent or excessively tardy without permission from assigned activity including work, classes, and scheduled health appointments<br>• Engaging in overt sexual behavior<br>• Violating center dress code | Progressive interventions:<br>More than 4 occurrences during a 60 calendar day period results in automatic Level II infraction and Fact-Finding Board. | No |

## EXHIBIT 2-2
## REQUIREMENTS FOR THE CONDUCT OF FACT-FINDING BOARDS

| Conduct of Fact-Finding Boards | | |
|---|---|---|
| | **Level I** | **Level II** |
| **TIMEFRAME** | Decision within 3 training days | Decision within 5 training days |
| **COMPOSITION** (Does not include Center Director (CD), Center Standards Officer (CSO), Counselor, or Security) | One senior staff member | Two staff, one student |
| **STUDENT PARTICIPATION** | Student removed from center immediately and placed on Fact-Finding Board Leave. | Student removed from center immediately and placed on Fact-Finding Board Leave if determined to be a threat to self or others, in accordance with the PRH |
| **STUDENT RIGHTS** | May provide written input for consideration | • If on center, appear before Board<br>• May make written input to Board |
| **CONSIDERATIONS** | Fact finding only | • Fact finding<br>• Seriousness of infraction<br>• Mitigating circumstances |
| **BOARD DETERMINATION** | Confirm documentation is present (incident report, witness and staff statements and/or other paperwork relevant to the specific charge(s))<br><br>If documentation supports charges, confirm responsibility, sign summary and forward packet to CD<br><br>If documentation is inadequate to support charges, request additional information or reduce charges and forward packet to CD | Consider documentation (incident report, summary, witness and staff statements and or other paperwork relevant to the exact charge)<br><br>Boards may not use, review, or consider Evaluations of Student Progress, or non-supporting statements at Board unless directly related to charge(s)<br><br>Vote, without the charged student present, to determine responsibility and make a recommendation to CD for retention or separation<br><br>Forward packet with recommendation to CD for decision |
| **DISPOSITION OF RESPONSIBILITY** | Automatic discharge/separation Level I Zero Tolerance | Presumption of discharge |
| **DOCUMENTATION** | Form: Summary of Fact-Finding Board Determination signed by Board member<br><br>CIS: Enter the exact date the Fact-Finding Board was held and its final disposition. | Form: Summary of Fact-Finding Board Hearing signed by Board members<br><br>CIS: Enter the exact date the Fact-Finding Board was held and its final disposition. Provide rationale if Board recommendation is not upheld. |
| **CENTER DIRECTOR'S ROLE** | If paperwork supports charges, sign summary and initiate separation processing | Review the Board's recommendation<br><br>Determine if recommendation is to be upheld, overturned, or if charges are to be reduced; sign decision and provide rationale if Board recommendation is not upheld |
| **STUDENT NOTIFICATION** | In writing | Verbally (if present on center), and in writing |
| **APPEALS** | May appeal to Regional Appeal Board (RAB) within 30 days | May appeal Board decision to CD, and CD's decision to Regional Appeal Board within 30 days |

## EXHIBIT 2-3
## MENU OF PROGRESSIVE DISCIPLINE INTERVENTIONS AND SANCTIONS FOR MINOR INFRACTIONS

| Minor Infractions:  Menu of Progressive Discipline Interventions and Sanctions | | | | |
|---|---|---|---|---|
| Select a minimum of one intervention and one sanction from the lists below for Minor Infractions. | | | | |
| 1st Offense | 2nd Offense | 3rd Offense | 4th Offense | 5th Offense in 60 Calendar Day Period |
| **Interventions:**<br>• Counseling referral<br>• Verbal apology<br>• Peer counseling | **Interventions:**<br>• Counseling referral<br>• Wellness referral (if applicable)<br>• Written and verbal apology<br>• CSS essay or assignment related to CSS skill deficiency<br>• Community service (4 hours) | **Interventions:**<br>• Individual or group counseling referral<br>• Community service (6-8 hours)<br>• Assignment to and meetings with adult mentor<br>• Intervention with relevant staff member<br>  o Equal Employment Opportunity (EEO) Officer for discriminatory behavior<br>  o Safety Officer for safety violations | **Interventions:**<br>• Referral to Center Standards Officer<br>• Community service (8- 10 hours) | Elevate to Level II, Pattern of Minor Infractions and refer to Fact-Finding Board for Adjudication |
| **Sanctions:**<br>• $1 fine<br>• Verbal or written reprimand | **Sanctions:**<br>• $2 fine<br>• Letter of caution<br>• Weekend restriction | **Sanctions:**<br>• $3 fine<br>• Behavior contract<br>• 7-day restriction | **Sanctions:**<br>• $5 fine<br>• Behavior contract<br>• 7-day restriction | |

Notes:
- As reflected in the Center's Behavior Management Plan, Peer Court may be incorporated into the Progressive Discipline process to recommend the appropriate interventions and sanctions.
- Interventions must be tailored to address specific skill deficiencies identified in the infraction report.
- CSS refers to Career Success Standards.

## EXHIBIT 2-4
## JOB CORPS BASIC HEALTH CARE RESPONSIBILITIES

A.    Medical

    1.    Assessment and diagnosis of illness and injury, to include:
- Cursory medical evaluation by a qualified health professional; must be completed within 48 hours after the student's entry.
- Entrance physical examination by a qualified health professional within 14 days after entry using Job Corps approved history and physical forms.
- Required entry laboratory studies
  - Hemoglobin or hematocrit
  - Pregnancy test (all females)
  - Pap smear (all females ≥ 21 years of age)
  - Chlamydia and gonorrhea testing
  - HIV testing
  - Urine drug screen
- Immunizations, to include boosters for incomplete immunization series, and hepatitis B vaccine for health occupations training students.
- Tuberculin skin test (Mantoux).
- Vision and hearing screening.
- Daily walk-in clinic and appointment system for above and for episodic illness or injury assessment by center physician and/or nurse.
- Inpatient unit visits for minor conditions, such as respiratory infections, or flu symptoms.

    2.    Treatment, as highlighted below, will be provided when necessary. Third-party payer information will be given to providers when off-center care is required.
- Primary emergency care for illness and injury, including first aid and CPR, and secondary care within capabilities, e.g., injection of epinephrine, and immediate transfer to hospital emergency room for specialized diagnosis and treatment, if needed.
- Treatment of urgent and other conditions not needing specialized care and that are within the capabilities of qualified health professionals on staff.
- Management of chronic health conditions as directed by qualified health professionals.
- Referral to off-center physicians for detailed specialized assessment.
- Access to prescription medications.

    If a student sustains an on-the-job injury that requires extensive or specialized treatment, he or she will be medically separated as a Medical Separation with Reinstatement Rights (MSWR) and a referral will be sent to the Office of Workers' Compensation Programs (OWCP).

B.    Oral Health

    1.    Assessment and diagnosis, to include:
- Dental readiness inspection within 14 days after entry to identify urgent care need for oral conditions that if not treated are expected to result in dental emergencies in the near future.
- Elective oral examination upon student request, including x-rays to precede dental treatment.

    2.    Treatment, to include:
- Dental procedures to treat oral disease and correct oral health conditions that may represent employability barriers. Specific procedures include:
  - o  Restorations
  - o  Extraction of pathological teeth
  - o  Root canal therapy on anterior and other strategic teeth
  - o  Replacement of missing upper anterior teeth with a removable prosthesis
  - o  Dental hygiene treatment that involves nonsurgical periodontal care to treat periodontal disease
- Referral to off-center facilities as necessary for emergent or urgent conditions treatable beyond the expertise of a general dentist.

    3.    Oral disease prevention education and management, to include:
- Oral strategies, such as oral hygiene instruction, risk assessments, and group education.
- Oral-health promotion activities with an emphasis on overall wellness and employability.

C.    Mental Health

    1.    Assessment and possible diagnosis, to include:
- Assessments and recommendations for Job Corps applicants.
- Review of Social Intake Form (SIF) or intake assessment performed by counseling staff of students who indicate mental health history, current mental health problems, or who request to see the center mental health consultant within 1 week of arrival.
- Mental-health assessments with recommendations for referred students.

    2.    Mental-health promotion and education, to include:
- Minimum of a 1-hour presentation on mental health promotion for all new students during the Career Preparation Period with an emphasis on employability.
- At least one annual center-wide mental-health promotion and education activity.
- Clinical consultation with Center Director, management staff, and Health and Wellness Director regarding mental health related promotion and education efforts for students and staff.
- Coordination with other departments/programs on center to develop integrated

promotion and education services.

3.  Treatment, to include:
    • Short-term counseling with mental health checks as needed. The focus of these sessions should be on retention and behaviors that represent employability barriers.
    • Collaboration with Trainee Employee Assistance Program (TEAP) Specialists in the short-term counseling of students with co-occurring conditions of mental health and substance use.
    • Collaboration with center physician and Health and Wellness staff on psychotropic medication monitoring of stable students, with the advice of consulting psychiatrist, if appropriate.
    • Collaboration with counseling staff in developing and/or leading psycho-educational skill building groups to promote (e.g., relaxation training, anger management, mood regulation, assertiveness skills, handling relationships, sleep hygiene, etc.).
    • Information exchange through regular case conferences between the Center Mental Health Consultant, counselors, and other appropriate staff members based on individual student needs.
    • Crisis intervention, as needed.
    • Referral to off-center mental-health professionals or agencies.

D.  Trainee Employee Assistance Program (TEAP)

1.  Substance use prevention and education, to include:
    • Minimum of a 1-hour interactive presentation on substance use prevention for all new students during the Career Preparation Period.
    • Presentation(s) on managing substance misuse, abuse and dependency conditions in the workplace students during the Career Development and Transition Periods.
    • At least three annual center-wide substance use prevention and education activities.
    • Clinical consultation with Center Director, management staff, Center Mental Health Consultant, and Health and Wellness Director regarding substance use related prevention and education efforts for students and staff.
    • Coordination with other departments/programs on center to develop integrated prevention and education services.

2.  Assessment for identification of students at risk for substance use problems to include:
    • Review of Social Intake Form (SIF) or intake assessment of all students performed by counseling staff within 1 week of arrival.
    • Formalized assessment measures (e.g., SASSI3 or SASSIA2) and clinical judgment to determine students' risk levels for substance use.
    • Collaboration with the Center Mental Health Consultant to determine when a MSWR or medical separation is appropriate and should be recommended for a student with substance use conditions.

3.  Intervention services for students identified at an elevated risk for substance use, to

include:
- Individual and group intervention services with a focus on behaviors that represent employability barriers.
- Collaboration with the Center Mental Health Consultant for students with co-occurring conditions of mental health and substance use.
- Referral to off-center substance abuse professionals or agencies for ongoing treatment and/or specialized services.

4. Drug and alcohol testing, to include:
   - Drug and alcohol testing procedures
   - Policies related to positive drug or alcohol tests
   - Notification of drug or alcohol test results

## EXHIBIT 2-5
### PLACEMENT PATHWAY PREREQUISITES FOR ENTRY



# PLACEMENT PATHWAY PREREQUISITES FOR ENTRY

## Advanced Training pathway prerequisites for entry include:

- Minimum appropriate TABE scores in both Reading & Math (may vary by AT)
- 100% TAR completion
- Minimum age 17 ½ for program entry with parental consent
- Driver's License
- Good to excellent center behavioral record
- Each AT will have its own requirements for background check (e.g., home state and state the JC center is located, or nation-wide)
- No physical issues that impact performance
- No mental health issues that impact performance
- Ability to have phone interview(s)
- (Varies by AT program) Certifications
- (May be required by AT) Enrollment in Community College as well as AT program
- (May be required by AT) Sending center provides trade related tools and clothing
- (May be required by AT) Must have positive impact on center
- Other criteria as required by specific AT

## Military pathway prerequisites for entry include:

- Each military branch has its own minimum ASVAB score (lowest score is 31) and varies based on demand
- Complete national background check
- No prescribed medications, major mental health issue, or legal charges. Some waivers can be applied for but very difficult to obtain
- No debts exceeding more than $500
- Maintain satisfactory behavior on center
- Student can't be receiving federal payments (e.g., social security payments)

- Some restrictions on tattoos (if visible and what content)
- If under 18, need parental consent to enlist
- Meet physical requirements based on height and weight measurement formula
- Minimum completion of 675 hours actual CTT training and attainment of either a Tier 1 HSD or a Hi-Set/GED (the exception is the marine branch which requires a Tier 1 diploma)
- CTT Certifications
- Other criteria as determined by specific military branch

## Apprenticeship pathway prerequisites for entry include:

- 100% CTT and e-TAR completion
- HSD or HSE/GED
- (Varies by apprenticeship program) CTT Certifications
- Required hours of pre-apprenticeship varies per CTT (e.g., NTC requires 1000 hours)
- (If required) Meet physical requirements
- (If required) Driver's License
- Most apprenticeship programs require minimum age of 18 years to be covered by Workmen's Compensation
- Other specific criteria as required by Apprenticeship program

## Post-secondary education pathway (ACT/College) prerequisites for entry include:

- HSD or HSE/GED
- (For college) Apply for FAFSA. Requires parental income documentation until the age of 25
- (For college) Requires SAT, ACT or other placement assessment by institution
- (For college) Maintain a 2.5 GPA or lose FAFSA funding
- (Varies with institution) Background check
- Other specific criteria as determined by post-secondary institution

**Entry-Level Job pathway prerequisites include:**

- 100% CTT and e-TAR completion
- HSD or HSE/GED
- Driver's license
- Certifications
- (If required) Physical requirements
- (If required) Background check
- Other specific criteria as determined by employer
- Verification of job placement

## APPENDIX 201
## COMMUNICATING WITH PERSONS WITH DISABILITIES

**These requirements are separate from accommodation requirements.** Your obligation to communicate effectively with people with disabilities – whether those people are students, staff, applicants for admission or employment, parents, guardians, or members of the public – is *separate from* your obligation to provide reasonable accommodations for qualified people with disabilities.

The Workforce Innovation and Opportunity Act (WIOA) https://www.congress.gov/113/bills/hr803/BILLS-113hr803enr.pdf, nondiscrimination regulations, which apply to Job Corps, distinguish between these two obligations, for a very simple reason: without clear, accurate, effective communication, any encounter between a person with a disability and a program from which he or she is seeking services, such as Job Corps, will be meaningless.

Therefore, when a person with a disability that affects his or her ability to communicate approaches Job Corps, the first thing you should do is find out how to communicate as effectively with that person as you do with people without disabilities.

It is important to understand that under the law, the burden is on Job Corps to provide the auxiliary aids and services (communication aids) that are needed for equally effective communication with a particular person with a disability. This means that you *cannot* and *must not* require the person with a disability to supply, or pay for his or her own interpreter, communication device, or whatever else is necessary for clear communication between him or her and Job Corps.

Furthermore, in deciding what type of aid or service is appropriate and necessary in order for you to communicate equally effectively with a particular person with a disability, the law requires you to "give primary consideration to" the requests of that person.  Why?  Because:

- He or she is the best source of information about his or her own needs.
- Not everyone who appears to have "the same" disability, or type of disability, is able to use and understand the same communication method. For example, while some people with hearing impairments understand American Sign Language, others communicate in Signed English, while still others do not understand sign language at all, and need a different communication method such as CART transcription.

Although Job Corps is not necessarily required to provide the precise communication aid requested by a person with a disability when an *equally effective*, less costly alternative is available, the law places on you the clear obligation to provide some method of communication that is effective for *that particular person* with a disability. This essentially means that you must engage in an interactive process with the person with a disability, similar to the process required for reasonable accommodations (see Form 2-03), to find out what communication method(s) the person can genuinely understand. This process itself, of course, requires you to communicate effectively with the person with a disability.

## APPENDIX 202
## TRANSMISSION, STORAGE, AND CONFIDENTIALITY OF MEDICAL, HEALTH, AND DISABILITY-RELATED INFORMATION

Any medical, health, or disability-related information about a particular person – whether that person is an applicant to Job Corps, an enrollee, an employee, an applicant for employment, or anyone else – must be treated with extreme care. Federal law requires that all such information be treated as strictly confidential, and that it be transmitted and stored in a way that ensures confidentiality.

This appendix explains the rules for transmission, storage, and confidentiality of medical and disability-related information in Job Corps.

**What information is disability-related?**

This category is broader than you might think. It includes *any* information that *indicates* (even if it doesn't explicitly state) that a particular person has a disability. For example, the fact that a particular applicant or student has an Individual Education Plan, or had one at some point during their education, means that he or she has a learning disability. Therefore, that fact is "disability- related information" that must be treated as confidential.

The category "disability-related information" is not limited to hard-copy or electronic records. It also includes discussions about the fact that a particular individual has a disability, or about specific details (such as a person's physical or behavioral symptoms, use of particular devices or equipment, or types of treatment) that indicate that he or she has a disability. Of course, some of the latter types of details will also fall under the category of medical information, and must be kept confidential as well.

**Confidentiality: The General Rule is Do Not Tell**

The Federal disability nondiscrimination laws that apply to Job Corps list specific categories of persons who are allowed to obtain medical (including health) or disability-related information about a particular individual. This means that unless you know that a given person falls into one of the specified categories, you must assume that the person is not entitled to medical or disability-related information about someone else; in other words, your default setting must be "don't tell."

**Who may be informed either about the fact that a particular individual has a disability, or about specific details related to a disability or medical/health condition?**

Only people in the following categories, and only when they **need to know** ("need to know" is interpreted narrowly):

- *Admissions counselors* who:
  - o   Need to know whether they will need to provide one or more accommodations, or communication aids, for an applicant and/or his or her parent or guardian during the admissions process
  - o   Need to know whether an applicant is entitled to a waiver of the upper age limit for admission because he or she has a disability
  - o   Must make a decision about an applicant's financial eligibility based on his or her status as a family of one

- *Instructors, residential staff, other center staff* – **only** those who **need to know** about:
  - o   An accommodation the person will be provided
  - o   Necessary restrictions on a person's duties, activities, diet

- *First aid and safety personnel* – **only if:**
  - o   The condition might require emergency treatment
  - o   The participant might need special assistance in an emergency evacuation

- *Administrative staff* of the center, center operator, Regional or National Office, or DOL (or other operating federal agency) who are doing monitoring or data validation

- *Government officials* investigating compliance with requirements related to nondiscrimination and/or equal opportunity

- *Health and wellness staff* who are examining or treating a particular person

- *Others* – only on a **need-to-know** basis (interpreted narrowly)

## Knowledge Versus Access

The categories of persons who are permitted to have access to a particular individual's underlying medical, health, or disability-related documents are still more limited: even among those who may be informed either about the fact that an individual has a disability, or about specific details related to a disability or medical condition. Very few people will genuinely need to see or use those documents.

*Examples:*

- Access to medical documentation that a participant is entitled to status as a family of one, or waiver of the upper age limit, should be limited to staff members who need to document the basis for such decisions.

- First aid personnel may need access to underlying documentation related to a person's medical condition in an emergency.

- Administrators or health and wellness staff who are considering whether a request for a reasonable accommodation should be granted may need to review documentation that is submitted in support of the request. In these cases, however, you should think about removing personally identifiable information from the documents. This approach has the advantage not only of protecting confidentiality, but also of helping

ensure that the decision-makers base their determination solely on the facts of a particular case.

- • Instructors, residential staff, or other center staff who are working with, or providing accommodations for, a particular person will rarely, if ever, need to see the person's medical records or other documents that demonstrate that he or she has a disability.

## Storage of Records that Contain Medical or Disability-Related Information

Federal disability nondiscrimination laws that apply to the Job Corps program require that any documents or other records that contain medical or disability-related information about a particular individual must be kept in files (either hard-copy or electronic) that are separate from all other information about the individual. Medical and disability-related information should be collected on separate forms and placed in the files reserved for medical and disability-related information. If a center, center operator, or staff member wants a document to be kept in a student's general file or an employee's personnel file, and that document happens to contain some medical or disability-related information, the medical or disability-related information must simply be removed from the document before it is put in the general or personnel file.

The files that contain medical and disability-related information must be stored in a way that satisfies the strict confidentiality and access requirements described above. In the majority of cases (particularly where hard copies of records are used), satisfying those requirements will mean that all medical- and disability-related records as a group must be stored separate from all other student, applicant, or employee files – in a separate drawer, file cabinet, or storage room, or on a separate server.

Regardless of whether the medical/health/disability files are maintained in electronic or hard- copy form, access to these files must be limited to the categories of persons listed in the "Knowledge Versus Access" section above. Hard copies of files must be kept locked, and access to the key or combination must be furnished only to authorized persons. Electronic files must be protected via passwords or other similar methods.

The requirement of separate storage makes sense when considered in the light of the laws requiring strict confidentiality of medical and disability-related information. The confidentiality requirements that apply to most information about a particular individual are less strict than the requirements that apply to medical and disability-related information. Therefore, while a number of different categories of outreach and admission/career transition services, center, or operator staffers may be permitted access to general information about a particular individual, a much narrower group is legally authorized to have access to the medical and disability-related records about that same individual. The most logical way to impose stricter limitations on access to the latter records is to store them separately. The alternative would be to drastically limit the categories of people who have access to the individual's entire file, in order to protect the medical, health, and disability-related information the file contains. Then, only the categories of persons listed in the "Knowledge Versus Access" section above would be able to use, or even look at, the file.

## Transmission of Medical, Health, and Disability-Related Information

When student, applicant, or employee records are being transmitted, the requirements described

above still apply. Any and all records that are medical-, health-, or disability-related, or that contain any of those types of information, must be kept separate from other records about the individual. If hard copies are being transmitted, put medical, health, and disability-related information in a separate file, and place that file in a sealed envelope that is clearly marked as containing such information. You may want to consider using numbers, rather than names, on the outside of such envelopes to identify whose records they contain.

Staff members who receive or sort files about individuals – for example, center records department staff who handle applicant and student files – **must not open** any envelopes containing medical, health, or disability-related information, unless the specific staff member is in one of the categories of authorized persons that are listed in the "Knowledge Versus Access" section above. Instead, those envelopes must be transferred to persons who are legally authorized to have access to such information. In the case of applicant files that arrive on center from an outreach and admissions contractor, for example, the sealed envelopes should be sent to the Health and Wellness Director or other person designated to conduct the initial direct threat review and clinical care review.

**Oral Transmission**

Keep in mind that the confidentiality of medical, health, and disability-related information must be maintained when the information is being transmitted orally – in other words, when it is being discussed aloud. This means that you must be sure that all such discussions take place in private locations where unauthorized persons cannot overhear the conversation, either voluntarily or involuntarily. Cubicles, for example, are inappropriate places to confer about medical or disability-related matters, or even to mention such information, unless the discussion is conducted in such a way that it is impossible for anyone who overhears to identify the person whose information is being discussed.

## APPENDIX 203
## MEDICATION MANAGEMENT GUIDELINES

Job Corps centers must comply with all state and Federal regulations regarding prescribed non-controlled medications, prescribed controlled substances, and over-the-counter medications, and follow medication management guidelines as specified below.

**Over-the-Counter (OTC) Medications:** OTC medications are drugs that have been found to be safe and appropriate for use without the supervision of a health care professional, such as a physician or nurse, and can be purchased without a prescription. Centers must comply with all state and Federal regulations regarding OTC medications and shall:

1. Make available OTC medications in the Health and Wellness Center (HWC). Document OTC medication use in the Student Health Record (SHR). If state law permits, stock bottles of OTC medications may be used in HWC.

2. Train and authorize non-health staff members to access OTC medications in first aid lockboxes for student use in compliance with state law. Eligibility, training, and authorizations will vary by state.

3. Outside of the HWC, store OTC medications in first aid lockboxes and make available, similar to a medicine cabinet, in education, trades, security, recreation, cafeteria, and residential areas for students use. OTC medications must be provided in individually packaged single doses in a properly sealed and properly labeled container.

4. Document OTC medication use outside of the HWC on a sign-out sheet kept with the OTC medication box. The sign-out sheet should include: the student's name, the medication taken, the signature of the student, and signature of the observing staff member. Each OTC lockbox and sign-out sheet must be returned the HWC at least weekly to restock and document. Information from the sign-out sheet must be recorded in the Student Health Record (SHR).

5. Report suspected inappropriate OTC medication use by a student to the HWC staff as soon as possible.

6. Center specific policies that comply with Federal and state laws must be outlined in a Standard Operating Procedure (SOP) for OTC medications (see Chapter 5, Exhibit 5-1).

**Prescribed Non-controlled Medications**: Prescription medications are drugs that can only be acquired or purchased through a prescription order written by a physician or other prescribing practitioner. Prescribed non-controlled medications are prescriptions that not classified as controlled substances. Centers must comply with all state and Federal regulations regarding prescribed non-controlled medications and shall:

1. Determine which center health practitioners are legally authorized to prescribe, dispense, or administer prescribed non-controlled medications according to state and Federal laws.

2. Confirm the rationale for long-term prescribed non-controlled medications at least monthly with case conference between the Health and Wellness Director (HWD) (or designee who is authorized under his/her state license to administer drugs) and the prescribing health professional. Medication rationale and review includes student adherence, side effects, and whether or not the medication is leading to the desired effect.

3. Document prescription orders and the administration of doses. Monthly Medication Administration Records (MAR) must be filed in the SHR. Prescription orders should be transcribed to a MAR exactly as the order reads.

4. Review and approve prescriptions by the center physician/nurse practitioner/physician assistant generated for students by health practitioners in the community or at the student's place of residence by the center physician/nurse practitioner.

5. Ensure that all prescribed non-controlled medications are given to the correct student in the right dose and by the proper route. In cases of a medication error, the center medical provider/center dentist/center psychiatrist (if applicable), HWD, and center director must be notified. Document in the SHR. All medication errors will be immediately reported to the Regional Office and the regional nurse specialist.

6. Provide the student with required consumer medicine information in accordance with state pharmacy laws each time a prescription is filled.

7. Handle, package, store, and observe prescribed non-controlled medications when the HWC is closed in compliance with Federal and state pharmacy laws. Center specific policies that comply with state laws must be outlined in a SOP for prescribed non- controlled medicines (see Chapter 5, Exhibit 5-1).

   a. If applicable according to state law where the center is located, the HWD will identify and train/certify unlicensed, non-health staff to be legally authorized to observe self-administration of doses when the HWC is closed. Non-health staff observing medication self-administration must meet state laws, be trained, and have a personal authorization on file for this task.

   b. Any medication dose observed after hours must be documented on a Medication Observation Record (MOR), and a HWC staff member should file the MOR in the SHR at least weekly.

8.      Four types of prescribed non-controlled medication should always be classified for self-management. These include: asthma inhalers, insulin (including vials or pens, syringes, and needles), Epi Pens, and oral contraceptives.

9.      Dispose of surplus or expired prescribed non-controlled medications in compliance with state and Federal laws.

10.     Send prescribed non-controlled medication(s) home with a student when he/she leaves the center. If a student leaves center when the HWC is closed, medications must be promptly sent to the student in compliance with the sending and receiving state laws.

**Prescribed Controlled Substances:** Controlled substances are highly regulated prescription medications that are classified in five categories by safety and potential for abuse. There are additional requirements for this classification of prescribed medications. Centers must comply with Federal and state regulations regarding prescribed controlled substances (or medications) and shall:

1.      Purchase, store, and administer all controlled substances in accordance with the regulation at 21 CFR Part 1300. Each center must maintain a controlled medication log and have a Drug Enforcement Administration (DEA) registration. The center can obtain its own DEA registration or use the center clinician's DEA registration number when ordering controlled substances.

2.      Limit the use of controlled medications and stock only a small supply of those medications that will be prescribed by the center physician, center dentist, or psychiatrist with a DEA registration. Documentation must be maintained showing that controlled medications in stock were prescribed by one of these individuals.

3.      Not stock Schedule II medications on center except when prescribed for a specific student. In such a case, the center shall order not more than enough controlled substance for a month's treatment for the student.

4.      Confirm the rationale for long-term controlled substances at least monthly with case conference between the Health and Wellness Director (HWD) (or designee who is authorized under his/her state license to administer controlled substances) and the prescribing health professional. Medication rationale and review includes student adherence, side effects, and whether or not the medication is leading to the desired effect.

5.      Review and approve prescriptions for controlled substances by the center physician/nurse practitioner/physician assistant generated for students by health practitioners in the community or at the student's place of residence by the center physician/nurse practitioner.

6.      Store all Schedule II, Schedule III, and Schedule IV medications under a double-

lock system in a secured area of the HWC. Only Health and Wellness staff who are authorized under their state license to dispense or administer controlled medications shall have access to the controlled medications.

7.    Ensure that two staff members (one must be staff authorized under their state license to dispense or administer controlled substances) receive and sign for medications received, noting the name(s) of the medications, dosage, amount, and date on a controlled substances log.

8.    Maintain a log of all Schedule II, Schedule III, and Schedule IV medications. When dispensing or administering these medications by order of the clinician, the date, time, medication, and dosage must be noted on the log and the nurse dispensing or administering the medication must sign his or her full name or initial in accordance with state prescribing regulations. The log must be maintained in the locked area designated for controlled medications.

9.    Document prescription orders and the administration of doses. Monthly Medication Administration Records (MAR) must be filed in the SHR. Prescription orders should be transcribed to a MAR exactly as the order reads.

10.   Provide the student with required consumer medicine information in accordance with pharmacy laws each time a prescription is filled.

11.   Ensure that all controlled substances are given to the correct student in the right dose and by the proper route. In cases of a medication error, the center medical provider/center dentist/center psychiatrist (if applicable), HWD, and center director must be notified. Document in the SHR. All medication errors will be immediately reported to the Regional Office and the regional nurse specialist.

12.   Inventory and reconcile controlled medications at least once a week. Two authorized staff members must note the results on the controlled medications log. Any miscounts or missing medications identified during the inventory must be immediately reported to the Regional Office and regional nurse specialist by the Center Director.

13.   Handle, package, store, and observe controlled substances when the HWC is closed in compliance with Federal and state pharmacy laws. Center specific policies that comply with Federal and state laws must be outlined in a SOP for prescribed controlled substances (see Chapter 5, Exhibit 5-1).

a.    If applicable according to state law where the center is located, the HWD will identify and train/certify unlicensed, non-health staff to be legally authorized to observe self-administration of doses when the HWC is closed. Unlicensed staff observing medication self-administration must meet state laws, be trained, and have a personal authorization on file for this task.

      b.      Any medication dose observed after hours must be documented on a Controlled Substance Medication Observation Record (CMOR), and a HWC staff member should file the CMOR in the SHR at least weekly.

14.      Send prescribed controlled substances home with a student when he/she leaves the center. If a student leaves center when the HWC is closed, medications must be promptly sent to the student in compliance with the sending and receiving state laws.

15.      Properly dispose of controlled substances that need to be destroyed because of expiration dates, contamination, or wastage, and document such actions on the controlled substances log. The log must be signed by two staff members (one must be staff authorized under their state license to dispense or administer controlled substances).

## FORM 2-01
## NOTICE OF MEDICAL INFORMATION USE, DISCLOSURE, AND ACCESS

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED, AND HOW YOU CAN GET ACCESS TO THIS INFORMATION**

<u>**Please Review Carefully**</u>

**This Notice Is Required by the Health Insurance Portability and Accountability Act of 1996**

We, the_____Health Center, are required by law to maintain the privacy of your protected health information and to provide you, the Job Corps student, with notice of our legal obligations and privacy practices with respect to your protected health information. We are required to abide by the terms of this Notice (or any Revised Notice currently in effect). We have the right to change the terms of the Notice and to make those changes effective for all protected health information that we maintain. If we make changes to the Notice, we will issue you a Revised Notice at your assigned Job Corps location. This Notice is effective as of April 14, 2003. We may use and disclose medical information about you under certain circumstances listed below. In each case, we will share only the minimum information necessary.

<u>**Treatment, Payment, and Health Care Operations**</u>

**Treatment.** We may share the contents of your medical files, including date of visits, symptoms presented, diagnosis, medications prescribed, treatment given or recommended, and referrals to other health providers with other health center staff members so that we may effectively treat you and follow up on your care.  In addition to sharing this information with health center nurses, doctors, dentists, mental health professionals, Trainee Employee Assistance Program (TEAP) specialists, or other health providers, we may share this information with health center clerks, receptionists, or other persons responsible for filing and entering data within the health center, and organizing patient flow and/or contacting you to set appointments or inform you of prescription availability or other medical information. We may share your prescription and other medical information with pharmacists or other providers of medicines or devices, and with center drivers who pick up medications at pharmacies or other stores, for the purpose of obtaining prescriptions, other medications, and devices for you. We may share information with medical laboratories necessary in identifying specimens for the purpose of testing. Center health care providers also may share your health information with specialists or other off-center health care providers for purposes of consultation or referral.

**Payment and Health Care Operations.** We may share the contents of your medical files, including referral and other information about care you received off center, with Medicaid and/or private insurance companies for the purposes of facilitating your access to health services not provided or paid for by Job Corps. We also may share information about illness or injuries you may incur in the performance of your duties with workers' compensation coordinators, for the purpose of determining your eligibility for benefits, the payment to you of benefits, and the provision of care to you under those benefits.

## Other Uses and Disclosures for Which Consent, Authorization, or Opportunity to Agree or Object Is Not Required

In addition to the above uses and disclosures of your medical information, federal law permits us to disclose medical information about you under the following circumstances:

- We may use or share any information required by law;

- We may share information about infection, disease, or other conditions with public health department authorized to receive such health information, as well as information about failure to follow prescribed treatments for these cases of infection or disease, to assist them in preventing or controlling health conditions and tracking vital events;

- We may contact you to provide appointment reminders or information about treatment alternatives or other health-related benefits and services;

- We may share information for certain public health activities, including for purposes related to the quality, safety, or effectiveness of products regulated by the Food and Drug Administration;

- We may share information with government authorities about individuals we believe may be victims of abuse, neglect, or domestic violence;

- We may share information for health oversight activities, including audits, licensing, and inspections of the health center, and determinations of our compliance with the medical privacy rules by the U.S. Department of Health and Human Services;

- We may share information in certain court proceedings;

- We may share information for law enforcement purposes;

- We may share information with a coroner, medical examiner, or funeral director to enable those people to perform their jobs with respect to people who have died;

- We may share information with organ donor organizations as necessary to allow authorized organ, eye, or tissue donations from people who have died;

- We may share information for certain approved limited research purposes;

- We may share information to avert a serious threat to health or safety;

- We may share information for workers' compensation purposes;

- We may share information for certain specialized government functions, including certain military or national security uses.

Other uses and disclosures will be made only with your written authorization. Job Corps requires you to authorize certain other uses and disclosures of your protected health information as a condition of

enrollment in Job Corps. Those uses and disclosures are outlined in a written authorization form that you have signed already, or that we will ask you to sign. You may revoke your authorization for these uses and disclosures, in writing, at any time, unless we have relied on the Authorization. Please note, however, that federal law permits Job Corps to condition enrollment in its programs on receiving a valid authorization from you of certain uses and disclosures of your protected health information. Although the health center must honor any withdrawal of authorization you make, and cannot condition treatment on your authorization, such a withdrawal may affect your continued enrollment in Job Corps.  Also, you may be asked to sign other voluntary authorizations. You may revoke a voluntary authorization, in writing, at any time, unless we have relied on that authorization.

## Your Rights

**The right to request restrictions.** You have the right to request restrictions on certain uses and disclosures we make of your protected health information for treatment, payment, or health care operations, and may request restrictions on disclosures to family members or friends relevant to your care. However, in most instances the health center is not required to agree to your request. Generally, your health information will not be disclosed to family members or friends if you object to such disclosure, but in an emergency or other circumstance in which we cannot obtain your agreement, we may disclose limited information if it appears necessary for your care, consistent with state law. In addition, in case of a disaster, your health information may be shared with the Red Cross or other public or private entities assisting in disaster relief efforts for the purpose of notifying your family members or other loved ones of your location, general condition, or death. Furthermore, if you are a minor, we may be required to share health information about you with your parent or guardian, although some types of information you may be able to restrict us from sharing with your parent or guardian. (We will follow state laws in those instances.)

**The right to receive your health information confidentially.** You have the right to receive your health information privately. For example, if you are expecting a letter containing information from your doctor to arrive at your mailbox, and you share a mailbox with others and do not wish for others to discover the letter, you may request that the letter be delivered to you in another way or at another location, or you may arrange to pick up the letter.

**The right to inspect and copy your health information.**  You have the right to look at and get a copy of your health information for as long as we maintain those records. However, under the law, we may deny you access to certain types of information, including psychotherapy notes kept by mental health professionals, information compiled in anticipation of a civil, criminal, or administrative action, certain information related to clinical or research studies, and classified information. Denials of this nature are final. In addition, we may deny you access to your health information if a health care provider believes that providing the information is likely to endanger the life or physical safety of you or someone else or, if your information refers to someone else, the access requested is likely to cause substantial harm to that person. Also, if your personal representative requests access to your health information, we may deny that person access if a health care provider believes the access is likely to cause substantial harm to you or another person. You may have denials of this nature reviewed by another health provider who was not involved in the initial denial decision, and we will abide by the decision of that reviewer.

**The right to amend your health information.** You have the right to have us amend (correct or clarify) your health information that we keep in our records, for as long as we maintain those records.

In most circumstances, however, if you ask us to change, add, or delete certain information that we did not create, or that is not a part of your record, or that you are not permitted to access, we do not have to make the amendment. Furthermore, we do not have to make any changes you request that would cause your record to be anything other than accurate and complete.

**The right to be informed of disclosures we make of your health information.** You have the right to know what health information we have given to others about you for the 6 years prior to the date of your request. Certain exceptions apply. For instance, we do not have to tell you of instances in which we have disclosed information for purposes of treatment, payment, or health care operations, or information that we gave directly to you or your representative, or certain directory information and information given to persons involved in your care, or information disclosed for national security purposes, or to law enforcement or corrections officials, or disclosures we made before we were required to comply with these notice standards.

**The right to receive a paper copy of this Notice.** You have the right to request and receive a paper copy of this notice.

**The right to complain about our use of your health information pursuant to the Health Insurance Portability and Accountability Act of 1996.** You may complain to us and to the Secretary for the U.S. Department of Health and Human Services if you believe your privacy rights pursuant to the Health Insurance Portability and Accountability Act of 1996 have been violated. To file a complaint with us or to request further information regarding your rights to privacy in your health information, please contact

_____

(designated health center privacy official: name, title, phone number)

In addition, you may file a complaint with the Secretary for Health and Human Services within 180 days of the date you learn of our objectionable action or omission. You must put your complaint in writing, you must name us specifically (including the name of your Job Corps center), and you must describe what we have done to which you object.

**Where to File Complaints Concerning Health Information Privacy:**

If your Job Corps center is located in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, or Vermont:

      Office for Civil Rights
      U.S. Department of Health and Human Services
      Government Center
      J.F. Kennedy Federal Building, Room 1875
      Boston, MA  02203
      Voice Phone: (617) 565-1340
      FAX: (617) 565-3809
      TDD: (617) 565-1343

If your Job Corps center is located in New Jersey, New York, Puerto Rico, or Virgin Islands:

      Office for Civil Rights
      U.S. Department of Health and Human Services
      Jacob Javits Federal Building
      26 Federal Plaza, Suite 3312
      New York, NY 10278
      Voice Phone: (212) 264-3313
      FAX: (212) 264-3039
      TDD: (212) 264-2355

If your Job Corps center is located in Delaware, District of Columbia, Maryland, Pennsylvania, Virginia, or West Virginia:

      Office for Civil Rights
      U.S. Department of Health and Human Services
      Public Ledger Building
      150 S. Independence Mall West, Suite 372
      Philadelphia, PA  19106-9111
      Main Line: (215) 861-4441
      Hotline: (800) 368-1019
      FAX: (215) 861-4431
      TDD: (215) 861-4440

If your Job Corps center is located in Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, or Tennessee:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> Atlanta Federal Center, Suite 3B70
> 61 Forsyth Street, SW
> Atlanta, GA  30303-8909
> Voice Phone: (404) 562-7886
> FAX: (404) 562-7881
> TDD: (404) 331-2867

If your Job Corps center is located in Illinois, Indiana, Michigan, Minnesota, Ohio, or Wisconsin:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> 233 N. Michigan Avenue, Suite 240
> Chicago, IL 60601
> Voice Phone: (312) 886-2359
> FAX: (312) 886-1807
> TDD: (312) 353-5693

If your Job Corps center is located in Arkansas, Louisiana, New Mexico, Oklahoma, or Texas:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> 1301 Young Street, Suite 1169
> Dallas, TX  75202
> Voice Phone: (214) 767-4056
> FAX: (214) 767-0432
> TDD: (214) 767-8940

If your Job Corps center is located in Iowa, Kansas, Missouri, or Nebraska:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> 601 East 12th Street, Room 248
> Kansas City, MO 64106
> Voice Phone: (816) 426-7278
> FAX: (816) 426-3686
> TDD: (816) 426-7065

If your Job Corps center is located in Colorado, Montana, North Dakota, South Dakota, Utah, or Wyoming:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> 1961 Stout Street, Room 1185 FOB
> Denver, CO  80294-3538
> Voice Phone: (303) 844-2024
> FAX: (303) 844-2025
> TDD: (303) 844-3439

If your Job Corps center is located in American Samoa, Arizona, California, Guam, Hawaii, or Nevada:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> 50 United Nations Plaza, Room 322
> San Francisco, CA 94102
> Voice Phone: (415) 437-8310
> FAX: (415) 437-8329
> TDD: (415) 437-8311

If your Job Corps center is located in Alaska, Idaho, Oregon, or Washington:

> Office for Civil Rights
> U.S. Department of Health and Human Services
> 2201 Sixth Avenue, Suite 900
> Seattle, WA  98121-1831
> Voice Phone: (206) 615-2287
> FAX: (206) 615-2297
> TDD: (206) 615-2296

If you would like to file a complaint by e-mail, send it to: OCRComplaint@hhs.gov or go to https://ocrportal.hhs.gov/ocr/smartscreen/main.jsf.

For more information, please contact the Office for Civil Rights, Department of Health and Human Services, Mail Stop Room 506F, Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, DC  20201.  Telephone number: (202) 205-8725.

**The right to complain about our use of your health information pursuant to the Rehabilitation Act of 1973.** You may complain to the Director of the Civil Rights Center, U.S. Department of Labor, if you believe your rights pursuant to the Rehabilitation Act of 1973 have been violated. To file a complaint or to request further information regarding your rights to privacy in your health information, please contact:

Director
Civil Rights Center
U.S. Department of Labor
200 Constitution Avenue, NW, Room N-4123
Washington, DC 20210
Voice Phone: (202) 693-5602
TTY: (202) 693-6515
E-mail Address: CRCexternalcomplaints@dol.gov

We are here to help you succeed and we will not take any negative action against you for making a complaint, whether you complain to us, to the Secretary for Health and Human Services, to the U.S. Department of Labor, or all three.

### <u>ACKNOWLEDGMENT OF RECEIPT OF NOTICE</u>

I,_____, have received a copy of this Notice.  I have read this Notice and I understand that it explains how my health information may be used and shared with others, and what my rights are with respect to my health information.


_____          _____
Signature                                     Date

## FORM 2-02
## HIV TESTING INFORMATION SHEET

Human Immunodeficiency Virus (HIV) is the virus that causes Acquired Immunodeficiency Syndrome (AIDS). This virus can only be transmitted to others through sexual contact, the introduction of infected blood into the bloodstream (e.g., by the sharing of syringes or needles), or from an infected mother to her infant, either during the birth process or by breast-feeding. A person who is infected with HIV is likely to come down with AIDS. However, AIDS usually does not develop until many years after a person has been infected, and persons with HIV infection may look and feel completely healthy.

Tests are available to determine the presence of antibodies to HIV. Antibodies are substances made by the body to fight infection. The presence of antibodies (a positive antibody test) indicates that a person is infected with HIV and is capable of infecting others with the virus. However, it takes time for the body to make antibodies after the virus gets into the body.  For this reason, the antibody test for a person who has recently been infected with HIV may show that a person is "negative" (does not have antibodies) or "indeterminate" (neither positive nor negative) even though that person actually carries the virus in his/her body. A test taken at a later time, when the body has had more time to make antibodies, would show that the person is positive.

If your HIV antibody test results are known, it helps your doctor decide how best to treat you for certain illnesses. If you are infected with the virus, you can receive treatment to help prevent or delay the illnesses that can occur with AIDS. It may also help you to make personal decisions if you know that you have HIV infection and could infect someone else. If your blood test is positive, Job Corps will conduct medical and psychosocial evaluations in order to provide appropriate medical care and counseling, as well as to determine whether it is appropriate for you to remain in Job Corps.

If your blood test is positive and the test results become known by others, they might think you have AIDS or that you might infect them. This may not be true, but you might be discriminated against by friends, family, employers, landlords, insurance companies, or others. Therefore, you should be extremely careful in disclosing your test results.

HIV test results and other related medical records may only be released to Job Corps staff with a need for that information for purposes of counseling, administration and delivery of health services, and to the local and/or state health department, when required by law.

Acknowledgement of receipt of information:


_____
Student Signature                                              Date

## FORM 2-03
### DEFINITIONS AND DOCUMENTATION REQUIREMENTS RELATED TO REASONABLE ACCOMMODATIONS FOR APPLICANTS AND STUDENTS WITH DISABILITIES

**PROCESS FOR AN APPLICANT OR STUDENT WITH A DISABILITY TO REQUEST REASONABLE ACCOMMODATION TO PARTICIPATE IN THE JOB CORPS PROGRAM**

## BACKGROUND

### What is the definition of disability?[10]

A disability is a physical or mental impairment that substantially limits one or more major life activities; a record (or past history) of such an impairment; or being regarded as having a disability.

### What is a physical impairment?

A physical impairment is any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:

| | |
|---|---|
| • Cardiovascular | • Musculoskeletal |
| • Circulator | • Neurological |
| • Digestive | • Reproductive |
| • Endocrine | • Respiratory (including speech organs) |
| • Genitourinary | • Skin |
| • Hemic and Lymphatic | • Special Sense Organs |
| • Immune | |

### What is a mental impairment?

A mental impairment is any mental or psychological disorder, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

---

[10] The Americans with Disabilities Act Amendments Act (ADAAA) went into effect January 1, 2009. The ADAAA makes it much easier for an individual to meet the definition of disability, be protected from discrimination, and be entitled to reasonable accommodations. Changes to this act apply to all federal disability nondiscrimination laws including the Workforce Innovation and Opportunity Act and Section 504 of the Rehabilitation Act that apply to Job Corps. While these laws are not identical, they are consistent, and have been modified to conform to the ADAAA. While all regulations that apply to Job Corps have not been updated, the ADAAA changes still apply to these regulations.

**Are there conditions, situations, or orientations that are not considered physical or mental impairments?**

The following conditions, situations, or orientations are not considered physical or mental impairments:

- Homosexuality and bisexuality

- Normal pregnancy

- Environmental, cultural, and economic disadvantages (*e.g.*, a prison record or a lack of education)

- Limited English proficiency/English as a second language

In addition, federal disability nondiscrimination laws do not protect people with the following conditions, even if the conditions would otherwise satisfy the definition of "disability."

- Transvestitism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders

- Compulsive gambling, kleptomania, or pyromania

- Psychoactive substance-use disorders resulting from current illegal use of drugs

- Environmental, cultural, or economic disadvantages (e.g., poverty, lack of education, prison record)

**What are major life activities?**

Major life activities include, but are not limited to: caring for oneself; performing manual tasks; seeing; hearing; eating; sleeping; walking; standing; sitting; reaching; lifting; bending; speaking; breathing; learning; reading; concentrating; thinking; communicating; interacting with others; and working. Other major life activities include the operation of a major bodily function, including functions of the immune system; special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system. This list is not exhaustive, but carries examples of some activities that can be considered.

**What is a substantial limitation?**

When making a determination on whether an individual is substantially limited in performing a major life activity:

- The determination requires an individualized assessment.

- The determination should not require extensive analysis.

- An impairment need not prevent, or severely or significantly limit a major life activity in order to be considered substantially limiting. Nonetheless, every impairment does not constitute a disability.

- The term "substantially limits" should be construed broadly in favor of expansive coverage; "substantially limits" is not meant to be a demanding standard.

- An impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict the individual from performing a major life activity in order to be considered substantially limiting.

- Although determination of whether an impairment substantially limits a major life activity as compared to most people will not usually require scientific, medical, or statistical evidence, such evidence may be used if appropriate.

- An individual need only be substantially limited, or have a record of a substantial limitation, in one major life activity to be covered under the first or second prong of the definition of disability.

- When determining whether a person is substantially limited in a major life activity, the beneficial effects of mitigating measures, except ordinary eyeglasses or contact lens, will be ignored.  Mitigating measures are things such as:

  o  Medication, medical supplies, equipment, or appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

  o  Use of assistive technology;

  o  Reasonable accommodations or auxiliary aids or services;

  o  Learned behavioral or adaptive neurological modifications; or

  o  Psychotherapy, behavioral therapy, or physical therapy.

Evidence showing that impairment would be substantially limiting without mitigating measures could include evidence of limitations that a person experienced prior to using a mitigating measure, evidence concerning the expected course of a particular disorder absent mitigating

measures, or readily available and reliable information of other types.

While the beneficial effects of mitigating measures are ignored; if the mitigating measure itself causes any limitations, they will be considered. The use of a mitigating measure cannot be required.

An impairment that is episodic or in remission meets the definition of disability if it would be substantially limiting when it is active. This means that chronic impairments with symptoms or effects that are episodic rather than present all the time can be a disability even if the symptoms or effects would only substantially limit a major life activity when the impairment is active. Examples of impairments that may be episodic include epilepsy, hypertension, asthma, diabetes, major depressive disorder, bipolar disorder, and schizophrenia.

The effects of an impairment lasting fewer than 6 months can be substantially limiting. At the same time, the duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only a short period of time are typically not covered, although they may be covered if sufficiently severe.

**Are there certain impairments that will always result in substantial limitation in performing certain major life activities?**

The following impairments are examples from the Americans with Disabilities Act Amendments Act (ADAAA) regulations of impairments that should be easily found to substantially limit a major life activity:

- Deafness substantially limits hearing

- Blindness substantially limits seeing

- An intellectual disability substantially limits brain function

- Partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function

- Autism substantially limits brain function

- Cancer substantially limits normal cell growth

- Cerebral palsy substantially limits brain function

- Diabetes substantially limits endocrine function

- Epilepsy substantially limits neurological function

- Human Immunodeficiency Virus (HIV) infection substantially limits immune function

- Multiple sclerosis substantially limits neurological function

- Muscular dystrophy substantially limits neurological function

- Major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function

**May the condition, manner, or duration under which a major life activity can be performed be considered in determining whether an impairment is a disability?**

For conditions that are not so obviously disabilities, the regulations state that in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population:

- The condition under which the individual performs the major life activity;

- The manner in which the individual performs the major life activity; and/or

- The duration of time it takes to perform a major life activity or the amount of time the activity can be performed.

**What are reasonable accommodations?**

Reasonable accommodations are any changes to the environment or in the way things are customarily done, that give a person with a disability an opportunity to participate in the application process, job, program, or activity that is equal to the opportunity given to similarly situated people without disabilities. Although many people with disabilities can (and do) apply for and participate in the Job Corps program without any reasonable accommodations, barriers do exist that keep other potential applicants or students with disabilities from applying or participating, and that could be overcome with some form of accommodation. Reasonable accommodation may involve providing an appropriate service or product; modifying or adjusting a job, work/academic environment, policy, program, or procedure; or any other action that removes those barriers for the person with a disability.

**Who is entitled to reasonable accommodations?**

Under federal law, only a person who meets one or both of the first two prongs of the disability definition (i.e., actual disability or record of a disability) is entitled to reasonable accommodation.[11]

---

[11] People who are regarded as having a disability are protected from discrimination by federal disability nondiscrimination laws. However, these people are not entitled to the positive actions, such as reasonable accommodations, that must be provided to people with actual, current disabilities or those with a record (past history) of a disability.

**How do federal disability nondiscrimination laws relating to drug addiction and alcoholism interact with Job Corps' Zero Tolerance Policy and alcohol-related policies?**

*Drug Addiction*

The definition of "individual with a disability" under federal law explicitly excludes persons who are *currently* engaging in the illegal use of drugs. This exclusion means that even though a particular person's drug addiction constitutes a disability, it is not against the law to take adverse action against that person – to separate him or her from Job Corps, or otherwise give him or her less favorable treatment than others – because of that drug addiction.

Only people who are *currently* using drugs illegally are excluded from protection under the relevant federal laws. The following categories of persons *are* considered individuals with disabilities under those laws, and are therefore protected from discrimination on the basis of *the drug addiction itself*:

- Persons with a drug addiction diagnosis who have successfully completed a supervised drug rehabilitation program (an in-patient, out-patient, or employee assistance program), and who are no longer using drugs illegally.

- Persons with a drug addiction diagnosis who have been rehabilitated successfully in some other way (*e.g.,* recognized self-help programs such as Narcotics Anonymous) and who are no longer using drugs illegally.

- Persons who have a drug addiction diagnosis, are currently participating in a supervised rehabilitation program, and who are no longer using drugs illegally.

A center **may** request documentation that an applicant/student:

- Has a drug addiction diagnosis

- Has completed/is participating in a rehabilitation program or been rehabilitated successfully in some other way

- Is not currently using, **only** if an applicant/student is requesting to be considered a person with a drug addiction disability (most likely so he/she can request reasonable accommodation)

An applicant who has a diagnosis of drug addiction but is not requesting accommodation cannot be required to provide documentation that he/she is not currently using drugs. A person who casually used drugs illegally in the past but did not become addicted is not an individual with a disability, and therefore is not protected from discrimination.

*Alcoholism*[12]

Even those who are currently using alcohol are protected by Federal disability nondiscrimination laws from adverse actions taken because of the alcoholism itself.  However, students are subject to the center's disciplinary policies and measures regarding the use and abuse of alcohol, as well as to Job Corps' Zero Tolerance policy regarding the use of drugs.

It is important to understand the difference between taking adverse action against someone because of his or her *alcoholism itself,* and taking adverse action against him or her because of the *behavior that the alcoholism causes*. Taking adverse action *because of someone's behavior* (rather than because of his or her status as an alcoholic) is not considered discrimination.

For example, suppose a student who is an alcoholic is discovered drinking alcohol on-center – an action that is prohibited under the center's disciplinary policy.  In this case, it is not discriminatory for the center to take action to discipline the student: the center is taking this action not because the center staff knows the student is an alcoholic, but because the student has violated the standards of conduct – in other words, because of the student's *behavior*. The policy is not intended to punish students for *being* alcoholics; it prohibits and punishes the *actual use of* alcohol – in other words, the *behavior*. For these reasons, the policy does not violate federal disability nondiscrimination law.


**POLICY**

An applicant or student with a disability is entitled to request and receive reasonable accommodation to participate in the Job Corps program at any time during the admissions process or enrollment. Each center is required to have a reasonable accommodation Standard Operating Procedure (SOP). The SOP should describe the center's process for ensuring applicants/students with disabilities who may need accommodation are engaged in an interactive process to consider/determine the functional limitations resulting from their disability and the potential accommodations that would allow them to participate in the Job Corps program. The center's Disability Coordinators (DCs) should ensure that a reasonable accommodation process SOP is in place, and should coordinate the center's reasonable accommodation process.

The reasonable accommodation process will have some variations depending on when the accommodation process begins, either during admissions or after enrollment. The center's reasonable accommodation SOP, and process should include both of these situations and the following components:

- Requesting accommodation

- Determining the need for accommodation

---

[12] As with illegal use of drugs, a person's use of alcohol does not constitute a disability unless it is an addiction that substantially limits one or more of the person's major life activities.

- Ensuring appropriate documentation

- Reviewing a request

- Determining reasonableness

- Entering the accommodation plan

- Notifying staff/viewing the accommodation plan

- Determining accommodation effectiveness

- Documenting the accommodation process

- Maintaining the accommodation file

- Storing accommodation and disabilitydocumentation

- Confidentiality

## PROCESS

### Requesting Accommodation

A reasonable accommodation request can be communicated in any form (e.g., oral, written, sign language). However, the request must be documented on the Job Corps Reasonable Accommodation Request Form – Program (included in this document). This form cannot be changed, and must be used to document the request.

The Admissions Counselor (AC) will inform each applicant of his or her right to request reasonable accommodation, and then review the request form with the applicant. If the applicant wants to request accommodation or discuss the need for accommodations with a DC, the request form should be completed.  The AC may assist with completion of the request form, as necessary.

If the applicant does not want to request accommodation, the AC should inform the applicant about his or her right to request reasonable accommodation at any point during the admissions process or during enrollment in the program. If a reasonable accommodation request is made after enrollment, a DC will go through the form with the student, and may assist with its completion, as necessary. All requests for reasonable accommodation to participate in the program will be reviewed at the center level (center of assignment).

**Determining the Need for Accommodation**

There must be an interactive process between the center and applicant/student (and parent/guardian, when appropriate) to determine accommodation needs.

- **Applicant to Participate in Program** – If an applicant:

  o Makes an accommodation request by completing the Job Corps Reasonable Accommodation Request Form – Program;

  o Indicates on the Job Corps Reasonable Accommodation Request Form – Program s/he would like to discuss the need for accommodation with a DC; or

  o Provides documentation that indicates s/he may be an individual with a disability who may need reasonable accommodation to participate in Job Corps.

  The DC must engage the applicant in an interactive process (even if the applicant did not request accommodation) to review request and/or determine possible accommodation needs.

- **Student to Participate in Program** – Applicants are not required to request accommodation during the admissions process and once enrolled in the program may request accommodation at any time. A student may complete the request form and/or make an accommodation request to any staff person. All requests should be referred to a DC.

If an applicant/student with a disability determines s/he does not want accommodations, a DC should ensure the decline is documented by ensuring completion of either the Job Corps Reasonable Accommodation Request Form – Program or the Reasonable Accommodation Review Due To Documentation of Disability Form as appropriate.

**Ensuring Appropriate Documentation**

If an applicant makes a reasonable accommodation request, the AC should ask the applicant for reasonable documentation about his or her disability and functional limitations. A DC will gather this information if the request is made after enrollment. Only the documentation that is needed to establish that (1) a person has a disability, and (2) the disability necessitates a reasonable accommodation, may be requested. It is important to obtain this type of information since the accommodation needs of an individual with a disability will depend on his or her functional capacities and limitations rather than his or her diagnosis. The applicant/student may be provided assistance to obtain the appropriate documentation to support the request. If an applicant/student provides insufficient documentation of a disability in response to the center's initial request, the center should explain why the documentation is insufficient and allow the person an opportunity to provide the missing information in a timely manner. A center cannot ask for documentation

when (1) both the disability and the need for reasonable accommodation are obvious, or (2) the person has already provided the center with sufficient information to substantiate that she or he has a disability and needs the reasonable accommodation requested.

DCs should not spend a lot of time analyzing whether an applicant/student meets the definition of disability or requesting extensive documentation. Instead, the focus should be on the accommodation, whether it is reasonable, whether it can be provided without an undue hardship, and whether there are other accommodations that can be considered.

The documentation about the disability and the functional limitations should come from an appropriate health-care or rehabilitation professional (e.g., physicians, psychiatrists, psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists). In addition, if the applicant has received a past accommodation, the associated documentation should be obtained (e.g., Individualized Education Program (IEP) or 504 Plan from the school system, along with supporting educational and psychological assessments when available).

All documentation should be reviewed to ensure the accommodation requested is supported by the documentation provided. Accommodations afforded to an applicant or student must be relevant to that individual's manifestations and functional limitations resulting from the impairment. For example, a student who has diabetes and who has been granted accommodations that includes schedule adjustments and frequent breaks related to the manifestations of his diabetes would not be entitled to the use of a calculator on the non- allowable portions of the Test of Adult Basic Education (TABE) unless there was also a corresponding disability in the area of math calculations. For examples of possible types of documentation for specific disabilities, see the Reasonable Accommodation Guidelines section of the Job Corps Disability website.

Reasonable accommodation is not provided to struggling students without disabilities. Keep in mind that reasonable accommodation has a legal foundation and is intended to provide barrier removal for some limitation imposed by a person's disability.

If a student's or applicant's disability or need for reasonable accommodation is not obvious, and she or he refuses to provide the reasonable documentation requested by the center, then she or he is not entitled to reasonable accommodation. If an applicant/student suspects that he or she may have a disability that has not been diagnosed and is unable to pay for an evaluation, the AC or a DC should provide the applicant/student with referral information.

*Documentation to Support Accommodations for Standardized Testing*

Types of accommodations that are allowable in a standardized testing situation such as the TABE usually are more limited than in other environments such as the academic and career technical training classrooms because certain accommodations may significantly alter what the test is intended to measure. Currently, centers should be using McGraw-Hill's guidelines on appropriate accommodations as a general guide for the types of accommodations that are allowed for use with students with disabilities during TABE testing (see Appendix 301).

Appropriate documentation must support accommodations. An accommodation cannot be provided simply because the student requests one or because staff members believe it would be helpful to a student. For example, a student with a documented reading disability would not likely be entitled to the use of a calculator. Certain accommodations are never appropriate in the standardized testing environment such as rephrasing the TABE test questions by simplifying, rewording, or otherwise changing the structure of the test and therefore impacting the standardization beyond what Job Corps allows.

**Reviewing a Request**

The Reasonable Accommodation Committee (RAC) is led by the center's DCs and always includes the applicant or the student. The RAC's primary functions are to:

- Review an applicant's request or need for accommodation (if documentation of disability is present) to participate in the Job Corps program when a center has recommended denial of an application or when the center intends to enroll the individual;

- Review a student's request or need for accommodation (if documentation of disability is present) to participate in the Job Corps program;

- Assist applicant or student in determining needed accommodations by identifying the functional limitations resulting from the disability (i.e., student cannot read print material because text appears as a series of jumbled letters and needs access to a text-reader, audio tapes, or other oral communication supports, student has mobility impairment, and needs first floor dorm room);

- Ensure accommodation review considers accessibility needs and barrier removal for all areas of the center (residential/classroom/common areas/transportation, etc.) in which it is needed;

- Meet with students when issues with implementation or effectiveness of accommodation plans are identified during the effectiveness review process and when referrals are made to the DC that indicate an accommodation plan review may be needed;

- Assist with accommodation review during the work-based learning and transition periods; or

- Review TABE waiver requests to evaluate accommodation supports and effectiveness, make recommendations about additional accommodation needs, if appropriate, and provide feedback for the regional paperwork.

*Reviewing a Simple Accommodation Request*

If the accommodation request is straightforward and does not involve significant expense, the review can be an informal meeting (phone or face-to-face) between a DC and the applicant/student (and parents, service providers, if applicable). Agreed upon accommodations can be determined at this meeting and approved by a DC.

*Reviewing a Complex Accommodation Request with RAC*

If the request involves complex accommodation issues and/or significant expense, a RAC meeting may be required. Participants will vary depending on the nature of the request, but must always include a DC (chairperson) and applicant/student and his or her parents (if the applicant/student is a minor or requests his or her parents attend the meeting). Other possible members may include:

- Academic Manager and the Health and Wellness Director, if the center has a dedicated position for a DC; otherwise, it is presumed that the Academic Manager and the Health and Wellness Director are DCs, see Chapter 2, Section 2.4, R1.

- Center Mental Health Consultant, physician, dentist, or TEAP Specialist

- Career Technical Training Manager

- Student's counselor

- Representatives of center departments directly impacted by the accommodation request

- Community social service agency if the applicant/student is receiving benefits in the community

A DC will provide information on the applicant's/student's accommodation request, functional limitations, and manifestations of the disability, as appropriate. The RAC will then determine:

- Whether Job Corps can provide the requested accommodation or an alternate accommodation that is equally effective. If no specific accommodations have been requested, the RAC will assist in identifying accommodations.

- The center staff responsible for ensuring the accommodation is made and the date by which the accommodation will be in place. Accommodations for applicants should be in place by the scheduled arrival date of the applicant.

- The amount and type of contribution to be obtained from other sources toward the purchase or acquisition of the requested accommodation.

- If appropriate accommodations can be developed/agreed to at this meeting, an accommodation plan can be developed. If additional information is needed or research into specific accommodations is necessary, a DC or appropriate staff should stay in contact with the applicant/student until a plan can be developed.

A summary of any informal or formal meetings with the applicant/student should be included as a note in the Center Information System (CIS) Notes tab. RAC meeting documentation (i.e., copy of agenda/list of attendees) should be maintained for all RAC meetings. For more information on reviewing a request and the RAC meeting process see the Reasonable Accommodation Guidelines section of the Job Corps Disability website.

*Accommodation Request or Documentation of Disability within Applicant File Review*

If the center's File Review Team has decided to recommend denial of an applicant who has a disability because it is believed that the applicant either poses a direct threat or that the applicant's health care needs exceed those of basic care as provided within Job Corps, the center's RAC will need to engage the applicant in the interactive process to determine whether or not accommodations would sufficiently reduce the barriers to enrollment such that the applicant can enroll in the program. Accommodation considerations within the assessment process will only include those related to the symptoms and behaviors that are presenting barriers to enrollment.  For more information, see Forms 1-07, 2-04, and 2-05.

**Determining Reasonableness**

There are many gray areas in the interpretation of what constitutes a reasonable accommodation, therefore, Job Corps has no specific list of accommodations that will or will not be provided. Each request for accommodation should be evaluated individually, and a determination made regarding whether it is reasonable.

If granting a requested accommodation would pose an undue hardship or fundamental alteration to the program, Job Corps is not obligated to provide it. Undue hardship means that providing the accommodation would be unduly costly or extensive. Fundamental alteration means that providing the accommodation would alter the nature or operation of the program.

When considering if a request is an undue hardship or fundamental alteration, consider:

- What is the net cost of the accommodation, taking into consideration the availability of tax credits, deductions, or outside funding?

- What are the overall financial resources of the center, center operator, contractor, outreach and admissions agency, or placement agency; any parent companies of any of these entities; and Job Corps as a whole? Does the center have the funds to provide the accommodation? Can the National Office provide funding?

- Can other agencies/organizations provide or contribute to the cost of providing the accommodation?

- Will the accommodation allow the individual applicant to participate in and benefit from the Job Corps program?

- Could the requested accommodation benefit other persons with disabilities?

- Will the requested accommodation affect the daily operation of the center, prevent or reduce the benefit other students receive from the program, or affect the ability of staff to do their job?

In cases where the center determines that providing the accommodation would be an undue hardship or fundamental alteration, the center must take any other action that would not result in such a hardship or alteration, but would allow the applicant to participate in the program. Job Corps is required to make every effort to accommodate an applicant with a disability at the appropriate center in accordance with the assignment procedures in Chapter 1. However, if this assignment is not sensible, the applicant should be assigned to a center that offers comparable training, and is able to accommodate the applicant's particular needs.

*Funding High Cost Accommodations*

Generally, centers are responsible for any costs associated with providing reasonable accommodation to students with disabilities. In rare cases, a high cost accommodation (e.g., sign language interpreter) may be needed. In these cases, if the center is unable to fund the accommodation or locate a funding source in the community, a request can be made through the appropriate Regional Office for National Office funding assistance. The Job Corps Reasonable Accommodation Funding Request Form must be used to request National Office funding. If supplemental funding is necessary after an initial request has been approved, it must be requested using the Job Corps Reasonable Accommodation Supplemental Funding Request Form.  Both forms are available in this appendix, and additional guidance for completing these forms is available from the Regional Disability Coordinators.

*Recommending Denial of an Accommodation*

Recommending denial of an accommodation should be a rare occurrence. **No accommodation can be denied at the center level.** If the center feels providing the accommodation would be an undue hardship or a fundamental alteration to the nature or operation of the program and no alternate accommodation can be agreed upon, the decision must be forwarded to the Regional Director for a final decision.

Before sending a recommendation for denial to the region, center staff should contact its Regional Disability Coordinator for guidance and review the following statements to determine if the reasonable accommodation process was completed.

- The center held an interactive RAC meeting that included the applicant/student;

- The interactive process is well documented;

- The RAC considered specific accommodations;

- If appropriate, the center contacted the Job Accommodation Network (JAN) and documented the date, name of the JAN staff person who assisted, and JAN's accommodation recommendations;

- The reason for the recommendation for denial of the accommodation is clearly documented, and is because providing the accommodation would be an undue hardship or a fundamental alteration to program;

- The center offered another solution that would permit the applicant/student to participate in the program to the greatest extent possible. The applicant's/student's decision to decline this offer is documented.

- If the recommendation for denial is based on undue hardship due to cost, funding from the National Office was requested.

If all steps were taken, the center should complete the Accommodation Recommendation for Denial form (included in this appendix) and submit along with all other documentation/notes/forms related to the request to the Regional Office for a final decision. The Regional Director will make a determination after consultation with Regional Disability Coordinators, other appropriate staff, and the National Office (i.e., National Health Staff) as to whether there is an obligation to grant the accommodation request.

If the Regional Director determines that the accommodation should be granted, the accommodation will be provided. If the Regional Director determines that there is no obligation to grant the accommodation, the applicant/student will be provided a written statement from the Regional Office that includes the reason for the denial and why no other accommodation is possible.

The center will make every effort to respond to the request in a timely manner and will inform the applicant/student if the request is being sent to the region for review or delayed for any other reason. Centers should complete the review of an accommodation request within 30 days of the arrival of the applicant's file on center. When this is not possible, a DC should document the reason.

**Entering the Accommodation Plan**

After accommodation determinations have been made and as soon as possible after the student enters the program, the accommodation plan will be entered in CIS using the accommodation plan icon. For students who require TABE testing accommodations, the plan will be entered prior to the administration of the first TABE test. Accommodation plans should not include information about an individual student's diagnosis, medication needs, or other health-related history or information. The DC and student will sign the plan. A copy of the plan must be provided to the student, and the original should be maintained in the student's accommodation

file.

## Notifying Staff/Viewing the Accommodation Plan

As necessary (i.e., when accommodation plans are added or updated in CIS), but at least biweekly, a DC should e-mail all staff members who interact with students a list of students with accommodation plans available in the CIS, the list should specifically indicate any plans that are new or updated. Copies of these e-mails should be maintained by a DC. Managers are responsible for ensuring that approved accommodations are implemented in their areas of supervision.

Staff should access plans in CIS using the accommodation plan icon. Access to the plan's content must be determined on a "need to know" basis. Since in most cases accommodations need to be provided throughout all departmental areas of the center, access to the plans may need to be center-wide.

## Determining Accommodation Effectiveness

As the student participates in the program, new needs may be identified or accommodation adjustments may be required. The effectiveness of a student's accommodation will be evaluated as part of student performance panels on a regular basis throughout his or her enrollment in Job Corps (at least every 60 days). Student and staff feedback is required as part of this process and this feedback should be documented in the accommodation file. Forms and additional guidance for supporting this process are available on the Job Corps Disability website.

*Note: Staff should not wait for a performance panel review to request a modification of an existing plan if a need for a change has been identified.*

## Documenting the Accommodation Process

Documentation of actions and decisions can be very important if an applicant/student alleges discrimination. Therefore all interactions with the applicant/student and activities related to the provision of reasonable accommodation should be documented. The Notes tab in CIS will be used to document the process. For examples of notes, see the Reasonable Accommodation Guidelines section of the Job Corps Disability website.

## Maintaining the Accommodation File

A separate accommodation file (similar to the student's health record) should be maintained for each student receiving accommodation. Appropriate staff should have access to the information and medical records should be stored separately (in student's health record).

All accommodation files will contain documents and information to support the provision of accommodation and notes/updates documenting the accommodation process. For suggested content and layout for an accommodation file, see the Reasonable Accommodation Guidelines section of the Job Corps Disability website. All suggested contents may not be required for each

accommodation file. If a different layout is preferred, it should be consistent for all accommodation files.

## Storing Accommodation and Disability Documentation

*Storage of Accommodation Files*

Each student should have only one accommodation file, and all accommodation files must be stored as a group in a separate drawer, file cabinet, or storage room that is locked. When the student separates, the accommodation file should be sealed and sent to records to be combined with other files into a single record and stored in a central location on center. See Appendix 202 for more information on storage of disability-related information.

*Storage of Non-Health Disability Documentation, No Accommodation Plan*

If a student with a disability does not wish to receive accommodations, either Reasonable Accommodation Review/Documentation of Disability Form or a Job Corps Reasonable Accommodation Request Form – Program will be completed for the student. A "disability, no accommodations" file will be created for each student that has a disability, but no accommodation plan. This file will contain the appropriate form and any non-health disability-related documentation such as an IEP. These files should be stored in the same location as the accommodation files, but should be differentiated (e.g., stored as a group in a separate area of the cabinet or color coded).

When the student separates, these files should be sealed and sent to records to be combined with other files into a single record and stored in a central location on center. See Appendix 202 for more information on storage of disability-related information.

## Confidentiality

Information regarding disability and prior accommodation will be discussed during the process. To maintain confidentiality, documentation is made available on a need-to-know basis only, and participants in the process should not discuss information about the request outside of the process. Those responsible for implementing the accommodation will be informed of the accommodation and the reasons for it only to the extent necessary to ensure effective implementation of the accommodation. See Appendix 202 for more information on confidentiality of disability-related information.

For more detailed information, tools, forms, tips, and resources to support the center reasonable accommodation process, see the Reasonable Accommodation Guidelines section of the Job Corps Disability website.

### JOB CORPS REASONABLE ACCOMMODATION REQUEST FORM – PROGRAM

If you are a person with a disability, you may request accommodations (changes in the way things are done, or other types of help) to assist you in successfully participating in the Job Corps program.  You **may** be qualified to receive reasonable accommodation if you ever:

- Had an IEP or 504 Plan in school
- Had special education support
- Had extra supports or pullout classes in school
- Were given extra time to complete assignments or tests in school
- Got help in a resource room in high school
- Were allowed extra time to get to and from class
- Received any adjustments to the scheduled school day for appointments or because of side effects of medication
- Were/are a client of Vocational Rehabilitation or a related program
- Receive Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI)

If you are worried about talking about your disability, it is important to understand that Job Corps upholds strict policies on confidentiality, which means this information will only be shared with those who need to know. The main reason for you telling us about your disability is so you can get the support you need to participate effectively/successfully while enrolled in the Job Corps program.

In high school, you may have gone to a separate resource room for instruction if you received special education services. In Job Corps, students with disabilities attend all the same classes and participate in all of the same programs as students without disabilities.

Depending on your disability and the type of accommodation you are asking for, we may ask you to provide documentation about your disability and how it affects you so we can determine your need for reasonable accommodation.  Each center has staff that can assist you with the accommodation process.

If you indicate that you would like accommodations, would like to discuss accommodations with a Center Disability Coordinator, or provide information indicating that accommodations may be necessary, a Center Disability Coordinator will contact you to talk about the need for accommodation.

You are not required to have an accommodation plan. Should you choose to have an accommodation plan, you will work jointly with a Center Disability Coordinator to develop one. If an accommodation you have requested cannot be provided because it is unreasonable, every effort will be made to offer you an equally effective alternate accommodation that is reasonable.

Your Admission's Counselor or a Center Disability Coordinator (if you are requesting accommodation after arrival on center) will guide you through completion of this form.

## SECTION A – APPLICANT/STUDENT

| Name: | | ID#: | |
|-------|--|------|--|
| Address: | | Phone: | |
| | | E-mail: | |

☐   I would like to request accommodations to participate in the Job Corps program. (***Please list the accommodations requested.***)
  •
  •
  •

☐   I think I may need an accommodation, but I am not sure what I will need. I would like to talk directly with a Center Disability Coordinator about my accommodation needs.

---

**Applicant/Student Signature**                                    **Date**

---

**Parent/Guardian Signature**                                    **Date**

*The Admission's Counselor should forward the center this form and related documentation in the sealed envelope containing health/disability information.*

## SECTION B – DISABILITY COORDINATOR

I have met with the applicant/student ☐ by telephone ☐ in person to discuss his or her accommodation needs.  The applicant/student:

☐   Has a ☐ drafted agreed upon accommodation plan pending enrollment* or has an ☐ agreed upon accommodation plan.

☐   Does not wish to receive accommodations. The applicant/student has been informed that s/he may request reasonable accommodation at any time.

☐   The center cannot agree to an accommodation plan. The Accommodation Recommendation for Denial form and related documentation are being sent to the Regional Office for review.

---

**Applicant/Student Signature**                                    **Date**

---

**Parent/Guardian Signature**                                    **Date**

---

**Disability Coordinator Signature**                                    **Date**

*\*Upon enrollment, the student's plan is entered into CIS, printed out and the student asked to review and sign the printed copy if in agreement.  The student is given a copy of the signed plan.*

### REASONABLE ACCOMMODATION REVIEW/
### DOCUMENTATION OF DISABILITY FORM

Job Corps policy requires that the Center Disability Coordinators engage an individual in the interactive reasonable accommodation process if the applicant or student either requests an accommodation (see the Job Corps Reasonable Accommodation Request Form–Program) or provides documentation of a disability. Center Disability Coordinators must use this form to document the interactive process for an applicant or student who has not requested accommodations, but who has provided documentation of the disability.

| Name: | | ID#: | |
|---|---|---|---|
| **Address:** | | **Phone:** | |
| | | **E-mail:** | |

☐ Documentation source(s) (e.g., IEP, Chronic Care Management Plan, health documentation, etc.)
  - 
  - 

I have met with the applicant/student ☐ by telephone ☐ in person to discuss his or her accommodation needs.  The applicant/student:

☐ Has a ☐ drafted agreed upon accommodation plan pending enrollment* or has an ☐ agreed upon signed accommodation plan.

☐ Does not wish to receive accommodations. The applicant/student has been informed that s/he may request reasonable accommodation at any time.

☐ The center cannot agree to an accommodation plan. The Accommodation Recommendation for Denial Form and related documentation are being sent to the Regional Office for review.

---

**Applicant/Student Signature**                                              **Date**

---

**Parent/Guardian Signature**                                                **Date**

---

**Disability Coordinator Signature**                                         **Date**

*Upon enrollment, the student's plan is entered into CIS, printed out and the student asked to review and sign the printed copy if in agreement. The student is given a copy of the signed plan and the original is stored in the accommodation file.*

## JOB CORPS REASONABLE ACCOMMODATION FUNDING REQUEST FORM

Centers are responsible for any costs associated with providing reasonable accommodation to an applicant or student with a disability. If a center cannot fund an accommodation or locate a funding source in the community, a request can be made through the appropriate Regional Office for National Office funding assistance for high-cost accommodations (those greater than $5,000).

All requests for funding assistance should be made as part of the accommodation process. Funding requests for accommodations already provided will not be considered. National Office funding for medications and personal use items is not available. This form can only be used to request funding assistance for an individual applicant or student. No requests that contain multiple students on the same form will be considered.

Please complete the appropriate section of the following form. All requests should be expedited so as not to unreasonably delay entry or provision of accommodation to the applicant/student.

| A. CENTER DISABILITY COORDINATOR REQUEST | |
|---|---|
| *Complete this section of the form and send it to your Regional Disability Coordinator within 7 days of the applicant's or student's reasonable accommodation committee meeting. You should include the applicant's IEP or other documentation that indicates the applicant's functional limitations and any past accommodations. You must contact your Regional Disability Coordinator for guidance on completing this form and providing supporting documentation.* | |
| **Center:** | **Center Disability Coordinator:** |
| **E-mail:** | **Phone:** |
| **Applicant/Student Name:** | **Date File Received on Center:** |
| **Accommodation Request Date:** | **RAC Meeting Date(s) and Attendees:** |
| **Describe the nature of the applicants/student's disability and resulting functional limitation(s).** | |
| **In the space below, list each accommodation with a one-time fixed cost (e.g., software, equipment, etc.,) that is being requested and provide the vendor estimates for these items with supporting documentation that was used to determine these costs. For accommodations requiring on-going costs (e.g., sign language interpreters), these costs should be estimated for a one-year period utilizing the Cost Analysis Form that will be provided to you by your Regional Disability Coordinator. This form must be completed and submitted with this funding request.** | |
| **Accommodation:** | **One-time Fixed Cost:** |
| **Accommodation:** | **One-time Fixed Cost:** |
| **Accommodation:** | **One-time Fixed Cost:** |
| **Accommodation:** | **One-time Fixed Cost:** |
| **Accommodation:** | **On-going Cost:** |
| **Accommodation:** | **On-going Cost:** |

| Total Estimated Fixed Costs: | Total Estimated On-going Costs: | Total Estimated Costs: |
|---|---|---|

**List other possible funding sources consulted along with their contact information. If any funding is being provided by these sources, please list amount.**

**How will this/these accommodations remove or minimize the barriers presented by the applicant's/students' functional limitation(s)?**

**Were any alternate accommodations considered?  If yes, list and describe why not chosen.**

**Could the requested accommodation(s) benefit other students with disabilities enrolled in the program? If yes, describe the benefit.**

*If you are requesting funding for a sign language interpreter, you must review the Deaf/Hard of Hearing Guidance available on the Job Corps Disability website, including the guidance on interpreting services. A DC must have the applicant/student complete the interview form available on the overview page of the guidance. This form should be included with your request.*

**Date Guidance reviewed:**

**List any other accommodations that will/are being provided.**

| Disability Coordinator Signature: | Center Director Signature: |
|---|---|

**Date Forwarded to Regional Disability Coordinator:**

**B.  REGIONAL DISABILITY COORDINATOR REVIEW**

*Please review the center's request. If the center section of the form is not complete or inadequate documentation/information has been provided, please contact the Center Disability Coordinator to resolve these concerns. If the center section of the form is complete and adequate documentation/ information has been provided,* **complete this section of the form and send it with a summary of your review to the Regional Office Program/Project Manager and cc National Health Staff within 7 days of receipt from the center.**

| Regional Disability Coordinator: | E-mail: |
|---|---|
| Phone: | Date Request Received: |
| Date Request Reviewed: | Date Forwarded to Regional Office: |

| Regional Disability Coordinator Signature: | |
|---|---|

**C.  REGIONAL PROGRAM/PROJECT MANAGER REVIEW**

*Please review the center's request. If the sections A or B of the form are not complete or inadequate information has been provided, please contact the Regional Disability Coordinator to resolve these concerns. If sections A and B of the form are complete and adequate documentation/information has been provided, **complete this section of the form and send to National Health Staff at the address below within 5 days of receipt from the Regional Disability Coordinator.***

*National Health Staff*
*U.S. Department of Labor*
*Office of Job Corps*
*200 Constitution Avenue, NW, Room N-4507*
*Washington, DC 20210*

| Program/Project Manager: | Phone: |
|---|---|
| E-mail: | Date Request Received: |
| Date Request Reviewed: | Date Forwarded to National Office: |
| Regional Director Signature: | Program/Project Manager Signature: |

**D.  NATIONAL HEALTH STAFF REVIEW**

*Please review the center's request and supporting documentation. If the required signatures are missing, or additional information is needed, please return the form to the Regional Disability Coordinator to resolve these concerns. If the previous sections of the form are complete and adequate information has been provided, draft an approval letter and begin the National Office signature process **within 3 days of receipt of form from the Regional Program/Project Manager.***

| National Office Health Staff Person: | Position: |
|---|---|
| Phone: | E-mail: |
| Date Request Received: | Date Request Reviewed: |
| Date Approval Letter Drafted: | Amount Approved (*if different from original request, please explain*): |

**E.  NATIONAL OFFICE SIGNATURE APPROVAL PROCESS**

*National Health staff will coordinate the signature approval process in the following order; the National Health and Wellness Director, Division Chief, Budget Chief, Deputy Director, and National Director. **Complete this section of the form within 7 days of beginning the signature approval process.***

| Health and Wellness Director Signature: | Date: |
|---|---|
| Division Chief Signature: | Date: |
| Budget Chief Signature: | Date: |
| Deputy Director Signature: | Date: |
| National Director Signature: | Date: |

| Final Amount Approved (*if no funding is approved or amount is different from original request, please explain*): | Final Disposition Date: |
|---|---|
| **F. NATIONAL OFFICE FINAL DISPOSITION** | |
| *If funding is approved, National Health staff will provide signed documentation to the Budget Chief, Regional Office Program/Project Manager, Center Disability Coordinator, and Regional Disability Coordinator. If the request is denied, National Health staff will notify the Regional Office Program/Project Manager, Center Disability Coordinator, and Regional Disability Coordinator.* | |
| **National Health Staff Making Notification:** | **Position:** |
| **Phone:** | **E-mail:** |
| **Date Notification Provided:** | **National Health Staff Signature:** |

## JOB CORPS REASONABLE ACCOMMODATION
## SUPPLEMENTAL FUNDING REQUEST FORM

Please complete this form to request supplemental funding for an accommodation funding request that has been approved using the Job Corps Reasonable Accommodation Funding Request Form. If this is a new accommodation funding request or all funds have been used from your initial request, complete the Job Corps Reasonable Accommodation Funding Request Form.

| A. CENTER DISABILITY COORDINATOR REQUEST | | |
|---|---|---|
| *Complete this section of the form and send it to your Regional Disability Coordinator and cc the Regional Office Program/Project Manager. Attach the most recent follow up you provided to your Regional Disability Coordinator and the student's accommodation plan.* | | |
| **Center Disability Coordinator:** | **E-mail:** | |
| **Phone:** | **Student Name/ID:** | |
| **Describe the accommodation that supplemental funding is being requested for and why additional funding is being requested (attach supporting documentation).** | | |
| **Amount of Additional Funding Being Requested:** | **Date of Last Request:** | **Amount Previously Requested:** |
| **Center Director Signature:** | | |
| **Disability Coordinator Signature:** | | |
| **Date forwarded to Regional Disability Coordinator:** | | |

| B. REGIONAL DISABILITY COORDINATOR REVIEW | |
|---|---|
| Please review the center's request. If the center section of the form is not complete or inadequate information has been provided, please contact the Center Disability Coordinator to resolve these concerns. If the center section of the form is complete and adequate information has been provided, ***complete this section of the form and send it to the National Health Staff and cc the Regional Program/Project Manager within 7 days of receipt from the center.*** | |
| **Regional Disability Coordinator:** | **E-mail:** |
| **Phone:** | **Date Request Received:** |
| **Date Request Reviewed:** | **Date Forwarded to Regional Office:** |
| **Regional Disability Coordinator Signature:** | |

## ACCOMMODATION RECOMMENDATION FOR DENIAL FORM

| | | | |
|---|---|---|---|
| **Center:** | | **Date:** | |
| **Applicant/Student:** | | **ID#:** | |
| **Regional Office:** | | **Date Submitted to Regional Office:** | |

If this request is for an applicant and you have already completed the Applicant File Review Center Recommendation for Denial Form, please attach this form to it and skip to Section B. If this request is for a student, please complete Sections A through C.

**Section A**

| Reasonable Accommodation Committee Participants | |
|---|---|
| Name: | Position: |
| Name: | Position: |
| Name: | Position: |
| Name: | Position: |

| Summarize the Applicant's Input: |
|---|
| |

**Section B**

Please list any accommodations that the center has identified as being unreasonable and then identify any alternative options that are deemed reasonable that the applicant rejected.  If none can be identified, please state none and explain why in the Summary section of the document.

| Accommodation | Applicant Requested? | Alternative Options | Basis for Unreasonableness |
|---|---|---|---|
| | ☐ Yes     ☐ No | | ☐ Unduly costly<br>☐ Fundamental Alteration |
| | ☐ Yes     ☐ No | | ☐ Unduly costly<br>☐ Fundamental Alteration |
| | ☐ Yes     ☐ No | | ☐ Unduly costly<br>☐ Fundamental Alteration |

**Section C**

Please show calculated costs for each accommodation being recommended for denial that has been identified as unduly costly and/or document why the accommodation requires a fundamental alteration to the program.

| Cost Analysis or Fundamental Alteration |
|---|
| |

| Summary/Notes |
|---|
|  |

**Center Director's Signature:**

_____

Signature                                                                        Date

| Regional Office Only | | |
|---|---|---|
| **Accommodation** | **Disposition** | |
|  | ☐ Concur with Recommendation | ☐ Deny |
|  | ☐ Concur with Recommendation | ☐ Deny |
|  | ☐ Concur with Recommendation | ☐ Deny |

*If the region does not support the recommendation for denial of the accommodation(s), then the center must be notified that it is responsible for providing the requested/agreed upon accommodation.

## FORM 2-04
## INDIVIDUALIZED ASSESSMENT OF POSSIBLE DIRECT THREAT

**Purpose**

To provide additional information and guidance on the direct-threat assessment process currently outlined in Chapter 1, Section 1.5, R4. This supersedes information in PRH Change Notice 11-03.

**Background**

Job Corps requires, as a qualification standard, that an applicant not pose a direct threat to the health or safety of himself/herself or others, including students and staff. Like any qualification standard, this requirement must apply to all applicants, not just to those with disabilities. If, however, an individual poses a direct threat as a result of a disability, Job Corps must determine whether a reasonable accommodation would either eliminate the risk or reduce it to an acceptable level.

This document provides Job Corps Health and Wellness staff, including Trainee Employee and Assistance Program (TEAP) specialists, with guidance designed to help them properly and lawfully assess an individual applicant's ability to safely participate in the Job Corps program.

If the assessor determines that the individual poses a direct threat and the threat results from a disability, the assessor must consider whether any accommodations or modifications would reduce the risk, and list any suggested accommodations or modifications. Please note that the assessor must not consider whether, in his/her view, a particular accommodation or modification is "reasonable;" that determination must be made by the Center Director or his/her designee, on the basis of a number of specific factors that are required by law.

**Instructions**

The attached form may be used to conduct an individualized assessment of an applicant's possible direct threat to self or others.

Federal disability nondiscrimination laws define a "direct threat" as **a significant risk of substantial harm to the health and safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation or modification.** A "significant risk" means a high, not a slight, probability; a speculative or remote risk is insufficient.

Determining whether an individual poses a significant risk of substantial harm to himself/herself or others must be made on a case-by-case basis. Job Corps should identify the specific risk posed by the disability. For individuals with psychiatric disabilities, Job Corps must identify the specific behavior of the individual that would pose the direct threat. Federal disability nondiscrimination laws make clear that an individual does not pose a direct threat simply because he or she has a history of psychiatric disability, or is currently receiving treatment for a psychiatric disability.

When evaluating whether an individual with a disability or medical condition poses a direct

threat, please keep in mind that there are special rules governing when disability-related inquiries, i.e., questions which are likely to elicit information about a disability can be made.

- In the context of evaluating an applicant for Job Corps, a direct-threat assessment may be done whenever Job Corps believes that a known or apparent disability or medical condition poses a direct threat to the health or safety of the individual or others. This typically will occur: (1) *after* the applicant has received conditional assignment to a Job Corps center and has completed the questions on the "Job Corps Health Questionnaire (ETA 6-53);" *and* (2) after specific, objective, factual information about that particular conditionally enrolled applicant is gathered that is medically related to any "yes" responses given to the questions in sections 8 or 9 of the questionnaire; *if* (3) the initial review of this specific, objective, factual information supports a reasonable belief that the conditionally enrolled applicant may have a medical condition or disability that poses a significant risk of substantial harm to the health or safety of the individual or others, i.e., direct threat. If all of these criteria are satisfied, the Health and Wellness Director will forward the applicant's information to the appropriate licensed health provider employed by the center for a detailed direct-threat assessment.

**Who May Conduct the Assessment?**

The clinical assessment of risk and degree of potential harm that may be caused by the individual's medical condition or disability is generally a medical matter properly determined by licensed health providers. Such providers employed by Job Corps include nurses, physicians, Center Mental Health Consultants, dentists, and TEAP specialists. This group, therefore, has a significant role to play in determining whether, in a given Job Corps setting, a particular individual's medical condition or disability poses a significant risk of substantial harm to the health or safety of himself/herself or others. Medical health conditions that may pose a direct threat should be assessed by nurses and/or physicians; mental health conditions should be assessed by mental health consultants; oral health conditions should be assessed by dentists; and conditions related to substance use should be assessed by TEAP specialists. In some cases, it may be necessary to consult an outside specialist with expertise in the particular medical condition or disability and its effects.

**Basis for the Assessment**

The determination that an individual has a medical condition or disability that poses a "direct threat" must be based on an individualized assessment of the individual's present ability to safely participate in the Job Corps program. This assessment must be made by a licensed health provider, based on a reasonable medical judgment that relies on the most current medical knowledge and the best available objective evidence. Before conducting a direct-threat assessment, the assessor may need to educate himself/herself about the current state of medical knowledge, and about the specific facts of the particular individual's medical history and/or the circumstances in which he or she has been or will be placed in the Job Corps program.

As noted above, the assessment must focus on the current medical condition or disability of the

specific individual named on the form. The determination cannot be based on generalizations about the medical condition or disability; the assessor must identify the specific risk that is posed by the medical condition or disability of the named individual in the applicable Job Corps context. Additionally, the harm must be serious and likely to occur, not remote and speculative. Subjective perceptions, irrational fears, patronizing attitudes, and stereotypes have no place in the assessment process.

**Factors to Be Considered**

In determining whether an individual has a medical condition or disability that poses a direct threat, the assessor must consider four specific factors: duration of the risk, nature and severity of the potential harm; likelihood that the potential harm will occur; and imminence of the potential harm.

If the assessor considers these four factors and determines that a direct threat is posed by the medical condition or disability, he/she must consider whether the risk can be eliminated or reduced to an acceptable level by reasonable accommodation or modification.

Relevant factors in making the direct threat assessment (including the consideration of whether the risk may be lessened or eliminated) may include:

- Input from the individual with the medical condition or disability

- The medical history of the individual, including his or her experience in previous situations similar to those he or she would encounter in the program

- Opinions of medical doctors, rehabilitation counselors, or therapists who have expertise in the condition involved and/or direct knowledge of the individual

Under federal disability nondiscrimination laws, the burden is on Job Corps to prove that a particular individual has a medical condition or disability that poses a direct threat. This means that if the objective, factual evidence is equivocal, or is insufficient to prove that the participation of that specific individual would pose a direct threat, the assessor must assume that no direct threat exists.

The four factors for determining direct threat are described below.

1. **Nature and severity of the risk.** In the professional judgment of the assessor:

   a. What *kind of harm* is potentially posed by this individual's medical condition or disability? **List the specific symptoms or behaviors** and the information on which the judgment is based.

   b. What is the *seriousness of the potential harm* in this particular case (e.g., death, incapacitation, serious injury, minor injury/emotional distress)? List the specific information on which the judgment is based.

2.    **Duration of the risk.** In the professional judgment of the assessor, how long will the risk last?  List the specific information on which the judgment is based.

3.    **Likelihood that the potential harm will occur.** In the professional judgment of the assessor, is the likelihood that potential harm will occur high, moderate, or low? List the specific information on which the judgment is based.

4.    **Imminence of the potential harm.** In the professional judgment of the assessor, how soon is the harm likely to occur? List the specific information on which the judgment is based.

Taking all four of these factors into consideration, the assessor should determine whether the applicant's condition poses a significant risk of substantial harm.

**Accommodations or Modifications**

If the individual is a person with a disability, the center's reasonable accommodation team must convene and consider accommodations and/or modifications that the individual may need. See Form 2-03 for definition of a disability. Once the accommodations and/or modifications have been identified, the qualified licensed professional who conducted the original assessment must review the previous findings to each of the factors giving consideration to the identified accommodations to determine whether or not the accommodations and/or modifications eliminate the threat or reduce it to below the level of threat.

If it is determined that the accommodations and/or modifications will remove the barriers to enrollment and are considered unreasonable, then the team must forward the list of identified accommodations and/or modifications to the Center Director for a "reasonableness" and/or undue hardship determination (see below).  If the accommodations and/or modifications identified would not eliminate the threat or sufficiently reduce it to below the level of threat, then the reasonable accommodation team (inclusive of the licensed professional) must indicate which accommodations and/or modifications would be insufficient and explain why.

Examples of Accommodation/Modification Consideration for Direct Threat

•    Schedule adjustments to allow the applicant to attend necessary off-center appointments

•    Shortened training day or later start to the training day to adjust for medication side- effects

•    Passes during the training day to allow applicant to leave class and meet with counselor to de-escalate behaviors as needed

Every effort should be made to identify appropriate accommodations and/or modifications, and reasonable accommodation teams are encouraged to use identified resources (e.g., Job

Accommodation Network) to assist them, as appropriate.

**Center Director Reasonableness Determination**

If there is a recommendation for an applicant to be enrolled with accommodations or modifications which you believe are not reasonable and/or pose an undue hardship, the **Center Director is responsible for making that determination** using the "Accommodation Recommendation of Denial Form" found on the Job Corps Disability website and including that form along with the applicant file that is being submitted to the Regional Office with a recommendation for denial. The final determination is made by the Regional Office.

Guidance on how to make this determination is available in the "Evaluating a Request and Denying a Request" sections of Form 2-03. Please attach the completed "Accommodation Recommendation of Denial Form" found on the Job Corps Disability website.

For more information on direct threat, see the Equal Employment Opportunity Commission (EEOC) Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (http://www.eeoc.gov/policy/docs/psych.html).

## FORM FOR INDIVIDUALIZED ASSESSMENT OF POSSIBLE DIRECT THREAT

**Applicant's Name:** _____   **Date of Review:** _____

**Center Name:** _____   **ID #:** _____

**Interview Conducted By:**      ☐ Telephone          ☐ In Person          ☐ Videoconference

In determining whether, in your professional judgment, the individual named above has a medical condition or disability that poses a direct threat, consider the following and respond accordingly.

Factors to be considered in determining whether a "significant risk of substantial harm" exists include: (1) duration of the risk, (2) nature and severity of the potential harm, (3) likelihood that the potential harm will occur, and (4) imminence of the potential harm.

Under the law, the burden is on Job Corps to prove that a specific individual poses a direct threat. Therefore, if the objective, factual information about the specific individual named above is equivocal, or is insufficient to *prove* that a direct threat exists, you must assume that the individual's disability or medical condition does not pose a direct threat.

If you determine that a "significant risk of substantial harm" exists, consider whether any accommodations or modifications would reduce the risk, and list any suggested accommodations or modifications. Do not consider whether, in your view, a particular accommodation or modification is "reasonable." That determination must be made by the center director or his/her designees.

**1.   What is the nature and severity of the potential harm?**

    **a.   What kind of harm is potentially posed by this individual's medical condition or disability?**
        *(Check the specific symptom(s) or behavior(s) or list under "Other")*

☐ Abusive Behavior Towards Authority and/or Peers

☐ Drug and Alcohol Use/Dependence

☐ Homicidal Behavior

☐ Paranoid Thinking

☐ Self-Injury

☐ Serious or Life Threatening Medical Condition

☐ Severe Sensory Impairment

☐ Severely Impaired Concentration

☐ Severely Impaired Impulse Control

☐ Severely Impaired Judgment

☐ Suicidal Behavior

☐ Threat of Sexually Inappropriate Behavior

☐ Threat of Violence – Assaultive Behavior

☐ Unpredictable Changes in Behavior

☐ Other (specify): _____
_____

    **b.   What is the seriousness of the potential harm in this particular case (e.g., death, incapacitation, serious injury, minor injury/emotional distress)?** _____
_____
_____
_____

**2.   What is the duration of the risk (i.e., how long will the risk last)?**
_____
_____
_____

**3.   What is the likelihood that the potential harm will occur (i.e., high, moderate, or low)?**
_____
_____
_____

**4.   What is the imminence of the potential harm (i.e., how soon is the harm likely to occur)?**
_____
_____
_____

**5.   Reasonable Accommodation Consideration**

Is this applicant a person with a disability?        ☐ Yes   ☐ No
*(i.e., documentation of a mental health, medical, substance-abuse, cognitive, or other type of disability is present in the applicant file or the disability is obvious (i.e., blind, deaf).*

If no, please skip to #6. If yes, convene the reasonable accommodation committee (RAC) along with the applicant and list below any accommodations and/ or modifications <u>discussed with the applicant</u> that could either remove or reduce the direct threat.

Note: Accommodations or modifications are not things that treat the impairment; they are things that will help the individual participate in the program. See Program Instruction 08-26 "Reasonable Accommodation and Case Management" for guidance.

☐   The RAC has been unable to identify any accommodations appropriate to support this applicant.
☐   The following accommodations/modifications listed below have been discussed with the applicant and considered as a part of this assessment:

*Please avoid suggesting extreme accommodations already known to likely be unreasonable unless the applicant has requested a specific support (i.e., 24 hour supervision). If unsure if a support or modification is really an accommodation or is actually a case management support, please contact your regional health and disability consultants for assistance.*

**Based on the specific symptoms and/or behaviors checked in Section 1a, please check the appropriate accommodations below discussed with the applicant.** *Please note: This list is not all inclusive. These are suggestions for your use and you may need to consider functional limitations and accommodations beyond this list which can be entered in the "Other" section.*

**Are there any changes we can make to our center policies, procedures, or practices to eliminate or reduce the level of threat?**

| | | |
|---|---|---|
| •  Schedule adjustments to allow the student to attend necessary off-center appointments | ☐ Yes | ☐ No |
| •  Shortened training day or later start to the training day to adjust for medication side effects | ☐ Yes | ☐ No |
| •  Modified first 30 days on center with a reduction in tasks to minimize stress | ☐ Yes | ☐ No |

- Provide applicant with pass to leave class if he/ she begins to feel anxious, angry or upset and go to designated "calm down" area          ☐ Yes        ☐ No
- Allow frequent breaks during the day                                        ☐ Yes        ☐ No
- Allow telephone calls during work hours to doctors and others for needed support  ☐ Yes        ☐ No
- Reduce mandatory participation in large group activities                      ☐ Yes        ☐ No
- Provide additional orientation on conduct and behavioral expectations         ☐ Yes        ☐ No

Other:

| **Are there any physical changes or placement considerations in the dorm we can make to eliminate or reduce the level of threat?** | | |
|---|---|---|
| • Provide single dorm room | ☐ Yes | ☐ No |
| • Modified door/window locks for safety | ☐ Yes | ☐ No |
| • Placement in residential dorm with fewer students and/or more experienced Residential Advisors (RAs)/Residential Counselors (RCs) | ☐ Yes | ☐ No |
| • Provide dorm room closer to RA's/RC's office | ☐ Yes | ☐ No |
| • Allow mobility coach | ☐ Yes | ☐ No |
| • Allow refrigerator in room | ☐ Yes | ☐ No |

Other:

| **Can we adjust our level of supervision or structure at the center to eliminate or reduce the level of threat?** | | |
|---|---|---|
| • Provide staff mentor as needed (like a job coach) | ☐ Yes | ☐ No |
| • Provide student mentor as needed | ☐ Yes | ☐ No |

Other:

| **Can our instructors and/or RA/RC staff adjust their communication methods in a way to eliminate or reduce the level of threat?** | | |
|---|---|---|
| • Provide detailed guidance | ☐ Yes | ☐ No |
| • Provide frequent feedback | ☐ Yes | ☐ No |
| • Provide praise and positive reinforcement | ☐ Yes | ☐ No |

Other:

| **Is there any special equipment or device to consider that can eliminate or reduce the level of threat?** | | |
|---|---|---|
| • Provide visual barriers to reduce startle responses | ☐ Yes | ☐ No |
| • Use of headphones to minimize distractions | ☐ Yes | ☐ No |

Other:

| **Allow special medical equipment in room and in trade.** | | |
|---|---|---|
| • Permission to use a service animal | ☐ Yes | ☐ No |

Other:

| **Summarize any special considerations and findings of the RAC as well as the applicant's input:** |
|---|
| |

*Please Note: Job Corps cannot impose accommodations upon an individual.  If the applicant does not accept*

*or agree to a specific accommodation, there is no need to consider that specific accommodation in your determination of whether the accommodations listed will reduce the barriers to enrollment sufficiently or not nor is there a need to complete a reasonableness review related to that specific accommodation.*

| Reasonable Accommodation Considerations: | | |
| --- | --- | --- |

Did the applicant participate in the RAC meeting?     ☐ Yes    ☐ No
(*Note:  The applicant must be a part of the discussion for reasonable accommodation*).

| RAC Participants: | | | |
| --- | --- | --- | --- |
| **Name:** | | **Position:** | |
| **Name:** | | **Position:** | |
| **Name:** | | **Position:** | |

If there is a recommendation for an applicant to be enrolled with the accommodations or modifications listed in #5 above which you believe are not reasonable and/or pose an undue hardship, the **Center Director is responsible for making that determination** using the "Accommodation Recommendation of Denial Form" found on the Job Corps Disability website and including that form along with the applicant file that is being submitted to the regional office with a recommendation for denial. The final determination is made by the regional office.

Guidance on how to make this determination is available in the "Evaluating a Request and Denying a Request" sections of Form 2-03. Please attach the completed "Accommodation Recommendation of Denial Form."

If there are agreed upon accommodations between the RAC and applicant listed above, then consider whether those accommodations reduce or eliminate the direct threat to allow for the applicant to be enrolled.

- If the accommodations would sufficiently reduce or eliminate the direct threat, then you do not need to complete the remainder of this assessment and the center can assign the applicant a start date. Retain all the paperwork included in completing this assessment within the applicant's Student Health Record.

- If the accommodations would NOT sufficiently reduce or eliminate the direct threat, please proceed to #6.

**6.  Based on the factors above, does the named individual have a medical condition or disability that poses a significant risk of substantial harm to the safety of himself/herself or of others if he or she participates in Job Corps?**

    ☐   In my professional judgement, the individual's participation poses a direct threat.

    ☐   In my professional judgement, the individual's participation does not pose a direct threat.

_____

**Printed or Typed Name and Title of Licensed Health Provider Completing Form**

_____

**Signature of Licensed Health Provider Completing Form**        **Date**

## FORM 2-05
## HEALTH CARE NEEDS ASSESSMENT

**Purpose**

To provide additional information and guidance on the health care needs assessment process currently outlined in Chapter 1, Section 1.5, R4.

**Background**

Based on a review of previous applications, Job Corps has learned that the majority of applicants' treatment and/or monitoring needs can be met, but there may be situations in which a particular applicant's needs are beyond what the Job Corps' health and wellness program can provide as defined as basic health care in Exhibit 2-4: Job Corps Basic Health Care Responsibilities.  Current disability data indicate that the majority of our applicants with medical, mental health, oral health, and substance abuse conditions have stable health and require only routine and episodic health care interventions with accommodations. However, a small percentage of applicants may have complex, newly diagnosed, persistent or recurring medical, mental health, oral health, and/or substance abuse health care issues that require services and/or care management beyond Job Corps' basic health care as determined Job Corps health and wellness staff.

This document provides guidance to Job Corps health and wellness staff on how to determine whether Job Corps can meet the medical, mental health, oral health, and/or substance abuse treatment/monitoring needs of a particular applicant.

This determination is derived in part by a review of the "Job Corps Health Questionnaire (ETA 6-53)."

The "Job Corps Health Questionnaire (ETA 6-53)" serves three main purposes:

1. Determine the health care needs of the applicant and assist in the assessment of whether Job Corps can meet those needs

2. Alert center staff to the potential need for evaluation of direct threat to self or others

3. Obtain consent for required routine medical assessments and/or consent to receive basic health care services

If the individual is a person with a disability, the center's reasonable accommodation committee (RAC) must convene and consider accommodations and/or modifications that the individual may need. Before making a recommendation about the applicant's enrollment, the qualified licensed professional who conducted the original assessment must review the previous findings giving consideration to the identified accommodations to determine whether or not the accommodations and/or modifications can remove the barriers to enrollment due to health care needs.

**Instructions**

The attached form may be used to conduct an individualized assessment of an applicant's health care needs.

**Who May Conduct the Assessment?**

The clinical assessment of health care needs caused by the individual's medical condition or disability fall under the health and wellness department on each center. As such, these clinical assessments are to be carried out by qualified licensed/certified health providers only. Those providers employed or subcontracted by Job Corps include nurses, physicians, center mental health consultants (CMHCs), dentists, and Trainee Employee Assistance Program (TEAP) specialists. This group, therefore, has a significant role to play in determining whether, in a given Job Corps setting, a particular individual's health care needs can be managed within the scope of Job Corps basic health services. Medical health conditions should be assessed by nurses and/or physicians; mental health conditions should be assessed by mental health consultants; oral health conditions should be assessed by dentists; and conditions related to substance use should be assessed by TEAP specialists. In some cases, it may be necessary to consult an outside specialist with expertise in the particular medical condition or disability and its effects.

**Indicators that a review is needed**

1.    Within the past six months, two or more emergency room visits or one or more hospitalizations for medical, mental health, oral health, and/or substance abuse reasons.

2.    New diagnosis or recurrence of medical, mental health, extensive untreated oral health, and/or substance abuse condition that would require frequent medication adjustments, significant health resources and/or substantial change to the training day (e.g., daily dialysis, only able to attend Job Corps three hours per day, hourly medication or behavioral monitoring, daily assistance with activities of daily living, long-term weekly on-center therapy provided by the CMHC, complex full-mouth reconstruction/rehabilitation).

3.    Failure to follow previous treatment recommendations by licensed health providers that have adversely affected the applicant's health, behavior, and/or adaptive functioning, and now requires significant health care management. (Note: Some students are non-adherent and experience adverse consequences, but may still benefit from enrollment. Examples might include substance abuse relapse, poor diabetic control, poor asthma control, etc.)

4.    Applicant has followed treatment recommendations by licensed health providers with no improvement in applicant's health, behavior, and/or adaptive functioning which continue to place applicant in need of significant health care management.

5.    Applicant's condition or behavior has not been successfully managed in a similar academic, work, or group environment in the past year.

6.      Applicant is in treatment for a condition that is not in the scope of Job Corps Basic Health Care Responsibilities (e.g., orthodontic braces for malocclusion).

**Elements of the Review Process**

The review should, at a minimum, be comprised of the following elements:

1.      A review of specific condition(s) identified on "Job Corps Health Questionnaire (ETA 6-53)," or self-disclosed by applicant.

2.      Review of health documentation in the file.

3.      Request additional recent health information, to determine applicant needs, if appropriate and medically necessary. Collaborate with OA counselor.

- If the "Job Corps Health Questionnaire (ETA 6-53)" indicates a health condition and there is no supporting information included and no note from the OA counselor indicating their attempt to secure information, contact the OA counselor to gather information.

- If the "Job Corps Health Questionnaire (ETA 6-53)" indicates a health condition and there is supporting information or a note from the OA counselor indicating they could not secure the information and the center wants additional information, the center will need to request that information from the applicant, provider, or facility.

- If a center wants additional tests or evaluations from the applicant and this information is necessary to make an enrollment decision, the center may request the applicant obtain these if they have insurance and/or access to a facility that can provide the testing or evaluations at a rate the applicant can afford. The center will need to work with the applicant and OA counselor to identify specific resources. If applicant cannot afford to obtain additional tests or evaluations, or has not provided the additional health information requested within a reasonable amount of time, the center must make their best recommendation based on the information available.

- In cases where a minor is involved, the center should collaborate with the OA counselor to get parent/guardian permission for health information.

4.      Documented communication with treating provider, if possible and required if there are conflicting recommendations between the center health consultant and the treating provider. If unable to contact treating provider, all attempts need to be clearly documented.  This should be included on Form 2-05.

5.      Interview with the applicant, either face to face, videoconferencing, or via telephone. Documentation of the interview process should be included on Form 2-05. If unable to contact applicant, all attempts need to be clearly documented including collaboration with OA counselor.

6.      Identification of the functional limitations (specific symptoms/behaviors) and health care needs of the applicant that are barriers to enrollment.

7.      If condition rises to a level of a disability, then refer to the RAC for consideration of accommodations and/or modifications for discussion with applicant. **See Form 2-03 for definition of a disability.**

8.      Consider if accommodations and/or modifications would remove the barriers to enrollment and make condition manageable at Job Corps as defined by basic health services in Exhibit 2-4.

**Decision Tree** (based on file review, treating provider information, if available, interview with applicant, and reasonable accommodations, if appropriate)

1.      **Health care needs manageable at Job Corps as defined by basic health care services in Exhibit 2-4,** but require community support services which are not available near center. Documentation of efforts to arrange for less frequent treatment in home state and/or to secure community support near center included on the health care needs assessment in section 7. (i.e., name of organizations/facilities and specific individual contacted). Applicant should be considered for center closer to home where health support and insurance coverage is available. **File is forwarded to Regional Office for final determination.**

   •      If community support is not available near requested center, the center must do the following:

          o      Contact the treating provider and discuss applicant's needs to see if less frequent treatment or monitoring can be arranged. For example, instead of monthly sessions with the psychiatrist, can it be every three months and allow applicant to go home and receive follow-up.

          o      If center is unable to make arrangements, applicant may be considered for center closer to home where health support and insurance coverage is available. Documentation of efforts to arrange for less frequent treatment in home state and to secure community support near requested center should be included in Section 7 of the health care needs assessment. (i.e., name of organizations/facilities and specific individual contacted). **File is forwarded to Regional Office for final determination.**

- For applicants being considered for any center who wear orthodontic braces, applicant furnishes proof of suitable period of compliance with current treatment plan; a treatment plan is in place for continued care; a signed agreement that the cost of continued treatment and transportation related to treatment will be borne by the student, parent, or legal guardian; and a signed agreement that he/she will remain compliant with the care plan and schedule appointments such that he/she will not exceed authorized leave limits for elective treatment.

**2.    Health care needs exceed basic health care as defined in Exhibit 2-4.**

- Applicant has health condition with current symptoms at a level that will interfere with successful participation in the program at this time. Deny entry and refer to other appropriate program/provider. File forwarded to Regional Office for final decision.

**Accommodations or Modifications**

If the individual is a person with a disability, the center's RAC must convene and consider accommodations and/or modifications that the individual may need. In considering accommodations related to the symptoms and behaviors that are presenting the barriers to enrollment, the RAC may only need to be comprised of the center clinician and a Disability Coordinator and the accommodations could be discussed during the same phone call as the one in which the clinical assessment is being performed.

Once the accommodations and/or modifications have been identified, the qualified licensed professional who conducted the original assessment must review the previous findings giving consideration to the identified accommodations to determine whether or not the accommodations and/or modifications can remove the barriers to enrollment due to health care needs.

**Center Director Reasonableness Determination**

If there is a recommendation for an applicant to be enrolled with accommodations or modifications which you believe are not reasonable and/or pose an undue hardship, the Center Director is responsible for making that determination using the "Accommodation Recommendation of Denial Form" found on the Job Corps Disability website and including that form along with the applicant file that is being submitted to the Regional Office with a recommendation for denial.   The final determination is made by the Regional Office.

Guidance on how to make this determination is available in the "Evaluating a Request and Denying a Request" sections of the Form 2-03. Please attach the completed "Accommodation Recommendation of Denial Form."

# FORM FOR INDIVIDUALIZED HEALTH CARE NEEDS ASSESSMENT

**Applicant's Name:** _____   **Date of Review:** _____

**Center Name:** _____   **ID #:** _____

**Interview Conducted By:**      ☐ Telephone           ☐ In Person            ☐ Videoconference

In determining whether, in your professional judgment, the above named individual's health care needs are beyond what the Job Corps' health and wellness program can provide as defined as basic health care in Exhibit 2-4: Job Corps Basic Health Care Responsibilities consider the following and respond accordingly.

If you determine that the individual's health care needs are beyond Job Corps basic health care responsibilities and their condition rises to a level of a disability, consider whether any accommodations or modifications would remove the barrier to enrollment and list any suggested accommodations or modifications. Do not consider whether, in your view, a particular accommodation or modification is "reasonable." That determination must be made by the center director or his/her designees.

| | |
|---|---|
| **1.** | **What factors triggered review of the individual's file for a health care needs assessment?** *[Please mark all that apply]* |

☐ Within the past six months, two or more emergency room visits or one or more hospitalizations for medical, mental health, oral health, and/or substance abuse reasons.

☐ New diagnosis or recurrence of medical, mental health, extensive untreated oral health, and/or substance abuse condition that would require frequent medication adjustments, significant health resources and/or substantial change to the training day (e.g., daily dialysis; only able to attend Job Corps 3 hours per day; hourly medication or behavioral monitoring; daily assistance with activities of daily living; long-term weekly on-center therapy provided by the CMHC; complex full-mouth reconstruction/rehabilitation).

☐ Failure to follow previous treatment recommendations by licensed health providers that have adversely affected the applicant's health, behavior, and/or adaptive functioning, and now requires significant health care management. (Note: Some students are non-adherent and experience adverse consequences but may still benefit from enrollment. Examples might include substance abuse relapse, poor diabetic control, poor asthma control, etc.).

☐ Applicant has followed treatment recommendations by licensed health providers with no improvement in applicant's health, behavior, and/or adaptive functioning, which continue to place applicant in need of significant health care management.

☐ Applicant's condition or behavior has not been successfully managed in a similar academic, work, or group environment in the past year.

☐ Applicant is in treatment for a condition that is not in the scope of Job Corps Basic Health Care Responsibilities (e.g., orthodontic braces for malocclusion).

| | |
|---|---|
| **2.** | **What is the applicant's history and present functioning to support statement of health care needs?** *(Include information from ETA 6-53, file review, Chronic Care Management Plan (CCMP) Provider Form, and interview with applicant.)* |

**ETA 6-53:** _____
_____

_____

**Applicant File Review Summary:**_____
_____
_____

**CCMP Provider Form:** Does provider recommend applicant to enter Job Corps?  ☐ Yes ☐ No
*If conflicting recommendation with treating provider, please indicate effort to contact treating provider for*
*discussion in addition to summary of information on the CCMP.*
_____
_____
_____

**Applicant Interview Summary:** _____
_____
_____

| 3. | What are the functional limitations (specific symptoms/behaviors) of the applicant that are barriers to enrollment at this time? |
|---|---|

☐ Avoidance of group situations and settings

☐ Impaired decision making/problem solving

☐ Difficulty coping with panic attacks

☐ Difficulty managing stress

☐ Difficulty regulating emotions

☐ Difficulty with communication

☐ Difficulty with concentration

☐ Difficulty handling change

☐ Difficulty with memory

☐ Difficulty with self-care

☐ Difficulty with sleep patterns

☐ Difficulty with social behavior, including impairment in social cues and judgment

☐ Difficulty with stamina

☐ Interpersonal difficulties with authority figures and/or peers

☐ Organizational difficulties

☐ Sensory impairments

☐ Uncontrolled symptoms/behaviors that interfere with functioning

☐ Other (specify): _____

*Please note: This list is not all inclusive. These are suggestions for your use and you may need to consider*
*functional limitations and accommodations beyond this list.*

| 4. | What are the health-care management needs of the applicant that are barriers to enrollment at this time? |
|---|---|

☐ Complex behavior management system beyond Job Corps current system

☐ Complex full mouth reconstruction/rehabilitation

☐ Daily assistance with activities of daily living

☐ Frequency and length of treatment

☐ Hourly monitoring required

☐ Medical needs requiring specialized treatment

☐ Out of state insurance impacting access to required and necessary health care

☐ Severe medication side effects

☐ Therapeutic milieu required

☐ Other (specify): _____

Brief Narrative: _____
_____
_____

| 5. | **Reasonable Accommodation Consideration** |
|---|---|

Is this applicant a person with a disability?       ☐ Yes   ☐ No
*(i.e., documentation of a mental health, medical, substance-abuse, cognitive, or other type of disability is present in the applicant file or the disability is obvious (i.e., blind, deaf). If no, please skip to Question #6.*

If yes, convene the reasonable accommodation committee (RAC) along with the applicant and list below any accommodations and/ or modifications underlined with the applicant that could either remove or reduce the barriers to enrollment as documented in Question #4 above.

Note: Accommodations or modifications are not things that treat the impairment; they are things that will help the individual participate in the program. See Program Instruction 08-26 "Reasonable Accommodation and Case Management" for guidance.

Check one of the two options below.

☐    The RAC has been unable to identify any accommodations appropriate to support this applicant.

☐    The following accommodations/modifications listed below have been discussed with the applicant and considered as a part of this assessment:

*Please avoid suggesting extreme accommodations already known to likely be unreasonable unless the applicant has requested a specific support (i.e., 24 hour supervision). If unsure if a support or modification is really an accommodation or is actually a case management support, please contact your regional health and disability consultants for assistance.*

| **Based on functional limitation(s) checked in Section 3, please check the appropriate accommodations below discussed with the applicant.** *Please note: This list is not all inclusive. These are suggestions for your use and you may need to consider functional limitations and accommodations beyond this list which can be entered in the "Other" section.* | | |
|---|---|---|
| **Avoidance of group situations and settings** | | |
| Allow student to arrive five minutes late for classes and leave five minutes early | ☐ Yes | ☐ No |
| Excuse student from student assemblies and group activities | ☐ Yes | ☐ No |
| Identify quiet area for student to eat meals in or near cafeteria | ☐ Yes | ☐ No |
| **Difficulty coping with panic attacks** | | |
| Allow student to designate a place to go when anxiety increases in order to practice relaxation techniques or contact supportive person | ☐ Yes | ☐ No |
| Provide flexible schedule to attend counseling and/or anxiety reduction group | ☐ Yes | ☐ No |
| Allow student to select most comfortable area for them to work within the classroom trade site | ☐ Yes | ☐ No |
| Provide peer mentor to shore up support | ☐ Yes | ☐ No |
| **Difficulty handling change** | | |
| Provide regular meeting with counselor to discuss upcoming changes and coping | ☐ Yes | ☐ No |
| Maintain open communication between student and new and old counselors and teachers | ☐ Yes | ☐ No |
| Recognize change in environment/staff may be difficult and provide additional support | ☐ Yes | ☐ No |
| **Difficulty managing stress** | | |
| Allow breaks as needed to practice stress reduction techniques | ☐ Yes | ☐ No |
| Modify education/work schedule as needed | ☐ Yes | ☐ No |
| Identify support person on center and allow student to reach out to person as needed | ☐ Yes | ☐ No |

| | | |
|---|---|---|
| **Difficulty regulating emotions** | | |
| Allow breaks as needed to cool down | ☐ Yes | ☐ No |
| Allow flexible schedule to attend counseling and/or emotion regulation support group | ☐ Yes | ☐ No |
| Teach staff to support student in using emotion regulation strategies | ☐ Yes | ☐ No |
| Provide peer mentor/support staff | ☐ Yes | ☐ No |
| **Difficulty with communication** | | |
| Allow student alternative form of communication (e.g. written in lieu of verbal) | ☐ Yes | ☐ No |
| Provide advance notice if student must present to group and opportunity to practice or alternative option (e.g. present to teacher only) | ☐ Yes | ☐ No |
| **Difficulty with concentration** | | |
| Allow use of noise canceling headset | ☐ Yes | ☐ No |
| Reduce distractions in learning/work environment | ☐ Yes | ☐ No |
| Provide student with space enclosure (cubicle walls) | ☐ Yes | ☐ No |
| **Difficulty with memory** | | |
| Provide written instructions | ☐ Yes | ☐ No |
| Allow additional training time for new tasks and hands-on learning opportunities | ☐ Yes | ☐ No |
| Offer training refreshers | ☐ Yes | ☐ No |
| Use flow-charts to indicate steps to complete task | ☐ Yes | ☐ No |
| Provide verbal or pictorial cues | ☐ Yes | ☐ No |
| **Difficulty with organization** | | |
| Use staff/peer coach to teach/reinforce organizational skills | ☐ Yes | ☐ No |
| Use weekly chart to identify and prioritize daily tasks | ☐ Yes | ☐ No |
| **Difficulty with self-care** | | |
| Provide environmental cues to prompt self-care | ☐ Yes | ☐ No |
| Assign staff/peer mentor to provide support | ☐ Yes | ☐ No |
| Allow flexible scheduling to attend counseling/supportive appointments | ☐ Yes | ☐ No |
| **Difficulty with sleep patterns** | | |
| Allow for a flexible start time | ☐ Yes | ☐ No |
| Provide more frequent breaks | ☐ Yes | ☐ No |
| Provide peer/dorm coach to assist with sleep routine/hygiene | ☐ Yes | ☐ No |
| Increase natural lighting/full spectrum light | ☐ Yes | ☐ No |
| **Difficulty with social behavior,** including impairment in social cues and judgment | | |
| Assign mentor to reinforce appropriate social skills | ☐ Yes | ☐ No |
| Allow daily pass to identified area to cool down | ☐ Yes | ☐ No |
| Provide concrete examples of accepted behaviors and teach staff to intervene early to shape positive behaviors | ☐ Yes | ☐ No |
| Adjust communication methods to meet students' needs | ☐ Yes | ☐ No |
| **Difficulty with stamina** | | |
| Allow more frequent or longer breaks | ☐ Yes | ☐ No |
| Allow flexible scheduling | ☐ Yes | ☐ No |
| Provide additional time to learn new skills | ☐ Yes | ☐ No |
| **Impaired decision making/problem solving** | | |
| Utilize peer staff mentor to assist with problem solving/decision making | ☐ Yes | ☐ No |
| Provide picture diagrams of problem solving techniques (e.g., flow charts, social stories) | ☐ Yes | ☐ No |
| **Interpersonal difficulties with authority figures and/or peers** | | |
| Encourage student to take a break when angry | ☐ Yes | ☐ No |
| Provide flexible schedule to attend counseling and/or therapy group | ☐ Yes | ☐ No |
| Provide peer mentor for support and role modeling | ☐ Yes | ☐ No |
| Develop strategies to cope with problems before they arise | ☐ Yes | ☐ No |
| Provide clear, concrete descriptions of expectations and consequences | ☐ Yes | ☐ No |
| Allow student to designate staff member to check in with for support when overwhelmed | ☐ Yes | ☐ No |
| **Sensory impairments** | | |
| Modify learning/work environment to assist with sensitivities to sound, sight, and smells | ☐ Yes | ☐ No |
| Allow student breaks as needed | ☐ Yes | ☐ No |

| Uncontrolled symptoms/behaviors that interfere with functioning | | |
|---|---|---|
| Alter training day to allow for treatment | ☐ Yes | ☐ No |
| Allow passes for health and wellness center outside of open hours to monitor symptoms | ☐ Yes | ☐ No |
| Reduce tasks and activities during CPP to not aggravate symptoms/behaviors | ☐ Yes | ☐ No |

| Other |
|---|
| |
| |
| |

| Summarize any special considerations and findings of the RAC as well as the applicant's input: |
|---|
| |

*Please Note: Job Corps cannot impose accommodations upon an individual. If the applicant does not accept or agree to a specific accommodation, there is no need to consider that specific accommodation in your determination of whether the accommodations listed will reduce the barriers to enrollment sufficiently or not nor is there a need to complete a reasonableness review related to that specific accommodation.*

| Reasonable Accommodation Considerations: | | |
|---|---|---|
| Did the applicant participate in the RAC meeting? | ☐ Yes | ☐ No |
| (***Note:  The applicant must be a part of the discussion for reasonable accommodation***). | | |

| RAC Participants: | | | |
|---|---|---|---|
| **Name:** | | **Position:** | |
| **Name:** | | **Position:** | |
| **Name:** | | **Position:** | |

If there is a recommendation for an applicant to be enrolled with the accommodations or modifications listed in Question #5 above which you believe are not reasonable and/or pose an undue hardship, the **Center Director is responsible for making that determination** using the "Accommodation Recommendation of Denial Form" found on the Job Corps Disability website and including that form along with the applicant file that is being submitted to the regional office with a recommendation for denial. The final determination is made by the regional office.

Guidance on how to make this determination is available in the "Evaluating a Request and Denying a Request" sections of the Form 2-03. Please attach the completed "Accommodation Recommendation of Denial Form."

If there are agreed upon accommodations between the RAC and applicant listed in Question #5 then consider whether those accommodations reduce the barriers to enrollment sufficiently to allow for the applicant to be enrolled.

• If the accommodations would sufficiently reduce the barriers to enrollment, then you do not need to complete the remainder of this assessment and the center can assign the applicant a start date. Retain all the paperwork included in completing this assessment within the applicant's Student Health Record.

• If the accommodations would NOT sufficiently reduce the barriers to enrollment for your center, please proceed to Question #6.

6. **Based on your review of the applicant's health care needs above, does the named individual have health care needs beyond what the Job Corps' health and wellness program can provide as defined as basic health care in Exhibit 2-4: Job Corps Basic Health Care Responsibilities?** *[Please mark one below.]*

☐    In my professional judgment, health care needs are manageable at Job Corps as defined by basic health care services in Exhibit 2-4, but require community support services which are not available near center. Documentation of efforts to arrange for less frequent treatment in home state and/or to secure community support near center can be found in Question #7 below. Applicant should be considered for center closer to home where health support and insurance coverage is available. **File is forwarded to Regional Office for final determination.**

☐    In my professional judgment, health care needs are not manageable at Job Corps as defined by basic health care services in Exhibit 2-4. Applicant has health condition with current symptoms at a level that will interfere with successful participation in the program at this time. Deny entry and refer to other appropriate program/provider. **File is forwarded to Regional Office for final determination.**

7. **If recommending a different center, document efforts to arrange less frequent treatment in home state and/or secure community support near center in the space below. (Include name of organizations/facilities and specific individuals contacted and why access is not available.)**

_____
_____
_____


_____

**Printed or Typed Name and Title of Licensed Health Provider Completing Form**


_____

**Signature of Licensed Health Provider Completing Form                         Date**

## FORM 2-06
## MYPACE CAREER PLAN REVIEW CHECKLIST



| MYPACE CAREER PLAN REVIEW CHECKLIST |
|---|
| **CAREER PREPARATION PERIOD** |
| **Center Name:** |

| Student Name: | Student ID: | Date of Entry: |
|---|---|---|
| Date of Birth: | Counselor: | CTT: |

### SECTION 1 - CAREER PATHWAY PLAN SUMMARY

| ☐ | Student's summary connects the dots along his/her pathway, ties together all short-term, mid-term, and long-term SMART career goals, and defines in chronological order the steps from his/her current position to his/her ultimate long-term career goal. |
|---|---|

| **SECTION 2 - STUDENT PROFILE AND TRAITS** |
|---|
| ☐ Desired Location Upon Exit:  Student's desired location upon exit aligns with student's mid-term career goal (pathway placement goal).   Student has a plan to address transitional concerns such as Housing, Transportation, etc. |
| ☐ Age:  Does the chosen pathway have a minimum age limitation for entry?  If student is a minor, has the center received parental/guardian consent for the career plan? |
| ☐ Date of Enrollment:  The Career Management Team monitors the date of entry to ensure student has adequate time for completion prior to the two-year program limitation.  If more than two years is anticipated to be needed due to special circumstances (e.g. low learning level), the center should apply for an extension at least 3 months prior to the two year period.  If student is granted an extension, the pathway & transition plan will need to be adjusted.  Some pathways (i.e. Advanced Training & post-secondary) have fixed enrollment dates. |
| ☐ Education Background:<br>How will a student's level of education impact the CTT trade the student selected on their plan?<br>How will a student's level of education impact their mid-term career goal (Post-Job Corps)?<br>*Ex. If a student's mid-term goal is to go to college, but the student's current reading level is 5th Grade", the Career Management Team should ensure that the student is aware of what it will take to be ready for college upon exit and/or discuss other possible mid-term goals that may be more appropriate.* |
| ☐ Favorite and Least Favorite Subjects:  This is to help the Career Management Team get an idea of what a student perceives as their academic strengths and weaknesses.  The academic manager could use this information along with other baseline assessments to help the student develop a viable academic plan. |
| ☐ Self-Identified Traits:  Do the "Self-Identified Traits" reasonably align with the traits assigned under the MyPACE Career Interest Profiler? |

| | |
|---|---|
| ☐ | Prior Employment History: Student has provided information related to their work experience prior to entering Job Corps. This information should be used by center staff to ensure a student's previous work experience and wages are given consideration when staff are assisting a student with developing a career pathway that both aligns with the student's individual career goals and interests; and increases the student's earning potential and/or vocational skills. |

## SECTION 3 – CHOSEN OCCUPATION (LONG-TERM CAREER GOAL)

| | |
|---|---|
| ☐ | Student's self-assigned traits (work style, work values, career priorities and interests), and skills reasonably match his/her chosen occupational profile. |
| ☐ | Student understands the relationship between their self-assigned traits and the education, training, and demands of their chosen occupation. |
| ☐ | Student is aware of the commitment it will take to achieve the level of education and related work experience required to achieve their long-term occupation |
| ☐ | Student has chosen an in-demand occupation that provides a "living wage"; leads to a successful career; and is suited to the student's interest, capabilities, and career goals. |
| ☐ | Student has provided a sound reason for how he/she identified their long-term goal (chosen occupation) |
| ☐ | Long-term goal is SMART (specific, measurable, attainable, recorded and time-based). |
| ☐ | Chosen Occupation "Occupation Traits" reasonably match student's "My Assigned Traits" |

| | |
|---|---|
| **SECTION 4 – CHOSEN PLACEMENT PATHWAY ACHIEVEMENT RECORD (MID-TERM CAREER GOAL)** ||
| Please refer to appropriate pathway sub-section below: (4a) Advanced Training, (4b) Military, (4c) Apprenticeship, (4d) Post-secondary Education (ACT/College), and (4e) Entry-Level Job. ||
| **Sub-section 4a – Advanced Training Pathway** ||
| ☐ | The Career Management Team and student have reviewed the "Prerequisites for Entry to the Advanced Training Pathway ". The student understands these requirements and can likely meet these requirements upon completion of the Job Corps program (see Exhibit 2-5). |
| ☐ | Student has provided a sound reason for how he/she identified an Advanced Training Program that appropriately aligns with his/her ultimate long-term career goal. |
| ☐ | The e-TAR code, Advanced Training program and location are accurately recorded on the student's MyPACE Career Plan. |
| ☐ | The mid-term Career SMART goal supports career progression and is specific, measurable, attainable, recorded and time-based. |
| ☐ | Career Management Team has assigned appropriate staff to support and monitor completion of the Advanced Training PAR and transitional tasks, and will inform Career Management Team of student progress throughout program.<br>• Timelines for pathway task completion and follow-up have been drafted.<br>• Short-term career planning goals have been developed for next 60 day ESP period (e.g. acquiring birth certificate for driver's license if not already attained, developing a plan to pay fines if needed). |

| | |
|---|---|
| **Sub-section 4b – Military PAR** | |
| ☐ | The Career Management Team and student have reviewed the "Prerequisites for Entry to the Military Pathway", student understands the Placement Pathway entry requirements and can likely meet the entry requirements after completion of the Job Corps program (see Exhibit 2-5). |
| ☐ | Career Management Team has discussed with student the requirements for delayed enlistment and has reviewed the Center Enlistment Contract" |
| ☐ | Student has provided a sound reason for how he/she identified a Military branch and military related occupation that appropriately aligns with his/her long-term career goal. |
| ☐ | The mid-term Career SMART goal supports career progression and is specific, measurable, attainable, recorded and time-based. |
| ☐ | Student has provided the correct contact information for the nearest recruitment office to their location |
| ☐ | Career Management Team has assigned appropriate staff to support and monitor completion of the Military PAR and transitional tasks, and will inform Career Management Team of student progress throughout program.<br>• Timelines for pathway task completion and follow-up have been drafted.<br>• Short-term pathway goals have been developed for next 60 day ESP period. |
| **Sub-section 4c - Apprenticeship PAR** | |
| ☐ | The Career Management Team and student have reviewed the "Prerequisites for Entry to the Apprenticeship Pathway ", student understands the Placement Pathway entry requirements and can likely meet the entry requirements after completion of the Job Corps program (see Exhibit 2-5). |
| ☐ | Student has provided a sound reason for how he/she identified an Apprenticeship Program that appropriately aligns with his/her long-term career goal.<br>• If student is unable to locate an apprenticeship program that aligns with their long-term or short-term career goal, Career Management Team may recommend the student choose another career pathway.<br>• Career Management Team understands requirement differences between state-approved and federally approved apprenticeships. |

| ☐ | The e-TAR code and chosen Apprenticeship program are accurately recorded on MyPACE Career Plan. |
|---|---|
| ☐ | Student has identified a potential apprenticeship program that aligns with the student's long-term career goal. |
| ☐ | The mid-term Career SMART goal supports career progression and is specific, measurable, attainable, recorded and time-based. |
| ☐ | Career Management Team has assigned appropriate staff to support and monitor completion of the Apprenticeship PAR and transitional tasks, and will inform Career Management Team of student progress throughout program.<br>• Timelines for pathway task completion and follow-up have been drafted.<br>• Short-term pathway goals have been developed for next 60 day ESP period. |

### Sub-section 4d - Post-Secondary Education (ACT/College) PAR

| ☐ | The Career Management Team and student have reviewed the "Prerequisites for Entry to the Post-Secondary (ACT/College) Pathway", student understands the Placement Pathway entry requirements and Career Management Team has determined the student can likely meet the entry requirements after completion of the Job Corps program (see Exhibit 2-5). |
|---|---|
| ☐ | Student has explored financial aid and scholarship options, and developed a tentative plan to secure adequate funding. |
| ☐ | Student has provided a sound reason for how he/she identified a college that appropriately aligns with his/her long-term career goal.  The chosen post-secondary institution is recorded on MyPACE Career Plan. |
| ☐ | The mid-term Career SMART goal supports career progression and is specific, measurable, attainable, recorded and time-based. |
| ☐ | Career Management Team has assigned appropriate staff to support and monitor completion of the Post-secondary PAR and transitional tasks, and will inform Career Management Team of student progress throughout program.<br>Timelines for pathway task completion and follow-up have been drafted.<br>Short-term pathway goals have been developed for next 60 day ESP period. |

| | |
|---|---|
| ☐ | If applicable, student intends to enroll in Advanced Career Training if student's selected college is an Advanced Career Training partner? |

### Sub-section 4e – Entry-Level Job PAR

| | |
|---|---|
| ☐ | The Career Management Team and student have reviewed the "Prerequisites to Entry Level Job Pathway ", student understands the Placement Pathway entry requirements and can likely meet the entry requirements after completion of the Job Corps program (see Exhibit 2-5). |
| ☐ | Student has provided a sound reason for how he/she identified an Entry-Level Job that appropriately aligns with his/her long-term career goal, in demand, and will make a living wage. |
| ☐ | Student has identified three potential employers in area student is willing to relocate to and has identified a JTM entry-level which pays a living wage, and aligns with student's long-term career goal. |
| ☐ | The mid-term Career SMART goal supports career progression and is specific, measurable, attainable, recorded and time-based. |
| ☐ | Career Management Team has assigned appropriate staff to support and monitor completion of the Entry-Level Job PAR and transitional tasks, and will inform Career Management Team of student progress throughout program. Timelines for pathway task completion and follow-up have been drafted. Short-term pathway goals have been developed for next 60 day ESP period. |

### SECTION 5 – CHOSEN JOB CORPS CAREER DEVELOPMENT EDUCATION AND TRAINING PROGRAM (SHORT-TERM CAREER GOALS)

| | |
|---|---|
| ☐ | Student is able to explain why his/her choice of CTT program area is the best choice for his/her career path, and can describe the similarity of knowledge and skills between the CTT and his/her mid- and long-term goals. |
| ☐ | The e-TAR code and CTT program chosen by the student are accurately recorded on the student's MyPACE Career Plan. |
| ☐ | Student understands the projected length of time to complete the CTT training program and is willing to commit to the required timeframe. |

| ☐ | The CTT selection is reasonably based on work style, work values, skills, career priorities, academic scores and career interests expressed by the student. |
|---|---|
| ☐ | There's slot availability in the chosen CTT selection.<br>   • If first choice is not available, assignment to a second choice CTT Program is compatible with the student's long-term career goals. |
| ☐ | Short-term SMART career goals in academics and CTT have been identified, and are specific, measurable, attainable, recorded and time-based. |
| ☐ | Student has accurately recorded the Primary Credential and Credential Sponsor associated with their chosen CTT program. |
| ☐ | Career Management Team has collaborated with student to identify his/her schedule, individualized mix of classes and activities, including any additional needed support that will move the student toward meeting the Career Success Standards and his/her career goals.<br>   • Accommodations to achieve career goals are identified.  (e.g., Staff will engage in conversations with Voc. Rehab. early on.)<br>   • Tutors, if needed, have been assigned.<br>   • Peer or staff mentors, if needed, have been assigned.  Other on- or off-center resources, as needed, have been assigned. |

| **SECTION 6 - TRANSITIONAL CONSIDERATIONS** |
|---|

| ☐ | Student has completed a Transitional Needs Assessment that identifies action items that will aid the student in successfully transitioning to his/her chosen Placement Pathway.  The CTS Provider and student have worked closely to develop an initial transition plan based on chosen pathway.  Considerations include (at a minimum):<br>• Housing<br>• Transportation<br>• Childcare<br>• Health care<br>• Work clothes/tools<br>• Food and nutrition<br>• Budgeting and money management<br>• Counseling/mentoring<br>• Job retention skills<br>• Legal services<br>• Other needs? |
|---|---|

| **SECTION 7 – INITIAL APPROVAL OF MyPACE CAREER PLAN (Transition from CPP to CDP)** |
|---|

| ☐ | Risk factors and barriers for a successful transition (e.g., drug & alcohol issues, low learning levels) have been identified from baseline assessments and the Career Management Team, as needed, has initiated multiple levels of intervention.  Other on-center and off-center resources have also been identified to provide additional support to the student on an as-needed basis (e.g., Recreation Specialist, other dorm staff, Student Conduct Coordinator, Mental Health Consultant, AA/NA Groups, etc.).  Career Management Team has developed an intervention support plan and will closely monitor student response to intervention.  This support plan begins to shape the student's individual career plan. |
|---|---|

| | During initial (first 60 day) ESP meeting, the Career Management Team has determined student: |
|---|---|
| ☐ | <ul><li>Has a clear understanding of and commitment to completing the Job Corps program;</li><li>Is adjusting to center life</li><li>Is a positive influence on center culture</li><li>Is progressing satisfactorily in all areas</li><li>Completed all CPP requirements (including MyPACE career planning requirements for CPP) and is ready to transition from CPP to CDP.</li></ul> |
| ☐ | The Career Management Team and student have reviewed the appropriate requirements on the "Pathway Prerequisites for Entry" documents (reference Exhibit 2-5). The student understands these requirements, and can likely meet these requirements upon completion of the Job Corps program. |
| ☐ | (If student is under 18) The counselor has received parental/guardian consent for student's MyPACE Career Plan and has notified parent/guardian of any major behavior or performance issues. |

| **Lead Career Management Team:** | **Date:** |
|---|---|
| **Center Director or Senior Management Designee:** | **Date:** |

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant*. | § | |

# Exhibit F

**David L. Carrasco SB8 Data**

1. In the last three years, what is the number per year of pregnant students.
   a. 2021 - 3 students
   b. 2020 -1 student
   c. 2019 -22 students
   d. Source –> **Health Utilization Report**

2. What do we believe to be the cost of our services specific to pregnant students based on PRH 2.3 R7?
   a. Physician (M.D) -Averages 5 hours per month at regular OBS
   b. 5 hours @ ($150.00)/month = $750.00
   c. Family Planning Coordinator/Pregnancy 4 hours @ ($29)/month education presentation= $116.00
   d. Nursing 8 hour @ ($29.00)/month nursing visits/pregnancy = $232.00
   e. TEAP  2 hours @ ($24.00) / month referral = $48.00
   f. CMHC 2 hours @ ($75.00)/month referral = $150.00
   g. Laboratory (HIV $5.00, Chlamydia $21.65, Gonorrhea: $9.00, hcg $8.00, CBC $3.50) = $47.15
   h. Prenatal medications 100 tabs bottle HHS = $1.76 (3 months' supply per student)

      Last full year at regular OBS (2019) used to determine a cost/pregnant student
   i. **2021** – 3 students a@ $750.00 + $348.00 + $48 + $150 + $47.15    = $4,029.45/month
   j. **2020** – 1 student @ $750.00 + $348.00 + $48 + $150 + $47.15    = $1,343.15/month
   k. **2019** – 22 students @ $750.00 + $348.00 + $48 + $150 + $47.15 = $29,549.30/month (average enrollment up to 7 months)

3. Of the total number of pregnancies, how many students opt to terminate pregnancy?
   a. None

4. Of the students who have opted to terminate pregnancy, how many did we transport via center transportation?
   a. None

5. Please also consider what additional expenses may occur should you need to drive a student to the nearest out of state clinic?
   a. Nearest out of state clinic is in Las Cruces which is 57 miles one way for an hour and a round trip is 114 miles; Staff staying with student at clinic (4 – 5 hrs. for procedure = 7 hrs. Staff Salary $13.00 x 7 = $97.00; Gas $3.15 per gallon depending on the vehicle is $40.00.
   b. To transfer a student to the nearest out of state center – Albuquerque Job Corps Center:
      i. Airline ticket plus luggage is $200.00
   c. Emergency evacuation per Ambulance is $800.00
   d. Average cost of abortion in Las Cruces in NM is $800.00 with no complications; with complications is $2000.00.

| | |
|---|---|
| **From:** | Attipoe, Doe - ETA JC |
| **To:** | Martino, Thony - ETA |
| **Cc:** | June Rentas |
| **Subject:** | FW: CARRASCO: Pregnancy Data |
| **Date:** | Wednesday, September 8, 2021 12:10:10 PM |
| **Attachments:** | image001.png |
| | Carrasco Pregnancy Data.docx |

Good morning:

This was sent last night at 9:14 p. m. I hope you received it.

Thanks.

Doe

---

**From:** Doe Attipoe
**Sent:** Tuesday, September 7, 2021 9:14 PM
**To:** 'Martino.Thony@dol.gov' <Martino.Thony@dol.gov>
**Cc:** June Rentas <Rentas.June@jobcorps.org>; Cheryll Yowell <cheryll.yowell@serratocorp.com>; Lisa Odle <Odle.Lisa@odlemanagement.com>; Stephen Fuller <Fuller.Stephen@dol.gov>
**Subject:** CARRASCO: Pregnancy Data

Good evening Thony:

Attached is Carrasco's revised Pregnancy Data for your review. Let me know if you have any questions.

Thanks.

*Doe Attipoe* M. Ed.
**Center Director**



**David L. Carrasco Job Corps Center**
**11155 Gateway West**
**El Paso, TX  79935**

**Office: 915-633-0999**
**Cell: 915-216-8697**
**Fax: 915-594-9173**
**attipoe.doe@jobcorps.org**



DOJ-00000023

**David L. Carrasco SB8 Data**

1. In the last three years, what is the number per year of pregnant students.
   a. 2021 - 3 students
   b. 2020 -1 student
   c. 2019 -22 students
   d. Source –> **Health Utilization Report**

2. What do we believe to be the cost of our services specific to pregnant students based on PRH 2.3 R7?
   a. Physician (M.D) -Averages 5 hours per month at regular OBS
   b. 5 hours @ ($150.00)/month = $750.00
   c. Family Planning Coordinator/Pregnancy 4 hours @ ($29)/month education presentation= $116.00
   d. Nursing 8 hour @ ($29.00)/month nursing visits/pregnancy = $232.00
   e. TEAP  2 hours @ ($24.00) / month referral = $48.00
   f. CMHC 2 hours @ ($75.00)/month referral = $150.00
   g. Laboratory (HIV $5.00, Chlamydia $21.65, Gonorrhea: $9.00, hcg $8.00, CBC $3.50) = $47.15
   h. Prenatal medications 100 tabs bottle HHS = $1.76 (3 months' supply per student)

      Last full year at regular OBS (2019) used to determine a cost/pregnant student
   i. **2021** – 3 students a@ $750.00 + $348.00 + $48 + $150 + $47.15    = $4,029.45/month
   j. **2020** – 1 student @ $750.00 + $348.00 + $48 + $150 + $47.15     = $1,343.15/month
   k. **2019** – 22 students @ $750.00 + $348.00 + $48 + $150 + $47.15 = $29,549.30/month (average enrollment up to 7 months)

3. Of the total number of pregnancies, how many students opt to terminate pregnancy?
   a. None

4. Of the students who have opted to terminate pregnancy, how many did we transport via center transportation?
   a. None

5. Please also consider what additional expenses may occur should you need to drive a student to the nearest out of state clinic?
   a. Nearest out of state clinic is in Las Cruces which is 57 miles one way for an hour and a round trip is 114 miles; Staff staying with student at clinic (4 – 5 hrs. for procedure = 7 hrs. Staff Salary $13.00 x 7 = $97.00; Gas $3.15 per gallon depending on the vehicle is $40.00.
   b. To transfer a student to the nearest out of state center – Albuquerque Job Corps Center:
      i. Airline ticket plus luggage is $200.00
   c. Emergency evacuation per Ambulance is $800.00
   d. Average cost of abortion in Las Cruces in NM is $800.00 with no complications; with complications is $2000.00.

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit G

| From: | Denise Pinson |
|---|---|
| To: | Martino, Thony - ETA |
| Cc: | Fuller, Stephen - ETA; McCoy, Demoyn - ETA Ctr; Gutierrez, David - ETA JC |
| Subject: | Fw: Center SB8 Info |
| Date: | Wednesday, September 8, 2021 11:03:13 AM |
| Attachments: | Laredo Info preg.docx |

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Mr. Martino:

Please see updated information for the Laredo JCC.  Please contact me with any additional questions.  Thank you.

**Denise N. Pinson, PMP, CF APMP**
Vice President, Education and Training

**Strategix Management LLC**
2101 L Street NW, Suite 400
Washington, DC 20037
**direct** | 202.924.3873
**office** | 202.467.8356
**email** | dpinson@strategixmanagement.com

**www.strategixmanagement.com**

cid:image004.png@01D46A73.3EFB31E0

The content of this email message is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. Email content may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

**From:** David Gutierrez <Gutierrez.David@jobcorps.org>
**Sent:** Wednesday, September 8, 2021 7:40 AM
**To:** Denise Pinson <dpinson@strategixmanagement.com>
**Cc:** Monica Robledo <Robledo.Monica@jobcorps.org>; Laura Ramirez <Ramirez.Laura@jobcorps.org>
**Subject:**

*David A. Gutierrez*

Center Director
Laredo Job Corps Center

Phone  956-727-5147
Mobile  956-744-8651
Gutierrez.David@jobcorps.org

DOJ−00000137

**Laredo Info**

1. In the last three years, what is the number per year of pregnant students.

   a.  2 for 2018

   b.  1 for 2019, Source – Health Utilization Report/MSWR CIS report

   c.  0 for 2020

2. What do we believe to be the cost of our services specific to pregnant students based on PRH 2.3 R7?

   a.  2018-2019 Doctors Hospital ER Visit 3,204, $7.13 mileage, $22.00 staff supervision

   b.  2019-2020 No expenses

   c.  2020-2021 No expenses

3. Of the total number of pregnancies, how many students opt to terminate pregnancy?

   a.  0

   b.  0

   c.  0

4. Of the students who have opted to terminate pregnancy, how many did we transport via center transportation?

   a.  0

   b.  0

   c.  0

5. Please also consider what additional expenses may occur should you need to drive a student to the nearest out of state clinic?

   Student and 1 chaperone via GSA vehicle nearest state clinic is in Sulphur LA, 7 hours away, 484 miles. The mileage and cost of an employee to chaperone (per diem $96 hotel, $55 meals a day, and mileage $522.72). This would be an overnight stay.
   .

DOJ–00000138

6.   ADD: Transportation Expenses: Student and 1 chaperone via Greyhound Bus

   a.  Alternate bus transportation $402 per person.

   b.  Food $55 per person per day

   c.   Hotel $96

DOJ-00000139

**Laredo Info**

1. In the last three years, what is the number per year of pregnant students.

    a.  2 for 2018

    b.  1 for 2019, Source – Health Utilization Report/MSWR CIS report

    c.  0 for 2020

2. What do we believe to be the cost of our services specific to pregnant students based on PRH 2.3 R7?

    a.   2018-2019 Doctors Hospital ER Visit 3,204, $7.13 mileage, $22.00 staff supervision

    b.   2019-2020 No expenses

    c.   2020-2021 No expenses

3. Of the total number of pregnancies, how many students opt to terminate pregnancy?

    a.   0

    b.   0

    c.   0

4. Of the students who have opted to terminate pregnancy, how many did we transport via center transportation?

    a.   0

    b.   0

    c.   0

5. Please also consider what additional expenses may occur should you need to drive a student to the nearest out of state clinic?

    Student and 1 chaperone via GSA vehicle nearest state clinic is in Sulphur LA, 7 hours away, 484 miles. The mileage and cost of an employee to chaperone (per diem $96 hotel, $55 meals a day, and mileage $522.72). This would be an overnight stay.
    .

6.   ADD: Transportation Expenses: Student and 1 chaperone via Greyhound Bus

    a.  Alternate bus transportation $402 per person.

    b.  Food $55 per person per day

    c.   Hotel $96

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

# Exhibit H

| | |
|---|---|
| **From:** | Rodney Butler |
| **To:** | Martino, Thony - ETA |
| **Subject:** | RE: Transportation Cost |
| **Date:** | Wednesday, September 8, 2021 10:41:33 AM |
| **Attachments:** | image001.jpg |
| | image002.png |
| | image003.jpg |
| | image004.png |
| | image005.png |

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

See AT Transportation cost below.

**From:** Rodney Butler
**Sent:** Wednesday, September 8, 2021 9:33 AM
**To:** 'Martino, Thony - ETA' <martino.thony@dol.gov>
**Cc:** Rodney Butler <rbutler@adamsaai.com>
**Subject:** Transportation Cost

Here is the first part of the transportation costs. I will have the transfer information soon.

1. In the last three years, what is the number per year of pregnant students.
   a. 44
   b. 13
   c. 3
   d. Source – Health Utilization Report
2. What do we believe to be the cost of our services specific to pregnant students based on PRH 2.3 R7?
   a. Nurse Practitioner is the Pregnancy/Family Planning Coordinator.
   b. Average 12-14 hours per month at regular OBS,
   c. 14 hours/month x 12 months/year @ annual salary $110,442 (based on salary.com average wage) = $8,920.80
   d. Last full year at regular OBS (2019) used to determine a cost/pregnant student
   e. **2019** - $8,920.80/44 = 202.75/student
   f. **2020** – 13*202.75 = $2,635.75
   g. **2021** – 3*202.75 = $405.50
3. Of the total number of pregnancies, how many students opt to terminate pregnancy
   a. We do not have knowledge of this number
4. Of the students who have opted to terminate pregnancy, how many did we transport via center transportation?
   a. We do not have knowledge of this number
5. What additional expenses may occur should you need to drive a student to the nearest out of state clinic?
   a. The cost would be significant since we are not close to another state. If we were to drive to Santa Teresa, New Mexico it would be 1160 miles round trip with an overnight stay for the driver and student.
   b. Student Per Diem Room = $96
   c. Student Per Diem = $41.25*2 = $82.50
   d. Staff Per Diem Room = $96
   e. Staff Per Diem - $41.25*2 = $82.50
   f. Mileage – 1160*0.56 = $649.60
   g. Staff Salary – 2 days x 8 hours x $26.75 = $428
   h. Total – $1,434.60
6. What additional expenses may occur should you need to transfer a student to another center out of state?

    a. 9 AT Transfers the prior full PY.
    b. Total Transportation cost - $2185.60
    c. $242.85 per student (one way)
    d. For this exercise, we would double that cost for the return back to the home center
    e. Total cost per student - $485.70

Rodney H. Butler
Executive Director of Business Development, Capture and Regional Operations
10400 Little Patuxent Parkway, Suite 320
Columbia, MD 21044
C: 443.414.6581 O: 410.964.2888 F: 410.964.2961



CONFIDENTIALITY NOTICE: This email, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, or disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy all copies of the original message.



DOJ-00000079





DOJ-00000081



DOJ-00000082

DOJ-00000083

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| *Defendant*. | § | |

# Exhibit I

| | |
|---|---|
| **From:** | Cheryll Yowell |
| **To:** | Martino, Thony - ETA |
| **Cc:** | Brown, Bobby - ETA JC |
| **Subject:** | RE: GARY SB8 Info |
| **Date:** | Wednesday, September 8, 2021 10:50:45 AM |
| **Attachments:** | image001.png |
| | North Texas SB8 Info.docx |

> CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Thony,

I also added that information into the document I sent you yesterday. It's attached if you need it.

Cheryll

---

**From:** Bobby Brown <Brown.Bobby@jobcorps.org>
**Sent:** Wednesday, September 8, 2021 9:23 AM
**To:** Thony Martino <martino.thony@dol.gov>
**Cc:** Cheryll Yowell <Cheryll.Yowell@serratocorp.com>
**Subject:** RE: GARY SB8 Info

Thony,

Transportation costs are below.

Bobby Brown
Center Director
North Texas Job Corps
1701 North Church Street
Mckinney, TX 75069
(972) 547-7850
Brown.Bobby@jobcorps.org

---

**From:** Thony Martino
**Sent:** Wednesday, September 8, 2021 8:12 AM
**To:** Cheryll Yowell <cheryll.yowell@serratocorp.com>; Bobby Brown <Brown.Bobby@jobcorps.org>; Butler, Robert D - OASAM DAL <Butler.Robert.D@dol.gov>; Lorraine Lane <Lane.Lorraine@jobcorps.org>; Doe Attipoe <Attipoe.Doe@jobcorps.org>; 'Denise Pinson' <dpinson@strategixmanagement.com>; David Gutierrez <Gutierrez.David@jobcorps.org>
**Cc:** Stephen Fuller <Fuller.Stephen@dol.gov>
**Subject:** RE: GARY SB8 Info

Expedited timeline:

I need all transportation costs back into me now please.

* Current Transportation Cost- Louisiana – Driving $485.00 (two drivers, gas, and per diem). Airfare $349.00.00 One way includes luggage fees
* Transportation Cost to Alternate Service Location - $956.00  Driving (two drivers gas, hotel and per diem)  Airfare New Mexico $336.00 One way includes luggage fees
* Average Transfer Cost = $531.50 considering all four options

---

**From:** Martino, Thony - ETA
**Sent:** Tuesday, September 7, 2021 5:49 PM
**To:** Cheryll Yowell <Cheryll.Yowell@serratocorp.com>; Brown, Bobby - ETA JC <Brown.Bobby@jobcorps.org>; Butler, Robert D - OASAM DAL <Butler.Robert.D@dol.gov>; Lane, Lorraine - ETA JC <Lane.Lorraine@jobcorps.org>; Attipoe, Doe - ETA JC CTR (Attipoe.Doe@jobcorps.org) <Attipoe.Doe@jobcorps.org>; Denise Pinson <dpinson@strategixmanagement.com>; Gutierrez, David - ETA JC <Gutierrez.David@jobcorps.org>
**Cc:** Fuller, Stephen - ETA <Fuller.Stephen@dol.gov>
**Subject:** GARY SB8 Info

Here's the Gary's doc we went over today. Please complete the transportation expenses and if possible return by mid morning. If your data does not look like Gary's please change course to add.


*Thony Martino*
*Acting Deputy National Director*
*Office of Job Corps*
*Employment and Training Administration*
*U.S. Department of Labor*
*202-329-2648*





DOJ-00000222

**North Texas SB8 Info**

<u>**Question 1**</u>
In the last 3 years how many pregnant students were served?
- Begin on 8/31/2021 and go back three years.
- 12 (information derived from CIS report, health utilization report, log in wellness )

<u>**Question 2**</u>
What is the cost of providing services to those pregnant students? -The center incurs zero costs when a student is pregnant because the student is automatically placed on medical insurance. The only time the center will incur a cost is when the student requires medications related to the pregnancy. Those medications are purchased through HHS and are stock meds. Students have no extra cost out of pocket. If the student does not have insurance for their first trimester appointments, they will be seen by the center physician until they are able to be seen for their OB appointments with insurance.
- Please consider how pregnant students are served on center:
  - How often are they seen in wellness? -They are seen once a month during the first trimester or as frequently as needed.
  - Do we transport to doctor visits? -Yes, we provide transportation to doctor visits. Transportation is provided by center transportation for every appointment up until delivery.
  - What about high-risk pregnancies? Is there extra monitoring, etc? -Yes, those students are encouraged to come to wellness when they have certain signs and symptoms of imminent premature labor. Students who show a need for further care will then be transported to OB emergency room for emergency care. If there is a very high risk, the center will call 911 and incur the cost of 911. As of today, the center has not had to call 911 for a student who is in labor.

<u>**Question 3**</u>
Of the number from question #1, how many opted to terminate the pregnancy?
Two students opted to terminate the pregnancy. The one student who opted to have an abortion, the center did not pay for the termination. The center does not incur costs of students who choose to have an abortion due to change notice 14-05 . The center did not transport the student to the abortion clinic.
- State the source of that information. How do we know? -The information is provided in change notice 14-05. Additional information can also be found in the PRH and the Family Planning TAG. All student information, whether they choose to deliver or have an abortion is also documented in the student health records.
- How many did the center transport? -The center transported 0 pregnant students.
- How many used the MSWR code for abortion in CIS? -The MSWR code for abortion was used for 1 student.

**Question 4 – Transportation Expenses**
Please also consider what additional expenses may occur should you need to drive a student to the nearest out of state clinic?

Current Transportation Cost- Louisiana
- Driving $485.00 (two drivers, gas, and per diem).
- Airfare $349.00.00 One way includes luggage fees

Transportation Cost to Alternate Service Location – New Mexico
- Driving (two drivers, gas, hotel and per diem)  $956.00
- Airfare New Mexico $336.00 One way includes luggage fees
- Average Transfer Cost = $531.50 considering all four options