IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:21-CV-796-RP |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court are the United States' Emergency Motion for a Temporary Restraining Order or Preliminary Injunction (the "Motion"), (Dkt. 8), the State of Texas's (the "State" or "Texas") Motion to Dismiss, (Dkt. 54), the Amici States'[1] Unopposed Motion for Leave to File Brief as Amici Curiae, (Dkt. 9), the United States' Opposed Motion for Protective Order of Audiovisual Recordings, (Dkt. 36), the State's Objections to the United States' Declarations, (Dkt. 55), and Erick Graham, Jeff Tuley, and Mistie Sharp's (the "Texas Intervenors") motion to strike lodged at the hearing, (Hr'g Tr., Dkt. 65, at 96). On October 1, 2021, the Court held a hearing at which it heard evidence and considered arguments on the United States' request for a preliminary injunction and the State's motion to dismiss. (Dkt. 61; Hr'g Tr., Dkt. 65). Having considered the parties' arguments, the evidence presented, and the relevant law, the Court issues the following order.

## I. INTRODUCTION

A person's right under the Constitution to choose to obtain an abortion prior to fetal viability is well established. Fully aware that depriving its citizens of this right by direct state action

---

[1] The Amici States are Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and the Attorney General of North Carolina Joshua H. Stein. (Dkt. 9).

would be flagrantly unconstitutional, the State contrived an unprecedented and transparent statutory scheme to do just that. The State created a private cause of action by which individuals with no personal interest in, or connection to, a person seeking an abortion would be incentivized to use the state's judicial system, judges, and court officials to interfere with the right to an abortion. Rather than subjecting its law to judicial review under the Constitution, the State deliberately circumvented the traditional process. It drafted the law with the intent to preclude review by federal courts that have the obligation to safeguard the very rights the statute likely violates.

A person's right under the Constitution to choose to obtain an abortion prior to fetal viability is well established. With full knowledge that depriving its citizens of this right by direct state action would be flagrantly unconstitutional, the State contrived an unprecedented and transparent statutory scheme whereby it created a private cause of action in which private citizens with no personal interest in or connection to a person seeking an abortion would be able to interfere with that right using the state's judicial system, judges, and court officials. Rather than challenging the right to abortion via the appropriate process of judicial review, the State went so far as to draft the law in such a way as to attempt to preclude a review of the constitutionality of the statute by federal courts who have responsibility to safeguard the very rights the statute likely violates.

## II. BACKGROUND

### A. Factual Background

This case concerns State legislature's passage of Senate Bill 8 ("S.B. 8"), a sweeping anti-abortion law. *See* Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021). S.B. 8 purports to ban all abortions performed on any pregnant person[2] where cardiac activity has been detected in the embryo, with no exceptions for pregnancies that result from rape, sexual abuse, incest, or fetal defect incompatible with life after birth. Tex. Health & Safety Code § 171.204(a). As explained further below, S.B. 8 can

---

[2] The Court recognizes that not all pregnant people identify as women.

be enforced through civil lawsuits by private citizens against anyone who performs, aids and abets or intends to participate in a prohibited abortion. *See id.* §§ 171.208, 171.210.

1. Abortion

The Court finds that the declarations of providers Gilbert, Dkt. 8-2, Hagstrom Miller, Dkt. 8-4, and Linton, Dkt. 8-5, credibly describe the details of embryonic development.[3] Fertilization of an egg usually happens at two weeks from the first day of a patient's last menstrual period ("LMP"). At three weeks LMP, the egg implants in the uterus and pregnancy begins. An ultrasound is first able to detect a pregnancy around four to five weeks LMP; the gestational sac is too small to detect before this time. (Gilbert Decl., Dkt. 8-2, at 8). An embryo then develops until nine weeks LMP. The embryo begins to form cells that in later stages of pregnancy will become the heart. An ultrasound during this phase will reveal a sac of fluid, sometimes with a dot inside that represents the embryo. At this early stage, certain cells produce cardiac activity, which appears on an ultrasound as "an electrical impulse that appears as a visual flicker within [the] dot." (*Id.* at 6). This electrical impulse can occur "very early in pregnancy," as soon as six weeks LMP or sometimes sooner; the embryo does not have a fully developed heart at this time. (*Id.*). At approximately ten weeks LMP, the embryo develops into a fetus. The fetus does not reach viability until approximately 24 weeks, although viability is an individual medical determination. (*Id.* at 6). "Viability is medically understood as the point when a fetus has a reasonable likelihood of sustained survival after birth, with or without artificial support[,]" and is "medically impossible at 6 weeks LMP . . . ." (*Id.* at 6–7).

---

[3] "In the field of medicine, physicians measure pregnancy from the first day of a patient's last menstrual period ("LMP"). . . . Pregnancy begins . . . at three weeks LMP, when the fertilized egg implants in the uterus and lasts until 40 weeks LMP. For the first nine weeks LMP, an embryo develops in the uterus. It is not until approximately 10 weeks LMP that clinicians recognize the embryo as a fetus." (Gilbert Decl., Dkt. 8-2, at 6).

The Court finds that abortion is a safe[4] and common medical procedure, based on the credible declarations of abortion providers founded on their education and experience. Most providers in Texas perform both medication and procedural abortions. A medication abortion consists of taking two medications, mifepristone and misoprostol, which initiate a process similar to a miscarriage. (*Id.* at 4). A procedural abortion requires a provider to conduct an abortion procedure in person on the patient. Approximately one quarter of women in the United States will have an abortion by the age of forty-five. (*Id.* at 8). In Texas alone, providers performed more than 50,000 abortions last year. (*Id.* at 8–9).[5] The declarants credibly describe a host of reasons why people might

---

[4] "Abortion is also one of the safest medical procedures. Fewer than 1% of pregnant people who obtain abortions experience a serious complication. And even fewer abortion patients—only approximately 0.3%—experience a complication that requires hospitalization. Abortion is far safer than pregnancy and childbirth. The risk of death from carrying a pregnancy to term is approximately 14 times greater than the risk of death associated with abortion. In addition, complications such as blood transfusions, infection, and injury to other organs are all more likely to occur with a full-term pregnancy than with an abortion." (Gilbert Decl., Dkt. 8-2, at 9).

[5] In addition, "others in the state self-manage their abortions (i.e., on their own without following a physician's advice) using a range of methods that can include herbs and vitamins, birth control pills, alcohol or drugs, and misoprostol obtained over the counter in Mexico." (Gilbert Decl, Dkt. 8-2, at 8–9).

obtain an abortion—commonly arising out of medical,[6] financial,[7] and family planning[8] concerns. In

some cases, "patients choose to have an abortion because their pregnancies are the result of rape,

incest, or other intimate partner violence." (*Id.* at 11).[9] Still others seek abortions after fetal

anomalies are diagnosed, when such diagnoses may result in severe disabilities or death. Fetal

---

[6] "For many, maternal health concerns make abortion desirable and even necessary. Pregnancy, including an uncomplicated pregnancy, significantly stresses the body, causes physiological and anatomical changes, and affects every organ system. It can worsen underlying health conditions, such as diabetes and hypertension. Some people develop additional health conditions simply because they are pregnant—conditions such as gestational diabetes, gestational hypertension (including preeclampsia), and hyperemesis gravidarum (severe nausea and vomiting). People whose pregnancies end in vaginal delivery may experience significant injury and trauma to the pelvic floor. Those who undergo a caesarean section (C-section) give birth through a major abdominal surgery that carries risks of infection, hemorrhage, and damage to internal organs." (*Id.* at 9–10). None of these conditions qualifies for the medical emergency exception in S.B. 8. *See* Tex. Health & Safety Code § 171.205(a).

[7] "Many Texans obtain abortions because they are unable to meet their basic needs. Pregnant patients who seek abortion care are often low-income and below the federal poverty line. 14.7% of working Texans live in poverty, and 34.5% are low income. This number is even higher for women of color; 19.1% of Black women and 20.5% of Latina women live in poverty in Texas. These patients are in dire financial circumstances and often struggle to pay for needs like housing, food, and medical care. As a result, these patients believe that obtaining an abortion is the best decision for themselves and for their families." (Gilbert Decl., Dkt. 8-2, at 10).

[8] "The majority of pregnant people who have abortions are already parents: sixty-one percent of pregnant patients who obtain abortions already have at least one child.  They do not desire—and . . . may not be able to afford or properly care for—another child. . . . Other patients seek abortions because having another child is not right for them and their families at the present time. Sixty-six percent of abortion patients intend to have at least one child in the future. Some Texans become pregnant when they are young or still in school and want to wait to have children later in life.  Some become pregnant with a partner with whom they do not wish to share a child. Others may be managing their own unrelated health issues, such as substance abuse disorders, and may determine that having a child would not be the best choice for them in their current condition." (*Id.* at 10–11).

[9] "For patients who have been abused, being pregnant often subjects them to increased surveillance and decreased control over their lives. Being pregnant also may make it more likely that their abusers will perpetrate more physical violence against them. Terminating the pregnancy may be critical for their physical health and psychological well-being." *Id.* at 11. A provider in Oklahoma credibly relates his experiences with survivors of rape seeking abortion in his clinics because the medical procedure is no longer available to them in Texas: "One of the most heart-wrenching cases I have seen recently was of a Texas minor who had been raped by a family member and traveled (accompanied by her guardian) all the way from Galveston, Texas—a 7- to 8-hour drive, one way—to get her abortion in Oklahoma because she was more than six weeks pregnant and could not get an abortion in Texas. And this patient is not the only sexual assault survivor from Texas that I have treated recently. I provided an abortion to another woman from Texas who had been raped and could not get an abortion in Texas because of S.B. 8. She was upset and furious that she could not get an abortion close to home and in her own state. She had to figure out how to take extra time off from work to make the trip to Oklahoma, as well as find childcare for her children. I know of at least one other patient from Texas on our schedule for this upcoming week who has indicated that their pregnancy was a result of sexual assault." (Yap Decl., Dkt. 8-9, at 9).

anomalies of this nature cannot be diagnosed until significantly later than six weeks LMP, and some cannot be diagnosed until 18 or 20 weeks LMP. (*See* Gilbert Decl., Dkt. 8-2, at 11). Many people do not realize they are pregnant at six weeks LMP because the markers of pregnancy vary greatly across the population.[10] As a result, they cannot seek abortion care until after embryonic cardiac activity is detectable.[11] Even so, the Court finds that "the vast majority of abortions in the United States and in Texas take place in the first 12 weeks of pregnancy"—but "most patients are at least 6 weeks LMP into their pregnancy when they make an abortion appointment." (Gilbert Decl., Dkt 8-2, at 8).

## 2. Abortion Regulation in Texas

Texas law contains a number of regulations for abortion procedures antecedent to the developments in S.B. 8 at issue here. Those regulations remain in force irrespective of the constitutionality of S.B. 8. State law requires physicians to perform an ultrasound before performing an abortion on a patient. An ultrasound typically cannot detect a pregnancy before four weeks LMP, when the gestational sac becomes visible. (*Id.* at 4). State law also requires a series of counseling

---

[10] "The commonly known markers of pregnancy—a missed menstrual period and pregnancy symptoms—are not the same for all pregnant people. First, not every pregnant person can rely on a missed menstrual period to determine whether they are pregnant. In people with an average menstrual cycle (e.g., a period every 28 days), fertilization begins at 2 weeks LMP, and they miss their period at 4 weeks LMP. Many people do not experience average menstrual cycles, though. Some people have regular menstrual cycles but only experience periods every 6 to 8 weeks, or even further apart. Others do not know when they will experience their next period because they have irregular cycles, which are caused by a variety of factors, including polyps, fibroids, endometriosis, polycystic ovary syndrome, eating disorders, and other anatomical and hormonal reasons. Some people may have irregular menstrual cycles because they are taking contraceptives or are breastfeeding. As a result, many people may not suspect they are pregnant until much later than 4 weeks LMP. Second, many people will not exhibit the commonly known symptoms of pregnancy. For instance, people may have negative results from over-the-counter pregnancy tests even when pregnant because these tests often cannot detect a pregnancy at 4 weeks LMP or earlier. Additionally, symptoms such as nausea or fatigue differ for each pregnant person, and some people never experience those symptoms. Further complicating early detection of pregnancy, it is common for pregnant people to experience light bleeding when the fertilized egg is implanted in the uterus and mistake that bleeding for a menstrual period." (Gilbert Decl., Dkt 8-2, at 7).
[11] "Even for someone with normal periods, 6 weeks LMP is only two weeks after a missed period, and many patients (including young people and those on birth control) do not have normal periods. And even after a patient learns that they are pregnant and decides they want to terminate the pregnancy, arranging an appointment for an abortion may take some time. Even assuming an appointment is available at a health center that is accessible to a patient, they need to come in for at least two visits (due to a different Texas law), and have to take time off work, arrange child care, and deal with other logistical issues that can result in some delay." (Linton Decl., Dkt. 8-5, at 6).

requirements to be completed, as well as imposing a 24-hour waiting period. Unless a person certifies that they live more than 100 miles from an abortion facility, they must make two trips to a clinic to complete these requirements because of the waiting period. *See* Tex. Health & Safety Code §§ 171.011–016. Appointments for counseling and for medication abortion must be done in person. *Id.*; *id.* § 171.063. Written parental consent or a court order are required for patients eighteen years old or younger. *Id.* §§ 33.001–014. The State also prohibits Medicaid coverage of abortion; most private insurers similarly refuse to cover the procedure. (*See* Hagstrom Miller Decl. I, Dkt. 8-4, at 4). Credible evidence establishes that these requirements create burdens for people seeking abortions. (*See* Gilbert Decl., Dkt. 8-2, at 12) ("Patients must coordinate transportation to the clinic, childcare for their family, lodging if they live far from a clinic, and time off from work (which may not be paid).")).

In addition, the Texas legislature passed H.B. 2 in 2013, imposing further restrictions on abortion facilities and providers. House Bill 2, 83rd Leg., 2nd Called Sess. (Tex. 2013). That law was enjoined and ultimately overturned by the Supreme Court. *See Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). But during the period of its operation, it forced many clinics to close, almost all of which have not reopened.[12] The result is that, whereas before H.B. 2 there were 44 clinics, now only 20 clinics serve the entire state. (*See* Hagstrom Miller Decl. I, Dkt. 8-4, at 5).[13] Similar closures

---

[12] "Because WWH lacked sufficient physicians with admitting privileges in Beaumont and Austin, we had to shut those clinics down. Additionally, our clinic in McAllen was shut down for eleven months and was only reopened because of an injunction awarded by the United States District Court for the Western District of Texas. Ironically, one of our physicians in Austin was able to obtain admitting privileges in Fort Worth, and so he commuted by plane in order to keep our clinic in Fort Worth open. The cost of flights put further economic pressure on WWH." (Hagstrom Miller Decl. I, Dkt. 8-4, at 5).

[13] "In fact, the WWH clinic in Austin (now operated by Whole Woman's Health Alliance) is the only WWH clinic closed by H.B. 2 to have reopened since the Supreme Court struck it down. Less than two years after reopening, the Austin clinic was forced to close again because an anti-abortion pregnancy crisis center, Austin LifeCare, bought out the lease for our existing building. The Austin Clinic had to find a new location and relocate our operations, reopening again in February 2019. . . . Independent abortion providers will not be able to recover from clinic closures. Once abortion clinics close, they remain closed permanently." (*Id.* at 5).

arose from Governor Abbott's Executive Order shuttering clinics due to COVID-19.[14] For low-income patients, often from marginalized communities, and often facing language barriers, "significant logistical and financial burdens" on accessing abortion services existed even prior to the enactment of S.B. 8.[15]

### 3. Senate Bill 8

S.B. 8 imposes an almost outright ban on abortions performed after six weeks of pregnancy, as well as other anti-abortion measures meant to empower anti-abortion vigilantes and target those who support abortion care in Texas.

### a. The Six-week Ban on Abortions

The cornerstone of S.B. 8 is its requirement that physicians performing abortions in Texas determine whether a "detectable fetal heartbeat" is present and bans any abortions performed if a "fetal heartbeat"[16] is detected or if the physician fails to perform a test for one. Tex. Health & Safety Code §§ 171.201(1), 171.203(b), 171.204(a). S.B. 8 empowers licensing authorities to discipline any licensed healthcare provider who perform abortions in violation of S.B. 8. Tex. Occ. Code §§ 164.053(a)(1)), 301.101, 553.003. S.B. 8 contains no exception for pregnancies that result from rape or incest, or for fetal health conditions that are incompatible with life after birth—though it does

---

[14] "Abortion providers had a similar experience last year when Governor Abbott issued a COVID-19 executive order that forced all of the abortion providers in the state to stop providing abortions for around three weeks. Even this short closure had a devastating and lasting impact on both the clinics and our patients. Had the closure lasted even a few weeks more, many clinics would have closed for good." (*Id.* at 6).

[15] "Most of WWH/WWHA's patients in Texas are Black, Latinx, or people of color from marginalized communities. Our patients overcome significant logistical and financial burdens to access abortion care at our clinics. The majority of our patients are poor or low-income and receive at least partial financial assistance for their abortions." (*Id.* at 4).

[16] Because an ultrasound can typically detect cardiac activity beginning at approximately six weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("LMP"), and "fetal heartbeat" is a medically inaccurate term since what the law intends to refer to is "cardiac activity detected in an embryo" the Court will refer to S.B. 8's ban as a "six-week ban" to more accurately reflect that the ban covers all abortions performed approximately six week LMP, usually just two weeks after a missed menstrual period, when an embryo begins to exhibit electrical impulses. (Compl. Dkt. 1, at 22) ("[D]espite S.B. 8's use of the phrase 'fetal heartbeat,' the Act forbids abortion even when cardiac activity is detected in an embryo.").

contain a narrow exception for "a medical emergency . . . that prevents compliance." Tex. Health & Safety Code § 171.205(a).

S.B. 8 creates liability for anyone who performs an abortion in violation of the six-week ban and anyone who "knowingly" aids or abets the performance of an abortion performed at six weeks or later. *Id.* § 171.208(a)(1)–(2). Although S.B. 8 does not define what constitutes aiding or abetting under the statute, it specifies that paying for or reimbursing the costs of the abortion would fall under the ban, which would apply "regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of [S.B. 8]." *Id.* In addition, a person need not even actually take steps to "aid and abet" a prohibited abortion to be held liable under S.B. 8; all that is required is that the person *intended* to "aid and abet" an abortion at six weeks or later. *Id.* § 171.208(a)(3).[17]

b. Enforcement of the Six-Week Ban

S.B. 8 precludes enforcement of the six-week ban by state or local authorities, instead empowering private citizens to bring civil actions against anyone who allegedly performs, or aids and abets in the performance of a banned abortion. *Id.* § 171.207(a). Despite having no exception to the six-week ban for pregnancies that result from rape or incest, S.B. 8 precludes those "who impregnated the abortion patient through rape, sexual assault, [or] incest" from bringing an S.B. 8 lawsuit. *Id.* § 171.208(j). S.B. 8 does not permit private citizens to bring civil suits against abortion patients. *Id.* § 171.206(b)(1).

Any private individual may bring suit under S.B. 8 in the county where "all or a substantial part of the events or omissions . . . occurred," in their county of residence (if they are a Texas resident) or the defendant's county of residence, or the county of a defendant entity's principal

---

[17] Amici raise the possibility that their citizens could be subject to suit by, among other activities, "perform[ing] research used to support abortion access in Texas" or "donat[ing] or provid[ing] in-kind support to abortion funds and other abortion advocacy groups in Texas . . ." (Br. of Amici, Dkt. 9-1, at 11).

office. *Id.* § 171.210(a). A private individual who brings suit can block transfer to a more appropriate

venue if not consented to by all parties. *Id.* § 171.210(b).[18] Private individuals who prevail in S.B.

lawsuits may be awarded (1) "injunctive relief sufficient to prevent" future violations or conduct that

aids or abets violations; (2) "statutory damages . . . in an amount of not less than $10,000 for each

abortion" that was provided or aided and abetted; and (3) "costs and attorney's fees." Tex. Health &

Safety Code § 171.208(b). Significantly, a private individual may prevail in a civil suit brought under

S.B. 8 without alleging any injury.

In contrast, those sued under S.B. 8 are prohibited from raising certain defenses enumerated

under S.B. 8, including that they believed the law was unconstitutional; that they relied on a court

decision, later overruled, that was in place at the time of the acts underlying the suit; or that the

patient consented to the abortion. *Id.* § 171.208(e)(2)–(3). S.B. 8 also states that people who are sued

may not rely on non-mutual issue or claim preclusion or rely on any other "state or federal court

decision that is not binding on the court in which the action" was brought as a defense. *Id.* §

171.208(e)(4)–(5). If a suit is successful, the person sued will be bound by a mandatory injunction,

violation of which will result in contempt orders. *Id.* § 171.208(b)(2). Furthermore, those sued under

S.B. 8 who prevail in their case are barred from recovering their costs and attorney's fees if they

prevail even if the person has been sued many times. *Id.* § 171.208(i). S.B. 8 also enlarges the statute

of limitations, allowing private individuals to sue up to four years from the date the cause of action

accrues. *Id.* § 171.208(d).

S.B. 8 changes the way state courts interpret binding precedent. "States may regulate

abortion procedures prior to viability so long as they do not impose an undue burden" on a patient's

---

[18] Texas generally limits the venue where an action may be brought to one where the events giving rise to a claim took place or where the defendant resides, *see* Tex. Civ. Prac. & Rem. Code § 15.002(a), and a Texas state court may generally transfer venue "[f]or the convenience of the parties and witnesses and in the interest of justice," *id.* § 15.002(b).

right to abortion, but states "may not ban abortions." *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 269 (5th Cir. 2019), *cert. granted in part*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021). Under S.B. 8, a defendant may not establish an undue burden by "merely demonstrating that an award of relief will prevent women from obtaining support or assistance, financial or otherwise, from others in their effort to obtain an abortion[] or . . . arguing or attempting to demonstrate that an award of relief against other defendants or other potential defendants will impose an undue burden on women seeking an abortion." Tex. Health & Safety Code § 171.209(d). And S.B. 8 eliminates undue burden as a defense in the event the Supreme Court "overrules Roe v. Wade, 410 U.S. 113 (1973) or Planned Parenthood v. Casey, 505 U.S. 833 (1992), regardless of whether the [S.B. 8] conduct . . . occurred before the Supreme Court overruled either of those decisions." *Id.* § 171.209(e).

## B. Procedural Background

The procedural background and timing of this case is connected to the fate of another case in this Court challenging the constitutionality of S.B. 8: *Whole Woman's Health v. Jackson*, USDC No. 1:21-cv-616 (W.D. Tex. 2021). The *Jackson* case had an intense ramp-up starting when Plaintiffs[19] filed a suit on July 13, 2021. (1:21-cv-616, Dkt. 1). Plaintiffs are a large group of abortion care providers and advocates who sued Texas Attorney General Ken Paxton, a state court judge, a state court clerk, a private individual who previously expressed his intent to bring S.B. 8 lawsuits, and various State officials. (*Id.*). Defendants filed motions to dismiss, (1:21-cv-616, Dkts. 48, 49, 50, 51),

---

[19] Plaintiffs in that action include Whole Woman's Health, Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services, Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center, Houston Women's Clinic, Houston Women's Reproductive Services, Planned Parenthood of Greater Texas Surgical Health Services, Planned Parenthood South Texas Surgical Center, Planned Parenthood Center for Choice, Southwestern Women's Surgery Center, Whole Woman's Health Alliance, Allison Gilbert, M.D., Bhavik Kumar, M.D., The Afiya Center, Frontera Fund, Fund Texas Choice, Jane's Due Process, Lilith Fund for Reproductive Equity, North Texas Equal Access Fund, Marva Sadler, Reverend Daniel Kanter, and Reverend Erika Forbes. (1:21-cv-616, Dkt. 1, at 9–14).

and then Plaintiffs filed a motion for preliminary injunction, (1:21-cv-616, Dkt. 53). Three days after the motions to dismiss were filed, two of the Defendants—the state court clerk and the private individual—filed a petition for writ of mandamus, arguing that this Court erred by purportedly "refusing to resolve [their] jurisdictional objections before proceeding to the merits." *In re Clarkston*, No. 21-50708 (5th Cir. Aug. 7, 2021). After dozens of filings, the Fifth Circuit denied the petition of mandamus on August 13, 2021. *Id.*

During the pendency of the petition for writ of mandamus, the Court set the preliminary injunction motion to be heard on August 30, 2021. (1:21-cv-616, Dkt. 61). On August 25, 2021, the Court denied the pending motions to dismiss. (1:21-cv-616, Dkt. 82). Defendants filed an interlocutory appeal to the Fifth Circuit. (1:21-cv-616, Dkt. 83). Finding that Defendants who are state officials asserted sovereign immunity, this Court stayed its proceedings as to those Defendants but could not, and did not, stay its proceedings as to the private individual. (1:21-cv-616, Dkt. 88). On that same day, the Fifth Circuit entered a "temporary administrative stay" of this Court's proceedings and denied Plaintiffs' request to expedite the interlocutory appeal. (1:21-cv-616, Dkt. 92). Two days later, on August 29, 2021, the Fifth Circuit denied Plaintiffs' requests for an injunction pending appeal and to vacate its administrative stay, among other denials. (1:21-cv-616, Dkt. 93).

With S.B. 8 about to go into effect, Plaintiffs filed an application for injunctive relief or, in the alternative, to vacate the Fifth Circuit's stays of this Court's proceedings with the Supreme Court. *Whole Woman's Health v. Jackson*, No. 21A24, 2021 WL 3910722, at *1 (U.S. Sept. 1, 2021). At midnight, S.B. 8 became law, and that night the Supreme Court issued its opinion denying Plaintiffs' request for an injunction or stay. *Id.* While acknowledging that Plaintiffs had "raised serious questions regarding the constitutionality of the Texas law at issue[,]" the Supreme Court expressed concern about the "complex and novel antecedent procedural questions." *Id.*

In dissent, Chief Justice Roberts noted that "[t]he statutory scheme before the Court is not only unusual, but unprecedented," because "[t]he legislature has imposed a prohibition on abortions after roughly six weeks, and then essentially delegated enforcement of that prohibition to the populace at large," with the "desired consequence appear[ing] to be to insulate the State from responsibility for implementing and enforcing the regulatory regime." *Id.* (Roberts, C.J., dissenting). The Chief Justice stated that he "would grant preliminary relief to preserve the status quo ante— before the law went into effect—so that the courts may consider whether a state can avoid responsibility for its laws in such a manner." *Id.* at *2. Justices Breyer, Sotomayor, and Kagan each wrote a dissenting opinion, noting the need to preserve judicial review in the face of S.B. 8's unusual enforcement regime. *See id.* at *3–5.

On September 10, 2021, the Fifth Circuit denied Plaintiffs' motion to dismiss the private individual's appeal, granted the private individual's motion to stay, and expedited the appeal "to the next available oral argument panel." (1:21-cv-616, Dkt. 95). The Fifth Circuit's order confirmed its stay of this Court's proceedings, and the *Jackson* case has come to a halt pending the resolution of Defendants' interlocutory appeal.

The United States filed the instant action for declaratory and injunctive relief on September 9, 2021. (Compl., Dkt. 1). The United States accuses the State of banning nearly all abortions after six weeks, and months before a pregnancy is viable, "in open defiance of the Constitution." (*Id.* at 1). "Because S.B. 8 clearly violates the Constitution," the United States alleges that the State "adopted an unprecedented scheme 'to insulate the State from responsibility.'" (*Id.* (quoting *Jackson*, 2021 WL 3910722, at *1 (Roberts, C.J., dissenting))). The United States seeks a declaratory judgment that S.B. 8 is "invalid under the Supremacy Clause and the Fourteenth Amendment, is preempted by federal law, and violates the doctrine of intergovernmental immunity." (*Id.* at 3). The United States also seeks an "order preliminarily and permanently enjoining the State of Texas, including its

officers, employees, and agents, including private parties who would bring suit under the law, from implementing or enforcing S.B. 8." (*Id*).

S.B. 8 was designed to stymie judicial review. (*Id.*) (citing Emma Green, *What Texas Abortion Foes Want Next*, THE ATLANTIC (Sept. 2, 2021), https://www.theatlantic.com/politics/archive/ 2021/09/texas-abortion-ban-supreme-court/619953/; Jacob Gershman, *Behind Texas Abortion Law, an Attorney's Unusual Enforcement Idea*, THE WALL ST. J. (Sept. 4, 2021), https://www.wsj.com/articles /behind-texas-abortion-law-an-attorneys-unusual-enforcement-idea-11630762683 (quoting Texas State Senator Bryan Hughes: "We were going to find a way to pass a heartbeat bill that was going to be upheld."); Jenna Greene, *Column: Crafty Lawyering on Texas Abortion Bill Withstood SCOTUS Challenge*, REUTERS (Sept. 5, 2021), https://reuters.com/legal/government/crafty-lawyering-texas-abortion-bill-withstood-scotus-challenge-greene-2021-09-05/(quoting Sen. Hughes as saying S.B. 8 is a "very elegant use of the judicial system")).

In its complaint, the United States describes the effects of S.B. 8 on Texans and the injuries to the United States. According to the complaint, after being deprived of their constitutional right to an abortion, pregnant people are crossing state lines to seek abortion care since S.B. 8 took effect. (Compl., Dkt. 1, at 12–13). The complaint also asserts that S.B. 8 irreparably injures the United States by depriving people of their constitutional rights while preventing them from vindicating those rights in federal court and unconstitutionally restricting the operation of the federal government and conflicting with federal law. (*Id.* at 14–24). The United States brings claims under the Fourteenth Amendment, preemption, and intergovernmental immunity. (*Id.* at 24–26).

On September 15, 2021, the United States filed an emergency motion requesting a temporary restraining order or preliminary injunction to enjoin the enforcement and effect of S.B. 8. (Mot. Prelim. Inj., Dkt. 8). The United States, through declarations, detailed the "devastating effects" S.B. 8 already was having in Texas and nearby states, including the vast majority of people seeking

abortions being turned away, some people forced to seek care in other states, scheduling backlogs in other states because Texans are claiming 50-75% of appointments, and losing health care professionals who fear liability. (*Id.* at 17–22). Arguing that S.B. 8 violates the Constitution and the principles of preemption and intergovernmental immunity, the United States makes its case that it is likely to succeed on the merits. (*Id.* at 23–32). The United States also contends that it has standing to bring this suit against the State and that its requested relief will redress its injuries. (*Id.* at 32–43). Finally, the United States argues it faces irreparable harm and the balance of the equities tip in favor of an injunction. (*Id.* at 43–44). The Court set a hearing for October 1, 2021. (Dkt. 12).

On the same day the United States filed its preliminary injunction motion, the Amici States filed their Unopposed Motion for Leave to File Brief as Amici Curiae. (Dkt. 9). The Amici States express their interests in protecting their residents' ability to seek abortion care and avoid suit and their more general interest in "ensuring each State abides by its constitutional obligation not to prohibit access to otherwise lawful and safe abortion care." (Dkt. 9-1, at 9). The Amici argue that S.B. 8 represents an "unprecedented attack on our constitutional order and rule of law," (*id.* at 12), and urge this Court to immediately enjoin the State from enforcing S.B. 8, (*id.* at 26–27).

Several would-be intervenors filed motions, starting with the Texas Intervenors. (Mot. Intervene, Dkt. 28, at 1). The Texas Intervenors, who also later filed an opposition to the preliminary injunction motion, (Dkt. 44), seek to "preserve their state-law rights and to ensure that Senate Bill 8's severability requirements are observed and enforced." (Mot. Intervene, Dkt. 28, at 1). The Texas Intervenors claim they intend to sue people and entities, pursuant to S.B. 8, "whose conduct is clearly unprotected by the Constitution[] and who cannot plausibly assert an 'undue burden' defense under [S.B. 8]." (*Id.* at 2). The Court granted the Texas Intervenors' motion to intervene. (Dkt. 40). The next motion to intervene was filed by Oscar Stilley ("Stilley"), an Arkansas resident "in federal custody[] on home confinement" who already has sued an abortion provider

under S.B. 8 in Bexar County. (Stilley Mot., Dkt. 31, at 1, 4). The Court granted Stilley's motion to intervene. (Dkt. 40). Finally, just a few days ago, Felipe Gomez, who also brought an S.B. 8 suit in Bexar County, filed a motion to intervene. (Dkt. 62). Since the response window to that motion is still open, it is not ripe or before the Court at this time.

On September 30, 2021, the State filed its response to the preliminary injunction, (Resp., Dkt. 43), and its motion to dismiss, (Dkt. 54).[20] In its motion to dismiss, the State argues that there is no justiciable controversy between the United States and Texas; the United States cannot obtain relief against state courts or private individuals; the United States is not injured; and the United States lacks a cause of action. (Dkt. 54). In its opposition to the preliminary injunction motion, the State contends that S.B. 8 is lawful because the United States has not shown a clear violation of the Fourteenth Amendment and the United States has not clearly shown S.B. 8 is preempted or violates intergovernmental immunity. (Resp., Dkt. 43, at 49–59). The State also asserts that the United States has not clearly shown irreparable harm or that the balance of the equities and public interest favor an injunction. (*Id.* at 59–69). Rounding out its arguments, the State disputes the requested injunction as unlawfully broad. (*Id.* at 69–71). Finally, the State requests that, should this Court grant the preliminary injunction motion, this Court stay the injunction to allow the State to seek a stay from "the appropriate appellate courts." (*Id.* at 71–72).

### III. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited

---

[20] In its response, the State improperly included two motions—the motion to dismiss, which it separately filed later, (Dkt. 54), and a request for a stay in the event an injunction is granted—with its response brief. (Dkt. 43; *see* Deficiency Notice, Dkt. 47). While normally a filing error of this kind is not of note, this Court refers to it only because the State did not refile its request for a stay as a separate motion. Assuming a miscommunication or a misunderstanding, the Court still considers the State's request for a stay to be before this Court even though it resides with the State's response brief.

subject matter jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

Pursuant to Rule 12(b)(6), a court may also dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 540, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The

tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). When the United States is a party, the third and fourth requirements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## IV. DISCUSSION

Due to the length, the Court offers a high-level roadmap of its legal analysis. The Court first considers two requests—a motion to seal and a set of evidentiary objections—before reaching the jurisdictional and procedural questions presented by the State's motion to dismiss. Satisfied that the Court has subject matter jurisdiction and that the United States has stated a valid claim against the State, the Court then addresses the United States' preliminary injunction motion.

### A. Motion to Seal and Evidentiary Objections

#### 1. United States' Motion to Seal

Before the hearing, on September 27, 2021, the United States filed its Opposed Motion for a Protective Order of Audiovisual Recordings. (Mot. Seal, Dkt. 36). Pursuant to Federal Rule of Civil Procedure 26(c)(1), the United States requests this Court to seal the audiovisual recordings of depositions (the "Depositions") of Patrice Rachel Torres, Laurie Bodenheimer, Alix McLearen, James S. De La Cruz, and Anne Marie Costello (the "Deponents"), civil servants who were deposed by the State. (*Id.* at 1). The United States argues the Deponents have a "legitimate privacy interest in limiting permanent and public dissemination of video recordings of them being deposed." (*Id.*). The United States relies on two United States District Court for the District of Columbia decisions that sealed audiovisual recordings of civil servants. (*Id.* at 2) (citing Order at 2–3, ECF No. 96, *Judicial Watch, Inc. v. U.S. Dep't of State*, (D.D.C. Apr. 25, 2019); *Judicial Watch v. Dep't of State*, No. 13-cv-1363-EGS (D.D.C. May 26, 2016)). The State opposes this request. (Resp. Mot. Seal, Dkt. 64).

Generally, the public has a right to inspect judicial records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right "promotes the trustworthiness of the judicial process, curbs judicial abuses, and provides the public with a better understanding of the judicial process, including its fairness[, and] serves as a check on the integrity of the system." *Bradley on behalf of AJW v. Ackal*,

No. 18-31052, 2020 WL 1329658, at *4 (5th Cir. Mar. 23, 2020) (citing *United States v. Sealed Search Warrants*, 868 F.3d 385, 395 (5th Cir. 2017)).

This right is not absolute and the "common law merely establishes a presumption of public access to judicial records." *Id.* (citing *SEC v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993)). The Fifth Circuit has neither assigned a particular weight to this presumption nor interpreted the presumption in favor of access as creating a burden of proof. *Id.* at *4. But in light of the public's right to access judicial records, courts are required to "use caution in exercising [their] discretion to place records under seal." *United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 689–90 (5th Cir. 2010) (citing *Fed. Sav. & Loan Ins. Corp. v. Blain*, 808 F.2d 395, 399 (5th Cir. 1987)). "In exercising its discretion to seal judicial records, the court must balance the public's common law right of access against the interests favoring nondisclosure." *Bradley*, 2020 WL 1329658, at *4 (citing *Van Waeyenberghe*, 990 F.2d at 848). "The presumption however gauged in favor of public access to judicial records is one of the interests to be weighed on the public's side of the scales." *Id.* (internal quotations omitted).

"Not every document, however, is a judicial record subject to the common law right of access." *Id.* at *5. "[S]ealing may be appropriate where orders incorporate confidential business information." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 204 (5th Cir. 2015). In some cases, such as those involving "trade secrets, the identity of informants, and the privacy of children," *Jessup v. Luther*, 277 F.3d 926, 928 (7th Cir. 2002), or those in which information could be used for "scandalous or libelous purposes," *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995), the interest in secrecy is compelling. But when the party seeking leave to file under seal "does not identify any particular confidential information in the orders that may cause it harm, and much of the information therein is available elsewhere," sealing is generally unwarranted. *N. Cypress*, 781 F.3d at 204; *see also Powers v. Duff & Phelps, LLC*, No. 1:13-CV-768, 2015 WL 1758079, at *7–8 (W.D. Tex.

Apr. 17, 2015) ("[T]he parties' decision to designate documents as confidential does not mandate that the Court seal the record. The standard for sealing court documents is more stringent than [the] standard for protecting discovery materials under a protective order."). "[I]n order for a document to be sealed, the movant must not only point to specific confidential information contained in the document, but must also show the specific harm that would be suffered if the public were granted access to this document." *Omega Hosp., LLC v. Cmty. Ins. Co.*, No. CV 14-2264, 2015 WL 13534251, at *4 (E.D. La. Aug. 12, 2015) (citing *N. Cypress*, 781 F.3d at 204).

The United States has not presented any compelling reasons for sealing the Depositions other than that civil servants have a privacy interest. (Mot. Seal, Dkt. 36, at 2). While civil servants may very well have such a privacy interest, the United States has not explained how it outweighs the presumption of public access to the court documents. *See Nixon*, 435 U.S. at 597; *Bradley*, 2020 WL 1329658, at *4 (citing *United States v. Sealed Search Warrants*, 868 F.3d at 395). Additionally, the United States does not seek to seal the transcripts of the Depositions. (Mot. Seal, Dkt. 36, at 2). The fact that the United States does not object to the content of the Depositions being public also favors access to the Depositions. *See N. Cypress*, 781 F.3d at 204. The Court will deny the United States' motion to seal.

2. The State's and the Texas Intervenors' Objections to the United States' Declarations

On September 30, 2021, the State filed its objections to the declarations attached to the United States' Motion. (Dkt. 55). The next day, during the hearing on the Motion, the State additionally objected to the two declarations attached to the United States' reply, (Dkt. 59). (Hr'g Tr., Dkt. 65, at 6–7). The State objected to those two declarations as improper because (1) they are new evidence submitted with a reply brief and (2) the State did not have the opportunity to cross examine one of the declarants. (*Id.* at 7). At the hearing on the preliminary injunction motion, the Texas Intervenors moved to strike three declarations proffered by the United States: Dr. Allison

Gilbert, Amy Hagstrom Miller, and Melaney Linton. (Hr'g Tr., Dkt. 65, at 96). The Texas

Intervenors moved to strike them as inadmissible hearsay. (*Id.*). The Texas Intervenors also objected

that they lacked a meaningful opportunity to contest the content of the declarations. (*Id.* at 96–97).

The Court took the evidentiary objections under advisement. (*Id.* at 7).

The Court will now deny the State's and the Texas Intervenors' evidentiary objections. For

preliminary injunctions, courts may less strictly follow the rules of admissibility and even may rely on

inadmissible evidence. *See, e.g.*, *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir.

1993) ("Furthermore, at the preliminary injunction stage, the procedures in the district court are less

formal, and the district court may rely on otherwise inadmissible evidence, including hearsay

evidence."); *Null v. Wainwright*, 508 F.2d 340, 344 (5th Cir. 1975) ("Strict evidentiary rules of

admissibility are generally relaxed in bench trials, as appellate courts assume that trial judges rely

upon properly admitted and relevant evidence."). The Court will examine the evidence presented

and make determinations, whether explicit or implicit, about whether to rely on that evidence as it

makes its findings of fact and conclusions of law.

To the extent the State or the Texas Intervenors believe they lacked a meaningful

opportunity to contest evidence, the Court notes that a full evidentiary hearing was held on October

1, 2021, at which the State, for example, presented deposition testimony from when the State cross-

examined declarants for the United States and had a meaningful opportunity to present and refute

evidence. (*See* Minute Entry, Dkt. 61). The Court reminds the Texas Intervenors that they did not

file their motion to intervene, (Dkt. 28), until two weeks after this case was filed; the Court

expedited its consideration of that motion; and the Court allotted them 30 minutes at the hearing (as

compared to the one hour given to each party) to present evidence or argument. (*See* Order Denying

Mot. Reconsideration, Dkt. 53, at 1–2). Taking into account the compressed schedule, the Court

provided the Texas Intervenors, like the parties, a meaningful opportunity to present and refute the evidence.

## B. Motion to Dismiss

"The statutory scheme [in S.B. 8] is not only unusual, but unprecedented." *Jackson*, 2021 WL 3910722, at *1 (Roberts, C.J., concurring). The intent of this scheme, according to its drafters, was to stymie judicial review and ensure that no private party would be able to bring a pre-enforcement suit to challenge the constitutionality of the law. *See supra* Section II(B). Thus far, this tact has been effective—the Supreme Court denied a private, pre-enforcement preliminary injunction against S.B. 8, and the law has been in effect for over a month. *See id.* at *3 (Sotomayor, J., dissenting). The United States seeks to establish that its distinct, sovereign interests in upholding the supremacy of the Constitution, safeguarding constitutional rights, ensuring the availability of judicial review, and protecting the work of federal agencies all warrant its opportunity to sue in this Court. Based on the following analysis, the Court holds that the United States indeed has standing to file its lawsuit with this Court

### 1. Standing

The first question this Court must answer is whether the United States has the authority to sue Texas to enjoin S.B. 8 in federal court. Article III of the Constitution confines the federal judicial power to the resolution of "Cases" and "Controversies." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). For there to be a case or controversy, the plaintiff must have a "personal stake" in the case. *Id.* A personal stake exists when three requirements are met: The plaintiff must show (i) that the injury it suffers is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (stating the three elements of Article III standing). The standing requirements are heightened somewhat in a motion for a preliminary injunction, where

the plaintiff must make a "clear showing" that she has standing to maintain the preliminary injunction. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). However, "[t]he injury alleged . . . need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted).

The United States asserts that S.B. 8 injures the federal government in two ways. (Mot. Prelim. Inj., Dkt. 8, at 12). First, it claims S.B. 8 unconstitutionally impairs the United States' responsibilities under federal law to provide abortion-related services in certain circumstances. (Compl., Dkt. 1, at 2). Specifically, it argues S.B. 8 will expose the United States and its third-party contractors to liability and increased costs for providing abortion-related services to persons in the care and custody of federal agencies.[21] Second, the United States asserts that it is "injured by Texas's attempt to circumvent its obligations under the federal Constitution" and "thwarting mechanisms of judicial review provided by federal law." *Id.* It contends it possesses the authority to sue when a state violates the federal government's interest in upholding the Constitution and injures the federal government's sovereignty. (Mot. Prelim. Inj., Dkt. 8, at 22).

### a. Injury-in-Fact

The first requirement of Article III standing doctrine is that the plaintiff's injury be concrete, particularized, and actual or imminent. *Lujan*, 504 U.S. at 560–61. An injury is "concrete" if it is "real, and not abstract." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). Certain harms readily qualify as concrete injuries under Article III, including traditional tangible harms such as physical or monetary injury. *Id.* However, a harm need not be tangible to be concrete; various intangible harms can meet this requirement, including violations of constitutional rights, such as freedom of speech or the free exercise of religion. *Spokeo*,

---

[21] The United States offers as examples of federal agencies impacted by S.B. 8 the Department of Labor, the Office of Refugee Resettlement, the Bureau of Prisons, the Centers for Medicare and Medicaid Services, the Office of Personnel Management, and the Department of Defense. (Compl., Dkt. 1, at 15–24).

136 S. Ct. at 1549; *TransUnion*, 141 S. Ct. at 2204. A harm is particularized if the plaintiff has

personally suffered the harm. *Lujan*, 504 U.S. at 560 n.1. Finally, a harm is actual or imminent if the

harm has happened or is sufficiently threatening, not merely if it may occur at some future time. *Id.*

at 564.

i. Injury-in-Fact to Federal Agencies and Programs

Insofar as S.B. 8 impedes the federal government's ability to provide abortion-related

services mandated by regulations, statutes, and case law, the United States has met its burden to

demonstrate a concrete, particularized, and actual injury. *See id.* at 561 ("The party invoking federal

jurisdiction bears the burden of establishing these elements."). This Court finds that S.B. 8

concretely injures the United States by prohibiting federal personnel and contractors from carrying

out their obligations to provide abortion-related services and subjecting federal employees and

contractors to civil liability for aiding and abetting the performance of an abortion. (Mot. Prelim.

Inj., Dkt. 8, at 17).

By imposing damages liability of $10,000 or more on any person performing, inducing,

aiding, or abetting an abortion, S.B. 8 exposes the federal government, its employees, and its

contractors to monetary injury. *See TransUnion*, 141 S. Ct. at 2204 (stating that certain harms readily

qualify as concrete injuries, such as monetary injury). Under S.B. 8, these employees and contractors

must choose between facing this civil liability and damages or violating federal regulations, statutes,

or case law. For example, the Federal Bureau of Prisons ("BOP") regulations provide that a BOP

prison's Clinical Director "*shall* arrange for an abortion to take place" when a pregnant inmate

requests an elective abortion. 28 C.F.R. § 551.23(c) (emphasis added). BOP further bears all costs of

providing an abortion "in the case of rape or incest." (*See* McLearen Decl., Dkt. 8-10, at 3–4). S.B. 8,

however, may result in civil liability even when the pregnancy was caused by rape, sexual assault, or

incest. Tex. Health & Safety Code § 171.208(j) (providing only that civil actions "may not be

brought by a person" who impregnated, through rape, sexual assault, or incest, the individual seeking an abortion).

Several other agencies of the federal government are similarly impacted by S.B. 8. The United States Marshals Service ("USMS") offers individuals in its custody the opportunity to seek elective abortions. (Sheehan Decl., Dkt. 8-11, at 2). The Department of Defense ("DoD") has a statutory obligation to provide abortion services in cases where the pregnant person's life would be endangered by carrying the fetus to term, or in instances of rape or incest. 10 U.S.C. §§ 1074; 1093(a). The Department of Health and Human Services' Office of Refugee Resettlement ("ORR") may not interfere with access to a pre-viability abortion for unaccompanied minors in the agency's custody. *J.D. v. Azar*, 925 F.3d 1291, 1338 (D.C. Cir. 2019). Indeed, the ORR must provide access to abortion services when requested and permitted by law. (De La Cruz Decl., Dkt. 8-12, at 5). The Department of Labor's ("DOL") Job Corps program employs private contractors that are contractually obligated to inform Job Corps participants about their options to terminate a pregnancy. (Matz Decl., Dkt. 8-14, at 2–3, 5–6; Torres Decl., Dkt. 8-13, at 3–4). The Office of Personnel Management ("OPM"), which manages the health benefits of federal employees, annuitants, and other statutorily eligible individuals, has contracts with providers that offer abortion procedures in certain circumstances. (Bodenheimer Decl., Dkt. 8-15, at 2). Finally, the Medicaid program in Texas, which is a cooperative state-federal program administered by Centers for Medicare & Medicaid Services ("CMS"), may be required to cover abortions that are deemed medically necessary. 42 U.S.C. § 1396d(a)(1)–(2); (Costello Decl., Dkt. 8-16, at 4).

Crediting the declarations of the administrators of the BOP, USMS, DoD, ORR, DOL, OPM, and CMS—and taking into account the regulations, statutes, and cases governing the abortion-related services provided by these agencies—this Court finds that the federal government indeed provides services that would subject federal employees and contractors to civil liability under

S.B. 8. As S.B. 8 forces these agencies to choose between facing civil damages or providing the mandated services, this Court further finds that the United States suffers a concrete injury to its ability to effectuate these services and programs. The injury is particularized as the impacted agencies are agencies of the federal government. Finally, the harm is actual—S.B. 8 took effect at midnight on September 1, 2021. *See Jackson*, 2021 WL 3910722, at *3 (Sotomayor, J., dissenting). Several of the United States' agency administrator declarants stated that upon S.B. 8 taking effect, they would be required to begin transporting those in their custody or care in Texas to out-of-state locations to receive abortion services, which would increase the cost of providing those services and possibly subject the agencies to civil liability for providing this transport. (*See* McLearen Decl., Dkt. 8-10, at 5–6; Sheehan Decl., Dkt. 8-11, at 4–5; De La Cruz Decl., Dkt. 8-12, at 7; Torres Decl., Dkt. 8-13, at 5–6; Matz Decl., Dkt. 8-14, 5–6). Overall, this Court finds that S.B. 8 subjects the United States to an injury-in-fact insofar as the United States provides abortion-related services to persons in the care or custody of federal agencies.

### ii. *Parens Patriae* Standing

The next question is whether the United States suffers an injury-in-fact such that it has standing to challenge a potential violation of Constitutional rights that not only impacts federal agencies, but the public at large. The United States argues that it possesses a "sovereign interest" in ensuring that States are not able to enact laws in plain violation of the Constitution. There is no doubt that harms to the exercise of Constitutional rights is a concrete harm for Article III purposes. *See generally Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) (permitting a suit based on a violation of free speech rights); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (permitting a suit based on a violation of the Free Exercise Clause). It is further without question that any harm posed to the United States by the enactment of S.B. 8 is actual; as stated above, the law went into effect at midnight on September 1, 2021. The primary question, then, is

whether the United States indeed has an interest in ensuring States may not enact laws that likely violate the Constitution such that the injury is particularized.

States have long had the authority to sue private defendants to vindicate citizens' rights, and, in doing so, to vindicate the interests of the state as a sovereign. *See, e.g.*, *State of Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237–38 (1907) (holding that Georgia could sue a private company over the release of noxious fumes because Georgia had an interest "independent of and behind the titles of its citizens" in preventing pollution that endangered the state's ecosystem). This authority of states to sue private defendants in *parens patriae* also extends to protecting federal rights.[22] *See, e.g.*, *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 451 (1945) (authorizing Georgia to sue a private company for violations of federal antitrust laws because "Georgia, as a representative of the public, is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister states . . . Georgia's interest is not remote—it is immediate").

The State asserts that *parens patriae* standing is limited to state governments. (Resp., Dkt. 43, at 18). However, this assertion is demonstrably incorrect. In *Massachusetts v. Mellon*, the Supreme Court indicated in dicta that the United States may also sue to vindicate federal rights. Indeed, as the Supreme Court noted, states may not sue the federal government to enforce their citizens' federal rights because "[i]n that field, it is the United States, and not the State, which represents [its citizens] as *parens patriae* when such representation becomes appropriate, and to the former, and not to the latter, they must look for such protective measures as flow from that status." *Commonwealth of Mass. v. Mellon*, 262 U.S. 447, 485–86 (1923). The Supreme Court lent further credence to this concept when

---

[22] *Parens patriae*—literally "parent of the country"—refers traditionally to the role of state as sovereign and guardian of persons under legal disability. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982) (citing Black's Law Dictionary 1003 (5th ed. 1979)).

it relied on the dicta in *Mellon* to deny Florida leave to file a suit in *parens patriae* against the United States for instituting an allegedly unconstitutional tax. *Florida v. Mellon*, 273 U.S. 12, 18 (1927); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (citing *Mellon* in support of the proposition that a "State does not have standing as the parent of its citizens to invoke these constitutional provisions against the federal government, the ultimate parens patriae of every American citizen"). The Fifth Circuit recently reinforced the concept that states may not sue the federal government in *parens patriae* to enforce Constitutional rights because the federal government is the ultimate *parens patriae* when it comes to enforcement of the Constitution. *Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (2021) (rehearing en banc) (quoting *Katzenbach*, 383 U.S. at 324).

The United States has standing to file suit in *parens patriae* for probable violations of its citizens' Constitutional rights. As stated in *Pennsylvania Railroad*, States can sue in *parens patriae* to vindicate their citizens' federal rights against private parties. But the dicta in *Mellon* (and the subsequent case law relying on this dicta) clarifies that states' standing to sue in *parens patriae* for violations of federal and Constitutional rights does not extend to suits against the federal government because, in that arena, the federal government's interest in protecting its citizens' rights overrides the state interest. *Id.* This preclusion of state standing necessarily implies the existence of federal standing. But this Court need not solely rely on this inference. The principle is stated outright: while states may sue in *parens patriae* in support of federal and constitutional rights in certain instances, the United States is the "ultimate parens patriae." *Id.* When it comes to violations of the federal and constitutional rights of U.S. citizens, the United States has standing to represent "[its citizens] as *parens patriae*," and it is to the United States they "look for such protective measures as flow from that status." *Mellon*, 262 U.S. at 485–86.

Having established that the United States has the authority to file this suit in *parens patriae*, it is necessary to identify the character of the federal government's particular interest. The Supreme

Court has stated that to maintain an action in *parens patriae*, a state "must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party." *Snapp*, 458 U.S. at 607. One way to establish this interest is by expressing a "quasi-sovereign interest," which is a "judicial construct that does not lend itself to a simple or exact definition," but generally refers to "a set of interests that the State has in the well-being of its populace." *Id.* at 601–02, 607 (noting, for example, that a state has a quasi-sovereign interest "in the health and well-being . . . of its residents" and "in not being discriminatorily denied its rightful status within the federal system").

A sovereign interest also may support a *parens patriae* suit. *Pennsylvania v. New Jersey*, 426 U.S. 660, 666 (1976) (denying Pennsylvania leave to file a suit in *parens patriae* because "[n]o sovereign or quasi-sovereign interests" of the state were implicated); *Com. Of Pa. v. Porter*, 659 F.2d 306, 315 (3d Cir. 1981) (noting that a suit by Pennsylvania in *parens patriae* was advancing the state's "significant sovereign interest" in preventing violations of its citizens' constitutional rights); *South Carolina v. North Carolina*, 558 U.S. 256, 266 (2010) (stating that "when a State is a party to a suit involving a matter of sovereign interest, it is *parens patriae* and it must be deemed to represent all [of] its citizens") (internal quotations omitted).

The United States sets out in its reply brief that it does not "principally" rely on *parens patriae* as a basis for standing because "it is suing to vindicate the government's own interest." (Reply, Dkt. 56-1, at 2 n.1). Possessing a sovereign or quasi-sovereign interest is, in fact, a requirement to sue in *parens patriae*. The United States, although it does not explicitly rely on *parens patriae* to support its standing argument, argues that it possesses both quasi-sovereign and sovereign interests in this suit. (*See* Compl., Dkt. 1, at 5). Regarding quasi-sovereign interests, the United States asserts that its interest in ensuring its citizens can invoke the power of the federal courts to vindicate their rights is a quasi-sovereign interest "in the health and well-being" of its citizens and "in not being . . . denied

its rightful status within the federal system." (*Id.* (citing *Snapp*, 458 U.S. at 601–02)). The State, in response, argues that S.B. 8 is "not hazardous to women's health." (Resp., Dkt. 43, at 19). However, this Court need not address the merits of these arguments. Instead, it finds that the United States possesses an indisputably sovereign interest sufficient to support its standing in this lawsuit.

The United States argues that it has a "profound sovereign interest" in vindicating its citizens constitutional rights and ensuring those rights "remain redeemable in federal court." (Compl., Dkt. 1, 4–5). It asserts that it has a weighty interest in protecting the supremacy of the Constitution by opposing laws that shield violations of U.S. citizens' constitutional rights from federal judicial review. (Reply, Dkt. 56-1, at 7). In response, the State contends that a sovereign interest in ensuring states do not violate the Constitution cannot support Article III standing. The State supports that argument by suggesting that sovereign injuries are limited to those described in *Snapp*, which include interests in "the exercise of sovereign power over individuals" and "the power to create and enforce a legal code." (Resp., Dkt. 43, at 20) (citing *Snapp*, 458 U.S. at 601). However, sovereign interests are not limited to those discussed in *Snapp*. The Supreme Court has found, for example, that a state has a sovereign interest in ensuring it receives "an equitable share of an interstate river's water." *South Carolina*, 558 U.S. at 274; *see also New Jersey v. New York*, 345 U.S. 369, 374–75 (1953). As another example, it is also a sovereign interest for a state to protect its economy from deceptive mortgage practices. *See Nevada v. Bank of America Corp.*, 672 F.3d 661, 671 (2012). The interests that were sufficient in these examples pale in comparison to the interest the United States asserts here—none of those interests involved the potential for large-scale violations of constitutional rights and frustration of core constitutional principles.

The State also asserts that the United States' interest in the case is nominal and insufficient to establish *parens patriae* standing. (Resp., Dkt. 43, at 18). However, the claim that the United States' interest in this case is merely nominal is unfounded. Federal courts have held that states suing in

*parens patriae* hold "significant sovereign interests of [their] own in" preventing violations of their citizens' constitutional rights. *Porter*, 659 F.2d at 315. Indeed, an interest in upholding the legitimacy of the constitution and vindicating the constitutional rights of United States citizens is arguably even more significant when the party seeking to do so is the federal government. *See Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1925) (noting that the United States' sovereign interest in enforcing constitutional provisions "seem to be stronger than those that have established a similar standing for a state").[23] Further, the concept of *parens patriae*—the government as the parent of the country—fits cleanly within the fundamental principles underlying the very sovereignty of the United States. "The government of the Union, then . . . is, emphatically, and truly, a government of the people . . . [i]ts powers are granted by them, and are to be exercised directly on them, *and for their benefit*." *U.S. Term Limits, Inc. v. Ray Thornton*, 514 U.S. 779, 839 (1995) (Kennedy, J., concurring) (quoting *M'Culloch v. Maryland*, 4 Wheat. 316 404–05 (1819)) (emphasis added). The United States is a government chartered by the people, and its sovereignty is conditioned on its ability to safeguard the rights of its citizens. Thus, when, as here, a state appears to deprive individuals of their constitutional rights by adopting a scheme designed to evade federal judicial review, the United States possesses sovereign interest in preventing such a harm. This interest is sufficient to establish a particularized injury.

### iii. *In Re Debs* Standing

While this Court finds the doctrine of *parens patriae* sufficient to establish the United States' injury for standing purposes, this Court finds, in the alternative, that the concepts underpinning *In*

---

[23] The United States cites—and the State does not directly dispute the applicability of—*Vt. Agency of Nat. Ress. v. United States ex rel. Stevens.* 529 U.S. 765 (2000); (*see also* Reply, Dkt. 56-1, at 2; Hr'g Tr., Dkt. 65, at 14). While *Vermont* was a qui tam relator case in which an individual was suing on behalf of the federal government over violations of federal law, the case is instructive here, as it states "[i]t is beyond doubt that the complaint asserts an injury" to the sovereignty of the United States "arising from violations of its laws." *Vt. Agency of Nat. Ress.*, 529 U.S. at 771.

*Re Debs* and its progeny likewise establish a particularized injury to sovereign interests of the United States. *Debs* arose out of the Pullman rail strike of 1894. The Supreme Court held that the United States had the authority to sue private parties for injunctive relief as the strike was obstructing interstate commerce. *In Re Debs*, 158 U.S. 564, 584 (1895). In support of the United States' interest in the case, the Supreme Court stated, "[t]he obligations which [the United States] is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often sufficient to give it a standing in court." *Id.* at 584.[24] This suggests the type of interest sufficient to give the United States standing can be interpreted broadly to encompass harms to the public interest and general welfare.

Lower courts have had differing interpretations of the interests that can establish standing under *Debs*. Some have given *Debs* an expansive reading, suggesting it offers the United States standing to sue whenever an alleged harm affects the public at large. *See, e.g.*, *United States v. Brand Jewelers, Inc.*, 318 F. Supp. 1293, 1296 (S.D.N.Y. 1970); *Porter*, 659 F.2d at 316–17 n.15. Others have cited *Debs* in support of standing based on more specific interests, such as national security and proprietary interests. *See, e.g.*, *United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972); *United States v. Allen*, 179 F. 13, 17 (8th Cir. 1910). Perhaps the most common reading of *Debs* is that it offers the United States standing when there are obstructions to interstate commerce. *See, e.g.*, *United States v. City of Montgomery*, 201 F. Supp. 590, 594 (M.D. Ala. 1962) (finding the United States had

---

[24] This Court notes that *Debs* was decided before the Supreme Court thought of standing and cause of action as analytically distinct concepts; indeed, it was not until the Supreme Court decided *Fairchild v. Hughes* in 1922 that the Supreme Court began directly addressing the "right to sue" as such. *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922) (finding that the plaintiff's "alleged interest in the question submitted is not such as to afford a basis for this proceeding"). This Court finds that relevance of *Debs* to this case is primarily in its discussion of non-statutory, equitable causes of action. (Reply, Dkt. 56-1, at 5). Therefore, the bulk of this Court's analysis of *Debs* occurs in its discussion of the United States' cause of action in Section IV(B)(2), *infra*. However, while *Debs* did not directly address standing, subsequent opinions have relied on *Debs* to determine the government's interest in the proceedings for standing purposes. As such, this Court's use of *Debs* to address standing will rely heavily on courts' interpretations of *Debs* in subsequent cases.

standing based on large-scale obstructions to interstate commerce); *United States v. Solomon*, 563 F.2d 1121, 1129 (4th Cir. 1977) (declining to rely on *Debs* to establish standing because the case did not involve a "factor of interstate commerce").

The State asserts that *Debs* and its progeny do not support the United States' standing argument, stating that the case stands for the limited proposition that the United States may sue to protect its proprietary interest in the mails and its statutory authority over interstate rail commerce, and that these narrowly defined interests are not present here. (Resp., Dkt. 43, at 20) (citing *Debs*, 148 U.S. at 583–84). However, the language of *Debs* itself does not support such a limited view of the United States' interests in the case. The Supreme Court explicitly stated that it declined to "place [its] decision upon" the proprietary interest ground alone. *Debs*, 158 U.S. at 584. The Court further stated that the national government has an interest in "brush[ing] away *all* obstructions to the freedom of interstate commerce or the transportation of the mails," not merely those obstructions over which the United States has statutory authority. *Id.* Several of the subsequent cases that have relied on *Debs* to establish the government's standing have not read *Debs* to require that the government's interest be based on a statute. *See, e.g.*, *Brand Jewelers*, 318 F. Supp. at 1297; *Marchetti*, 466 F.2d at 1313; *United States v. City of Jackson, Miss.*, 318 F.2d 1, 15 (5th Cir. 1963) (noting that a "proprietary interest provides a non-statutory basis for standing of private persons and would provide a basis for the United States to sue . . .").[25]

Neither the Supreme Court nor the Fifth Circuit have expressly limited *Debs*'s implications for standing, at times offering both more expansive and confined readings of the scope of the interests supported by *Debs*. *See, e.g.*, *Hopkins Fed. Sav. & Loan Ass'n v. Cleary*, 296 U.S. 315, 339

---

[25] While the State is correct in noting that *Jackson*'s subsequent history left open the question of whether the United States has standing to sue under *Debs* absent congressional authorization, the subsequent history does not overrule the Fifth Circuit's statements in *Jackson* regarding the government's standing to sue without a statutory basis.

(1935) (citing *Debs* in support of government standing when the interest at issue involves a matter "of grave public concern"); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (stating the "United States may sue to protect its interests," which include "ensuring . . . routes of commerce over which it has assumed control, remain free of obstruction") *Sanitary Dist. of Chicago v. United States*, 266 U.S. at 426 (noting *Debs* offered the government standing to remove obstructions to interstate commerce); *Fla. E. Coast Ry. Co. v. United States*, 348 F.2d 682, 685 (5th Cir. 1965) (same); *City of Jackson*, 318 F.2d at 14 (same). Furthermore, in cases where the Supreme Court or the Fifth Circuit relied on a more limited reading of *Debs*, they did not do so to the exclusion of a broader reading.

In the absence of additional guidance from the Supreme Court and the Fifth Circuit as to the scope of *Debs*'s standing analysis, this Court finds that *Debs* supports standing where the government's interest is preventing harms to "the general welfare" and the "public at large."[26] The United States has demonstrated that its interest in this case does relate to such harms. The same sovereign interests that supported the United States' standing argument in *parens patriae* are applicable here. The United States' interest in vindicating its citizens constitutional rights and ensuring those rights "remain redeemable in federal court" fits within the broad interest *Debs* articulated in preventing harms that affect the public broadly. (*See* Compl., Dkt. 1, 4–5).

However, this Court notes that were *Debs*'s progeny to be read narrowly to support standing only in cases involving interstate commerce, the United States has likewise demonstrated an interest sufficient to establish standing. In *Debs*, the Supreme Court found the United States had standing to sue regarding protests that interfered with interstate commerce. *Debs*, 158 U.S. at 582. This Court finds that S.B. 8 interferes with interstate commerce. Congress acknowledged that abortion

---

[26] While the *interests* that form the basis for standing under *Debs* may be broad, the *types* of suits the United States may institute based on these interests are subject to limiting principles. *See infra*, Section IV(B)(2).

implicates interstate commerce when it enacted a ban on "partial-birth abortions." *See* 18 U.S.C. §
1531(a). And the particular features of S.B. 8 burden interstate commerce even beyond the impacts
of traditional legislation. By extending liability to persons anywhere in the country, S.B. 8's structure
all but ensures that it will implicate commerce across state lines—whether through insurance
companies reimbursing Texas abortions, banks processing payments, medical device suppliers
outfitting providers, or persons transporting patients to their appointments. (Compl., Dkt. 1, at 13).
In addition to imposing liability on those coming into Texas, the law has also already had the effect
of pushing individuals seeking abortions into other states. (*See* Br. of Amici, Dkt. 9-1, at 25–26). This
stream of individuals across state lines burdens clinics in nearby states and impedes pregnant
individuals in surrounding states from accessing abortions due to backlogs. (*See* Tong Decl., Dkt. 8-
6; Cowart Decl., Dkt. 8-7; Rupani Decl., Dkt. 8-8; Yap Decl., Dkt. 8-9). These harms to interstate
commerce are independently sufficient to support the United States' right to sue in this case.

### b. Causation

The second requirement of Article III standing is that the plaintiff's injury was likely caused
by the defendant. *Lujan*, 504 U.S. at 560–61. The causal connection must be such that the injury is
"fairly traceable" to the challenged action of the defendant. *Id.* The United States has established
that the passage of S.B. 8 caused immediate injury to interests of the United States. Its interests
include ensuring that federal agencies can follow statutes, regulations, and judicial decisions
instructing them to provide abortion-related services without the agencies being subject to liability.
S.B. 8 going into effect also harmed the United States' sovereign interest in upholding the supremacy
of the Constitution and ensuring that citizens may access their constitutional rights. S.B. 8 taking
effect immediately chilled pregnant individuals from accessing their constitutional right to an
abortion and discouraged abortion providers from providing services, even before a single private
lawsuit was ever filed to enforce the law. (Hagstrom Miller Decl. I, Dkt 8-4, at 2 – 3; Gilbert Decl.,

Dkt. 8-2, at 12–14; Linton Decl., Dkt. 8-5, at 7–9; *see also supra* Section II(A). The state's contrary

suggestion, that this chilling of access to abortion rights is a "counterintuitive theory," minimizes

legitimate and serious constitutional injury. (*See* Resp., Dkt. 43, at 46).

     The State argues that the Supreme Court's decision in *Muskrat* precludes the United States

from identifying the State as the source of its injuries. According to the State, *Muskrat* prohibits

federal courts from hearing "a proceeding against the government in its sovereign capacity" when

"the only judgment required is to settle the doubtful character of the legislation in question." (Resp.,

Dkt. 43, at 1) (quoting *Muskrat v. United States*, 219 U.S. 346, 361–62 (1911)). The State asserts that

*Muskrat* stands for the principle that federal courts may not hear cases to determine the

constitutionality of a statute that the sovereign itself is not enforcing, because any injury based on

such a statute is not traceable to future action of the state. (*Id.* at 4–5).

     But the State's characterization of *Muskrat*'s holding is taken out of context and, in any

event, *Muskrat* does not apply here. In *Muskrat*, the Supreme Court assessed whether Congress could

artificially create standing for an action between parties that were not truly adverse to one another to

test the constitutionality of a law. *Muskrat*, 219 U.S. at 350. In 1906, Congress passed a law that

"undertook to increase the number of [Native Americans] entitled to share in the final distribution

of lands and funds" authorized by an earlier statute. *Id.* at 248. Disputes arose over the

constitutionality of the 1906 law, and so, in 1907, Congress passed another Act purporting to offer

standing to four individuals to sue the United States—which was to distribute the lands and funds

under the 1906 law—to test the law's constitutionality. *Id.* at 348–50. However, the United States did

not have interests adverse to those of the plaintiffs; it did not seek to dispute the constitutionality of

the law or the plaintiffs' right to receive the land and funds. *Id.* at 361. Congress, in manufacturing

this cause of action, was setting the stage for the Court to issue an advisory opinion on the

constitutionality of the 1906 law, and advisory opinions have been "disapproved by this Court from

the beginning." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998) (citing *Muskrat*, 219 U.S. at 362). Therefore, the central theme of *Muskrat* is that Congress may not artificially manufacture standing for a plaintiff to sue a non-adverse party, because to do so would, in essence, require a federal court to issue an advisory opinion. *Muskrat*, 219 U.S. at 357. The case does not, as the State suggests, act as a general bar from establishing standing in federal courts when a sovereign defendant claims it cannot be held responsible for implementing and enforcing its own laws. The State merely asserting that it is absolved of any enforcement liability does not mean that it did not cause a constitutional injury.

Furthermore, taking *Muskrat* in context, the holding does not apply here. Congress has not purported to legislatively manufacture standing for the United States to test the constitutionality of S.B. 8. Nor is the United States seeking an advisory opinion from this Court on the law's constitutionality. The United States' suit against the State is an Article III "case or controversy." Interests of the United States—such as its interest in protecting federal agencies and programs from liability, and its sovereign interest in upholding the Constitution—have already been directly harmed by the State's implementation of S.B. 8, and the United States seeks to enjoin the state and state actors from continuing to engage in actions that harm those interests. *Muskrat* does not prevent the United States from establishing standing in this lawsuit.

### c. Redressability

The issue of redressability in this case is interwoven with the cause-of-action analysis, the central question being whether a suit in equity is an appropriate and available remedy for the United States.

### 2. Cause of Action

S.B. 8 was deliberately crafted to avoid redress through the courts. (*See generally* Newman Decl., Dkt. 8-3). Yet it is this very unavailability of redress that makes an injunction the proper

remedy—indeed, the only remedy for this clear constitutional violation. No cause of action created by Congress is necessary to sustain the United States' action; rather, traditional principles of equity allow the United States to seek an injunction to protect its sovereign rights, and the fundamental rights of its citizens under the circumstances present here. This case strikes at the core function of the equitable cause of action, as, "[w]hether acting through its judiciary or through its Legislature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." *Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*, 281 U.S. 673, 682 (1930). The American legal system cannot abide a situation where constitutional rights are only as good as the states allow— "[t]o impose on [the United States] the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs . . . ." *M'Culloch v. Maryland*, 4 Wheat. 316, 424 (1819).

a. The Foundations of the Equitable Remedy

Equitable remedies have a long been established as tools available to courts, predating the Constitution itself. *See Irvine v. Marshall*, 61 U.S. 558, 565 (1857) ("[C]ases in equity are to be understood [as] suits in which relief is sought according to the principles and practice of the equity jurisdiction, as established in English jurisprudence"). The federal judicial power extends to "all cases, in law and equity, arising under [the] Constitution[,]" U.S. CONST. art. III, § 2, through which grant of authority "adopt[s] equitable remedies in all cases . . . where such remedies are appropriate." *Paine Lumber Co. v. Neal*, 244 U.S. 459, at 475 (1917). As Justice Scalia has explained, suits in equity to "enjoin unconstitutional actions by state and federal officers" are a judge-made remedy deeply rooted in American jurisprudence, reflecting "a long history of judicial review . . . , tracing back to

England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (quoting Jaffe &

Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. REV. 345 (1956)).

The State is mistaken in searching for a blueprint of the cause of action here. For the United

States' cause of action is a creature of equity, a centuries-old vehicle which eschews categorical

definition. That remedy is available where no adequate remedy exists at law; any attempt to codify

such situations would be futile, and likely require powers of clairvoyance which no legislator

possesses. Relying on *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), the

State argues for limiting equitable actions to the exact claims available at common law. (Resp., Dkt.

43, at 14). That reliance, however, is misplaced. *Grupo Mexicano* at most stands for the proposition

that federal courts have jurisdiction over suits in equity, in which the broad equitable remedies that

predate the Constitution remain available. The formal source of that jurisdiction is codified in the

Judiciary Act of 1789, as discussed in *Grupo Mexicano*. However, the principle itself is broader and is

not defined by that Act. Indeed, by the time he returned to the question in *Armstrong*, Justice

Scalia—the author of *Grupo Mexicano*—had dispensed with any need to locate this power in the

Judiciary Act. Nowhere in the latter case did he cite to the Judiciary Act. Rather, he wrote of general

equitable powers "tracing back to England," translating to the "judge-made remedy" in the federal

courts. *Armstrong*, 575 U.S. at 327. It is the essential nature of equity that it is not subject to strict

limitations, unless and until Congress acts directly to restrict it.

Equity exists independent of any remedies conferred under state law, as, "[t]he Federal

courts . . . are not limited to the remedies existing in the courts of the respective states, but are to

grant relief in equity according to the principles and practice of the equity jurisdiction as established

in England." *Paine Lumber*, 244 U.S. at 476; *see Robinson v. Campbell*, 16 U.S. 212, 222–23 (1818)

("[T]he remedies in the courts of the United States, are to be, at common law or in equity,

not according to the practice of state courts, but according to the principles of common law and

equity, as distinguished and defined in that country from which we derive our knowledge of those principles."). Indeed, "[t]he right to equitable relief does not depend upon the nature or source of the substantive right whose violation is threatened, but upon the consequences that will flow from its violation." *Paine Lumber*, 244 U.S. at 476; *see Holland v. Challen*, 110 U. S. 15, 25, (1884) ("If the controversy be one in which a court of equity only can afford the relief prayed for, its jurisdiction is unaffected by the character of the questions involved.").

Far from a novel vehicle, "injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). And the action in equity is "unlike the Bivens remedy, which [courts] have never considered a proper vehicle for altering" unconstitutional regulations.[27] *Id.* That an equitable action is available to challenge a violation of the United States' sovereignty does not rest on judicial or congressional recognition of a right of action under the specific constitutional right at issue. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 491 n.2 (2010) ("The Government asserts that petitioners have not pointed to any case in which this Court has recognized [a] . . . right of action directly under . . . the Appointments Clause or separation-of-powers principles. . . . If the Government's point is that [such a] claim should be treated differently than every other constitutional claim, it offers no reason and cites no authority . . . .") (quotations omitted); *see Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for [the Supreme] Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

b. Unavailability of Remedies at Law

Equitable remedies are appropriate where "in the particular case the threatening effects of a continuing violation . . . are such as only equitable process can prevent." *Paine Lumber*, 244 U.S. at

---

[27] The State attempts to analogize to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971), and its progeny in its objections to this suit. (Resp., Dkt. 43, at 23 n.7). But this case is not an action for damages, so the limitations on *Bivens* actions and other damages actions have no bearing here.

476. That is, an injunction is appropriate where required by the "ends of justice": where "the remedy in equity could alone furnish relief." *Watson v. Sutherland*, 72 U.S. 74, 79 (1866). A state may not, within its authority, legislate in a manner that deprives its citizens of the avenues of redress required under the constitution. *See, e.g.*, *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18, 31 (1990) ("If a State places a taxpayer under duress promptly to pay a tax . . . and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation."); *Reich v. Collins*, 513 U.S. 106, 111 (1994) ("[W]hat a State may not do . . . is to reconfigure its scheme, unfairly, in midcourse—to "bait and switch," . . . . Georgia held out what plainly appeared to be a 'clear and certain' postdeprivation remedy . . . and then declared, only after Reich and others had paid the disputed taxes, that no such remedy exists."); *cf. Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[Section] 102(c) may [not] be read to exclude review of constitutional claims. . . . [W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. . . . '[S]erious constitutional question[s]' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.") (internal citations omitted). The federal courts cannot abide state foreclosure of judicial review of constitutional claims.

When no other remedy is available, by statutory right or otherwise provided by law, traditional principles of equity remain to ensure that fundamental rights are protected. Indeed, "'[e]quity suffers not a right to be without a remedy.'" *CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011) (quoting R. Francis, Maxims of Equity 29 (1st Am. ed. 1823)). Where the State has acted deliberately to remove all possible remedies at law, equity remains available to vindicate federal rights. *See Paine Lumber Co.*, 244 U.S. at 474 (noting that an equitable remedy is available where Defendants acted with "malice . . . in the intentional doing of an unlawful act, to the direct damage

of another, without just cause or excuse"). Equitable relief is not appropriate in all—or even most—circumstances; but where it is called for, there is no doubt as to its propriety:

> The Constitution of the United States does not declare in terms that infringements of the rights thereby secured may be prevented by injunction. Ordinarily they may not be. It is only where a threatened infringement will produce injury and damage for which the law can afford no remedy—such, for instance, as irreparable and continuing damage, . . .—that resort may be had to equity; and when this does appear, the right to an injunction arises because that is the only appropriate relief.

*Paine Lumber Co.*, 244 U.S. at 476–77. Put simply, "[t]he absence of a plain and adequate remedy at law affords the only test of equity jurisdiction . . . ." *Watson*, 72 U.S. at 79.

Here, S.B. 8 is deliberately structured so that no adequate remedy at law exists by which to test its constitutionality. By purporting to preclude direct enforcement by state officials, the statutory scheme is intended to be insulated from review in federal court.[28] The State itself concedes that the law's terms proscribe review by the federal courts, limiting review to state court alone. (Resp., Dkt. 43, at 27).[29] And even in state court, the opportunities for review are severely constrained. By limiting the defenses that a defendant may raise in state court, the law's authors effectively cut off any hope that a defendant will prevail. *See supra* at II(A)(3)(b). The State makes much of potential defendants' ability to challenge the constitutionality of the statute in state court. (Resp., Dkt. 43, at 27, 36, 45, 50). However, the law itself prohibits defendants from raising the defense that they believed the law to be unconstitutional. Tex. Health & Safety Code § 171.208(e)(2). And by preventing defendants from recovering any attorney's fees in the event that they prevail, the law winnows down the class of individuals financially able to sustain the litigation—even if they are sure

---

[28] The State's invocation of *United States v. Madison County Board of Education*, 326 F.2d 237 (5th Cir. 1964), misses the point. The issue in that case was not the general authority of the federal government to bring an equitable action, but the propriety of it doing so when the challenged statute provided a remedy—review in the federal courts of appeals. *Id.* at 242. Here, federal judicial review is not merely "inadequate," *id.*, it is unavailable.

[29] The State also offers the possibility that a suit could make its way to federal court if filed against a federal officer, who then elected to remove the suit. This possibility is open to only a small subset of potential defendants, and as such cannot suffice to render review available.

to prevail. Moreover, the scheme provides no mechanism for suit by pregnant persons seeking abortions, the individuals most affected by the law. Given these circumstances, the Court finds that redress at law is likely unavailable in federal court and is likely unavailable through the state courts as well. Thus, this is a paradigmatic case in which equitable remedies are necessary vindicate a fundamental constitutional right.

### c. The United States as a Plaintiff in Equity

The United States is well within its authority to bring this suit, as "the Constitution contemplates suits among the members of the federal system" including those "commenced and prosecuted against a State in the name of the United States[.]" *Alden v. Maine*, 527 U.S. 706, 755–56 (1999). Such a power is inherent in the very "constitutional duty" of the Executive to "take Care that the Laws be faithfully executed." *Id.* (quoting U.S. CONST. art. II, § 3). The United States may, as may any private plaintiff with standing, resort to equity to protect its interests. As the Fifth Circuit wrote in *City of Jackson*:

> [T]here is no reason to restrict the Nation's non-statutory rights of action within the same limits established for private persons. The Constitution cannot mean to give individuals standing to attack state action inconsistent with their constitutional rights but to deny to the United States standing when States jeopardize the constitutional rights of the Nation. Or that the United States may sue to enforce a statute but not sue to preserve the fundamental law on which that statute is based. Or that the United States may sue to protect a proprietary right but may not sue to protect much more important governmental rights, the existence and protection of which are necessary for the preservation of our Government under the Constitution.

318 F.2d at 15–16. The State notes that in a subsequent denial of rehearing en banc, two judges limited their concurrences so that they did "not reach the question whether the United States would have standing to sue under the Commerce Clause [or the Fourteenth Amendment of the Constitution] absent all of these enactments of the Congress." ." (*See* Resp., Dkt. 43, at 30) (citing *United States v. City of Jackson, Miss.,* 320 F.2d 870, 872–73 (5th Cir. 1963) (Bootle, J., specially concurring); *accord. id.* at 873 (Ainsworth, J., specially concurring)). However, as the United States

correctly notes, that subsequent history does not alter the precedential value of the decision and its reasoning, even if the judges ultimately relied on different ground in that instance. (Reply, Dkt. 59, at 16). And, as the United States further notes, the Fifth Circuit subsequently relied on *City of Jackson* as support for the constitutional bases for suits by the United States in the public interest. (*Id.*) (citing *Fla. E. Coast Ry.*, 348 F.2d at 685).

Where appropriate, as here, federal courts have not hesitated to grant injunctions sought by the United States to vindicate otherwise unprotected constitutional rights, even when no cause of action is provided by statute. This relief is premised on the basic principle, articulated in *Debs*, that "[e]very government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other . . . ." 158 U.S. at 584. The Court has recognized the authority of the United States to sue in equity when its own proprietary interests are at stake. *See, e.g., United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888); *Wyandotte Transp. Co.*, 389 U.S. at 201 ("Our decisions have established . . . the general rule that the United States may sue to protect its interests."). And courts have held that interference with interstate commerce can constitute a national interest of sufficient weight as to sustain appeals to equity by the United States. *See supra* Section IV(B)(1)(a)(iii). Indeed, "[n]o delicate touch is required in weighing unlawful state action against national policy. This is doubly true in a constitutional area, interstate commerce, in which the Federal Government has unquestioned paramount interest. . . . Under [the Commerce Clause] there is authority for the United States to sue without specific congressional authorization." *City of Jackson*, 318 F.2d at 13–14. In *Debs*, the Court enjoined protests that interfered with interstate commerce, explaining that "[t]he strong arm of the national government may be put forth to brush

away all obstructions to the freedom of interstate commerce . . ." 158 U.S. at 582;[30] *see Sanitary District of Chicago*, 266 U.S. at 425–26 ("The United States is asserting its sovereign power to regulate commerce [and uphold its treaty obligations] . . . . [I]n matters where the national importance is imminent and direct even where Congress has been silent the States may not act . . . .").

Courts have long embraced the principle that United States can sue in equity to right a "grievous wrong upon the general public . . . ." *United States v. Am. Bell Tel. Co.*, 128 U.S. 315, 357 (1888); *see also Robbins v. United States*, 284 F. 39, 46, (8th Cir. 1922) ("[N]ational policy is involved of protecting the public in traveling within the park, and in such a case, injunction is the proper remedy."). This right inheres in such extreme cases where "the wrongs complained of are such as affect the public at large, and are in respect of matters which by the constitution are intrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights . . . ." *Debs*, 158 U.S. at 586. For example, in *Debs*, the Court recognized the authority of the United States to enjoin the Pullman strikes when they constituted a fundamental threat to interstate commerce, an area of chief federal concern. *Id.* at 564. The United States may properly turn to the courts for an injunction "[w]hen a State, not by some sporadic act against a particular individual but by a law or pattern of conduct, takes action motivated by a policy which collides with national policy as embodied in the Constitution," and when "the action of a State violative of the Fourteenth Amendment conflicts with the Commerce Clause and casts more than a shadow on the Supremacy Clause . . . ." *City of Jackson*, 318 F.2d at 14.

The State questions the strength of *Debs* as authority for this suit, but its objections are misplaced. It cites *Solomon*, 563 F.2d at 1127, for the proposition that *Debs* requires a statutory

---

[30] To the extent that the State claims *Debs* should be limited as authority to cases involving interstate commerce, (Resp., Dkt. 43, at 20–21), the Court there made clear that it did not intend its reasoning to be so limited, cautioning, "[w]e do not care to place our decision upon this ground alone." *Debs*, 158 U.S. at 584.

interest in order to provide a cause of action. (Resp., Dkt. 43, at 21).[31] The State misreads both *Debs* and *Solomon* in so arguing. In *Solomon*, the controversy involved "no factor of interstate commerce[,]" nor injury to "the public at large," nor a "situation that constitutes a national emergency." *Solomon*, 563 F.2d at 1129. By contrast, here the offending law implicates interstate commerce. *See supra* Section IV(B)(1)(a)(iii). Its harms affect the public at large, as it affects any person with reproductive capacity, who engages in sexual contact with a person with reproductive capacity, or who can conceivably be sued under S.B. 8. *See supra* at II(A)(3)(a). Further, it has, in just over one month, had a "truly catastrophic" effect. (Gilbert Decl., Dkt. 8-2, at 13). Likewise, the State's claim that *Debs* is limited to claims to abate a public nuisance is incorrect. (Resp., Dkt. 43, at 28). By its own terms, *Debs* speaks of a broader federal authority: "The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights intrusted by the constitution to its care." *Debs*, 158 U.S. at 582. When a public nuisance interferes with "the full and free exercise" of federal power, then an equitable action provides a remedy. But a public nuisance is far from the only way in which "the security of all rights intrusted by the constitution" may be imperiled. *Debs*, 158 U.S. at 582.[32]

---

[31] The State also cites the concurrence of Judge Tamm in *Clark v. Valeo*, 559 F.2d 642, 654 (D.C. Cir. 1977), for the same point. (*See* Resp., Dkt. 43, at 21). This case is entirely inapposite, as it dealt with interbranch conflict over the interpretation of election regulations and was dismissed as unripe. The considerations relevant to executive interference in election administration raise a host of concerns related to separation of powers and justiciability that are not present here.

[32] This case is also unlike the post *Armstrong*, 575 U.S. 320, cases, where courts have declined to read in statutory causes of action where none are provided by the legislature. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 903 (10th Cir. 2017) ("[T]o determine whether a private plaintiff may enforce the [Controlled Substances Act], we must first determine whether that plaintiff has substantive rights in the CSA that he or she is seeking to vindicate."). Here, the constitutional right to abortion under the Fourteenth Amendment is firmly established, and is rooted in the Constitution rather than a legislative grant. *See infra* Section IV(C). Unlike the statutory grants at issue in the *Armstrong* line, abortion is a substantive, enforceable right sufficient to sustain an action for equitable relief for its protection. Similarly, the holding of *Armstrong* itself, that there is no independent cause of action under the Supremacy Clause, has no bearing here, where the United States does not purport to bring suit under that clause. Rather, it moves under the equitable cause of action available to parties with standing who can show an ongoing violation of federal law—which Justice Scalia recognized in *Armstrong*, 575 U.S. at

These objections aside, the Court need not go so far as to endorse the broadest reading of *Debs* to find a substantial likelihood of success here. First, the United States can be expected to use its discretion in deciding to commence the significant, and potentially politically damaging, undertaking of a suit in equity in federal court. *See Alden*, 527 U.S. at 751 ("When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government."). Moreover, the confluence of circumstances here is unlikely to be repeated with such frequency as to overwhelm the courts. The United States offers three limiting principles to determine when the United States may bring a suit in equity to vindicate the rights of citizens: (1) a state law violates the constitution, (2) that state action has a widespread effect, and (3) the state law is designed to preclude review by the very people whose rights are violated. (*See* Hr'g Tr., Dkt. 65, at 24). The Court expresses no opinion as to whether there may be other considerations apparent in future cases that will call for further limiting the availability of equitable relief. However, under the circumstances present here, it is substantially likely that the equitable cause of action has firm support, and the United States may seek an injunction against the State.

The final factor identified by the United States will likely carry the most weight, as states can be expected not to deliberately deprive their citizens of redress through the courts. It is the rare case in which direct actions by the state lead directly and indisputably to a deprivation of fundamental federal rights.[33] But in the unlikely event that the state behaves so egregiously that it actively infringes constitutional protections, then the United States may properly sue to enjoin the offensive

---

[33] The State cites *City of Philadelphia*, where the Third Circuit declined to allow the Attorney General to enjoin purportedly unconstitutional policies of the city's police department based in part on its fear of sanctioning unconstrained executive interference with local policing. 644 F.2d at 201. The court there worried that to allow federal enforcement under the circumstances there would endorse "standards . . . so vague as to lack real content." *Id.* By contrast, here there is a clear metric by which to assess the propriety of the United States' suit: the presence of deliberate state action in violation of the supremacy of the federal government and Constitution.

action. The Fifth Circuit has affirmed this principle, granting equitable relief to the United States "[w]hen a State, not by some sporadic act against a particular individual but by a law or pattern of conduct, takes action motivated by a policy which collides with national policy as embodied in the Constitution." *City of Jackson*, 318 F.2d at 14; *cf. Ex parte Hull*, 312 U.S. 546, 549 (1941) (invalidating a prison regulation requiring court documents to pass through an internal review process before being filed because "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus"); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961) ("By its inaction, . . . the State, has not only made itself a party to the [challenged action], but has elected to place its power, property and prestige behind the admitted discrimination. [It] has so far insinuated itself into a position of interdependence . . . that it must be recognized as a joint participant . . . ."); *Brinkerhoff-Faris Tr.*, 281 U.S. at 678–79 (where state law administrative remedy was futile, but state court refused to hear case due to failure to exhaust administrative remedies, equitable relief in federal court was appropriate; and "[i]f the result above stated were attained by an exercise of the state's legislative power, the transgression of the due process clause of the Fourteenth Amendment would be obvious").

Above all, it is the intentional design of the law by state actors for the chief purpose of avoiding judicial review that sets it apart—and makes it particularly likely to be appropriate for this Court to enjoin. Indeed, there have been many examples of unconstitutional state laws attempting to restrict abortion—not to mention laws in other areas—in which private parties have successfully challenged through the ordinary operation of judicial review. *See, e.g.*, *June Med. Servs., LLC v. Russo*, 140 S. Ct. 2103 (2020); *Hellerstedt*, 136 S. Ct. at 2320; *Stemberg v. Carhart*, 530 U.S. 914 (2000); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 883 (1992); *Webster v. Reprod. Health Servs.*, 492 U.S. 490 (1989); *Thornburgh v. American Coll. of Obstetricians and Gynecologists*, 476 U.S. 747 (1986); *City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416 (1983); *Colautti v. Franklin,* 439 U.S. 379 (1979); *Planned Parenthood*

*v. Danforth*, 428 U.S. 52 (1976). The United States has not brought suit over any of these laws, nor should it have had to. But when the machinations of the state effectively cut off private access to the federal courts, and the other factors identified by the United States are present, the situation may warrant resort to an equitable action by the United States.

There can be no doubt that S.B. 8 was a deliberate attempt by lawmakers, notably its author, State Senator Bryan Hughes, to "find another way" around resistance to enforcement of laws criminalizing abortion. (Newman Decl., Dkt. 8-3, at 5) (citing Jenna Greene, *Column: Crafty Lawyering on Texas Abortion Bill Withstood SCOTUS Challenge*, REUTERS (Sept. 5, 2021), https://reuters.com /legal/government/crafty-lawyering-texas-abortion-bill-withstood-scotus-challenge-greene-2021-09-05/).[34] Hughes has openly described his motivation to avoid judicial review that would invalidate S.B. 8, stating, "[w]e were going to find a way to pass a heartbeat bill that was going to be upheld." (*Id.* at 9) (citing Jacob Gershman, *Behind Texas Abortion Law, an Attorney's Unusual Enforcement Idea*, THE WALL ST. J. (Sept. 4, 2021), https://www.wsj.com/articles/ behind-texas-abortion-law-an-attorneys-unusualenforcement-idea-11630762683). Jonathan Mitchell, who conceived of the bill, pledged to lawmakers that S.B. 8 would "have a fighting chance, and will have a better chance than a regular heartbeat law" to avoid, not by its content but by it structure, being invalidated as unconstitutional. (*Id.* at 17) (citing Michael S. Schmidt, *Behind the Texas Abortion Law, a Persevering Conservative Lawyer*, N.Y. TIMES (Sept. 12, 2021), https://www.nytimes.com/2021/09/12/us/

---

[34] Hughes described the law as "a very elegant use of the judicial system"; others called it "creative lawyering" on the part of Jonathan Mitchell—the law's architect. (Newman Decl., Dkt. 8-3, at 5). Hughes and Mitchell spearheaded a conference call between Hughes, Mitchell, and other legislators at which Mitchell convinced the group to back the law. (*Id.* at 17). Beginning with local ordinances designed to ban abortion while insulating municipalities from footing the bill for litigation, Mitchell set out to "counter the judiciary's constitutional pronouncements" protecting the right to abortion (*Id.* at 14–15). Mitchell was "galvanized" to formulate the "more radical concepts" underlying the law by what he considers "political branches [that] have been too willing to cede control of constitutional interpretation to the federal judiciary." (*Id.* at 13–14). Mitchell sought to show "that the states need not adopt a posture of learned helplessness in response to questionable or unconstitutional rulings." (*Id.* at 15).

politics/texas-abortion-lawyerjonathan-mitchell.html). State actors worked deliberately to craft a statutory scheme that would avoid review by the courts, and thereby circumvent any pronouncement of its unconstitutionality. The words of the *Debs* Court are perhaps even more fitting in this case: "[i]f ever there was a special exigency, one which demanded that the courts should do all that courts can do, it was disclosed by this bill . . . ." 158 U.S. at 592. Without endorsing the breadth of the principle in *Debs*, equity allows the United States to sue when other remedies are deliberately withheld by the State.

### d. The Lack of Statutory Basis

Finally, equitable remedies need not be rooted in an act of Congress. Defendants make much of the lack of a statutory cause of action under which the United States may sue. However, "[t]he principles of equity exist independently of, and anterior to, all congressional legislation." *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 339 (1906). As Justice Miller explained, "[t]he powers of the executive officers of England are . . . vested in the executive officers of the United States" not automatically but as "defined by law, *constitutional or statutory*," such "that to *one or both* of these sources we must resort . . . ." *San Jacinto Tin Co.*, 125 U.S. at 307–08 (quoting the case of *The Floyd Acceptances*, 7 Wall. 676 (1868)) (emphasis added). And the absence of statutory language enshrining these equitable principles in law cannot alone diminish their force. The Supreme Court has "frequently cautioned that [i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *United States v. Wells*, 519 U.S. 482, 496 (1997); *see Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (discussing how congressional "inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn . . . .") (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)); *see Helvering v. Hallock*, 309 U.S. 106, 119–20 (1940) ("To explain the cause of non-action by Congress when Congress itself sheds no light is to venture

into speculative unrealities.")). Thus, the absence of a statutory cause of action should not be equated with a decision by Congress to withhold a cause of action.

The State makes much of legislative history from the 1950s and 1960s regarding a statutory cause of action for the Attorney General to bring equitable actions to enforce Fourteenth Amendment rights. (Resp., Dkt. 43, at 46). In *United States v. City of Philadelphia*, the Third Circuit looked to debates regarding three provisions that Congress considered and ultimately did not pass. 644 F.2d 187, at 193–97 (3d Cir. 1980). It took that history to evince a legislative intent "to deny the government the right of action here." *Id.* at 197. But that history has little bearing on the action here. *City of Philadelphia* and the legislative debates it cites must be understood in their respective contexts. The legislative debates in the 1950s and 1960s were concerned exclusively with enforcement of the Civil Rights Acts of 1957, H.R. 6127, 85th Cong. (1957), the Civil Rights Act of 1960, H.R. 8601, 86th Cong. (1960), and the Civil Rights Act of 1964, H.R. 7152, 88th Cong. (1964). Those statutes were addressed at countering racial discrimination specifically, just as the *City of Philadelphia* litigation itself concerned racially discriminatory policing practices subject to the civil rights statutes. *City of Philadelphia*, 644 F.2d at 190. The legislative debates at issue occurred between 1957 and 1964, placing them a decade before the Supreme Court first recognized the right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973). Congress could not have considered and declined to provide a cause of action relating to the right to abortion before the right itself had ever been recognized. The implication that these legislators intended to express any opinion at all regarding a right that did not yet exist, in discussions relating specifically to the Civil Rights Acts, borders on the absurd.

The legislators there could not have contemplated the possibility, much less intended, that their discussions regarding civil rights enforcement would have the effect of ousting other constitutional rights. In considering enforcement of the Civil Rights Acts, Congress took pains to ensure that adequate procedural mechanisms were available. *See, e.g., City of Philadelphia*, 644 F.2d at

194 ("[Congress] provided several criminal and civil actions. In s 9 of the Civil Rights Act of 1866, . . . it even authorized the President to call out the military 'to prevent the violation and enforce the due execution of this Act.'"); *id.* at 197 ("The Judiciary Committee deleted the proposed Title III and reported H.R. 7152 with a substitute designed to authorize the Attorney General under certain circumstances to sue to enjoin racial segregation in public facilities owned or operated by a state or local government."). But by providing for enforcement in this single area, it in no way precluded any mechanisms for constitutional enforcement in other areas. This legislative history cannot stand for the proposition that there is no cause of action when the state has acted, as it has here, to actively, aggressively, and deliberately deprive its citizens of a constitutional right.

While the reasoning of *City of Philadelphia* may be faulty in its breadth—and to the extent that it purports to speak to all litigation under the Fourteenth Amendment, *see id.* at 196—the result is correct. There, unlike here, no freestanding right to relief in equity existed because a remedy was available at law. Here, no such remedy is available because of the state's decision to foreclose any avenue of relief. There, ordinary enforcement mechanisms whereby citizens could vindicate their federal rights had not been curtailed by the state. Instead, "Congress ha[d] enacted a comprehensive remedial scheme while deliberately refusing to create the right of action asserted here." *City of Philadelphia*, 644 F.2d at 199–200. A private right of action remained under the Civil Rights Acts. *Id.* at 206. Indeed, the Court provided a laundry list of available mechanisms by which the injuries arising out of unlawful policing practices could be remedied: (1) private suits against "state officials for damages or injunctive relief under 42 U.S.C. §§ 1981, 1982, 1983, and 1985;" (2) class actions on the same bases; (3) private actions against the city under *Owen v. City of Indep.*, 445 U.S. 622 (1980), and *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978); (4) private injunctive actions which had "been maintained successfully against 'widespread' violations committed by local law enforcement officials;" and (5) criminal prosecutions by the United States for constitutional

violations under 18 U.S.C.A. §§ 241 and 242. *City of Philadelphia*, 644 F.2d at 192–93. There can be no claim that no remedies at law existed for the injuries there, even if the efficacy of those remedies is less than clear. The same cannot be said here. And, in particular, it is the deliberate action by the State to foreclose all private remedies that separates this case from *City of Philadelphia*. Thus, the legislative history discussed in *City of Philadelphia* cannot be taken as evidence of legislative intent to foreclose the equitable cause of action here.

Neither does the private right of action under § 1983 foreclose this suit.[35] There is no evidence that § 1983 was meant to displace suits brought by the United States. That mechanism is designed to empower private plaintiffs in their suits against state officers; it is not a tool for the United States as plaintiff. *See Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) ("[T]he limited scope of § 1983 weighs against recognition of the *Bivens* claim" as both provide analogous remedies to private parties). Section 1983 in no way divests the United States of its existing cause of action in equity, nor scales back that equitable authority. The equitable cause of action predates the private cause of action and would have continued to exist whether § 1983 had been enacted. Moreover, it would have been antithetical to the purposes of § 1983 to, by the same legislative act, restrict the United States' ability to protect against the constitutional ills targeted by the private right of action. And if these principles were ever in doubt, the State provides no evidence whatsoever for its affirmative defense that Congress intended to supersede preexisting equitable remedies through its enactment of § 1983. *See, e.g., United States v. Haggerty*, 997 F.3d 292, 299 (5th Cir. 2021) ("[A]n affirmative defense .

---

[35] The United States correctly notes, (*see* Reply, Dkt. 59, at 10), that the legislative debates at issue in *City of Philadelphia* took place were nearly a century after Congress created the § 1983 individual cause of action for constitutional violations as part of the Ku Klux Klan Act of 1871. *See Monroe v. Pape*, 365 U.S. 167, 171 (1961). This substantial gap in time counsels against reading § 1983 together with the debates at issue in *Philadelphia* as support for an implicit denial of a cause of action for the United States. *See Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008) ("Negative implications raised by disparate provisions are strongest' in those instances in which the relevant statutory provisions were 'considered simultaneously when the language raising the implication was inserted.") (quotations omitted).

. . must first be raised by a defendant—i.e., the defendant bears the burden of pleading and production . . . .").

Further, under the State's construction, the United States would have *less* of a claim to enforce the Fourteenth Amendment than other parts of the constitution. (*See* Hr'g Tr., Dkt. 65, at 26). This cannot be the case. The suggestion is particularly troubling given the context in which the Fourteenth Amendment was passed and ratified. The history of Reconstruction is populated with instances of states failing to protect the constitutional rights of their citizens. *See, e.g., McDonald v. City of Chi., Ill.*, 561 U.S. 742, 857 (2010) (Thomas, J., concurring) (chronicling the history of lynching of Black people following the Civil War); *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983) ("[Ku Klux] Klan outrages—arson, robbery, whippings, shootings, murders, and other forms of violence and intimidation. . . . went unpunished . . . because Klan members and sympathizers controlled or influenced the administration of state criminal justice."); *Strauder v. State of W. Va.*, 100 U.S. 303, 310 (1879) ("[T]he statute of West Virginia, discriminating in the selection of jurors, as it does, against negroes because of their color, amounts to a denial of the equal protection of the laws to a colored man when he is put upon trial for an alleged offence against the State . . . ."). This abdication of duty led to the ratification of the Fourteenth Amendment, an attempt to use federal power and affirmative federal enforcement to protect those abandoned, if not targeted, by the states. Indeed, the Department of Justice itself was created in this same period to serve these same ends.[36] Thus, the power to sue to vindicate the constitutional rights of citizens against states that would infringe them strikes at the core of the mandate of the Department of Justice, and the essence of the Fourteenth Amendment.

---

[36] *See* Bryan Greene, *Created 150 Years Ago, the Justice Department's First Mission Was to Protect Black Rights*, SMITHSONIAN MAG. (July 1, 2020), https://www.smithsonianmag.com/history/created-150-years-ago-justice-departments-first-mission-was-protect-black-rights-180975232/.

As to abortion regulations specifically, the State cites the cause of action provided to the Attorney General in the Freedom of Access to Clinic Entrances Act of 1993, H.R. 796, 103rd Cong. (1993) (codified at 18 U.S.C. § 248(c)(2)(A)), as evidence that Congress has contemplated all of the potential rights of action it could create related to abortion and has "refused to create a broader cause of action for the Attorney General." (Resp., Dkt. 43, at 16). Yet this is only one narrow provision addressed to a single issue within the much broader field of abortion rights. To suggest that Congress has given its final word on the subject of abortion through this single statute would read far more into that enactment than could have plausibly been intended. Abortion is a robust right, implicating numerous areas of potential regulation. Yet there is remarkably little legislation on the subject. Indeed, it is the lack of comprehensive federal regulation of abortion that makes the State's invocation of statutory causes of action regarding desegregation—a densely regulated area— particularly inapt. (Resp., Dkt. 43, at 48) (citing 42 U.S.C. §§ 2000b(a), 2000c-6(a)). The absence of a legislatively created cause of action should not be taken to be more than it is: a lack of Congressional action one way or the other, with no effect on the preexisting equitable cause of action. Because Congress has not acted, nothing about this action in equity supersedes any act of Congress. Rather, it is the State that attempts by this law to supersede the Supremacy Clause and the Fourteenth Amendment.

The Court finds the United States is substantially likely to establish a cause of action in equity against the State.

### 3. Scope of Relief

The State's deliberate attempts to evade federal judicial review extend to the form and scope of relief that may be afforded by this Court. The United States seeks a preliminary and permanent injunction against the State prohibiting the enforcement of S.B. 8. (Compl., Dkt. 1, at 26). Specifically, the United States seeks to enjoin three categories of obligors: (1) the State, (2) state

actors, and (3) private individuals. (*Id.*). Based on the analysis below, the Court concludes it has the authority to enjoin the State, its officials, and private individuals.

a. Application to the State of Texas

Prior to the ratification of the U.S. Constitution, and over the centuries since its ratification, politicians, scholars, and judges have debated the extent to which federal courts may hear and grant relief in a lawsuit against a state. The Constitution and our system of government and laws were structured to protect state sovereignty for many important reasons, including the desire to uphold federalism and preclude the national government from "act[ing] upon and through the States." The Federalist No. 15 at 109 (Alexander Hamilton). The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subject of any Foreign State." U.S. CONST. amend. XI. Although the Eleventh Amendment somewhat minimally protects states from suit, "the Constitution's structure, its history, and the authoritative interpretations by [the Supreme] Court make clear, the States' immunity from suit is a fundamental aspect of [state] sovereignty." *Alden*, 527 U.S. at 755. State sovereignty is not unbounded. States are "residuary sovereigns," and "States and their officers are bound by obligations imposed by the Constitution . . . that comport with the constitutional design." *Id.* at 748, 755.

Within that framework, the threshold question in this Court's sovereign immunity analysis— whether the State is shielded from an equitable suit brought by the United States—presents virtually no complications. The Supreme Court has explained in no uncertain terms that "[i]n ratifying the Constitution, the States consented to suits brought by other States or by the Federal Government." *Alden*, 527 U.S. at 755; *see also United States v. Mississippi*, 380 U.S. 128 (1965) ("The reading of the Constitution urged by Mississippi [that a state cannot be sued by the United States] is not supported by precedent, is not required by any language of the Constitution, and would without justification in

reason diminish the power of courts to protect the people of this country against deprivation and destruction by States of their federally guaranteed rights."). For the same reasons, the State is not shielded by the principle of sovereign immunity from this equitable lawsuit by the United States, and, quite reasonably, the State does not contend otherwise.[37]

Even in the absence of a dispute, this Court briefly examines the rationale for why a state yields its sovereignty to the federal government as it guides the Court's analysis. In *Alden*, the Supreme Court discussed the history and contours of state sovereign immunity at length. 527 U.S. at 712–30, 41–48. While recognizing Maine's sovereign powers derive from the structure of our Constitution, the Supreme Court clarified that the "constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the Constitution or valid federal law." *Id.* at 754–55. The Court continued: "We are unwilling to assume the States will refuse to honor the Constitution . . . . The good faith of the States thus provides an important assurance that '[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land.'" *Id.* at 755 (quoting U.S. CONST. art. VI). Here, the State—by fashioning S.B.8 to insulate it from federal judicial review and then enacting it as law despite its apparent deprivation of a recognized constitutional right—appears to be intentionally doing the very thing the Supreme Court was unwilling to fathom.

Satisfied that the United States has standing to seek injunctive relief to vindicate the rights of its citizens, uphold the primacy of the Constitution, and safeguard our republic's system of law against the State's aggressively defiant acts, this Court holds that it has the authority to enjoin the State of Texas. The State offers virtually no rebuttal, other than to argue that it must understand

---

[37] The Court notes that S.B. 8 claims the State "has sovereign immunity . . . in any equitable action that challenges the validity of [S.B. 8] on constitutional grounds or otherwise." Tex. Health & Safety Code § 171.211(b).

"who is supposed to do what" in the face of an injunction.[38] (Mot. Dismiss, Dkt. 50-2, 15–16). The Court generally agrees. To that end, the Court asked the State during the preliminary injunction hearing: "[I]f the Court were to enjoin the state of Texas from giving effect to this statute, what would you believe that would obligate you to do, if anything?" (Hr'g Tr., Dkt. 65, at 89–90). The State responded:

> Honestly, I'm not sure and I think that's part of the problem. If it just says the state of Texas standing alone and our position, I think correctly, is that the state of Texas is not enforcing this, then I would hope that we could get some kind of further clarity from the Court about what exactly the Court intends. I don't know if any -- I don't mean to suggest that anyone would want to do anything that could lead to contempt. Again, I'm not sure. It's hard to imagine what it -- like should I call state court judges and tell them to be on the lookout for these filings?

(*Id.* at 90). The State effectively conceded that its employees, like state judges, have a role to play if the Court were to issue an injunction against the State.

Indeed, the State has its prints all over the statute. The operation and enforcement of S.B. 8 requires the State and its employees to act, whether those acts are the maintenance of a lawsuit or carrying out a court order regarding the enforceability of S.B. 8. The State enacted S.B. 8 when Governor Abbott signed it into law; the law represents the State's pre-viability abortion policy; the State chose to partially delegate its enforcement authority to private individuals; and the State's judiciary accepts and hears S.B. 8 lawsuits. *See, e.g.*, (Resp., Dkt. 43, at 49–50) (explaining how the State, through S.B. 8, chose to regulate abortion care: "Texas has not banned all pre-viability abortions," and "Texas has enacted a private cause of action"). And the State continues to defend S.B. 8, disclaiming responsibility by pointing the finger at the private individuals who the State deputized as enforcers. The State's disavowal of S.B. 8 is unconvincing. Employing a private cause

---

[38] The State's role demonstrates the United States' injuries are fairly traceable and redressable by the State as explained *supra* Section IV(B)(2), (3).

of action neither relieves the State of its obligations to enforce and maintain its own law nor exempts the State from this federal court's authority to impose an injunction.

The Supreme Court recognized that states cannot avoid the preservation of constitutional rights through a scheme of deflection in *Cooper v. Aaron*, 358 U.S. 1 (1958). In *Cooper*, the Little Rock schools sought to delay mandated desegregation largely because of the unrest caused by Arkansas's governor whose troops blocked Black students from entering a white high school in 1957. *Id.* at 17. "Had Central High School been under the direct management of the State itself, it could hardly be suggested that those immediately in charge of the school should be heard to assert their own good faith as a legal excuse for delay in implementing the constitutional rights of these respondents, when vindication of those rights was rendered difficult or impossible by the actions of other state officials. The situation here is in no different posture because the members of the School Board and the Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment, they stand in this litigation as the agents of the State." *Id.* at 15–16. Quoting from *Ex parte Virginia*, 100 U.S. 339, 347 (1879), the Supreme Court explained that "'[a] State acts by its legislative, its executive, or its judicial authorities . . . . Whoever, by virtue of public position under a State government, . . . denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning.'" *Cooper*, 358 U.S. at 16–17. The Supreme Court concluded: "Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, or whatever the guise in which it is taken." *Id.* at 17.

Likewise, the State's scheme to disguise its enforcement role and disclaim accountability collapses upon cursory inspection. The State enacted S.B. 8 and created a private enforcement scheme that clothes private individuals with the State's enforcement power. *See id.* at 17. That

delegation alone would have been sufficient to show state action. The practical operation of an S.B. 8 lawsuit in Texas courts deepens the State's enforcement role. As set out above, the State plays a role at every step of an S.B. 8's lifecycle in Texas courts. A private cause of action enforcement scheme is meaningless without state action. Yet, the State endeavors to use it as a sword (to effectuate its regulation of abortion) and a shield (to insulate those regulations from federal review). The State cannot pin the enforcement of S.B. 8 solely on the backs of private individuals and avoid federal judicial review or injunctive relief. An injunction properly runs against the State.

The United States also asks this Court to stay all state court proceedings brought under S.B. 8. (Reply, Dkt. 56-1, at 26). The Anti-Injunction Act provides that federal courts generally are prohibited from enjoining state court proceedings. 28 U.S.C. § 2283. That restriction does not apply when the United States seeks the injunction. *In re Grand Jury Subpoena*, 866 F.3d 231, 233 (5th Cir. 2017). Federal courts, in suits brought by the United States, have enjoined state court proceedings. *See, e.g.*, *United States v. Texas*, 356 F. Supp. 469, 473 (E.D. Tex. 1972), *aff'd*, 495 F.2d 1250 (5th Cir. 1974) ("Accordingly, it is . . . [o]rdered that the District Court of Dallas County, 162nd Judicial District of the State of Texas, is permanently enjoined from further proceedings in the case."). Given that the State does not argue otherwise, this Court finds that it also can enjoin the state judiciary without running afoul of the Anti-Injunction Act.[39]

### b. Application to State Officers

In addition to sovereign immunity not shielding the State from this suit, the doctrine of sovereign immunity also offers no protection to state actors when the United States sues a state in an equitable action like this. Typically, a person, rather than the United States, sues a state official for

---

[39] The State contends that an injunction against it would not bind its courts from hearing S.B. 8 lawsuits with a strained analogy to *Muskrat*, 219 U.S. at 362. (Resp., Dkt. 43, at 12–13). While the *Muskrat* Court expressed a concern about advisory opinions, *Muskrat* has no bearing on whether an injunction prohibiting the State from maintaining S.B. 8 lawsuits also binds the judges and court clerks who oversee and administer S.B. 8 lawsuits.

a violation of a constitutional right, and the Court starts from the premise that the state has

sovereign immunity and looks to whether the *Ex parte Young* exception to sovereign immunity

applies. In *Ex parte Young*, the Supreme Court held that lawsuits may proceed in federal court when a

plaintiff requests prospective relief against state officials in their official capacities for ongoing

federal violations. 209 U.S. 123, 159–60 (1908). The exception "rests on the fiction . . . that because

a sovereign state cannot commit an unconstitutional act, a state official enforcing an

unconstitutional act is not acting for the sovereign state and therefore is not protected by the

Eleventh Amendment." *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001). Because state officials

lack sovereign immunity protection in a suit brought by the United States, this Court need not

address whether their conduct falls within the *Ex parte Young* exception.[40] Even so, the Supreme

Court's reasoning for creating the *Ex parte Young* exception informs this Court's determination. The

exception "is based in part on the premise that sovereign immunity bars relief against States and

their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief

against state officers must therefore be permitted if the Constitution is to remain the supreme law of

---

[40] In *Jackson*, Chief Justice Roberts noted in his dissent that the procedural posture of that case before the Supreme Court required the Supreme Court to address "particularly difficult" questions like "whether the exception to sovereign immunity recognized in *Ex parte Young* . . . should extend to state court judges in circumstances such as these" in the "course of two days." 2021 WL 3910722, at *2 (Roberts, C.J., dissenting). In addition to having a brief but longer period of time than two days for consideration, this Court not required to conduct an *Ex parte Young* analysis by virtue of the United States bringing this equitable lawsuit and eliminating the State's claim to sovereign immunity. This also is not a case brought by individuals against a state like the abortion providers who sued the Louisiana governor and attorney general in *Okpalobi*. 244 F.3d at 409. There, the Fifth Circuit, sitting en banc, was confronted with whether the *Ex parte Young* exception protected Louisiana from suit by individuals when no enforcement connection existed between the abortion statute and the two state officials. *Id.* at 416–17. Similarly, this Court is not constrained by the concerns expressed by the Fifth Circuit in *Jackson*, when it found no enforcement connection between the judges and court clerks and S.B. 8 under the rubric of an *Ex parte Young* analysis. *Whole Woman's Health v. Jackson*, No. 21-50792, 2021 WL 4128951, at *4 (5th Cir. Sept. 10, 2021) ("Plaintiffs fail to show any enforcement connection between any of the State Defendants and S.B. 8, and therefore cannot satisfy either understanding of *Ex parte Young*.").

the land." *Alden*, 527 U.S. at 747. It is rooted in the "supreme authority of the United States." *Young*, 209 U.S. at 167.

Lacking the protections of sovereign immunity, an injunction against the State also would run as to people who act as an arm of the state, such as state judicial officials like judges and court clerks. Given that it is the threat of S.B. 8 lawsuits that deters providers from offering abortion care services, *see supra* Section IV(B)(1)(a)(i), an injunction must halt existing S.B. lawsuits and prevent new suits from being maintained by the state judiciary. Even though private individuals file S.B. 8 lawsuits, the state judiciary plays a role in the lawsuits through several official actions including docketing, maintaining, hearing, and rendering relief in an S.B. 8 lawsuit.[41] The State cannot claim that its state court judges and court clerks are not "officers, agents, servants, [or] employees" of the State. Fed. R. Civ. P. 65(d)(2); *see, e.g.*, Tex. Gov't Code § 411.201 ("'Active judicial officer' means . . . a person serving as a judge or justice of the supreme court, the court of criminal appeals, a court of appeals, a district court, a criminal district court, a constitutional county court, a statutory county court, a justice court, or a municipal court[.]"). When they act in their official capacities, state district court judges and court clerks generally act as an arm of the state as a state official. *See Clark v. Tarrant Cty., Tex.*, 798 F.2d 736, 744 (5th Cir. 1986) (stating that Texas "district judges . . . are undeniably elected state officials."); *Holloway v. Walker*, 765 F.2d 517 (5th Cir. 1985) (recognizing that Texas state judges are state elected officials), *cert. denied*, 474 U.S. 1037 (1985); *see also Davis v. Tarrant Cty., Tex.*, 565 F.3d 214, 228 (5th Cir. 2009) ("[In cases brought by individuals,] Texas judges are entitled

---

[41] Even taking into account the Fifth Circuit's pronouncement that because S.B. 8 states that it "'shall be enforced exclusively through the private civil actions[,]'" *Jackson*, 2021 WL 4128951, at *4 (quoting Tex. Health & Safety Code § 171.207(a)), "exclusive means exclusive," *id.*, and therefore state judges and clerks have no connection to the enforcement of S.B. 8 actions, this Court is not bound by the Fifth Circuit's *Ex parte Young* analysis in *Jackson* regarding sovereign immunity since the state actors in this case have no claim to sovereign immunity.

to Eleventh Amendment immunity for claims asserted against them in their official capacities as state actors.").

The Fifth Circuit's opinion in *Jackson*, 2021 WL 4128951, reinforces what S.B. 8 already makes clear: Texas courts are a necessary component to the operation of S.B. 8. In *Jackson*, the Fifth Circuit considered whether to stay this Court's proceedings in a related case challenging the constitutionality of S.B. 8. *Id.* at *1. In deciding to stay the proceedings in the district court, the Fifth Circuit recognized the sovereign immunity claim of state officials, including a state district judge and court clerk, *id.* at *3, and did not shy away from the notion that state judicial officials act as an arm of the state, referring to state district "court clerks who act under the direction of judges acting in their judicial capacity." *Id.* at *5. In this case, the United States seeks to enjoin the State "including all of its officers, employees, and agents." (Compl., Dkt. 1, at 26). Just like *Jackson*, this lawsuit challenges the constitutionality of the same law and revolves around the same operative facts. One significant, material difference between this case and *Jackson* is that the United States is the plaintiff here. In both cases, the courts have determined that state officials like judges and clerk act as an arm of the State, but the legal conclusions drawn from that determination differ: there, being a state actor potentially protects judges and clerks from suits brought by individuals whereas, here, being a state actor provides no protection to judges and clerks from a suit brought by the United States. In other words, "Texas's scheme to insulate its law from judicial review by deputizing private parties to carry out unconstitutional restrictions on the State's behalf" unravels in the face of a lawsuit by the United States. *Jackson*, 2021 WL 3910722, at *5 (Kagan, J., dissenting). In *Jackson*, clinging to sovereign immunity was a (thus far) successful strategy; in this case, it is the judges and clerks' very role as state officials that leaves them vulnerable to an injunction.

The State's main argument seems to be that, even if state judges and court clerks act as an arm of the state, S.B. 8's language divorces the State from enforcement of the law—"the State does

not enforce [S.B. 8]," (Resp., Dkt. 43, at 17)—and relies on individuals to bring private causes of action. The law states:

> [T]he requirements of this subchapter shall be enforced exclusively through the private civil actions described in Section 171.208. No enforcement of this subchapter, and no enforcement of Chapters 19 and 22, Penal Code, in response to violations of this subchapter, may be taken or threatened by this state, a political subdivision, a district or county attorney, or an executive or administrative officer or employee of this state or a political subdivision against any person.

Tex. Health & Safety Code § 171.207. S.B. 8's enforcement provision states that only private individuals can bring an S.B. 8 suit. It is a fallacy to allow the State to disclaim an enforcement role. *See Shelley v. Kraemer*, 334 U.S. 1 (1948); (*see supra* Section IV(B)(3)(a); *see infra* Section IV(B)(3)(c)). A lawsuit's very existence requires state action; it cannot be filed, maintained, heard, or resolved without state action. Indeed, S.B. 8 expressly states that an individual who files an S.B. 8 lawsuit relies on state action: a person "may bring a civil action," may "prevail in [the] action," "the court shall award[] injunctive relief[,] statutory damages[,] and . . . costs and attorney's fees." Tex. Health & Safety Code § 171.208(a), (b). S.B. 8 further dictates when courts cannot award damages. *Id.* § 171.208(c). S.B. 8 mandates when courts cannot award attorney's fees and costs. *Id.* § 171.208(i). S.B. 8 instructs when courts may not award relief. *Id.* § 171.209(f). S.B. 8 even explicitly grants "official immunity" to "each [state] officer and employee" who is sued in a challenge to S.B. 8. *Id.* § 171.211(b). Any argument that the State, through its judicial system and judges, is not involved in the enforcement of S.B. 8 lawsuits is contradicted by the plain language of the statute and by the reality of how state courts operate as an arm of the state to enforce the law, especially when the State has intentionally crafted a statute to employ private citizens as its proxy. Put simply, the State's participation in enforcing S.B. 8 lawsuits amounts to actionable state action. *See Shelley*, 334 U.S. at 18 ("[I]t has never been suggested that state court action is immunized from the operation of [the Fourteenth Amendment] simply because the act is that of the judicial branch of the state government.").

Finally, federal courts have the authority to specifically enjoin state judicial officials should this Court enjoin natural persons in addition to the State. The Supreme Court has instructed that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam v. Allen*, 466 U.S. 522, 541–42 (1984); *see Mireles v. Waco*, 502 U.S. 9, 10 n.1 (1991) (stating that while a judge is generally immune from a suit for money damages, a "judge is not absolutely immune from criminal liability . . . or from a suit for prospective injunctive relief"). In *Pulliam*, the Supreme Court considered judicial immunity in Section 1983 actions but, in its reasoning, it relied, in part, on the "common law's rejection of a rule of judicial immunity from prospective relief." 466 U.S. at 536. Because its reasoning sounded partly in the common law, the *Pulliam*'s Court reasoning and its conclusion that prospective relief is available against state court judges undermines the State's argument that Article III prohibits federal court relief against state judges acting in their Article III capacity.

### c. Application to Private Individuals

The United States also asks this Court to enjoin those "private parties who bring suit under S.B. 8." (Compl., Dkt 1, at 26). The private individuals, like the state officials, are themselves acting as an arm of the state. The State entrusted part of its enforcement authority to private individuals by deputizing them to bring S.B. 8 lawsuits. *Jackson*, 2021 WL 3910722, at *3 (Sotomayor, J., dissenting) ("[T]he Texas Legislature has deputized the State's citizens as bounty hunters, offering them cash prizes for civilly prosecuting their neighbors' medical procedures."). In *Jackson*, the Fifth Circuit's analysis of its appellate jurisdiction over a private individual who might sue under S.B. 8 hinged on the fact that the "connection between judges, clerks, and [the private individual are] impossible to miss." *Jackson*, 2021 WL 4128951, at *7. So much so that the Fifth Circuit determined that the private individual's "jurisdictional issues [under S.B. 8] are 'inextricably intertwined' with the same issues in the State Defendants' appeal . . . ." *Id.* (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35,

51 (1995)). S.B. 8 vests private individuals with the authority to enforce the statute, "a traditionally exclusive state power." (Mot. Prelim. Inj., Dkt. 8, at 40). The Chief Justice of the Supreme Court has himself described the statutory scheme as "unprecedented" and noted that it "delegated enforcement . . . to the populace at large. . . . to insulate the State from responsibility for implementing and enforcing the regulatory regime." *Jackson*, 2021 WL 3910722, at *1 (Roberts, C.J., dissenting).

As such, private individuals enforcing S.B. 8 are properly regarded as state actors. "Individuals suing under S.B. 8 are not suing 'for violation of distinct legal duties owed' to them as individuals, but instead are suing 'for violation of legal duties owed the public.'" (Mot. Prelim. Inj., Dkt. 8, at 40) (quoting *Texas v. Dep't of Labor*, 929 F.3d 205, 213 (5th Cir. 2019)). Courts have characterized private parties as state actors where a state allows or is involved with conduct that would be unconstitutional should the state itself engage in that conduct.[42] *See also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621–22 (1991) ("Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function; and whether the injury caused is aggravated in a unique way by the incidents of governmental authority.") (internal citations omitted). Apt is *Shelley*, a 1948 case brought by the Kraemers, a white couple, against the Shelleys, a Black couple, to stop the Shelleys from moving into the house they had just purchased in a St. Louis neighborhood.[43]

---

[42] *See, e.g.*, *Reitman v. Mulkey*, 387 U.S. 369, 380–81 (1967) (finding state action where law "authorize[d] . . . racial discrimination in the housing market"); *Smith v. Allwright*, 321 U.S. 649, 663–64 (1944) (holding that a state's establishment of primary system made party that set up an all-white primary "an agency of the state"); *Nixon v. Condon*, 286 U.S. 73 (1932) (state's conferral of authority to party committee to determine who may vote in primary created state action); *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 615–16 (1989) (finding state action where the government removed "all legal barriers" to private conduct at issue and "made plain . . . its strong preference" that private parties engaged in the conduct).

[43] Before the Supreme Court were a bundle of cases, the first of which that came to the Supreme Court on certiorari was the dispute arising from the Shelleys' purchase of their home. *Shelley*, 334 U.S. at 4.

334 U.S. at 4–6. The Kraemers sought to enforce the terms of a restrictive covenant that specifically excluded Blacks from occupying the property. *Id.* Before the Supreme Court, the Shelleys, who were unaware of the restrictive covenant when they purchased their home, argued that they had been denied equal protection of the laws. *Id.* at 8. Confident that racial restrictive covenants violate the Fourteenth Amendment when they involve "action by state legislature or city councils," the Court considered whether "agreements among private individuals" to discriminate removed the state action necessary to invoke the Fourteenth Amendment. *Id.* at 12–13. Noting that a restrictive covenant standing alone would not violate the Constitution, the Supreme Court concluded that "here there was more. These are cases in which the purposes of the agreements were secured only by judicial enforcement by state courts of the restrictive terms of the agreements." *Id.* at 13–14. The Supreme Court imputed the unconstitutional acts of the private individuals to the state because the state "grant[ed] judicial enforcement" of the unconstitutional act. *Id.* at 20. Likewise here, the State has granted judicial enforcement of private causes of action brought under S.B. 8. and has done more. In addition to allowing its judiciary to enforce a likely unconstitutional S.B. 8, the State designed S.B. 8's private cause of action enforcement mechanism and authorized private individuals to bring suit on its behalf, and the private individuals who bring an S.B. 8 suit "make extensive use" of the state judicial system. *Edmonson*, 500 U.S. at 622 ("Although private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, our cases have found state action when private parties make extensive use of state procedures with 'the overt, significant assistance of state officials.'") (internal citations omitted). The fact that the enforcement of S.B. 8 begins with a private individual does not immunize the State. *See Shelley*, 334 U.S. at 20 ("Nor is the Amendment ineffective simply because the particular pattern of discrimination, which the State has enforced, was defined initially by the terms of a private agreement.").

While this Court is convinced that private individuals who bring an S.B. 8 lawsuit act as an arm of the State in this case, this Court also examines whether it has the authority to enjoin them separately for being in active concert with the State. Under Federal Rule of Civil Procedure 65, an injunction may bind the parties, the parties' "officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with the parties or the parties' officers. Fed. R. Civ. P. 65(d)(2)(A)-(C). To avoid the likely insurmountable challenge of providing actual notice to all people who can bring an S.B. 8 suit—if such notice would be necessary—the Court must be satisfied that the private individuals who sue under S.B. 8 act in active concert with the State in order to issue an injunction as to them as nonparties. Most courts look to whether the nonparty is in privity with the parties or the nonparty's "interest [was] represented adequately by a party in the original suit." *Texas*, 929 F.3d at 211. Deputizing private individuals to sue abortion providers creates the necessary privity and obviates the need for individualized notice.

The private individuals who bring S.B. 8 lawsuits are in active concert with the State to enforce S.B. 8. As the State acknowledged, Rule 65(d)(2) was intended to prevent defendants from "'nullify[ing] a decree by carrying out prohibited acts through aiders and abettors[.]'" (Resp., Dkt. 43, at 24) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)). Private individuals who file S.B. 8 lawsuits help effectuate the State's blueprint to potentially deprive Texans of their constitutional rights. Before S.B. 8, these individuals would have had neither a cause of action to obtain relief in a suit against abortion care providers nor standing to bring such a suit. The State chose to deputize them; the State chose to remove any requirement that they suffer an injury to bring suit (an injury is almost always required to bring suit); and the State chose to incentivize them by automatically awarding them damages of at least $10,000 if their suit is successful. Tex. Health & Safety Code § 171.208(a), (b).

This Court's conclusion that private individuals are either state actors or in active concert with the State is bolstered by the positions of the intervenors in this case. In their Motion to Intervene, which this Court granted, (Dkt. 40), the Texas Intervenors stated that they intend to sue people and entities that violate S.B. 8 for conduct that is "clearly unprotected by the Constitution." (Mot. Intervene, Dkt. 28, at 2). The Texas Intervenors carefully tried to argue they are not state actors, but their declared intent to enforce S.B. 8 speaks the loudest. For example, Jeff Tuley ("Tuley") intends to bring S.B. suits for (1) non-physician abortions, (2) self-administered abortions, and (3) post-viability abortions. (*Id.* at 3; Tuley Decl., Dkt. 28-1, at 7). To explain why he sought intervention in this case, Tuley stated: "Preserving this enforcement mechanism is important to Mr. Tuley because several district attorneys in Texas refuse to enforce these laws." (Mot. Intervene, Dkt. 28, at 3). Tuley admitted that he seeks to stand in place of district attorneys in abortion cases where the district attorney *does have* the enforcement right to bring a lawsuit, like for a post-viability abortion that is already prohibited by the State and enforced by the State. The Texas Intervenors want to use the procedural mechanisms of S.B. 8 to enforce abortion restrictions that are not substantively prohibited by S.B. 8. But those abortion restrictions are already enforced by the State. Adding private causes of action to the mix either duplicates or supplants the enforcement work being done by the State. Whether duplicating the efforts of the State or supplanting the State, the Texas Intervenors are acting in active concert with the State or acting as an arm of the State.

More broadly, the Intervenors as a group believe that the State granted them a roving commission to enforce the State's abortion laws. The fact that the Texas Intervenors understand that their interests would be impacted if this Court enjoins enforcement of S.B. 8 drives home the point that the Texas Intervenors recognize that they are carrying out state policy and enforcement and that an injunction of S.B. 8 would interfere with their rights to enforce state laws. The other intervenor, Oscar Stilley ("Stilley"), an Arkansas resident who filed an S.B. 8 lawsuit against an

abortion provider, spells it out: "The State of Texas in enacting [S.B. 8] has delegated power that it does have to people it does not know." (Stilley Resp., Dkt. 48, at 2, 8). He continues: "We are told that doctors don't have standing to raise the constitutional rights of their patients – but Oscar Stilley somehow has standing to sue people he'd probably like if he knew them, for things he doesn't disagree with, which caused him no damage or injury whatsoever." (*Id*.). Stilley has sued an abortion provider and wants to continue suing abortion providers and health insurance companies solely to make money. (*Id.* at 5–7). His strategy is to sue and then offer a cheap settlement of "perhaps as low as $100 per abortion"—versus $10,000 or more in statutory damages. (*Id.* at 6). His is a volume business. Setting aside the absurdity and perversity of a law that incentivizes people who do not disagree with abortion care to sue abortion providers to make a quick buck, Stilley explicitly states his perception that the State delegated part of its enforcement power, i.e., bringing suits, to him. (*Id.* at 2).

The State's concern that private individuals should not be enjoined because they have not been heard by the Court conflates persons who are enjoined through an injunction with persons who may be in contempt for violating an injunction. The State relies on *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, in which the party subsidiary company and its nonparty parent company were enjoined. 395 U.S. 100, 109 (1969). The Supreme Court vacated the judgment against the nonparty parent company. *Id.* at 110. The State wrongly assumes that a federal court cannot enjoin a person or entity without first providing every possible obligor with notice and an opportunity to be heard. In fact, the Supreme Court, in *Arizona v. United States*, upheld an injunction against Arizona that governed the conduct of its state and local law enforcement officers who had not first been given notice or an opportunity to be heard regarding the injunction. 567 U.S. 387, 410 (2012). What the *Zenith* Court held was that "a nonparty with notice cannot be held in contempt until shown to be in concert or participation." 395 U.S. at 112. Since the question of contempt is not before this Court, the Court

takes no position on whether it can hold in contempt a person who has not received notice of or been heard on an injunction.

### C. Motion for Preliminary Injunction

1. Likelihood of Success on the Merits

The Court's findings of fact, together with its analysis of the parties' submissions, lead it to conclude that the United States is substantially likely to succeed on the merits of its claims. It is substantially likely that S.B. 8 violates the Fourteenth Amendment, whether as an unconstitutional pre-viability abortion ban, or as an unconstitutional undue burden on pre-viability abortion. It is also substantially likely that S.B. 8 unconstitutionally interferes with principles of preemption and intergovernmental immunity.

a. Whether S.B. 8 Violates the Fourteenth Amendment

The United States argues that S.B. 8 purports to deny Fourteenth Amendment substantive due process rights to pre-viability abortions, in contravention of binding precedent. S.B. 8 prohibits any "abortion on a pregnant woman if the physician detected a fetal heartbeat . . . or failed to perform a test to detect a fetal heartbeat." Tex. Health & Safety Code § 171.204(a). It allows for an exception only in the case of a documented "medical emergency[.]" *Id.* § 171.205. When the Supreme Court heard a preliminary challenge to S.B. 8 in *Jackson*, the comments on the law's substance ranged from "serious questions regarding [its] constitutionality," 2021 WL 3910722, at *1, to concerns that it "threatens to invade a constitutional right," *id.* at *3 (Breyer, J., dissenting), to incredulity at the "flagrantly unconstitutional law engineered to prohibit women from exercising their constitutional rights and evade judicial scrutiny . . . ." *id.* (Sotomayor, J., dissenting). Even at that preliminary stage, before the constitutional issues were even before the court, the "clear, and indeed undisputed, conflict with *Roe* and *Casey*" was plain to see. *Id.* at *5 (Kagan, J., dissenting). As Justice Sotomayor wrote in dissent, "[t]he Act is clearly unconstitutional under existing precedents.

The [state] respondents do not even try to argue otherwise. Nor could they: No federal appellate

court has upheld such a comprehensive prohibition on abortions before viability under current law."

*Id.* at *4 (Sotomayor, J., dissenting).

### i. Unconstitutionality of Pre-Viability Abortion Bans

Indisputable, binding precedent holds that pre-viability bans on abortions are

unconstitutional. Indeed, the Supreme Court has long held that "a State may not prohibit any

woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505

U.S. at 879; *see also Roe*, 410 U.S. at 163 ("[F]or the period of pregnancy prior to [viability], the

attending physician, in consultation with [her] patient, is free to determine, without regulation by the

State, that, in [her] medical judgment, the patient's pregnancy should be terminated."). In recent

years, the Fifth Circuit has repeatedly confirmed that outright bans on pre-viability abortions are

"unconstitutional under Supreme Court precedent without resort to the undue burden balancing

test." *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020); *see also Jackson*, 945 F.3d

at 274 ("Until viability, it is for the woman, not the state, to weigh any risks to maternal health and

to consider personal values and beliefs in deciding whether to have an abortion."). Seen in light of

the nearly half-century of precedent in this line, "the Act is a breathtaking act of defiance—of the

Constitution, of this Court's precedents, and of the rights of women seeking abortions throughout

Texas." *Jackson*, 2021 WL 3910722, at *4 (Sotomayor, J., dissenting).

The State contends that S.B. 8 does not constitute an outright "ban" on pre-viability

abortions; rather it attempts to characterize the law as a regulation that poses "mere obstacles" to

pre-viability abortion access. (Resp., Dkt. 43, at 49). But there can be no question that S.B. 8

operates as a ban on pre-viability abortions in contravention of *Roe v. Wade*, and "equates to a near-

categorical ban on abortions beginning six weeks after a woman's last menstrual period, before many

women realize they are pregnant, and months before fetal viability." *Jackson*, 2021 WL 3910722, at *3

(Sotomayor, J., dissenting). The State analogizes to *Gonzales v. Carhart*, in which the Court upheld a law prohibiting the intact dilation and evacuation method of abortion. 550 U.S. 124, 135 (2007). But the law in question there was limited exclusively to a single method; it had no effect whatsoever on abortions, at any stage of pregnancy, performed using any other method. Indeed, "the Act allow[ed], among other means, a commonly used and generally accepted method, so it [did] not construct a substantial obstacle to the abortion right." *Id.* at 165. As such, it could not accurately be considered an abortion ban. In contrast, S.B. 8 effectively forecloses all abortions, by any method, that occur after approximately six weeks of pregnancy. In this way, S.B. 8 reaches far more widely than did the law at issue in *Gonzales*—so far, in fact, that it can properly be considered a ban subject to the constitutional requirements of *Roe v. Wade.*

    *June Medical*, 140 S. Ct. at 2112–13, is similarly illustrative. The State suggests that the impact of the law at issue there was so extensive as to render it effectively a ban, and, whether or not a ban, to render it comparable to S.B. 8. But again, the two laws should not be equated. Though the Court in no way intends to minimize the consequences had the law at issue in *June Medical* been upheld, its reach was still far more limited than that of S.B. 8—a law that prohibits all abortions, by any method, by any doctor, that occur after cardiac activity is detected. The former is a regulation that poses an undue burden on obtaining abortion services; the latter is a categorical ban. Indeed, faced with patients showing embryonic cardiac activity earlier than six weeks LMP, who "are incredibly frustrated because they feel like they did everything 'right' under the law by trying to get to the abortion clinic as soon as possible," Planned Parenthood physicians "explain to patients that S.B. 8 is effectively a near total ban on abortion." (Linton Decl., Dkt. 8-5, at 11).

The credible declarations from providers make clear the extent to which S.B. 8 has cut off abortion access.[44] The recent statistics at the two Planned Parenthood Center for Choice, Inc. ("PPCFC"), facilities in Houston and Stafford are illustrative. Ordinarily, the clinics provided an average of 25 abortions per day. In the week preceding S.B. 8 going into effect, that number ballooned to 205 daily, with 184 for Texas residents. (Linton Decl., Dkt. 8-5, at 10). Between September 1 and September 10, PPCFC performed 123 ultrasounds at the first appointments required under state law to take place at least 24 hours before an abortion. The clinics had 63 patients scheduled for abortions in the next ten days but could only perform 52 because "some patients had embryonic activity by the time they returned." (*Id.*).[45] Thus, the clinics went from performing approximately 25 abortions per day to approximately 5 per day, all at less than six weeks LMP.[46] For the approximately 20 women per day who, but for S.B. 8, would have received abortion care at PPCFC, the Court can only speculate as to the hardships they had to endure. Since

---

[44] "Before S.B. 8 took effect, Southwestern [Women's Surgery Center ("Southwestern")] provided medication abortion up to 10 weeks from the first day of a patient's last menstrual period ("LMP") and procedural abortions through 21 weeks and 6 days LMP. Since September 1, 2021, Southwestern has provided only procedural abortions up until detection of a "fetal heartbeat" as defined under S.B. 8 and described below. In a typical year, prior to S.B. 8 taking effect, the clinic performed approximately 9,000 medication and procedural abortions, and I personally performed between 2,000 and 3,000 abortions at Southwestern over the last year." (Gilbert Decl., 8-2, at 4-5). In addition, "[i]n 2020, the four [Whole Women's Health ("WWH")]/[Whole Women's Health Alliance ("WWHA")] clinics in Texas provided approximately 9,200 abortions. Of these patients, less than 10% were at gestations less than 6 weeks LMP." (Hagstrom Miller Decl. I, Dkt 8-4, at 3–4). The various Planned Parenthood centers and affiliates in Texas (comprising 11 of the 24 licensed facilities in the state) provided, as a low estimate, 14,184 abortions last year. Between 90% and 93.4% of these abortions were provided at 6 weeks LMP or later. (*See* Linton Decl., Dkt. 8-5, at 4–6).

[45] "Unfortunately, we have had to inform some patients at their second visit that they were barred under S.B. 8 from having an abortion. At their first visit, there was no embryonic cardiac activity on the ultrasound, but when they came back the next day after the state-mandated waiting period, there was embryonic cardiac activity and we were not able to provide the abortion. This means patients can lose their ability to access abortion in Texas literally overnight. As a result, our physicians have to caution patients that even though cardiac activity is not shown at the ultrasound appointment, it could occur on the day of the abortion, which causes patients significant stress. Another patient was found to be about five weeks pregnant without embryonic cardiac activity, so she could have qualified for an abortion, but at the same visit, she also learned she had COVID-19. By the time she would finish the mandatory quarantine, she would be too far along in her pregnancy to get an abortion in Texas." (Linton Decl., Dkt. 8-5, at 9).

[46] "The vast majority of abortion patients at Southwestern before S.B. 8 took effect were 6 or more weeks LMP. In 2020, Southwestern performed only 936 abortions for patients up to 5 weeks, 6 days LMP—only 10% of the 8,623 abortions the clinic provided in total that year." (Gilbert Decl., Dkt. 8-2, at 5).

September 1, 2021, these providers ceased performing abortions after detection of embryonic cardiac activity.[47] One provider, who oversees four Texas clinics, stated that between September 1 and September 14, "[w]e have already turned away more than 100 patients . . . , and every day the law is in effect, we are forced to turn away the majority . . . ." (Hagstrom Miller Decl. I, Dkt 8-4, at 4). Indeed, "S.B. 8 bans approximately 90% of the abortions . . . previously performed" at those four clinics." (*Id.* at 7). This credible evidence establishes that "S.B. 8 has had an immediate and devastating effect on abortion care in Texas." (*Id.*).

Although "[m]ost patients obtain an abortion as soon as they are able[,]" many do not know they are pregnant at the point when embryonic cardiac activity becomes detectable. (Gilbert Decl., Dkt. 8-2, at 8). Most people are at least six weeks LMP into pregnancy when they make their first abortion appointment, and so are permanently precluded from obtaining an abortion in Texas. (*Id.*). Clinics have stopped providing both procedural and medication abortions, as "in the rare instance where the medication fails to complete the abortions, the clinic would be unable to provide the medically appropriate procedure to complete the abortion." (Gilbert Decl., Dkt. 8-2, at 4–5).[48]

---

[47] (*See* Gilbert Decl., Dkt. 8-2, at 4) ("Since September 1, 2021, Southwestern has provided only procedural abortions up until detection of a 'fetal heartbeat' as defined under S.B. 8."); (Hagstrom Miller Decl. I, Dkt. 8-4, at 4) ("Since S.B. 8 took effect on September 1, 2021, all four WWH/WWHA clinics in Texas have stopped offering both medication and procedural abortions for patients whose pregnancies have cardiac activity, meaning that our clinics are only providing abortions to patients with gestational ages under approximately 6 weeks LMP."); (*Id.* at 7) (I have had personal conversations with the majority of independent abortion clinics in Texas regarding S.B. 8 and can affirm that the independent abortion providers in Texas are all complying with S.B. 8. All of these clinics continue, for now, to provide abortions only for pregnant people without any embryonic or fetal cardiac activity, meaning that we are forced to turn away the majority of patients seeking abortion in Texas."); (Linton Decl., Dkt. 8-5, at 7) ("The risk of civil liability, damages, and certain cost of litigation if a provider offers abortion in violation of S.B. 8 (as well as the possibility of a court order stopping the provider from providing abortions) means that none of the Planned Parenthood providers—and, to my knowledge, no other abortion provider in Texas—has offered services after embryonic cardiac activity is detected since September 1. . . . Because of the real possibility that [Planned Parenthood South Texas] Surgical Center and its physicians and staff will be sued for providing any abortions, and be forced to defend against these meritless lawsuits, it has suspended all abortion services as of September 1.").

[48] Another provider addresses the same concerns: "We have seen at least two patients who obtained

According to one provider's credible description, "[m]edication abortion is thus not an option we feel we can provide patients in light of S.B. 8's restrictions, even though it is medically preferred for many patients." (Gilbert Decl., Dkt. 8-2, at 4–5). The provider describes how, because of S.B. 8, she "had two patients . . . who are minors, who had never had a pelvic exam before, and who both preferred a medication abortion that I was unable to provide." (*Id.* at 15). As that provider credibly summarized, "[a]s a practical matter, S.B. 8 is a near total ban on abortion. It prohibits abortion care at the earliest moments that a pregnancy may be detected and often before a patient has any reason to suspect that they may be pregnant." (*Id.* at 8).

### ii. Undue Burden

Even if S.B. 8 is more properly characterized as a regulation, it is nonetheless unconstitutional because it places an "undue burden" on individuals seeking an abortion. *Casey*, 505 U.S. at 874. More specifically, "an undue burden is a shorthand for the conclusion that a state regulation has the purpose[49] or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. Since the Court set out this standard, it has invalidated state laws that impose far lower burdens on access to abortion care than does S.B. 8. In *Hellerstedt*, it held unconstitutional a Texas law (H.B. 2) requiring that doctors who perform abortions have active admitting privileges at a hospital no more than 30 miles from the abortion facility, and that such facilities meet the state-law standards "ambulatory surgical centers." 136 S. Ct. at 2299. These requirements led approximately half of the abortion clinics in Texas to

---

medication abortions before September 1 and returned at their follow-up visits after September 1 with ongoing pregnancies—meaning they were in the very small fraction of patients for whom the medication abortion was unsuccessful. In the past, we would have provided these patients with procedures to complete their abortions, as that is the medical standard of care, but because of S.B. 8 we were forced to turn these patients away. One of these patients was only 18 years old. Our physician was so upset that a staff member had to help the doctor break the news to the patient." (Hagstrom Miller Decl., Dkt. 8-4, at 10).
[49] *See supra* Section IV(B)(2)(c).

close, meaning that women forced into the few remaining clinics faced longer wait times, crowding, and longer distances to travel to providers. *Id.* at 2313. Based on the "substantial obstacle" the regulations "[e]ach place . . . in the path of women seeking a previability abortion, each constitutes an undue burden on abortion access . . . , and each violates the Federal Constitution." *Id.* And in *June Medical*, the Court invalidated an almost identical Louisiana law, again explaining that "the burdens [the law] imposes far outweigh any . . . . benefit, and thus the Act imposes an unconstitutional undue burden." 140 S. Ct. at 2121.

While the laws at issue in those cases surely created severe impediments to abortion access, they pale in comparison to the obstacles at issue here. For, as one provider credibly described:

> Even under the best circumstances, if a Texan determines they are pregnant as soon as they miss their period, they would have roughly two weeks to decide whether to have an abortion, comply with state-mandated procedures for obtaining an abortion, resolve all financial and logistical challenges associated with abortion care in Texas, and obtain an abortion. As a result of S.B. 8, the many pregnant people who do not learn that they are pregnant until after 6 weeks LMP may never access abortion in Texas.

(Gilbert Decl., Dkt. 8-2, at 8). Moreover, under S.B. 8, a doctor must be willing to pay no less than $10,000 for every abortion she performs. *See* Tex. Health & Safety Code § 171.208(i). Nor does the deterrent stop there: so too must every nurse, security guard, insurer, or rideshare driver. This law is not a question of a one-time, excessive, and unnecessary resource investment needed to comply with a law. It is an ongoing, wide-ranging, and debilitating burden on anyone associated with providing abortions, sufficient to effectively cut off access to the medical procedure entirely. (*See* Hagstrom Miller Decl. I, Dkt. 8-4, at 7; Gilbert Decl., Dkt. 8-2, at 16–17). If any provider does take the extraordinary step of proceeding with an abortion in the face of the law, she will be saddled with litigation extending potentially for years, and in which she is precluded from even raising the unconstitutionality of the law as a defense and must also contend with repercussions from

professional licensing boards.[50] And even if the provider ultimately prevails, the law prohibits her

from ever recovering attorney's fees from her opponent. *See* Tex. Health & Safety Code § 171.208(i).

Given the unlikelihood of any provider having the financial wherewithal to overcome under these

financial obstacles, the effect of S.B. 8 is to force all abortion providers in Texas to cease performing

constitutionally protected medical procedures.

These provisions operate—and were intended to operate—as an effective deterrent to

provision of pre-viability abortion services in Texas, precluding the vast majority of individuals from

accessing this constitutional right. One provider lamented that, "[n]ow that abortion is almost

entirely inaccessible in Texas, patients have few options and each of their stories is more

heartbreaking than the last."[51] Indeed, it is the dismantling of the provider network that constitutes

the undue burden on access to abortion.[52] The same provider noted credibly that "S.B. 8 is like no

other abortion restriction or abortion ban we have dealt with before," and its "immediate impact . . .

---

[50] The Court finds credible the provider's description that "our physicians, particularly the ones that travel from out of state, are concerned that if lawsuits are filed against them, they will be required to report these lawsuits to their professional licensure boards and hospitals in every state where they are licensed, and that they will ultimately lose their professional privileges and credentials. For most of our physicians, the risk was too great to even come to work." (Hagstrom Miller Decl. I, Dkt. 8-4, at 11).

[51] Declarant and abortion provider Amy Hagstrom Miller describes some of these "heartbreaking" cases: "The first patient we saw at our Fort Worth clinic on September 1 was ineligible under S.B. 8. She had a 3-month-old daughter and had just started a new job. She had just left an unsupportive partner and moved in with her parents and feared that if she told them about her pregnancy, they would kick her out. Similarly, we saw a patient on September 1 at our Austin clinic who was so stunned to learn she was 10 weeks LMP and ineligible for abortion in Texas that she was in too much shock to process our suggestions for where to turn for care. We saw another patient last week with consistent periods who had no signs of pregnancy other than a positive pregnancy test. The patient thought she was likely 4-5 weeks LMP but was shocked to learn that her ultrasound showed that she was beyond 13 weeks. The patient already has a young infant at home, less than a year old. We have not heard from any of these patients since they left our clinics." (*Id.*).

[52] (*See* Gilbert Decl., Dkt. 8-2, at 13) ("Southwestern has weathered short-term abortion bans in Texas before and barely survived. Last year, when Southwestern was shut down for approximately three weeks due to the COVID-19 executive order shutdown, the impact was severe. Repeatedly having to stop and restart services, as various court orders allowed us to reopen only to be shut down again hours later, created absolute chaos for our patients and staff. The COVID-19 shutdown took an immense emotional toll on our staff and drove our clinic to the financial brink. . . . [I]t took us months to work through the patient backlog. Even then, we were unable to see every patient who needed our services.").

on our patients, staff, and physicians has been truly catastrophic." (Gilbert Decl., Dkt. 8-2, at 13).

Indeed, as a Planned Parenthood Provider credibly described the state of affairs:

> both practically and emotionally, abortion providers and their staff are now barely hanging on due to S.B. 8. Our staff are doing all they can to help patients navigate this awful law, including working long hours to get patients in as quickly as possible for their appointments. They are doing their best to provide as many ultrasounds on a daily basis as they can in order to catch those few patients where cardiac activity will not be detected, but there are only so many working hours in a day and our staff are still dedicated to providing high-quality care. This experience has also been traumatic for our physicians and staff as they must tell patient after patient that they cannot care for them, despite that, medically, they should be able to and, indeed, went through significant medical training to provide the very medical care that their patients are asking them to provide and are entitled to receive. They are essentially being forced to inflict trauma on their patients.

(Linton Decl., Dkt. 8-5, at 14–15). The law appears to be having the desired chilling effect: the provider describes a staff "plagued by fear and instability" who "remain seriously concerned that even providing abortions in compliance with S.B. 8 will draw lawsuits from anti-abortion vigilantes or others seeking financial gain under S.B. 8's bounty hunting scheme." *Id.*[53] As one provider aptly observed, the days since the ban went into effect "have been nothing short of agonizing for our staff. No one should be forced to risk overwhelming costs of litigation and crushing penalties to

---

[53] Gilbert continues, "I am one of only two physicians, out of the eight physicians that typically provide care at our clinic, who is currently providing abortions at Southwestern. While our other physicians are willing to provide S.B. 8-compliant abortions, we feel constrained to limit the potential liability of our physicians to lawsuits brought under S.B. 8 by having fewer physicians providing abortions. Bringing in additional providers also adds to the clinic's costs at a time when Southwestern confronts an unknown period of higher security costs and significantly reduced patient volume." *Id.* Further, "[b]ecause S.B. 8 allows almost anyone to sue me, Southwestern, and the staff who work with me, I continue to worry that just by coming to work, I risk exposure to multiple lawsuits . . . ." (*Id.* at 17–18).

provide safe and common health care. No one should be subject to state-directed harassment for caring for patients in need." (Linton Decl., Dkt. 8-5, at 12).[54]

Providers understand that "[e]ven if there is no basis for the suits [they] know will be filed, . . . [their] physicians, nurses, and staff will be forced to travel to the claimant's home county, hire a lawyer, and spend months, if not years, defending themselves." (Hagstrom Miller Decl. I, Dkt. 8-4, at 7).[55] Indeed, "The costs of defending against what could be a flood of lawsuits in every county in Texas would be impossible for abortion providers to absorb, even if they were to win each case." (Linton Decl., Dkt. 8-5, at 8). The threats are not limited to litigation itself—"almost immediately

---

[54] "Abortion providers deal with relentless harassment from abortion opponents, including as they come into work each day, which has increased since S.B. 8 took effect. For example, Texas Right to Life ('TRTL') launched a 'whistleblower' website to recruit S.B. 8 claimants, as well as 'informants' to support S.B. 8 enforcement suits by providing information about abortion providers' and support networks' perceived violations. Though the website, which could previously be found at www.prolifewhistleblower.com, is currently down, TRTL has expressed its intention to quickly restore it. The website stated that '[a]ny abortion performed in violation of the Texas Heartbeat Act is a criminal offense, and any individual or entity that aids or abets an abortion on a child with a detectable heartbeat in Texas is violating the law as well.' It further provided that '[TRTL] will ensure that these lawbreakers are held accountable for their actions' and invited visitors to '[j]oin the Team of Pro-Lifers working to enforce' S.B. 8 and '[s]end an anonymous tip or information about potential violations' of the Act. Recruits who clicked on the button inviting them to become a 'team member' by submitting contact information were asked: 'How are you interested in enforcing the Texas Heartbeat Act?' with response options of 'Litigating,' 'Plaintiff,' 'Data Collection,' and 'Other' and they were also asked to provide the 'best time for a TRTL team member to call you to talk about enforcing' S.B. 8. Individuals who selected the option to send an anonymous tip were asked to provide 'as much detail as possible' on 'how [they thought] the law ha[d] been violated,' as well as 'how [they] obtain[ed] this evidence' and the 'Clinic or Doctor this evidence relate[d] to.' Our staff have also had to endure protestors trespassing; conducting drone surveillance; blocking roads, driveways, and entrances; yelling at staff and patients; using illegal sound amplification; video recording staff, staff vehicles, and license plates, as well as surreptitiously recording inside the health center; trying to follow staff home; and more. On the first day S.B. 8 went into effect, we had to call the police because a protestor was blocking the driveway with his vehicle. He came back the next day, and even had a porta-potty delivered. The next day, someone trespassed on the property and vandalized a few of our signs. We are also aware that someone created a forum on Reddit where numerous individuals posted discussions on how they could be bounty hunters under S.B. 8 and turn doctors into the police, but which has since been taken down." (Linton Decl., Dkt. 8-5, at 13–14).

[55] One provider notes credibly, "[w]hile we generally have low staff turnover, ever since S.B. 8 started receiving public attention, staff began to express serious fears that their jobs would no longer exist . . . . [W]e have lost around one staff member every week, including two of our clinic directors. . . . Our physicians in particular, many of whom are licensed in multiple states and travel to Texas to provide patient care, are extremely concerned about their potential personal and professional liability under S.B. 8. Our physicians and nurses worry that lawsuits under S.B. 8 might trigger investigations and other repercussions, including loss of licensure, that will follow these professionals for the rest of their careers, even if they choose to practice outside Texas." (Hagstrom Miller Decl., Dkt. 8-4, at 10–11).

after" S.B. 8 was signed into law, vigilantes began harassing providers based on their newfound

enforcement authority.[56] The deterrent effect of the law has translated directly to a "devastating"

impact as clinics must "turn away patients in droves . . . ." (Gilbert Decl., Dkt. 8-2, at 14–15).

Providers are "only able to help a fraction of the patients [they] ordinarily would see and treat, as

most patients . . . are beyond the gestational limit imposed by S.B. 8." Indeed, one provider stated

that "[i]f the law is not struck down soon, [her] clinic in Dallas will inevitably close." *Id.* at 14.[57]

---

[56] "In late May, an individual snuck into the Austin Clinic by following a patient through the front door to evade our security. Once inside, the individual distributed a letter about S.B. 8 to our Austin Clinic staff and those present in the reception area. . . . The individual was asked to leave, but once outside, the individual was joined by another person and both individuals continued to distribute the letter to staff outside, still on the clinic's private property. The letter gives a phone number and email address for individuals to use to report violations of S.B. 8 and states: 'please call or send us a text at any time.' The threats have continued despite our public statements that we would be and now are in compliance with S.B. 8. On the day before S.B. 8 took effect, our Fort Worth clinic opened at 7:30 am and was working until 11:56 pm to serve as many patients as possible before the law took effect at midnight. Our physician and staff were in tears, terrified that they would not be able to see every patient who was still sitting in the waiting room before the deadline. All the while, our clinic was under surveillance from anti-abortion activists stationed outside. Protesters flooded the areas around our clinic, shining flashlights into the cars of patients as they entered and exited the parking lots. After nightfall, the protesters brought in giant lights and shined them at the clinic, illuminating the parking lot and the building in order to track our every move. The protesters called the fire and police departments multiple times throughout that day in an attempt to stop our work or slow down the last abortions we would be able to provide after six weeks LMP. Since September 1, the threats have only gotten worse. Several days before S.B. 8 took effect, my staff brought to my attention a website run by Texas Right to Life called prolifewhistleblower.com. . . . The website requests information from individuals interested in enforcing S.B. 8, including those interested in 'litigating' or becoming a 'plaintiff.' . . . My staff also identified a subreddit called 'TexasBountyHunters' where individuals have posted plans to enforce S.B. 8. In addition, WWH and WWHA have seen an uptick in protester activity at our clinics, and threatening calls, emails, and social media posts. For example, one message we received read: 'It's a shame we can no long murder innocent babies in their mother's womb. If your women are so about 'Their body, their choice' then let's make the law this: As long as a woman is willing to die along with her unborn child we'll allow her to get rid of it. You see? It's not about her body at all, it's about the body of the unborn child which is a human at conception. Thank God for the sane people that still exist in this world. You should be in prison for life.'" (Hagstrom Miller Decl. I, Dkt. 8-4, at 10–11).

[57] Another provider expressed that "[i]f we are not able to resume providing abortion services soon, I am worried about our ability to retain staff. Even before S.B. 8 took effect, the Act was already taking a negative toll on our ability to recruit new staff. PPCFC has already had two prospective staff members decline job offers specifically because of fear of S.B. 8." (Linton Decl., Dkt. 8-5, at 14).

        With all the turmoil and uncertainty caused by S.B. 8, "[p]atients are panicked, both for

themselves and their loved ones." (Gilbert Decl., Dkt. 8-2, at 15).[58] Even those who attempt to

comply with the law may be harmed. For example, one provider describes seeing a patient "who has

been taking the same contraception consistently for a decade and nonetheless found herself

pregnant. She was only 5.4 weeks LMP but had detectible cardiac activity, so I had to turn her

away." *Id.* The 24-hour waiting period required under state law "is also compounding the burden of

S.B. 8" as patients "become ineligible for abortion care between their first and second

appointments." *Id.* at 16.[59] One provider describes patients "devastated to learn that after two

appointments, . . . their only option for abortion care is to leave Texas, which not all can do."[60]

Moreover, "because under S.B. 8 patients only have a very limited window of time after discovering

they are pregnant to decide that they want an abortion, S.B. 8 is forcing some patients to make a

decision about their abortion before they are truly ready to do so." (Gilbert Decl., Dkt. 8-2, at 17).[61]

One provider credibly describes "particular[] concern[s] about the unaccompanied migrant teenagers

---

[58] Gilbert continues, "I saw a patient for counseling who was eligible for an abortion under S.B. 8 but nonetheless broke down in tears because she was so scared that her sister, who was planning to drive her to the clinic the next day for her procedure, would be sued under S.B. 8 for aiding and abetting. Other patients are making appointments before they have received a positive pregnancy test, seeking unnecessary blood tests and procedures, for fear that if they are pregnant, they will be unable to access care." (*Id.*)

[59] The Court finds credible Gilbert's statement that one in fifteen patients becomes ineligible for abortion under S.B. 8 between their first and second appointments. *Id.* Further, according to a provider, Planned Parenthood "call centers also inform patients that if there is embryonic cardiac activity, they will have to seek abortion out of state, and so if they think the pregnancy is greater than six weeks LMP, they may come in for an ultrasound to help them determine the gestational age of their pregnancy, but we will not be able to perform their abortion. Explaining the new law to people and the fact that it means we cannot provide them an abortion, and then helping them navigate a way to get out of state and get to another provider, means that calls with patients are taking twice as long as they used to. As a result, our hold times have increased significantly, which in turn makes it harder for us to reach and schedule those people who may still be eligible for an abortion but have a short window to get in for an appointment before they are banned." (Linton Decl., Dkt. 8-5, at 9).

[60] "One patient, for example, showed cardiac activity when she arrived for her abortion and upon learning she was ineligible for an abortion, she broke down in tears." (*Id.*)

[61] A provider notes that one of her clinics "already had a woman who came to one of our health centers reporting that because she had no money or resources, she said she had turned to the internet where she found some 'abortion tea.' She took it, and it didn't work. The ultrasound showed embryonic cardiac activity, and so we had to tell her that her only option was to try and travel out of state." (Linton Decl., Dkt. 8-5, at 12).

who often present at our . . . clinic, as the logistical barriers to these patients' care mean that they are unable to reach us for treatment prior to 9 weeks LMP," at least in part because "the judicial bypass process [for minors] usually takes at least 2 weeks. The majority of these patients do not become pregnant through consensual sex and tend to be much younger than other minor patients we treat." (Hagstrom Miller Decl., Dkt. 8-4, at 8-9).

Even though the ban has been in effect for just over a month, necessarily limiting the data available, this harm is still far from speculative. One provider stated that S.B. 8 "shut down about 80 percent of the abortion services we provide." (Newman Decl., Dkt. 59-1, at 4–6) (citing Alan Braid, *Opinion: Why I Violated Texas's Extreme Abortion Ban*, Wash. Post (Sept. 18, 2021), https://www. washingtonpost.com/opinions/2021/09/18/texas-abortion-provider-alan-braid/). Others place the figure higher: between 85% and 95% of all abortions previously provided in Texas are now prohibited by law. (*See* Hagstrom Miller Decl. I, Dkt. 8-4, at 3-4; Gilbert Decl., Dkt. 8-2, at 5; Linton Decl., Dkt. 8-5, at 6). This burden is far more extreme than that created by H.B. 2 in *Hellerstedt*, which caused half of abortion facilities to close, doubled the number of women living more than 50 miles from a clinic, and increased the number of women living more than 150 miles from a clinic by more than 350%. *Hellerstedt*, 136 S. Ct. at 2296.[62] The law thus has both the "purpose" *and* the

---

[62] As a whole, the situation is even more dire for minors: "[n]ow that the school year has begun, minors who cannot confide in their families about their pregnancies or desire for an abortion are unable to explain a protracted absence from school. Thus, S.B. 8 condemns minors to carry to term or take matters into their own hands." (Rupani Decl, Dkt. 8-8, at 8). Indeed, "[t]he near impossibility of obtaining an abortion within the time permitted by the Act is all the more clear for our minor patients. Minor patients without a history of pregnancy may be less likely to recognize early symptoms of pregnancy than older patients who have been pregnant before. In addition, some of these patients cannot obtain written parental authorization for an

"effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. If this situation does not constitute an undue burden, it is hard to imagine what would.

The State makes a half-hearted attempt to establish that pregnant persons are still able to access abortions since S.B. 8 went into effect on September 1. But its assertions only illustrate how effective the ban has been. The State cites *only one* case of an abortion being performed in post-S.B. 8 Texas. (Resp., Dkt. 43, at 50) ("Even as everyone is adjusting to the new law, women have been able to obtain post-heartbeat abortions. Dr. Alan Braid, for example, reports that at least one of his patients received an abortion 'beyond the new legal limit[.]'")). With this claim, the State appears to argue that abortion services remain available because providers are willing to act in violation of S.B. 8—in other words, the law is constitutional because people will violate it. The absurdity of this reasoning speaks for itself. Moreover, the abortion in question was a unique case, as it was seemingly performed to invite publicity of the unconstitutional law. (Newman Decl., Dkt. 59-1, at 4–6) (citing Alan Braid, *Opinion: Why I Violated Texas's Extreme Abortion Ban*, Wash. Post (Sept. 18, 2021), https://www. washingtonpost.com/opinions/2021/09/18/texas-abortion-provider-alan-braid/); (Hagstrom Miller Decl. II, Dkt. 59-2 at 2 ("To my knowledge only one abortion in violation of S.B. 8 has occurred since September 1.")). Even if this was not the only prohibited abortion to take place,

---

abortion as required by state law and must obtain a court order permitting them to receive care. Tex. Fam. Code §§ 33.001–33.014. A court may take up to five business days to rule on a patient's petition to bypass the state's parental-consent law for abortions, *id.* § 33.003, not including any time that may be necessary for a minor patient to appeal an unfavorable decision. That process cannot realistically happen before a patient's pregnancy reaches 6 weeks LMP." (Linton Decl., Dkt. 8-5, at 7). According to Linton, "the law is having a particularly burdensome effect on minors who need a judicial bypass. We have already seen minors who do not show embryonic cardiac activity at their initial ultrasound appointment, but will inevitably show cardiac activity by the time that they come back for the abortion because it will take them days to get a judicial bypass. These patients are so desperate, and we are worried that they will do something unsafe because the only alternative for them to get an abortion is to go out of state, which is incredibly difficult for a minor to do on their own. It is also our experience that some minors seeking a judicial bypass do so because they cannot tell their parents about their pregnancy and abortion decision for fear of violence. We worry S.B. 8 will force them into a dangerous situation." (Linton Decl., Dkt. 8-5, at 11).

the absence of other examples in a state which ordinarily would have seen thousands of abortions in a month's time makes clear the immediate chilling effect of the law.[63]

### iii. Out-of-State Recourse

The State further asserts that Texas residents can still travel to other states to access abortion care, which nullifies the likely unconstitutionality of the ban. (Resp., Dkt. 43, at 51). It argues that the fact that people are travelling across state lines to obtain abortions, which may ultimately force other states to expand their capacity, proves that abortion is still accessible and will remain so. (*See* Tong Decl., Dkt. 8-6, at 3–5). But forcing people to make expensive and otherwise unnecessary journeys to secure abortions cannot render this law constitutional.[64] And even if they try to accommodate the influx, other states may not be able to expand their capacity to keep pace.[65] The

---

[63] To be clear, the claim of constitutional infirmity does not arise out of the existence of a state tort law on its own, as the State suggests with its puzzling analogy to *New York Times v. Sullivan*, 376 U.S. 254 (1964) and *Snyder v. Phelps*, 562 U.S. 443 (2011). (*See* Resp., Dkt. 43, at 69; Hr'g Tr., Dkt. 65, at 70). It is the chilling effect of the state law that creates the grave constitutional concern here, in contrast to the comparatively innocuous defamation and other tort laws at issue in the cases the State cites. Here, review of the tort law is unavailable through the ordinary process available in those cases because the abortion services that would result in civil actions have been coerced out of existence.

[64] (*See* Hagstrom Miller Decl. I, Dkt 8-4, at 8) ("Based on our prior experiences with clinic shutdown laws, we know that the majority of our patients will not be able to travel out of state to obtain an abortion due to their work, school, family, or childcare responsibilities and the high costs. In addition, many of our patients have cited fears about travel during the COVID-19 pandemic or an inability to travel due to COVID-19 as one of the many reasons they cannot travel out of state for care."); (Gilbert Decl., Dkt. 8-2, at 16) ("I talked to a colleague in Alabama who saw a patient last week from Dallas who drove ten hours to get to her, only to be forced to wait several days for her procedure due to Alabama's 48-hour waiting period.").

[65] A provider in Oklahoma and Kansas explained that her staff were "working hard to expand our capacity and increase the number of patients we can serve at both clinics. . . . [by] working toward adding more clinic days at both locations. Hiring and scheduling physicians and other support staff is no simple feat, though. In both Kansas and Oklahoma, it is difficult to find in-state physicians who are willing to provide abortion care because of the documented stigma, harassment, and violence abortion providers face. As a result, we must recruit doctors from other states who will travel to our clinics. These physicians work with us on a part-time basis and maintain medical practices and personal lives in their home states. It is challenging to find out-of-state abortion providers willing to travel to our clinics, and even when we do find them, they must become licensed in Kansas or Oklahoma before they can provide there. Our clinics also have a critical need for additional support staff. In particular, we need more nurses . . . . Hiring this medical staff during a pandemic is challenging to do. Trust Women Oklahoma City has already asked its physicians to increase their clinic days to provide abortions three days each week. Some doctors are able to make this arrangement, but others cannot. If S.B. 8 is not blocked, we will work toward providing abortions four days per week (up from two days), but such a move is entirely dependent on our ability to hire and schedule new physicians and staff. But

State's examples only serve to illuminate just how unduly burdensome this ban is in practice. Indeed, "[w]hile some patients have been able to pull together the resources to travel out of state for medical care, many others cannot do so and are being forced to carry their pregnancy to term against their will or to seek ways to end their pregnancies on their own." (Linton Decl., Dkt. 8-5, at 5). And this says nothing of the burden on patients and providers in other states. The Court finds, as one provider credibly described, "[a]bsorbing thousands of Texas residents will have a domino effect on access and wait times, and will interfere with our ability to provide timely reproductive and sexual health care to the communities we currently serve. Thus, patients living in [other states] must delay preventative care or go without . . . ." (Cowart Decl., Dkt. 8-7, at 8).

Many patients are unable to travel to other states for any number of reasons, from immigration status to dangerous family situations to financial constraints.[66] Indeed, "[t]raveling out of state for abortion care presents significant, if not insurmountable, logistical and financial challenges" such that "even the lucky ones able to travel are both delayed in obtaining care and need to travel hundreds more miles to reach an abortion provider." (Hagstrom Miller Decl., Dkt. 8-4, at 9).[67] And delay is more than a minor inconvenience: patients must "continue to cope with the physical symptoms of pregnancy, which for many include debilitating nausea and vomiting[;]" face the risk that "others will discover the pregnancy, including abusive partners or family members[;]"

---

even if the two Trust Women clinics do expand their capacity, I fear that we still will not be able to serve Texans and other out-of-state patients affected by S.B. 8." (Tong Decl., Dkt. 8-6, at 8–9).

[66] (*See* Hagstrom Miller Decl. I, Dkt. 8-4, at 4) ("A majority of patients at the McAllen Clinic are Spanish speakers, and many face immigration-related restrictions on traveling outside of the Rio Grande Valley. For example, while many of the patients are in this country legally, their visas prohibit them from traveling outside of the Rio Grande Valley, so they cannot travel to New Mexico or even to San Antonio for any reason, including to access abortion services."); (Gilbert Decl., Dkt. 8-2, at 14–15) ("[T]here have been multiple undocumented patients who were ineligible for an abortion under S.B. 8, but who stated that traveling out of state was not an option for fear of being stopped by border patrol and deported. Another patient said she could not travel out of state because she could not tell her unsupportive family that she was having an abortion and 'disappear for a few days' without an explanation.").

[67] "For example, we saw one patient in McAllen who had already made a backup appointment in Oklahoma, an 11-hour drive away. I have also spoken to colleagues in Michigan, Florida, New York, New Mexico, and Georgia who have all seen patients from Texas in the last week." (Hagstrom Miller Decl. I, Dkt. 8-4, at 9).

deal with increasing costs and medical risks of both pregnancy and abortion with increasing

gestational age; and "cope with the fear of not being able to obtain abortion care in time (based on

other states' gestational age limits, as most of the states surrounding Texas ban abortion after 22

weeks LMP)—and of the life-altering consequences of having to go through childbirth against their

will." (Hagstrom Miller Decl., Dkt. 8-4, at 9). The increased travel burdens have forced more Texans

to turn to practical support organizations for financial and other support.[68] The director of one non-

---

[68] One out of state provider credibly described some of the practical obstacles: "We have also seen patients who are homeless and face tremendous difficulties navigating how to travel a long distance to get an abortion. One Texas patient, for example, told us that by the time they realized they were pregnant, they could not have an abortion under S.B. 8 but they did not have any funds to travel out of state. The patient told us they felt defeated, but knew that having an abortion was the best choice for them for a number of reasons. Fortunately, we were able to get them an appointment at our health center in Colorado and provide assistance for them to get there. Sadly, this level of personal and individualized support will simply not be possible for everyone who contacts us (and there are so many more who will never contact us). Carless individuals trying to find transportation to our health centers from Texas are also experiencing numerous obstacles to travel. For example, we recently provided care to a Texas patient who was 7 weeks pregnant, but who did not have her own credit card to rent a car (which many rental companies require) in order to travel to New Mexico for an appointment. Although the patient is employed full-time, saving the funds to rent the car and pay for gas (in addition to the cost of the abortion) was difficult for her. The patient told us she was ultimately able to secure a rental car by using a friend's credit card, and drove alone out and back to her appointment in the same day—over 1000 miles round trip—because she didn't have paid time off work and couldn't afford to miss the hours." (Cowart Decl., Dkt. 8-7, at 5).

profit has witnessed the challenges her clients must face,[69] all while contending with potential liability under S.B. 8, and dwindling funds available to support patients in need.[70]

---

[69] "The number of callers seeking assistance . . . has shot up from approximately ten per week to ten to fifteen per day. All but one has been unable to obtain an abortion in Texas because no abortion provider is offering abortion care in the state after approximately six weeks of pregnancy, and virtually all our clients are past six weeks. As a result, our callers are frantically trying to secure the resources needed to attend abortion appointments out of state. By driving virtually all Texas residents out of state for abortion care and saddling abortion facilities closer to various areas of Texas with long wait times, S.B. 8 has forced our callers to secure appointments in farther and farther locations, including Tulsa and Oklahoma City, Oklahoma; Wichita, Kansas; Santa Fe and Albuquerque, New Mexico; Denver, Colorado; and Seattle, Washington. Traveling to any of these locations from Texas has been much more expensive, logistically demanding, and nerve-wracking for our clients than traveling within the state, particularly during the COVID-19 pandemic. . . . The out-of-state travel precipitated by S.B. 8 has also required lodging spanning multiple days, added food costs, extended time away from work depriving clients of critical wages and jeopardizing their jobs, extended time away from children requiring alternate care arrangements, extended time away from home making it difficult to conceal a pregnancy or abortion from an abuser, and extended time away from school compromising minors' confidentiality before their parents.

One of our clients obtained an ultrasound . . . only to learn there was cardiac activity and she would be unable to obtain an abortion in Texas. To do so, she traveled almost 200 miles roundtrip within the state. Since then, she has struggled to secure enough time off of work to leave Texas. The client's appointment is not for another three weeks, in Oklahoma City, Oklahoma, which will require her to make close to a 1,000-mile round-trip for abortion care. . . . Another client has an appointment today in Albuquerque, New Mexico and called us in a panic yesterday because, despite fighting tooth and nail, she had been unable to come up with the funds for a hotel or any ground transportation. Fortunately, we were able to work with another practical support organization to make sure she could obtain her abortion. . . . Another consequence of S.B. 8 is that most of our current clients must end their pregnancies without the support of loved ones, who can rarely make lengthy trips without substantial financial and practical support either. . . . [O]ur clients now have to choose between obtaining earlier appointments in even more distant locations or delaying their abortion care even longer to get an appointment closer (but not close) to home. Most of our clients attempt to travel farther because they are committed to ending their pregnancies as soon as possible. . . . One Texan faced with this dilemma, piled her children into her car and drove over 15 hours overnight to obtain a medication abortion in Kansas rather than struggle to patch together the money needed for air-fare and childcare or remain in limbo. Another Texan traveled 12 hours round-trip to Oklahoma during the day to get her procedure because she did not want her partner to know and was scared he would find out if she was not home overnight." (Rupani Decl., Dkt. 8-8, at 2).

[70] "S.B.8 has constrained [the organization's] ability to increase its budget to match the surge in callers and greater scope of their needs. In the seven business days thus far in September, we have already spent $10,000. We estimate that we will expend at least $25,000 before October, or a minimum of $10,000 more than usual. Yet, at least fifteen potential donors have expressed fear that funding . . . . could be understood as aiding or abetting under the statute. Accordingly, we have been unable to increase the number of callers we help since S.B. 8 took effect." When [the organization] lacks the resources to help a caller leave the state for abortion care, we refer them to other practical support organizations throughout the country. Because these organizations are serving the same influx of Texans, however, they too are often at capacity. Several callers have been unable to obtain assistance from any of us and thus unable to leave Texas for an abortion. Notably, almost all of them have at least one child at home and have expressed that they cannot afford to care for their existing children if they are forced to have another. In my experience, these callers will carry to term against their will if S.B. 8 remains in effect." (*Id.* at 7–8)

Texas residents forced to leave the state must also contend with the abortion restrictions and backlogs in other states. The Court finds credible the evidence showing that the inundation of Texas patients overburdens abortion services in other states, many of which are already stretched to the breaking.[71]  For example, one provider in Oklahoma described the debilitating pressure on that state's limited abortion care resources. Before S.B. 8 went into force, her clinic provided abortions to approximately ten Texas patients per week, totaling about one quarter of their patients. (Tong Decl., Dkt. 8-6, at 4). Since September 1, however, there has been a "dramatic increase in patient volume": "the clinic's call volume has more than doubled from approximately 15 patient appointment calls per day to 30 to 40. About two-thirds of our patient appointment calls now come from Texas patients seeking abortions that are unavailable throughout their home state." (*Id.*). The clinic is scheduling at capacity but can accommodate no more than 40 patients per day and 80 per week. Less than two weeks after the law went into effect, the clinic "has been forced to delay patients' abortions because of the volume of appointments needed." (*Id.*).[72] A provider at two Planned Parenthood facilities in Oklahoma credibly expressed similar sentiments:

> I have treated numerous individuals who reside in Texas and who have been forced to travel to Oklahoma to terminate their pregnancies. The surge of Texans that we have provided abortions to in our Oklahoma health centers since September 1 is unprecedented, and the demand only continues to grow. . . . [T]his is causing our schedules to become very

---

[71] In neighboring Oklahoma, only one clinic in the state provides abortions after approximately 18 weeks LMP. (Tong Decl., Dkt. 8-6, at 3). As Tong describes, "[d]ue to Oklahoma's burdensome anti-abortion restrictions, there are only four abortion clinics in the state, all of which are located in Oklahoma City and Tulsa. Pregnant people in rural areas of Oklahoma, including the panhandle and southwestern corner of the state, must travel hundreds of miles to reach the nearest abortion provider. Very few doctors who live in Oklahoma are willing to provide abortion care. The regulatory requirements are extremely burdensome, and physicians who do provide abortions are subject to discrimination in the medical and local communities, harassment, and threatened and actual violence. . . . Trust Women Oklahoma City is therefore staffed entirely by Oklahoma-licensed physicians based in other states who travel to Oklahoma City to provide abortion care. . . . As a result, Trust Women Oklahoma City is able to offer abortion appointments only two days each week." (*Id.* at 2–3).

[72] "Before September 1, if a patient called on Monday for an appointment, the clinic would generally be able to schedule the patient for an abortion on a Thursday or Friday of the same week (with the mandatory 72-hour delay required by Oklahoma law). Now, the clinic is scheduling patients for appointments three weeks in advance—a significant delay for a time-sensitive medical procedure, and a delay that was extremely rare before September 1." (*Id.*).

backlogged and I fear that we will not be able to continue to serve our existing patient population in Oklahoma in a timely manner given the overflow of patients coming from Texas. I believe this will force many patients to have abortions later in pregnancy, pressure patients from communities in Oklahoma to scramble to seek care in other states farther away, influence some patients to attempt to terminate their pregnancies outside the medical system altogether in unsafe ways, or result in people carrying unwanted pregnancies to term.

(Yap Decl., Dkt. 8-9, at 3).[73] The provider also notes credibly that, among the obstacles to obtaining an abortion in Oklahoma, the state has a 72-hour waiting period, making the travel prohibitively burdensome or expensive for some. (Yap Decl., Dkt. 8-9, at 5).[74] The impact on the Oklahoma clinics is stunning:

Since S.B. 8 took effect twelve days ago, I was the sole provider at our Tulsa and Oklahoma City health centers . . . and treated 69 patients who reside in Texas. In the days leading up to S.B. 8's effective date, I also treated many patients from Texas who had heard about the law in the news and were already scared . . . . [I]n the first six months of 2021 we treated a total of 175 Texas residents. . . . [W]e saw 40% of the total number of patients from Texas that we would normally see in six months in just twelve days. And since S.B. 8 took effect, we have seen an overall staggering 646% increase of Texan patients per day compared to the first six months of the year. Currently, people who are traveling from Texas to get an abortion in Oklahoma are taking up at least 50% (and on some days nearly 75%) of the appointments we have available at our Oklahoma health centers. . . . Indeed, there are over 240 Texans that have made appointments to . . . this week and next week.[75]

---

[73] The declarant is "the only abortion provider at our Tulsa health center" and must "occasionally travel to Oklahoma City to provide abortions when not other provider can." The Oklahoma City Planned Parenthood facility relies on "out-of-state doctors who each travel to Oklahoma to provide care a few days per month." (Id. at 4). The facilities have provided more than 1,300 abortions in 2021. (Tong Decl., Dkt. 8-6, at 3).

[74] "We have had at least two patients from Texas make appointments to have a medication abortion but after they had traveled to our Tulsa health center, we determined that they were ineligible for a medication abortion and had to be rescheduled for another day to get a procedural abortion. This meant they had to travel back to Texas, and then make another round trip from Texas to Oklahoma—traveling hundreds of miles to get an abortion. We had to reschedule one of these patients for one week later because—due to her work schedule—the only day she could make the long trip to Oklahoma was the following Saturday. This is a concern we have heard from other Texas patients, too. Our schedule was already booked but we made an exception because otherwise this patient would have had to wait two weeks, forcing her to have a more expensive procedure, which she said she could not afford." (Tong Decl., Dkt. 8-6, at 7).

[75] The provider continues his credible description, "on Saturday, September 10, I provided abortions at our Tulsa health center and of the 28 patients that received abortions, 17 were from Texas. The day before when I provided abortions in Oklahoma City, of the 30 patients who received abortions, 23 of those patients were from Texas. We expect this trend to only worsen over the coming weeks. . . . Specifically, for the week of September 13, there are 101 people scheduled to have abortions at our Tulsa health center, of which 52 are from Texas. And at our Oklahoma City health center, there are 219 people scheduled to have abortions, of which 137 are people who live in Texas." (Yap Decl., Dkt. 8-9, at 6). Further, "[b]ecause our schedules in Oklahoma are quickly filling up, we have also begun telling people that they can travel to our health centers in Kansas, or even Arkansas, to get an appointment sooner." (Id. at 9).

This provider echoes the concern that "[p]regnant people from Texas are scared and are frantically trying to get appointments. They are doing everything they can to get to a state that will allow them to terminate their pregnancies." (*Id.* at 5).[76]

Similarly, in Kansas, a clinic that previously provided 20-40 abortions per week, and few to Texas residents, has seen a crushing increase in patients.[77] Since S.B. 8 took effect, "the clinic's total call volume has doubled, and approximately half of our calls now come from Texas patients seeking abortions that they are no longer able to obtain in their home state. That clinic, Trust Women Wichita is scheduling as many abortion procedures as it can—approximately 30 patients per clinic day, or 60 patients per week." (*Id.* at 5). About half of its patients now are from Texas, traveling from as far as San Antonio and Houston—some travel 600 miles each way simply to obtain the pills

---

[76] The provider continues, "What I have seen unfold since S.B. 8 took effect has been absolutely devastating. The patients that are able to make it to Oklahoma to get their abortion are having to make substantial sacrifices and overcome numerous obstacles, including struggling to come up with the funds to make the trip to Oklahoma. They are also scared that someone may find out that they had an abortion when they go back home to Texas and are unsure of what could happen to them under S.B. 8. Those patients who are seeking abortions in the context of intimate partner violence or other family violence are risking more than they already do in order to travel out of state to end their unwanted pregnancies. People are also worried about having to travel long distances in the middle of a pandemic and what that could mean for the health and safety of themselves and their families. And I too fear that this increased travel puts myself, our staff, and our patients at greater risk of contracting COVID-19.

I also know that we are seeing only a fraction of the people in Texas who are seeking to have an abortion, with some finding care in other states and others who simply cannot travel out of state or are afraid to do so. I fear that many people, especially those with the fewest resources, will not be able to obtain safe abortion care at all and will either seek to terminate their pregnancies themselves outside the medical system, or be forced to carry unwanted pregnancies to term. Abortion is one of the safest medical procedures, but by forcing patients to travel long distances and likely delay their procedures, Texas is endangering its citizens. Not only is there no medical basis for this ban, but it is already inflicting serious hardship and trauma on patients who are making very personal decisions that are right for them and their families." (*Id.* at 10).

[77] "Trust Women Wichita provides abortion care to approximately 1500 patients per year. . . . There are only four abortion clinics in Kansas, serving the state's nearly three million residents, and all four clinics are in the Wichita or Kansas City metropolitan areas. Trust Women Wichita currently schedules patients for abortions two days each week. Our schedule is limited by the availability of our physicians, nearly all of whom fly into Wichita from out of state to perform abortions and have other practices in their home states, and the capacity of our nurses and our staff. . . . [I]n 2019, Kansas abortion providers cumulatively provided abortions for only 25 patients from Texas. . . . In 2020, that number soared to 289 because many abortions were unavailable in Texas and Oklahoma for approximately one month." (Tong Decl., Dkt. 8-6, at 5).

for a medication abortion. (*Id.* at 5–6).[78] This influx has resulted in scheduling delays for "most or all" patients seeking abortion services at the clinic, increasing the risks and anxieties associated with the process. (Tong Decl., Dkt. 8-6, at 6) ("Delays can result in adverse mental health consequences for pregnant people who are forced to carry their pregnancies longer than they desired or intended."). And with the overlapping state regulation regimes, a delayed abortion can mean the difference between a medication abortion—only available up to 11 weeks LMP in Kansas—or a procedural abortion, if a patient is able to obtain an abortion at all. (*Id.* at 6–7).[79] The provider was "extremely concerned about [the Oklahoma and Kansas clinics'] ability to provide abortion care to all pregnant people who contact us." (*Id.*).[80]

---

[78] An Oklahoma provider relates the same phenomenon: "While historically (before S.B. 8 took effect) the patients we treated from Texas tended to live near the border, we are now seeing patients in Oklahoma who are traveling from all across Texas. I treated one patient, for example, who got in her car at midnight in Texas so that she could drive through the night and make it to Oklahoma in the morning for her abortion appointment, and then she had to turn around the same day to travel back to Texas. Another patient traveled six hours (one way) to get to Oklahoma and said she drove alone because she was worried about asking someone to accompany her in case they could get in trouble under S.B. 8. Just since S.B. 8 took effect, I have treated patients who have traveled from as far as Austin, Houston, Round Rock and San Antonio, which means patients are traveling anywhere from 5 to 8 hours (one way) to get to our health centers in Tulsa or Oklahoma City. . . . I can think of at least one patient who got a last minute ticket to come by plane, and returned back to Texas the same day.

I also treated a patient from Texas who found someone to give her a ride to Tulsa, Oklahoma for her appointment, but the trip took longer than expected and they arrived too late for her to get an abortion that day. We managed to accommodate her on the Oklahoma City schedule for the next day, but she had to scramble to find a hotel in Oklahoma for the night and get assistance to be able to pay for the hotel. Unfortunately, her ride could not spend the night in Oklahoma so she had to also find help to get to Oklahoma City from Tulsa, and then we had to help her with a bus ticket to get back to Texas. There was only one bus that she could take, so we had to get her in and out of the abortion clinic with enough time to make it to the bus station. . . . And while we are going to extraordinary measures to accommodate patients due to S.B. 8, this is not a sustainable way to operate our health centers." (Yap Decl., Dkt. 8-9, at 5–7).

[79] "Additionally, although abortions at any gestational age are very safe, delays will push patients towards more complicated procedural abortions in their second trimester. Later-stage procedural abortions carry increased medical risks, may involve multiple visits to the clinic over two days, and involve significantly more financial cost to patients—creating even more hardship for the economically and medically vulnerable populations we serve. Most alarmingly, delays in abortion care might prevent some pregnant people from obtaining an abortion altogether. Although we are working to mitigate that possibility, the need to accommodate so many additional patients will mean that Trust Women may become unable to see some patients before they reach the legal gestational limit for abortion in Kansas." (Tong Decl., Dkt. 8-6, at 7).

[80] Further, the clinics "have direct experience with abortion bans in neighboring states and know that the influx of patients in Kansas and Oklahoma will require capacity we do not have. For example, during the

Clinics in Colorado, New Mexico, and Nevada have also seen an increase in Texas patients since S.B. 8 went into force. Ordinarily, Planned Parenthood facilities in these states provide an average of 8.8 abortions for Texas residents per week. (Cowart Decl., Dkt. 8-7, at 3). "Yet, in a one-week period (9/3/21–9/9/21), [the facilities] provided abortion services to 20 Texas patients—which is 53% of [the] typical monthly patient volume [in] less than a third of the month" and "at least 64 Texas residents who have scheduled appointments . . . in the coming weeks . . . ." (*Id.*).[81] To be clear, of these states, only New Mexico shares a border with Texas. Patients are thus undertaking significant travels, in the midst of a pandemic, to access abortion care.[82] In these states too, the constant stream of Texas patients has created backlogs that in some places prevent residents from accessing abortion services in their own communities. As the Planned Parenthood provider explains credibly, a "significant percentage of the appointments available in our relatively small New Mexico health centers are going to Texas residents. . . . [O]n August 31, the day prior to the law taking effect, all of our online abortion appointments for [the] Albuquerque health center were made by

COVID-19 emergency in 2020, when both Texas and Oklahoma had executive orders preventing pregnant people in those states from accessing abortions, Trust Women Wichita provided abortions to 200 Texans. Both of those abortion bans were short-lived but taught us that we do not have the capacity to accommodate large numbers of out-of-state patients in addition to the patients living in the communities we typically serve." (*Id.* at 8).

[81] According to the credible provider, "this number may be an underestimation as we don't require patients to provide their address or location when making an appointment." (Cowart Decl., Dkt. 8-7, at 4).

[82] Patients from Texas travel incredibly long distances to reach our health centers in New Mexico and Colorado; one patient even traveled all the way to one of our Southern Nevada health centers. For example, we have had Texas patients travel from Fort Worth to Boulder, CO (approximately 790 miles one way); San Antonio to Park Hill, CO (approximately 930 miles one way); and Houston to Fort Collins, CO and Aurora, CO (approximately 1000 miles one way). Even those Texas patients who have come from cities that are closer to the New Mexico border (such as El Paso and Amarillo) are having to make 4-hour drives (one way) to reach our Albuquerque, NM health center. When faced with longer wait times at their "nearest" location within our states, some patients have had to travel longer distances to access the care they need. On average, the Texas patients we have seen since S.B. 8 went into effect have traveled approximately 650 miles (one way) to access abortion out of state." (*Id.* at 4). Moreover, "for patients who are experiencing intimate partner violence, seeking an out-of-state abortion poses numerous challenges. For example, one patient told us that she is discreetly attempting to leave Texas without her husband finding out because he is abusive and she does not want to carry this pregnancy to term. She has told our staff that she is desperate, and is going to extraordinary lengths to scrape together the funds (including selling personal items) to be able to make the additional expenses of an out-of-state trip, but is very worried that her husband will find out given all the logistical planning that she is doing." (*Id.*).

Texas residents." (*Id.* at 5). Further, "[f]rom September 1 to September 11, Texas patients made up close to one-third (29%) of the total abortion patients we saw at our New Mexico health centers." (*Id.*). When New Mexico clinics were similarly overwhelmed by Texas patients following Governor Abbot's shutdown of clinics early in the pandemic, providers were forced to refer New Mexico patients to Colorado clinics, "negatively impacting their ability to seek care closer to their homes in New Mexico."[83] According to credible calculations by a provider, "[i]f we averaged the number of patients seen over the 5-week COVID-19 ban in Texas and assumed the current ban would follow a similar pattern, [we] would expect to see 2,080 patients from Texas per year, up from 458 . . . . This would be 4.5 times as many patients as [we] usually see[] from Texas." (*Id.* at 7). But these smaller clinics simply cannot cope with such an increase in demand;[84] "[e]ven before the pandemic, this would have strained operations and impacted patients from across our region. But . . . the pandemic has put significant strain on our operations and we are not operating today at the same capacity . . . ." (*Id.* at 7). Among other complications, the pandemic has created staffing shortages that further burden abortion care resources.[85] "Thus, despite sound operations, exhausting effort, and deep

---

[83] "During the approximately five weeks when Texas deemed abortion services non-essential (3/22/20–4/25/20), [Planned Parenthood facilities in the three states] saw 198 patients from Texas where we would have expected only 44 patients based on prior monthly averages. This was a 350% increase over expected patient volume from Texas and is a relevant case study for what we can anticipate since the State's ban on abortions after 6 weeks went into effect. During the time that the COVID-19 executive order was in place, we were referring patients from New Mexico to our Colorado health centers in Durango and Cortez . . . . At its peak during the COVID-19 ban, PPRM saw double the Texas patients in one week (64) than would typically be observed in an entire month. Naturally, the numbers from this five-week period only captured Texas patients who had the means, funding, and could take time away from school, work and other responsibilities to facilitate travel outside of Texas for abortion care and undercounts the true demand for services. For a host of reasons, many people will be unable to make the long out-of-state trips to bordering states at all." (Cowart Decl., Dkt. 8-7, at 6–7).

[84] "[A]ccording to the most recent publicly available data, in 2019, there were 55,966 abortions performed in Texas on Texas residents, whereas in 2019, the total number of abortions performed in New Mexico was 2,735. In 2020, there were 10,368 total abortions performed in Colorado." (*Id.* at 7).

[85] "Currently, we are at 75% staff capacity with significant shortages of licensed providers and support staff. Indeed, right now due to staffing shortages, two New Mexico sites are sharing providers as we work to increase staffing. Dealing with an influx of patients traveling long distances from another state also adds to the stress and concerns our staff have about their own health and safety in avoiding contracting COVID-19." (*Id.* at 8).

dedication to all patients regardless of their zip code, there is simply no way we can increase capacity

by that sort of magnitude to absorb tens of thousands Texas patients seeking their important, legal

health care." (*Id.* at 8). These circumstances "will inevitably lead to scheduling delays[,]" as the

facilities were already scheduling two weeks in advance by mid-September. (*Id.* at 6). Moreover, the

clinics in New Mexico and Nevada do not provide abortions after 18 weeks LMP, meaning wait

times are even longer for those at later gestational stages.[86] According to the Amici, similar effects

are expected to be felt in California and Illinois as well, underscoring the vast geographic reach of

S.B. 8's implications. (Br. of Amici, Dkt. 9-1, at 10).

All this is to say that the State does not exist in a vacuum. Indeed, if Texas's neighbors,

much less every other state, were to pass laws similar to S.B. 8—which if S.B. 8 is constitutional—

they are free to do—there would be no other states to which pregnant people could travel to obtain

an abortion. (*See* Newman Decl., Dkt 59-1, at 2) (citing Kurtis Lee & Jaweed Kaleem, *The New Texas

Abortion Law Is Becoming a Model for Other States*, L.A. TIMES (Sept. 18, 2021), https://www.latimes.

com/world-nation/story/2021-09-18/texas-abortionunited-states-constitution) ("From the Deep

South to the Upper Midwest, legislators in many conservative states have started to explore how

similar laws could be put in place in the months ahead."). Underscoring the national scope of the

harm, Kansas clinics are now struggling to cope with an influx of patients from Louisiana who, prior

to the passage of S.B. 8 would have traveled to Texas for abortions, but now must find another,

---

[86] The provider continues credibly, "[u]nderstandably, people are devastated that they cannot access health care closer to home and that they are having to wait longer and face tremendous barriers than if Texas had not forced abortion providers to shut down. One Texas patient had planned her pregnancy but recently learned that the fetus had an anomaly incompatible with life. She was told by her doctor in Texas that there is no exception under S.B. 8 for her circumstances, and that her only options were either to carry to term with the fetus dying after birth, or to leave the state to receive the needed care to terminate the pregnancy. Understandably, she was stricken with grief in dealing with this added burden. Our patient does not want to incur the trauma of being forced to carry the pregnancy to term, and is hoping to move past this loss to continuing planning her family. Faced with this heartbreaking "option," she decided to make the long trip to Colorado to seek care out of state." (*Id.* at 6).

more hospitable state among the ever-dwindling number. (Tong Decl., Dkt. 8-6, at 6). And laws recently enacted in Oklahoma will, if they take effect, further burden the region's abortion care resources.[87] Even now, an Oklahoma provider "had one woman from Texas who made an appointment . . . but by the time she was scheduled, completed the consult appointment, and made it in for the abortion appointment, . . . learned she was past the gestational age limit by which we could provide an abortion at our clinic[,]" meaning the provider  "regrettably had to refer that Texas patient to a health center hours away in Colorado." (Yap Decl., Dkt. 8-9, at 7). Indeed, states across the country have enacted record numbers of abortion restrictions in recent years, including laws that purport to ban all or most abortion services. (*See* Br. of Amicus, Dkt. 9-1, at 26). Given this trend, there are increasingly few places for Texas residents to turn. State lines only provide a refuge so long as different laws exist across them. But the constitutionality of a Texas law surely cannot turn on the policy choices of its fellow states.

### iv. Other Provisions of S.B. 8

The "undue burden" affirmative defense also fails to save the law, in the event that the law is understood as a regulation rather than a ban, and assuming that the deterrent effect of the law has not succeeded to the extent that a provider can still be found to perform the procedure. The *Casey* court was clear in defining an "undue burden," explaining, "Because we set forth a standard of general application to which we intend to adhere, it is important to clarify what is meant by an undue burden. . . . To the extent that the opinions of the Court or of individual Justices use the undue burden standard in a manner that is inconsistent with this analysis, we set out . . . the controlling standard." 505 U.S. at 876–77. The affirmative defense written into S.B. 8 "bears no

---

[87] "Oklahoma has passed five anti-abortion laws, all of which will take effect on November 1, 2021, unless blocked by court order. At least two of those laws would decimate abortion access in the state: (1) H.B. 1102, which is essentially a total ban on abortion that declares provision of abortion to be unprofessional conduct by physicians that carries a penalty of, at a minimum, suspension of medical licensure for one year, and (2) H.B. 2441, which bans abortion at approximately six weeks LMP." (Tong Decl., Dkt. 8-6, at 9).

resemblance" to the *Casey* standard, (Mot. Prelim. Inj., Dkt. 8, at 15), and so cannot bring an otherwise unconstitutional law into compliance with that precedent. Further, it is implausible that this obscure and somewhat unclear provision in the law will be sufficient to convince providers to continue to provide abortions in the face of all of the obstacles discussed above. And unless it has this effect, the affirmative defense—despite its name—does nothing to lessen the undue burden imposed by S.B. 8.

Having found that Section 3's post-embryonic cardiac activity ban is likely unconstitutional, the remaining provisions of S.B. 8 must also be found facially invalid, as this Court declines to comb through S.B. 8 "in piecemeal fashion" after determining that "the statutory provisions at issue [are] facially unconstitutional." *Hellerstedt*, 136 S. Ct. at 2318–19, *as revised* (June 27, 2016). Sections, 6 ,7 and 9 of S.B. 8 are unconstitutional in that they serve no purpose aside from implementing and punishing non-compliance with the six-week ban. For example, the Court need not assess separately S.B. 8's mandate that physicians test for cardiac activity in an embryo before performing an abortion because this requirement has no cognizable state interest aside from "the prohibition on abortion after detection of cardiac activity." *See Planned Parenthood S. Atl.*, 2021 WL 672406, at *1; *SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 472 F. Supp. 3d 1297, 1324 (N.D. Ga. 2020) (remaining provisions of Georgia abortion law invalid where "mutually dependent" on section found unconstitutional). Similarly, the remaining sections of Section 3 that purport to create scheme to enforce the six-week ban have no meaning in the absence of any prohibition of abortions under S.B. 8. *See* S.B. 8 § 171.208(a)(2) (limiting liability to those who aid or abet an abortion "performed or induced in violation of" S.B. 8). As such, Sections 3, 6, 7, and 9 of S.B. 8 are facially invalid in their entirety, and accordingly their enforcement must be enjoined. The same must be true for the entirety of S.B. 8, for "[t]he provisions are unconstitutional on their face: Including a severability provision in the law does not change that conclusion. *Hellerstedt*, 136 S. Ct. at 2319.

The State argues that, should the Court find any provision of S.B. 8 to be unconstitutional, it should sever such provisions from the law and leave the remaining provisions intact. In support of this request, the State cites the severability provision of the law, which confirm that the Texas legislature "intended all provisions . . . to be severable," that it "would have enacted any and all provisions . . . regardless of whether any provisions are subsequently determined to be unconstitutional," and that "each provision is severable." (Resp., Dkt. 43, at 55). However, as the Supreme Court wrote in *Hellerstedt*, "our cases have never required us to proceed application by conceivable application when confronted with a facially unconstitutional statutory provision." 136 S. Ct. at 2319. Such an approach would be "quintessentially legislative work" outside the bounds of the court's ordinary review. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). The State attempts to distinguish the law and its severability provision from those at issue in *Hellerstedt*, but such a distinction cannot stand, because the severability provision of the *very same law* is at issue: Texas Health and Safety Code Chapter 171. In that case and here, the State has attempted to insulate its amendments to that law with substantially the same severability provisions. *Compare Hellerstedt*, 136 S. Ct. at 2318–19 ("The severability clause says that 'every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provision in this Act, are severable from each other.'. . . It further provides that if 'any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected.'") (*citing* H.B. 2, § 10(b), *with* Resp., Dkt. 43, at 70 ("In section 171.212 . . . , the Texas Legislature explicitly stated that (1) it intended all provisions of chapter 171, in which the heartbeat provisions are located, to be severable, and (2) it would have enacted any and all provisions of chapter 171 regardless of whether any provisions are subsequently determined to be

unconstitutional.")). Here, as there, the Court "reject[s] Texas' invitation to pave the way for legislature to immunize their statutes from facial review." *Hellerstedt*, 136 S. Ct. at 2319.

b. Whether S.B. 8 Violates Preemption and Intergovernmental Immunity Principles

The United States also separately asserts as-applied challenges based on S.B. 8's interference with federal officers and programs that provide or facilitate abortions for those under the programs' ambits. (Compl., Dkt. 1, at 15–24; Mot. Prelim. Inj., Dkt. 8, at 16–22). As the Court has already established the United States' likelihood of success in establishing the unconstitutionality of S.B. 8 broadly, it need not dwell extensively on as-applied challenges to S.B. 8's impact on federal programs. However, it will briefly address this point as it finds the United States has a high likelihood of success in demonstrating that S.B. 8 violates constitutional principles of preemption and intergovernmental immunity. Under the doctrine of preemption, "state laws are preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399 (2012). State laws are also preempted when they "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Aldridge v. Miss. Dep't of Corrections*, 990 F.3d 868, 875 (5th Cir. 2021) (quotations omitted). This doctrine includes cases where "compliance with both federal and state regulations is a physical impossibility." *Arizona*, 567 U.S. at 399 (quotations omitted). In order for a state law to be preempted, it must be in "sharp conflict" with the federal law. *Williams*, 987 F.3d at 198.[88]

Regarding intergovernmental immunity, states cannot "control the operations of the constitutional laws enacted by Congress" nor directly impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 24124, 2425 (2020). States may not subject federal officers to liability by states for carrying out their federal duties. *In re Neagle*, 135 U.S. 1, 62 (1890) (noting that

---

[88] The preemption doctrine applies to federal regulations as well as statutes. *See, e.g.*, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 138, 141 (1963).

the Supremacy Clause protects the right of the United States and its officers to enforce federal law without state interference). Further, a state law violates intergovernmental immunity if it "interferes with a federal contractor's ability to discharge" its contractual obligations to the federal government. *Student Loan Servicing*, 351 F.Supp.3d at 73–74.

In response to the United States' arguments that S.B. 8 is preempted by federal law and violates principles of intergovernmental immunity, the State's primary argument is that "Texas courts are unlikely to interpret the Act to apply the federal government . . ." (Resp., Dkt. 43, at 39).[89] However, this argument is ineffective for two reasons: First, S.B. 8 does not explicitly disclaim its applicability to the federal government. And second, without an explicit disclaimer, the doctrines of preemption and intergovernmental immunity are violated, regardless of whether anyone actually sues the United States to enforce S.B. 8. The United States has sufficiently established that S.B. 8 conflicts with the laws and regulations governing the abortion-related services of its agencies, as it would subject them to liability for carrying out their mandates to provide or facilitate pre-viability abortions. (*See, e.g.*, McLearen Decl., Dkt. 8-10, at 4–5; Sheehan Decl., Dkt. 8-11, at 6; Matz Decl.,

---

[89] The State argues this Court should not decide the applicability of S.B. 8 to the federal government because of the *Pullman* abstention doctrine. (Resp., Dkt. 43, at 40). The *Pullman* abstention doctrine is appropriate only when "(1) there is a substantial uncertainty as to the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *See Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). The doctrine "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Southwest Airlines Co. v. Texas Inter. Airlines, Inc.*, 546 F.2d 84, 92 (1977) (citing *Alleghany Cty. V. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959)). "[A]bstention is inappropriate when the United States seeks to assert in federal court a superior federal interest." *United States v. Composite State Bd. Of Medical Examiners, State of Ga.*, 656 F.2d 131, 135 (1981). As discussed *supra* in Section IV(B)(1)(a)(ii), the United States has a significant federal interest in ensuring its agencies are able to follow the laws and regulations governing their provision of abortion-related services. This interest is superior to that of the State's in supporting the validity of S.B. 8, as S.B. 8 likely violates the Supremacy Clause, preemption, and principles of intergovernmental immunity. As such, this Court does not find that this case fits within *Pullman*'s "extraordinary and narrow exception" to this Court's jurisdiction.

Dkt. 8-14, at 5; Bodenheimer Decl., Dkt. 8-15, at 3).[90] For example, S.B. 8 permits liability for providing abortion services in cases of rape, incest, and assault, *see* Tex. Health & Safety Code § 171.208(j), while federal regulations require BOP to assume all costs for an individual who requests an abortion if the pregnancy resulted from rape or incest. (McLearen Decl., Dkt. 8-10, at 6, 25); 28 C.F.R. § 551.23. This type of direct conflict between S.B.8 and federal law easily constitutes a case where "compliance with both federal and state regulations is a physical impossibility." *Arizona*, 567 U.S. at 399 (quotations omitted).

The State additionally goes through each of the federal programs cited by the United States as being impacted by S.B. 8 and, in doing so, makes three main arguments. First, the State asserts that BOP, USMS, ORR, OPM, DOL, and Medicaid are only required to perform abortion-related services when they are able to do so in line with the applicable state law regarding abortions, and as such, should be able to accommodate S.B. 8. (Resp., Dkt. 43, at 40–42). But, of course, the requirement that abortion provision be consistent with state law assumes the constitutionality of the state law. Requiring federal programs providing mandated abortion services to suffer liability based on a state law that is likely unconstitutional "subject[s] federal officers to liability . . . for carrying out their federal duties" and is thus most likely violation of intergovernmental immunity. *See In Re Neagle*, 135 U.S. at 62.

---

[90] The Texas Intervenors argue that any federal obligations to arrange for post-heartbeat abortions can be "fulfilled by having those abortions performed in other states." (Int. Resp., Dkt. 44, at 16). The State itself made this argument during the October 1, 2021 hearing on the preliminary injunction. (Hr'g Tr., Dkt. 65, at 86). But that is precisely the issue—in order for these agencies to comply with their responsibilities under federal statutes, regulations, and case law, they must expend considerable resources. (McLearen Decl., Dkt. 8-10, at 5–6; Sheehan Decl., Dkt. 8-11, at 4–5; De La Cruz Decl., Dkt. 8-12, at 7; Torres Decl., Dkt. 8-13, at 5–6; Matz Decl., Dkt. 8-14, 5–6). The agency directors have stated they are unsure of how to comply with their federal law obligations and S.B. 8 simultaneously, and whether providing services that purport to violate S.B. 8 will subject them to liability. (*See, e.g.*, McLearen Decl., Dkt. 8-10, at 4). This is sufficient to demonstrate that S.B. 8 is, at the very least, "an obstacle to the accomplishment and execution of" these agencies' obligations under the law. *See Aldridge*, 990 F.3d at 875.

The second argument the State makes is that DoD and ORR are not themselves responsible for coordinating abortion services but must instead simply "step out of the way" when individuals in their care or custody request such services. (Resp., Dkt. 43, at 41–42; *see also* Hr'g Tr., Dkt. 65, at 57). However, the evidence before this Court does not support this conclusion. ORR regulations state that the agency "must provide access to abortion services when requested and permitted by law." (Def. Hr'g Exh., Dkt. 67-11, at 44–46; De La Cruz Decl., Dkt. 8-12, at 5). Further, the DoD has the authority to use federal funds to provide abortions to individuals in its care when "the life of the mother would be endangered" or where the pregnancy resulted from "rape or incest." S.B. 8 explicitly. 10 U.S.C. § 1093(a). But S.B. 8 allows suits based on "rape, sexual assault, [or] incest," and the law provides only a very narrow exception for abortions during a "medical emergency," which may not be interpreted by providers working with DoD to encompass an abortion any time the mother's life might be endangered. *See* Tex. Health & Safety Code § 171.205(a).[91] As such, the regulations and statutes governing the ORR and DoD are in conflict with S.B. 8 and likely violate the preemption doctrine.

Finally, regarding DOL, the State makes the curious argument that there is no violation of intergovernmental immunity since only one or two participants in Texas's Job Corps centers requested abortion services between 2019-21. (Resp., Dkt. 43, at 41, 43–44). It appears the State believes there is some sort of volume requirement when it comes to the number of people that must be affected by a law to find a violation of intergovernmental immunity. This requirement, of course, does not exist. *See Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2323 (2004) ("There are no *de minimis* violations of the Constitution—no constitutional harms so slight that the courts are obliged to ignore them."). S.B. 8 has already changed the way DOL provides healthcare for their

---

[91] This same conclusion applies to Medicaid, which *must*, when medically necessary, provide abortion-related services for pregnancies resulting from rape or incest, or to save the life of the pregnant person. (Costello Decl., Dkt. 8-16, at 4).

participants by increasing costs and limiting opportunities for these individuals to access abortions, should they request one. (*See* Torres Decl., Dkt. 8-13, at 5–6; Matz Decl., Dkt. 8-14, 5–6).[92] The law plainly conflicts with the agency's obligations to facilitate services for any present or future Job Corps participants seeking an abortion beyond the timeline allowed by S.B. 8. As such, there is a high likelihood S.B. 8 violates intergovernmental immunity.

Given the propriety of the United States as plaintiff, the State as defendant, the nature of the equitable action, and the apparent constitutional violations, the Court finds that the United States is substantially likely to succeed on the merits of its claims.

### 2. Irreparable Harm

The party seeking a preliminary injunction must prove that irreparable harm is likely, not merely possible. *Winter*, 555 U.S. at 22. Irreparable harm "consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008). The State urges that a preliminary injunction would not prevent irreparable harm, as "[t]he *threat* of liability would remain given the significant possibility that a preliminary injunction would be stayed, reversed, or not turned into a permanent injunction . . . ." (Resp., Dkt. 43, at 60). What the State fails to understand, or chooses not to acknowledge, are the stakes of this injunction in the lives of its citizens. The cases it cites address monetary penalties, funding regulations, and arbitration procedures. *See, e.g., American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 766 F.2d 715 (2d Cir. 1985); *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985); *Ohio v. Yellen*, No. 1:21-cv-181, 2021 WL 1903908, at *14 (S.D. Ohio May 12, 2021); *Chiafalo v. Inslee* 224 F. Supp. 3d 1140, 1147 (W.D. Wash. 2016); *Oxford Capital*

---

[92] Job Corps administrator Rachel Torres testified during a deposition that the North Texas Job Corps center does not pay costs related to abortion services for its participants. (Def. Hr'g Exh. 12, Dkt. 67-12, at 36–38). This is in line with her sworn declaration, which explained how three of the four Job Corps sites in Texas do in fact pay for abortion-related costs. (Torres Decl., Dkt. 8-13, at 5).

*Ill., L.L.C. v. Sterling Payroll Fin., L.L.C.*, No. 1:01-cv-1173, 2002 WL 411553, at *5 (N.D. Ill. Mar. 15, 2002). At the most basic level, these cases do not present the same fundamental and immediate threats to the lives and wellbeing of citizens as seen here. Attempts to analogize to those cases are of course valid to understand the legal principles, but this exercise cannot be allowed to overshadow the reality that real people are being denied the constitutionally protected right to make decisions about their pregnancies. The State attempts to distance the law from its consequences, but let us be clear: S.B. 8 prevents individuals from exercising their right to obtain abortions in Texas, and an injunction will restore that right. The Court finds credible the appraisal of the current state of affairs by one provider:

> Every day that S.B. 8 is in effect, our patients are in jeopardy. Draconian laws like S.B. 8 do not stop people from needing abortions, and they don't stop abortions from happening—by eliminating safe and legal options, they only force abortion care underground with potentially devastating consequences. This cruel and dangerous law is causing irreparable harm to our patients and the communities we serve.

(Linton Decl., Dkt. 8-5, at 15).

The State attempts to argue that a preliminary injunction will provide no redress to the harms caused by S.B. 8, claiming that the deterrent effect of S.B. 8 will remain even if the law is preliminarily enjoined. (Resp., Dkt. 43, at 61). This claim rests on the section of S.B. 8 providing that "reliance on any court decision that has been overruled on appeal or by a subsequent court" is "not a defense." Tex. Health & Safety Code § 171.208(e)(3). The State claims it is unlikely providers will be willing to resume abortion procedures upon an injunction, given that the retroactivity provision in S.B. 8—of questionable legality itself—extends future liability to abortions facilitated during the operation of any preliminary injunction. There is no reason to assume providers will be so deterred. Indeed, the President and Chief Executive Officer of Whole Women's Health and Whole Women's Health Alliance (which collectively operate four clinics in Texas) has represented that the clinics under her authority will resume providing those abortions prohibited under S.B. 8 "if and when a

preliminary injunction is entered in this case[,]" and has received personal confirmation that other

clinics will do the same. (*See* Hagstrom Miller Decl. II, Dkt. 59-2, at 2).[93] But even if the desired

chilling effect of this provision does materialize, such speculation is no reason for the Court to tie its

own hands.

Despite the State's attempts to obscure the question, the irreparable harm inquiry is in reality

quite clear: people seeking abortions face irreparable harm when they are unable to access abortions;

these individuals are entitled to access to abortions under the U.S. Constitution; S.B. 8 prevents

access to abortion; a preliminary injunction will allow—at least for some subset of affected

individuals—abortions to proceed that otherwise would not have.[94] The harm from S.B. 8 has

already materialized, as "[t]he civil penalties and burdens of litigation threatened by this ban are

severe and . . . . have already prevented abortion providers from carrying out [their] medical and

ethical duties." (Gilbert Decl., Dkt. 8-2, at 15). It is clear that, absent an injunction, "[t]he majority of

pregnant Texans who want an abortion will be forced to carry those pregnancies to term and face

the risks—medical and financial—attendant with childbirth." (Hagstrom Miller Decl. I, Dkt. 8-4, at

8). Moreover, the Court finds credible the existential threat to abortion clinics, and thus to the

---

[93] Hagstrom Miller further attests, "this week our physicians have been using their discretion to provide patients whose pregnancies are found to have cardiac activity with all state mandated information to comply with Texas's 24-hour mandatory delay, so that if and when a preliminary injunction is entered, we will be ready to call those patients to come in for abortions. . . . I have had personal conversations with the majority of independent abortion clinics in Texas regarding S.B. 8. I can affirm that like WWH/WWHA, many providers will resume pre-viability abortion services to patients with cardiac activity up to the legal limit in Texas (17.6 weeks LMP or 21.6 weeks LMP, depending on the type of clinic) if and when a preliminary injunction is entered in this case. While we continue to have concerns about liability under S.B. 8 if the injunction is later reversed, neither we nor our patients can wait the months or even years for completion of all S.B. 8 litigation to resume services. If this Court issues an injunction, we intend to follow the Court's order and resume services.") (*Id.* at 2-3).

[94] (*See* Rupani Decl., Dkt. 8-8, at 8) ("Despite our staff working 12- to 14-hour days, however, [a practical aid organization] cannot meet the level and scope of need we are seeing since S.B. 8 took effect. Indeed, no network of organizations can serve the untold number of Texans seeking abortions whose only option now is to leave the state, but who cannot afford to or are practically unable to do so. Currently, the relatively fortunate clients are those who are able to leave Texas, subject nonetheless to delayed abortion care, lengthy travel, and significant time away from work and home. In these ways, S.B. 8 has triggered an unprecedented crisis that will persist until the statute is invalidated.").

constitutional right to abortion, as articulated by the President and Chief Executive Officer of

Whole Women's Health and Whole Women's Health Alliance:

> If the law remains in effect for an extended period of time, and we are only able to serve a fraction of our patients with a fraction of our staff, we will have to shutter our doors and stop providing any healthcare to the communities we serve. I believe that, without court-ordered relief in the next couple of weeks, S.B. 8 will shutter most if not all of the remaining abortion clinics in Texas. . . . We simply cannot stay open if we are only providing a fraction of patient services.

(Hagstrom Miller Decl. I, Dkt. 8-4, at 11). Therefore, an injunction is appropriate and warranted to

prevent irreparable harm to the United States' interest in protecting the constitutional rights of its

citizens.

### 3. Balance of Equities and Public Interest

When the United States is a party to a preliminary injunction motion, the final two factors of

the inquiry—balance of the equities and public interest—merge. *Nken*, 556 U.S. at 435. Here it is

abundantly clear that the harm to the plaintiff and the public interest "are one and the same, because

the government's interest *is* the public interest . . . ." P*ursuing Am.'s Greatness v.

Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The State argues that, to the extent S.B. 8

causes any harm to individual citizens, it is not within the United States' purview to rectify those

harms, and that the harm to the United States itself is merely "*de minimis*" financial costs. (Resp.,

Dkt. 43, at 54). However, the United States' interest in vindicating the constitutional rights of its

citizens is a sovereign interest, as "our National Government is republican in form and . . . national

citizenship has privileges and immunities protected from state abridgement by the force of the

Constitution itself." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 842 (1995) (Kennedy, J.,

concurring). The United States is charged with protecting those "privileges and immunities." *See*

*Brackeen*, 994 F.3d at 292 n.13 (stating that the federal government, and not the state, is the ultimate

protector of the constitutional rights of its citizens). Defending the constitutional rights of citizens is

always in the public interest. *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079

(6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979)).

Included within the United States' interest in upholding the legitimacy of the Constitution is

the federal government's interest in defending against schemes that offer state governments an

opportunity to do an end run around the Constitution. *See infra* Section V (discussing how the model

of S.B. 8 could be replicated to impede upon other types of constitutional rights). The United States

has demonstrated that it is in its interest—and therefore the public's interest—to prove that the

Constitution is not only as strong as one state's thinly veiled attempt to restrict constitutional rights

and preclude judicial review. "[T]here is the highest public interest in" preserving

"constitutional guarantees, including those that bear the most directly on private rights. *United States

v. Raines*, 362 U.S. 17, 27 (1960). Conversely, the State can have no interest in enforcing a law that is

likely unconstitutional on its face, nor can it have any valid interest in shielding an arguably

unconstitutional law from judicial review. *See Velazquez*, 531 U.S. at 546 (noting that a statute written

with the intent to limit judicial review "threatens severe impairment of the judicial function").

## V. THE PRELIMINARY INJUNCTION AND ITS EFFECT

Based on the foregoing, this Court holds that a remedy in equity is warranted and will enter a

preliminary injunction that comports with the well-established principles of equity. The State insists

that this Court should examine the individual provisions of S.B. 8 and sever only portions of it.

(Resp., Dkt. 43, at 70–71); Tex. Health & Safety Code § 171.212. While S.B. 8's severability clause

"express[es] the enacting legislature's preference for a narrow judicial remedy," its severability clause

does not require this Court to perform legislative work.[95] *Hellerstedt*, 136 S. Ct. at 2319. Like the

*Hellerstedt* Court, this Court will not attempt the legislative exercise of picking and choosing what

---

[95] While S.B. 8 states that "[n]o court may decline to enforce the severability requirements . . . on the ground that severance would rewrite the statute or involve the court in legislative or lawmaking activity," this Court follows the Supreme Court's instructions.

portions of S.B. 8 could remain in effect, if any, to avoid the substantial risk of causing the "inconsistent application of only a fraction of interconnected regulations" in Chapter 171 of the Texas Health and Safety Code. *Id.* at 2320.

Despite the Texas Attorney General's lack of clarity about what the State would do in the face of a preliminary injunction, this Court trusts that the State will identify the correct state officers, officials, judges, clerks, and employees to comply with this Order. The Court relies on the Texas Attorney General's representation that the State "would [not] want to do anything that could lead to contempt." (Hr'g Tr., Dkt. 65, at 90).

**IT IS ORDERED** that the State of Texas, including its officers, officials, agents, employees, and any other persons or entities acting on its behalf, are preliminarily enjoined from enforcing Texas Health and Safety Code §§ 171.201–.212, including accepting or docketing, maintaining, hearing, resolving, awarding damages in, enforcing judgments in, enforcing any administrative penalties in, and administering any lawsuit brought pursuant to the Texas Health and Safety Code §§ 171.201–.212. For clarity, this Court preliminarily enjoins state court judges and state court clerks who have the power to enforce or administer Texas Health and Safety Code §§ 171.201–.212.

As set out above, this Court has the authority to enjoin the private individuals who act on behalf of the State or act in active concert with the State, including the Intervenors, and that injunction would be commensurate in scope with S.B. 8's grant of enforcement power. However, the Court need not craft an injunction that runs to the future actions of private individuals per se, but, given the scope of the injunctions discussed here and supported by law, those private individuals' actions are proscribed to the extent their attempts to bring a civil action under Texas Health and Safety Code § 171.208 would necessitate state action that is now prohibited.

**IT IS ORDERED** that the State of Texas must publish this preliminary injunction on all of its public-facing court websites with a visible, easy-to-understand instruction to the public that S.B. 8 lawsuits will not be accepted by Texas courts. **IT IS FURTHER ORDERED** that the State of Texas shall inform all state court judges and state court clerks of this preliminary injunction and distribute this preliminary injunction to all state court judges and state court clerks. The Court recognizes that it may not be in the best position to dictate the particulars. Accordingly, the State may propose different means of disseminating this information—that still achieve the goals of informing the state judiciary and plainly informing the public of this preliminary injunction and its effect—for this Court's review and approval.

In reaching the conclusion that a preliminary injunction is necessary here, the Court has attempted to carefully and thoughtfully weigh the important interests of the parties in this case and be mindful of the larger principles at play. In particular, the Court acknowledges the State's concern that this decision could increase the number of suits brought by the United States against states. The Court is satisfied that this is an exceptional case and likely will remain an exceptional case for several reasons. First, historically, the United States does not file many suits against states. In the last decade, the United States sued a state fourteen times under a theory of preemption or intergovernmental immunity. (Hr'g Tr., Dkt. 65, at 105). And, "those were actions brought by administrations of different political parties." (*Id.*). Second, the United States acts when state law violates the Constitution and has a widespread effect. (*See id.* at 24). Third, and this what makes this case exceptional, the United States seeks to enjoin the State in this case not only because the United States believes S.B. 8 violates the constitutional rights of Texas citizens and is causing widespread, significant injuries, but also because the United States alleges that the State "designed [S.B. 8] to preclude the ability of those whose rights are being violated from vindicating their rights." (Hr'g Tr., Dkt. 65, at 24).

The United States, in response to this Court's questioning about limiting principles, explained:

> [T]he reason that the United States had to file this action is not just that Texas enacted legislation that was designed unconstitutionally to impose restrictions on abortion rights. Other states have done the same things. And women who have wanted to pursue abortions or clinics that provide abortions have succeeded in challenging those laws [through] the ordinary procedures.
>
> What's unique and what's different about this law is that it specifically deprives those who are affected by the law of an ability to obtain the redress that is necessary in order to defend the Constitution. It's because of this system of deterrence that Texas is trying to effectively do an end run around the supremacy clause. And that limitation, the equitable principle that if other easier remedies are available that equity will not create a remedy, that is a limiting principle; and it's a limiting principle that doesn't come into effect here only because Texas has devised this scheme that the chief justice described as unprecedented.

(Hr'g Tr., Dkt. 65, at 25). The Court further observes that this case is exceptional because it is the rare intersection where the United States has standing *and* a cause of action to vindicate its citizens' rights. To the extent that this Court's holding leads to more lawsuits like this one, this Court would rely on the Congress and higher courts to narrow the scope of the cause of action.

Moreover, had this Court not acted on its sound authority to provide relief to the United States, any number of states could enact legislation that deprives citizens of their constitutional rights, with no legal remedy to challenge that deprivation, without the concern that a federal court would enter an injunction. As has been reported, "legal scholars fear that the law in Texas will lead to a rush of similar efforts in other states, prompting local legislators to pursue new measures on gun rights, immigration[,] and other divisive political issues, all in an effort to sidestep the federal government. From the Deep South to the Upper Midwest, legislators in many conservative states have started to explore how similar laws could be put in place in the months ahead." (The New Texas Abortion Law Is Becoming a Model for Other States, L.A. Times, Supp. Dec. Newman, Dkt. 56-2, at 10–11). Equally plausible is that states at the other end of the political spectrum could use a similar tactic to ban or impermissibly limit another constitutional right, like a right grounded in the

Second Amendment, to further a political agenda. This Court's preliminary injunction, should it stand, discourages states from doing so: if legislators know they cannot accomplish political agendas that curtail or eliminate constitutional rights and intentionally remove the legal remedy to challenge it, then other states are less likely to engage in copycat legislation. Thus, rather than increase the number of suits by the United States, this Court's preliminary injunction maintains the status quo of very few such suits and preserves this cause of action for exceptional cases like this one.

Finally, the State has requested, in the event the Court preliminarily enjoins enforcement of S.B. 8, that the Court stay any injunction until the State has the opportunity to seek appellate review. The State has forfeited the right to any such accommodation by pursuing an unprecedented and aggressive scheme to deprive its citizens of a significant and well-established constitutional right. From the moment S.B. 8 went into effect, women have been unlawfully prevented from exercising control over their lives in ways that are protected by the Constitution. That other courts may find a way to avoid this conclusion is theirs to decide; this Court will not sanction one more day of this offensive deprivation of such an important right.

## VI. CONCLUSION

Based on the Court's findings of fact and conclusions of law:

**IT IS ORDERED** that the United States' Emergency Motion for Temporary Restraining Order or Preliminary Injunction, (Dkt. 8), is **GRANTED** as set out above in Section V.

**IT IS FURTHER ORDERED** that the States of Texas's Motion to Dismiss, (Dkt. 54), is **DENIED**.

**IT IS FURTHER ORDERED** that Amici States' Unopposed Motion for Leave to File Brief as Amici Curiae, (Dkt. 9), is **GRANTED**.

**IT IS FURTHER ORDERED** that the United States' Opposed Motion for a Protective Order of Audiovisual Recordings, (Dkt. 36), is **DENIED**.

**IT IS FURTHER ORDERED** that the State of Texas's Objections to the United States' Declarations, (Dkt. 55), are **DENIED**.

**IT IS FINALLY ORDERED** that the Texas Intervenors' motion to strike, lodged at the preliminary injunction hearing, (Hr'g Tr., Dkt. 65, at 96), is **DENIED**.

**SIGNED** on October 6, 2021.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE